## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF MARYLAND<br>    200 St. Paul Place, 16th Floor<br>    Baltimore, MD 21202<br><br>COMMONWEALTH OF PENNSYLVANIA<br>    15th Floor, Strawberry Square<br>    Harrisburg, PA 17120<br><br>COMMONWEALTH OF MASSACHUSETTS<br>    One Ashburton Place, 18th Floor<br>    Boston, MA 02108<br><br>PEOPLE OF THE STATE OF CALIFORNIA *ex rel.*<br>XAVIER BECERRA, Attorney General<br>    300 South Spring Street, Suite 1702<br>    Los Angeles, CA 90013<br><br>STATE OF CONNECTICUT<br>    P.O. Box 120<br>    Hartford, CT 06141<br><br>STATE OF DELAWARE<br>    820 North French Street<br>    Wilmington, DE 19801<br><br>DISTRICT OF COLUMBIA<br>    441 4th Street, N.W., 6th Floor<br>    Washington, DC 20001<br><br>STATE OF HAWAII<br>    425 Queen Street<br>    Honolulu, HI 96813<br><br>PEOPLE OF THE STATE OF ILLINOIS<br>    100 West Randolph Street<br>    Chicago, IL 60601<br><br>STATE OF IOWA<br>    1305 E. Walnut Street<br>    Des Moines, IA 50319<br><br>STATE OF MINNESOTA<br>    445 Minnesota Street, Suite 1100<br>    St. Paul, MN 55101-2130 | **COMPLAINT**<br>**CIVIL ACTION NO:** _____ |

STATE OF NEW YORK
   120 Broadway, 3rd Floor
   New York, NY 10271

STATE OF NORTH CAROLINA *ex rel.*
JOSH STEIN, Attorney General
   114 W. Edenton Street
   Raleigh, NC 27603
   P.O. Box 629
   Raleigh, NC 27602

STATE OF OREGON
   Oregon Department of Justice
   1162 Court Street, NE
   Salem, OR 97301

STATE OF RHODE ISLAND
   150 South Main Street
   Providence, RI 02903

STATE OF VERMONT
   109 State Street
   Montpelier, VT 05609

COMMONWEALTH OF VIRGINIA, *ex rel.* MARK R.
HERRING, Attorney General
   Barbara Johns Building
   202 N. Ninth Street
   Richmond, VA 23219

     and

STATE OF WASHINGTON
   Office of the Washington Attorney General
   1125 Washington Street SE
   P.O. Box 40100
   Olympia, WA 98504,
                  Plaintiffs,
    v.

UNITED STATES DEPARTMENT OF EDUCATION,
   400 Maryland Avenue, S.W.
   Washington, D.C. 20202

     and

ELISABETH D. DEVOS, *in her official capacity as
Secretary of Education,*
   400 Maryland Avenue, S.W.
   Washington, D.C. 20202,

               Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      The State of Maryland, by and through Attorney General Brian E. Frosh; the
Commonwealth of Pennsylvania, by and through Attorney General Josh Shapiro; the
Commonwealth of Massachusetts, by and through Attorney General Maura Healey; the People
of the State of California, by and through Attorney General Xavier Becerra; the State of
Connecticut, by and through Attorney General George Jepsen; the State of Delaware, by and
through Attorney General Matthew P. Denn; the District of Columbia, by and through Attorney
General Karl A. Racine; the State of Hawaii, by and through Attorney General Douglas S. Chin;
the People of the State of Illinois, by and through Attorney General Lisa Madigan; the State of
Iowa, by and through Attorney General Thomas J. Miller; the State of Minnesota, by and through
Attorney General Lori Swanson; the State of New York, by and through Attorney General Eric
T. Schneiderman; the State of North Carolina *ex rel.* Josh Stein, Attorney General; the State of
Oregon, by and through Attorney General Ellen F. Rosenblum; the State of Rhode Island, by and
through Attorney General Peter F. Kilmartin; the State of Vermont, by and through Attorney
General Thomas J. Donovan, Jr.; the Commonwealth of Virginia, by, through, and at the relation
of Attorney General Mark R. Herring; and the State of Washington, by and through Attorney
General Robert W. Ferguson (the "States"), file this Complaint for declaratory and injunctive
relief against Defendants the United States Department of Education ("the Department") and
Secretary of Education Elisabeth D. DeVos, and hereby allege the following:

### INTRODUCTION

2.      This lawsuit challenges the Department's summary and unlawful delay,
amendment, and/or rescission of the "Gainful Employment Rule" (the "Rule"), a final agency
regulation, in violation of the Administrative Procedure Act ("APA"). In delaying and refusing

to enforce the Rule, the Department failed to engage in notice and comment rulemaking, failed to

provide a justification for its actions, acted arbitrarily and capriciously and in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right, and withheld or unreasonably

delayed agency action, all in violation of the APA.

3.      The Department is responsible for administering various loan and grant programs

under Title IV of the Higher Education Act ("HEA"), which is the primary source of federal

student aid. As a result, the Department has an obligation to ensure that these programs are not

abused by for-profit and other educational institutions that rely on federal aid for the bulk of their

revenue but fail to give their students adequate skills to obtain employment that will allow them

to pay back their loan obligations.

4.      The Rule is designed to enforce the HEA's requirement that applicable programs

must "prepare students for gainful employment in a recognized occupation." 20 U.S.C.

§§ 1002(b)(1)(A)(i), 1088(b)(1)(A)(i), 1002(c)(1)(A). It was issued in response to growing

concerns that certain educational programs "are leaving students with unaffordable levels of loan

debt in relation to their earnings." Program Integrity: Gainful Employment, 79 Fed. Reg. 64,890

(Oct. 31, 2014).

5.      The Rule allows students to make informed decisions by requiring covered

educational institutions to provide prospective students with accurate information about the total

costs and financial benefits of their programs, including, but not limited to average earnings and

debt load of their graduates, so that students fully understand the financial implications of

choosing to attend.

6.      In addition, the Rule holds institutions accountable for forcing students to take on

massive amounts of debt while failing to give them the tools necessary to earn enough to repay

their obligations. It does so by prohibiting these programs from remaining in the federal student loan program. The Rule, however, gives institutions multiple opportunities to show that they can meet their obligation to "prepare students for gainful employment," and penalizes only those that repeatedly and flagrantly fail to do so.

7.      The Department duly promulgated the Rule on October 31, 2014, after an extensive negotiated rulemaking process in which it received over 95,000 public comments from students, postsecondary institutions, state government officials, consumer advocates, and other concerned individuals and institutions. The Department, moreover, gave affected schools eight months to prepare for implementation of the rule, which was effective on July 1, 2015.

8.      The Rule has been upheld by federal courts three separate times: this Court upheld it in full in 2015; the United States District Court for the Southern District of New York upheld the Rule in full in 2015; and, except for a limited finding related to a small number of cosmetology schools, this Court upheld the Rule again in 2017.

9.      Despite these decisions, the Department has recently issued two notices in the Federal Register purporting to delay central aspects of the Rule (the "Delay Notices"). The Department has also announced its intent to issue a new regulation to replace the Rule, and has stated that it refuses to further enforce certain aspects the Rule. By delaying and refusing to enforce essential aspects of the Rule, the Department has effectively revoked a duly promulgated and implemented regulation. Under the APA, it may not do so without engaging in a public, deliberative process and soliciting, receiving, and responding to comments from stakeholders and members of the public.

10.     Both the language of the Delay Notices and the circumstances of their announcement make clear that the stated basis for the delays is a pretext for repealing the Rule and replacing it with a new rule that will eliminate these important student protections.

11.     To be clear, the Department may engage in a negotiated rulemaking process to revise the Rule, provided that it complies with its statutory obligations in doing so. But under the HEA, any new rule will not go into effect for approximately two years. *See* 20 USC § 1089(c)(1). And during this time, the Department has an obligation to enforce the Rule as it currently stands – it cannot "run out the clock" through a series of delays intended to stall until it can implement a new regulation.

12.     The Delay Notices issued by the Department operate as an amendment to or rescission of the Rule. The APA does not permit the Department to delay a duly promulgated and implemented regulation in order to draft a replacement, and it similarly does not permit the Department to delay or refuse to enforce a duly implemented rule without complying with the requirements of that statute.

13.     The Department's actions violate the APA in the following respects: (1) the Department delayed, modified, amended, and/or repealed the Rule without observance of procedure required by law; (2) the Department's delay, modification, amendment, and/or repeal of the Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . . [and] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and (3) the Department unlawfully withheld or unreasonably delayed actions required by the Rule.

**JURISDICTION**

14.     This action arises under the APA, 5 U.S.C. §§ 553, 701-706. This Court has subject matter jurisdiction over this action because it is a case arising under federal law. 28 U.S.C. § 1331. In addition, this Court has the authority to issue the declaratory relief sought pursuant to 28 U.S.C. § 2201.

15.     This is an action against officers and agencies of the United States. Therefore, venue is proper in this Court under 28 U.S.C. § 1391(e). Venue is also proper in this Court because Defendant the United States Department of Education resides in this judicial district, Defendant Elisabeth D. DeVos performs her official duties in this judicial district, and the events giving rise to this action took place in this judicial district.

**THE PARTIES**

16.     Plaintiff the State of Maryland brings this action by and through Attorney General Brian E. Frosh.

17.     Plaintiff the Commonwealth of Pennsylvania brings this action by and through Attorney General Josh Shapiro

18.     Plaintiff the Commonwealth of Massachusetts brings this action by and through Attorney General Maura Healey.

19.     Plaintiff People of the State of California brings this action by and through Attorney General Xavier Becerra.

20.     Plaintiff the State of Connecticut brings this action by and through Attorney General George Jepsen.

21.     Plaintiff the State of Delaware brings this action by and through Attorney General Matthew P. Denn.

22.     Plaintiff the District of Columbia brings this action by and through Attorney General Karl A. Racine.

23.     Plaintiff the State of Hawaii brings this action by and through Attorney General Douglas S. Chin.

24.     Plaintiff People of the State of Illinois brings this action by and through Attorney General Lisa Madigan.

25.     Plaintiff the State of Iowa brings this action by and through Attorney General Thomas J. Miller.

26.     Plaintiff the State of Minnesota brings this action by and through Attorney General Lori Swanson.

27.     Plaintiff the State of New York brings this action by and through Attorney General Eric T. Schneiderman.

28.     Plaintiff the State of North Carolina brings this action by and through Attorney General Josh Stein.

29.     Plaintiff the State of Oregon brings this action by and through Attorney General Ellen F. Rosenblum.

30.     Plaintiff the State of Rhode Island brings this action by and through Attorney General Peter F. Kilmartin.

31.     Plaintiff the State of Vermont brings this action by and through Attorney General Thomas J. Donovan, Jr.

32.     Plaintiff the Commonwealth of Virginia brings this action by, through, and at the relation of Attorney General Mark R. Herring.

33.     Plaintiff the State of Washington brings this action by and through Attorney General Robert W. Ferguson.

34.     The Plaintiff States, by and through their Attorneys General, are charged with protecting their respective States and citizens and enforcing their respective state consumer protection statutes. These statutes prohibit unfair and deceptive acts or practices.[1]

35.     The States have an interest in the enforcement of the Rule, which protects States and their residents from direct and imminent concrete injury.

36.     Defendant the United States Department of Education is an executive agency of the United States government. The Department's principal address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

37.     Defendant Elisabeth DeVos is the Secretary of the United States Department of Education and is being sued in her official capacity. Her official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

## FACTUAL ALLEGATIONS

38.     Under Title IV of the HEA, the federal government provides financial assistance to students pursuing higher education. *See* 20 U.S.C. § 1071 *et seq*. Federal student loan programs ("Title IV loans") are an essential part of this assistance. These programs are designed

---

[1] *See, e.g.*, Cal. Bus. & Prof. Code § 17200 *et seq*.; 815 ILCS 505/2; Conn. Gen. Stat. Sec. 42-110b; Iowa Consumer Fraud Act, Iowa Code § 714.16; Md. Code Ann., Com. Law §§ 13-101 *et seq*.; Massachusetts Consumer Protection Act, M.G.L. c. 93A; Minnesota's Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69 and Minnesota's Deceptive Trade Practices Act, Minn. Stat. § 325D.44; New York General Business Law §§ 349 and 350; New York Executive Law § 63(12); N.C. Gen. Stat. Chapter 75; Oregon Unlawful Trade Practices Act, Oregon Revised Statutes 646.605 *et seq*.; Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq*.; Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §6-13.1-1, *et seq*.; Virginia Consumer Protection Act, Va. Code §§ 59.1-196 through 59.1-207; 9 V.S.A. §§ 2451, *et seq*.; Washington Consumer Protection Act, RCW 19.86.010, et seq.; Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq*.; Delaware Consumer Fraud Act and Uniform Deceptive Trade Practices Act, 6 Del. C. §§ 2511-2536; Haw. Rev. Stat. § 480-2.

to provide financial support to students and expand access to higher education to those who could not otherwise afford to pursue a degree or certificate.

39.     Loans offered to students under Title IV have become a significant source of revenue for many postsecondary institutions, and are a particularly important source of revenue for for-profit schools.

40.     Unlike most educational institutions, for-profit schools, which offer various degree and certificate programs, are owned and operated as businesses. Several are even publicly traded. Like other for-profit businesses, a principal function of these schools is to produce economic returns for their owners and shareholders. *See* For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success, United States Senate, Health, Education, Labor and Pensions Committee, at 1 (July 30, 2012) ("Senate Report") available at https://www.help.senate.gov/imo/media/for_profit_report/Contents.pdf.

41.     For-profit schools receive the vast majority of their revenue from the federal government in the form of Title IV loans. For example, in 2009, fifteen publicly traded for-profit education companies received 86 percent of their revenues from taxpayer-funded loans. *Id*. at 3. Taxpayers invested $32 billion in for-profit schools in the 2009-10 academic year, more than the annual budgets of the U.S. Department of Justice and the U.S. Department of State during that time period. *Id*. at 15; Office of Mgmt. & Budget, Exec. Office of the President, Historical Tables, Budget of the United States Government, Fiscal Year 2012 (2011), Table 4.1 available at https://www.gpo.gov/fdsys/pkg/BUDGET-2012-TAB/pdf/BUDGET-2012-TAB.pdf.

42.     To participate in the Title IV loan program, all for-profit institutions, postsecondary vocational institutions, and non-degree programs at public or nonprofit

institutions must provide a "program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. §§ 1002(b)(1)(A)(i), 1002(c)(1)(A), 1088(b)(1)(A)(i).

43.     On March 25, 2014, the Department issued a notice of proposed rulemaking that noted "growing concerns about educational programs that, as a condition of eligibility for [federal student loans], are required by statute to provide training that prepares students for gainful employment in a recognized occupation (GE programs), but instead are leaving students with unaffordable levels of loan debt in relation to their earnings, or leading to default." 79 Fed. Reg. 16,426 (March 25, 2014).

44.     After completing a negotiated rulemaking as required by statute, the Department promulgated the Rule on October 31, 2014. The Rule is designed to address serious concerns that certain eligible institutions were not living up to their obligation to prepare students for gainful employment. During the rulemaking process, the Department received 95,000 comments, reflecting the widespread nature of the concerns underlying the Rule.

45.     The Rule operates by requiring programs to provide greater transparency to prospective students by mandating disclosure of at least sixteen items, including, but not limited to the total cost of the program, the average debt load, the student loan default rate, and the average earnings of program graduates. 34 C.F.R. § 668.412; *see also* 79 Fed. Reg. 64,890 (Oct. 31, 2014). This information must be provided on schools' websites, in schools' promotional materials, and directly to a prospective student before the student signs an enrollment agreement, completes registration, or makes a financial commitment to the institution. *See id.*

46.     The Rule also restricts access to Title IV loans by programs that repeatedly and flagrantly fail to give their graduates the tools they need to be gainfully employed. To determine which programs are ineligible, the Rule requires the calculation of the average debt load relative

to the average earnings for program graduates, referred to as the "debt-to-earnings rates." 34 C.F.R. §§ 668.403; 668.404; 668.410; *see also* 79 Fed. Reg. 64,890 (Oct. 31, 2014). Programs with debt-to-earnings rates that are above certain thresholds are considered "failing," while those with ratios that are slightly below the failing range are considered "in the zone." 34 C.F.R. § 668.403(c).

47. Programs that are determined to be failing for two out of three consecutive years are declared ineligible, as are those that are either failing or in the zone for four consecutive years. 34 C.F.R. § 668.403(c)(4). Ineligible programs are prohibited from disbursing Title IV loans to students. 34 C.F.R. § 668.410(b).

48. The disclosure and enforcement provisions are grounded in the simple fact that a program that requires students to take on large amounts of debt without giving them the skills needed to earn enough to repay that debt is failing in its obligation "to prepare students for gainful employment." *See* 79 Fed. Reg. 64,890, 65,038 (Oct. 31, 2014); 34 C.F.R. § 668.403.

49. In order to ensure that it has accurate earnings information for program graduates, the Rule relies on data from the Social Security Administration. 34 C.F.R. § 668.404. But the Rule allowed institutions to appeal the Department's earnings calculations and argue that the Social Security Administration's data does not fully reflect the earnings of program graduates. 34 C.F.R. §§ 668.405; 668.406.

50. Most of the provisions of the Rule were to be effective July 1, 2015, giving institutions eight months to prepare. 79 Fed. Reg. 64,890 (Oct. 31, 2014).

51. Despite immediate legal challenges, the Rule was upheld in full on three occasions in three different courts. *See Association of Private Sector Colleges & Universities v. Duncan*, 110 F.Supp.3d 176 (D.D.C. 2015) (upholding the Department's ability to promulgate

gainful employment regulations and upholding the revised debt-to-earnings test and the disclosure, reporting, and certification requirements), aff'd, 640 F. App'x 5 (D.C. Cir. 2016); *Association of Proprietary Colleges v. Duncan*, 107 F.Supp.3d 332 (S.D.N.Y. 2015).

52.     On January 9, 2017, the Department released the first debt-to-earnings rates for applicable programs as required by the Rule. These rates demonstrated that over 800 programs "fail[ed] the Department's accountability standards." Of these 800 failing programs, *ninety-eight percent* were offered by for-profit institutions. *See* https://www.ed.gov/news/press-releases/education-department-releases-final-debt-earnings-rates-gainful-employment-programs

53.     These results confirmed the urgent need for the Rule, as they demonstrated that a significant number of institutions of higher education that are subject to the Rule – nearly all of which were for-profit institutions – were requiring students to take on significant debt without giving them the tools they needed to be able to repay that debt.

54.     For any program that could be ineligible for Title IV loans in the next year, the Rule requires the institution to provide information, resources, and a warning to students and prospective students stating the following:

> This program has not passed standards established by the U.S. Department of Education. The Department based these standards on the amounts students borrow for enrollment in this program and their reported earnings. If in the future the program does not pass the standards, students who are then enrolled may not be able to use federal student grants or loans to pay for the program, and may have to find other ways, such as private loans, to pay for the program

34 C.F.R. § 668.410(a).

55.     As laid out in the Rule, a school that wished to appeal the debt-to-earnings calculation was required to file a short notice of intent to appeal by January 23, 2017, and final appeal documentation by March 10, 2017. *See* Gainful Employment Electronic Announcement

#101, https://ifap.ed.gov/eannouncements/010617GEAnn101AddtlInfoAltEarnAppeals

DERates.html (last visited on October 13, 2017); *see also* 34 C.F.R. § 668.406.

56.     The Rule states that any institution that timely submits an appeal of the debt-to-

earnings rates is not subject to any consequences under 34 C.F.R § 668.410 while the

Department considers the appeal. 34 C.F.R. § 668.406(e)(2). As a result, such institutions are not

required to issue the warning to current and prospective students required by 34 C.F.R.

§ 668.410(a).

57.     On January 19, 2017, the Department released the updated template for schools to

use in compliance with the disclosure requirements of the Rule. *See* Gainful Employment

Electronic Announcement #103, https://ifap.ed.gov/eannouncements/011917GEEA103

Releaseofthe2017GEDisclosureTemplate.html (last visited on October 13, 2017). This

notification informed schools that they would have until April 3, 2017 to update their disclosures

using the new template. *Id.*

## Cosmetology Schools Challenge the Appeals Process Under the Rule

58.     On February 10, 2017, the American Association of Cosmetology Schools

("AACS"), a trade organization of mostly for-profit cosmetology schools, sued under the APA

seeking to enjoin the Department from enforcing the Rule against its member schools.

59.     The AACS claimed that the relying on a debt-to-income calculation was arbitrary

and capricious as applied to its member schools and that the use of data from the Social Security

Administration undercounted the income of many of their graduates, who are self-employed

and/or receive significant income in the form of tips. *See Am. Ass'n of Cosmetology Sch. v.

DeVos*, No. 17-0263, 2017 WL 2804886, --- F.Supp.3d ---- (D.D.C. June 28, 2017). Although

the Rule provided a method for schools to appeal the graduate earnings numbers using a survey

completed by the schools' graduates, AACS claimed that the Rule required a response rate – 50

percent for a state-sponsored data system and nearly 100 percent for school-specific surveys –

that was arbitrary and capricious.

60.     On June 28, 2017, this Court issued a narrow ruling finding that the required

response rate of graduate surveys used by schools that were filing alternative earnings appeals

due to alleged underreporting of tipped and self-employment income was arbitrary and

capricious. *Id.* at *8, 17. The Court, however, rejected AACS's arguments (1) that the entire

debt-to-earnings calculation scheme was arbitrary and capricious and (2) that the Department

acted arbitrarily and capriciously in rejecting the alternatives presented by AACS during the

rulemaking process. *Id.* at *8-9.

61.     In attempting to fashion the most limited remedy possible, the Court prohibited

the Department from enforcing the "numerical survey requirements currently in effect for

alternate earnings appeals *against AACS member schools*," in order to "remove[] the arbitrary

and capricious reasoning behind the *otherwise-valid premise that alternate earnings appeals*

*justify the presumptive use of SSA data*." *Id.* at *39 (emphasis added).

62.     On two additional occasions in the Order, the Court reaffirmed that its remedy

applied to AACS member institutions only, stating that "*AACS member institutions* need not

secure any specific amount of survey responses or state-sponsored data to raise an appeal" and

that "*AACS member schools* will have broader, more feasible options to challenge their [debt-to-

earnings] rates before they become final." *Id.* (emphasis added).

63.     The Court went "no further" in its order than providing this limited relief to

AACS member schools, and specifically avoided "upending the entire administrative scheme."

*Id*. at *2; *see also* *39 (stating that the decision "also avoids upending the entire GE regulatory scheme").

64.     The Court's ruling did not mention or have any impact on the disclosure requirements of the Rule in 34 C.F.R. § 668.412.

## The Department Delays Crucial Aspects of the Rule

65.     On March 6, 2017, several months before this Court's decision in *AACS v. DeVos*, the Department announced that *all* schools would be given until July 1, 2017 (114 additional days from the original deadline of March 10, 2017) to submit alternative earnings appeals of the debt-to-earnings rates that were released by the Department on January 9, 2017. It further announced that all schools would also be given until July 1, 2017 (90 additional days from the original deadline of April 3, 2017) to comply with the Rule's updated disclosure requirements. *See* Gainful Employment Electronic Announcement #105, https://ifap.ed.gov/eannouncements/ 030617GEAnnounce105AddtlSubTimeAEAandGEDisReq.html (last visited on October 13, 2017). The only basis offered for these delays was that they were "taken to allow the Department to further review the GE regulations and their implementation." *Id.*

66.     On July 5, 2017, seven days after the *AACS* decision, a document entitled, "Announcement of applicable dates; request for comments" was published in the Federal Register. 82 Fed. Reg. 30,975 (July 5, 2017) ("First Delay Notice"). The First Delay Notice again extended the deadline to comply with the disclosure requirements relating to promotional materials and direct notifications to students about to enroll, from the already-delayed deadline of July 1, 2017, to July 1, 2018. It also extended (without providing a new date) the deadline for *all* programs across the country to file alternate earnings appeals from the previous delayed deadline of March 10, 2017.

67.     The Department's only stated rationale for this delay was that it "believes that it should evaluate the utility of these disclosures to students and the implementation of this requirement." 82 Fed. Reg. 30,975 (July 5, 2017).

68.     The Department failed to provide any explanation or basis for the delay of the July 1, 2017 disclosure deadline (which had already been delayed once previously) for schools to provide the required disclosures. 82 Fed. Reg. 30,975 (July 5, 2017).

69.     The Department stated in the First Delay Notice that its decision to delay the deadline for all programs to file alternate earnings appeals was made "in light of the Court Order in *American Association of Cosmetology Schools v. DeVos*, Civil Action No. 17-0263, D.D.C. June 28, 2017 (Court Order)." 82 Fed. Reg. 30,975 (July 5, 2017).

70.     Despite invoking the ruling in the *AACS* litigation, the First Delay Notice extended the alternate earnings appeal filing deadline for *all* schools across the country, rather than just AACS member schools. The Department failed to provide any explanation or basis in the First Delay Notice as to why the *AACS* decision justified delaying the deadline for all schools.

71.     The Department did not engage in the required notice and comment rulemaking and failed to provide an opportunity for the public to submit written data, views, or arguments regarding its delay of the disclosure and alternate earnings appeal deadlines before their implementation. Although the Department invited comments on its action, the First Delay Notice stated that any comments would be used "in determining whether to take any *future* action in connection with the implementation of the disclosure requirements." 82 Fed. Reg. 30,975 (July 5, 2017) (emphasis added). The delay of disclosure deadlines and the expansion of alternative

appeals to non-AACS member schools were immediately effective at the time of the posting of the First Delay Notice.

72.    By illegally delaying these disclosure deadlines and extending alternative appeal deadlines to all institutions affected by the Rule, the Department upended the Gainful Employment administrative scheme in its totality.  This is precisely what the court in *AACS* sought to avoid doing.

73.    The First Delay Notice further stated that the Department would issue an additional Federal Register notice to "specifically implement the Court Order, including establishing new [alternate earnings appeals] deadlines," and that it "anticipate[d] doing so within 30 days from the publication date of this notice." 82 Fed. Reg. 30,975, 30,976 (July 5, 2017).

74.    On August 18, 2017, another "Announcement of applicable dates; request for comments" was published in the Federal Register by the Department. 82 Fed. Reg. 39,362 (August 18, 2017) (the "Second Delay Notice"). The Second Delay Notice established "new deadlines for submitting notices of intent to file alternate earnings appeals and for submitting alternate earnings appeals" and announced "additional information that will be considered when evaluating alternate earnings appeals." *Id.* Specifically, it extended the deadline to file a notice of intent to file an alternate earnings appeal to October 6, 2017, and extended the deadline for filing an appeal to February 1, 2018.

75.    As with the First Delay Notice, these extended deadlines apply to all nationwide programs affected by the Rule, rather than just programs at AACS member schools. *Id.*

76.    The Department claimed in the Second Delay Notice that it was applying these new deadlines to all programs at all schools affected by the Rule because "the Court [in *AACS*]

noted concerns with the response threshold required for the graduate surveys used for all programs in the alternate earnings appeal." 82 Fed. Reg. 39,362, 39,363. But the Department provided no explanation or analysis as to why the Court's decision warranted extending the deadline for schools that were not members of AACS or for extending it for programs that prepare students for employment in careers outside of tipped or self-employed fields.

77.     In addition to delaying the deadline for all schools affected by the Rule, the Department announced in the Second Delay Notice that it would consider "all graduate surveys, regardless of response rate" in evaluating earnings appeals. 82 Fed. Reg. 39,362, 39,363. No justification for this decision was offered except the claim that the Department "seeks to reduce the burden on institutions in conducting these appeals while still ensuring that institutions provide enough information for the Department to determine whether the program graduates for whom alternate earnings data are provided are a valid representation of the overall cohort." *Id.*

78.     As with the First Delay Notice, the Department did not engage in notice and comment rulemaking and failed to provide an opportunity for the public to submit written data, views, or arguments regarding its extension of the deadline for alternate earnings appeals. Although the Department invited comments, the Second Delay Notice (like the First) stated that any comments would be used "in determining whether to take any *future* action in connection with the upcoming negotiated rulemaking." *Id*. (emphasis added). The delay of appeal deadlines was immediately effective at the time of the posting of the Second Delay Notice.

79.     Because of the delay in the deadline for appeals of the debt-to-earnings rates, the Second Delay Notice stated that "[i]nstitutions intending to file a notice of intent to appeal do not have to issue warnings to students unless they fail to timely submit an alternate earnings appeal or the appeal is resolved." *Id.*

80.     By delaying alternative appeals deadlines until February 1, 2018, and by suspending the Rule's requirements with respect to surveys in alternative earnings appeals, the Department upended the Gainful Employment administrative scheme.

**The Department's Refusal to Enforce Crucial Aspects of the Rule**

81.     The Rule requires the Department, for each Title IV loan award year, to begin the process of determining each program's debt-to-earnings rates by "[c]reating a list of the students who completed the program during the cohort period and providing the list to the institution" and "[a]llowing the institution to correct the information about the students on the list." 34 C.F.R. § 668.405(a)(1), (2). The list of students who completed the applicable programs that is provided to institutions is often referred to by the Department as the "Draft GE Completers Lists." It is necessary that institutions confirm which students completed the applicable programs because it is the required method for the Department to match the graduates' Social Security Administration mean and median annual earnings with their student loan debt totals to determine the debt-to-earnings rates for each program under the application of the Rule. *See* 34 C.F.R. § 668.405(a).

82.     Without creating the Draft GE Completers Lists, providing them to the institutions, and allowing the institutions to correct them, the Department cannot complete the other required steps to calculate the debt-to-earnings rates, as is required by the Rule. *See* 34 C.F.R. § 668.405(a).

83.     For the first set of debt-to-earnings rates that were issued on January 9, 2017, the Department sent the Draft GE Completers Lists on June 1, 2016. *See* Gainful Employment Electronic Announcement #80, https://ifap.ed.gov/eannouncements/060816GEEA80Additional InfoInstitutionsReviewingDraftGECompletersList.html (last visited on October 13, 2017).

84.     On June 6, 2017, after a hearing on the Fiscal Year 2018 budget request from the Department, Senator Richard Durbin submitted questions to Secretary DeVos by letter asking if the Department had taken the first step in enforcement of the Rule for 2018 by sending Draft GE Completers Lists to all schools affected by the Rule for purpose of calculating and publishing debt-to-earnings rates, as required by the Rule.

85.     In response, the Department admitted on August 3, 2017, that it has not "provided the draft completers lists" and that it did not "currently have any timetable to send completers lists to schools for 2017." *Gainful Employment Delay and Implementation*, *available at* https://www.documentcloud.org/documents/3914394-DeVosDurbinGainful.html (last visited on October 16, 2017). As of the current date, the Draft GE Completers Lists have not been sent to institutions and no further update has been provided by the Department as to when it plans to provide the Draft GE Completers Lists to institutions.

86.     By refusing to provide the Draft GE Completers Lists to institutions, the Department is refusing to enforce the Rule and/or unreasonably delaying enforcement of the Rule.

87.     By refusing to provide Draft GE Completers Lists to institutions as required by the Rule, the Department has further upended the Gainful Employment administrative scheme.

**The Department's Violations of the APA Cause Harm to the States and Their Citizens**

88.     The States have an interest in protecting the health, safety, and welfare of their citizens and in safeguarding their ability to enforce state law.

89.     Consistent with this obligation, the States have brought numerous enforcement actions in response to abusive practices by for-profit and other institutions of higher education.

Below are examples of schools that have recently been subjects of time-consuming and costly

litigation, enforcement actions, and extended investigations by the States:

- **The Career Institute, LLC.**
  - o Complaint, Massachusetts v. The Career Institute, LLC. *et al*., No. 13-4128H (Mass. Super. Ct. Sept. 17, 2015) *available at* http://www.mass.gov/ago/docs/consumer/aci-amended-complaint.pdf; Final Judgment by Consent, Massachusetts v. The Career Institute, LLC. *et al*., No. 13-4128H (Mass. Super. Ct. June 1, 2016) *available at* http://www.mass.gov/ago/docs/consumer/aci-consent-judgment.pdf.

- **ITT Educational Services, Inc.**
  - o Complaint, Massachusetts v. ITT Educ. Servs. Inc., No. 16-0411 (Mass. Super. Ct. Mar. 31, 2016)

- **The Salter School**
  - o Complaint, Massachusetts v. Premier Educ. Grp., No. 14-3854 (Mass. Super. Ct. Dec. 9, 2014) *available at* http://www.mass.gov/ago/docs/press/2014/salter-complaint.pdf; Final Judgment by Consent, Massachusetts v. Premier Educ. Grp., No. 14-3854 (Mass. Super. Ct. Dec. 11, 2014) *available at* http://www.mass.gov/ago/docs/press/2014/salter-judgment-by-consent.pdf.

- **Westwood College, Inc.**
  - o Complaint, People of the State of Illinois v. Westwood College, Inc. *et al.*, No. 12 CH 01587 (Cir. Ct. Cook County Jan. 18, 2012); Second Amended Complaint, Doc. No. 57, No. 14-cv-03786 (U.S. Dist. Ct., N. Dist. Ill. Sept. 30, 2014); Settlement entered on October 9, 2015.

- **Education Management Company** (including The Art Institutes and Brown Mackie College)
  - o Complaint, Commonwealth of Pennsylvania v. Education Management Corp., Case No. 545 M.D. 2015 (PA. Commw. Ct., Nov. 16, 2015)(Consent Order entered on November 20, 2015).
  - o Consumer Protection Division, Office of the Attorney General of Maryland v. Education Management Corporation, *et al*. Case No. 24-C-15-005705 (Md. Cir. Ct. Nov. 16, 2015).
  - o Complaint, People of the State of Illinois v. Education Management Corporation *et al*., No. 2015 CH 16728 (Cir. Ct. Cook County Nov. 16, 2015); Consent Judgment, People of the State of Illinois v. Education Management Corporation *et al*., No. 2015 CH 16728 (Cir. Ct. Cook County Nov. 16, 2015).
  - o Complaint, State of New York v. Education Management Corp., *et al*., No. 453046/15 (N.Y. Sup. Ct. Nov. 16, 2015); Consent Order and Judgment (N.Y. Sup. Ct. Jan. 14, 2016).

- o   Complaint, State of Oregon v. Education Management Corp., et al., No.
      15CV30936 (OR. Cir. Ct. Nov. 16, 2015); Stipulated General Judgment (OR.
      Cir. Ct. Nov. 17, 2015).
- o   $95.5 million global settlement, intervention by States of California, Illinois,
      Minnesota, and others, *United States ex rel. Washington v. Education
      Management Corp., et al.*, No. 07-00461 (W.D. Pa., Nov. 13, 2015).

- **Corinthian Colleges, Inc.**
    - o   Illinois investigation initiated on 12/14/2011; Opp. to Debtor's Obj. with
          findings, Doc. No. 1121, In re: Corinthian Colleges, Inc. *et al.* No. 15-10952
          (KJC) (U.S. Bankr. Ct. Dist. of Del., Dec. 9, 2015).
    - o   Complaint, Massachusetts v. Corinthian Colleges, Inc. *et al.* No. 14-1093 (Mass.
          Super. Ct. Apr. 3, 2014) *available at* http://www.mass.gov/ago /docs/press
          /2014/everest-complaint.pdf.
    - o   $1.1 billion judgment, *People of the State of California v. Corinthian Colleges*,
          *Inc., et al.*, No. CGC-13-534793 (Cal. Super. Ct, Mar. 23, 2016) available at
          https://oag.ca.gov/system/files/attachments/press_releases/Corinthian
          %20Final%20Judgment_1.pdf.
    - o   California's Objection to Bankruptcy Plan Confirmation, *In re Corinthian
          Colleges, Inc. et al.*, No. 15-10952, Doc. No. 824 (Bankr. D. Del., Aug. 21,
          2015).

- **The Career Education Corporation's Sanford Brown Schools**
    - o   Assurance of Discontinuance obtained by New York on August 19, 2013,
          available at https://ag.ny.gov/press-release/ag-schneiderman-announces-
          groundbreaking-1025-million-dollar-settlement-profit.

- **Sullivan & Cogliano Training Centers, Inc.**
    - o   Complaint, Massachusetts v. Sullivan & Cogliano Training Centers, Inc., No.
          13-0357B (Mass. Super. Ct. Apr. 3. 2013) *available at*
          http://www.mass.gov/ago/audioandvideo/s-and-c-complaint.pdf; Consent
          Judgment, Massachusetts v. Sullivan & Cogliano Training Centers, Inc., No. 13-
          0357B (Mass. Super. Ct. Oct. 28, 2013).

- **Lincoln Technical Institute, Inc.**
    - o   Complaint, Massachusetts v. Lincoln Tech. Inst., No. 15-2044C (Mass. Super.
          Ct. July 8, 2015); Consent Judgment, Massachusetts v. Lincoln Tech. Inst., No.
          15-2044C (Mass. Super. Ct. July 13, 2015) *available at*
          http://www.mass.gov/ago/docs/press/2015/lincoln-tech-settlement.pdf.

- **Kaplan**
    - o   Assurance of Discontinuance, In the Matter of Kaplan, Inc., Kaplan Higher
          Education, LLC, No. 15-2218B (Mass. Super. Ct. July 23, 2015) *available at*
          http://www.mass.gov/ago/docs/press/2015/kaplan-settlement.pdf.

- **Hosanna College of Health**
  - Complaint, Massachusetts v. Hosanna College of Health, Inc. *et al.* No. 16-0608B (Mass. Super. Ct. Feb. 24, 2016).

- **Minnesota School of Business, Inc. and Globe University, Inc.**
  - Complaint, Minnesota v. Minnesota School of Business, Inc. et al., No. 27-CV-14-12558 (Minn. Dist. Ct. July 22, 2014); Findings of Fact, Conclusions of Law and Order, Minnesota v. Minnesota School of Business et al., No. 27-CV-14-12558 (Minn. Dist. Ct. Sep. 8, 2016); Supreme Court Opinion, 885 N.W.2d 467 (Minn. 2017).

90.     The investigations leading to many of these actions demonstrated that many for-profit educational institutions have deliberately targeted low-income and minority residents with deceptive information about their programs and enrolled students in programs that were unlikely to lead to employment that would allow graduates to repay the high cost of tuition. As a result, low-income and minority residents are often the primary victims of conduct that the Rule was designed to prevent.

91.     The Department's illegal delays and refusal to enforce the Rule harm current and prospective students by depriving them of adequate information to make informed choices about enrolling in educational programs. Were students given full and complete information about the costs, benefits (or lack thereof), and potential for the program to be ineligible for Title IV loans, many students would choose not to enroll in programs that saddle them with massive debt burdens and limited employment prospects. Instead, such students would choose to enroll in other educational programs that make more economic sense, including, in some cases, programs at State-funded institutions of higher education.

92.     By making changes to crucial aspects of the Rule without engaging in notice and comment rulemaking and refusing to enforce other parts of the Rule, the Department has caused the following harms to the States, among others: (1) waste and loss of State-funded grant and loan money provided to schools that would otherwise be ineligible for Title IV loans or required

to warn students about potential ineligibility for Title IV loans, due to their failure to provide students with an education that can lead to gainful employment and repayment of the loans; (2) loss of State resources from the need to increase enforcement of state consumer protection laws due to unfair and deceptive conduct by institutions that should be ineligible for Title IV loans or ineligible for a license to operate in the State due to failure to comply with federal law; (3) loss of tuition money from State-funded higher education institutions; and (4) a diversion of resources to enforcement actions directed against abusive practices by for-profit and other educational programs.

93.     Failure to enforce the Rule also denies critical rights and protections to the States' residents and disproportionately harms their low-income and minority residents, who are more likely to be targeted by the abusive practices of for-profit schools. The loss of these rights and protections causes substantial injury to students who enroll in institutions that fail to provide them with an education that can lead to gainful employment and repayment of the loans.

## CAUSES OF ACTION

### COUNT I

#### Failure To Adhere to Procedures Required by Law

94.     The States incorporate by reference paragraphs 1 through 93 of this Complaint.

95.     The APA provides a general cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. §§ 702-704.

96.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

97.     The APA requires all agencies to give "(g)eneral notice of proposed rule making" and provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c). Under the APA, an agency must generally use the same procedures in amending or repealing a rule as it used in issuing the rule.

98.     The opportunity to submit comments for possible *future* rules is insufficient to comply with the Department's obligations under the APA.

99.     The HEA requires the Department to "obtain public involvement in the development of proposed regulations" related to student financial assistance programs and to "submit such regulations to a negotiated rulemaking process." 20 U.S.C. § 1098a(a)(1), (b)(2).

100.    The Department has delayed, modified, amended, and/or repealed the Rule by issuing: (a) the First Delay Notice's delay of disclosure deadlines; (b) the First Delay Notice's expansion of alternative earnings appeals to all schools; (c) the Second Delay Notice's delay of the deadline for filing alternative earnings appeals for all schools until February 1, 2018; and, (d) the Second Delay Notice's elimination of any required response rate for surveys used in alternative earnings appeals for all schools.

101.    These changes have prevented meaningful enforcement of the Rule and are tantamount to amending or repealing it without engaging in notice and comment rulemaking or otherwise complying with the HEA and the APA. By its own terms, the First Delay Notice is intended to facilitate the Department's replacement of the Rule, as it states that "the Department expects to further review these requirements as part of its review of the GE regulations and their implementation, including through negotiated rulemaking." 82 Fed. Reg. 30,976.

102.    The Department did not engage in a notice and comment process, initiate a

negotiated rulemaking, or otherwise comply with the HEA and APA in delaying, modifying,

amending, and/or repealing the Rule.

103.    As a result, the Department promulgated the Delay Notices without adhering to

the procedural requirements of 5 U.S.C. § 553(c), (d) and 20 U.S.C. § 1098a.

104.    The Delay Notices should therefore by vacated and set aside pursuant to 5 U.S.C.

§ 706(2)(D).

## COUNT II

## Arbitrary and Capricious Action

105.    The States incorporate by reference paragraphs 1 through 93 of this Complaint.

106.    The APA provides a general cause of action for parties adversely affected or

aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. § 702-

704.

107.    Under the APA, a reviewing court shall "hold unlawful and set aside agency

action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law . . . . [and] in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

108.    When delaying, modifying, amending, and/or repealing a duly promulgated rule,

the agency must identify its authority or basis to do so.

109.    The Department has delayed, modified, amended, and/or repealed the Rule by

issuing: (a) the First Delay Notice's delay of disclosure deadlines; (b) the First Delay Notice's

expansion of alternative earnings appeals to all schools; (c) the Second Delay Notice's delay of

the deadline for filing alternative earnings appeals for all schools until February 1, 2018; and,

(d) the Second Delay Notice's elimination of any required response rate for surveys used in alternative earnings appeals for all schools.

110.    These changes have prevented meaningful enforcement of the Rule and are tantamount to amending or repealing it. By its own terms, the First Delay Notice is intended to facilitate the Department's replacement of the Rule, as it states that "the Department expects to further review these requirements as part of its review of the GE regulations and their implementation, including through negotiated rulemaking." 82 Fed. Reg. 30,976.

111.    Although the Delay Notices operate as an amendment to or rescission of the Rule, the Department failed to identify any authority or basis for its actions, and none exists. The lack of any legal basis for the Department's actions renders the Delay Notices arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and in excess of statutory authority or short of statutory right.

112.    In addition, the Delay Notices substantively amend the Rule by modifying the appeals process so as to make it far easier for programs to challenge the use of earnings information received from the Social Security Administration in calculating debt to earnings rates. These substantive amendments to the Rule go far beyond the scope of any change required to comply with this Court's order in *American Association of Cosmetology Schools v. DeVos* and lack any authority or legal basis. The Delay Notices' expansion of the appeals process will dramatically limit the effectiveness of the Rule and is inconsistent with the Department's obligation to ensure that applicable institutions "prepare students for gainful employment in a recognized occupation." As a result, the Delay Notices are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and in excess of statutory authority or short of statutory right.

113.    The Delay Notices should therefore by vacated and set aside pursuant to 5 U.S.C. § 706(2)(A) and/or 5 U.S.C. § 706(2)(C).

## COUNT III

### Action Unlawfully Withheld Or Unreasonably Delayed

114.    The States incorporate by reference paragraphs 1 through 93 of this Complaint.

115.    The APA provides a general cause of action for parties adversely affected or aggrieved by agency action for which there is no other adequate remedy in court. 5 U.S.C. § 702-704.

116.    Under the APA, a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

117.    Under the Rule, the Department is obligated to provide Draft GE Completers Lists to applicable institutions for applicable programs in order to begin the process of determining each program's debt-to-earnings ratio. *See* 34 C.F.R. § 668.405.

118.    The Department, however, has publicly stated that it has neither provided nor prepared the Draft GE Completers Lists for the previous award year, and that it has no timetable to do so.

119.    The Department's failure to carry out its obligation to provide the Draft GE Completers Lists to institutions is itself an unlawful withholding of action and/or an unreasonable delay of action, for which it has no legal authority or basis.

120.    For the debt-to-earnings rates published in January of 2017, Draft GE Completers Lists were sent on June 1, 2016, to allow sufficient time for responses from institutions and determination of debt-to-earnings ratios by the Department. The Department's failure to provide the Draft GE Completers Lists in a timely manner will make it impossible for the Department to

publish debt-to-earnings rates for the previous award year, resulting in an additional unlawful withholding and/or unreasonable delay of agency action, for which the Department has no legal authority or basis.

121.    The Department should be compelled to carry out its legal duties under the Rule, including, but not limited to, providing institutions with Draft GE Completers Lists and calculating and issuing debt-to-earnings rates, pursuant to 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

WHEREFORE, the States request that this Court enter judgment in their favor and grant the following relief:

a.  Declare the Delay Notices unlawful;

b.  Vacate the Delay Notices;

c.  Order that the Gainful Employment Rule be enforced in its entirety, including, but not limited to, providing institutions with Draft GE Completers Lists and calculating and publishing debt-to-earnings rates;

d.  Award Plaintiffs reasonable costs, including attorneys' fees; and

e.   Grant such other and further relief as the Court deems just and proper.

Dated: October 17, 2017

Respectfully Submitted,

FOR THE STATE OF MARYLAND
BRIAN E. FROSH
ATTORNEY GENERAL

By:   */s/ Christopher J. Madaio*
Christopher J. Madaio
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
(410) 576-6585
Cmadaio@oag.state.md.us

FOR THE COMMONWEALTH OF
PENNSYLVANIA
JOSH SHAPIRO
ATTORNEY GENERAL

By:   */s/ Michael J. Fischer*
Michael J. Fischer
Chief Deputy Attorney General
John M. Abel
Jesse Harvey
Senior Deputy Attorneys General
Office of the Pennsylvania Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120
(215) 560-2402
mfischer@attorneygeneral.gov

FOR THE COMMONWEALTH OF
MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

By: */s/ Yael Shavit*
Yael Shavit
Assistant Attorney General
Office of the Massachusetts Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2197
yael.shavit@state.ma.us

FOR THE STATE OF CALIFORNIA
XAVIER BECERRA
CALIFORNIA ATTORNEY GENERAL

By: */s/ Bernard A. Eskandari*
Bernard A. Eskandari
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 897-2652
bernard.eskandari@doj.ca.gov

FOR THE STATE OF CONNECTICUT
GEORGE JEPSEN
ATTORNEY GENERAL

By: */s/ Joseph J. Chambers*
Joseph J. Chambers
Assistant Attorney General
Connecticut Office of Attorney General
PO Box 120
Hartford, CT 06141-0120
(860) 808-5270
joseph.chambers@ct.gov

FOR THE STATE OF DELAWARE
MATTHEW P. DENN
ATTORNEY GENERAL

By:   */s/ Christian Douglas Wright*
      Christian Douglas Wright
      Director of Consumer Protection
      Deputy Attorney General
      Delaware Department of Justice
      820 N. French Street
      Wilmington, DE  19801
      (302) 577-8400
      christian.wright@state.de.us

FOR THE DISTRICT OF COLUMBIA
KARL A. RACINE
ATTORNEY GENERAL

By:   */s/ Philip Ziperman*
      Philip Ziperman
      Assistant Attorney General
      Attorney General for the District of Columbia
      441 4th Street, N.W., 6th Floor
      Washington, DC 20001
      (202) 442-9886
      Philip.Ziperman@dc.gov

FOR THE STATE OF HAWAII
DOUGLAS S. CHIN
ATTORNEY GENERAL OF HAWAII

By:   */s/ Bryan C. Yee*
      Bryan C. Yee
      Deputy Attorney General
      425 Queen Street
      Honolulu, Hawaii 96813
      (808) 586-1180
      bryan.c.yee@hawaii.gov

PEOPLE OF THE STATE OF
ILLINOIS, by LISA MADIGAN
ATTORNEY GENERAL OF ILLINOIS

By:  */s/ Joseph Sanders*
     Joseph Sanders
     Gregory W. Jones
     Assistant Attorneys General
     Consumer Fraud Bureau
     Office of the Illinois Attorney General
     100 W. Randolph St., 12th Fl.
     Chicago, IL 60601
     312-814-6796 (Joseph)
     312-814-4987 (Gregory)
     Fax: 312-814-2593
     jsanders@atg.state.il.us
     gjones@atg.state.il.us

FOR THE STATE OF IOWA
THOMAS J. MILLER
ATTORNEY GENERAL

By:  */s/ Jessica Whitney*
     Jessica Whitney
     Director - Consumer Protection
     Office of the Attorney General of Iowa
     1305 E. Walnut St.
     Des Moines, Iowa 50319
     (515) 281-8772
     Jessica.Whitney@iowa.gov

FOR THE STATE OF MINNESOTA
LORI SWANSON
ATTORNEY GENERAL

By:  */s/ Jason Pleggeknuhle*
     Jason Pleggeknuhle
     Assistant Attorney General
     Bremer Tower, Suite 1200
     445 Minnesota Street
     St. Paul, MN 55101
     (651) 757-1147 (Voice)
     (651) 282-5832 (Fax)
     jason.pleggenkuhle@ag.state.mn.us

FOR THE STATE OF NEW YORK
ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL OF NEW YORK

By:  */s/ Jane M. Azia*
Jane M. Azia
Chief, Bureau of Consumer Frauds and
Protection
120 Broadway, 3rd floor
New York, NY 10271
Tel.: (212) 416-8727
Jane.azia@ag.ny.gov

FOR THE STATE OF NORTH CAROLINA
JOSH STEIN
ATTORNEY GENERAL OF NORTH
CAROLINA

By:  */s/ Matt Liles*
Matt Liles
Assistant Attorney General
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC  27603
P.O. Box 629
Raleigh, NC  27602
(919) 716-0141
mliles@ncdoj.gov

FOR THE STATE OF OREGON
ELLEN F. ROSENBLUM
ATTORNEY GENERAL

By:  */s/ Andrew Shull*
Andrew Shull
Assistant Attorney General
Oregon Department of Justice
1162 Court Street, NE
Salem, OR 97301
(503) 934-4400
Andrew.shull@doj.state.or.us

FOR THE STATE OF RHODE ISLAND
PETER F. KILMARTIN
ATTORNEY GENERAL

By:  */s/ Neil F.X. Kelly*_____
Neil F.X. Kelly
Deputy Chief, Civil Div.
Assistant Attorney General
Edmund F. Murray, Jr.
Special Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2284
nkelly@riag.ri.gov
emurray@riag.ri.gov

FOR THE STATE OF VERMONT
THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

By:  */s/ Christopher J. Curtis*
Christopher J. Curtis
State of Vermont
Office of the Attorney General
Chief, Public Protection Division
109 State St.
Montpelier, VT 05609
(802) 828-5586
christopher.curtis@vermont.gov

FOR THE COMMONWEALTH OF
VIRGINIA
MARK R. HERRING
ATTORNEY GENERAL

By:  */s/ Samuel T. Towell*_____
Samuel T. Towell
Deputy Attorney General, Civil Litigation
Cynthia E. Hudson
Chief Deputy Attorney General
Barbara Johns Building
202 N. Ninth St.
Richmond, Virginia 23219
(804) 786-6731
stowell@oag.state.va.us

FOR THE STATE OF WASHINGTON
ROBERT W. FERGUSON
ATTORNEY GENERAL

By: */s/ Jeffrey T. Sprung*_____
    Jeffrey G. Rupert
    Chief, Complex Litigation Division
    Jeffrey T. Sprung (D.C. Bar No.: 384880)
    Benjamin J. Roesch
    Assistant Attorneys General
    Office of the Washington Attorney General
    1125 Washington St. SE
    P.O. Box 40100
    Olympia, WA 98504
    (206) 326-5492 (Sprung)
    jeffreyr2@atg.wa.gov
    jeff.sprung@atg.wa.gov
    benjaminr@atg.wa.gov
    cynthiaa@atg.wa.gov