## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF MARYLAND, COMMONWEALTH OF PENNSYLVANIA, COMMONWEALTH OF MASSACHUSETTS, PEOPLE OF THE STATE OF CALIFORNIA *ex rel.* XAVIER BECERRA, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF HAWAII, PEOPLE OF THE STATE OF ILLINOIS, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEW YORK, STATE OF NORTH CAROLINA *ex rel.* JOSH STEIN, Attorney General, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, *ex rel.* MARK R. HERRING, Attorney General, and STATE OF WASHINGTON,<br><br>          Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, and BETSY DEVOS, *in her official capacity as Secretary of Education,*<br><br>          Defendants. | **CIVIL ACTION NO: 1:17-cv-2139-KBJ** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS                                                                    i

TABLE OF AUTHORITIES                                                                 ii

INTRODUCTION                                                                         1

STATEMENT OF FACTS                                                                   3
   I.    Federal Student Loans                   3
   II.   The Gainful Employment Rule                 3
   III.  Litigation Challenging the Gainful Employment Rule          6
   IV.  The Department Delays Implementation of the Gainful Employment Rule.     8
   V.   The Department's Refusal to Comply with Additional Aspects of the Rule     10

LEGAL STANDARD                                                                      12

ARGUMENT                                                                            12
   I.    The Department Violated the APA by Undertaking Substantive Rulemaking Without Observing Procedures Required by Law     14
     A.  The Department's Delay of the Gainful Employment Rule Constitutes Substantive Rulemaking     14
     B.  The Delay Notices Violate the APA Because the Department Did Not Provide for Notice and Comment or Negotiated Rulemaking     18
   II.   The Department Violated the APA by Failing to Provide an Adequate Explanation for Its Stay of the Gainful Employment Rule, Including a Reasoned Analysis for Its Change of Position     22
   III.  The Department is Unlawfully Withholding or Unreasonably Delaying Required Action in Violation of 5 U.S.C. § 706(1)     28
     A.  The Department's Duty to Send Draft GE Completers Lists to Institutions to Use in the Calculation of Debt-to-Earnings Rates is a Discrete Agency Action.     29
     B.  The Department's Failure to Send Draft GE Completers Lists to Institutions to Use in the Calculation of Debt-to-Earnings Rates is Unreasonable and Violates Its Statutory Mandate.     32
     C.  This Court Should Compel the Agency to Act.     35

CONCLUSION                                                                          38

# TABLE OF AUTHORITIES

## CASES

*Am. Fed. of Gov't Emps. v. Block*,
　655 F.2d 1153 (D.C. Cir. 1981) .......................................................................... 20, 21, 26

*Am. Mar. Ass'n v. U.S.*,
　766 F.2d 545 (D.C. Cir. 1985) ..................................................................................... 27

*Ass'n of Cosmetology Schs. v. DeVos*,
　258 F. Supp. 3d 50 (D.D.C. 2017) ........................................................................ passim

*Ass'n of Private Sector Colleges & Univs. v. Duncan*,
　110 F. Supp. 3d 176 (D.D.C. 2015) ..................................................................... 6, 29, 30

*Ass'n of Private Sector Colleges & Univs. v. Duncan*,
　107 F. Supp. 3d 332 (S.D.N.Y. 2015) .............................................................................. 6

*Biodiversity Legal Found. et al. v. Norton*,
　285 F. Supp. 2d 1 (D.D.C. 2003) ............................................................................. 34, 36

*Burlington Truck Lines v. United States*,
　371 U.S. 156 (1962) ............................................................................................... 23, 27

*Clean Air Council v. Pruitt*,
　862 F.3d 1 (D.C. Cir. 2017) ............................................................................. 15, 19, 20

*Cobell v. Babbitt*,
　91 F. Supp. 2d 1 (D.D.C. 1999) ..................................................................................... 31

*Cobell v. Norton*,
　240 F.3d 1081 (D.C. Cir. 2001) ............................................................... 30, 31, 33, 34, 35

*Council of S. Mountains, Inc. v. Donovan*,
　653 F.2d 573 (D.C. Cir. 1981) ...................................................................................... 20

*Cutler v. Hayes*,
　818 F.2d 879 (D.C. Cir. 1987) ................................................................................. 35, 36

*Cutler v. Hayes*,
　549 F.Supp. 1341 (D.D.C. 1982) ................................................................................... 36

*Envtl. Def. Fund v. Costle*,
　657 F.2d 275 (D.C. Cir. 1981) ...................................................................................... 29

*Envtl. Def. Fund v. E.P.A.*,
716 F.2d 915 (D.C. Cir. 1983) ...................................................................... 15

*Envtl. Def. Fund, Inc. v. Gorsuch*,
713 F.2d 802 (D.C. Cir. 1983) ......................................................... 15, 19, 20

*Geneme v. Holder*,
935 F. Supp. 2d 184 (D.D.C. 2013) ............................................................. 34

*In re Am. Rivers & Idaho Rivers United*,
372 F.3d 413 (D.C. Cir. 2004) ..................................................................... 29

*In re Bluewater Network*,
234 F.3d 1305 (D.C. Cir. 2000) ................................................................... 35

*In re Int'l Chem. Workers Union*,
958 F.2d 1144 (D.C. Cir. 1992) ................................................................... 34

*Michigan v. E.P.A.*,
135 S. Ct. 2699 (2015)........................................................................... 27, 28

*Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish Cnty.*,
554 U.S. 527 (2008)...................................................................................... 12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................................. passim

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*,
979 F.2d 227 (D.C. Cir. 1992) ..................................................................... 14

*Nat'l Res. Def. Council v. E.P.A.*,
683 F.2d 752 (3d Cir. 1982)......................................................................... 15

*Nat'l Venture Capital Ass'n v. Duke*,
No. 17-1912, 2017 WL 5990122 (D.D.C. Dec. 1, 2017)................................ 2, 17, 19, 21

*N. Mariana Islands v. U.S.*,
686 F. Supp. 2d 7 (D.D.C. 2009) ................................................................. 20

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)........................................................................................ 29

*Open Communities Alliance et al. v. Carson et al.*,
No. 17-CV-2192-BAH, 2017 WL 6558502 (D.D.C. Dec. 23, 2017). ................. 2

*Petry v. Block*,
    737 F.2d 1193 (D.C. Cir. 1984) ................................................................ 20

*Pub. Citizen Health Research Grp. v. Auchter*,
    702 F.2d 1150 (D.C. Cir. 1983) ................................................................ 35

*Pub. Citizen Health Research Grp. v. FDA*,
    724 F. Supp. 1013 (D.D.C. 1989) ............................................................. 36

*Resolute Forest Prod., Inc. v. U.S. Dep't of Agric.*,
    187 F. Supp. 3d 100 (D.D.C. 2016) .......................................................... 27

*Sierra Club v. Jackson*,
    833 F. Supp. 2d 11 (D.D.C. 2012) ..................................................... passim

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) ............................................................ 34, 36

*State of N. J., Dept. of Envtl. Prot. v. E.P.A.*,
    626 F.2d 1038 (D.C. Cir. 1980) ................................................................ 19

*U.S. v. Cotton*,
    760 F. Supp. 2d 116 (D.D.C. 2011) .......................................................... 21

## STATUTES

20 U.S.C. § 1002(b)(1)(A)(i) ................................................................. 1, 3, 29

20 U.S.C. § 1002(c)(1)(A). ...................................................................... 3, 29

20 U.S.C. § 1071 *et seq.*............................................................................... 3

20 U.S.C. § 1088(b)(1)(A)(i) ................................................................... 3, 29

20 U.S.C. § 1098a ......................................................................................... 2

20 U.S.C. § 1098a ................................................................................... 4, 18

20 U.S.C. § 1231a ....................................................................................... 30

5 U.S.C. § 551 ....................................................................................... 1, 15

5 U.S.C. § 553 ..................................................................................... passim

5 U.S.C. § 706(1) ................................................................................ passim

## RULES AND REGULATIONS

34 C.F.R. § 668.403 ................................................................................................ 6

34 C.F.R. § 668.404 ................................................................................................ 6

34 C.F.R. § 668.405 ........................................................................................ passim

34 C.F.R. § 668.406 ............................................................................................ 6, 24

34 C.F.R. § 668.410 ................................................................................................ 6

34 C.F.R. § 668.412 ........................................................................... 5, 8, 15, 16, 24

79 Fed. Reg. 16,426 (March 25, 2014) ........................................................... passim

82 Fed. Reg. 30,975 (July 5, 2017) ................................................................ passim

82 Fed. Reg. 39,362 (August 8, 2017) ........................................................... passim

D.D.C. Local Civ. R. 7(h) ....................................................................................... 3

D.D.C. Local Civ. R. 7(l) ....................................................................................... 12

Fed. R. Civ. P. 56(a) .............................................................................................. 12

Fed. R. Civ. P. 56(b) .............................................................................................. 12

## INTRODUCTION

This action challenges the unlawful delay and de facto rescission by the Department of Education (the "Department") of a duly promulgated rule known as the "Gainful Employment Rule" (the "Rule"), as well as the Department's failure to comply with non-discretionary regulatory tasks required by the Rule. The Department announced its decision to delay the Rule's implementation through two brief "Delay Notices," both of which failed to comply with the requirements of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). *See Program Integrity: Gainful Employment*, 82 Fed. Reg. 30,975 (July 5, 2017) (attached hereto as Exhibit 1); *Program Integrity: Gainful Employment*, 82 Fed. Reg. 39,362 (August 18, 2017) (attached hereto as Exhibit 2) (hereinafter "Delay Notices").

The Gainful Employment Rule was issued following a robust negotiated rulemaking process and was designed to protect student loan borrowers from educational programs that, as a condition of eligibility for federal student loans, are required by the Higher Education Act, *see, e.g.*, 20 U.S.C. § 1002(b)(1)(A)(i), to provide training that prepares students for gainful employment in a recognized occupation, "but instead are leaving students with unaffordable levels of loan debt in relation to their earnings, or leading to default." *Program Integrity: Gainful Employment*, 79 Fed. Reg. 16,426 (March 25, 2014) (attached hereto as Exhibit 3). The Rule protects students through a combination of disclosure requirements and enforcement provisions. The disclosure requirements ensure that prospective students have the information necessary to determine whether a particular program will adequately prepare them for gainful employment. In addition, the enforcement provisions penalize schools that victimize students by forcing them to take on massive amounts of debt without giving them sufficient skills to earn enough to be able to pay back that debt.

Through the Delay Notices, the Department has crippled the Rule's disclosure requirements and enforcement provisions. Specifically, the Department has unilaterally pushed back the date by which programs are required to comply with the two most important disclosure requirements in the Rule. It has further rendered the enforcement provisions toothless by delaying certain key deadlines and refusing to enforce several requirements in the Rule designed to ensure that programs that wish to appeal a finding that they are failing to adequately prepare students for gainful employment do so on the basis of credible evidence. The Department took all of these steps in the name of a "regulatory reset"—effectively announcing that it was simply not going to enforce a rule with which it did not agree, while it initiated the process of rewriting that rule.

The Department's actions violate the law. First, the Department failed to comply with procedures required by law—namely, the notice and comment requirements of the APA, 5 U.S.C. § 553, and the negotiated rulemaking requirements of the Higher Education Act ("HEA"), 20 U.S.C. § 1098a, thereby violating the APA, 5 U.S.C. § 706(2)(D). As this Court reaffirmed just three days ago, an order "delaying a rule's effective date is tantamount to amending or revoking a rule." *See Open Communities Alliance et al. v. Carson et al.*, No. 17-CV-2192-BAH, 2017 WL 6558502, at *10 (D.D.C. Dec. 23, 2017) (citations, internal quotation marks, and alterations omitted). Second, the Department failed to offer a reasoned basis for its decision in the Delay Notices, thus rendering its actions arbitrary, capricious, otherwise contrary to the law, and in excess of the Department's statutory authority. *See* 5 U.S.C. § 706(2)(A), (C). Third, the Department continues to refuse to carry out its clear obligations under the Rule to calculate and report certain data in a transparent attempt to gut the effectiveness of the Rule, in violation of the APA. 5 U.S.C. § 706(1).

For these reasons, Plaintiffs respectfully request that this Court grant their Motion for Summary Judgment, vacate the Delay Notices, and require the Department to implement the Rule.

## STATEMENT OF FACTS[1]

### I.   FEDERAL STUDENT LOANS

Title IV of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1071 *et seq.* ("Title IV"), authorizes the federal student financial aid program. Under Title IV, the Department administers multiple federal student loan programs, including the Federal Family Education Loan Program ("FFEL program") and the William D. Ford Direct Student Loan Program ("Direct Loan program").

In order to participate in the Title IV student loan program, the HEA requires that all for-profit institutions, all postsecondary vocational institutions, and all non-degree programs at public or nonprofit institutions provide a "program of training to prepare students for gainful employment in a recognized occupation," unless certain other criteria are satisfied. 20 U.S.C. § 1002(b)(1)(A)(i); 20 U.S.C. § 1088(b)(1)(A)(i); 20 U.S.C. § 1002(c)(1)(A).

### II.   THE GAINFUL EMPLOYMENT RULE

On March 25, 2014, the Department issued a notice of proposed rulemaking that noted "growing concerns about educational programs that, as a condition of eligibility for [federal student loans], are required by statute to provide training that prepares students for gainful employment in a recognized occupation (GE programs), but instead are leaving students with

---

[1] The present case involves judicial review of agency action and is therefore governed by D.D.C. Local Civil Rule 7(h)(2). Accordingly, pursuant to D.D.C. Local Civil Rule 7(h)(1), this memorandum provides a statement of facts citing to the administrative record in its present form, and the Plaintiffs have not submitted a separate statement of material facts as to which there is no dispute.

unaffordable levels of loan debt in relation to their earnings, or leading to default." 79 Fed. Reg. 16,426.

Under the HEA, the Department must provide public notice and comment, as well as engage in a negotiated rulemaking process when issuing rules related to the federal student loan programs. 20 U.S.C. § 1098a(a)(1), (b)(1) (requiring the Department to "obtain public involvement in the development of proposed regulations" under Title IV and to "obtain the advice of and recommendations from individuals and representatives of the groups involved in student financial assistance programs."). If the negotiators reach consensus on a proposed rule, the Department must publish the proposed rule in the Federal Register for public comment. If no consensus is reached, the Department may draft a proposed rule and must publish it in the Federal Register for public comment.

When it previously considered making changes to the Gainful Employment Rule, consistent with the HEA, the Department held three negotiated rulemaking committee meetings on September 9-11, November 18-20, and December 13, 2013. 79 Fed. Reg. 16,426, 16,430. The constituencies represented in these meetings included: students, legal assistance organizations that represent students, financial aid administrators at postsecondary institutions, State higher education executive officers, State Attorneys General, two-year public institutions of higher education, four-year public institutions of higher education, private non-profit institutions of higher education, and private for-profit institutions of higher education, among others. *Id.* However, at the final meeting on December 13, 2013, the committee was not able to come to a consensus on the Department's proposed regulations. *Id*. at 16,431. Thereafter, on March 25, 2014, the Department published a Notice of Proposed Rulemaking ("NPRM") for gainful employment regulations. 79 Fed. Reg. 16,426. In response to the invitation for comments

included in that NPRM, the Department received approximately 95,000 comments on the

proposed regulations. Program Integrity: Gainful Employment, 79 Fed. Reg. 64,890, 64,892

(Oct. 31, 2014).

On October 31, 2014, the Department published the final Gainful Employment Rule in

the Federal Register. 79 Fed. Reg. 64,890 (Oct. 31, 2014). The Rule was intended to:

> address growing concerns about educational programs that, as a condition of
> eligibility for title IV, HEA program funds, are required by statute to provide
> training that prepares students for gainful employment in a recognized occupation
> (GE programs), but instead are leaving students with unaffordable levels of loan
> debt in relation to their earnings, or leading to default.

*Id*. The Department also expressed concern "about the growing evidence, from Federal and State

investigations and qui tam lawsuits, that many GE programs are engaging in aggressive and

deceptive marketing and recruiting practices." *Id*. To address these concerns, the Department

established reporting and disclosure requirements to "increase the quality and availability of

information about the outcomes of students enrolled in GE programs." *Id.* The Department noted

that these reporting and disclosure requirements would benefit:

> Students, prospective students, and their families, as they make critical decisions
> about their educational investments; the public, taxpayers, and the Government,
> by providing information that will enable better protection of the Federal
> investment in these programs; and institutions, by providing them with
> meaningful information that they can use to help improve student outcomes in
> their programs.

*Id*.

The Rule mandated disclosure of approximately sixteen items for each applicable

program, including: the total cost of the program, the average debt load, the student loan default

rate, and the average earnings of program graduates. 34 C.F.R. § 668.412 (2014). This

information must be provided on schools' websites, in schools' promotional materials, and

directly to prospective students before the students sign enrollment agreements, complete

registration, or make financial commitments to an institution. *Id.* The Rule also restricts access to federal student loan funding for those programs that repeatedly fail the "debt-to-earnings rates," which is a measure of the average debt load relative to the average earnings for program graduates. 34 C.F.R. §§ 668.403; 668.404; 668.410.

In order to ensure that it has accurate earnings information for program graduates, the Rule relies on data from the Social Security Administration. 34 § C.F.R. 668.404. The Rule also has a built-in mechanism for institutions to appeal the Department's earnings calculations and argue that the Social Security Administration's data did not fully reflect the earnings of program graduates. 34 §§ C.F.R. 668.405; 668.406.

Most provisions of the Rule became effective on July 1, 2015, giving institutions eight months to prepare after the announcement of the Rule on October 31 2014. 79 Fed. Reg. 64,890.

## III.   LITIGATION CHALLENGING THE GAINFUL EMPLOYMENT RULE

Despite lawsuits being filed in two different courts, including this Court, the Rule was upheld on three occasions. *Ass'n of Private Sector Colleges & Univs. v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015) (upholding the Department's ability to promulgate gainful employment regulations, the revised debt-to-earnings test, and the disclosure, reporting, and certification requirements of the Rule), *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016); *Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332 (S.D.N.Y. 2015) (finding that the GE Rule and the applicable debt to earnings rates contained in those Rules were a result of "reasoned decisionmaking").

More recently, on February 10, 2017, the American Association of Cosmetology Schools ("AACS"), a trade organization including mostly for-profit cosmetology schools, filed a lawsuit in this Court to enjoin the Department from enforcing the Rule against its member schools. *Am. Ass'n of Cosmetology Schs. v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017). AACS claimed that the debt-to-income calculation scheme was arbitrary and capricious as applied to its member schools

because Social Security Administration data undercounted the income of many of the graduates of its member schools who are self-employed or receive a significant amount of income in the form of tips but failed to report such income to the Internal Revenue Service. *See id*. Although the Rule provided a method for schools to appeal the graduate earnings numbers using surveys completed by schools' graduates, AACS claimed that the Rule required a response rate—50 percent for a state-sponsored data system and nearly 100 percent for school-specific surveys— that was arbitrary and capricious. *Id*. at 73-75.

On June 28, 2017, this Court ruled that one aspect of the appeal process set forth in the Rule—the required response rate of graduates for the surveys used by schools that were filing alternative earnings appeals due to alleged underreporting of tipped and self-employment income—was enacted in an arbitrary and capricious manner. *Id.* at 63, 74. This Court, however, rejected AACS's arguments that the entire debt-to-earnings calculation scheme was arbitrary and capricious and further denied AACS's claim that the Department acted arbitrarily and capriciously in rejecting the alternatives to the debt to earnings rates presented by AACS during the rulemaking process. *Id.* at 63-64.

In its ruling, this Court prohibited the Department from enforcing the "numerical survey requirements currently in effect for alternate earnings appeals *against AACS member schools*," which would "remove[] the arbitrary and capricious reasoning behind the otherwise-valid premise that alternate earnings appeals justify the presumptive use of SSA data." *Id.* at 76 (emphasis added). On two additional occasions in the Order, this Court made it clear that its remedy applied *only* to AACS member institutions, stating that "*AACS member institutions* need not secure any specific amount of survey responses or state-sponsored data to raise an appeal"

and that "*AACS member schools* will have broader, more feasible options to challenge their

[debt-to-earnings] rates before they become final." *Id.* at 77 (emphasis added).

## IV.    THE DEPARTMENT DELAYS IMPLEMENTATION OF THE GAINFUL EMPLOYMENT RULE.

On June 14, 2017, the Department and Secretary DeVos first announced that they were

seeking a "regulatory reset" of the Gainful Employment rule. *See* U.S. Department of Education,

Press Release, *Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers,*

*Higher Ed Institutions* (June 14, 2017) (attached hereto as Exhibit 4), *available* at

https://www.ed.gov/news/press-releases/secretary-devos-announces-regulatory-reset-protect-

students-taxpayers-higher-ed-institutions (last accessed December 26, 2017). Later that same

month, the Department and Secretary DeVos made clear that the purpose of the delays was to

facilitate the goal of a "regulatory reset" of the entire Gainful Employment Rule, falsely

representing that: "Since their creation under the previous administration, Gainful Employment

regulations have been repeatedly challenged by educational institutions and overturned by the

courts, underscoring the need for a regulatory reset." *See* U.S. Department of Education, Press

Release, *DeVos Presses Pause on Burdensome Gainful Employment Regulations* (June 30, 2017)

(attached hereto as Exhibit 5), *available at* https://www.ed.gov/news/press-releases/devos-

presses-pause-burdensome-gainful-employment-regulations (last accessed December 26, 2017).

On July 5, 2017, seven days after the *AACS* decision, the Department caused to be

published in the Federal Register an "announcement of applicable dates; request for comments."

("First Delay Notice"). 82 Fed. Reg. 30,975. The First Delay Notice extended the deadline for

institutions to comply with the disclosure requirements of the Rule for promotional materials and

for direct notifications to students about to enroll, as codified in 34 C.F.R. § 668.412(d) and (e),

until July 1, 2018, and extended indefinitely the deadline for all programs across the country to

file alternate earnings appeals. *Id.* at 30,976. The Department's stated rationale for delaying the

requirement for institutions to provide disclosures in marketing materials and to prospective students prior to enrollment was that the Department "believes that it should evaluate the utility of these disclosures to students and the implementation of this requirement." *Id*. The Department also explicitly stated that it expected "to further review these requirements as part of its review of the GE regulations and their implementation, including through negotiated rulemaking." *Id*. The Department's extension of the deadline to file alternate earnings appeals for all schools was "in light of the Court Order in *American Association of Cosmetology Schools v. DeVos*, Civil Action No. 17-0263, D.D.C. June 28, 2017 (Court Order)." *Id*. The Department conducted no negotiating committee hearings and received no comments from interested parties prior to publishing the First Delay Notice. *See, generally, id*. The Department invited comment only after the enactment of the First Delay Notice, which it claimed it would consider "in determining whether to take any future action in connection with the implementation of the disclosure requirements." *Id*. Furthermore, the Department did not address the effect of the delays in the First Delay Notice upon students. *See, generally* 82 Fed. Reg. 30,975.

Thereafter, on August 18, 2017, the Department caused to be published in the Federal Register another notice providing an "announcement of applicable dates; request for comments" ("Second Delay Notice"). 82 Fed. Reg. 39,362. The Second Delay Notice established "new deadlines for submitting notices of intent to file alternate earnings appeals and for submitting alternate earnings appeals" and announced "additional information that will be considered when evaluating alternate earnings appeals." *Id*. The deadlines established by the Second Delay Notice—October 6, 2017 to file a notice of intent to file an alternate earnings appeal and February 1, 2018 to file an alternate earnings appeal—apply to *all* programs affected by the Rule nationwide, not simply those at AACS member schools. *Id*. at 39,363. The Department stated in

the Second Delay Notice that the basis for applying the new deadlines to all programs at all schools affected by the Rule was that "the [AACS] Court noted concerns with the response threshold required for the graduate surveys used for all programs in the alternate earnings appeal." *Id*. The Department offered no further explanation why the response threshold was onerous for programs unrelated to those offered by AACS member schools and failed to provide any basis why the delays could not be limited just to AACS member schools, or similarly situated programs training students for employment where a significant amount of their income is in the form of tips. *See generally id*.

Furthermore, the Second Delay Notice provided that the Department would consider "all graduate surveys, regardless of response rate" in alternate earnings appeals. *Id*. The Department's explanation for this provision was that it "seeks to reduce the burden on institutions in conducting these appeals while still ensuring that institutions provide enough information for the Department to determine whether the program graduates for whom alternative earnings data are provided are a valid representation of the overall cohort." *Id*. The Department conducted no negotiating committee hearings and invited no public comment prior to publishing the Second Delay Notice. The Department only stated that it would consider public comments "in determining whether to take any future action in connection with the upcoming negotiated rulemaking." *Id*. As in the First Delay Notice, the Department did not address the effect of these changes on students in the Second Delay Notice. *See generally* 82 Fed. Reg. 39,362.

## V.   THE DEPARTMENT'S REFUSAL TO COMPLY WITH THE RULE'S REQUIREMENTS TO CALCULATE AND PUBLISH DEBT-TO-EARNINGS RATES

Among other crucial requirements, the Rule requires the Department, for each student loan award year, to determine the debt-to-earnings rate for each applicable program, which

involves "[c]reating a list of the students who completed the program during the cohort period and providing the list to the institution" and "[a]llowing the institution to correct the information about the students on the list." 34 C.F.R. §§ 668.405(a)(1); 668.405(a)(2). The Department sent the first of these "Draft GE Completers Lists" to institutions on June 1, 2016. *See Gainful Employment Electronic Announcement #78 – Draft GE Completers List Files* (May 31, 2016) (attached hereto as Exhibit 6); *Gainful Employment Electronic Announcement #79 – GE Completers List Viewer Tool and Import Tool Now Available* (June 1, 2016) (attached hereto as Exhibit 7). Pursuant to the Rule, the Department allowed institutions 45 days to "provide evidence showing that a student should be included on or removed from the list." 34 C.F.R. §§ 668.405(c)(2)(i). The information collected from the institutions was used in the Department's January 8, 2017 publication of debt-to-earnings rates for students who completed an applicable program during the 2014-2015 financial aid award year. *See Gainful Employment Electronic Announcement #100 – Upcoming Release of Final Gainful Employment Debt-to-Earnings (D/E) Rates* (Jan. 6, 2017) (attached hereto as Exhibit 8).

Although the Department is still required by the Rule to create and publicize debt-to-earnings rates for subsequent financial aid award years, the Department has refused to send Draft GE Completers Lists to institutions, and, thereby, in effect, refused to calculate debt-to-earnings rates for programs. In August of 2017, United States Senator Richard Durbin asked the Department if it had "provided the draft completers lists to schools for 2017" and, if not, when it "expect[ed] to do so." *See* Dep't of Ed.'s Response to Sen. Durbin Questions: "Gainful Employment Delay and Implementation" (Aug. 3, 2017) (attached hereto as Exhibit 9). In response, the Department stated that it had not "provided the draft completers lists" and further stated that it does not "currently have any timetable to send completers lists to schools for 2017."

*Id.* at 3. This failure, which continues to date, ensures that the Department will not be able to publish debt-to-earnings rates for the 2015-2016 financial aid award year, despite the requirements of the Rule.

## LEGAL STANDARD

A movant is entitled to summary judgment when the pleadings and the record demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under the Federal Rules of Civil Procedure, a party may move for summary judgment "at any time until 30 days after the close of discovery." Fed. R. Civ. P. 56(b). The D.D.C. Local Civil Rules require only that a dispositive motion in a civil action "be filed sufficiently in advance of the pretrial conference that it may be fully briefed and ruled on before the conference." D.D.C. Local Civ. R. 7(l).

Under the APA, a reviewing court must set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The reviewing court must also hold unlawful and set aside an agency action undertaken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(C), (D). An agency action may only be upheld "on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)

. The reviewing court will not uphold a challenged rule where the justification offered by the agency in court differs from the justification provided in the challenged rule. *Morgan Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish Cnty.*, 554 U.S. 527, 544 (2008).

## ARGUMENT

The Department's delay of the Gainful Employment Rule, which operated as a rescission of the Rule, is arbitrary, capricious, not in accordance with law, in excess of statutory authority,

and was undertaken without observance of procedures required by law. The Department's refusal to enforce the Gainful Employment Rule is also an unlawful withholding or unreasonable delay of agency action. First, the Department's delay of the Gainful Employment Rule and refusal to enforce the Rule violated the procedural requirements of the APA, which requires agencies engaging in substantive rulemaking to provide the public with notice and an opportunity to comment, and the HEA, which requires the Department to undertake a negotiated rulemaking process before issuing rules related to Title IV programs. These requirements apply to the Department's Delay Notices, which are substantive rules that affect the rights and obligations of student borrowers and schools and effectively operate as a rescission of the Gainful Employment Rule as part of the Department's "regulatory reset." The Department's failure to undertake negotiated rulemaking and provide an opportunity for notice and comment violates the APA. 5 U.S.C. § 706(2)(D).

Second, the cursory Delay Notices fail to provide any adequate explanation for delaying the Gainful Employment Rule. They fail to contain a reasoned analysis justifying the Department's change of course regarding the Rule, contrary to the requirement that an agency must "examine the relevant data and articulate a satisfactory explanation" for its action. *State Farm*, 463 U.S. at 43. Where an agency is reversing course and rescinding a rule, the explanation provided by the agency must include a reasoned analysis for its change of position. *Id.* The Department's failure to articulate a satisfactory explanation and to provide a reasoned analysis for its reversal of position regarding the Gainful Employment Rule also violates the APA. 5 U.S.C. § 706(2)(A), (C).

Third, the Department's failure to carry out its obligation to provide the Draft GE Completers Lists to institutions that will allow it to publish debt-to-earnings rates for the

13

previous award year is an unlawful withholding of action and/or an unreasonable delay of action, for which the Department has no legal authority or basis. The Department's unlawful withholding or failure to comply with statutorily required measures also violates the APA. 5 U.S.C. § 706(1).

The Department's failure to satisfy the requirements of the APA renders the Delay Notices and the Department's failure to publish debt-to-earnings rates is unlawful. Therefore, the Delay Notices must be set aside and the Department must be ordered to enforce the Gainful Employment Rule in its entirety.

I.  **THE DEPARTMENT VIOLATED THE APA BY UNDERTAKING SUBSTANTIVE RULEMAKING WITHOUT OBSERVING PROCEDURES REQUIRED BY LAW**

The APA requires federal agencies engaging in rulemaking to provide the public with notice and an opportunity to comment. *See* 5 U.S.C. § 553. And it is well-settled that "an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked." *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992). Moreover, an agency "may not alter" such a rule "without notice and comment." *Id.* Here, both Delay Notices substantively modified the Rule and therefore were subject to the APA's notice and comment requirements. Yet the Department did not follow the APA's notice-and-comment procedures with respect to either Delay Notice, and its failure is not justified under any of the exceptions to notice and comment rulemaking in the APA. As a result, both Delay Notices were issued "without observance of procedure required by law" and should be "h[e]ld unlawful and set aside." *See id.* § 706(2)(E).

A.  **The Department's Delay of the Gainful Employment Rule Constitutes Substantive Rulemaking**

Both Delay Notices are substantive rules under the APA. The APA defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect

designed to implement, interpret, or prescribe law or policy," and it defines "rulemaking" as the "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(4) & (5). The Delay Notices are agency statements of general applicability that, by design, alter the rights and obligations of regulated parties and students, and operate as a repeal of important provisions of the Gainful Employment Rule.

Delaying critical aspects of a final rule constitutes substantive rulemaking. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (holding that the EPA's stay of four aspects of a rule on performance standards was "essentially an order delaying the rule's effective date … tantamount to amending or revoking a rule"); *Envtl. Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802, 813 (D.C. Cir. 1983) (finding the suspension of regulations as to a class of regulated facilities should be reviewed by the court as "the promulgation of a regulation"); *Envtl. Defense Fund, Inc. v. E.P.A.*, 716 F.2d 915, 920 (D.C. Cir. 1983) (holding the delayed implementation of certain reporting requirements were, on their face, substantive rulemaking subject to the notice and comment period). This principle flows logically from the fact that the effective date "is an essential part of any rule" because "without an effective date a rule would be a nullity because it would never require adherence." *Nat'l Res. Def. Council v. U.S. E.P.A.*, 683 F.2d 752, 762 (3rd Cir. 1982).

The Delay Notices at issue here fundamentally change portions of the Gainful Employment Rule in three critical respects. First, the First Delay Notice extended the deadline until July 1, 2018 for institutions to comply with the Rule's requirement that they disclose gainful employment information in promotional materials directly to students, eighteen months after the requirement's original effective date. *See* 34 C.F.R. § 668.412(h) ("Institutions must comply with the requirements of this section beginning January 1, 2017."). Second, the Second

Delay Notice extended the deadline for schools to file alternate earnings appeals until February 1, 2018, nearly one year after the original deadline. *See* 82 Fed. Reg. at 39,363. And, third, the Second Delay Notice wrote out of the Rule several requirements related to alternate earnings appeals, such as the response rate required by alternate earnings surveys used by schools. *See* 82 Fed. Reg. at 39,363 (stating that the Department "will not enforce" certain provisions of the existing Rule relating to earnings appeals).

These changes effectively gut the Rule. As a result of the First Delay Notice, institutions currently have no obligation to ensure that prospective students receive information about the debt load and earnings of their graduates, and these institutions similarly have no obligation to include this information in their promotional materials. *See* 34 CFR § 668.412(d) ("Promotional materials") & (e) ("Direct distribution to prospective students"). Rather, the only disclosure obligation currently in effect is the requirement that schools provide such information on their web pages, thus decreasing the likelihood that students will be aware of this important information. *See id.* § 668.412(c) ("Program Web pages"). And by delaying the earnings appeal deadlines, the Second Delay Notice allowed additional institutions to avoid the Rule's requirement to provide warning notices to current and prospective students by simply filing a notice of *intent* to file an appeal. Finally, by refusing to enforce certain requirements relating to earnings appeals, the Department has given *all* programs the benefit of the *AACS* ruling, even though that decision was expressly limited to AACS member schools, and its reasoning does not apply to many programs whose graduates do not derive substantial income from tips. *See Am. Ass'n of Cosmetology Schs.*, 258 F. Supp. 3d at 76 (ordering that the Department "may not enforce the numerical survey requirements currently in effect for alternative earnings appeals against AACS member schools"). The net result is that all programs that elect to appeal are

16

entitled to fully discretionary, case-by-case review—thus allowing the Department complete

leeway to further undercut the Rule. *See id, see also* 82 Fed. Reg. at 39,363.

The Delay Notices were issued against the backdrop of the announced "regulatory reset."

In fact, the new Gainful Employment rulemaking proceedings have recently commenced. Thus,

in addition to affecting the rights and obligations of students and schools, the Delay Notices

facilitate the Department's intended replacement of the Rule. In its June 14, 2017 "Regulatory

Reset" announcement, the Department stated:

> [a]s part of the Department's regulatory review of its regulations, the agency will
> also convene a second negotiated rulemaking committee on Gainful Employment.
> As the Department worked on implementing this regulation, it became clear that,
> as written, it is overly burdensome and confusing for institutions of higher
> education.

Exh. 4 (June 14, 2017, Press Release).

The Department's announcement demonstrates that the Delay Notices at issue are part of

the Department's stated plan to replace the existing the Rule. *See, e.g., Nat'l Venture Capital

Ass'n v. Duke*, No. 17-1912, 2017 WL 5990122, at *6 (D.D.C. Dec. 1, 2017) (vacating a delay

rule that was used to "bridge the gap" until full recession, thus effectively eliminating the

benefits of the underlying rule, when the agency delayed the effective date of a duly promulgated

rule by eight months without notice and comment and when the agency had indicated that it was

"highly likely" the existing rule would be rescinded).

The Delay Notices have an impact on the regulated industry, affect the rights and

obligations of the parties involved, and function as a rescission of portions of the Gainful

Employment Rule pending the Department's new negotiated rulemaking. As a result, the Delay

Notices constitute substantive rulemaking.

**B.**     **The Delay Notices Violate the APA Because the Department Did Not Provide for Notice and Comment or Negotiated Rulemaking**

Because the Delay Notices constitute substantive rulemaking, the notices were subject to the APA's notice and comment requirements. The APA provides that notice of a proposed rulemaking "shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law." 5 U.S.C. § 553(b). An agency is required to "give interested persons an opportunity to participate in the [rulemaking] through submission of written data, views, or arguments . . . " *Id.* at § 553(c). In addition, the HEA requires the Department to undertake a negotiated rulemaking process involving participants representing a wide range of groups when making rules affecting federal student loan programs. 20 U.S.C. § 1098a(b). Despite these requirements – with which the Department complied in *promulgating* the Rule in 2014 – the Department issued the Delay Notices without providing an opportunity for notice and comment and without undertaking negotiated rulemaking.

There are two exceptions to the notice and comment requirements. 5 U.S.C. § 553(b)(3)(A), (B). The first deals with "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). The second exception allows an agency to forgo notice and comment "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). The good cause exception also expressly applies to the HEA's negotiated rulemaking requirement. 20 U.S.C. § 1098a(b)(2).

Neither exception applies here, nor has the Department invoked or set forth a basis to invoke either exception in the Delay Notices. The Delay Notices, on their face, are not

interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice. The Delay Notices do not contain a statement of good cause explaining why "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," as required to invoke the good cause exception. 5 U.S.C. § 553(b)(3)(B). "Congress expected, and the courts have held, that the various exceptions to the notice-and-comment provisions of section 553 will be narrowly construed and only reluctantly countenanced." *State of N.J., Dept. of Envtl. Prot. v. E.P.A.*, 626 F.2d 1038, 1046 (D.C. Cir. 1980). "Scrutiny of a claimed exemption should be exacting where an agency seeks . . . to 'undo all it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of repeal.'" *Gorsuch*, 713 F.2d at 816-17. In determining whether an agency action falls into one of the exceptions, "[i]t is the substance of what the [agency] has purported to do and has done which is decisive." *Id*. at 816.

The Delay Notices do not fall within the interpretative rule exception because this courts have consistently held that delaying implementation of aspects of a rule are substantive rules affecting the rights or obligations of the regulated industry and the public. *See Nat'l Venture Capital Ass'n*, 2017 WL 5990122, at *7 (noting that the APA's notice and comment requirements apply with no less force when the agency seeks to delay or repeal a valid final rule); *Clean Air Council*, 862 F.3d at 6-7 (holding that two-year stay of portions of regulations was "tantamount to amending or revoking a rule" because the stay temporarily relieved the regulated entities of their obligations to submit monitoring surveys and repair leaks, and eliminated the threat of civil penalties, citizens' suits, fines and imprisonment if they did not comply); *Gorsuch*, 713 F.2d at 817-18 (finding that postponement of a permit process as to an entire class of facilities was "in substance the promulgation of a regulation" because it resulted in

19

the "exemption of a whole class from the prescribed obligations required by law for the protection of the public"). As discussed in Section IV.A.1 above, the Delay Notices at issue in this case altered the rights and obligations of all regulated schools and the public. Accordingly, the Delay Notices were substantive—not interpretative—rules subject to the APA's notice and comment requirements. *See Clean Air Council*, 862 F.3d at 6-7; *Gorsuch*, 713 F.2d at 817-18.

Furthermore, the Delay Notices do not fall within the good cause exception to the notice and comment requirement. The Department's failure to invoke and explain any alleged "good cause" is dispositive. But in any event, to the extent that the Department is relying on its perceived need for a "regulatory reset" and/or the *AACS* Court Order as its "good cause" for avoiding the notice and comment period, these rationales do not and cannot provide a basis that notice and comment are impracticable, unnecessary, or contrary to the public interest. This Court has made clear "[t]hose exceptions [to the notice and comment requirements] are not escape clauses that may be arbitrarily utilized at the agency's whim; they are desperate measures whose use should be limited to emergency situations." *N. Mariana Islands v. U.S.*, 686 F. Supp. 2d 7, 14 (D.D.C. 2009) (*citing Petry v. Block*, 737 F.2d 1193, 1200 (D.C. Cir. 1984)) (internal quotation marks omitted). Courts must consider "the entire set of circumstances surrounding the agency's rulemaking," including any deadlines for rulemaking, the agency's diligence, obstacle's outside of the agency's control, and any public harm that could result. *Id*. at 14-15. *See, e.g., Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580-82 (D.C. Cir. 1981) (finding "good cause" to issue a six-month delay of implementation of new coal-mining regulations set to go into effect approximately two weeks before agency announced the delay when necessary testing was not yet complete due to factors beyond the agency's control and despite the agency's due diligence); *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1157-59 (D.C. Cir.

1981) (finding good cause to dispense with notice-and-comment period because the absence of immediate new inspection standards would have likely resulted in consumer harm). Furthermore, the need for legal certainty does not constitute good cause for dispensing with the notice and comment requirement, because all regulations resolve uncertainty. *See U.S. v. Cotton*, 760 F. Supp. 2d 116, 128 (D.D.C. 2011). Also, an agency cannot rely on concern for preserving its own resources as "good cause" to avoid the notice and comment requirement—even if the agency anticipates it will ultimately rescind a rule promulgated under a previous presidential administration. *See Nat'l Venture Capital Ass'n*, 2017 WL 5990122, at *10 (noting that although "[e]lections have consequences …the [APA] shapes the contours of those consequences"; therefore, the Department of Homeland Security did not have good cause to delay implementation of an Obama-era immigration rule simply because the Department thought it highly likely it would ultimately rescind the rule).

Although the D.C. Circuit has previously held that an agency had good cause to dispense with the notice and comment period when seeking to comply with a court order, the facts of the case so holding are inapposite to the case at hand because the Delay Notices are not necessary to comply with the *A.A.C.S.* court's order, which was explicitly limited to A.A.C.S. member schools. In *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1157-59 (D.C. Cir. 1981), the D.C. Circuit held that the promulgation of temporary regulations without a notice and comment period was necessary when a court order held that the regulations then in place were completely null and void. Because the court order in that case caused "an unusual emergency situation" that threatened imminent harm to the economy and consumers, the Court found immediate agency action was necessary. *See Am. Fed'n of Gov't Emp.*, *AFL-CIO*, 655 F.2d at 1157-59. But unlike the order in *Am. Fed'n of Gov't Emp., AFL-CIO*, the *AACS* Court Order

21

affected a limited component of the Rule (the alternate earnings appeals process) for a limited

subset of the regulated industry (AACS member schools). Moreover, the *AACS* Court explicitly

stated its intention that the order "avoid upending the entire GE regulatory scheme." *Am. Ass'n*

*of Cosmetology Schs*, 258 F. Supp. 3d at 76. This clearly stated intention of the *AACS* Court

belies any claim that legal challenges to the rule give rise to "good cause" to dispense with

negotiated rulemaking and the notice-and-comment process.

The Delay Notices constitute substantive rules, which affects the rights and obligations of

all schools regulated by the Gainful Employment Rule and students entering those schools. The

*AACS* Court Order did not create an emergency situation as to the disclosure requirement or the

alternate appeals process with respect to all schools that would constitute "good cause" under the

strictly interpreted good cause exception. Yet in issuing the Delay Notices, the Department did

not comply with the APA's notice and comment requirements or the HEA's negotiated

rulemaking procedures. Accordingly, the Delay Notices should be held unlawful and set aside

because they were issued without observance of procedure required by law. 5 U.S.C.

§ 706(2)(D).

**II.    THE DEPARTMENT VIOLATED THE APA BY FAILING TO PROVIDE AN ADEQUATE
EXPLANATION FOR ITS DELAY OF VARIOUS ASPECTS OF THE GAINFUL EMPLOYMENT
RULE, INCLUDING A REASONED ANALYSIS FOR ITS   CHANGE OF POSITION**

In addition to violating the APA's requirement to provide notice and a comment period,

the Delay Notices at issue fail to sufficiently set forth factual findings and a reasoned analysis

supporting the Department's decision to alter and/or forestall certain provisions of the Gainful

Employment Rule. Further, the Notices wholly fail to address the costs and benefits of delaying

the disclosure and alternative earnings appeal deadlines in the Rule and fail to address a more

limited agency action such as a delay limited only to schools with traditionally underreported

income. As such, the Delay Notices are arbitrary and capricious, in violation of the 5 U.S.C.

§ 706(2)(A).

An agency acts arbitrarily or capriciously if it has relied on factors Congress did not

intend it to consider, entirely failed to consider an important aspect of a problem, or offered an

explanation either contrary to the evidence before the agency or so implausible as not to reflect

either a difference in view or agency expertise. *State Farm*, 463 U.S. at 43. Further, when

promulgating a rule, an agency "must examine the relevant data and articulate a satisfactory

explanation for its action including a 'rational connection between the facts found and the choice

made.'" *Id*. ("The agency must make findings that support its decision, and those findings must

be supported by substantial evidence." (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156,

168 (1962)). To satisfy the APA, an agency reversing or departing from a previous policy or

rescinding a rule "is obligated to supply a reasoned analysis for the change." *State Farm*, 463

U.S. at 42.

With regard to the First Delay Notice's extension allowing schools additional time to

comply with requirements to disclose certain information in program promotional materials and

directly to prospective students, the Department's only offered justification is a statement that it

"believes that it should evaluate the utility of these disclosures to students and the

implementation of this requirement." 82 Fed. Reg. at 30,975. The First Delay Notice contains no

further explanation beyond this vague statement, fails to identify what it specifically seeks to

evaluate about the disclosures' utility, and, most importantly, fails to provide any findings of the

evaluation of the disclosure's utility that would provide a basis for the delay.[2] The determination

---

[2] The Department previously evaluated the disclosures' utility, and concluded after notice-and-comment rulemaking that "[t]he disclosure requirements will help ensure students, prospective students, and their families, the public, taxpayers, and the Government, and institutions have access to meaningful and comparable information about student outcomes and the overall performance of GE programs." 79 Fed. Reg. at 64891 (Oct. 31, 2014). It also

to delay these disclosures is clearly contrary to the requirements of *State Farm*, as it fails to identify supporting facts and contains no articulation of the Department's rationale. Unfortunately, the consequences of the Department's delay decision will result, at least for the time being, in prospective students not receiving vital information regarding program outcomes either through school promotional materials or directly from the school in advance of making a financial commitment. *See* 34 C.F.R. § 668.412(d), (e). Such important considerations need, at the very least, to be addressed by the Department, yet it entirely failed to do so.

With regard to the Department's decisions to set new alternate earnings appeal deadlines and to not enforce certain alternate earnings appeal provisions related to graduate surveys or state sponsored data systems, both the First and Second Delay Notices lean heavily on the *AACS* opinion for justification. The First Delay Notice, in announcing the general extension of the deadline for filing alternate earnings appeals for *all* programs, states, without further explanation, the Department's decision was made "in light of the Court Order in *American Association of Cosmetology Schools v. DeVos*, No. 17-0263 D.D.C. June 28, 2017 (Court Order)." 82 Fed. Reg. at 30,975-76. Likewise, in the Second Delay Notice, the Department, while specifically acknowledging that the *AACS* Court Order only applies to members of the American Association of Cosmetology Schools, nevertheless, states it is applying the new deadlines to *all* programs subject to GE regulations because "…the Court noted concerns with the response threshold required for the graduate surveys used for all programs in the alternate earnings appeal under 34 CFR § 668.406…" 82 Fed. Reg. at 39,363. Finally, the Second Delay Notice prefaces the Department's decision not to enforce certain provisions related to graduate surveys and State-

---

found that "[a]s a result of the disclosure requirements, . . . students and prospective students will have access to more and better information about GE programs so that they can choose a program more likely to lead to successful employment outcomes." *Id.* at 64933.

sponsored data systems by indicating it is doing so "[t]o further comply with the [AACS] Court Order…" 82 Fed. Reg. at 39,363.

For both Delay Notices, the Department's reliance on the *AACS* ruling to justify the revision of the alternate earnings appeal structure for *all* programs is specious. First, the *AACS* Court specifically expressed that it intended to avoid "upending the entire GE regulatory scheme" by limiting its ruling to schools that are members of the American Association of Cosmetology Schools, negating any argument in favor of delaying the deadline for *all* schools. *Am. Ass'n of Cosmetology Schls.*, 258 F. Supp. 3d at 76 (stating that its prohibition against Department enforcement of numerical survey requirements applies *only* to AACS member schools). Further, the *AACS* opinion did not find fault with respect to the regulation's impact on *reported* income. *Id.* at 73 ("The Court has no reason to believe that SSA data is anything but precise with respect to reported earnings, and AACS does not challenge the regulations on the grounds that SSA data is in any way flawed with respect to reported income."). Finally, the Court, after identifying concerns about the underreporting of income in certain industries, was clear that its determination was limited in scope due to the underreporting issue. *Id.* at 76 ("[G]iven that the DOE acted arbitrarily and capriciously with respect to *the problem of underreporting*, the Court now must fashion a remedy."(emphasis added)).

Thus, despite the limited nature of the *AACS* ruling, the Department's Delay Notices seek to use it as a pretext to delay and modify the entire alternate earning appeal process. Again, this effort fails in the face of the required articulation of a connection between the facts and the Department's decision. *See State Farm*, 463 U.S. at 42. The limited scope of the *AACS* Court Order did not necessitate an emergency re-write of the entire regulatory scheme, which might justify rulemaking absent a notice and comment period. *Cf. Am. Fed'n of Gov't Emp., AFL-CIO*,

655 F.2d at 1154 (agency could forego notice and comment period when court order nullifying current regulations created an "unusual emergency situation" requiring the immediate promulgation of new interim standards). Indeed, the Department failed to issue or address whether it even considered a more limited change, such as limiting the elimination of numerical survey requirements to only AACS schools or programs with traditionally underreported income, much like cosmetology. The Department should have considered these options. *See State Farm*, 463 U.S. at 48 (wherein the Court required an agency to consider amending a car-safety regulation to keep one of the two required safety measures in place instead of rescinding the whole rule and stated that an "alternative way of achieving the objectives of the Act should have been addressed and adequate reasons given for its abandonment."). And indeed, the notice-and-comment procedure would have supplied it with the evidence necessary to do so. Since other fields do not have the same incidence of underreporting, it was arbitrary and capricious for the Department not to consider and discuss constructing a more limited change. Instead, without reference to any Department findings, the Department decided to improperly forge ahead with a delay and structural rewrite impacting *all* programs, even those untethered from the *AACS* court's decision and reasoning.

As its justification for further modifying the alternative earnings appeals aspect of hte Rule, the Second Delay Notice broadly references an intent to "reduce the burden on institutions …while still ensuring that institutions provide enough information to the Department to determine whether the program graduates for whom alternate earnings data are provided are a valid representation of the overall cohort." 82 Fed. Reg. at 39,363. The referenced "burden" and the manner in which the modifications will "ensure" that adequate information is provided are not supported by any data and there is no discussion of how the Department came to its

conclusions. Standing alone, the Department's mere identification of a problem and imposition

of a solution without any analysis of the supporting data upon which it relied make its

modifications arbitrary and capricious. *See State Farm*, 463 U.S. at 43. *See also Burlington

Truck Lines, Inc.*, 371 U.S. at 168; *Resolute Forest Prod., Inc. v. U.S. Dep't of Agric.*, 187 F.

Supp. 3d 100, 123 (D.D.C. 2016) ("[W]here an agency has relied on incorrect or inaccurate data

or has not made a reasonable effort to ensure that appropriate data was relied upon, its decision is

arbitrary and capricious and should be overturned."). Further, the Department assumes a

"burden" that will be cured by its rewrite of the earnings appeals process but does not explicitly

explain the nature of the assumed burden. *See Am. Ass'n of Cosmetology Schls.*, 258 F. Supp. 3d

at 72 (an agency must explicitly explain and justify the non-obvious assumptions essential to its

actions) (*quoting Am. Mar. Ass'n v. U.S.*, 766 F.2d 545, 566 n.30 (D.C. Cir. 1985)).

Finally, the Department's Delay Notices are devoid of any analysis or discussion of

resulting costs and benefits. A reasoned analysis considers both the "advantages and

disadvantages"—the costs and benefits of agency action. *Michigan v. E.P.A.*, 135 S. Ct. 2699,

2707 (2015) ("Reasonable regulation ordinarily requires paying attention to the advantages *and*

the disadvantages of agency decisions." (emphasis in original)). *See also State Farm*, 463 U.S. at

43, 54 ("Normally, an agency rule would be arbitrary and capricious if the agency…entirely

failed to consider an important aspect of the problem).

In contrast, the Gainful Employment Rule contains just such an analysis. *See* 79 Fed.

Reg. 64,890,65,078-81. For example, the Final Regulations list significant benefits, including:

the availability of improved market information to the public, improvement in the quality of

programs, reductions in costs and student debt, increased earnings, the elimination of poor

performing programs, and a better return on educational investment for students, prospective

students, and their families, as well as for taxpayers. *Id.* Notably, the Final Regulations estimate Federal taxpayer funds will be allocated more efficiently to higher-performing programs, where students are more likely to graduate with manageable amounts of debt, gain stable employment and repay their loans, which will lower the cost of loans subsidized by the Federal Government. *Id*. at 65,080. The Delay Notices fail to address any consideration of their effects on these critical issues, specifically the elimination of the Rule's benefits to students and taxpayers—two of the primary beneficiaries of the Rule. As such, the Delay Notices are arbitrary and capricious. *Michigan*, 135 S. Ct. at 2707.

As set forth above, the Department's Delay Notices are not in accord with the requirement that an agency must examine the relevant data and articulate a satisfactory explanation for its actions, including a rational connection between the facts found and the choices made. *See State Farm*, 463 U.S. at 43. The Department failed to make any independent findings in support of the Notices, ignored any discussion of the costs and benefits of its determinations, and instead, with regard to the alternate earnings appeal process, improperly relied on a narrow court determination to justify an end-run around these legal requirements. The Delay Notices are therefore arbitrary, capricious, not in accordance with law, and in excess of the Department's statutory authority. 5 U.S.C. § 706(2)(A), (C).

## III.    THE DEPARTMENT IS UNLAWFULLY WITHHOLDING OR UNREASONABLY DELAYING REQUIRED ACTION IN VIOLATION OF 5 U.S.C. § 706(1)

In addition to the Delay Notices, the Department has violated the APA by unlawfully refusing to perform or unreasonably delaying the calculation of the debt-to-earnings rates, the accountability metric that the Department is required to calculate pursuant to the Gainful Employment Rule. The APA provides relief for a failure to act in § 706(1): "The reviewing court shall ... compel agency action unlawfully withheld or unreasonably delayed." Under 5 U.S.C.

§ 706(1) of the APA, a court may order an agency to perform a "discrete agency action" that the agency "is required to take," "which includes, of course, agency regulations that have the force of law." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 n.1 (2004).

To meet its burden on a claim for unreasonable delay, a plaintiff need only show that the agency has a duty to take a specific action and that the agency's delay in taking that action is unreasonable. *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004). To show unlawful withholding of an agency's action, a plaintiff must demonstrate that the agency has violated its statutory mandate by failing to act. *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).

**A.**   **The Department's Duty to Send Draft GE Completers Lists to Institutions to use in the Calculation of Debt-to-Earnings Rates is a Mandatory Non-Discretionary Agency Action.**

The Gainful Employment Rule requires the Department to determine, "[f]or each award year," the debt-to-earnings rates for all applicable programs at all applicable institutions. 34 C.F.R. § 668.405(a). This is not a discretionary task that the Department may disregard at its whim. Instead, calculating debt-to-earnings rates to determine whether institutions are complying with the requirement in the Higher Education Act that applicable institutions provide a "program of training to prepare students for gainful employment in a recognized occupation" is the entire and specific purpose for which the Rule was created and is a specific, unequivocal command. *See Ass'n of Private Sector Colleges & Univs. v. Duncan*, 110 F. Supp. 3d 176, 190–92 (D.D.C. 2015), aff'd, 640 F. App'x 5 (D.C. Cir. 2016); 20 U.S.C. § 1002(b)(1)(A)(i); 20 U.S.C. § 1088(b)(1)(A)(i); 20 U.S.C. § 1002(c)(1)(A).

To carry out its duty to calculate debt-to-earnings rates, the Gainful Employment Rule provides a series of specific tasks that the Department must perform, the first of which is, for

each applicable program, "[c]reating a list of the students who completed the program during the cohort period and providing the list to the institution." 34 C.F.R. § 668.405(a)(1). The creation of the Draft GE Completers Lists is necessary to allow "the institution to correct the information about the students on the list" within 45 days and ensure that the Department accurately calculates the debt-to-earnings of all graduates of applicable institutions' programs. 34 C.F.R. §§ 668.405(a)(2); (c)(2). These mandatory obligations effectuate Congress's instruction that "the Secretary shall prepare and disseminate to ... institutions information concerning applicable programs" and "collect data and information on applicable programs for the purpose of obtaining objective measurements of the effectiveness of such programs in achieving the intended purposes of such programs." 20 U.S.C. § 1231a; *see Ass'n of Private Sector Colleges & Universities*, 110 F. Supp. 3d at 201 (explaining that the Gainful Employment Rule's reporting "requirements supply the data necessary to feed the debt-to-earnings metrics, which are "'objective measurements of the effectiveness of ['gainful employment'] programs'") (quoting 20 U.S.C. §1231a; brackets in original).

The United States Court of Appeals for the District of Columbia confronted the question of whether an agency action amounting to a "clear, ministerial duty" that was non-discretionary could be enforced by a court, pursuant to the APA, in *Cobell v. Norton*, 240 F.3d 1081, 1107-08 (D.C. Cir. 2001). In that case, the Court affirmed a decision of this Court finding that the Department of the Interior acted unreasonably in its delay in discharging its fiduciary duties related to trust accounts of beneficiaries of "Individual Indian Money." *Id.* at 1095. Although the Department of the Interior argued that injunctive relief could not be granted given the lack of a clear ministerial duty, the Court held that the Department had "specific intermediate statutory duties, short of but necessarily leading up to the ultimate duty to render an accurate accounting"

which created "rights in favor of plaintiffs." *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 36 (D.D.C. 1999), *aff'd and remanded sub nom. Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001). Here, the Department has a clear ministerial duty to carry out the necessary steps that will ultimately allow it to evaluate the extent to which programs prepare participants for gainful employment. *See, e.g.* 34 C.F.R. § 668.405(a) (listing seven steps that the Secretary takes to determine the debt-to-earnings rates, including "[c]reating a list of the students who completed the program during the cohort period and providing the list to the institution, as provided in paragraph (b) of this section.").

The Department has fulfilled its ministerial list-creating duties in the past, to the benefit of students and taxpayers. On June 1, 2016, pursuant to and in recognition of its non-discretionary duty under the Rule, the Department sent Draft GE Completers Lists to applicable institutions and allowed the institutions 45 days to, among other things, "provide evidence showing that a student should be included on or removed from the list." *See* Exh. 6 (Gainful Employment Electronic Announcement #78); Exh. 7 (Gainful Employment Electronic Announcement #79); 34 C.F.R. §§ 668.405(c)(2)(i). After providing the Draft GE Completers Lists and allowing for timely corrections from the institutions, on January 8, 2017, pursuant to and in recognition of its non-discretionary duty under the Rule, the Department issued debt-to-earnings rates related to students who completed applicable programs during the 2014-2015 award year. Exh. 8 (Gainful Employment Electronic Announcement #100). Like the Department of the Interior in *Cobell*, the Department in this case has a specific series of intermediary duties that lead up to the ultimate duty to calculate debt-to-earnings rates. As such, the Department's duty to issue the Draft GE Completers Lists to schools is a non-discretionary, specific intermediate statutory duty.

**B.     The Department's Failure to Send Draft GE Completers Lists to Institutions to use in the Calculation of Debt-to-Earnings Rates is Unreasonable and Violates its Statutory Mandate.**

The Department's delay in sending Draft GE Completers Lists is unreasonable. There is no dispute that the Department failed to send Draft GE Completers Lists for students who completed applicable programs during the 2015-2016 award year to applicable institutions in June of 2017, nor has it done so to date. In August of 2017, United States Senator Richard Durbin asked the Department if it had "provided the draft completers lists to schools for 2017" and, if not, when it "expect[ed] to do so." Exh. 9 (Department's Response to Sen. Durbin Questions). In response, the Department stated that it had not "provided the draft completers lists" and further stated that it does not "currently have any timetable to send completers lists to schools for 2017." *Id.* at 3. In 2016, the Department created a timeline[3] for which it would complete the required duties of calculating debt-to-earnings rates, which involved sending Draft GE Completers Lists in June, approximately seven months before publicizing the debt-to-earnings rates. Based upon the Department's established timeline, the Department has delayed sending Draft GE Completers Lists to institutions, thereby also delaying the 45-day period provided to institutions to correct the lists and, most importantly, delaying indefinitely the calculation of debt-to-earnings rates for the 2015-2016 financial aid award year. This failure to begin the process of calculating debt-to-earnings rates makes it impossible for the Department to calculate and publicize debt-to-earnings rates for the 2015-2016 financial aid award year, as

---

[3] The Rule requires the Department to create a Draft GE Completers List, 34 C.F.R. § 668.405(b), and builds in a 45-day period after the Department sends institutions its draft list for the institutions to make corrections. 34 C.F.R. § 668.405(c)(2). After receiving and evaluating any corrections from the institutions, the Department submits the list to the Social Security Administration, which must analyze it and match income data. 34 C.F.R. § 668.405(d). The Department must then analyze the SSA data and calculates the debt-to-earnings rate. 34 C.F.R. § 668.405(e). Each of these required steps takes time, and so for the previous year the Department prudently started the process in June 2016 in order to publish the debt-to-earnings rate by January 2017.

required by the Rule, by January of 2018. Publication of debt-to-earnings rates in January is important, because to serve the purpose as explained in the Final GE Rule, this information must be available to students, prospective students, and their families as they are making decisions about what schools to visit, apply to, and enroll in. 79 Fed. Reg. at 64891 (Oct. 31, 2014). For many prospective students, that means winter and early spring.

Applying the *Cobell* Court's analysis of agency delay, the Court should consider the following four factors in reviewing whether the delay of sending Draft GE Completers Lists is unreasonable:

> First, "the court should ascertain the length of time that has elapsed since the agency came under a duty to act".... Second, "the reasonableness of the delay must be judged 'in the context of the statute' which authorizes the agency's action."... Third, the court must examine the consequences of the agency's delay.... Finally, the court should give due consideration in the balance to "any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources."

*Cobell*, 240 F.3d at 1096.

As to the first and second factor, the Rule expressly provides that calculation of the debt-to-earnings rates must be done "for each award year" (34 C.F.R. § 668.405(a)) and the failure to send Draft GE Completers Lists to the institutions in June of 2017 will prevent the Department from calculating and publishing the debt-to-earnings rates for the previous financial aid award year. The Department sending of Draft GE Completers Lists in June 2016 in preparation to publish debt -to-earnings rates in January 2017 is evidence of the Department's understanding that the creation and issuance of Draft GE Completers Lists must be done months in advances of the publication of debt-to-earnings rates. Therefore, although the length of the delay is measured in months and not years, the length of the delay is substantial because it will prevent the

Department from accomplishing its non-discretionary duty of calculating debt-to-earnings rates

for the 2015-2016 financial aid award year. Although there is no *per se* rule as to how long a

delay is too long, "inordinate agency delay would frustrate congressional intent by forcing a

breakdown of regulatory processes." *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149

(D.C. Cir. 1992) (internal citations omitted). Rather, "in absence of a specific timeline" in the

Rule, "the APA's general reasonableness standard applies." *Geneme v. Holder*, 935 F. Supp. 2d

184, 193 (D.D.C. 2013); *see also Biodiversity Legal Found. et al. v. Norton*, 285 F. Supp. 2d 1,

7-8 (D.D.C. 2003) ("When a statute grants some degree of discretion to an agency as to the

timing of a required action, thereby imposing merely a general duty of timeliness, suit should be

brought as a claim for unreasonable delay under the APA") (citations and internal quotations

omitted); *Sierra Club v. Thomas*, 828 F.2d 783, 794-96 (D.C. Cir. 1987) (explaining the

difference between claims challenging an agency's refusal to comply with an absolute time

requirement for action and an agency's more generalized unreasonable delay, and that both types

of claims are valid). This holding is premised on the notion that without an ability to compel

legally required actions that have no express deadline, an agency "could effectively prevent

judicial review of [its] policy determinations by simply refusing to take agency action." *Cobell*,

240 F.3d at 1095. The Department has put forth no basis for its refusal to create and transmit the

Draft GE Completers Lists to applicable institutions, but, based upon its delays of other aspects

of the Gainful Employment Rule, as discussed herein, the intent of the Department is clear: until

it can implement a revision to the Rule, the Department will refuse to effectuate the required

duties of the Rule.

As to the third factor in *Cobell*, consequences of further delay are severe because the

Gainful Employment Rule's entire accountability program, which prohibits an institution's

34

participation in the Title IV federal student loan program for programs that fail the debt-to-earnings metrics, is predicated upon the Department making debt-to-earnings calculations for each financial aid award year. The failure to publish rates in 2018 will prevent the accountability aspect of the Gainful Employment Rule from becoming implemented, acting as a *de facto* rescission of the entire accountability aspect of the Rule. As in *Cobell*, the injury from delay to the States' residents who attend schools that are not preparing them for gainful employment in a manner that allows them to pay back their student loan debts "could cause irreparable harm to plaintiffs' interests." *Cobell*, 240 F.3d at 1097 (stating that "the interests at stake are not merely economic interests in [an administrative scheme], but personal interests in life and health"); *Pub. Citizen Health Research Grp. v. Auchter*, 702 F.2d 1150, 1157-58 (D.C. Cir. 1983) (holding that the significant consequences resulting from the agency's inaction formed a sufficient basis to compel the agency to rectify its unreasonable delay in setting a certain standard).

Finally, as to the fourth factor in *Cobell*, the Department has not proffered "any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987). When asked by Senator Durbin when it expected to issue the Draft GE Completers Lists, the Department flatly responded that it had "no timetable" to do so but gave no plea of error, convenience, difficulty, or limited resources for the reason why it already delayed by two months the sending of the Draft GE Completers Lists and had no plans to issue them. Accordingly, the failure to send Draft GE Completers Lists is unreasonable.

### C.     This Court Should Compel the Agency to Act.

As a result of the "breakdown of regulatory processes" *Cutler*, 818 F.2d at 897 n.156, a court must interfere with the normal progression of agency proceedings to correct "transparent violations of a clear duty to act." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir.

2000). In *Cutler*, the plaintiffs sued the Food and Drug Administration ("FDA") for its unreasonable delay in completing a scientific review of certain over-the-counter drugs. *Id.* at 882. The FDA had commenced the review to determine if the drugs could be designated safe and effective in response to a law that prohibited the marketing of new drugs not generally recognized as safe and effective. *Id.* at 884. The district court rejected the plaintiffs' claim upon finding that because the FDA established the review process as one of several ways the agency could have, in its discretion, carried out its statutory duty, the FDA's completion of that review was not mandatory. *Id.* at 886 (*citing Cutler v. Hayes*, 549 F.Supp. 1341, 1347-48 (D.D.C. 1982)). The D.C. Circuit reversed, holding that the scientific review was not a voluntary program by the agency and, because the agency was statutorily obligated to perform a review, it was legally required to complete the process, and do so within a reasonable time. *Id.* at 895, 898-99. In its decision, the D.C. Circuit made clear that an "agency's freedom to exercise its discretion" is not "equat[ed]. . . with voluntariness." *Id.* at 895.

The holdings of *Cutler* and *Cobell* apply here. The Gainful Employment Rule provides a set of discrete, required duties for the Department, the Department created a process to meet its duties, and now the Department must continue its non-discretionary duties of calculating and publishing debt-to-earnings rates to effectuate the regulatory scheme at the heart of the Rule. *See id.* at 895-96; *Biodiversity Legal Found.*, 285 F. Supp. 2d at 2-3 (finding that while the agency has discretion in deciding whether to revise a critical habitat designation, once it decides to revise that designation, it must do so within a reasonable time); *Pub. Citizen Health Research Grp. v. FDA*, 724 F. Supp. 1013, 1020- 21 (D.D.C. 1989) (finding that there was a valid unreasonable delay claim challenging agency's failure to conclude discretionary rulemaking once it decided to act); *Sierra Club*, 828 F.2d at 794 (noting unreasonable delay claims are

premised on the notion that "while [the agency] may have discretion over whether to act at all, it has exercised that discretion by deciding that it would determine what action, if any, to take, and that it must now do so").

As set forth above, the Department's delay and stated refusal to comply with its duties to create and submit to applicable institutions the Draft GE Completers Lists is unreasonable. This Court should, therefore, order the Department to promptly comply with the non-discretionary requirements of the Rule, including the creation and submission to applicable institutions of the Draft GE Completers Lists, the collection of revisions offered by the institutions, and the calculation and publication of debt-to-earnings rates for the 2015-2016 financial aid award year.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for summary judgment and order appropriate relief.

Dated: December 26, 2017

                                    Respectfully Submitted,

                                    FOR THE STATE OF MARYLAND
                                    BRIAN E. FROSH
                                    ATTORNEY GENERAL

By:  */s/ Christopher J. Madaio*
      Christopher J. Madaio
      Assistant Attorney General
      Office of the Attorney General
      Consumer Protection Division
      200 St. Paul Place, 16th Floor
      Baltimore, MD 21202
      (410) 576-6585
      Cmadaio@oag.state.md.us

      FOR THE COMMONWEALTH OF
      PENNSYLVANIA
      JOSH SHAPIRO
      ATTORNEY GENERAL

By:  */s/ Michael J. Fischer*
      Michael J. Fischer
      Chief Deputy Attorney General
      John M. Abel
      Jesse Harvey
      Senior Deputy Attorneys General
      Office of the Pennsylvania Attorney General
      16th Floor, Strawberry Square
      Harrisburg, PA 17120
      (215) 560-2402
      mfischer@attorneygeneral.gov

FOR THE COMMONWEALTH OF
MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

By: */s/ Yael Shavit*
Yael Shavit
Assistant Attorney General
Office of the Massachusetts Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2197
yael.shavit@state.ma.us

FOR THE STATE OF CALIFORNIA
XAVIER BECERRA
CALIFORNIA ATTORNEY GENERAL

By: */s/ Bernard A. Eskandari*
Bernard A. Eskandari
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 897-2652
bernard.eskandari@doj.ca.gov

FOR THE STATE OF CONNECTICUT
GEORGE JEPSEN
ATTORNEY GENERAL

By: */s/ Joseph J. Chambers*
Joseph J. Chambers
Assistant Attorney General
Connecticut Office of Attorney General
PO Box 120
Hartford, CT 06141-0120
(860) 808-5270
joseph.chambers@ct.gov

39

FOR THE STATE OF DELAWARE
MATTHEW P. DENN
ATTORNEY GENERAL

By:  */s/ Christian Douglas Wright*
Christian Douglas Wright
Director of Consumer Protection
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 577-8400
christian.wright@state.de.us

FOR THE DISTRICT OF COLUMBIA
KARL A. RACINE
ATTORNEY GENERAL

By:  */s/ Philip Ziperman*
Philip Ziperman
Assistant Attorney General
Attorney General for the District of Columbia
441 4th Street, N.W., 6th Floor
Washington, DC 20001
(202) 442-9886
Philip.Ziperman@dc.gov

FOR THE STATE OF HAWAII
DOUGLAS S. CHIN
ATTORNEY GENERAL OF HAWAII

By:  */s/ Bryan C. Yee*
Bryan C. Yee
Deputy Attorney General
425 Queen Street
Honolulu, Hawaii 96813
(808) 586-1180
bryan.c.yee@hawaii.gov

PEOPLE OF THE STATE OF
ILLINOIS, by LISA MADIGAN
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Joseph Sanders*
    Joseph Sanders
    Gregory W. Jones
    Assistant Attorneys General
    Consumer Fraud Bureau
    Office of the Illinois Attorney General
    100 W. Randolph St., 12th Fl.
    Chicago, IL 60601
    312-814-6796 (Joseph)
    312-814-4987 (Gregory)
    Fax: 312-814-2593
    jsanders@atg.state.il.us
    gjones@atg.state.il.us

FOR THE STATE OF IOWA
THOMAS J. MILLER
ATTORNEY GENERAL

By: */s/ Jessica Whitney*
    Jessica Whitney
    Director - Consumer Protection
    Office of the Attorney General of Iowa
    1305 E. Walnut St.
    Des Moines, Iowa 50319
    (515) 281-8772
    Jessica.Whitney@iowa.gov

FOR THE STATE OF MINNESOTA
LORI SWANSON
ATTORNEY GENERAL

By: */s/ Jason Pleggenkuhle*
    Jason Pleggenkuhle
    Assistant Attorney General
    Bremer Tower, Suite 1200
    445 Minnesota Street
    St. Paul, MN 55101
    (651) 757-1147 (Voice)
    (651) 282-5832 (Fax)
    jason.pleggenkuhle@ag.state.mn.us

FOR THE STATE OF NEW YORK
ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL OF NEW YORK

By:   */s/ Jane M. Azia*_____
       Jane M. Azia
       Chief, Bureau of Consumer Frauds and
       Protection
       120 Broadway, 3rd floor
       New York, NY 10271
       Tel.: (212) 416-8727
       Jane.azia@ag.ny.gov

FOR THE STATE OF NORTH CAROLINA
JOSH STEIN
ATTORNEY GENERAL OF NORTH
CAROLINA

By:   */s/ Matt Liles*_____
       Matt Liles
       Assistant Attorney General
       North Carolina Department of Justice
       114 W. Edenton St.
       Raleigh, NC  27603
       P.O. Box 629
       Raleigh, NC  27602
       (919) 716-0141
       mliles@ncdoj.gov

FOR THE STATE OF OREGON
ELLEN F. ROSENBLUM
ATTORNEY GENERAL

By:   */s/ Andrew Shull*_____
       Andrew Shull
       Assistant Attorney General
       Oregon Department of Justice
       1162 Court Street, NE
       Salem, OR 97301
       (503) 934-4400
       Andrew.shull@doj.state.or.us

FOR THE STATE OF RHODE ISLAND
PETER F. KILMARTIN
ATTORNEY GENERAL

By:  */s/ Neil F.X. Kelly*⎯⎯⎯⎯⎯⎯
Neil F.X. Kelly
Deputy Chief, Civil Div.
Assistant Attorney General
Edmund F. Murray, Jr.
Special Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2284
nkelly@riag.ri.gov
emurray@riag.ri.gov

FOR THE STATE OF VERMONT
THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

By:  */s/ Christopher J. Curtis*
Christopher J. Curtis
State of Vermont
Office of the Attorney General
Chief, Public Protection Division
109 State St.
Montpelier, VT 05609
(802) 828-5586
christopher.curtis@vermont.gov

FOR THE COMMONWEALTH OF
VIRGINIA
MARK R. HERRING
ATTORNEY GENERAL

By:  */s/ Samuel T. Towell*⎯⎯⎯
Samuel T. Towell
Deputy Attorney General, Civil Litigation
Cynthia E. Hudson
Chief Deputy Attorney General
Barbara Johns Building
202 N. Ninth St.
Richmond, Virginia 23219
(804) 786-6731
stowell@oag.state.va.us

43

FOR THE STATE OF WASHINGTON
ROBERT W. FERGUSON
ATTORNEY GENERAL

By: */s/ Jeffrey T. Sprung*_____
Jeffrey G. Rupert
Chief, Complex Litigation Division
Jeffrey T. Sprung (D.C. Bar No.: 384880)
Benjamin J. Roesch
Assistant Attorneys General
Office of the Washington Attorney General
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(206) 326-5492 (Sprung)
jeffreyr2@atg.wa.gov
jeff.sprung@atg.wa.gov
benjaminr@atg.wa.gov
cynthiaa@atg.wa.gov