IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF MARYLAND, et al., ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 1:17-2139 (KBJ) |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| EDUCATION, and ELIZABETH DEVOS, in her ) | |
| official capacity as Secretary of Education, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ..................................................................................... 3

    I.     Title IV of the Higher Education Act's Gainful Employment Requirement ......... 3

    II.    The Department's Gainful Employment Regulations ............................................ 3

        A.    Original GE Regulations ................................................................ 3

        B.    2014 Final Rule ............................................................................. 4

        C.    D/E Rate Calculation .................................................................... 5

        D.    Disclosure Requirements .............................................................. 7

    III.   The Department's Implementation Thus Far ....................................................... 7

        A.    Disclosure Requirements .............................................................. 8

        B.    Initial Year's D/E Rate Calculation ............................................. 9

            1.    GE Completers Lists ...................................................... 9

            2.    SSA Earnings Data & Draft D/E Rates ........................ 10

            3.    Final D/E Rates & Alternate Earnings  Appeals .......... 10

    IV.   *AACS v. DeVos* ................................................................................ 11

    V.    The Department's Response to *AACS* ................................................. 14

        A.    June 30, 2017 EA & July 5, 2017 Federal Register Announcement ....... 14

        B.    August 18, 2017 EA & Federal Register Announcement ....................... 15

    VI.   Procedural History ............................................................................... 16

STANDARD OF REVIEW ................................................................................... 16

ARGUMENT ..................................................................................................................... 17

    I.         PLAINTIFFS LACK STANDING ................................................................... 17

             A.        The States Cannot Sue the Federal Government on Behalf of
                      Their Residents Under a Theory of *Parens Patriae* Standing .................. 18

             B.        The States Fail to Show an Article III Injury of Their Own ..................... 19

             C.        The Direct Injuries the States Assert Are Not Fairly Traceable to the
                      Department's Challenged Actions or Failure to Act................................. 23

    II.       PLAINTIFFS DO NOT FALL WITHIN THE ZONE OF INTERESTS OF
             THE GE REGULATIONS ................................................................... 25

    III.      THE DEPARTMENT'S POSTPONEMENT OF THE DISCLOSURE
             REQUIREMENTS IN § 668.412(d) AND (e) IS NOT FINAL AGENCY
             ACTION SUBJECT TO THE APA CHALLENGES IN COUNTS I AND II ... 26

    IV.     THE DEPARTMENT DID NOT VIOLATE PROCEDURAL
             REQUIREMENTS BY ISSUING THE JULY 5 AND AUGUST 18, 2017
             ANNOUNCEMENTS WITHOUT NOTICE AND COMMENT ....................... 29

    V.       THE JULY 5 AND AUGUST 18, 2017 ANNOUNCEMENTS WERE NOT
             ARBITRARY AND CAPRICIOUS ................................................................. 33

    VI.     THE DEPARTMENT DID NOT UNREASONABLY WITHHOLD OR
             DELAY DRAFT GE COMPLETERS LISTS FOR 2017 ................................... 36

CONCLUSION ..................................................................................................................... 40

## **TABLE OF AUTHORITIES**

### **Cases**

*Abulhawa v. U.S. Dep't of Treasury*, 239 F. Supp. 3d 24 (D.D.C. 2017) ................................ 25

*\*Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982) ........................... 18

*\*Am. Ass'n of Cosmetology Schools ("AACS") v. DeVos*,
     258 F. Supp. 3d 50 (D.D.C. 2017) .................... 2, 3, 11, 12, 13, 14, 15, 31, 32, 33, 35, 39

*Am. Fed'n of Gov't Employee., AFL-CIO ("AFGE") v. Block*,
     655 F.2d 1153 (D.C. Cir. 1981)................................................................... 31, 32

*Arizona v. Bowsher*, 935 F.2d 332 (D.C. Cir. 1991) ............................................... 20

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ....................................................... 23

*Ass'n of Private Colls. & Univs. APSCU v. Duncan ("APSCU I")*,
     870 F. Supp. 2d 133 (D.D.C. 2012) .......................................................... 3, 4

*APSCU v. Duncan ("APSCU II")*, 681 F.3d 427 (D.C. Cir. 2012) ................................ 4

*APSCU. v. Duncan ("APSCU III")*, 110 F. Supp. 3d 176 (D.D.C. 2015) ............................ 3, 37

*Baker v. Carr*, 369 U.S. 186 (1962)................................................................... .18

*Barker v. Conroy*, No. CV 16-850 (RMC), 2017 WL 4563165 (D.D.C. Oct. 11, 2017) ....... 17-18

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................... 27

*Buffalo Field Campaign v. Zinke*,
     No. 16-CV-1909 (CRC), 2018 WL 646887 (D.D.C. Jan. 31, 2018) ............................. 16

*Chamber of Commerce v. EPA*, 642 F.3d 192 (D.C. Cir. 2011) ................................... 23

*Chesapeake Climate Action Network v. Export-Import Bank*,
     78 F. Supp. 3d 208 (D.D.C. 2015) ................................................................. 24

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ........................................... 17, 20

*Clarke v. Securities Indus. Ass'n*, 479 U.S. 388 (1987) ......................................... 25, 26

*Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017) ......................................... 28

*Cobell v. Babbitt*, 91 F. Supp. 2d 1, 4, 36 (D.D.C. 1999) ......................................... 38

iv

*Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) .......................................................... 36, 37

*Commonwealth v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976) ....................................................... 19

*Ctr. for Biological Diversity v. Zinke,* 260 F. Supp. 3d 11 (D.D.C. 2017) ..................................... 36

*Cutler v. Hayes*, 818 F.2d 879 (D.C. Cir. 1987) ..................................................... 37, 38

*Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597 (2013) ..................................................... 34

*EME Homer City Generation, L.P. v. EPA*., 795 F.3d 118 (D.C. Cir. 2015) ....................... 31, 32

*Envtl. Def. Fund, Inc. v. EPA*, 716 F.2d 915 (D.C. Cir. 1983) ..................................................... 30

*Envtl. Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802 (D.C. Cir. 1983) ........................................... 30

*Florida v. Mellon*, 273 U.S. 12 (1927) ..................................................................................... 20

*Gov't of Province of Manitoba v. Zinke*,
　　No. CV 02-2057 (RMC), 2017 WL 3437658 (D.D.C. Aug. 10, 2017) ................... 18, 19

*Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015) ................................... 25

*Hall v. Sebelius*, 689 F. Supp. 2d 10 (D.D.C. 2009) ................................................................ 26

*Hoffman v. Jeffords*, 175 F. Supp. 2d 49 (D.D.C. 2001),
　　*aff'd*, No. 02-5006, 2002 WL 1364311 (D.C. Cir. May 6, 2002) ............................. 21, 22

*Jackson v. Mabus*, 808 F.3d 933 (D.C. Cir. 2015) ................................................................. 17

*JEM Broad. Co. v. FCC*, 22 F.3d 320 (D.C. Cir. 1994) ........................................................... 29

*Lexmark Int'l, Inc. v. Static Control Components, Inc*., 134 S. Ct. 1377 (2014) ....................... 25

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................... 18, 24

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................................. 20

*\*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ............................................................... 18, 20

*Md. People's Counsel v. FERC*, 760 F.2d 318 (D.C. Cir. 1985) ............................................... 19

*Menoken v. Miles*, 270 F. Supp. 3d 200, 213 (D.D.C. 2017) ................................................. 23

*Nat. Res. Def. Council, Inc. v. U.S. EPA*, 683 F.2d 752 (3d Cir. 1982) ................................... 30

*Norton v. SUWA*, 542 U.S. 55, 64 (2004) ................................................................ 36

*Page v. Shelby*, 995 F. Supp. 23 (D.D.C. 1998) ................................................. 21, 22

*Pharm. Research & Mfrs. v. U.S. Dep't of Health & Human Servs.,*
    43 F. Supp. 3d 28 (D.D.C. 2014) ................................................................... 8

*Picur v. Kerry*, 128 F. Supp. 3d 302 (D.D.C. 2015) ................................................ 17

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279 (D.C. Cir. 2007) .. 21

*Telecommc'ns Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ......................... 38

*United States v. Windsor*, 570 U.S. 744, 133 S. Ct. 2675 (2013) ................................. 18

*Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253 (4th Cir. 2011) ......................... 21

*West v. Lynch*, 845 F.3d 1228 (D.C. Cir. 2017) ..................................................... 25

## **Statutes**

5 U.S.C. § 553 ....................................................................................... 16

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ...................................... 16

5 U.S.C. § 704 ................................................................................ 26, 27, 36

5 U.S.C. § 706 ............................................................... 16, 17, 26, 27, 36, 37, 38

Higher Education Act ("HEA") Title IV, 20 U.S.C. §§ 1070 *et seq.* ........................... 1, 3

20 U.S.C. § 1002 ............................................................................. 1, 3

20 U.S.C. § 1088 ............................................................................. 1, 3

20 U.S.C. § 1098a ............................................................................. 16

20 U.S.C. § 1231a ............................................................................. 37

## **Regulations**

Notice of Proposed Rulemaking ("NPRM"), 79 Fed. Reg. 16426 (Mar. 25, 2014) ...................... 4

Final regulations ("2014 Final Rule"),
  79 Fed. Reg. 64890 (Oct. 31, 2014) ............................................................................ 4, 7

34 C.F.R. § 668.403 ...................................................................................................... 4, 5

34 C.F.R. § 668.404 .................................................................................................... 4, 15

34 C.F.R. § 668.405 .................................................................... 5, 6, 27, 36, 37, 38

34 C.F.R. § 668.406 .............................................................. 6, 13, 14, 15, 16, 35

34 C.F.R. § 668.410 ............................................................................... 6, 11, 14

34 C.F.R. § 668.412 .......................... 7, 8, 9, 15, 22, 24, 26, 27, 28, 29, 30, 34

34 C.F.R. §§ 668.81–.99 ............................................................................... 27

## Other Administrative Materials

82 Fed. Reg. 30975 (July 5, 2017) .......................................................... 9, 15, 30, 32

82 Fed. Reg. 39362 (Aug. 18, 2017) ...................................................... 15, 32, 35

**INTRODUCTION**

In this case, seventeen states and the District of Columbia ("Plaintiffs" or "the States") seek to challenge alleged delays and failures to act by defendants the Department of Education ("the Department") and Elizabeth DeVos, the Secretary of Education (collectively, "Defendants" or "the Department'), in connection with the Department's implementation of regulations promulgated under Title IV of the Higher Education Act of 1965 ("HEA"), which in turn attempt to implement language in the HEA requiring certain postsecondary programs to "prepare students for gainful employment in a recognized occupation." *See* 20 U.S.C. §§ 1002(b)(1)(A)(i), (c)(1)(A), 1088(b)(1)(A)(i). Under those Gainful Employment ("GE") regulations, which were set forth in a 2014 Final Rule and went into effect in July 2015, programs subject to the requirement must meet certain minimum debt-to-earnings ("D/E") rates in order to remain eligible for Title IV federal financial assistance.

The States' claims should be rejected, and judgment should be entered in favor of Defendants. As an initial matter, the States lack standing. They can neither assert their citizens' alleged rights against the federal government on a theory of *parens patriae*, nor identify their own injuries fairly traceable to actions or failures to act of the Department. For similar reasons, the States' asserted interests, in maintaining their own resources and not enforcing their own state consumer protection laws unnecessarily, fall outside the zone of interests that the GE regulations were intended to protect.

The Department is also entitled to judgment as a matter of law on the merits. The States challenge two decisions of the Department on the basis that they were made without going through notice and comment rulemaking. However, the first of these decisions—to extend the deadline by which schools must include the 2017 disclosure template in promotional materials or

directly to prospective students—did not require notice and comment because it was procedural in nature. The second of these decisions—to change the deadlines and other aspects of the alternate earnings appeals—did not require notice and comment because the changes were reasonably necessary as a result of the ruling by a member of this Court in *American Ass'n of Cosmetology Schools* ("*AACS*") *v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017). Issued three days before the alternate earnings appeal deadline, *AACS* held that the appeals process, as set forth in the existing regulations, failed to adequately account for underreported income due to self-employment, cash income, and tips. The changes that the Department announced were a direct result of that judicial decision.

The States also raise substantive challenges to these decisions. However, neither decision is arbitrary or capricious. The first reasonably allows for further consideration of the utility of providing disclosures in promotional materials or directly to students when the same information is already available on a GE program's website—a requirement that the Department left in place. The second decision reasonably implements the Court's *AACS* ruling by extending deadlines and removing the numerical thresholds for alternate earnings data that the Court found objectionable, while allowing the Department to consider response rates as evidence of the reliability of a school's data.

Finally, the States assert a claim of unreasonable delay with respect to the Department's failure, thus far, to provide schools with draft GE Completers Lists—which identify the students who completed a GE program during the relevant period—for 2017. The Court should also grant judgment to Defendants on that claim. Such a claim would require the States to show that the Department failed to fulfill a mandatory duty to issue GE Completers Lists, and that such delay was unreasonable. However, the GE regulations do not impose such a duty. Moreover, to the

extent the issuance of draft GE Completers Lists for 2017 has been delayed, the delay is

reasonable under the circumstances. Indeed, as a result of *AACS* and other factors, the

Department is still in the process of finalizing the previous year's D/E rates, based on alternate

earnings appeals that were only recently submitted and remain pending. It is not unreasonable for

the Department to wish to complete that initial year's D/E rate calculation before embarking on

the process again for a subsequent year. Judgment should be entered in favor of Defendants on

all claims.

## STATEMENT OF FACTS

**I.     Title IV of the Higher Education Act's Gainful Employment Requirement**

The HEA's Title IV, 20 U.S.C. §§ 1070 *et seq.,* authorizes the Department to enter into

agreements with postsecondary schools that allow students at those schools to receive federal

loans. The HEA provides loan eligibility not only for students earning traditional degrees at

traditional colleges and universities, but also for students at for-profit trade and vocational

schools. *See* 20 U.S.C. §§ 1002(a), 1088(b). Congress defined the latter category of schools to

include those that "provide[] an eligible program of training to prepare students for gainful

employment in a recognized occupation." *Id.* §§ 1002(b)(1)(A)(i), (c)(1)(A), 1088(b)(1)(A)(i)).

Congress did not define "what makes employment 'gainful.'" *APSCU v. Duncan* ("*APSCU I*"),

870 F. Supp. 2d 133, 146 (D.D.C. 2012)). It thus "le[ft] a policy gap, which it is the

Department's prerogative to fill." *APSCU. v. Duncan* ("*APSCU III*"), 110 F. Supp. 3d 176, 186

(D.D.C. 2015).

**II.     The Department's Gainful Employment Regulations**

**A.     Original GE Regulations**

The Department originally promulgated Gainful Employment ("GE") regulations in 2010

and 2011, following a period of negotiated rulemaking and public notice and comment that

began in 2009. *See APSCU I*, 870 F. Supp. 2d at 142-43 (describing regulatory background of 2010 and 2011 Final Rules). In a 2012 decision, Judge Contreras held that the Department had "failed to provide a reasoned explanation for a core element" of the Department's central regulation, and that that regulation, and those that depend upon it, must be vacated. *Id.* at 158. The Department moved to amend the Court's ruling, but that motion was denied. *APSCU v. Duncan* ("*APSCU II*"), 930 F. Supp. 2d 210, 221 (D.D.C. 2013).

### B.     2014 Final Rule

The Department proposed amended GE regulations in March 2014, and issued a Final Rule later that year with an effective date of July 1, 2015. *See generally* 79 Fed. Reg. 16426 (Mar. 25, 2014) (Notice of Proposed Rulemaking ("NPRM")); 79 Fed. Reg. 64890 (Oct. 31, 2014) (Final regulations ("2014 Final Rule")). Under the scheme set forth in the 2014 Final Rule, the Department would calculate two D/E rates—the discretionary income rate and the annual earnings rate—for each eligible GE program in a school subject to the regulations. 34 C.F.R. § 668.403(b). Based on the results, the Department would then determine whether a GE program "passes," "fails," or is "in the zone." *Id.* § 668.403(c). The Department would identify a program as passing in a given year if its graduates' average annual loan payment is less than or equal to 20% of discretionary income[1] or 8% of annual earnings. 34 C.F.R. § 668.403(c)(1). A program would fail if its graduates' average annual loan payment is more than 30% of discretionary income and 12% of annual earnings. *Id*. § 668.403(c)(2). A program that did not pass and had at least one D/E rate in between these figures is "in the zone." *Id*. § 668.403(c)(3).

---

[1] The Department calculates discretionary income by subtracting (1.5xPoverty Guideline) from the higher of the mean or median annual earnings of a program's graduates within a two- or four-year cohort period. *See* 34 C.F.R. § 668.404(a)(1). 150 percent of the Poverty Guideline "is considered to be protected or reserved to enable students to meet basic living costs," for a family size of one. 79 Fed. Reg. at 64934. Thus, "[o]nly the remaining amount of annual earnings is considered to be available to make loan payments." *Id.*

4

The 2014 Final Rule provides that, ultimately, a program will lose eligibility for Title IV funds if it has failing D/E rates for 2 out of 3 consecutive years, or has a combination of D/E rates that are in the zone or failing for 4 consecutive years. *Id*. § 668.403(c)(4).

### C.   D/E Rate Calculation

Under the GE regulations, the process of calculating D/E rates for the year involves a series of steps. The Department first calculates the annual loan payment for a GE program, based on the median loan debt of students who completed the program during the applicable period. *Id.* § 668.405(b), (d). The Department then calculates the annual earnings of the students who completed the program during the applicable period, based on earnings data from the Social Security Administration ("SSA"). *Id.* § 668.405(c). The D/E rate is calculated by dividing the annual loan payment by the annual earnings.

At certain points during the process of calculating D/E rates, the GE regulations require schools to provide certain data; at other points, schools have an opportunity to correct or seek amendment of data that the Department has provided. For example, as part of the process, the Department creates "a list of the students who completed [each GE] program during the [relevant two- or four-year] cohort period," 34 C.F.R. § 668.405(a)(1), who will be the students for whom the Department gathers earnings and loan data for purposes of the D/E rate calculation for that program. It then provides that list to the relevant school, which then may submit corrections to the list. *Id.* § 668.405(a)(1)-(2), (c).

In addition, the GE regulations provide that the Department will furnish schools with draft D/E rates as well as the underlying data used to calculate those rates, including mean and median annual earnings and individual student loan information. *Id.* § 668.405(e)(3)(i). Schools then have 45 days within which to challenge the student loan debt information before the

5

Department issues final D/E rates. *Id.* § 668.405(f).

Finally, after the expiration of this 45-day period, the GE regulations provide that the Department will transmit the calculated final D/E rates for each GE program to the school in a "notice of determination." *Id.* § 668.405(a)(6), (g). If the notice of determination shows that a GE program is in the zone or failing, the school running that program has the opportunity to file an "alternate earnings appeal." *Id.* §§ 668.405(7), .406(a). In order to prevail in such an appeal, the school must show that its program would achieve a better result (either passing or falling in the zone) if, rather than SSA earnings data, the Department used alternate earnings either from a survey conducted by the school or from a State-sponsored data system. *Id.* § 668.406(b)(1), (c), (d). The GE regulations provide that a school seeking to file an appeal must notify the Department of its intent to submit an appeal no later than 14 days after the date of the notice of determination. *Id.* § 668.406(e)(1)(i). The school must then submit recalculated D/E rates using alternate earnings, as well as supporting documentation, no later than 60 days after the date of the notice of determination. *Id.* § 668.406(e)(1)(1)(ii).

The GE regulations provide that, while an appeal is pending, a school is not subject to certain requirements imposed on schools that are or may become ineligible for Title IV funding in the next year. *Id.* § 668.406(e)(2) (cross-referencing warning requirements set forth in 34 C.F.R. § 668.410). If no appeal is submitted, or if an appeal is unsuccessful, a school with a program at risk of losing eligibility for Title IV funding based on its final D/E rates for the following year must provide warnings of the possibility of future Title IV ineligibility to students and prospective students and must refer students and prospective students to information about other similar programs. *Id.* § 668.410(a).

D.    **Disclosure Requirements**

In addition to describing the procedures for calculating D/E rates, the GE regulations also require schools to make certain disclosures regarding their GE programs when providing information about those programs to students and others. *See id.* § 668.412. In order to comply with these disclosure requirements, schools must use a "disclosure template" provided by the Department. *Id.* § 668.412(a). The GE regulations state that the Department "will conduct consumer testing to determine how to make the disclosure template as meaningful as possible," and that the Department will identify the information to be included in the template in a Federal Register notice. *Id.* Schools must update the information in the disclosure template at least annually, "[i]n accordance with procedures and timelines established by the Department." *Id.* § 668.412(b)(1).

The GE regulations identify three different disclosures that a school must make using the disclosure template. First, schools must provide the disclosure template for a GE program on any web page with information about that program, or they must provide a "prominent, readily accessible, clear, conspicuous, and direct link to the disclosure template" for that program. *Id.* § 668.412(c)(1). Second, schools must include the disclosure template for a GE program on any promotional materials that they make available to prospective students when such materials identify or otherwise promote that program. *Id.* § 668.412(d). Third, schools must provide a copy of the disclosure template to a prospective student before the student completes enrollment or registration or makes a financial commitment to the school. *Id.* § 668.412(e).

III.    **The Department's Implementation Thus Far**

The 2014 Final Rule went into effect on July 1, 2015. *See* 79 Fed. Reg. at 64890. By that time, the Department had made available National Student Loan Data System ("NSLDS")

7

Gainful Employment Submittal File Record Layouts so that schools could prepare their systems to submit required GE information to the Department. *See* U.S. Dep't of Educ., Gainful Employment Electronic Announcement ("EA") #51 (Jan. 9, 2015).[2] The Department announced in February 2015 that the NSLDS website for voluntary gainful employment reporting was functional.  EA #52 (Feb. 11, 2015). The Department later announced that schools were required to submit GE program information by July 31, 2015, for the 2008-2009 through 2013-2014 award years, and were required to submit the information for the 2014-2015 award year by October 1, 2015. EA #56 (June 30, 2015). The Department set a deadline of December 31, 2015, for schools to identify their GE programs to the Department. EA #54 (June 11, 2015). Meanwhile, in June 2015, the Department began making available updated chapters of its GE Operations Manual as they became available. EA #55 (June 15, 2015); *see also* EA #68 (Nov. 10, 2015).

### A.    Disclosure Requirements

With respect to the disclosure requirements set forth in 34 C.F.R. § 668.412, the Department had provided schools with a disclosure template in connection with the previous version of the GE regulations in the fall of 2016, several months before the new year's template was supposed to be used. EA #99 (Dec. 16, 2016). However, the Department announced in December 2016 that, because 2017 was the first year schools were required to make disclosures in accord with the 2014 Final Rule, the Department was delayed in providing the 2017

---

[2] The Department's Electronic Announcements regarding gainful employment are available at https://ifap.ed.gov/GainfulEmploymentInfo/GEDCLandEAV2.html. The Court may take judicial notice of material on the Department's website. *Pharm. Research & Mfrs. v. U.S. Dep't of Health & Human Servs.,* 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies."). For the Court's convenience, the Department also provides cited EAs in its Administrative Record, filed concurrently herewith.

template. *Id.* The Department instructed schools to continue using their 2016 template until the 2017 template was available. *Id.* The Department did not provide the 2017 template until January 19, 2017. EA #103 (Jan. 19, 2017). At the time it provided the 2017 template, it informed schools that they had until April 3, 2017 to update their disclosure templates and begin providing the disclosure templates on their promotional materials and directly to prospective students. *Id.* On March 6, 2017, the Department announced that schools would have until July 1, 2017 to make these changes. EA #105 (Mar. 6, 2017). The Department explained that this would allow the Department "to further review the GE regulations and their implementation." *Id.*

On June 30, 2017, the Department announced that the July 1, 2017 deadline would remain in effect with respect to disclosures on GE program websites. EA #106 (June 30, 2017); *see also* 82 Fed. Reg. 30975, 30976 (July 5, 2017). However, the Department explained that it believed that it should evaluate the utility of the disclosure provisions in 34 C.F.R. § 668.412(d) and (e), and the implementation of those requirements, before it required schools to include the disclosure template in promotional materials or directly distribute the disclosure template to prospective students. 82 Fed. Reg. at 30976. The Department also indicated that it planned to further review the disclosure requirements "as part of its review of the GE regulations and their implementation, including during negotiated rulemaking." *Id.*

On January 19, 2018, approximately the same time as the previous year, the Department released the 2018 GE disclosure template and announced that schools would have until April 6, 2018 to update their website disclosures using the template. EA #110 (Jan. 19, 2018).

### B.   Initial Year's D/E Rate Calculation

#### 1.   GE Completers Lists

For its first D/E rate calculation under the 2014 Final Rule, the Department initially

anticipated that it would send schools the list of students who completed a GE program during the applicable time period, which it called the "GE Completers List," in late 2015. *See* EA #63 (Oct. 15, 2015). In order to facilitate schools' ability to submit challenges to the GE Completers List, the Department implemented a new web-based application where such challenges could be submitted. EA #64 (Oct. 22, 2015). In December 2015, the Department changed its estimate of when the GE Completers List would be available to "later this winter." EA #71 (Dec. 11, 2015). In February 2016, the Department revised its prediction again to "Spring 2016." EA #73 (Feb. 3, 2016). Ultimately, the Department did not provide this initial draft GE Completers List to schools until June 1, 2016. EA #78 (May 31, 2016).

The Department advised schools that the 45-day period for submitting corrections would not begin to run until the Department made available a new GE Completers List Corrections Submission process. *Id.* After announcing that process would become available on June 13, 2016, the Department set a deadline of July 28, 2016 for schools to submit corrections.  EA #81 (June 10, 2016). The Department then made final GE Completers Lists available to schools, and also sent them to SSA, in September 2016. EA #88 (Sept. 8, 2016).

### 2.      SSA Earnings Data & Draft D/E Rates

The Department made SSA's calculation of mean and median annual earnings available to schools later in October 2016. EA #91 (Oct. 7, 2016). On October 19, 2016, the Department made available to schools draft D/E rates for each GE program at the school. EA #93 (Oct. 20, 2016). The Department announced that the deadline to challenge those rates based on the underlying loan data would be December 7, 2016. EA #94 (Oct. 21, 2016).

### 3.      Final D/E Rates & Alternate Earnings Appeals

The Department then issued final D/E rates on January 9, 2017. EA #100 (Jan. 6, 2017).

The deadline for schools with GE programs with "failing" or "in the zone" D/E rates to submit a notice of intent to file an alternate earnings appeal was set for January 23, 2017, and the deadline for such schools to submit appeal documentation would be March 10, 2017. EA #101 (Jan. 6, 2017). However, on March 6, 2017, the Department extended the March 10 deadline to July 1, 2017. *See* EA #105 (Mar. 6, 2017). This extension also extended the time during which schools that filed a notice of intent to appeal need not provide warnings pursuant to § 668.410(a). *See id.*

## IV.    *AACS v. DeVos*

On February 10, 2017, after the deadline to submit a notice of intent to file an alternate earnings appeal for this first year of D/E rate calculations, but before the final deadline to submit appeal documentation, an association of cosmetology schools filed suit, challenging the Department's implementation of the GE regulations as arbitrary and capricious as applied to cosmetology schools. *AACS*, 258 F. Supp. 3d at 55; Compl., *AACS*, No. 17-0263 (D.D.C. filed Feb. 10, 2017).  AACS argued that there was "widespread underreporting of income in the cosmetology industry" because, among other things, a significant portion of income was in the form of cash or tips. *AACS*, 258 F. Supp. 3d at 55. As a result, AACS asserted, the SSA data that the Department used to calculate annual earnings did not reliably reflect the earnings of graduates of cosmetology programs. *Id.*

In opposition to AACS's arguments, the Department noted that cosmetology programs did not "present a unique situation" with respect to underreporting and that commenters during the rulemaking process "identified cosmetology as an *example* of an industry where individuals may be self-employed or receive cash or tip income," but "they did not suggest that cosmetology was the *only* such industry." Def. Opp. to Pl. Mot. for S.J. [ECF 23], at 18 & n.9, *AACS* (D.D.C. filed Apr. 24, 2017) (citing comments identifying "freelance artists," HVAC or appliance repair,

and "any number of industries" as other examples that may have "large numbers of individuals [who] are self-employed or have significant tip income"). Indeed, the Department recognized, "many other vocational professions, such as massage therapy, plumbing, or accounting, are likely to include significant rates of self-employment and tip income." *Id.*

The Court issued a decision on June 28, 2017, granting AACS's motion for summary judgment in part. Responding to AACS's assertions with respect to underreporting, the Court held that the Department's "overall methodology for determining a program's average income is arbitrary and capricious." *AACS*, 258 F. Supp. 3d at 73. The Court recognized that the Department "had discretion to use SSA data as the presumptive measure of average income for GE programs." *Id.* (observing that "devising formulas for each program based on its own unique mix of self-employment, cash income, and tip income would quickly become unadministrable"). But the Court was persuaded that, "although SSA data is highly accurate in some respects and is thus a useful starting point for determining average earnings, it has significant shortcomings," particularly in connection with self-employment income, cash income, and tip income, which, the Court specifically observed, were common forms of income not only for graduates of cosmetology programs but for graduates of other GE programs as well. *Id.* Indeed, the Court observed that "[t]he problem of underreporting extends across multiple industries and even across individual entities within those industries." *Id.* at 74. The Court further held that the Department had not adequately responded to comments raising this issue during the GE rulemaking process. *See id.*

The Court also held that the alternate earnings appeal process, as it had been established in the 2014 Final Rule, did not mitigate the shortcomings presented by initial use of the SSA data because the Department's assumption "that programs would be able to effectively use the

alternate-earnings appeal process" was flawed. *Id.* The Court pointed to the Department's

decision in the 2014 Final Rule, "inexplicably requiring high response rates to submit state-

sponsored or survey-based alternate earnings calculation," as "narrowly circumscribe[ing] the

alternate-earnings appeal process, making it unfeasible for certain programs to appeal their

designations." *Id.* at 55. As a basis for that conclusion, the Court credited AACS's evidence that

"cosmetology schools are simply unable to mount appeals because of the onerous regulatory

prerequisites to doing so." *Id.* at 75.

In light of these holding, the Court determined that it was necessary to remedy the

Department's "arbitrarily and capriciously rigid use of SSA data to calculate D/E rates," *id.* at

76, as well as the Department's "arbitrary and capricious narrowing of appellate recourse," *id.* at

55.  In order to "avoid upending the entire administrative scheme," the Court determined that it

would "remove barriers to appeal, making it more widely available for programs subject to the

regulations." *Id.* Accordingly, the Court prohibited the Department from "enforc[ing] the

numerical survey requirements currently in effect for alternate earnings appeals against AACS

member schools." *Id.* at 76. Instead, AACS member schools would not need to "secure any

specific amount of survey responses or state-sponsored data to raise an appeal," but would "have

broader, more feasible options to challenge their D/E rates before they become final," and the

Department would have to decide, "on a case-by-case basis, what modicum of evidence is

enough to overcome the presumption in favor of using SSA data for each particular program."

*Id.* at 76-77.

The Court set forth specific prohibitions in its Order accompanying its memorandum

opinion. *AACS*, Order of June 28, 2017 [ECF 29]. First, the Court ordered that the Department

"not require [AACS] member schools to adhere to" the requirement in 34 C.F.R. § 668.406(d)(2)

that schools "'[d]emonstrate that annual earnings data were obtained for more than 50 percent of the number of students in the cohort period" not excluded from the D/E calculation, as well as the requirement that the "number of students must be 30 or more." *Id.* The Court further ordered that the Department "not require AACS member schools to adhere to the requirements" in 34 C.F.R. § 668.406(b)(3) and (c) that an institution must "include in its appeal the alternate earnings of all the students who completed the program during the same cohort period that the Secretary used to calculate the final D/E rates," and that the institution "conduct a survey to obtain annual earnings information of" those students; and also prohibited the Department from requiring that "a particular number or percentage of students respond to institutional surveys for alternate earnings appeals." *Id.*

The Court further ordered that the Department "reasonably extend the deadline for AACS member schools to file alternate earning[s] appeals under 34 C.F.R. § 668.406," and that the Department "reopen the alternate-earnings appeal process for any AACS member schools who failed to timely submit notice of alternate earnings appeal under 34 C.F.R. § 668.406." *Id.* Finally, the Court ordered that the Department "not require AACS member schools who failed to timely submit notice of alternate earnings appeal under 34 C.F.R. § 668.406 to post warnings as required by 34 C.F.R. § 668.410(a) until the new deadline for alternate earnings appeal has passed." *Id.*

## V.      The Department's Response to *AACS*

### A.      June 30, 2017 EA & July 5, 2017 Federal Register Announcement

The Court's June 28, 2017 Order in *AACS* was issued three days before the previously-announced July 1, 2017 deadline for schools to submit their alternate earnings appeals. On June 30, 2017, the Department issued an electronic announcement, alerting schools and others that it

14

had sent an announcement to the Federal Register, stating that, in response to the *AACS* ruling, it would extend the deadline for all programs to file alternate earnings appeals, and that it would issue a Federal Register notice within 30 days that would specifically implement the Court's Order and set new deadlines. EA #106 (June 30, 2017). The announcement appeared in the Federal Register on July 5, 2017. 82 Fed. Reg. at 30975-76.[3]

### B.      August 18, 2017 EA & Federal Register Announcement

On August 18, 2017, the Department issued an electronic announcement as well as a Federal Register announcement, alerting schools to new deadlines for alternate earnings appeals. EA #108; 82 Fed. Reg. 39362 (Aug. 18, 2017). The Department set October 6, 2017 as the deadline for all programs to file a notice of intent to file alternate earnings appeals, and February 1, 2018, as the deadline to file those appeals. 82 Fed. Reg. at 39363.

The Department explained that these new deadlines were being established "on a one-time basis to comply" with the Court's Order in *AACS* because, although the Order by its terms applied only to AACS members, the Court's memorandum opinion had "noted concerns with the response threshold required for the graduate surveys used for all programs." *Id.* In response to those concerns, the Department further announced that it would not enforce § 668.406(b)(3) or (c) to the extent these provisions require that a graduate survey contain responses from all students that are not exempted under § 668.404(e), nor will the Department require a 50 percent threshold response rate." *Id.* Instead, the Department would "consider the response rate, the

---

[3] In the same announcement, the Department also indicated, as previously explained, that it would allow additional time, until July 1, 2018, for institutions to comply with the disclosure requirements set forth in 34 C.F.R. § 668.412(d) and (e) and invited comment on the extension. *Id.* Meanwhile, on August 2, 2017, the Department issued an electronic announcement (EA #107), reminding schools to submit their GE program data for 2016-2017 to NSLDS by October 1, 2017. *See* EA #107.

nonresponse bias analysis," and other information when determining whether a school's appeal presented reliable alternate earnings information. *Id.* Similarly, for appeals based on state survey data, the Department indicated that it would not enforce the numerical response thresholds set forth in § 668.406(b)(3) or (d) but instead would consider the response rate along with other information when evaluating appeals on a case-by-case basis. *Id.* The Department also invited comments, which would be considered in the upcoming negotiated rulemaking. *Id.*

## VI.   Procedural History

The States filed their Complaint in this case on October 17, 2017, raising three challenges under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Count I asserts that the Department's July 5, 2017 and August 18, 2017 Federal Register Notices violate the procedural rulemaking requirements of the APA, 5 U.S.C. § 553(c), (d), and the HEA, 20 U.S.C. § 1098a. Compl. ¶¶ 94-104 Count II asserts that the Department's July 5, 2017 and August 18, 2017 Federal Register Notices should be set aside under the APA, 5 U.S.C. § 706(2)(A) and (C) as arbitrary and capricious and in excess of statutory authority. Compl. ¶¶ 106-113. Count III asserts that the Department's failure to provide Draft GE Completers Lists "for the previous award year" is an unlawful withholding or delay of final agency action under the APA, 5 U.S.C. § 706(1). Compl. ¶¶ 115-121. On December 26, 2017, the States filed a Motion for Summary Judgment with respect to all three of these claims.

## STANDARD OF REVIEW

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Buffalo Field Campaign v. Zinke*, No. 16-CV-1909 (CRC), 2018 WL 646887, at *4 (D.D.C. Jan. 31, 2018) (internal quotation omitted). However, "because of the limited role of a

court in reviewing [an] administrative record[,] the typical Rule 56 summary judgment standards do not apply in an APA case." *Picur v. Kerry*, 128 F. Supp. 3d 302, 308 (D.D.C. 2015) (internal quotation omitted). Instead, courts apply the standards of review set forth in the APA, 5 U.S.C. § 706, which directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Picur*, 128 F. Supp. at 308 (quoting 5 U.S.C. § 706(2)(A). This standard of review is "deferential," and does not allow a court to substitute its judgment for that of the agency. *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015) ("The question is not what we would have done, nor whether we agree with the agency action. Rather, the question is whether the agency action was reasonable and reasonably explained.").

## ARGUMENT

## I.      PLAINTIFFS LACK STANDING

Article III of the Constitution limits the jurisdiction of the federal courts to certain "Cases" and "Controversies." The Supreme Court has explained that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted). One part of this constitutional limitation is that a plaintiff must have standing, a requirement that is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.*

The standing inquiry turns on whether the States have "'alleged such a personal stake in the outcome of the controversy' as to meet federal court jurisdiction and justiciability requirements." *Barker v. Conroy*, No. CV 16-850 (RMC), 2017 WL 4563165, at *3 (D.D.C. Oct.

11, 2017) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Article III requires that the States

establish that (1) they have suffered "'an injury in fact—an invasion of a legally protected

interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

hypothetical,'"; (2) the injury is "fairly traceable to the defendants' actions"; and (3) it is

"'likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision.'" *Id.* (quoting *United States v. Windsor*, 570 U.S. 744, 133 S. Ct. 2675, 2685-86

(2013)). The States "bear[] the burden of establishing these elements," which "are not mere

pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan v. Defenders*

*of Wildlife*, 504 U.S. 555, 561 (1992).

### A.   The States Cannot Sue the Federal Government on Behalf of Their Residents Under a Theory of *Parens Patriae* Standing

The States assert that, as states, they have "an interest in protecting the health, safety, and

welfare of their citizens," and that the Department's delays in implementing and enforcing the

GE regulations have "harm[ed] current and prospective students," and have "denie[d] critical

rights and protections" to their "low-income and minority residents." Compl. ¶¶ 88, 91, 93.

These allegations cannot confer standing on the States. Although in some circumstances, a state

may assert "*parens patriae*" standing to raise a claim on behalf of its citizens, it is well settled

that the States may not assert such standing against the federal government. *Alfred L. Snapp &*

*Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982) ("A State does not have standing as

parens patriae to bring an action against the Federal Government."); *Massachusetts v. Mellon*,

262 U.S. 447, 485–86 (1923) ("[I]t is no part of [a state's] duty or power to enforce [the rights of

its citizens] in respect of their relations with the federal government."). In light of *Snapp* and

*Mellon*, the D.C. Circuit has also "ruled that a state cannot proceed as *parens patriae* when the

United States, the superior 'parent of the country,' is the defendant." *Gov't of Province of*

*Manitoba v. Zinke*, No. CV 02-2057 (RMC), 2017 WL 3437658, at *15 (D.D.C. Aug. 10, 2017) (citing *Commonwealth v. Kleppe*, 533 F.2d 668, 677 (D.C. Cir. 1976)); *see also Md. People's Counsel v. FERC*, 760 F.2d 318, 320 (D.C. Cir. 1985) ("[A] State does not have standing as *parens patriae* to bring an action against the Federal Government." (citation omitted)). Following this principle in a recent decision, Judge Collyer held that the State of Missouri lacked standing to sue the Bureau of Reclamation based on alleged environmental harms of its citizens. *Gov't of Province of Manitoba*, 2017 WL 3437658, at *17. Similarly here, the Court should reject the States' standing to sue the Department based on alleged injuries of their residents.

**B.      The States Fail to Show an Article III Injury of Their Own**

The States also allege that they, as states, have been directly harmed by the Department's delays or failure to act in implementing the GE regulations because they have expended resources in connection with schools that, if the GE regulations had been implemented, would have been deemed ineligible for Title IV funding or would have been required to post warnings about their potential future ineligibility for such funding. Compl. ¶ 92. Specifically, the States allege that (1) they have provided grant and loan funding to schools that "would otherwise be ineligible for Title IV loans or required to warn students about potential ineligibility for Title IV loans," (2) they have expended more resources on enforcement of state consumer protection laws against schools that "should be ineligible for Title IV loans or ineligible for a license to operate in the State due to failure to comply with federal law"; (3) they have lost tuition money "from State-funded higher education institutions"; and (4) they have diverted resources to enforcement actions against "abusive practices by for-profit and other educational programs." *Id.* However, the States fail to identify any specific instance of harm to any specific Plaintiff that, they contend, is due to any of the specific delays or failure to act by the Department that they seek to challenge.

19

These assertions fail to identify a cognizable injury for standing purposes. The States essentially assert that, if the GE regulations as a whole had been implemented in the manner and on the timetable that the States preferred, the States would not have included certain schools in their own state programs, or the States would not have enforced their own state laws against schools within their state. However, the States have no legally protected interest in the operation of federal laws that do not regulate or impose obligations on the States themselves. *See, e.g.*, *Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991) (noting that states may not, consistent with the Supremacy Clause, "directly regulate the federal government's operations or property"). Courts have rejected a state's standing to challenge a federal law when the law did not directly interfere with or commandeer the state's own enforcement scheme, and the only injury identified was a collateral impact on state revenues or the state's own regulatory efforts. *See Florida v. Mellon*, 273 U.S. 12, 17 (1927) (state lacked standing to challenge federal inheritance tax on ground that it would decrease state's property tax revenues); *Massachusetts*, 262 U.S. at 484-85 (state lacked standing to challenge the Maternity Act, which provided for appropriations to states for cooperative efforts to enhance maternal and infant health, where "[n]o rights of the state falling within the scope of the judicial power have been brought within the actual or threatened operation of the statute"). At bottom, the States have identified nothing more than "self-inflicted injuries" that are a result of their own independent decisions regarding allocation of resources and enforcement efforts, rather than a result of any direct burden imposed upon them by the Department. *See Clapper*, 568 U.S. at 418.

Nor does this case present a situation like that in *Massachusetts v. EPA*, 549 U.S. 497 (2007), where the Court held that Massachusetts had standing to challenge the EPA's denial of a rulemaking petition on greenhouse gases based on the state's assertion that rising sea levels would

cause a "serious loss of [the state's] coastal property." *Id.* at 515, 521 (concluding that the state had identified a risk of harm "that is both 'actual' and 'imminent'"); *see also Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 270 (4th Cir. 2011) (state lacked standing to challenge a federal law when the law did not "directly burden" the state, did not "commandeer [the state's] enforcement officials," and did not "threaten [the state's] sovereign territory"). Here, no such threat to the States' territory is at issue.

To the extent the Department's implementation of the GE regulations has been delayed, such a delay has merely maintained the status quo that existed before the GE regulations were promulgated in the first place. The States cannot plausibly claim an injury based on the mere specter of losing the additional enforcement benefits they speculatively allege the GE regulations would have conferred. *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1294 (D.C. Cir. 2007) ("Were all purely speculative increased risks deemed injurious, the entire requirement of actual or imminent injury would be rendered moot, because all hypothesized, nonimminent injuries could be dressed up as increased risk of future injury." (citation omitted)).

Moreover, the speculative nature of the States' assertions by itself renders their supposed injuries implausible. Indeed, the States identify "precisely the kind of vague, conjectural and hypothetical harm which cannot confer standing." *Hoffman v. Jeffords*, 175 F. Supp. 2d 49, 56–57 (D.D.C. 2001) (quoting *Page v. Shelby*, 995 F. Supp. 23, 28 (D.D.C. 1998)), *aff'd*, No. 02-5006, 2002 WL 1364311 (D.C. Cir. May 6, 2002). The States have identified three specific actions or failures to act by the Department as the subjects of their APA challenges—(1) the Department's July 5, 2017 extension of the deadline by which schools must include the 2017 disclosure template in promotional materials or notifications to prospective students, (2) the

Department's July 5 and August 18, 2017 changes to the deadlines and other aspects of the alternate earnings appeal process, and (3) the Department's delay in providing schools with a draft GE Completers List for 2017. *See* Compl. ¶¶ 94-121. However, the States appear simply to assume the potential impact on schools, and students' willingness to attend such schools, if the Department had not taken the actions, or implemented the delays, that the States challenge, and further assume that the States would have allocated their own resources differently as a result.

The States' assertions are similar to those previously rejected by members of this Court, which relied on speculation regarding what might have happened or might happen in the future, had circumstances been different. For example, in *Page*, the plaintiff sought to challenge a Senate procedural rule based on the assertion that, if not for the rule, legislation that he desired would be enacted. *Page*, 995 F. Supp. at 27-28. However, the Court in that case recognized that the plaintiff "does not and cannot name particular" legislation that might be considered in the future, and that would be affected by the rule, and that his assertions of harm therefore were too speculative to qualify as an actual injury in fact for standing purposes. *Id.* at 28. Similarly, in *Hoffman*, the plaintiff sought to challenge a senator's decision to change parties, but the Court held that he lacked standing because "[t]here is absolutely no way of knowing what legislation, if any, would have been enacted had" the senator remained a member of his original party. *Hoffman*, 175 F. Supp. 2d at 57.

Similarly here, the States cannot describe with particularity what would have happened, had the Department not extended schools' deadlines to provide disclosures under 34 C.F.R. § 668.412(d) and (3); had it not made the changes to alternate earnings appeals set forth in the July 5 and August 18, 2017 Federal Register announcements; and had it provided 2017 GE Completers Lists to schools earlier. They cannot identify which schools might have been

affected, or when, nor can they identify how any different impacts on schools would have affected their own resource allocations. The States' asserted injuries thus are insufficiently concrete and particularized to support standing.

### C.   The Direct Injuries the States Assert Are Not Fairly Traceable to the Department's Challenged Actions or Failure to Act

Moreover, the States cannot establish that their asserted injuries are fairly traceable to any of the actions or failures to act that they seek to challenge here because those alleged injuries depend on the independent actions of third parties—schools and students—not before the Court. "The traceability requirement ensures that a plaintiff's asserted injury was caused by the defendant and 'not the result of the independent action of some third party not before the court.'" *Menoken v. Miles*, 270 F. Supp. 3d 200, 213 (D.D.C. 2017) (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)). "The D.C. Circuit has required 'substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress.'" *Id.* (quoting *Arpaio*, 797 F.3d at 20). Such evidence would have to show that "'absent the [Department's] allegedly unlawful actions' [or failure to act], there is a 'substantial probability' that Plaintiffs would 'not be injured.'" *Id.* (quoting *Chamber of Commerce v. EPA*, 642 F.3d 192, 201 (D.C. Cir. 2011)).

The States cannot meet that burden here. The States rely on an attenuated chain of contingencies to tie their alleged injuries to the challenged actions and failures to act by the Department. This chain is simply too speculative to satisfy the traceability prong of the standing analysis. The alleged injuries—in the form of funding decisions for schools or students within a state, or heightened expenditures to enforce state consumer protection laws—will be incurred, if at all, as the result of hypothetical future compliance decisions made by schools and hypothetical responses to those decisions by student borrowers; they will not result from any direct action

taken by the Department. Where, as here, the "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed" to demonstrate standing. *Lujan*, 504 U.S. at 562; *see also Chesapeake Climate Action Network v. Export-Import Bank*, 78 F. Supp. 3d 208, 216 (D.D.C. 2015) ("[I]n those cases where plaintiff was not the subject of government action or inaction, and where the harm to the plaintiff comes instead from the agency's regulation of an independent third party not before the court, standing is ordinarily substantially more difficult to establish." (citation omitted)).

Indeed, it is difficult to conceive how the States could establish a causal link between any of the three actions or failures to act that they identify as the subjects of their APA challenges, on the one hand, and the conduct of schools or students that might trigger the States' enforcement of state laws, or other allocation of state resources, on the other. There is simply no plausible basis to assert what schools and students might have done differently if the Department's actions regarding disclosures under 34 C.F.R. § 668.412(d), alternate earnings appeals, or the GE Completers List had been other than they were. Certainly, the States allege no facts that support the notion that a specific state Plaintiff would not have provided funding to students of a specific school, or would not have initiated a specific enforcement action against that school, had the Department required that school to provide disclosures in its promotional material or to prospective students, or to submit alternate earnings appeals earlier using the standards originally set forth in the 2014 Final Rule; or had it or provided that school with a draft GE Completers List for 2017. To the extent the States contend that they base their own funding decisions on Title IV eligibility, they have not asserted facts showing that a particular GE program's Title IV eligibility would have been affected by the challenged actions. Moreover, nothing in Title IV requires that States base their own funding decisions on

24

Title IV eligibility; rather, States are free to set their own standards for providing funding. Because the States' theory of causation "is based on speculation upon  speculation about how third parties might act," *Abulhawa v. U.S. Dep't of Treasury*, 239 F. Supp. 3d 24, 35 (D.D.C. 2017), they have failed to carry their burden of establishing the causation element of standing. *See also West v. Lynch*, 845 F.3d 1228, 1236 (D.C. Cir. 2017) (where challenged conduct "is at best an indirect or contributing cause of the plaintiff's injury—*i.e.*, if the  injury may or may not follow from the conduct, based on a 'chain of contingencies'—the plaintiff  faces an uphill climb in pleading and proving redressability" (citations omitted)).[4] The States therefore lack standing, and their claims should be dismissed for lack of subject matter jurisdiction.

## II.     PLAINTIFFS DO NOT FALL WITHIN THE ZONE OF INTERESTS OF THE GE REGULATIONS

Aside from their failure to satisfy Article III standing requirements, the States also fall outside the zone of interests protected or regulated by the GE regulations, in general, or the Department's July 5 and August 18, 2017 announcements and its delay in providing schools with draft GE Completers Lists for 2017, in particular. The Supreme Court has directed that courts "presume that a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388 (2014)). Interests that are "marginally related to or inconsistent with the purposes implicit" in a statute or rule do not satisfy the zone of interests requirement. *Clarke v. Securities*

---

[4] For the same reasons, Plaintiffs' asserted injuries are also not redressable. A ruling in Plaintiffs' favor would have no power to compel schools or students to act in any particular way, and Plaintiffs have not shown how such a ruling could affect their allocation of resources or their state law enforcement actions.

*Indus. Ass'n,* 479 U.S. 388, 394 (1987). The interests that the States assert in their capacities as

states are only marginally related to the purposes of the GE regulations. The GE regulations are

aimed at providing students and prospective students with more information about the debt to

earnings rates of graduates at GE programs they are attending or considering, and are also

concerned with the Department's  provision of federal Title IV loan guarantees. The injuries that

the States assert they—as opposed to their citizens—have incurred focus on the allocation of

state budgetary resources and state law enforcement efforts. Neither Congress nor the

Department could have intended that states, as opposed to schools or students, be the ones

"relied upon to challenge" the Department's implementation of the GE regulations. *See Clarke*,

479 U.S. at 399.   The States' claims therefore are subject to dismissal on this basis as well.

## III.     THE DEPARTMENT'S POSTPONEMENT OF THE DISCLOSURE REQUIREMENTS IN § 668.412(d) AND (e) IS NOT FINAL AGENCY ACTION SUBJECT TO THE APA CHALLENGES IN COUNTS I AND II

The States' challenges to the Department's extension of the deadline to satisfy certain

disclosure requirements also fail because they identify no final agency action at issue. In Counts

I and II, the States invoke the cause of action available under the APA, 5 U.S.C. § 706(2), which

provides for review of "final agency action." *See* 5 U.S.C. § 704. The APA defines "agency

action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent

or denial thereof, or failure to act." *Perrigo Research & Dev. Co. v. U.S. FDA*, No. 17-2517

(ABJ), 2017 WL 6017349, at *6 (D.D.C. Dec. 1, 2017) (quoting 5 U.S.C. § 551(13)). "Courts

may not . . . review non-final agency action."  *Hall v. Sebelius*, 689 F. Supp. 2d 10, 17 (D.D.C.

2009). In the absence of another statutory right of action, the final agency action requirement

applies, whether a plaintiff asks a court to "set aside" agency action that is "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or

"without observance of procedure required by law," *id.* § 706(2)(D).

Here, the States seek to set aside the Department's July 5, 2017 announcement postponing the deadline by which schools must include the 2017 disclosure template in their promotional materials, and provide them to prospective students. Even if the announcement here of a temporary postponement of certain aspects of the disclosure requirements in § 668.405 were deemed an "agency action" under the APA definition—an issue that is far from clear—it does not qualify as "final" for purposes of an APA challenge.

A final agency action must "'mark[] the consummation of the agency's decision making process'" and cannot be "'tentative or interlocutory'"; it must also determine "'rights or obligations' or have 'legal consequences.'" *Soundboard Ass'n v. U.S. FTC*, 251 F. Supp. 3d 55, 63 (D.D.C. 2017) (quoting *Bennett v. Spear*, 520 U.S. 154, 177 (1997)). By the APA's own terms, a "preliminary, procedural, or intermediate" agency action is not final. *See* 5 U.S.C. § 704. In this Circuit, courts also consider "(1) whether the agency has taken a definitive legal position concerning its statutory authority; (2) whether the case presents a purely legal question of statutory interpretation; and (3) whether the agency action imposes an immediate and significant practical burden" on the plaintiff. *Soundboard Ass'n*, 251 F. Supp. 3d at 63 (interanl quotation omitted). Ultimately, "[w]hether an agency action is final is a flexible and pragmatic inquiry." *Id.* (internal quotation omitted).

The Department's July 5, 2017 announcement extending the deadline by which schools must provide disclosures under § 668.412(d) and (e) does not mark the consummation of a decision making process by the Department; rather, it is preliminary and procedural in nature. The extension does not reflect a definitive legal position by the Department, nor does it impose an "immediate and significant practical burden" on the States, *Soundboard Ass'n*, 251 F. Supp.

3d at 63. Indeed, the postponement of the deadline for § 668.412(d) and (e) disclosures did not change the fact that schools are still required to include the Disclosure Template on their GE program websites under § 668.412(c). The postponement thus affects only the manner in which schools must disseminate those disclosures, and only temporarily. Meanwhile, prospective students and others remain able to view the substance of the disclosures by visiting the schools' websites. Moreover, unlike 34 C.F.R. § 668.410, which sets forth consequences relating to a GE program's final D/E rate, including the program's potential loss of eligibility for Title IV funding, § 668.412 does not specify any consequence for a school's failure to provide required disclosures.[5] In addition, the temporary nature of the extension suggests that it does not state an "unequivocal position" but instead is "contingent on future agency actions." *Am. Airlines, Inc. v. TSA*, 665 F.3d 170, 174 (D.C. Cir. 2011).

The States cite *Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017), where the Court of Appeals held that EPA's stay of certain portions of a rule regulating methane and other greenhouse gas emissions qualified as final agency action because it was "essentially an order delaying the rule's effective date," and thus "tantamount to amending or revoking" the rule itself. *Id.* at 6. But *Clean Air Council*, which addressed a stay that EPA "proposed to extend . . . for years," *id.* at 7, did not alter the pragmatic approach that governs the final agency action inquiry; it thus cannot be read to mean that *every* delay by an agency that temporarily suspends an obligation otherwise imposed by a regulatory scheme is automatically a final agency action subject to APA challenge.

---

[5] The Department's regulatory scheme provides a mechanism for initiating an enforcement action under 34 C.F.R. §§ 668.81—.99 (setting forth procedures for imposing fines, suspensions, or terminations). However, those provisions do not specify under what circumstances the Department might initiate such an enforcement action for an alleged violation of § 668.412.

The postponement here does not qualify as final for the reasons already explained. Indeed, unlike in *Clean Air Council*, the Department has not stayed any portion of the 2014 Final Rule indefinitely; to the contrary, the Department has been implementing the Rule. Its procedural decision to delay certain requirements for an finite, temporary period while other requirements remain in effect is not equivalent to delaying the effective date of the Rule itself, nor is it tantamount to amending § 668.412(d) or (e). The States thus may not challenge the Department's postponement of the disclosure template requirements in § 668.412(d) and (e) on the grounds that the postponement violated procedural notice and comment requirements or was arbitrary and capricious.

## IV.   THE DEPARTMENT DID NOT VIOLATE PROCEDURAL REQUIREMENTS BY ISSUING THE JULY 5 AND AUGUST 18, 2017 ANNOUNCEMENTS WITHOUT NOTICE AND COMMENT

While the States' claims are barred for jurisdictional and other preliminary reasons, the Department is also entitled to summary judgment on the merits. With respect to the States' Count I, the Department violated no procedural requirement when issuing the July 5, 2017 and August 18, 2017 Federal Register notices. The States argue that notice and comment was required because these announcements "substantively modified" the 2014 Final Rule. Pl. Mem. at 14. The States' notice and comment claims should be rejected, both in regard to the July 5, 2017 announcement extending the deadline by which schools must begin making their disclosure template available pursuant to 34 C.F.R. § 668.412, and in regard to the July 5 and August 18, 2017 changes to the alternate earnings appeals.

First, in regard to the disclosure template dissemination requirements of § 668.412, notice and comment was not required because the establishment of a deadline for beginning certain methods of disclosure template dissemination is procedural in nature. Procedural rules

are exempt from the APA's notice and comment requirements because they do not alter the rights or interests of regulated parties. *See JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994). Here, the July 5, 2017 announcement did not alter the rights or interests of regulated parties as set forth in the 2014 Final Rule. The Rule states that schools must comply with the requirements of § 668.412 beginning January 1, 2017. 34 C.F.R. § 668.412(h). However, § 668.412 also states that the Department will set forth "procedures and timelines" governing schools' obligations to update the information in their disclosure template. *Id.* § 668.412(b). As discussed above, subsection (c) requires that schools include that disclosure template on their GE program websites, *id.* § 668.412(c), while subsections (d) and (e) require that schools include that disclosure template in promotional materials, *id.* § 668.412(d), and provide the disclosure template to prospective students, *id.* § 668.412(e). The Department's June 5, 2017 announcement postponed only the latter requirements. 82 Fed. Reg. at 30976. Thus, as the States acknowledge, Pl. Mem. at 16, schools must continue to display the disclosure template on GE programs' websites, and students and others may access the same information there that they would receive through dissemination under § 668.412(d) or (e). *See* 82 Fed. Reg. at 30976. As explained above, the postponement thus affects the timing of specific methods of disseminating the disclosure template, but does not prevent students and others from accessing the same information by visiting a GE program's website.

The temporary and limited nature of the July 5, 2017 postponement distinguishes the situation here from the cases cited by Plaintiffs, which addressed indefinite or permanent suspensions of regulatory obligations. *See Envtl. Def. Fund, Inc. v. EPA*, 716 F.2d 915, 917 (D.C. Cir. 1983) (describing EPA's "permanently suspend[ing]" a reporting requirement one year, followed by its deferring compliance the next year by six months); *Envtl. Def. Fund, Inc. v.*

*Gorsuch*, 713 F.2d 802, 809 (D.C. Cir. 1983) (explaining that EPA's decision to suspend the effective date of new regulations "indefinitely delayed the time when actual compliance . . . would be compelled"); *Nat. Res. Def. Council, Inc. v. U.S. EPA*, 683 F.2d 752, 761 (3d Cir. 1982) (addressing "EPA's action in indefinitely postponing the effective date" of regulatory amendments). Here, the States' claim that the postponement "effectively gut[s] the Rule," Pl. Mem. at 16, is disingenuous, at best. Accordingly, the June 5, 2017 postponement should properly be considered procedural in nature and thus exempt from notice and comment requirements.

Second, the Department also was not required to go through notice and comment when implementing changes to the alternate earnings appeal deadlines and standards in the July 5, 2017 and August 18, 2017 Federal Register notices. Those changes were a reasonable response to the Order of June 28, 2017, issued by the Court in *AACS*. It is well established that an agency need not wait to go through notice and comment rulemaking "when rulemaking without notice and comment is 'a reasonable and perhaps inevitable response to' a 'court order.'" *EME Homer City Generation, L.P. v. EPA.*, 795 F.3d 118, 134 (D.C. Cir. 2015) (quoting *Am. Fed'n of Gov't Employee., AFL-CIO* ("*AFGE*") *v. Block*, 655 F.2d 1153, 1157 (D.C. Cir. 1981)). In *AFGE*, the D.C. Circuit upheld the Department of Agriculture's issuance of emergency regulations, without notice and comment, after a court held that the existing regulations establishing uniform poultry inspection rates were invalid. *Id.* The Court of Appeals reasoned that even though the court had not required the agency to issue such regulations, "the absence of specific and immediate guidance" from the Department of Agriculture would have created confusion and caused "harm and economic disruption" to poultry processors and to consumers. *Id.* Moreover, the agency would be able to go forward with a new rulemaking "once [the] emergency situation has been eased by the promulgation of interim rules." *Id.* at 1158. More

31

recently, in *EME Homer City Generation*, the Court of Appeals similarly recognized that EPA could replace a rule that had been held invalid by the Court without following notice and comment procedures because "it would have been utterly 'unnecessary' and wasteful to go through notice and comment given [the Court's] decision." *EME Homer City Generation,* 795 F.3d at 135.

Here, the Department's July 5, 2017 and August 18, 2017 Federal Register announcements extended the deadlines for schools to provide a notice of intent to file an alternate earnings appeal, and to file such an appeal, as a direct result of the Court's decision in *AACS*, holding that certain requirements in the alternate earnings appeal process set forth in the 2014 Final Rule were invalid. *See* 82 Fed. Reg. at 30975-76 (deadlines would be extended "in light of the Court Order" in *AACS*); 82 Fed. Reg. at 39363 (same). The August 18, 2017 announcement also stated that "[t]o further comply with the Court Order," the Department would not enforce the requirements set forth in the 2014 Final Rule that set minimum response thresholds for alternate earnings data, but instead would consider response rates as a factor when assessing the alternate earnings data's reliability. *Id.* The Department made clear that these changes were being implemented "on a one-time basis to comply with the Court Order." *Id.* At the same time, the Department solicited comments for purposes of considering "whether to take any future action in connection with the upcoming negotiated rulemaking." *Id.* Under these circumstances, for the same reasons recognized by the D.C. Circuit in *AFGE* and *EME Homer City Generation*, therefore, notice and comment was not required.

The States' primary argument to the contrary is that the Court's Order did not require that the Department change the alternate earnings appeal process for any school other than AACS members. Pl. Mem. at 16 (complaining that "the Department has given *all* programs the

benefit of the *AACS* ruling"); *see id.* at 21. According to the States, the reasoning in *AACS* would not apply uniformly because many GE programs do not have graduates who "derive substantial income from tips." *Id.* at 16. However, the Court in *AACS* expressly recognized that underreporting can occur across many industries, not only due to tip income but also due to self-employment and cash income. *AACS*, 258 F. Supp. 3d at 73-74. And the Court's criticisms of the alternate earnings appeal process had broad application and were not limited to cosmetology schools, or even programs with a high incidence of underreported income. *See id.* at 56 (referring to the Department's "arbitrary and capricious narrowing of appellate recourse"). The Court cast doubt on the validity of "inexplicably requiring high response rates to submit state-sponsored or survey-based alternate earnings calculations," *id.*, finding that the Department did not sufficiently explain the statistical significance of the numerical thresholds for such calculations set forth in the GE regulations, and referring to them as "onerous regulatory prerequisites" that made it effectively impossible to submit an appeal. *See id.* at 75. Given the Court's reasoning, the Department's decision to apply the changes that were necessary under *AACS* to all programs was reasonable. Indeed, if the Department had not done so, it would have faced a high risk that any program that was excluded from the changes would file its own claim in this Court, raising the same arguments raised in *AACS*, and prevail.

The States otherwise argue that the *AACS*-related, one-time changes set forth in the July 5 and August 18, 2017 Federal Register notices were "part of the Department's stated plan to replace the existing Rule." Pl. Mem. at 17. However, the Department reasonably concluded that these changes were required, given the Court's ruling in *AACS*. Moreover, the new deadlines set forth in the July 5 and August 18, 2017 notices remained in effect and have now passed, and GE programs were required to comply with those deadlines. There is no basis to conclude that the Department's actions had any purpose other than to comply with *AACS*. Nor would any

such secondary purpose alter the conclusion that, in light of *AACS*, the Department was justified

in issuing the July 5 and August 18, 2017 changes in the alternate earnings appeal deadlines and

standards without following notice and comment.

## V.   THE JULY 5 AND AUGUST 18, 2017 ANNOUNCEMENTS WERE NOT ARBITRARY AND CAPRICIOUS

The Department is also entitled to judgment as a matter of law with respect to Count II.

The Department's postponement of the disclosure template dissemination requirements in

§ 668.412(d) and (e) was reasonable. "When an agency interprets its own regulation, the Court,

as a general rule, defers to it unless that interpretation is plainly erroneous or inconsistent with

the regulation." *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013). Here, the 2014 Final

Rule sets forth an implementation date of July 1, 2017 for the disclosure template requirements.

34 C.F.R. § 668.412(h). However, § 668.412 confers continuing authority on the Department to

adjust the disclosure template requirements as it deems warranted. The provision states that the

Department "will conduct consumer testing to determine how to make the disclosure template as

meaningful as possible." *Id.* § 668.412(a). The provision lists certain pieces of information that

might be included in the disclosure template but leaves it to the Department to "identif[y] the

information that must be included" at a later time, by publishing a notice in the Federal Register.

*Id.* The provision also allows the Department to establish "procedures and timelines" to govern

updates to the disclosure template. *Id.* § 668.412(b).

The Department's decision to postpone requiring schools to disseminate the disclosure

template in promotional materials and to provide the template directly to prospective students,

while continuing to make the disclosure template available on GE program websites, is not

inconsistent with the regulation, nor is it unreasonable. Indeed, the Department's conclusion that

it should evaluate the utility of distributing the disclosure template as set forth in § 668.412(d)

and (e) is consistent with the regulation's statement that the Department would continue to consider "how to make the disclosure template as meaningful as possible." *Id.* § 668.412(a). The Department's July 5, 2017 postponement of the requirements in § 668.412(d) and (e) was not arbitrary or capricious, and the States' challenge to that decision thus should be rejected.

The States' substantive challenge to the Department's July 5 and August 18, 2017 changes to the deadlines and standards applicable to alternate earnings appeals also fails as a matter of law. Those changes cannot be deemed arbitrary and capricious because, as described above, they reasonably implemented the Court's decision in *AACS*. The States suggest that the Department should have made greater efforts to identify GE programs that had no graduates with self-employment, cash, or tip income, for whom the SSA data alone should provide accurate earnings data. Pl. Mem. at 25-26. However, the record in *AACS* already suggested that a wide variety of GE program graduates likely had such income. *AACS*, 258 F. Supp. 3d at 73-74. Moreover, as noted above, the concern that the Court in *AACS* expressed regarding the response thresholds in the alternate earnings appeals would necessarily apply broadly to any GE program seeking to file an alternate earnings appeal, regardless of whether the appeal was based on self-employment, cash, and tip income, or some other dispute with the SSA earnings data. *See id.* at 74-75 (referring to appeal process as posing "onerous regulatory prerequisites"). The Department's decision to apply the changes to all GE programs was reasonable in light of the reasoning of the Court in *AACS* and the record in that case.

Moreover, the States' assertion that the Department failed to explain its reasoning when modifying the alternate earnings appeal standards is not well taken. The Court in *AACS* held that the strict numerical threshold requirements in 34 C.F.R. § 668.406 were unduly burdensome. *AACS*, 258 F. Supp. 3d at 74, 76-77. The Department responded by eliminating those strict

numerical thresholds while stating that it would consider response rates when determining whether a program's alternate earnings data was sufficiently reliable to warrant granting an appeal. 82 Fed. Reg. at 39363. The Department's reasoning in doing so is apparent: It wished to comply with *AACS* while reserving the ability to consider response rates as necessary in order to evaluate the reliability of program data. The Department's consideration of these issues, and its corresponding changes to the alternate earnings appeal standards, were not arbitrary and capricious. The Court thus should grant summary judgment to the Department on Count II.

## VI.   THE DEPARTMENT DID NOT UNREASONABLY WITHHOLD OR DELAY DRAFT GE COMPLETERS LISTS FOR 2017

The Department is also entitled to judgment as a matter of law on Count III. In Count III, the States ask the Court, pursuant to 5 U.S.C. § 706(1), to compel the Department to "carry out its legal duties under the Rule, including, but not limited to, providing institutions with Draft GE Completers Lists and calculating and issuing debt-to-earnings rates." Compl. ¶ 121. A claim under § 706(1) "'can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*.'" *Ctr. for Biological Diversity v. Zinke,* 260 F. Supp. 3d 11, 20 (D.D.C. 2017) (quoting *Norton v. SUWA*, 542 U.S. 55, 64 (2004)). The "discreteness" requirement ensures that a lawsuit targeting agency inaction will be no broader in scope that a lawsuit challenging "final agency action" under 5 U.S.C. §§ 704 and 706(2). *Id.* (citing *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001)). Thus, to the extent the States seek to mount a "'broad programmatic attack,'" by requesting that the Court broadly require the Department to implement the GE regulations, their claim is barred at the outset. *See id.* (quoting *SUWA*, 542 U.S. at 65).

To the extent the States seek relief limited to an order requiring the Department to provide schools with draft GE Completers Lists for 2017, their claim also fails. The States point

to 34 C.F.R. § 668.405(a)(1) as the source of the Department's obligation to create Completers

Lists. Pl. Mem. at 30. However, rather than imposing a mandatory obligation on the Department,

that provision simply describes the procedure that the Department would follow in order to

calculate a GE program's D/E rate in a given year. *See* 34 C.F.R. § 668.405(a)(1) ("Overview.

For each award year, the Secretary determines the D/E rates for a GE program at an institution

by—Creating a list of the students who completed the program during the cohort period and

providing the list to the institution, as provided in paragraph (b) of this section[.]"). While the

GE regulations may contemplate the Department's provision of draft GE Completers Lists as one

step in the process of calculating D/E rates, the purpose of the description in the regulations is

not to impose a mandatory obligation on the Department, but instead to provide notice to schools

that, once they receive those Lists, they will have an opportunity to review the Lists and, if

necessary, submit corrections. *See id.* § 668.405(a)(2) (stating that after the Department provides

Completers Lists to schools, it will "[a]llow[]" schools "to correct the information about the

students on the list").

This reading of § 668.405 is consistent with the fact that Congress has not expressly

required the Department to calculate D/E rates or condition Title IV funding on GE programs'

adherence to certain D/E thresholds. The States cite 20 U.S.C. § 1231a as a statute that

"instruct[s] the Secretary to '"prepare and disseminate to . . . institutions information concerning

applicable programs.'" Pl. Mem. at 30 (quoting 20 U.S.C. § 1231a). However, as the Court in

*APSCU III* recognized, § 1231a simply provides "broad authority" for the Department to collect

information, *APSCU III*, 110 F. Supp. 3d at 201; it does not impose a mandatory obligation on

the Department to perform any particular discrete action, as would be required to invoke

§ 706(1). Indeed, rather than implementing such a direct mandate, the GE regulations are a

product of the Department's interpretation of ambiguous statutory language. *APSCU III*, 110 F. Supp. 3d at 186 (Congress "le[ft] a policy gap, which it is the Department's prerogative to fill").

The States' attempt to analogize the reference in the GE regulations to the draft GE Completers Lists to the requirements at issue in *Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2011), and *Cutler v. Hayes*, 818 F.2d 879 (D.C. Cir. 1987), is misplaced. *Cobell* relied heavily on the Secretary's obligation to carry out certain fiduciary responsibilities owed to beneficiaries of Individual Indian Money trust accounts, holding that the defendants owed "specific intermediate statutory duties" that "create rights in favor of [the] plaintiffs, in connection with the government's "High Level Implementation Plan," which was its "most comprehensive plan to discharge its trust duties." *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 4, 36 (D.D.C. 1999). *Cutler* addressed a situation where Congress had expressly directed the Food and Drug Administration ("FDA") to determine whether proposed new drugs were both safe and effective, and the plaintiffs argued that the agency's delay in proceeding with an over-the-counter review program that it had established in order to comply with that statutory mandate frustrated the purposes of the statute. *Cutler*, 818 F.2d at 894-95. In contrast, the draft GE Completers Lists are not part of any similar discharge of fiduciary or statutory obligations, nor have the States argued that such obligations have been frustrated. Fairly read, the GE regulations, including the description in § 668.405 of the Department's provision of GE Completers Lists to schools, are designed to describe how the Department will calculate D/E rates so that schools will understand the process and what will be required of them along the way. There is no basis to interpret § 668.405 as creating an obligation of the Department that an outside third party can seek to enforce.

Moreover, even if § 668.405(a)(1) is interpreted as imposing an obligation on the Department to provide schools with GE Completers Lists for 2017, no delay has occurred that "is

so egregious as to warrant [the] mandamus" remedy of § 706(1). *Telecommc'ns Research & Action Ctr. v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984). As described above, the Department did not provide Completers Lists for 2016 until June 1, 2016, over six months after it had originally anticipated doing so. The Department's calculation of D/E rates last year, the first year that it carried out such calculations under the 2014 Final Rule, was then disrupted by the Court's decision in *AACS*, which required the Department to delay its alternate earnings appeal timeline by another several months. Indeed, the deadline for schools to submit their alternate earnings appeal documentation has only recently passed, and the Department is still in the process of addressing those appeals. Many schools that submitted appeals thus do not yet know the outcome of the initial year's D/E rate calculation process. It is reasonable that the Department seeks to complete the D/E rate calculations for that initial year before embarking on the process again for the following year. Indeed, had the Department provided schools with GE Completers Lists in June 2017, as the States suggest, and begun the D/E rate calculation process for the 2015-2016 award year at that time, it would have done so in the face of uncertainty regarding the outcome of the *AACS* litigation, and it would then have had to allocate resources to the various steps involved in the D/E rate calculation for that year at the same time it was attempting to complete the process for the initial year, including the changes to the alternate earnings appeals that the *AACS* decision required.[6] The Department's decision instead to wait until the initial year of D/E

---

[6] Plaintiffs are incorrect that the Department's failure to provide schools with 2017 GE Completers Lists is inconsistent with an established "timeline," *see* Pl. Mem. at 32 & n.3. The GE regulations allow for certain response times by schools at certain stages in the D/E rate calculation process, and the Department has issued announcements informing schools in advance when it anticipated issuing certain information, but it has not committed to any specific deadline for issuing D/E rates for a given year, particularly at this early stage when the process for the initial year is not yet complete. Indeed, the 2014 Final Rule, cited by Plaintiffs, does not identify a particular month or season as the goal for publishing D/E rate information. Moreover, the delay

rate calculations is entirely complete before initiating the process for the next year is reasonable.

The Court thus should grant summary judgment to the Department on Count III.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Plaintiff's Motion for Summary

Judgment and grant Defendant's Cross-Motion for Summary Judgment.

Dated:  February 13, 2018                          Respectfully Submitted,

                                                   CHAD A. READLER
                                                   Acting Assistant Attorney General
                                                   JESSIE K. LIU
                                                   United States Attorney
                                                   MARCIA BERMAN
                                                   Assistant Director, Federal Programs Branch

                                                    /s/ Kathryn L. Wyer
                                                   KATHRYN L. WYER
                                                   Trial Attorney
                                                   United States Department of Justice
                                                   Civil Division, Federal Programs Branch
                                                   20 Massachusetts Avenue NW Room 7124
                                                   Washington, D.C. 20530
                                                   Tel.: (202) 616-8475
                                                   Fax: (202) 616-8470
                                                   Email: kathryn.wyer@usdoj.gov
                                                   *Attorneys for Defendants*

---

and changes to the alternate earnings appeals necessitated by *AACS* has meant that the Department is now addressing those appeals while also engaging in a separate negotiated rulemaking process that is intended to lead to final regulations that, pursuant to statutory requirements, must be published on or before November 1, 2018 in order for them to go into effect on July 1, 2019, *see* 20 U.S.C. § 1089, further burdening the Department's resources.