**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF MARYLAND, COMMONWEALTH OF PENNSYLVANIA, COMMONWEALTH OF MASSACHUSETTS, PEOPLE OF THE STATE OF CALIFORNIA *ex rel.* XAVIER BECERRA, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF HAWAII, PEOPLE OF THE STATE OF ILLINOIS, STATE OF IOWA, STATE OF MINNESOTA, STATE OF NEW YORK, STATE OF NORTH CAROLINA *ex rel.* JOSH STEIN, Attorney General, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, *ex rel.* MARK R. HERRING, Attorney General, and STATE OF WASHINGTON,<br><br>                                        Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, and ELISABETH D. DEVOS, *in her official capacity as Secretary of Education,*<br><br>                                        Defendants. | **CIVIL ACTION NO: 1:17-cv-2139-KBJ** |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY MEMORANDUM IN
SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

ARGUMENT .................................................................................................................. 3

    I.    The States Have Standing to Pursue This Action ................................................... 3

          A.    The States Have Been Injured by Defendants' Conduct ............................ 4

          B.    The States May Assert *Parens Patriae* Standing........................................ 7

          C.    The States' Injuries Are Fairly Traceable to Defendants' Actions ............. 8

          D.    The States Fall Within the "Zone of Interests" of the Relevant Statute ..... 9

    II.    The Postponement of the Disclosure Requirements Constitutes Final Agency Action ................................................................................................................. 11

    III.    The Delay of the Disclosure Dissemination and Changes to the Alternate Earnings Appeal Process Were Improperly Issued Without Observance of Procedures Required by Law and Were Arbitrary and Capricious ........................................ 13

          A.    The Delays of the Disclosure Requirements Were Substantive Changes Requiring Notice and Comment and Were Arbitrary and Capricious...... 13

          B.    The Alternate Earnings Appeal Changes Required Notice and Comment and Were Arbitrary and Capricious ........................................................ 16

    IV.    The Department's Unlawful Withholding or Unreasonable Delay Violates the APA ................................................................................................................. 20

          A.    The Calculation of Debt-to-Earnings Rates is a Discrete Agency Action 20

          B.    The Department's Duty to Send Draft GE Completers Lists to Institutions is a Mandatory, Non-Discretionary Agency Action. ................................ 21

          C.    The Department's Delay is Egregious and Unreasonable. ....................... 23

CONCLUSION ............................................................................................................. 26

# TABLE OF AUTHORITIES

## CASES

*Abrams v. Heckler*, 582 F. Supp. 1155 (S.D.N.Y. 1984) .................................................. 7

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982) ........................... 7, 8

*Allen v. Wright*, 468 U.S. 737 (1984) ......................................................................... 8

*Am. Ass'n of Cosmetology Schs. v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017) .................. *passim*

*Am. Fed'n of Gov't Employee, AFL-CIO v. Block*, 655 F.2d 1153 (D.C. Cir. 1981) ....... 17, 18, 19

*Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017), *cert. denied*, No. 17-641, 2018 WL 942459 (Feb. 20, 2018) ......................................................................................... 7, 9

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................................... 11

*Center for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11 (D.D.C. 2017) ................. 20, 21, 22

*City of New York v. Heckler*, 578 F. Supp. 1109 (E.D.N.Y.), *aff'd*, 742 F.2d 729 (2d Cir. 1984) . 7

*Clarke v. Securities Industry Assn.*, 479 U.S. 388 (1987) ........................................... 10

*Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017) ........................................ 12-13, 16

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) .................................................... 23-24

*Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573 (D.C. Cir. 1981) ...................... 16

*EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118 (D.C. Cir. 2015) ................... 17, 18, 19

*Envtl. Def. Fund v. E.P.A.*, 716 F.2d 915 (D.C. Cir. 1983) .......................................... 16

*Envtl. Defense Fund v. Gorsuch*, 713 F.2d 802 (D.C. Cir. 1983) ................................... 14

*Investment Company Institute v. Camp*, 401 U.S. 617 (1987) ...................................... 10

*Maryland People's Counsel v. F.E.R.C.*, 760 F.2d 318 (D.C. Cir. 1985) ......................... 4, 8

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ........................................................... 4

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) .......................................................... 7

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) .... 10

*Mead Data Cent., Inc. v. U.S. Dept. of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ................ 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . 19

*N. Mariana Islands v. U.S.*, 686 F. Supp. 2d 7 (D.C. Cir. 2009) ................................................... 17

*Nat'l Res. Def. Council v. E.P.A.*, 683 F.2d 752 (3rd Cir. 1982) ................................................. 14

*Nat'l Venture Capital Ass'n v. Duke*, No. 17-1912, 2017 WL 5990122 (D.D.C. Dec. 1, 2017). 14, 16

*Petry v. Block*, 737 F.2d 1193 (D.C. Cir. 1984) ........................................................................ 18

*Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356 (D.C. Cir. 1996)...... 10, 11

## STATUTES & LEGISLATIVE MATERIALS

5 U.S.C.

    § 551 ......................................................................................................................... 22

    § 553 ......................................................................................................................... 17

    § 704 ......................................................................................................................... 11

15 U.S.C. § 717 ............................................................................................................................. 8

20 U.S.C.

    § 1001 ......................................................................................................................... 6

    § 1002 ......................................................................................................................... 6

    § 1099a ................................................................................................................... 3, 10

    § 1099b ....................................................................................................................... 3

    § 1099c ....................................................................................................................... 3

## REGULATIONS

34 C.F.R. § 668.403 ...................................................................................................................... 5

34 C.F.R. § 668.405 ................................................................................................................ 21, 24

34 C.F.R. § 668.412 ............................................................................................................... *passim*

*Negotiated Rulemaking Committees; Negotiator Nominations and Schedule of Committee Meetings—Borrower Defenses, Financial Responsibility, and Gainful Employment*, 82 Fed. Reg. 41194 (Aug. 30, 2017) .................................................................................... 11

*Program Integrity: Gainful Employment*, 79 Fed. Reg. 64,890 (Oct. 31, 2014)........................ 21

*Program Integrity: Gainful Employment*, 82 Fed. Reg. 30,97 (July 5, 2017)............................ 16

## OTHER AUTHORITIES

N.Y. Times, *DeVos Is Discarding College Policies That New Evidence Shows Are Effective*
    (June 30, 2017)................................................................................................................ 5

*Press Release, Education Department Releases Final Debt-to-Earnings Rates for Gainful
    Employment Programs* (Jan. 9, 2017).............................................................................. 5

*The Triad: Promoting a System of Shared Responsibility, Issues for Reauthorization of the
    Higher Education Act, Hearing Before the Senate Committee on Health, Education,
    Labor, and Pensions*, S. Hrg. 113-815 (2013).................................................................. 3

U.S. Department of Education Office of Inspector General, *Recommendations for the
    Reauthorization of the Higher Education Act*2 (Mar. 2, 2018) ......................................... 6

## INTRODUCTION

The States respectfully submit this combined memorandum in opposition to Defendants' cross-motion for summary judgment and reply memorandum in support of their motion for summary judgment. In their opening memorandum, the States explained how the Department of Education has refused to enforce a duly promulgated regulation designed to protect students from being victimized by for-profit and other educational institutions. This regulation, known as the "Gainful Employment Rule" (the "Rule"), required institutions to provide meaningful disclosures to potential students about, among other things, the earnings and debt load of program graduates, so that they could make informed choices about whether to enroll. It also penalized programs that victimized their students by requiring students to take on high student loan debt without giving them the skills they would need to earn a sufficient income to pay that debt back. Under the Rule, such programs could lose eligibility for federal student loans if they received a failing or "in the zone" score on a measurement of graduates' average debt load relative to their average earnings (the "debt-to-earnings rate") for multiple years.

Rather than carry out its obligation to enforce the Rule, the Department has taken a series of actions to ensure that the Rule is never carried out in a meaningful way. Without any justification, it had repeatedly delayed the deadline for programs to comply with the two most important disclosure obligations under the Rule, thus making it more difficult for prospective students to obtain information about their job prospects if they choose to enroll. And the Department has also gutted the aspect of the Rule related to programs challenging their debt-to-earnings rate by announcing, again without any meaningful justification, that it would not enforce certain requirements that programs must satisfy to appeal the determination of a program's graduates' earnings. Finally, the Department has exacerbated its refusal to enforce the

Rule by failing to calculate debt-to-earnings rates and by refusing to provide programs with "draft completers lists" for 2017 – an essential step in the debt-to-earnings calculation process that the Department has no discretion to disregard.

The Department's actions (and failure to act) violate the law. In their opening memorandum, the States explain why summary judgment should be granted and the Department should be required to comply with is obligations. In response, the Department[1] now contends that this Court may not hear this case because the States do not have standing and because the challenged disclosure delays do not constitute "final agency action." But the suggestion that the States lack standing ignores the Rule itself, which detailed how the States are harmed by educational institutions that fail to adequately prepare their students for gainful employment. The Rule was intended to prevent these harms – and the Department's refusal to enforce it unsurprisingly injures the States. Moreover, the argument that the delays do not constitute final agency action is foreclosed by precedent recognizing that an agency's refusal to enforce the requirements of an existing regulation is no different from issuing a new regulation.

The arguments offered by the Department on the merits of the States' claims are no more convincing. The Department suggests that it is free to change compliance deadlines in the Rule without following the requirements of the Administrative Procedure Act, ignoring clear precedent from the D.C. Circuit as well as the language of the Rule itself. It similarly argues that its dramatic expansion of the ability of programs to appeal is consistent with this Court's decision in *Am. Ass'n of Cosmetology Schs. v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017) ("*AACS*"), while also acknowledging that it goes well beyond what was required by that decision – a concession that is fatal to their argument. Finally, the Department's claim that it has no

---

[1] Defendants U.S. Department of Education and Elisabeth S. DeVos, in her official capacity as Secretary of Education, are collectively referred to as "the Department."

obligation to calculate debt-to-earnings rates or produce draft completers lists to institutions in a timely fashion rests on the faulty premise that it is not bound by its own regulations – a suggestion that flies in the face of fundamental principles of administrative law.

This Court should grant the States' summary judgment motion, deny the Department's cross-motion, and order the Department to carry out its obligations under the Rule.

## ARGUMENT

## I.   THE STATES HAVE STANDING TO PURSUE THIS ACTION

The States play a unique and integral role in the oversight of higher education across the country, acting as one leg of the "triad" responsible for regulation of colleges and universities. *See* 20 U.S. Code §§ 1099a, 1099b, & 1099c (discussing responsibilities of States, accrediting agencies, and the Department); *see also The Triad: Promoting a System of Shared Responsibility, Issues for Reauthorization of the Higher Education Act, Hearing Before the Senate Committee on Health, Education, Labor, and Pensions*, S. Hrg. 113-815, at 2 (2013) (Statement of Sen. Harkin) ("Historically … States have been tasked with consumer protection, and the Federal Government with oversight of compliance."). As a result, the States have a vested interest in seeing that the Department carries out its legal obligations.

The failure of the Department to live up to its responsibilities under the Rule harms the States – both directly, in the form of additional costs imposed on them and the increased enforcement burden they must carry, and to the States' *parens patriae* interest in protecting the well-being of their residents. The States therefore have standing to challenge the actions the Department has taken to delay and undermine the Rule as well as its refusal to perform the obligations the Rule imposes on it. The Department's arguments to the contrary ignore the role played by the States in oversight of higher education and disregard they very real harms that the

3

States will suffer as a result of the Department's actions. And they also ignore the fact that, as both the Supreme Court and the D.C. Circuit have recognized, States are entitled to "special solicitude" in any standing analysis. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 520 (2007); *Maryland People's Counsel v. F.E.R.C.*, 760 F.2d 318, 320 (D.C. Cir. 1985) (discussing "special solicitude for states and state agencies" in standing analysis). The Department's claim that the States lack standing is without merit and should be rejected.

### A.      The States Have Been Injured by the Department's Conduct

The States have been harmed and will continue to be harmed by the Department's refusal to enforce the Rule. As detailed in the States' complaint, they face the waste and loss of State-funded grant and loan money that is paid to schools that would otherwise be ineligible for Title IV loans or that would see a reduction in enrollment if they were required to fully comply with the Rule's disclosure requirements and specifically inform prospective students that they were identified as "failing" or "in the zone." In addition, States are forced to spend additional resources to investigate fraudulent programs, including programs that would otherwise be ineligible for Title IV funding if the Rule were fully enforced. Finally, the States lose tuition money from State-sponsored educational institutions, as some students who would otherwise attend State institutions opt to attend for-profit institutions whose programs would be precluded from receiving Title IV funds if the Department enforced the Rule.

These harms are not speculative – to the contrary, they find support in the findings the Department made in issuing the Rule. For instance, the *Federal Register* notice setting forth the language and policy basis for the Rule specifically acknowledged that states would see a benefit "from improved oversight of their investments in postsecondary education" as well as the fact that "State and local postsecondary education funding will be allocated more efficiently to

higher-performing programs." *Program Integrity: Gainful Employment*, 79 Fed. Reg. 64,890,

65,080 (Oct. 31, 2014). Results from the Rule's early implementation – before the current

leadership of the Department elected to stop enforcing it – confirmed that the States could

potentially see significant benefits as a result. When the Department published the first year of

debt-to-earnings rates in January 2017 (based on 2015 data), it identified more than 800

programs as failing, 98% of which were offered by for-profit institutions. *See* Press Release,

Education Department Releases Final Debt-to-Earnings Rates for Gainful Employment Programs

(Jan. 9, 2017), *available at* https://www.ed.gov/news/press-releases/education-department-

releases-final-debt-earnings-rates-gainful-employment-programs (attached hereto as Exh. A).

Under the Rule, programs that fail two years in a row become ineligible for Title IV

funding. *See* 34 C.F.R. § 668.403(c)(4)(i). Had the Department continued to enforce the Rule and

published a second year of debt-to-earnings rates, some of these programs would have failed

again, in which case they would no longer be eligible for Title IV funding. In fact, it was

reported that 300 programs closed after receiving one failing evaluation – presumably because

their leadership realized that they were likely to fail again and lose federal student aid. *See* N.Y.

Times, *DeVos Is Discarding College Policies That New Evidence Shows Are Effective* (June 30,

2017), *available at* https://www.nytimes.com/2017/06/30/upshot/new-evidence-shows-devos-is-

discarding-college-policies-that-are-effective.html (attached hereto as Exh. B). And programs

that wished to avoid this fate would necessarily need to improve their performance on the debt-

to-earnings metric, either by reducing the debt load of their graduates (through lower tuition) or

helping graduates earn more (through improving the quality of the program or providing better

job placement assistance).

In addition, the Rule also acknowledged the critical role played by states in identifying the failures of these programs to live up to their obligations under the HEA, observing, "Several State Attorneys General have sued for-profit institutions to stop these fraudulent marketing practices, including manipulation of job placement rates." 79 Fed. Reg. at 64,907. It went on to detail several enforcement actions brought by states that uncovered abuses by for-profit institutions. *See id.* at 64,907-08 (discussing various investigations and enforcement actions by 16 states). The Department concluded, "This accumulation of evidence of misrepresentations to consumers by for-profit institutions regarding their outcomes provides a sound basis for the Department to conclude that a strong accountability framework for assessing outcomes by objective measures is necessary to protect consumers from enrolling and borrowing more than they can afford to repay." *Id.* at 64,908.

Thus, the Department recognized that these State-led investigations demonstrated that many for-profit and other programs were failing "to prepare students for gainful employment in a recognized occupation." *See* 79 Fed. Reg. at 64,890. Under the HEA, such programs are not eligible for Title IV funding. *See* 20 U.S.C. §§ 1001(b)(1), 1002(b)(1)(A)(i), (c)(1)(A). Through the Rule, the Department therefore carried out its statutory obligation to ensure that only eligible programs received federal funds. But by refusing to enforce the Rule, the Department has now placed the burden back on the States to use their consumer protection laws and other tools to police programs that would not be in existence if the Department complied with the Rule, and thereby caused injury to the States.[2]

---

[2] A recent report by the Department's Inspector General confirmed that fraud remains a serious problem among for-profit institutions, finding: "[The Office of Inspector General's] resources devoted to postsecondary school investigations continue to be disproportionately devoted to fraud and abuse in [the for-profit] sector." U.S. Department of Education Office of Inspector General, *Recommendations for the Reauthorization of the Higher Education Act*, at 2 (Mar. 2, 2018) (attached hereto as Exh. C). The report further stated, "We continue to believe that a school receiving funding for programs designed to provide training for a specific occupation need to be held accountable for the success in securing employment for its students in that occupation." *Id.* at 3.

6

The harms identified by the States are more than sufficient to establish standing. As the D.C. Circuit has held, "[a] plaintiff can establish standing "based on allegations of a 'substantial risk' of future injury." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017), *cert. denied*, No. 17-641, 2018 WL 942459 (U.S. Feb. 20, 2018). The Department argues that the injuries the States identify are "implausible" and "speculative," but disregards the findings in the Rule itself that support the States' assertions. To the contrary, the record establishes that the harms to the States are very real.

### B.     The States May Assert *Parens Patriae* Standing

In addition, the States may assert *parens patriae* standing based on the injury suffered by their residents as a result of the Department's refusal to enforce the Rule. The Department does not dispute that the States' residents have suffered injury as a result of its actions, nor could it: because it refuses to enforce the Rule, more students will find themselves saddled with debt that they are unable to pay off.

Instead, the Department argues that *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 610 n.16 (1982), and *Massachusetts v. Mellon,* 262 U.S. 447, 485-86 (1923), prohibit the States from suing the federal government on the basis of their *parens patriae* standing. While those cases may preclude states from relying on *parens patriae* standing in challenging a federal *statute*, *see id.*, they do not preclude *parens patriae* actions challenging actions by a federal agency in violation of federal statutes. *See Abrams v. Heckler*, 582 F. Supp. 1155, 1159 (S.D.N.Y. 1984) ("Here, plaintiffs do not challenge any federal statute. Rather, they rely on § 953 of the Omnibus Budget Reconciliation Act of 1980, and seek to enjoin an administrative agency from violating that statute."); *see also City of New York v. Heckler*, 578 F. Supp. 1109, 1122 (E.D.N.Y.), *aff'd*, 742 F.2d 729 (2d Cir. 1984).

One of the cases relied on by the Department confirms that the States may assert their *parens patriae* standing here. In *Maryland People's Counsel v. FERC*, then-judge Scalia held that a state agency had *parens patriae* standing to challenge a decision by the Federal Energy Regulatory Commission. *See* 760 F.2d 318, 321 (D.C. Cir. 1985). After acknowledging language from *Mellon* and *Snapp* limiting the States' ability to assert *parens patriae* standing against the federal government, the court concluded that the limitations of those cases are not constitutional in nature, but apply to what is referred to as the "'prudential component'" of standing, "an element that the courts must dispense with if Congress so provides." 760 F.2d at 321 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). The court noted that the governing statute allowed "'[a]ny party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding" to seek judicial review'" of that order, 760 F.2d at 320 (quoting 15 U.S.C. § 717r(b)) (alteration in original), and further authorized states and state agencies to participate before the commission, *id.* The same principle applies here, as the States have statutory standing under the APA, which allows them to seek redress for the injuries to their *parens patriae* interest caused by the Department's failure to enforce the Rule.

### C.     The States' Injuries Are Fairly Traceable to Defendants' Actions

The Department argues that the States' asserted injuries are not "fairly traceable" to its actions. Its argument on this point rests on the same premise as its claim that the States cannot demonstrate injury: that the injuries are speculative in nature. The Department claims, "[t]here is simply no plausible basis to assert what schools and students might have done differently if the Department's actions regarding disclosures under 34 C.F.R. § 668.412(d), alternate earnings appeals, or the GE Completers List had been other than they were." Def. Br. 24.

This assertion is completely false. If the Department had enforced the Rule, some programs would have found themselves ineligible for Title IV funding, while others would have seen a significant decline in enrollment after they provided full disclosure to prospective students about their track record. And many would improve their performance, such that they were no longer subject to a risk of losing federal funding. Any of these outcomes would have lessened the harm to the States. Indeed, these are the outcomes contemplated by the Rule. *Program Integrity: Gainful Employment*, 79 Fed. Reg. 16,426 (Mar. 25, 2014) ("For programs that perform poorly under the measures, institutions would need to make improvements in the initial years of the rule, or lose program eligibility for title IV, HEA program funds . . . The transparency framework is designed to establish reporting and disclosure requirements that would increase the transparency of student outcomes of GE programs so that information is disseminated to students, prospective students, and their families that is accurate and comparable and could help them make better informed decisions about where to invest their time and money in pursuit of a postsecondary degree or credential.")

In any event, the States are not required to show that the Department's actions are the sole basis for their injury. To the contrary, "Article III standing does not require that the defendant be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries; it requires only that those injuries be 'fairly traceable' to the defendant." *Attias*, 865 F.3d at 629. The injuries identified by the States are all "fairly traceable" to the Department's refusal to enforce the Rule, and are therefore sufficient to establish Article III standing.

**D.      The States Fall Within the "Zone of Interests" of the Relevant Statute**

Finally, the States fall within the "zone of interests" of the relevant statute. This test "'is not meant to be especially demanding,'" and is to be applied "in keeping with Congress's

'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'"

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)

(quoting *Clarke v. Securities Industry Assn.,* 479 U.S. 388, 399 (1987)). Therefore, "[t]he benefit

of any doubt goes to the plaintiff," *Patchak*, 567 U.S. at 225, and a plaintiff falls within the zone

of interests unless its "interests are so marginally related to or inconsistent with the purposes

implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the

suit," *Clarke*, 479 U.S. at 399. This is a comparatively light burden, as "there need be no

indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 399-400 (citing

*Investment Company Institute v. Camp,* 401 U.S. 617 (1987)).

The D.C. Circuit has further held that a plaintiff falls within the "zone of interests" of the

relevant statue "if it is among those [who] Congress expressly or directly indicated were the

intended beneficiaries of a statute, or if it is a suitable challenger to enforce the statute—that is, if

its interests are sufficiently congruent with those of the intended beneficiaries that the litigants

are not more likely to frustrate than to further ... statutory objectives." *Scheduled Airlines Traffic

Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1359 (D.C. Cir. 1996) (citations and internal

quotation marks omitted) (alteration in original).

Here, there can be no serious dispute that the States fall within the zone of interests of the

Higher Education Act, the "relevant statute" for purposes of standing. Indeed, the Higher

Education Act specifically contemplates involvement by the States and delegates responsibility

to the States. *See* 20 U.S.C. § 1099a. In fact, in announcing the current rulemaking effort to

replace the Rule, the Department identified "State attorneys general and other appropriate State

officials" as "having interests that are significantly affected by the topics proposed for

negotiations." *Negotiated Rulemaking Committees; Negotiator Nominations and Schedule of*

10

*Committee Meetings—Borrower Defenses, Financial Responsibility, and Gainful Employmen*t, 82 Fed. Reg. 41194, 41195-96 (Aug. 30, 2017).

The States all have a strong interest in promoting higher education within their borders, and thus have a strong interest in seeing effective federal support for higher education. They all maintain their own systems of higher education – and are therefore directly subject to the Rule – and have an interest in seeing that other educational institutions do not deceive prospective students so as to lure them into programs that will ultimately not provide them with the tools they need to succeed. And even if the States are not treated as "intended beneficiaries" of the statute, their interests "are sufficiently congruent" with those of students that the States' involvement in litigation relating to the HEA is certainly more likely to further rather than frustrate the objections of that act. *Scheduled Airlines Traffic Offices,* 87 F.3d at 1359.[3]

## II.     THE POSTPONEMENT OF THE DISCLOSURE REQUIREMENTS CONSTITUTES FINAL AGENCY ACTION

The Department argues that the postponement of the disclosure deadline is not reviewable under 5 U.S.C. § 704 because it is not a "final agency action." *See* Def. Br. at 26. There is no basis for this assertion.

Agency action is considered final if two criteria are satisfied. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). First, the agency action "must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* (citation omitted). And, second, it "must be one by which 'rights or obligations have been

---

[3] The Department attempts to narrowly define the States' interests as "the allocation of state budgetary resources and state law enforcement efforts." Def. Br. 26. But even defined in these terms, the test is plainly satisfied: a purpose of the HEA – and the specific requirement that programs receiving Title IV funding prepare students for "gainful employment" – is to ensure the responsible use of taxpayer funds.

determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (citation omitted). Both criteria are satisfied here.

First, there is nothing "tentative or interlocutory" about the Department's announcement that it would extend the deadline for programs to comply with the most important disclosure obligations under § 668.412. Rather, the effect of that announcement was to eliminate, for a period of one year (following a previous extension of three months), programs' obligation to comply with the two most significant disclosure obligations under the Rule.[4] Defendants' assertion that the decision is "preliminary and procedural" begs the question: preliminary to *what*? To the extent Defendants are suggesting that they may *further* delay the Rule, the case for judicial review is even stronger. And if instead the Department is implying that the delays are preliminary to their efforts to replace the Rule through the current rulemaking process, their argument would imply that any agency could simply choose to stop enforcing any rule it dislikes and evade judicial review until it comes up with a replacement.

Second, there can be no serious dispute that "rights or obligations have been determined" as a result of the delay. The First Delay Notice eliminated the obligation of programs to comply with the two most meaningful disclosure obligations under the Rule. The fact that programs are still required to comply with a third (and less effective) disclosure obligation to merely post information somewhere on their internet website, *see* Def. Br. 28, only underscores the arbitrary nature of the decision to delay the other disclosure obligations, but it does nothing to render that decision immune from judicial review.

The DC Circuit recognized in *Clean Air Council v. Pruitt* that staying lawful requirements of a regulation is "tantamount to amending or revoking a rule" and therefore

---

[4] The Rule provides that programs must comply with the disclosure obligations "beginning January 1, 2017." 34 C.F.R. § 668.412(h).

constitutes final agency action. 862 F.3d 1, 6 (D.C. Cir. 2017). The suggestion that *Clean Air Council* does not control here because portions of the rule at issue in that case were stayed indefinitely, Def. Br. 29, makes no sense. Nothing in that decision suggests that it was the indefinite nature of the stay that made it subject to review. In fact, when the court decided *Clean Air Council*, the requirements at issue had been stayed for only one month. Here, by contrast, the Department's First Delay Notice had the effect of staying the disclosure obligations for an additional year and, as a result, they will now not go into effect until eighteen months after the effective date in the Rule itself. If the Department's argument were correct, an agency could avoid enforcing a rule by issuing a series of finite stays, arguing each time that the stay did not constitute final agency action.

III. **THE DELAY OF THE DISCLOSURE DISSEMINATION AND CHANGES TO THE ALTERNATE EARNINGS APPEAL PROCESS WERE IMPROPERLY ISSUED WITHOUT OBSERVANCE OF PROCEDURES REQUIRED BY LAW AND WERE ARBITRARY AND CAPRICIOUS.**

While the Department organizes its response by claim, it makes similar arguments regarding the arbitrary and capricious nature of the disclosure deadlines as well as their failure to provide for notice and comment for these changes. The Department also makes similar arguments regarding these claims when dealing with the changes to the alternate earnings appeals. As such, first, the States will address the Department's arguments relating to the disclosure delays, followed by the Department's arguments regarding the alternate earnings appeal.

A. **The Delay of the Disclosure Requirements Was A Substantive Change Requiring Notice and Comment, and Was Arbitrary and Capricious.**

The Department attempts to justify delaying the dissemination of disclosures in promotional materials and to prospective students by relying on its discretion in revising the

information contained in disclosure updates and by claiming that the delays were temporary and consistent with the Rule.[5] This strained interpretation of the Rule fails for three reasons: (1) institutions were expressly required to make the now-delayed disclosures by a date certain, under a distinct provision of the Rule; (2) discretion in providing updated information in disclosures does not allow the Department to completely refuse to provide these disclosures in the first place; and (3) the delay of the Rule is effectively a revocation of these disclosure requirements and, therefore, is not procedural.

First, the Gainful Employment Rule provided a specific date by which schools had to comply with the disclosure requirements: January 1, 2017.  34 C.F.R. § 668.412(h). This implementation date expressly applied to all requirements of 34 C.F.R. § 668.412, including the provisions requiring direct distribution of disclosure templates to prospective students and in promotional materials. *Id*. There are no qualifications to this effective date, which is an integral part of the Rule. *See Nat'l Res. Def. Council v. E.P.A.*, 683 F.2d 752, 762 (3rd Cir. 1982) ("[W]ithout an effective date a rule would be a nullity because it would never require adherence."). As such, the Department had no discretion to alter this requirement by pushing back the implementation date to July 1, 2018, eighteen months after the requirement's original effective date, without notice and comment. *See Nat'l Venture Capital Ass'n v. Duke*, No. 17-1912, 2017 WL 5990122, at *7 (D.D.C. Dec. 1, 2017) (noting that the APA's notice and comment requirements apply with no less force when the agency seeks to delay or repeal a valid final rule); *Envtl. Defense Fund v. Gorsuch*, 713 F.2d 802, 817-18 (D.C. Cir. July 26, 1983) (postponement of permit process not an interpretative rule "[b]ecause of its substantive effect on

---

[5] The only disclosure obligation currently in effect is the requirement that schools provide such information on their web pages. *See* 34 CFR § 668.412(c).

the obligations of the owners of existing facilities and on the rights of the public"). Because the delay changes this express provision of the Rule and therefore affects the obligations of regulated entities, it is by its very nature a substantive change and not an "interpretation" of a Department regulation. As such, the change required notice and comment.

Second, the Department claims it was afforded the discretion to issue the delay by § 668.412(b), which does not apply to whether or not disclosures have to be distributed in the first place. Section 668.412(b) states, in full:

> (1) In accordance with procedures and timelines established by the Secretary, the institution must update at least annually the information contained in the disclosure template with the most recent data available for each of its GE programs. (2) The institution must update the disclosure template to include any student warning as required under § 668.412(a)(7).

34 C.F.R. § 668.412(b). This provision only grants the Department authority to set timelines with respect to updating information contained in disclosures. It does *not* grant the Department carte blanche to decide to stop requiring these disclosures in the first place. Moreover, even if this provision provided the Department the authority it claims, it still requires these informational updates "at least annually." *Id.* The Department, however, delayed these disclosure provisions an additional year, extending the deadline to eighteen months beyond the Rule's original effective date, disregarding § 668.412(b)'s requirement of an annual update. As such, even if the regulation supported the Department's argument, the delay was still impermissible.

Third, Defendants appear to misunderstand the critical nature of the disclosures it delayed. Disclosures provided to students prior to enrollment and in promotional materials can have a substantive effect on the students' decision making. Not all prospective students will have seen the disclosures on schools' websites, so inclusion of these disclosures on promotional materials and, most importantly, in materials provided directly to prospective students ensures that this important information is received by those who most need to see it.

15

Delayed implementation of a final rule typically constitutes substantive rulemaking. *See Clean Air Council v. Pruitt,* 862 F.3d 1, 9 (D.C. Cir. 2017) (finding that an agency has no "inherent authority" to delay a duly-promulgated regulation without following required procedures).[6] The Department attempts to minimize the effect of the delay by claiming that it is "temporary and limited" and that all students would see the disclosures anyway. In doing so, the Department ignores its own claim that the delay of these requirements is part of the "regulatory reset." Rather than just a change in deadlines, the delay is an effective rescission of critical elements of the Rule as the Department attempts to revise it. *See* 82 Fed. Reg. 30,976 (July 5, 2017) (stating that the Department "believes that it should evaluate the utility of these disclosures to students and the implementation of this requirement" in current rulemaking process). Such a change is tantamount to a revocation of the Rule. *See, e.g., Nat'l Venture Capital Ass'n v. Duke*, No. 17-1912, 2017 WL 5990122 at *6 (D.D.C. Dec. 1, 2017) (vacating a delay rule that was used to "bridge the gap" until full recession, thus effectively eliminating the benefits of the underlying rule, when the agency delayed the effective date of a duly promulgated rule by eight months without notice and comment and indicated that it was "highly likely" the existing rule would be rescinded). As a result, it should be held unlawful and set aside.

**B.      The Alternate Earnings Appeal Changes Required Notice and Comment and Were Arbitrary and Capricious**

The Department justifies extending the alternate earnings appeal deadlines and changing the appeal standards by claiming such action was warranted as a result of the *AACS* court's

---

[6] *See also Envtl. Def. Fund v. E.P.A.*, 716 F.2d 915, 920 (D.C. Cir. 1983)("The suspension or delayed implementation of a final regulation normally constitutes substantive rulemaking under APA."); *Nat. Res. Def. Council v. E.P.A.*, 683 F.2d 752, 761 (3d Cir. 1982) ("EPA's action in indefinitely postponing the effective date of the amendments fit the definition of 'rule' in the APA, and, as such, was subject to the APA's rulemaking requirements."); *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 n. 28 (D.C. Cir. 1981) ("[T]he December 5 order was a substantive rule since, by deferring the requirement that coal operators supply life-saving equipment to miners, it had 'palpable effects' upon the regulated industry and the public in general.").

ruling. Although the *AACS* court specifically limited its ruling so it would not "upend[] the entire

GE regulatory scheme," *AACS*, 258 F. Supp. 3d at 76, the Department's actions will have

precisely this effect by completely changing the alternate earnings appeal process. The

Department overreaches in applying the limited *AACS* ruling to the appeals process for all GE

programs.

The *AACS* ruling only took issue with respect to the Department's methodology as it

related to underreported earnings. It stated: "The Court has no reason to believe that SSA data is

anything but precise with respect to reported earnings, and AACS does not challenge the

regulations on the grounds that SSA data is in any way flawed with respect to reported income."

*AACS*, 258 F. Supp. 3d at 73. The *AACS* court went on to fashion a limited and specific remedy,

ordering only that the Department "may not enforce the numerical survey requirements currently

in effect for alternate earnings appeals against AACS member schools." *Id*. Thus, the *AACS*

court avoided "upending the entire GE regulatory scheme." *Id*.

In justifying the changes to the appeal process, the Department does not rely on the "good

cause" exception to the notice and comment requirement as set forth in 5 U.S.C. § 553, although

it cites to cases involving that standard. *Am. Fed'n of Gov't Employee, AFL-CIO v. Block*, 655

F.2d 1153, 1154-55 (D.C. Cir. 1981) ("*AFGE*") ("The procedural question in this case is simply

stated: whether the Department possessed good cause to forego the rulemaking requirements of

section 553 of the Administrative Procedure Act"); *EME Homer City Generation, L.P. v. EPA*,

795 F.3d 118, 133 (D.C. Cir. 2015) ("EPA explained here that it invoked the 'good cause'

exception…"). Regardless, exceptions under this provision are "only reluctantly countenanced,"

*State of N. J., Dept. of Envtl. Prot. v. E.P.A.*, 626 F.2d 1038, 1046 (D.C. Cir. 1980), and should

only be used in "emergency situations." *N. Mariana Islands v. U.S.*, 686 F. Supp. 2d 7, 14 (D.C.

17

Cir. 2009) (*citing Petry v. Block*, 737 F.2d 1193, 1200 (D.C. Cir. 1984). The Department has not

contended that the delay of and changes to the alternative earnings appeal process were

necessitated by an emergency situation, nor is there any evidence to support such a contention.

The cases relied on by the Department involve court orders that were far more sweeping.

In *AFGE*, the Department of Agriculture promulgated two new regulations in response to a court

order finding discrimination in the enforcement of inspection rates in poultry processing plants in

Arkansas. 655 F.2d at 1154-55. The court order required the Department "to use uniform

inspection rate standards and to apply and enforce same uniformly" and to not allow "to exist

any practice which results in disparate inspection rate standards for same or similar situations."

*Id*. at 1155. This broad order necessarily required regulatory change, but it left the details of how

to prohibit any practice resulting in disparate inspection rate standards up to the agency. *See id*.

at 1157. The court specifically did not "mandate[e] the action to be taken by the Department to

comply with [its] injunction." *Id*. Similarly in *EME Homer City Generation, L.P. v. EPA*, the

court upheld the enactment of a rule without notice and comment after that same court had

previously "instructed EPA to build a replacement for [the rule] from the ground up." 795 F.3d

118, 133 (2015) ("*EME*").

This is not such a situation. Here, the States *do not* claim that the Department was

incorrect in changing the alternate earnings appeal requirements as it pertained to AACS schools,

as the *AACS* court mandated the specific action to be taken for those schools. That narrowly-

tailored order left nothing to the Department's discretion, and in fact specifically sought to avoid

upending the GE regulatory scheme. As such, those cases are inapposite because those courts

gave the agencies broad discretion to address issues, which the *AACS* court did not do here.

Moreover, the *EME* court noted that it would be "unnecessary and wasteful to go through notice and comment" regarding the approval of State Implementation Plans for environmental regulations, given the court's previous decision finding the original approval of those plans to be in error. *Id*. at 133-35. Here, however, notice and comment were necessary to the extent the Department wished to go beyond the *AACS* court's order in modifying the appeal process by, for instance, identifying other programs whose graduates had underreported income. Since the *AACS* ruling did not take issue with or call for changes to be made to the appeals process for programs with accurate reported earnings, the Department oversteps itself by relying on that ruling for such a purpose. Notice and comment were required for such a change to *all* GE programs. *See AFGE*, 655 F.2d at 1156 ("The more expansive the regulatory reach of these rules, of course, the greater the necessity for public comment.")

In addition to violating the APA's notice and comment requirements, the Department's decision was also arbitrary and capricious. These changes did not reasonably implement the *AACS* decision, because the *AACS* court's findings only ever dealt with underreported income industries. *AACS*, 258 F. Supp. 3d at 73 ("The DOE dealt with the underreporting issue in two ways. . . Second, it noted that SSA data is only one of three possible sources of earnings data; programs could also appeal for the use of state-sponsored data or survey-based data."). Clearly, alternate earnings appeals were completely unnecessary for accurately-reported industries. As a result, the changes to the appeals process for accurately-reported industries were not reasonably related to the *AACS* court's findings and were arbitrary and capricious. Furthermore, by failing to articulate why the limited *AACS* ruling should apply to all programs, the Department failed to provide an adequate explanation for the changes. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (holding that an agency "must examine the

relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'"). Since the alternate earnings appeal was only meant to address issues with underreported earnings industries, the Department cannot justify modifying the process for industries with accurate reported earnings.

As such, this use of the *AACS* court's limited and specific ruling to alter the alternate earnings appeal for all programs is arbitrary and capricious. Accordingly, the changes to the alternate earnings appeal deadlines and process should be held unlawful and set aside.

## IV.   THE DEPARTMENT'S UNLAWFUL WITHHOLDING OR UNREASONABLE DELAY VIOLATES THE APA.

The Department's claim that it is entitled to judgment as a matter of law on Count III of the Complaint fails, because the Department's unreasonable delay in calculating the debt-to-earnings rates, including the failure to provide schools with draft GE Completers Lists, violates § 706(1) of the APA.

### A.   The Department's Duty to Calculate Debt-to-Earnings Rates is a Discrete Agency Action.

The Department argues, with little support, that the States are making a "broad programmatic attack" by asking the Court to order the Department to implement the debt-to-earnings calculations required by the Rule.  Def. Br. at 36.  The Department points to one case for this proposition, which is readily distinguishable from the facts at issue here. In *Center for Biological Diversity v. Zinke*, this Court rejected a claim that the Department of the Interior's failure to complete an internal review of its procedures for oil and gas offshore exploration and development under the National Environmental Policy Act was unlawful under the APA.  260 F. Supp. 3d 11, 15-16 (D.D.C. 2017). This ruling was based on a regulation that merely established an ongoing obligation for the agency to review its procedures and make changes when necessary,

but did not mandate that an agency actually complete the review and did not demand a public announcement of its decision. *Id.* at 16. Without any specific requirement to take a certain action beyond "continu[ing] to review," this Court held that the Department of the Interior's general obligation to make periodic reviews does not qualify as a discrete action that was compelled by law. The Court found notable that "an agency can fully comply with [the regulation] without undertaking any judicially reviewable final action." *Id.* at 27.

In this case, however, there is a much more discrete and specific requirement mandating that the Department calculate, "[f]or each award year," the debt-to-earnings rates for all applicable programs at all applicable institutions. 34 C.F.R. § 668.405(a). The Rule does not simply require an ongoing review of procedures, nor does it give the Department the option to issue the debt-to-earnings rates when necessary like the rule at issue in *Biological Diversity.* Instead, as the Departments stated in support of the final regulations for the Rule, it was establishing a debt-to-earnings rate, with which "the Department *will* evaluate whether a GE program remains eligible for title IV, HEA program funds." 79 Fed. Reg. at 64890 (Oct. 31, 2014) (emphasis added). If the Department does not issue debt-to-earnings rates every year, it is failing in its duty to evaluate whether GE programs remains eligible for federal student loans and failing to comply with the specific and discrete mandate of the Rule. As a result, the calculation of debt-to-earnings rates is a discrete and specific agency action and should be compelled by this Court, pursuant to the APA.

### B.     The Department's Duty to Send Draft GE Completers Lists to Institutions is a Mandatory, Non-Discretionary Agency Action.

The Department asserts that there is no mandatory obligation to issue debt-to-earnings rates or the Draft GE Completers Lists and that, instead, the language of the Rule merely notifies institutions of a procedure that the Department will follow if it decides to issue debt-to-earnings

rates.  This argument makes little sense in light of the plain language of the Rule, which provides

a series of specific tasks that the Department must perform in order to comply with the

requirement in the Higher Education Act that applicable institutions provide a "program of

training to prepare students for gainful employment in a recognized occupation." Although the

Higher Education Act does not directly dictate the calculation of debt-to-earnings rates or the

creation of Draft GE Completers Lists, the Rule itself has the operation of law and is "designed

to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4) & (5).  As a result, the

Rule is an agency statement of general applicability that, by design, alters the rights and

obligations of regulated parties and students.  Permitting an agency to refuse to implement

regulations that contain a specific and discrete set of actions would allow an agency to merely

ignore and read out of existence any rule with which it has a policy disagreement.  For the same

reasons that the Delay Notices are unlawful delays of agency actions, the inaction of the

Department in regards to its calculation of debt-to-earnings rates and creating Draft GE

Completers Lists is an unlawful delay of agency action.

It is a well-established principle that an agency is bound by its own regulations. *See e.g.*

*Mead Data Cent., Inc. v. U.S. Dept. of Air Force*, 566 F.2d 242, 258 (D.C. Cir. 1977). The

*Biological Diversity* decision is in line with this maxim. That decision did not dispute that a

regulation *could* create a non-discretionary duty, but simply found that the regulation at issue in

that case lacked "the degree of mandatoriness needed to give rise to a claim" under § 706(1). 260

F. Supp. 3d at 26. Although the Court did not compel agency action in that case, it did not base

its holding on the fact that the relevant provision was a regulation rather than a statute. *Id.* at 26-

27. The Rule at issue in this case, however, does provide a mandatory and non-discretionary duty

that the Department issue debt-to-earnings rates "[f]or each award year," and the Department

should be compelled by this Court to comply with its own Rule and issue the debt-to-earnings

rates and the Draft GE Completers Lists.

### C.     The Department's Delay is Egregious and Unreasonable.

Lastly, the Department asserts that the delay in providing Draft GE Completers Lists has

not been sufficiently egregious to warrant a remedy under § 706(1) of the APA.  Def. Br. at 38-

40.  This argument relies upon the notion, unsupported by affidavit or any other basis other than

counsel's unsupported assertions, that the Department's calculation of the debt-to-earnings rates

was delayed by the *AACS* opinion and that the Department now is waiting to calculate debt-to-

earnings rates until it completes adjudicating the alternative earnings appeals from the previous

debt-to-earnings calculation.  Def. Br. at 39.  Except for a vague and unsupported reference to

the "allocation of resources," no reason is given for why alternative earnings appeals must be

completed before the next round of debt-to-earnings calculations can even begin.  However, the

*AACS* opinion and the adjudication of alternative earnings appeals are completely unrelated to

the creation of Draft GE Completers Lists and the calculation of the debt-to-earnings rates,

which relies upon earnings data obtained by the Department from the Social Security

Administration.  Moreover, the Department has neither begun to issue determinations on the

alternative earnings appeals, nor has it announced when it will make such decisions, making the

continued delay of even the start of the next round of debt-to-earnings rates all the more

egregious.

In *Cobell*, the court laid out the following four factors for making a determination that a

delay is unreasonable: (1) the length of time that has elapsed since the agency came under a duty

to act; (2) the reasonableness of the delay in context of the requirement for the agency to act; (3)

the consequences of the agency's delay; and, (4) any plea of administrative error, administrative

convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources. *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001).  The Department failed to address these factors in any meaningful way,[7] especially in regards to the consequences of the Department's delay, except to claim that the AACS ruling necessitated the delay.

In addition to the reasons set forth in the States' opening memorandum (*See* Pl. Br. at 32-35), the Department's delay will have several significant consequences that outweigh any perceived difficulty in performing the calculation of the debt-to-earnings rates while the alternative earnings appeals is pending: first, it will permit programs that should not be entitled to continue to receive federal student loan to continue to receive that money, thereby resulting in the injuries discussed in Section I, *supra*, and in the opening memorandum.  Second, the continued delay of the calculation of the debt-to-earnings rates will permit the Department to achieve its stated goal of avoiding implementation of the rule during the period of time needed to effectuate a replacement of the rule, which will go into effect on July 1, 2019.  For these reasons, and for the reasons discussed in the States' opening memorandum, the Department's refusal to comply with the Rule's requirement in 34 C.F.R. § 668.405(a) that the Department to issue debt-to-earnings rates "for each award year" and, instead, to wait to initiate the debt-to-earnings calculations until the previous year's alternative earnings appeals are adjudicated, is egregious and unreasonable.

---

[7] In a footnote, the Department disputes that by publishing the debt-to-earnings rates in January of 2017, it established a timeline that it must follow for publishing future debt-to-earnings rates.  Although there is no deadline in the Rule for when the debt-to-earnings rates must be published, the Rule is clear that the Department is required to determine, "[f]or each award year," the debt-to-earnings rates for all applicable programs at all applicable institutions. 34 C.F.R. § 668.405(a).  Because the Department failed to provide Draft GE Completers Lists in 2017, the Department's will be unable to calculate debt-to-earnings rates for the previous award year, thereby frustrating the intent of the Rule and "forcing a breakdown of regulatory processes." *See In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992).

24

The Court should, therefore, deny summary judgment to the Department on Count III, grant summary judgment in favor of the States, and order that the Department comply with the Rule's requirements to issue debt-to-earnings rates and Draft GE Completers Lists.

## CONCLUSION

For the reasons set forth above, the States respectfully request that the Court grant their motion for summary judgment and deny defendants' cross-motion for summary judgment, and order appropriate relief.

Dated: March 6, 2018                          Respectfully Submitted,

FOR THE STATE OF MARYLAND
BRIAN E. FROSH
ATTORNEY GENERAL

By:  */s/ Christopher J. Madaio*
       Christopher J. Madaio
       Assistant Attorney General
       Office of the Attorney General
       Consumer Protection Division
       200 St. Paul Place, 16th Floor
       Baltimore, MD 21202
       (410) 576-6585
       Cmadaio@oag.state.md.us

FOR THE COMMONWEALTH OF
PENNSYLVANIA
JOSH SHAPIRO
ATTORNEY GENERAL

By:  */s/ Michael J. Fischer*
       Michael J. Fischer
       Chief Deputy Attorney General
       John M. Abel
       Jesse Harvey
       Senior Deputy Attorneys General
       Pennsylvania Office of Attorney General
       Strawberry Square
       Harrisburg, PA 17120
       (215) 560-2171
       mfischer@attorneygeneral.gov

PEOPLE OF THE STATE OF
ILLINOIS, by LISA MADIGAN
ATTORNEY GENERAL OF ILLINOIS

By:  */s/ Joseph Sanders*
　　　Joseph Sanders
　　　Gregory W. Jones
　　　Assistant Attorneys General
　　　Consumer Fraud Bureau
　　　Office of the Illinois Attorney General
　　　100 W. Randolph St., 12th Fl.
　　　Chicago, IL 60601
　　　312-814-6796 (Joseph)
　　　312-814-4987 (Gregory)
　　　Fax: 312-814-2593
　　　jsanders@atg.state.il.us
　　　gjones@atg.state.il.us

FOR THE COMMONWEALTH OF
MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

By:  */s/ Yael Shavit*
　　　Yael Shavit
　　　Assistant Attorney General
　　　Office of the Massachusetts Attorney General
　　　One Ashburton Place
　　　Boston, MA 02108
　　　(617) 963-2197
　　　yael.shavit@state.ma.us

FOR THE STATE OF CALIFORNIA
XAVIER BECERRA
CALIFORNIA ATTORNEY GENERAL

By:  */s/ Bernard A. Eskandari*
　　　Bernard A. Eskandari
　　　Deputy Attorney General
　　　300 South Spring Street, Suite 1702
　　　Los Angeles, California 90013
　　　(213) 897-2652
　　　bernard.eskandari@doj.ca.gov

27

FOR THE STATE OF CONNECTICUT
GEORGE JEPSEN
ATTORNEY GENERAL

By: */s/ Joseph J. Chambers*
Joseph J. Chambers
Assistant Attorney General
Connecticut Office of Attorney General
PO Box 120
Hartford, CT 06141-0120
(860) 808-5270
joseph.chambers@ct.gov

FOR THE STATE OF DELAWARE
MATTHEW P. DENN
ATTORNEY GENERAL

By: */s/ Christian Douglas Wright*
Christian Douglas Wright
Director of Consumer Protection
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 577-8400
christian.wright@state.de.us

FOR THE DISTRICT OF COLUMBIA
KARL A. RACINE
ATTORNEY GENERAL

By: */s/ Philip Ziperman*
Philip Ziperman
Assistant Attorney General
Attorney General for the District of Columbia
441 4th Street, N.W., 6th Floor
Washington, DC 20001
(202) 442-9886
Philip.Ziperman@dc.gov

28

FOR THE STATE OF HAWAII
RUSSELL A. SUZUKI
ACTING ATTORNEY GENERAL OF
HAWAII

By:  */s/ Bryan C. Yee*
        Bryan C. Yee
        Deputy Attorney General
        425 Queen Street
        Honolulu, Hawaii 96813
        (808) 586-1180
        bryan.c.yee@hawaii.gov

        FOR THE STATE OF IOWA
        THOMAS J. MILLER
        ATTORNEY GENERAL

By:  */s/ Jessica Whitney*
        Jessica Whitney
        Director - Consumer Protection
        Office of the Attorney General of Iowa
        1305 E. Walnut St.
        Des Moines, Iowa 50319
        (515) 281-8772
        Jessica.Whitney@iowa.gov

        FOR THE STATE OF MINNESOTA
        LORI SWANSON
        ATTORNEY GENERAL

By:  */s/ Jason Pleggenkuhle*
        Jason Pleggenkuhle
        Assistant Attorney General
        Bremer Tower, Suite 1200
        445 Minnesota Street
        St. Paul, MN 55101
        (651) 757-1147 (Voice)
        (651) 282-5832 (Fax)
        jason.pleggenkuhle@ag.state.mn.us

29

FOR THE STATE OF NEW YORK
ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL OF NEW YORK

By:   */s/ Jane M. Azia*
      Jane M. Azia
      Chief, Bureau of Consumer Frauds and
      Protection
      120 Broadway, 3rd floor
      New York, NY 10271
      Tel.: (212) 416-8727
      Jane.azia@ag.ny.gov

FOR THE STATE OF NORTH CAROLINA
JOSH STEIN
ATTORNEY GENERAL OF NORTH
CAROLINA

By:   */s/ Matt Liles*
      Matt Liles
      Assistant Attorney General
      North Carolina Department of Justice
      114 W. Edenton St.
      Raleigh, NC  27603
      P.O. Box 629
      Raleigh, NC  27602
      (919) 716-0141
      mliles@ncdoj.gov

FOR THE STATE OF OREGON
ELLEN F. ROSENBLUM
ATTORNEY GENERAL

By:   */s/ Andrew Shull*
      Andrew Shull
      Assistant Attorney General
      Oregon Department of Justice
      1162 Court Street, NE
      Salem, OR 97301
      (503) 934-4400
      Andrew.shull@doj.state.or.us

FOR THE STATE OF RHODE ISLAND
PETER F. KILMARTIN
ATTORNEY GENERAL

By: */s/ Neil F.X. Kelly*_____
Neil F.X. Kelly
Deputy Chief, Civil Div.
Assistant Attorney General
Edmund F. Murray, Jr.
Special Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2284
nkelly@riag.ri.gov
emurray@riag.ri.gov

FOR THE STATE OF VERMONT
THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

By: */s/ Christopher J. Curtis*
Christopher J. Curtis
State of Vermont
Office of the Attorney General
Chief, Public Protection Division
109 State St.
Montpelier, VT 05609
(802) 828-5586
christopher.curtis@vermont.gov

FOR THE COMMONWEALTH OF
VIRGINIA
MARK R. HERRING
ATTORNEY GENERAL

By: */s/ Samuel T. Towell*_____
Samuel T. Towell
Deputy Attorney General, Civil Litigation
Cynthia E. Hudson
Chief Deputy Attorney General
Barbara Johns Building
202 N. Ninth St.
Richmond, Virginia 23219
(804) 786-6731
stowell@oag.state.va.us

31

FOR THE STATE OF WASHINGTON
ROBERT W. FERGUSON
ATTORNEY GENERAL

By: */s/ Jeffrey T. Sprung*

    Jeffrey G. Rupert
    Chief, Complex Litigation Division
    Jeffrey T. Sprung (D.C. Bar No.: 384880)
    Benjamin J. Roesch
    Assistant Attorneys General
    Office of the Washington Attorney General
    1125 Washington St. SE
    P.O. Box 40100
    Olympia, WA 98504
    (206) 326-5492 (Sprung)
    jeffreyr2@atg.wa.gov
    jeff.sprung@atg.wa.gov
    benjaminr@atg.wa.gov
    cynthiaa@atg.wa.gov

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing document, and any attachments thereto, to be electronically filed with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system, and that all participants in the case will be served by the CM/ECF system.


Dated: March 6, 2018              */s/ Michael J. Fischer*
                                  Michael J. Fischer
                                  Chief Deputy Attorney General
                                  Pennsylvania Office of Attorney General
                                  Strawberry Square
                                  Harrisburg, PA 17120