IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF MARYLAND, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:17-2139 (KBJ) |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| EDUCATION, and ELIZABETH DEVOS, in her | ) | |
| official capacity as Secretary of Education, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 2

     I.     PLAINTIFFS LACK STANDING ...................................................... 2

          A.     Plaintiffs Fail to Demonstrate They Have Suffered Their Own Injury
That Is Fairly Traceable to the Department Actions They Challenge ........ 2

               1.     Plaintiffs Cannot Rely on Collateral Financial Injuries .................. 2

               2.     Plaintiffs Fail to Meet Their Substantial Burden to Show
Causation Where Their Asserted Injuries Depend on Conduct
of Regulated Third Parties ............................................................. 4

          B.     Plaintiffs Fail to Establish *Parens Patriae* Standing .................................. 8

          C.     Plaintiffs Do Not Fall Within the Zone of Interests of the Relevant
Statutory Provision ................................................................................... 10

     II.     PLAINTIFFS FAIL TO SHOW THAT THE TEMPORARY POSTPONEMENT
OF SOME, BUT NOT ALL, DISCLOSURE REQUIREMENTS IN § 668.412
QUALIFIES AS FINAL AGENCY ACTION ..................................................... 13

     III.     PLAINTIFFS FAIL TO SHOW THAT NOTICE AND COMMENT
RULEMAKING WAS REQUIRED FOR THE ACTIONS THEY
CHALLENGE.................................................................................................... 14

     IV.     PLAINTIFFS FAIL TO SHOW THAT THE DEPARTMENT'S ACTIONS
WERE ARBITRARY AND CAPRICIOUS ........................................................ 17

     V.     PLAINTIFFS FAIL TO ESTABLISH THAT THE DEPARTMENT
UNREASONABLY DELAYED OR WITHHELD THE ISSUANCE OF
DRAFT GE COMPLETERS LISTS ................................................................... 18

CONCLUSION ................................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Abrams v. Heckler*, 582 F. Supp. 1155 (S.D.N.Y. 1984)  ...................................................... 9

*\*Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982)  ....................................... 8, 10

*Alvarado Parkway Inst., Inc. v. Mendez*, 789 F. Supp. 1190 (D.D.C. 1992) ............................... 4

*\*Am. Ass'n of Cosmetology Schools ("AACS") v. DeVos*,
    258 F. Supp. 3d 50 (D.D.C. 2017) ............................................................................. *passim*

*Am. Fed'n of Gov't Employees, AFL-CIO v. Vilsack*, 118 F. Supp. 3d 292 (D.D.C. 2015),
    *aff'd*, 672 F. App'x 36 (D.C. Cir. 2016) ........................................................................... 5

*APSCU. v. Duncan ("APSCU III")*, 110 F. Supp. 3d 176 (D.D.C. 2015) ................................... 9

*Atkins v. Fischer,* 232 F.R.D. 116 (D.D.C. 2005) ......................................................... 7

*Bd. of Educ. v. Bd. of Educ.*, 728 F. Supp. 910 (W.D.N.Y. 1990) ................................ 11

*City of New York v. Heckler*, 578 F. Supp. 1109 (E.D.N.Y. 1984)  ............................... 9

*Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017) ...................................... 13, 15

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ....................................................... 20

*CS-360, LLC v. SBA*, 20 F. Supp. 3d 104 (D.D.C. 2013) ........................................... 15

*Ctr. for Biological Diversity v. Zinke,* 260 F. Supp. 3d 11 (D.D.C. 2017) ................................. 19

*Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152 (D.C. Cir. 2005) ........................... 11, 12

*Florida v. Mellon*, 273 U.S. 12 (1927) ........................................................................ 3

*Gov't of Province of Manitoba v. Zinke*, 273 F. Supp. 3d 145 (D.D.C. 2017). ............................. 9

*Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015) ..................................... 10

*In re Barr Laboratories, Inc.,* 930 F.2d 72 (1991) ..................................................... 20

*Lindh v. Murphy*, 521 U.S. 320 (1997) ........................................................................ 15

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................. 3, 4, 5

*Maryland People's Counsel v. FERC*, 760 F.2d 318 (D.C. Cir. 1985) .................................. 9, 10

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................... 3

*\*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ................................................. 3, 8, 10

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930 (D.C. Cir. 2004) ...................... 5

*North Carolina v. EPA*, 587 F.3d 422 (D.C. Cir. 2009) ................................................. 3

*Norton v. SUWA*, 542 U.S. 55 (2004) ................................................................... 19

*Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976) ................................................. 9

*Renal Physicians Ass'n v. Dep't of Health & Human Servs.*, 489 F.3d 1267 (D.C. Cir. 2007) .... 5

*Scheduled Airlines Traffic Offs., Inc. v. Dep't of Defense*,
   87 F.3d 1356 (D.C. Cir. 1996) ....................................................................... 12

*Sierra Club v. Gorsuch*, 715 F.2d 653 (D.C. Cir. 1983) ................................................ 20

*Skalka v. Kelly*, 246 F. Supp. 3d 147 (D.D.C. 2017),
   *appeal dismissed*, No. 17-5102, 2017 WL 4220432 (D.C. Cir. July 27, 2017) .............. 20

*Soundboard Ass'n v. FTC*, 251 F. Supp. 3d 55 (D.D.C. 2017) .......................................... 14

*Weber v. Cranston School Committee*, 212 F.3d 41 (1st Cir. 2000) .................................... 11

## Statutes

5 U.S.C. § 702 ........................................................................................ 4

5 U.S.C. § 704 ....................................................................................... 13

5 U.S.C. § 706 ............................................................................... 10, 13, 19

Higher Education Act ("HEA") Title IV, 20 U.S.C. §§ 1070 *et seq.* .............................. 1

20 U.S.C. § 1070 ..................................................................................... 11

20 U.S.C. § 1098a ............................................................................... 12, 15

20 U.S.C. § 1099a ............................................................................... 10, 11

20 U.S.C. § 1400 ..................................................................................... 11

**Regulations**

Final regulations ("2014 Final Rule"),
    79 Fed. Reg. 64890 (Oct. 31, 2014) ..................................................................... 4, 7, 8, 20

34 C.F.R. § 668.404 ..................................................................................................................... 18

34 C.F.R. § 668.405 .................................................................................................................. 18, 19

34 C.F.R. § 668.412 .............................................................................................................. 13, 14, 17

**Other Administrative Materials**

82 Fed. Reg. 30975 (July 5, 2017) .............................................................................................. 13

Notice of Negotiated Rulemaking Committees, 82 Fed. Reg. 41194, 41195 (Aug. 30, 2017) ... 12

## **INTRODUCTION**

The plaintiff states and the District of Columbia ("Plaintiffs" or "the States") have failed to show that they have standing to bring this challenge against the Department of Education and the Secretary of Education (collectively, "Defendants" or "the Department"), contesting three aspects of the Department's implementation of gainful employment ("GE") regulations that were promulgated pursuant to Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070 *et seq.* The States claim that they have incurred financial harms in each of the three instances: (1) because the Department delayed the start date for GE programs to begin disclosing certain information in particular ways (though the same information is available on GE program websites); (2) because the Department applied the Court's ruling in *American Association of Cosmetology Schools* ("*AACS*") *v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017), regarding when and how GE programs may submit alternate earnings appeals to the Department's debt-to-earnings ("D/E") rate calculations, to all schools; and (3) because the Department had not yet begun the next year's D/E rate calculation process by the time the Complaint was filed, while appeals of the initial year's calculations were still underway. But the asserted financial harms are entirely speculative, relying on baseless assumptions about what would have happened if these delays and applications of a Court order had not occurred, and the States provide no evidence establishing a causal link between the actions or inaction of the Department that they challenge and the independent actions of schools and students. Nor can the States show they fall within the zone of interests of Title IV when Title IV is intended to benefit students, not states.

The States also fail to advance their claims on the merits. They cannot justify the notion that notice and comment rulemaking was required to extend a deadline that would have passed before the Department could have concluded a rulemaking process, or to implement the Court's

order in *AACS*. Nor do the States show that either of these actions were arbitrary and capricious. By its nature, the extension of the disclosures deadline amounts to nothing but a procedural adjustment, and the Department's application of the Court's order to all GE programs was more than reasonable, given that there was no clear way to isolate the order's impact or otherwise avoid successful challenges on the same issue by others.

The States also fail to support the notion that this Court should broadly compel the Department's further implementation of the GE regulations, including the issuance of D/E rates for the next year and all of the many steps within that process. The Department reasonably had not initiated a second year of D/E rate calculations by October 2017, when the States filed this action, when the first year's process was still underway and the new deadline to submit appeals, following AACS, had not yet passed. However, the Department recently has announced its intention to continue the D/E rate calculation process by issuing Draft Completers Lists to schools this spring. The Court should reject the States' challenges and grant summary judgment to the Department.

## ARGUMENT

## I.    PLAINTIFFS LACK STANDING

As explained in Defendant's opening brief, the States fail to identify a concrete or certainly impending injury that would be suffered by the States themselves as a result of the agency conduct that they challenge, nor can they rely on a theory of *parens patriae* standing for their suit against the federal government. The States fail to show otherwise.

### A.    Plaintiffs Fail to Demonstrate They Have Suffered Their Own Injury That Is Fairly Traceable to the Department Actions They Challenge

#### 1.    Plaintiffs Cannot Rely on Collateral Financial Injuries

In their opposition brief, the States first attempt to rely on their own asserted injury to

support their standing. However, the States fail to overcome the speculative nature of those assertions, particularly given that their "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (explaining that in such a circumstance, "much more is needed" to show standing). The States attempt to invoke the "special solicitude" that courts have accorded when a state asserts an injury to a "quasi-sovereign interest" in the "earth and air within its domain," such as the interest in reducing air pollution that was at issue in *Massachusetts v. EPA*, 549 U.S. 497, 518-19 (2007), and *North Carolina v. EPA*, 587 F.3d 422, 426 (D.C. Cir. 2009). However, the States have identified no similar interest at issue here. Rather, by their own description, the States' asserted injury amounts to nothing but the failure to receive collateral financial benefits that, they speculate, would inure to them if the Department implemented the GE regulations, as a whole, in their preferred manner and on their preferred timetable. Pl. Opp. at 4 (identifying as injuries the "waste and loss of State-funded grant and loan money" paid to schools with Title IV-eligible GE programs, the expenditure of "additional resources to investigate fraudulent programs," and the "lo[ss] [of] tuition money" from students who choose to enroll in GE programs at for-profit schools rather than state schools). The Supreme Court rejected similar assertions of collateral injury in *Florida v. Mellon*, 273 U.S. 12, 17 (1927) (alleged decrease in state's property tax revenues), and *Massachusetts v. Mellon*, 262 U.S. 447 (1923) (no cognizable injury to a state where no "rights of person or property" or "rights of dominion over physical domain" were at issue). The States make no effort to distinguish those holdings, which preclude standing based on the States' asserted injury here.

Moreover, even if the States' alleged financial injury were cognizable, the States fail to establish that it qualifies as plausible, much less actual, as required at the summary judgment

stage. *Cf. Alvarado Parkway Inst., Inc. v. Mendez*, 789 F. Supp. 1190, 1197 (D.D.C. 1992) ("When standing is challenged on a motion for summary judgment, '[t]he burden is on the party seeking review under [5 U.S.C.] § 702 to set forth specific facts (even though they may be controverted by the Government) showing that he has satisfied its terms.'" (quoting *Lujan*, 497 U.S. at 884)). The States set forth no specific facts showing that the GE regulations as a whole, if implemented in the manner and on the timetable they prefer, would save them money, much less that any of the three specific items they address in this action—the imposition on GE programs of certain disclosure requirements, programs' submission of D/E rate appeals, and the Department's provision of Draft GE Completers Lists—would do so.

Indeed, the States cite a single source for their allegation—the Department's 2014 Final Rule—but the Final Rule predicted that the GE regulations could cost states *more* money. *See* Final regulations ("2014 Final Rule"), 79 Fed. Reg. 64890, 65081 (Oct. 31, 2014) ("State and local governments may experience increased costs as enrollment in public institutions increases as a result of some students transferring from programs at for-profit institutions.").[1] The States thus fail to satisfy the injury-in-fact prong of standing based on their own alleged injury.

> ### 2. Plaintiffs Fail to Meet Their Substantial Burden to Show Causation Where Their Asserted Injuries Depend on Conduct of Regulated Third Parties

The States also fail to satisfy the causation and redressability prongs. The States freely acknowledge that the direct cause of their asserted injuries is not the Department, but schools with GE programs, and students seeking training in such programs. Pl. Opp. at 9 (alleging that "[i]f the

---

[1] Even the statement in the Final Rule quoted by the States, Pl. Opp. at 4-5, does not support their assertion that they would save money. Rather, that statement predicts the more nebulous benefit that any money states might invest in private GE programs would be better spent. *See* 79 Fed. Reg. at 65080 (predicting "improved oversight of [states'] investments in postsecondary education" and "more efficient[] allocation of funding to "higher-performing programs").

Department had enforced the Rule, some [GE] programs would have found themselves ineligible for Title IV funding, while others would have seen a significant decline in enrollment" by students). Courts consistently recognize that "the causation and redressability aspects of the Article III standing inquiry are 'substantially more difficult to establish' if a third party who is not before the court is the direct cause of the plaintiff's alleged injury." *Am. Fed'n of Gov't Employees, AFL-CIO v. Vilsack*, 118 F. Supp. 3d 292, 300 (D.D.C. 2015) (quoting *Lujan*, 504 U.S. at 562), *aff'd*, 672 F. App'x 36 (D.C. Cir. 2016). Indeed, courts have identified only two categories of cases where a plaintiff has been able to establish standing based on the Government's regulation of a third party. *Id.* The first category involves cases where "'the challenged government action authorize[s] conduct that would otherwise [be] illegal.'" *Id.* (quoting *Renal Physicians Ass'n v. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007)). The second involves cases "'where the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress.'" *Id.* (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940 (D.C. Cir. 2004)).

Neither circumstance is present here. The States have not alleged that the Department has authorized conduct that would otherwise be illegal. To the contrary, they appear to allege that schools may choose to violate the States' consumer protection laws as a result of the Department's alleged actions or inaction in implementing the GE regulations. Pl. Opp. at 6 (arguing that the Department "has placed the burden back on the States to use their consumer protection laws"). But the Department has in no way endorsed or encouraged, much less authorized, schools' violations of state consumer protection laws, and the States cite no evidence to the contrary.

Nor have the States presented substantial evidence of a causal link between the Department's alleged actions or inaction, on the one hand, and the States' purported expenditures, on the other. The States' theory of standing relies entirely on the idea that, but for the Department conduct that the States challenge, some GE programs would have either become ineligible for Title IV funding or improved their programs, which in turn would have made unnecessary the expenditures that the States now claim are required. Pl. Opp. at 4. However, both links in the States' proposed chain of causation are unsupported by any evidence at all, much less by substantial evidence.

For one thing, as Defendants have explained, the States fail to explain how, in their view, schools and students would be affected by the three specific actions or failure to act by the Department that the States seek to challenge. Rather, the States rely on the general assumption that, "[h]ad the Department . . . published a second year of debt-to-earnings rates," some programs that "failed" under the first year's rates "would have failed again," and would therefore "no longer be eligible for Title IV funding." Pl. Opp. at 5; *see id.* at 9 (asserting that "[i]f the Department had enforced the Rule," some programs would have become ineligible for Title IV funding, others would have had a decline in enrollment, and still others would improve their performance). By their own description, the States make no attempt to identify any specific consequence attributable to the particular subjects of the States' APA challenge—the Department's alleged delay in requiring schools to provide certain disclosures, the Department's implementation of the *AACS* decision, or the Department's alleged failure to provide Draft GE Completers Lists.

Moreover, the States offer no evidence that their broad assumption is accurate. After all, as of the time the States filed suit, no full cycle of D/E rate calculations, including the appeal

process, had been completed under the GE regulations, and no GE program had been deemed ineligible for Title IV funding pursuant to the regulations.[2] Certainly, the Department does not anticipate that a large number of GE programs will be rendered ineligible as a result of the D/E rate calculation process. *See* 79 Fed. Reg. at 65081 ("[T]he majority of programs, even at for-profit institutions, are expected to pass the D/E rates measure[.]"). The States thus have submitted nothing but speculation regarding a causal link between the Department's actions that they seek to challenge and a GE program's continued operation or students' decisions to enroll in that program.

In addition, the connection to state expenditures is even more tenuous. While the States suggest that they would benefit financially because GE regulations would lead to increased enrollment in state programs, the Final Rule anticipated no such result, instead suggesting that "many students who switch programs are expected to do so within the for-profit sector, substantially reducing [any] impact on State and Local governments" (and, as explained above, to the extent states felt a financial impact from the GE regulations, the Final Rule predicted that states' costs would increase, not decrease). *Id.* The Department cautioned, however, that whatever the impact might be, it was "dependent on student transfer patterns and State and local government choices," such as increasing public institutions' enrollment capacities or developing

---

[2] The States cite a newspaper article reporting that, of 500 GE programs that were identified as "failing" under the first year's D/E rate calculation but had not appealed as of the date of the article, 300 had already shut down. However, even if the Court considered a newspaper article as evidence—contrary to well-established principles holding statements in such material to "constitute inadmissible hearsay," *Atkins v. Fischer,* 232 F.R.D. 116, 132 (D.D.C. 2005)—the reported result indicates nothing about why those programs shut down or what other GE programs may do in the future. The reported number could just as plausibly suggest that a significant number of programs were unable to gather the information that was necessary to appeal before the *AACS* decision because the appeal requirements were onerous, as the plaintiffs in *AACS* alleged. Alternatively, the report could suggest that all the worst programs have already shut down, so that no similar result is likely to follow future years' announcements of D/E rates.

online courses. *Id.*

The States likewise fail to show a necessary connection between their criteria for providing grant and loan money to students and the GE regulations. Rather, the States are free to adopt their own criteria for such funding entirely separate from the Department's criteria for Title IV eligibility.

The States similarly fail to support a connection between the GE regulations and the States' expenditures on fraud investigations. Indeed, the States have submitted no evidence that GE programs with "failing" D/E rates under the regulations are likely to engage in fraud or be the subject of a state investigation. Nor have they shown that the number of investigations they conduct, or their overall budget allocation to such investigations, would change if some GE programs shut down or improved their job placement rates. Simply put, the States have not met their burden to provide substantial evidence of a causal link between the actions that they challenge and the injuries that they allege.

## B.  Plaintiffs Fail to Establish *Parens Patriae* Standing

The States also attempt to establish their standing under an alternative *parens patriae* theory, but that attempt is likewise unavailing. As discussed in Defendants' opening brief, the Supreme Court has unequivocally declared that states cannot represent their citizens as *parens patriae* in a suit against the federal government. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982) ("A State does not have standing as parens patriae to bring an action against the Federal Government."); *Massachusetts v. Mellon*, 262 U.S. at 485–86 ("[I]t is no part of [a state's] duty or power to enforce [the rights of its citizens] in respect of their relations with the federal government."). The States nevertheless argue that this well-established principle

does not preclude *parens patriae* standing in this case because they seek to challenge administrative action rather than a federal statute. Pl. Opp. at 7.

But the States' argument on this point relies on two district court cases in other districts that admittedly conflict with the law in the D.C. Circuit. *E.g.*, *Abrams v. Heckler*, 582 F. Supp. 1155, 1159 (S.D.N.Y. 1984) (citing *Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976), as "to the contrary" of its holding). Indeed, this Court has recently rejected an argument similar to the one espoused by the States here, and instead affirmed that under *Kleppe*, as well as Supreme Court precedent, a state "cannot sue the Federal Government in the State's role as parens patriae." *Gov't of Province of Manitoba v. Zinke*, 273 F. Supp. 3d 145, 167–68 (D.D.C. 2017).

Moreover, despite the States' effort to characterize it as such, this is not a case where the States seek "to vindicate the congressional will by preventing [an alleged] violation of a statute by the administrative agency charged with its enforcement." *City of New York v. Heckler*, 578 F. Supp. 1109, 1123 (E.D.N.Y. 1984) (internal quotation omitted). There can be no suggestion here that Defendants have violated the Higher Education Act because this Court has already recognized that Congress imposed no express requirements regarding "gainful employment"; rather, the GE regulations reflect the Department's interpretation of ambiguous statutory language. *APSCU. v. Duncan* ("*APSCU III*"), 110 F. Supp. 3d 176, 186 (D.D.C. 2015) (Congress "le[ft] a policy gap, which it is the Department's prerogative to fill").

The States' emphasis on *Maryland People's Counsel v. FERC*, 760 F.2d 318, 321 (D.C. Cir. 1985), is also misplaced. There, the Court of Appeals relied on express statutory language conferring standing on states to seek redress under the Natural Gas Act. *Id.*; *see Zinke*, 273 F. Supp. 3d at 167 (recognizing that in *Maryland People's Counsel*, the state "was expressly

granted standing by statute"). The States point to the APA as similarly conferring "statutory standing." Pl. Opp. at 8. However, the APA does nothing of the kind. Rather, the APA, 5 U.S.C. § 706, sets forth a cause of action against a federal agency for those who otherwise *have* standing. Given that § 706 does not mention states or any other potential plaintiff, reading that provision as the States suggest would in effect mean that anyone could assert "statutory standing" under the APA, thus eviscerating any Article III limitations on suits against federal agencies. Indeed, under the States' theory, they could overcome the limitation on *parens patriae* standing set forth in *Snapp* and *Mellon* by relying not only on the APA but on any statutory right of action against the federal government, even where the statute makes no mention of states at all. Because there is no basis for such an expansion of *Maryland People's Counsel*, the Court should reject the States' theory and hold that they cannot invoke *parens patriae* standing against Defendants in this case.

**C.      Plaintiffs Do Not Fall Within the Zone of Interests of the Relevant Statutory Provision**

The States also contend that they fall within the relevant zone of interests, as required for them to satisfy prudential standing requirements, because the Higher Education Act "contemplates involvement by the States and delegates responsibility to the States." Pl. Opp. at 10 (citing 20 U.S.C. § 1099a). However, the States misunderstand the zone of interests requirement. As explained in Defendants' opening brief, the necessary inquiry is whether a plaintiff's interests "fall within the zone of interests *protected* by the law invoked." *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015) (emphasis added). The States may have an interest in education that in some sense parallels that of the federal government, and the federal government may in some respects rely on and impose *obligations* on the States in furtherance of this shared interest; thus, § 1099a requires states to share licensing information

about schools with the federal government and notify the federal government if a state revokes a

license or has evidence that a school has engaged in fraud. 20 U.S.C. § 1099a(a). But such

obligations do not suggest that the Higher Education Act in general, or the federal financial

assistance provisions of Title IV in particular, are in any way designed to *protect* the States'

interests.

Other courts have relied on the stated purpose of a statute when determining whether a

plaintiff fell within its zone of interests. Thus, in *Weber v. Cranston School Committee*, 212 F.3d

41 (1st Cir. 2000), the court held that parents' interests fell within the zone of interests protected

by the IDEA because that statute expressly referenced the interests of parents when stating its

mission to ensure "that the rights of children with disabilities and parents of such children are

protected." *Id.* at 51 (quoting 20 U.S.C. § 1400(d)(1)(B)); *accord Bd. of Educ. v. Bd. of Educ.*,

728 F. Supp. 910, 913 (W.D.N.Y. 1990) ("Although LEA's such as Seneca Falls play an

important role in implementing the EHA, the procedural safeguards at issue here are clearly

designed for the benefit of handicapped children and their parents."). A similar approach here

confirms that the financial interests asserted by the States are not within Title IV's zone of

interests. Rather, Congress identified the purpose of Title IV as "to assist in making available the

benefits of postsecondary education to eligible students . . . in institutions of higher education."

20 U.S.C. § 1070(a). States, and their financial interests, are not mentioned.

And while the States point to their invited participation in negotiated rulemaking

processes, the D.C. Circuit has already recognized that negotiated rulemaking provisions in the

No Child Left Behind Act "do not offer any promise of purposeful protection of the concrete

interests" even of students and parents, much less of other rulemaking participants. *Ctr. for Law

& Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157–58 (D.C. Cir. 2005) (holding neither advocacy

organizations nor students had standing to challenge the composition of a negotiated rulemaking committee). Here, unlike *Center for Law & Education*, the States do not seek to challenge a negotiated rulemaking, so the statutory provision applicable to such processes in the Title IV context, 20 U.S.C. § 1098a, is not relevant in any event. But even if it were, the fact that "students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies" are mentioned as possible participants in negotiated rulemaking, 20 U.S.C. § 1098a(a)(1), in no way suggests that Title IV is intended to protect the interests of all those constituencies. *See also* Notice of Negotiated Rulemaking Committees, 82 Fed. Reg. 41194, 41195 (Aug. 30, 2017) (identifying constituencies whose interests "are significantly affected" but not suggesting the rulemaking was intended to "protect" those constituencies).

The States also contend that, even if they are not intended beneficiaries of the Higher Education Act, they fall within the zone of interests as "suitable challengers" because their interests are "sufficiently congruent" to those of students within their borders. Pl. Opp. at 10-11 (citing *Scheduled Airlines Traffic Offs., Inc. v. Dep't of Defense*, 87 F.3d 1356, 1359 (D.C. Cir. 1996)). However, where the States are acting on their own behalf, rather than as *parens patriae* (which is precluded here for the reasons previously explained), the financial injures that the States assert are at best marginally related to the interests Congress sought to protect in Title IV. Indeed, the States cite no instance where a state was held to fall within the zone of interests of a federal law that did not directly regulate or seek to benefit the state. The States thus fail to show that they fall within the relevant zone of interests of Title IV.

## II.   PLAINTIFFS FAIL TO SHOW THAT THE TEMPORARY POSTPONEMENT OF SOME, BUT NOT ALL, DISCLOSURE REQUIREMENTS IN § 668.412 QUALIFIES AS FINAL AGENCY ACTION

Defendants have explained that the Department's extension of a deadline for schools with GE programs to begin disclosing certain information in promotional materials and in direct mailings to students does not qualify as "final agency action" subject to challenge under the APA, 5 U.S.C. §§ 704, 706(2). *See* Def. Mem. at 26-29. As a practical matter, the extension of that deadline until July 1, 2018, while proceeding with a requirement that the same information be made available on GE program websites, did not mark the consummation of a decisionmaking process during this initial year of implementing the GE regulations. *See* EA #106 (June 30, 2017); 82 Fed. Reg. 30975, 30976 (July 5, 2017). Nor did it impose any burdens on states or change the substance of information that GE programs must disclose; rather, it merely put on hold two methods of disseminating that information, while leaving a third method (GE program websites) in place.

While the States contend that the methods described in 34 C.F.R. § 668.412(d) and (e) were "the most significant" and "most meaningful" methods of disclosure, they provide no support for that contention, nor do they explain the legal significance of their characterization.[3] The States also argue that the distinction between the finite postponement here and the indefinite suspension at issue in *Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017), is irrelevant

---

[3] Indeed, the States misleadingly suggest that 34 C.F.R. § 668.412(c), the disclosure requirement currently in effect, "merely" requires disclosures to be posted "somewhere on [programs'] internet website," Pl. Opp. at 12, implying that a school could bury the information on a webpage that no one ever visits. In fact, however, the provision requires that "*any* Web page containing academic, cost, financial aid, or admissions information about a GE program" contain the required information, and that the page include either the full disclosure template or a "prominent, readily accessible, clear, conspicuous, and direct link" to the template. 34 C.F.R. § 668.412(c)(1) (emphasis added).

because the Department "could" simply issue a series of finite postponements that would in effect amount to an indefinite suspension. Pl. Opp. at 13. But where the Court must conduct a "pragmatic inquiry" into whether an action is truly "final," *Soundboard Ass'n v. FTC*, 251 F. Supp. 3d 55, 63 (D.D.C. 2017), such a series of postponements could be taken into account in the future, if they were to occur, along with other relevant circumstances. The States' imagined parade of horribles at this juncture therefore is unwarranted. Taking into account the history of the first year of the GE regulations' implementation, where the Department has repeatedly made adjustments, whether due to technological issues, intervening judicial decisions, or otherwise, the Court should recognize that the extension of the deadline at issue here is not a final agency action.[4]

## III.    PLAINTIFFS FAIL TO SHOW THAT NOTICE AND COMMENT RULEMAKING WAS REQUIRED FOR THE ACTIONS THEY CHALLENGE

As explained in Defendants' opening brief, the Department was not required to follow notice and comment rulemaking procedures when it issued two announcements, on July 5 and August 18, 2017, that postponed the deadline for making disclosures under 34 C.F.R. § 668.412(d) and (e) and also postponed deadlines and made other changes associated with alternate earnings appeals after Judge Contreras issued an Order in *AACS* addressing the appeals process. The States continue to argue that notice and comment was required for these announcements. Indeed, under the States' theory, once an agency promulgates a final rule that contains deadlines for compliance, the agency is precluded from extending those deadlines,

---

[4] The proposed amicus brief filed the Institute for College Access & Success and other groups (ECF No. 38-1) addresses the disclosure requirements at length, *see* Am. Br. at 14-21, but raises no new arguments that warrant a separate response. At bottom, the Department's extension of the deadline for schools to implement § 668.412(d) and (e) must be viewed from a pragmatic perspective, and its limited nature, both in duration and in scope, given that it is not preventing access to any information, does not warrant subjecting this action to an APA challenge.

regardless of how brief or necessary the extension, without following the same notice and comment procedures used for the original rule. Such a theory is untenable as a matter of common sense, especially where the notice and comment process itself would take longer than the proposed period of extension. Here, for example, the GE regulations were promulgated through the Department's negotiated rulemaking process under 20 U.S.C. § 1098a. As the States acknowledge, that process is governed by a specific calendar, with the result that any rule promulgated through this process cannot go into effect until over a year after the process began. The States cite nothing that requires the Department to go through such a process either in order to delay a relatively minor, nonsubstantive requirement in a rule, or to comply with a court order compelling the agency to take action. Rather, in arguing that a "delay" "typically constitutes substantive rulemaking" requiring notice and comment, the States rely on cases addressing suspension of a rule as a whole, or its effective date—neither of which occurred here. Pl. Opp. at 16.

With respect to the extension of the § 668.412(d) and (e) disclosures, the States also rely on cases such as *Clean Air Council*, where the rule at issue—establishing methane emission standards—was deemed to have a significant substantive impact. *See Clean Air Council, 862 F.3d* at 8-9. Here, in contrast, the postponement of certain methods of disclosure was procedural not only because the question of when a requirement goes into effect is procedural, *see CS-360, LLC v. SBA*, 20 F. Supp. 3d 104, 112 (D.D.C. 2013) (recognizing that a rule setting a filing deadline was "procedural in a strict sense" (quoting *Lindh v. Murphy*, 521 U.S. 320, 327 (1997))), but also because the postponement itself addressed certain procedures for disseminating information, while the information itself would still be available and could be accessed in a different manner (on GE program websites). The States fail to acknowledge the procedural nature of these

15

requirements, instead simply characterizing disclosures as "crucial" and possibly affecting students' enrollment decisions, and speculating that students may not visit the websites of programs they attend or wish to attend. Pl. Opp. at 15. The States offer no support for those statements, however. The Court should hold that the limited extension of a deadline for a specific way of disseminating information is procedural and thus not subject to notice and comment requirements.

Insofar as the Department's announcements addressed the Court's decision in *AACS* regarding alternate earnings appeals, the States largely rehash the same arguments they made in their opening brief, which should be rejected for the reasons previously explained. It cannot be disputed that, once the Court in *AACS* issued an Order, days before the deadline in effect at that time for submission of alternate earnings appeals, expressly requiring the Department to extend the deadlines for such appeals, the Department had to issue *some* kind of announcement immediately, extending those deadlines and addressing the other aspects of the Court's ruling. Indeed, the States appear to concede that the Department had good cause to forego notice and comment to the extent it was implementing the *AACS* decision. Pl. Opp. at 18. The States' argument, then, is simply that the substance of the Department's announcement went beyond what, in the States' view, was required. *See id.* at 19 (arguing that the "Department oversteps itself" because its response to *AACS* affected "*all* GE programs"). But that argument properly addresses the substantive issue of whether the Department's action implementing the *AACS* decision was reasonable, not the procedural issue of whether notice and comment was required prior to implementing a court order. The Court should grant judgment in favor of Defendants with respect to the States' notice and comment challenge.

16

## IV.    PLAINTIFFS FAIL TO SHOW THAT THE DEPARTMENT'S ACTIONS WERE ARBITRARY AND CAPRICIOUS

As Defendants have explained, the Department's extension of the disclosure requirements in 34 C.F.R. § 668.412(d) and (e), as well as its implementation of the *AACS* decision, were not only procedurally proper but also substantively reasonable, and the States have failed to establish otherwise in their opposition brief. Indeed, the States fail to argue that the disclosure extension was arbitrary or capricious, instead focusing solely on their procedural argument that the extension required notice and comment (which, as discussed above, is also flawed). To the extent the States seek to rely solely on the fact that § 668.412(h) identifies the date by which *schools* must comply with the provision as January 1, 2017, their argument fails. That subsection does not impose requirements on the Department or limit the discretion that it retains, pursuant to other parts of the regulation, to set forth more specifically what schools must do. As explained by Defendants, the regulation makes clear that the Department will engage in an ongoing evaluation of the disclosure requirements "to make the disclosure template as meaningful as possible," 34 C.F.R. § 668.412(a), and also may adjust "procedures and timelines" for updating the template, *id.* § 668.412(b). In light of that discretion, as well as the fact that the Department was implementing the GE regulations for the first time during this period, it was not arbitrary or capricious for the Department to pause requirements relating to certain methods of disclosure while leaving the information in the disclosure template fully available to anyone visiting a GE program's website.

The States also fail to establish that the Department implemented the *AACS* decision in an arbitrary or capricious manner. As Defendants have explained, while the Court in *AACS* limited its decision to alternate earnings appeals rather than the GE regulations as a whole, the Court called that appeals process into question for all schools, not just AACS member schools.

*See* Def. Mem. at 33, 35. In particular, the Court's ruling called into question the graduate survey

response rates required under the regulation for schools seeking to submit alternate earnings

data, thus opening the door for any school to challenge the alternate earnings appeal

requirements on the same basis. *AACS*, 258 F. Supp. 3d at 75. The States' only response to this

point is that some GE programs should not have to file alternate earnings appeals at all because

Social Security Administration data should be accurate for industries that involve no self-

employment, cash, or tip income. Pl. Op. at 19. The States do not identify those industries,

however, and the GE regulations as promulgated clearly allow any GE program to submit an

appeal, regardless of industry.[5] As such, the Department reasonably adjusted the appeal

deadlines and procedures for all GE programs.

## V.    PLAINTIFFS FAIL TO ESTABLISH THAT THE DEPARTMENT UNREASONABLY DELAYED OR WITHHELD THE ISSUANCE OF DRAFT GE COMPLETERS LISTS

The States' final challenge, in Count III of their Complaint, asserts that, despite various

delays and challenges that the Department faced in its initial year of implementing the GE

regulations, including the *AACS* decision, the Department should have forged ahead with the

next year's D/E rate calculation process without regard to the initial year's implementation

process or whether that process was close to completion. Indeed, the States first contend that the

Court should compel the Department simply to implement the GE regulations as a whole, based

on the general "overview" in 34 C.F.R. § 668.405(a) of the steps that the Department takes in

order to calculate D/E rates "[f]or each award year." Pl. Opp. at 21. However, as Defendants

have explained, such a request in this context amounts to a "broad programmatic attack" on the

---

[5] The D/E rate calculation process also does not require that the reported income of GE program
graduates be limited to income earned in the profession for which the graduate received training
in a GE program. *See* 34 C.F.R. § 668.404(c). Thus, any GE program might have graduates with
income in these categories.

Department's implementation of the GE regulations, which is inappropriate for an unreasonable delay challenge under the APA, 5 U.S.C. § 706(1). *See* Def. Mem. at 36 (citing *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017); *Norton v. SUWA*, 542 U.S. 55, 64 (2004)). While the Department's ultimate determination of a GE program's final D/E rate for a given year would qualify as a final agency action, a court order compelling such a determination at this point, which as 34 C.F.R. § 668.405(a) makes clear, involves many intermediate steps and requires the participation of GE programs themselves in submitting and reviewing information, would raise the same "prospect of pervasive oversight by federal courts over the manner and pace of agency compliance" that the Supreme Court recognized in *SUWA* was "not contemplated by the APA." *See SUWA*, 542 U.S. at 67.

In any event, regardless of whether the Court views the States' challenge as seeking to compel the issuance of final D/E rates or the Draft Completers Lists that are an early step of the D/E rate calculation process, it should hold that the Department has not unreasonably delayed or withheld required agency action, for the reasons previously explained. Def. Mem. at 36-40. As the States' arguments make clear, the issue here boils down to whether it was unreasonable for the Department to hold off on the second year of calculating D/E rates under the GE regulations, given delays in the initial year of those calculations, including the delays resulting from the *AACS* decision, which pushed the Department's consideration of alternate earnings appeals for the initial year to early 2018. As previously explained, § 668.405(a), the provision identified by the States as imposing a mandatory duty on the Department, contains no language imposing any such obligation, either with respect to the issuance of D/E rates or with respect to the timing of its completion of the various steps of that process. Instead, that provision simply describes the steps in the D/E rate calculation process. *See* 34 C.F.R. § 668.405(a) ("For each award year, the

Secretary determines the D/E rates for a GE program at an institution by--[listing various steps]"). In the absence of a statutory deadline, "[a]n agency's own timetable for performing its duties . . . is due 'considerable deference.'" *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001) (quoting *Sierra Club v. Gorsuch*, 715 F.2d 653, 658 (D.C. Cir. 1983)).

The Department's timetable here is more than reasonable under the circumstances. While the States contend that the Department should have gone ahead with the next year's calculation without regard to the status of the first year's calculation, the Department had always contemplated that GE programs would get the results of their appeals for one year before the D/E rate calculation process begins for the next year, as one purpose of the process is to encourage GE programs to improve their D/E rates in future years. *See* 79 Fed. Reg. at 64892 (final GE regulations were designed to ensure that schools "have a meaningful opportunity and reasonable time to improve their programs after the regulations take effect, and ensure that those improvements are reflected in the D/E rates"); *see also id.* at 64925 (discussing time period prior to ineligibility as allowing for time for programs to improve). Moreover, the unexpected delay in the alternate earnings appeal process resulting from the *AACS* decision inevitably affected the Department's ability to juggle other obligations, requiring it to prioritize how it would allocate its resources—a fact that is well within the Court's discretion to consider. *See Cobell*, 240 F.3d at 1096 (identifying "administrative convenience," "practical difficulty" and "need to prioritize in the face of limited resources" as relevant when considering a claim of unreasonable delay); *see also Skalka v. Kelly*, 246 F. Supp. 3d 147, 153 (D.D.C. 2017) (recognizing an agency's "lack of resources" is "'a problem for the political branches to work out'" (quoting *In re Barr Laboratories, Inc.,* 930 F.2d 72, 75 (1991))), *appeal dismissed*, No. 17-5102, 2017 WL 4220432 (D.C. Cir. July 27, 2017).

Despite those challenges, now that the Department is reviewing the alternate earnings appeals for the initial year of implementation, it has issued an announcement asking GE programs to ensure the accuracy of their data before the Department issues Draft Completers Lists later this spring. *See* EA #112 (March 16, 2018) (attached hereto).[6] In light of all the circumstances, the States fail to show that the Department has egregiously delayed its issuance of Draft Completers Lists, or otherwise engaged in unreasonable delay warranting an order by this Court compelling the Department to act.[7]

## CONCLUSION

For the foregoing reasons and those set forth in Defendant's opening brief, the Court should deny Plaintiff's Motion for Summary Judgment and grant Defendant's Cross-Motion for Summary Judgment.

Dated:  March 27, 2018                      Respectfully Submitted,

                                            CHAD A. READLER
                                            Acting Assistant Attorney General
                                            JESSIE K. LIU
                                            United States Attorney
                                            MARCIA BERMAN
                                            Assistant Director, Federal Programs Branch

                                             /s/ Kathryn L. Wyer
                                            KATHRYN L. WYER
                                            Trial Attorney
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Avenue NW Room 7124
                                            Washington, D.C. 20530

---

[6] The Department's Electronic Announcements relating to its implementation of the GE regulations are available at https://ifap.ed.gov/GainfulEmploymentInfo/GEDCLandEAV2.html .

[7] The proposed amici also argue that the Department should be compelled to provide Draft Completers Lists. *See* Am. Br. at 21-25. Again, however, the amici offer little to the discussion. Amici cite nothing that suggests the Department intended that the process of calculating a new year's D/E rate go forward regardless of the status of the previous year's calculations.

Tel.: (202) 616-8475
Fax: (202) 616-8470
Email: kathryn.wyer@usdoj.gov
*Attorneys for Defendants*