## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF MARYLAND, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 17-cv-2139-KBJ |
| UNITED STATES DEPARTMENT OF EDUCATION | ) |
| and BETSY DEVOS, *in her official capacity as* | ) |
| *Secretary of Education*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## BRIEF OF AMICI CURIAE
## THE INSTITUTE FOR COLLEGE ACCESS & SUCCESS (TICAS),
## AMERICAN FEDERATION OF TEACHERS, CENTER FOR PUBLIC INTEREST
## LAW, CENTER FOR RESPONSIBLE LENDING, CHILDREN'S ADVOCACY
## INSTITUTE, CONSUMER ACTION, CONSUMER FEDERATION OF CALIFORNIA,
## DEMOS, MISSISSIPPI CENTER FOR JUSTICE, PUBLIC CITIZEN, INC., PUBLIC
## COUNSEL, PUBLIC GOOD LAW CENTER, PUBLIC LAW CENTER,
## UNIDOSUS, VETERANS EDUCATION SUCCESS,
## VETERANS' STUDENT LOAN RELIEF FUND, AND YOUNG INVINCIBLES
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN
## OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Julie A. Murray
D.C. Bar No. 1003807
Allison M. Zieve
D.C. Bar No. 424786
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

*Counsel for Amici Curiae*

Dated: March 1, 2018

**CORPORATE DISCLOSURE STATEMENT**

Amici curiae have not issued shares or debt securities to the public and have no parents, subsidiaries, or affiliates that have issued shares or debt securities to the public. The general purpose of the organizations is to advocate for the public interest on a range of issues, including those that affect or bear on students and college access, civil rights, veterans, educators, and consumers.

# TABLE OF CONTENTS

Page(s)

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF AUTHORITIES ............................................................................... iii

STATEMENT OF AMICI CURIAE'S INTERESTS ................................................. 1

BACKGROUND ........................................................................................... 2

SUMMARY OF ARGUMENT ............................................................................ 6

ARGUMENT ................................................................................................ 7

I.       The Department's Unlawful Actions Harm Students and Remove Powerful
         Incentives for Institutions To Abide by The Law. ............................................ 6

II.      The Department's Changes to the Disclosure Requirement Violate the APA. ......... 14

         A.       The Department's announcement weakening the disclosure requirement
                  constitutes final agency action. ............................................................. 15

         B.       The Department's authority to adopt "procedures and timelines" for disclosure
                  and to do "consumer testing" does not permit it to violate the APA. ................ 17

         C.       The Department's suspension of key portions of the disclosure requirement
                  inexplicably departs from its earlier position. ........................................... 19

III.     The Department's Previous Positions Make Clear That It Has An Obligation To
         Provide Draft Completers Lists to Institutions and That Its Delay Is Unlawful. ....... 21

CONCLUSION ............................................................................................. 25

APPENDIX: DESCRIPTIONS OF AMICI CURIAE ............................................... A1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*\*Ass'n of Private Sector Colleges & Universities v. Duncan*,
  110 F. Supp. 3d 176 (D.D.C. 2015) ........................................................................... *passim*

*Ass'n of Private Sector Colleges. & Universities v. Duncan*,
  640 F. App'x 5 (D.C. Cir. 2016) ........................................................................................1

*Ass'n of Proprietary Colleges v. Duncan*,
  107 F. Supp. 3d 332 (S.D.N.Y. 2015) ...............................................................................1

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................................15

*Beverly Enterprises, Inc. v. Herman*,
  50 F. Supp. 2d 7 (D.D.C. 1999) ......................................................................................15

*Career College Ass'n v. Riley*,
  74 F.3d 1265 (D.C. Cir. 1996) ........................................................................................15

*Catholic Healthcare West v. Sebelius*,
  748 F.3d 351 (D.C. Cir. 2014) ........................................................................................19

*Clean Air Council v. Pruitt*,
  862 F.3d 1 (D.C. Cir. 2017) ............................................................................................15

*\*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ....................................................................................................19

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................................................................19

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ......................................................................................18

*NetCoalition v. SEC*,
  715 F.3d 342 (D.C. Cir. 2013) ........................................................................................15

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ..........................................................................................................19

*\* Authorities on which we chiefly rely are marked with asterisks.*

*U.S. Army Corps of Engineers v. Hawkes Co.*,
   136 S. Ct. 1807 (2016) ..........................................................................................15, 16

*\*United States v. Picciotto*,
   875 F.2d 345 (D.C. Cir. 1989) ......................................................................................18

## STATUTES AND RULES

5 U.S.C. § 553(b)(3)(A) ..........................................................................................................17

5 U.S.C. § 704 ........................................................................................................................15

20 U.S.C. § 1001(b)(1) .............................................................................................................2

20 U.S.C. § 1002(a)(1) .............................................................................................................2

20 U.S.C. § 1002(b)(1)(A)(i) ....................................................................................................2

20 U.S.C. § 1070 .......................................................................................................................2

20 U.S.C. § 1088(a)(1) .............................................................................................................5

20 U.S.C. § 1089(c) ..................................................................................................................5

34 C.F.R. § 668.81 ..................................................................................................................16

34 C.F.R. § 668.99 ..................................................................................................................16

34 C.F.R. § 668.403 .............................................................................................................3, 4

34 C.F.R. § 668.404 ..................................................................................................................3

34 C.F.R. § 668.405 ...............................................................................................7, 21, 22, 23

34 C.F.R. § 668.412 .......................................................................................................ссылка *passim*

Department of Education, Announcement of Applicable Dates; Request for Comments,
   82 Fed. Reg. 30,975 (July 5, 2017) ...........................................................5, 14, 16, 19,21

Department of Education, Announcement of Applicable Dates; Request for Comments,
   82 Fed. Reg. 39,362 (Aug. 18, 2017) ...........................................................................5

Department of Education, Program Integrity: Gainful Employment Final Rule,
   79 Fed. Reg. 64,890 (2014) ..................................................................................... *passim*

Department of Education, Program Integrity: Gainful Employment Proposed Rule,
79 Fed. Reg. 16,426 (2014) ..............................................................................20

**ADDITIONAL AUTHORITIES**

Press Release, Department of Education, Education Department Releases Final Debt-to-
Earnings Rates for Gainful Employment Programs (Jan. 9, 2017),
https://www.ed.gov/news/press-releases/education-department-releases-final-
debt-earnings-rates-gainful-employment-programs ........................................................3, 4

Press Release, Department of Education, Secretary DeVos Announces Regulatory Reset
to Protect Students, Taxpayers, Higher Ed Institutions (June 14, 2017),
https://www.ed.gov/news/press-releases/secretary-devos-announces-regulatory-
reset-protect-students-taxpayers-higher-ed-institutions ........................................................5

Press Release, New York State Office of the Attorney General, A.G. Schneiderman
Announces Groundbreaking $10.25 Million Dollar Settlement With For-Profit
Education Company That Inflated Job Placement Rates To Attract Students (Aug.
19, 2013), https://ag.ny.gov/press-release/ag-schneiderman-announces-
groundbreaking-1025-million-dollar-settlement-profit ...............................................13, 14

Stephanie Riegg Cellini & Nicholas Turner, *Gainfully Employed? Assessing the
Employment and Earnings of For-Profit College Students Using Administrative
Data*, NBER Working Paper No. 22287, http://www.nber.org/papers/w22287
(last updated Jan. 2018) ...................................................................................10

*U.S. Senate Health, Education, Labor and Pensions Committee, For Profit Higher
Education: The Failure to Safeguard the Federal Investment and Ensure Student
Success (2012), https://www.help.senate.gov/imo/media/for_profit_report/ PartI-
PartIII-SelectedAppendixes.pdf ................................................................................. *passim*

U.S. Department of Education, Gainful Employment Information,
https://studentaid.ed.gov/sa/about/data-center/school/ge ...................................................4

## STATEMENT OF AMICI CURIAE'S INTERESTS[1]

Amici curiae are seventeen groups that advocate for students and college access, civil rights, veterans, educators, and consumers. Amici have been leading voices sounding the alarm on the for-profit college industry's harmful and sometimes unlawful practices, which frequently leave students saddled with a lifetime of debt and little to no improvement in their capacity to earn a living. Collectively, amici have deep experience working with students affected by the Gainful Employment Rule issued by the Department of Education (ED, or the Department). *See* ED, Program Integrity: Gainful Employment Final Rule, 79 Fed. Reg. 64,890 (2014). Additional information about each of the amici is provided in the Appendix.

Nearly all of the amici participated in the rulemaking that led to the Gainful Employment Rule. They urged the Department to adopt a robust rule that would bar Title IV funding for career education programs that leave students worse off than when they started. They also asked the Department to adopt strong disclosure requirements to help ensure that students and their families can make informed choices and avoid failing programs. Although amici advocated for a stronger rule than the one ultimately issued, they believe that the Gainful Employment Rule remains a valuable tool to address some of the most egregious, harmful conduct by career training programs. Accordingly, all amici submitted briefs in support of the Department in one or both of two earlier challenges to the rule brought by trade groups representing the for-profit industry. *See Ass'n of Private Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015), *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016); *Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332 (S.D.N.Y. 2015).

---

[1] This brief was not authored in whole or in part by counsel for a party. No person or entity other than amici or their counsel made a monetary contribution to the preparation or submission of this brief.

Amici are concerned by the Department's recent announcements that it will not fully implement the Gainful Employment Rule, and by the agency's failure to take steps critical to the rule's accountability mechanism. They submit this brief to provide context regarding the impetus for the rule and the harms created by the Department's refusal to fully implement and enforce it. Given their familiarity with the rulemaking, amici also bring to the Court's attention key portions of the Gainful Employment Rule and comments submitted during the rulemaking that bear on plaintiffs' claims and demonstrate why the Department's recent actions are arbitrary and capricious. Although amici do not address all arguments put forward by the Department in this litigation, they support the plaintiffs' claims in full and urge this Court to grant plaintiffs' motion for summary judgment.

Plaintiffs and defendants consent to amici's participation in this case.

## BACKGROUND

The federal government spends billions of dollars each year on student aid under Title IV of the Higher Education Act (HEA), 20 U.S.C. § 1070 *et seq*. This aid, which includes Stafford, PLUS, and Perkins loans and Pell grants, is the largest stream of federal postsecondary education funding. To obtain Title IV funds, students must attend an HEA-eligible institution. As a condition of eligibility, the HEA has long required certain postsecondary programs (hereinafter, career training programs) to provide "training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. § 1001(b)(1); *id.* § 1002(a)(1), (b)(1)(A)(i). This requirement advances Congress's goal of ensuring that "training offered by these programs . . . equip[s] students to earn enough to repay their loans." Gainful Employment Rule, 79 Fed. Reg. at 64,893. The covered career training programs—for example, those intended to prepare students to be hairdressers or barbers, medical assistants, nurses, or massage therapists—include nearly all programs at for-profit

educational institutions, along with some others at public and private, non-profit schools. *Id.* at 64,890, 65,025.

In 2014, the Department of Education adopted the Gainful Employment Rule to address overwhelming evidence that some career training programs, particularly at for-profit institutions, were failing to prepare students for jobs that would enable them to repay their federal student debt, thus endangering the federal government's investment and leaving some students worse off than they would have been had they never pursued postsecondary education. The rule imposes, as a condition of continued receipt of Title IV funding, new accountability requirements by "defin[ing] what it means to prepare students for gainful employment in a recognized occupation." *Id.* at 64,890. Specifically, programs must demonstrate that their debt-to-earnings rates, which measure the debt burden of graduates who received federal financial aid relative to their earnings, meet defined thresholds. 34 C.F.R. §§ 668.403, 668.404.

In January 2017, the Department published the first year of debt-to-earnings rates and identified more than 800 failing programs nationwide. *See* Press Release, ED, Education Department Releases Final Debt-to-Earnings Rates for Gainful Employment Programs (Jan. 9, 2017), https://www.ed.gov/news/press-releases/education-department-releases-final-debt-earnings-rates-gainful-employment-programs. Although programs at for-profit institutions account for only one-third of the nation's career training programs, Gainful Employment Rule, 79 Fed. Reg. at 65,025, 98 percent of the failing programs last year were in the for-profit sector, *see* Press Release, Education Department Releases Final Debt-to-Earnings Rates. Because programs whose rates fail to meet the Gainful Employment Rule's debt-to-earnings thresholds for two out of any three consecutive award years become ineligible for Title IV funding, 34 C.F.R. § 668.403(c)(4)(i), the failing programs identified in early 2017 are at risk of losing their funding

whenever the next round of debt-to-earnings rates is available. More than 1200 additional schools were identified as "in the zone" last year, *see* Press Release, Education Department Releases Final Debt-to-Earnings Rates, meaning that they too are at risk of losing their Title IV funding should they remain classified as "in the zone" or failing for three more consecutive years. 34 C.F.R. § 668.403(c)(4)(ii). Based on calculations by amicus curiae The Institute for College Access & Success (TICAS), the failing programs likely enroll more than 115,000 students, while programs "in the zone" likely enroll more than 240,000.[2]

The Gainful Employment Rule also imposes disclosure requirements for career training programs that rely on Title IV funds. The rule identifies sixteen, non-exclusive categories of information that a program may be required to disclose, such as information about a program's cost, its students' loan repayment rate and annual earnings rate, its placement rate, whether the program is accredited and by whom, and whether the program satisfies applicable prerequisites for professional licensure or certification. *Id.* § 668.412(a). As required by the rule, *see id.*, the Department adopted a disclosure template for schools to use when disclosing these categories of information, *see* AR-II-94. Although the Gainful Employment Rule left the Department some flexibility in determining what information appears each year in the disclosure template, *see* 34 C.F.R. § 668.412(a), the rule directly addressed the *manner* in which disclosure must be made. Specifically, institutions must make requisite disclosures (1) on their websites, (2) in promotional materials for the relevant programs, and (3) directly to prospective students. *Id.* § 668.412(c)-(e).

---

[2] These calculations use data from Department of Education, Gainful Employment Information, https://studentaid.ed.gov/sa/about/data-center/school/ge. The calculations are based on the Verified Student Count for programs, which represents the number of Title-IV-receiving students who completed the programs in the applicable cohort period, as listed in the Gainful Employment earnings data file. The counts do not include the many students who do not complete the programs.

The rule provides that "[i]nstitutions must comply with the [disclosure] requirements . . . beginning January 1, 2017." *Id.* § 668.412(h).

Despite the years of work that went into the Gainful Employment Rule's development and implementation, the Department under Secretary Betsy DeVos has initiated a new negotiated rulemaking to reexamine the Gainful Employment Rule, which the Department now characterizes as "overly burdensome." Press Release, ED, Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers, Higher Ed Institutions (June 14, 2017), https://www.ed.gov/news/press-releases/secretary-devos-announces-regulatory-reset-protect-students-taxpayers-higher-ed-institutions. Given the constraints that apply to negotiated rulemaking under the HEA, any replacement for the Gainful Employment Rule could not take effect until July 1, 2019, at the earliest. *See* 20 U.S.C. § 1089(c); *see also id.* § 1088(a)(1).

In the interim, the Department has set about to undermine the Gainful Employment Rule in numerous ways. As described in the plaintiff States' memorandum (at 8-12), the Department has made two announcements—without notice or an opportunity for public comment—that have, among other things, suspended key portions of the rule's disclosure requirements. *See* ED, Announcement of Applicable Dates; Request for Comments, 82 Fed. Reg. 30,975 (July 5, 2017), AR-I-45-46; ED, Announcement of Applicable Dates; Request for Comments, 82 Fed. Reg. 39,362 (Aug. 18, 2017), AR-I-49-50. Moreover, it has effectively gutted the Gainful Employment Rule's accountability mechanism by failing to compile and provide to schools Draft Completers Lists, the first step in the process for determining debt-to-earnings rates. In so doing, the Department has forestalled the day when any failing programs will see their Title IV funds terminated and prolonged the period in which students will attend career training programs that will ruin their financial futures.

## SUMMARY OF ARGUMENT

The Department's recent announcements delaying or suspending implementation of the Gainful Employment Rule and the agency's failure to provide Draft Completers Lists are harming students, who are the key beneficiaries of the rule. To gauge the extent of that harm, the Court need only look to the ample administrative record that supported the Gainful Employment Rule and the Department's own statements in adopting the rule. These statements and evidence demonstrate that the rule is necessary to protect students, particularly those targeted by predatory, for-profit colleges, such as students who are veterans, people of color, from low-income families, and single parents. The rule is a key tool to combat predatory schools' misrepresentation and outright fraud and to cut off funding for programs that fail to offer a quality education. Every day that the Department's unlawful actions remain in place is another day too many that predatory schools are permitted to operate at student expense.

The Department's defense of its unlawful announcements and failure to compile and provide Draft Completers Lists cannot be squared with the positions it took in the Gainful Employment rulemaking and in previous litigation over the Gainful Employment Rule. The Department already considered the utility of the disclosure requirement. It also adopted very specific parameters for the manner in which key information must be disclosed to prospective students and the public and determined that this multi-pronged approach to disclosure was necessary to effectuate the rule's purpose. It cannot now disavow this determination, or the rationale that underlay it.

Likewise, the Department's failure to compile and provide Draft Completers Lists to schools this year, thereby forestalling any enforcement of the rule against failing programs, cannot be squared with the Department's rulemaking rationale. In the rulemaking, the Department was

clear that it would issue debt-to-earnings rates roughly every twelve months—a timeline that is impossible for it to meet at this point given its failure to initiate the process by compiling Draft Completers Lists. Moreover, its model weighing the rule's costs and benefits was built on the same assumption that debt-to-earnings rates would be issued once per year, and those rates necessarily depend on the annual provision of Draft Completers Lists. Although the Department contends that it has no obligation to compile Draft Completers Lists, its contention also cannot be squared with its position in previous litigation. There, the Department conceded that 34 C.F.R. § 668.405 of the Rule—which makes clear its duty to compile the lists—is not merely descriptive in nature, but instead establishes procedural protections for schools and corresponding agency obligations.

## ARGUMENT

### I.   The Department's Unlawful Actions Harm Students and Remove Powerful Incentives for Institutions To Abide by The Law.

ED's recent announcements and failure to forward Draft Completers Lists to institutions are a backdoor attempt to gut the Gainful Employment Rule. So long as those unlawful actions continue, students—key beneficiaries of the rule—will suffer the consequences, and the predatory behavior that the Gainful Employment Rule is designed to address will persist and increase with renewed vigor. This Court need not take amici's word for it, or that of the plaintiffs. The Department's own statements in the Gainful Employment Rule, and the evidence before the Department during that rulemaking, make clear that students bear the cost of the Department's failure to fully implement and enforce the Gainful Employment Rule.

**A.**     The Gainful Employment Rule was adopted against the backdrop of grave concerns with respect to the quality of some institutions' career training programs and the inability of students who attend those programs—particularly programs in the for-profit sector—to repay their student loans. At the time of the rule's adoption, tuition and fees at for-profit colleges were twice

what they were for equivalent programs at less-than-two-year public colleges and four times what they were for equivalent programs at two-year public schools. *See* Education Trust Comments, ED-2014-OPE-0039-1729.[3] Unsurprisingly, students at for-profit programs were more likely than those at other institutions to rely on loans, including federal student aid, to finance their education. Gainful Employment Rule, 79 Fed. Reg. at 65,033. On average, students at for-profit schools had larger amounts of debt than those who attended non-selective public or non-profit institutions. *Id.*

Certain groups of students—including students of color, low-income students, veterans, and women—were acutely affected by for-profit colleges' high costs (and their poor quality and outcomes, as discussed below). One commenter in the Gainful Employment rulemaking, for example, indicated that 74 percent of African American students and 72 percent of Hispanic students attending for-profit colleges took out federal loans, compared to 24 percent and 27 percent, respectively, of their peers at other institutions. Education Trust Comments at 4, ED-2014-OPE-0039-1729; *see also* American Ass'n of University Women Comments at 1, ED-2014-OPE-0039-2072 (stating that women who enrolled in for-profit colleges were more than twice as likely to take out federal student loans than women at other colleges and universities).

Despite these high costs to students, the Department was presented during the Gainful Employment rulemaking with abundant evidence that some for-profit career training programs provided students with a substandard education, marked by poor quality instructors, few if any student support services, and high rates of withdrawal. A Senate investigation of the for-profit industry, on which the Gainful Employment Rule repeatedly relied, demonstrated that many for-profit schools used students' tuition and fees to pad school profit margins and pay for recruitment

---

[3] All citations to comments submitted during the Gainful Employment rulemaking are available at www.regulations.gov.

and marketing. *See* U.S. Senate Health, Education, Labor and Pensions Committee, For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success 6 (2012) (hereinafter, HELP Report), https://www.help.senate.gov/imo/media/for_profit_report/ PartI-PartIII-SelectedAppendixes.pdf; Index of Administrative Record at 5, *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015) (including this report in the Gainful Employment Rule's administrative record). On average, for-profit institutions that responded to a document request by the Senate HELP Committee spent $2,050 per student on instruction in 2009—a spending level that generally fell well below that for public and non-profit schools. HELP Report at 86-87. The National Consumer Law Center (NCLC), which frequently provides legal assistance to students attending for-profit programs, further explained that its clients often "complained about unqualified instructors, a school's failure to provide books or other materials, the lack of up-to-date, operational or sufficient instructional equipment, and internships that do not involve any of the skills the students have learned." NCLC Comment at 4, ED-2014-OPE-0039-0585; *see also*, *e.g.*, Veterans' Student Loan Relief Fund Fact Sheet, ED-2014-OPE-0039-2368 (collecting veterans' experiences with low program quality at for-profit schools).

Unsurprisingly, many students do not complete substandard programs. The Senate investigation concluded that more than half a million students (or 54 percent) who enrolled in 2008-2009 in a for-profit institution examined in the report left without a degree or certificate by the middle of 2010. HELP Report at 73. Even students who graduated from for-profit programs often struggled to pay off their loans due to low earning potential and few job prospects. *See* Gainful Employment Rule, 79 Fed. Reg. at 65,031. For example, the Department's own calculations indicate that more than a quarter of career training programs subject to the debt-to-earnings measures in the Gainful Employment Rule produced graduates with mean and median

earnings below $15,080 per year, the earnings of a full-time worker earning the federal minimum wage. *Id.*[4]

For-profit institutions' toxic mix of high student debt, low program quality, and poor employment prospects has unsurprisingly led to high rates of student loan default. The Department estimated that more than one in five students who attend career training programs subject to the accountability metrics in the rule would default on their federal student loans within the first three years of repayment. *Id.* It also observed that student loan default rates were "consistently . . . highest among students attending for-profit institutions." *Id.* at 65,033; *see also* HELP Report at 114 (stating that students who attend for-profit schools "default at nearly three times the rate of students who attend[] other types of institutions" and indicating that students who attended for-profit educational institutions account for nearly half of all student loan defaults). An analysis conducted by The Institute for College Access and Success (TICAS) "found 114 programs—all at for-profit colleges—where there were more defaulters in a single cohort year of defaults than there were graduates in a two-year period." TICAS Comments at 3, ED-2014-OPE-0039-1935. Put another way, students receiving federal aid to attend these "parasitic programs" were "more likely to default than they [we]re to complete the credential they sought." *Id.*

As one commenter told the Department during the Gainful Employment rulemaking, strong regulation of for-profit schools is necessary to ensure that fewer students report that going to

---

[4] Later evidence confirms the difficulty that students at for-profit schools have in paying off their federal student loans. One recent study using Department of Education data found that students in for-profit certificate programs, which are covered by the Gainful Employment Rule, were worse off than students who had not gone to such programs at all, when considering the students' earnings and debt load. Stephanie Riegg Cellini & Nicholas Turner, *Gainfully Employed? Assessing the Employment and Earnings of For-Profit College Students Using Administrative Data*, NBER Working Paper No. 22287, http://www.nber.org/papers/w22287 (last updated Jan. 2018).

college is the worst mistake of their lives. *See* Center for Responsible Lending Comments, ED-2014-OPE-0039-1727. Yet the Department, by gutting the Gainful Employment Rule's accountability mechanism to cut off Title IV funding to failing programs, has left students unprotected.

**B.**     The Department's own statements in the Gainful Employment Rule and evidence introduced during the rulemaking make equally clear that students are harmed by the Department's recent actions hamstringing the rule's disclosure requirements. The Department acknowledged in the rule "that some for-profit institutions have taken advantage of the lack of access to reliable information about [career training] programs to mislead students." Gainful Employment Rule, 79 Fed. Reg. at 65,034. That observation was well supported by the administrative record, which demonstrated, for example, that some for-profit schools trained their employees not to disclose a program's true cost. For example, one former recruiter for a for-profit college explained that he was trained to state the cost of the program only for each term. As he noted, "often times" the student would "automatically assume there are only two or three terms like a traditional school, and there is [sic] in reality, five per year." HELP Report at 54. Another school's internal training manual instructed recruiters to give non-answers to a student's first two questions about program cost and, if asked a third time, "to state the cost per credit hour, but not the number of credits required to graduate in the program." *Id.* at 54-55. The manual expressly stated: "Do not give out the complete program cost." *Id.* at 55.

A veterans' group also brought to the Department's attention evidence from recruiters regarding predatory schools' attempts to hide material information from students. For example, one salesman for for-profit DeVry testified before Congress that he was "instructed to pose as a 'military advisor' affiliated with the Pentagon" in his efforts to recruit veterans; four other DeVry

salesmen subsequently told Congress that they were instructed to do the same thing. Veterans Education Success Comments at 5, ED-2014-OPE-0039-2363. And a former recruiter at for-profit South University stated, "It just got to the point where I felt like I was lying to these people on a regular basis. . . . Honestly, I just felt dirty doing the things I was doing. It's almost like they were trying to make me take advantage of people's belief in what this education was going to get them, when I didn't buy into it myself." *Id.* at 6.

The Department also had before it substantial evidence that predatory schools misled students about programs' accreditation, their sufficiency for students to seek professional certification or licensure, and the transferability of their credits to other schools. For-profit schools may have only national accreditation, for example, which can impair students' ability to obtain licensure or certification under some circumstances and to transfer their credits with for-profit institutions to non-profit private or public schools. Many students, "especially first-in-the-family college students, . . . do not find out until it is too late" that the programs they are attending do not meet necessary certification or licensing exam criteria. Consumer Federation of California, et al., Comments at 31, ED-2014-OPE-0039-1932. One commenter described to the Department the story of a Marine corporal, who stated, "When I attempted to transfer my units from [for-profit institution] Brown Mackie to [a public college], I found out that none of my units transferred because they didn't have the right level of accreditation." Veterans Education Success Comments at 8, ED-2014-OPE-0039-2363. Another former student of a for-profit school, a single mother with two children, testified in a congressional hearing that only after she finished a sonography program at the college did she learn that it lacked programmatic accreditation. *Id.* at 13.

The Senate HELP Report, on which the Department relied in the rule, also examined accreditation-related online information provided by for-profit companies and found some lacking.

For example, in analyzing programs offering clinical psychology doctorates, it noted that some states require accreditation by the American Psychological Association for an individual to receive a license to practice as a psychologist. One institution offering this program, Argosy University, correctly noted on its website that some of its campuses were accredited, but it did not mention on the same page "that two of its [eleven] programs were not accredited, nor that graduates from those two programs would not be able to practice in several States." HELP Report 109; *accord* Gainful Employment Rule, 79 Fed. Reg. at 65,033 (citing same). For-profit Concord Law School, which was not accredited by the American Bar Association (ABA), stated on its JD web page that graduates were eligible to sit for the California Bar Exam (which does not require a degree from an accredited law school), but it did "not mention that the program was not accredited by the [ABA] and that as a result, even students who ultimately passed the California Bar Exam would not be allowed to sit for the required bar examination in many other States." HELP Report 109; *see also id.* at 104 (stating that a prospective student would have had to "click on a small-print section titled 'Concord Law School accreditation and disclosure information' and to read multiple small-print paragraphs" to learn this information).

Moreover, the Department was informed about predatory institutions' misleading statements with respect to job placement rates. In one investigation, the Attorney General of New York discovered that for-profit Career Education Corporation inflated its graduates' job placement rates in disclosures to students, accreditors, and the state. *See* Press Release, New York State Office of the Attorney General, A.G. Schneiderman Announces Groundbreaking $10.25 Million Dollar Settlement With For-Profit Education Company That Inflated Job Placement Rates To Attract Students (Aug. 19, 2013), https://ag.ny.gov/press-release/ag-schneiderman-announces-groundbreaking-1025-million-dollar-settlement-profit; *see* Index of Administrative Record at 3,

*Ass'n of Private Sector Colls. & Univs.*, 110 F. Supp. 3d 176 (including this press release in the Gainful Employment Rule's administrative record). The state alleged that company employees had counted graduates' "employment at single one-day health fairs, including fairs initiated at the request" of the company, as job placements, and had mischaracterized "graduates' job duties in order to improperly count such students as employed in the field in which the student trained or a related field." Press Release, New York State Office of the Attorney General. Although the company did not admit wrongdoing, it entered into a $10.25 million settlement with the state, which included an agreement to pay more than $9 million toward restitution for eligible consumers. *Id.* As part of the Attorney General's investigation, the company audited its job placement reports and "announced that it was revising placement rates for 49 of its campuses, and that 36 of those no longer met its accreditor's standards for placement." HELP Report at 164.

The Gainful Employment Rule's disclosure requirements were intended to combat misleading statements by predatory institutions and those institutions' efforts to obscure material information that might reflect poorly on their programs. The Department's decision to weaken the disclosure requirements harms those very students that the requirements were intended to help.

## II.     The Department's Changes to the Disclosure Requirement Violate the APA.

The Gainful Employment Rule requires that institutions provide program-related disclosures through three means: on an institution's web page, directly to prospective students, and in promotional materials. The Department's announcement of July 5, 2017, excuses institutions from complying with the disclosure requirement with respect to the latter two manners of disclosure, explaining that the Department intends to "evaluate the utility of these disclosures to students and the implementation of th[e] [disclosure] requirement" before requiring disclosure directly to prospective students and in promotional materials. 82 Fed. Reg. at 30,976.

**A.   The Department's announcement weakening the disclosure requirement constitutes final agency action.**

An agency action must ordinarily be "final" to be subject to challenge under the Administrative Procedure Act (APA). 5 U.S.C. § 704. To satisfy the APA's demand for finality, an action must "'mark the consummation of the agency's decisionmaking process'" and "'must be one by which rights or obligations have been determined or from which legal consequences will flow.'" *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). The Department contends that its announcement relieving institutions from the obligation to make key disclosures directly to prospective students and in promotional materials does not satisfy either of these criteria for final agency action. *See* Defs.' Summ. J. Memo. 27. It is wrong.

First, in reliance on the fact that the action delays portions of the disclosure requirement only until July 1, 2018, the Department contends that the change is only "temporar[y]" and thus cannot mark the consummation of the agency's decisionmaking. *Id.* at 28. But a "final order need not necessarily be the very last order" of an agency. *NetCoalition v. SEC*, 715 F.3d 342, 351 (D.C. Cir. 2013) (internal quotation marks and alteration omitted). The fact that a rule's application has an end date, or that the agency may later adopt a new rule after that date, does not preclude the initial rule from marking the consummation of an agency's decisionmaking with respect to the period of time covered by that rule. *See, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (holding with "no difficulty" that a stay of a rule that suspended the rule's compliance deadlines was final for purposes of the APA and collecting cases); *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1268 (D.C. Cir. 1996) (holding that an "interim final rule" was in final form, and that "interim" referred "only to the Rule's intended duration—not its tentative nature"); *accord Beverly Enterprises, Inc. v. Herman*, 50 F. Supp. 2d 7, 17 (D.D.C. 1999). The Department's announcement

offers no indication that the Department has any intention of reconsidering its suspension of portions of the disclosure requirement before July 1, 2018. The announcement is the final word of the agency for this period of time.

The Department also argues that the announcement does not "alter the rights or interests of regulated parties" and, therefore, cannot be final. Defs.' Summ. J. Memo. 30. Its argument in this regard is belied by the announcement's plain language, which provides that the "Department is allowing institutions additional time—until July 1, 2018—to comply" with the disclosure requirements in 34 C.F.R. § 668.412(d) and (e). 82 Fed. Reg. at 30,976. Thus, until July 1, 2018, regulated institutions have no obligation to comply with the suspended portions of the disclosure requirement, and prospective students have no concomitant right to receive the information in the manners for which compliance has been suspended.

In an attempt to show that the announcement has no legal effect, the Department argues that § 668.412, in which the disclosure requirement resides, "does not specify any consequence for a school's failure to provide required disclosures." Defs.' Summ. J. Memo. 28. But that section's silence as to consequences does not mean that the requirement it sets forth is illusory. Even the Department acknowledges that it *could* take an enforcement action under 34 C.F.R. §§ 668.81-.99 if a school failed to provide required disclosures under § 668.412. *See id.* at 28 n.5. The fact that "those provisions do not specify under what circumstances the Department might initiate such an enforcement action," *id.*, is irrelevant. What matters is that the Department's announcement makes clear that it will *not* bring an enforcement action for non-compliance with the suspended portions of the disclosure requirement. Legal consequences thus indisputably flow from the Department's announcement. *See, e.g.*, *Hawkes*, 136 S. Ct. at 1814 (holding that legal consequences flowed from an agency action that bound agencies "authorized to bring civil

enforcement proceedings" and "creat[ed] a five-year safe harbor from such proceedings for a property owner"). The announcement is a final agency action subject to challenge under the APA.

**B.      The Department's authority to adopt "procedures and timelines" for disclosure and to do "consumer testing" does not permit it to violate the APA.**

The Department contends that even if the announcement weakening the disclosure requirement is final, the announcement is neither procedurally invalid nor arbitrary and capricious. First, the Department contends that it was not required to undertake notice-and-comment rulemaking in issuing the disclosure announcement because the announcement effected changes that are "procedural in nature," Defs.' Summ. J. Memo. 29, and procedural rules are exempt from the APA's notice-and-comment requirement, 5 U.S.C. § 553(b)(3)(A). For support, the Department points (at 30) to § 668.412(b)(1), which provides that, "[i]n accordance with procedures and timelines established by the Secretary, [an] institution must update at least annually the information contained in the disclosure template with the most recent data available for each of its [Gainful Employment] programs." In the Department's view, its authority under § 668.412(b)(1) to adopt "procedures and timelines" for updating disclosures permits it to suspend two of the three express requirements in that same regulatory section bearing on the manner in which disclosure is made.

Section 668.412(b)(1) cannot bear the weight placed on it by the Department. It does not purport to provide the Department with authority to suspend mandatory subsections elsewhere in the regulation, including § 668.412's requirement that "[a]ll promotional materials" identifying a career training program "by name or otherwise promot[ing] the program *must include*," inter alia, "the disclosure template," *id.* § 668.412(d)(1) (emphasis added), and its requirement that "[b]efore a prospective student signs an enrollment agreement, completes registration, or makes a financial commitment to the institution, the institution *must provide* the prospective student . . . , as a

separate document, a copy of the disclosure template," *id.* § 668.412(e)(1) (emphasis added). That § 668.412(b)(1) is not intended to permit the Department to substantively modify—and thereby effectively rescind—other portions of the same section is bolstered by § 668.412(h), which expressly provides that "[i]nstitutions must comply with the requirements of this section beginning January 1, 2017." The Department does not have the option to excuse schools from complying with the regulation after that date.

Moreover, the Department could not have legally adopted such a catchall provision granting it future authority to effectively revise § 668.412 even if it had tried to do so. An agency may not "grant itself a valid exemption to the APA for all future regulations, and be free of [the] APA's troublesome rulemaking procedures forever after, simply by announcing its independence in a general rule." *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989). So, for example, in *United States v. Picciotto*, an agency argued that a regulation authorizing it to adopt "additional conditions" on demonstrations in parks "grant[ed] it the authority to impose new substantive restrictions . . . without engaging in notice and comment procedures." *Id.* at 346. The D.C. Circuit rejected this argument, holding that the underlying regulation did not release the agency from its obligation to conduct notice-and-comment rulemaking for a later-adopted "condition" that limited the types of property that demonstrators could store in a park. *Id.* at 346-47; *see also Mendoza v. Perez*, 754 F.3d 1002, 1024 (D.C. Cir. 2014) (holding that an agency action that "effectively amend[s] a legislative rule" is subject to notice-and-comment rulemaking (internal quotations and alteration omitted)).

The Department similarly contends that its changes to the disclosure requirement were not arbitrary and capricious because, in deciding not to enforce § 668.412(d) and (e), it was exercising its "continuing authority" under § 668.412(b) to "establish 'procedures and timelines' to govern

updates to the disclosure template," and under § 668.412(a) "to conduct consumer testing to determine how to make the disclosure template as meaningful as possible." Defs.' Summ. J. Memo. 34. As an initial matter, this legal rationale is nowhere to be found in the Department's announcement suspending portions of the disclosure requirement. *See generally* 82 Fed. Reg. 30,975. Indeed, the announcement regarding the disclosure requirement does not even cite § 668.412(b) or (c), or discuss consumer testing. The Department cannot now rely on a post hoc justification for its action that was not, in fact, the basis on which it suspended portions of the disclosure requirement. *See, e.g.*, *Catholic Healthcare W. v. Sebelius*, 748 F.3d 351, 354 (D.C. Cir. 2014) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)). Moreover, nothing in § 668.412 suggests that the references to "procedures and timelines" or "consumer testing" with respect to the disclosure template would permit the Department to effectively repeal other portions of the section written in mandatory terms.

### C.   The Department's suspension of key portions of the disclosure requirement inexplicably departs from its earlier position.

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). When an agency changes its position, it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* at 2126 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). The Department's failure to do so in announcing the suspension of portions of the disclosure requirement renders its action arbitrary and capricious.

Specifically, during the rulemaking, the Department made clear that it viewed the *manner* of disclosure as critical to the effectiveness of the rule. In the notice of proposed rulemaking, for example, the Department indicated that negotiators during the negotiated rulemaking had "warned

of the high-pressure tactics that predatory institutions might use to coerce prospective students to enroll, arguing that students need to have this information before they actually enroll in a program." ED, Program Integrity: Gainful Employment Proposed Rule, 79 Fed. Reg. 16,426, 16,479 (2014). To combat these high-pressure tactics, it proposed to require not just disclosure on an institution's website, but also direct delivery of disclosures to students before they have made a financial commitment to a school. *See id.* at 16,480. In the final rule, the Department emphasized that it agreed with "commenters who stated that it is important that prospective students receive the information in the disclosure template *directly and clearly prior to enrolling in a program.*" 79 Fed. Reg. at 64,984 (emphasis added); *see also id.* at 64,979 (rejecting some commenters' assertions that the disclosure requirements violated institutions' First Amendment rights and emphasizing that "requiring an institution to *both* include the disclosure template on its program Web site *and* directly distribute the template to prospective students is the most effective manner of advancing [the agency's] significant government interest" (emphasis added)).

Having concluded that direct delivery of disclosures to prospective students was critical to the rule, the Department provided significant detail about how those disclosures must be made. The resulting regulation provides that delivery must occur "[b]efore a prospective student signs an enrollment agreement, completes registration, or makes a financial commitment"; that delivery be made only by hand delivery, as part of a group presentation, or by email (and then only if the disclosure "is the only substantive content in the email"); and that, unlike with the other disclosure requirements, an institution must maintain records of acknowledgement that the student received the disclosure. 34 C.F.R. § 668.412(e); *see also* Gainful Employment Rule, 79 Fed. Reg. at 64,984. The Department concluded that "[r]equiring these types of acknowledgments" was necessary to provide "adequate assurance that a prospective student has received important information about

the program." Gainful Employment Rule, 79 Fed. Reg. at 64,984. The Department's new position, however, does not have any of these safeguards; placement of disclosures on a website does not ensure that prospective students receive them before deciding to enroll, nor does it provide the type of compliance records that would later facilitate enforcement where necessary.

The Department's announcement suspending the requirement that disclosures be provided directly to prospective students and in promotional materials does not even try to wrestle with the Department's rationale advanced in the Gainful Employment Rule, which is directly contrary to the Department's new position. Instead, the Department acts as if it is just now assessing the "utility of these disclosures to students." 82 Fed. Reg. at 30,976. The suspension of the disclosure provisions was arbitrary and capricious and should be declared unlawful.

### III.     The Department's Previous Positions Make Clear That It Has An Obligation To Provide Draft Completers Lists to Institutions and That Its Delay Is Unlawful.

**A.**     The Department contends that it cannot have unreasonably delayed or unlawfully withheld the provision of Draft Completers Lists to institutions because the Department has no legal obligation to provide these lists in the first place. The Department's assertion contradicts its previous statements.

By way of background, 34 C.F.R. § 668.405, which makes clear the Department's obligation to create Draft Completers Lists, begins in subsection (a) with an overview of the steps that the Department must take with respect to issuing debt-to-earnings rates. Most steps identified in that process are then described in more detail in subsections (b) through (g). Subsection (a)(1) provides that "[f]or each award year," the Department "determines the [debt-to-earnings] rates for a [Gainful Employment] program at an institution by" first "[c]reating a list of students who completed the program during the cohort period," that is, a Draft Completers List, "and providing the list to the institution." *Id.* § 668.405(a)(1). The Department then "allow[s] the institution to

correct the information about the students on the list," *id.* § 668.405(a)(2), after which it obtains student earnings information, calculates draft rates subject to challenge by institutions, and finalizes those rates with a process for administrative appeal, *id.* § 668.405(a)(3)-(7).

Although the Department now portrays 34 C.F.R. § 668.405 as descriptive in nature and contends that it does not give rise to any obligation to create Draft Completers Lists, *see* Defs.' Summ. J. Memo. 37, it took an irreconcilable position about the legal effect of § 668.405 less than three years ago, when a trade group challenged the Gainful Employment Rule. *See Ass'n of Private Sector Colls. & Univs.*, 110 F. Supp. 3d 176. In that litigation, the trade group argued that the system for determining debt-to-earnings rates failed to provide sufficient due process to schools and thus violated the APA. Although the Department contended that institutions' due-process rights were not implicated by the rule, it stated that § 668.405 provided "procedural protections" to schools. *Ass'n of Private Sector Colls. & Univs.*, No. 14-1870, Doc. 24, Defs.' Reply at 24 n.25 (filed Apr. 22, 2015). The Department pointed, for example, to the procedures in subsection (c), which details the process by which schools may review the Draft Completers Lists and make corrections to them. *Id.*, Doc. 17, Defs.' Summ. J. Memo. 38 n.27 (filed Mar. 6, 2015). That "procedural protection" would of course make no sense if the government had no obligation to provide Draft Completers Lists to institutions in the first place. The Department also pointed to subsection (e) as a protection intended to "provid[e] schools with the mean and median aggregate earnings figures used to calculate" the debt-to-earnings rates. *Id.*, Doc. 24, Defs.' Reply at 24 n.25. That right would be meaningless if the Department had no obligation to show schools the information that appears on Draft Completers Lists—that is, the students for whom rates will be calculated. The district court in that case accepted the Department's position, holding that the APA's requirements for informal adjudication were met "where the regulations allow schools to,

for example, see the mean and median earnings figures the Department used to calculate debt-to-earnings rates, offer contrary earnings data based on the school's own survey of graduates or other state-gathered data, and challenge the list of students the Department used in its calculations." *Ass'n of Private Sector Colls. & Univs.*, 110 F. Supp. 3d at 197-98.

**B.**     The Department also contends that, if it has an obligation to provide Draft Completers Lists to institutions, its delay in doing so is reasonable. Defs.' Summ. J. Memo. 38-39. It argues that it "has not committed to any specific deadline for issuing" debt-to-earnings rates "for a given year." *Id.* at 39 n.6.

In making these assertions, the Department ignores not only the plain language of the Gainful Employment Rule, which requires it to determine debt-to-earnings rates "[f]or each award year," 34 C.F.R. § 668.405(a)(1), but also key portions of the rationale it set forth when adopting the rule. In the preamble to the Gainful Employment Rule, the Department made clear that it expected debt-to-earnings determinations to be made every year. Specifically, in explaining how institutions could appeal debt-to-earnings rates, the Department provided an example of how appeals would work in two consecutive years and stated that under its "anticipated timeline," it would issue draft debt-to-earnings rates "early" each "calendar year." Gainful Employment Rule, 79 Fed. Reg. at 16,462. Now, early in the second calendar year, the Department has not only failed to issue draft debt-to-earnings rates, but also failed to compile the underlying Draft Completers Lists on which those rates are based. It last compiled the lists in June 2016. *See* AR-II-68, 71.

Moreover, the model that the Department used to calculate the Gainful Employment Rule's costs and benefits is based on the assumption that the process for issuing and challenging debt-to-earnings rates—which begins with Draft Completers Lists—will be repeated every year. The Department's model estimated the budget impact of the rule between 2016 and 2024. *See* Gainful

23

Employment Rule, 79 Fed. Reg. at 65,082. That model built in assumptions for each year based on what students would likely do in response to new information that their schools were failing or "in the zone" under the rule, *see id.* at 65,077-78, 65,082, and assumed that the first schools would be deemed ineligible for Title IV funding in 2018, with the number of ineligible programs growing each year after that, *see id.* at 65,083. The Department's current position (at 39-40)—that it can wait until "the initial year of [debt-to-earnings] rate calculations is entirely complete before initiating the process for the next year"—could add *years* to the process, which is clearly at odds with the Department's cost-benefit analysis in the rule.

The Department's position that it will not initiate new debt-to-earnings rates until it resolves all pending appeals from the last round is also at odds with other portions of the Gainful Employment Rule in which the Department stressed that the rule's accountability mechanism to cut off funding to failing schools should proceed apace. For example, some commenters asked the Department to provide institutions with a longer period of time than provided under the rule to submit alternate earnings appeals challenging draft debt-to-earnings rates. Gainful Employment Rule, 79 Fed. Reg. at 64,961-62. The Department refused, explaining that "[t]o permit more time would . . . unnecessarily increase the risk that more students would invest their time and money, and their limited eligibility for title IV, HEA program funds, in a program that does not meet the [regulations'] minimum standards." *Id.* at 64,962. Under the Department's litigating position, however, students could spend additional years in a program doomed to lose its funding.

Similarly, the Department considered during the rulemaking a request to permit disbursement of Title IV funds to students attending programs rendered ineligible for Title IV funds "until the student[s] complete[] the program[s]." *Id.* at 64,972. The Department rejected this request, instead concluding that students could receive Title IV funds at an ineligible program only

"through the end of any ongoing loan period or payment period" at the time ineligibility is determined (here, the final debt-to-earnings rate determination), which could last no more than "a full award year." *Id.*; *see also id.* n.178. The Department emphasized that "extend[ing] the period during which students may continue to receive title IV, HEA program funds to attend an ineligible program would encourage students to invest more time, money, and limited Pell Grant eligibility in programs that produce unacceptable outcomes." *Id.* at 64,972. That the Department would now permit such student outcomes by cutting off the rule's accountability mechanism at the outset is contrary to the rationale it advanced during rulemaking and the rule's intent of protecting students.

## CONCLUSION

For the foregoing reasons and those in plaintiffs' motion for summary judgment, this Court should grant summary judgment to the plaintiffs and deny summary judgment to the Department.

Dated:  March 1, 2018

Respectfully submitted,

/s/ Julie A. Murray
Julie A. Murray
D.C. Bar No. 1003807
Allison M. Zieve
D.C. Bar No. 424786
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
jmurray@citizen.org

*Counsel for Amici Curiae*

## APPENDIX: DESCRIPTIONS OF AMICI CURIAE

### American Federation of Teachers

The American Federation of Teachers is a union of 1.7 million professionals that champions fairness; democracy; economic opportunity; and high-quality public education, healthcare and public services for our students, their families, and our communities. We are committed to advancing these principles through community engagement, organizing, collective bargaining and political activism, and especially through the work our members do. Our commitment to high quality public education includes the belief that higher education should be affordable and accessible to all, and that students should be able to obtain academic and career credentials of genuine practical and intellectual worth without incurring debt.

### Center for Public Interest Law

The Center for Public Interest Law (CPIL), founded in 1980 at the University of San Diego School of Law, serves as an academic center of research and advocacy in regulatory and public interest law. In addition to its academic program, in which law student interns learn the substantive law governing the operation and decision making of state regulatory agencies, CPIL has an advocacy component in which it represents the interests of the unorganized and underrepresented in California's legislature, courts, and regulatory agencies.

### Center for Responsible Lending

The Center for Responsible Lending (CRL) is a non-profit, non-partisan research and policy advocacy organization that works to protect homeownership and family wealth by fighting predatory lending practices. Since we began in 2002, we have witnessed, studied, and fought against outrageous lending abuses that strip billions of dollars from American families. CRL strives to advance financial opportunity, security, and wealth for families and communities. We are particularly focused on promoting fair and sustainable lending practices and ending abusive financial practices that have a disproportionate impact on people of color, low- and moderate-income families, and other populations including immigrants, students, seniors, women, and military personnel. These populations have too often received reduced access to responsible products and are intentionally targeted for predatory lending. Our affiliation with Self-Help, a lender to traditionally underserved borrowers, confirms that fairness and opportunity can be at the center of a thriving financial marketplace for all.

### Children's Advocacy Institute

The Children's Advocacy Institute (CAI), founded at the non-profit University of San Diego School of Law in 1989, is one of the nation's premier academic, research, and advocacy organizations working to improve the lives of children and youth. In addition to its academic component, in which CAI trains law students and attorneys to be effective child advocates, CAI seeks to leverage change for children and youth through impact litigation, regulatory and legislative advocacy, research, and public education at the state and federal levels.

### Consumer Action

Consumer Action has been a champion of underrepresented consumers since 1971. A national, non-profit 501(c)(3) organization, Consumer Action focuses on financial education that empowers low-to-moderate-income and limited-English-speaking consumers to financially prosper. It also

advocates for consumers to advance consumer rights and promote industry-wide change, particularly in the field of personal finance, including student loans.

## Consumer Federation of California
The Consumer Federation of California (CFC) is a non-profit advocacy organization. Since 1960, CFC has been a voice for consumer rights, campaigning for state and federal laws that place consumer protection ahead of corporate profit. Each year, CFC testifies and advocates before the California legislature on dozens of bills that affect millions of our state's consumers, and it appears before state agencies in support of consumer regulations.

## Demos
Demos is a public policy and research organization working for an America where we all have an equal say in our democracy and an equal chance in our economy. Demos views an affordable, quality higher education system as a pillar of our nation's commitment to equity and upward mobility and believes that a robust Gainful Employment Rule is key to ending abusive practices among some institutions in our higher education system and ensuring that students are not overburdened by debt from institutions that provide little value in the job market.

## The Institute for College Access & Success
The Institute for College Access & Success is an independent, non-profit organization that works to make higher education more available and affordable for people of all backgrounds. Through non-partisan research, analysis, and advocacy, we aim to improve the processes and public policies that can pave the way to successful educational outcomes for students and for society.

## Mississippi Center for Justice
The Mississippi Center for Justice is a non-profit, public interest law firm committed to advancing racial and economic justice. Supported and staffed by attorneys, community leaders, and volunteers, the Center develops and pursues strategies to combat discrimination and poverty statewide.

## Public Citizen, Inc.
Public Citizen, Inc. is a non-profit consumer advocacy organization founded in 1971. Public Citizen represents consumer interests through research, public education, lobbying, litigation, and administrative advocacy on a broad range of issues, including consumer rights in the marketplace, financial regulation, and corporate accountability. Public Citizen supports robust regulation of predatory, for-profit educational institutions and student lending practices that leave many students with overpriced educations that do not prepare students for the workplace.

## Public Counsel
Public Counsel is the nation's largest public interest law firm specializing in delivering pro bono legal services to low-income communities. Founded in 1970, Public Counsel strives to achieve three main goals: protect the legal rights of disadvantaged children; foster economic justice by providing individuals and institutions in underserved communities with access to quality legal representation; and represent immigrants who have been the victims of torture, persecution, domestic violence, trafficking, and other crimes. In 2016, Public Counsel staff and over 4,800 volunteers provided legal services to 19,000 individuals and more than 300 non-profit

organizations, and conducted impact litigation on behalf of over 12 million people. Many of our clients suffer from the practices of for-profit colleges described in this brief, including foster youth, veterans, and at-risk students who are often the first in their families to go to college.

## Public Good Law Center

The Public Good Law Center is a public interest organization dedicated to the proposition that all are equal before the law. Through participation in cases of particular significance for consumer protection and civil rights, Public Good seeks to ensure that the protections of the law remain available to everyone. The Gainful Employment Rule serves that purpose by providing prospective students with crucial information before they make decisions that could profoundly impact their career prospects and financial well-being.

## Public Law Center

The Public Law Center is committed to providing access to justice for Orange County, California, low-income residents, and does so by providing free civil legal services, including counseling, individual representation, community education, and strategic litigation and advocacy to challenge societal injustices. The Public Law Center regularly assists low-income students, including veterans, who have enrolled in for-profit schools because of false promises and misinformation and subsequently have to deal with paying for an education that they cannot use.

## UnidosUS

UnidosUS, previously known as NCLR (National Council of La Raza), is the nation's largest Hispanic civil rights and advocacy organization. Through its unique combination of expert research, advocacy, programs, and an Affiliate Network of nearly 300 community-based organizations across the United States and Puerto Rico, UnidosUS simultaneously challenges the social, economic, and political barriers that affect Latinos at the national and local levels. For almost 50 years, UnidosUS has united communities and different groups seeking common ground through collaboration, and that share a desire to make our country stronger. As Latino enrollment in higher education continues to increase and given the disproportionate enrollment of Latino students at for-profit schools, with high loan default rates and low graduation rates, UnidosUS has consistently called for strong gainful employment regulations to protect thousands of Latino students from poorly performing for-profit institutions.

## Veterans Education Success

Veterans Education Success is a non-profit organization dedicated to protecting and defending the integrity of the GI Bill and other federal education programs for veterans and service members. Veterans Education Success provides individual assistance to veterans who have been deceived or defrauded by predatory colleges.

## Veterans' Student Loan Relief Fund

The Veterans' Student Loan Relief Fund is a national non-profit organization that provides assistance to veterans who have been defrauded by for-profit schools.

**Young Invincibles**
Young Invincibles is a national research and advocacy organization committed to amplifying the voices of young adults ages 18 to 34 and expanding economic opportunity for the Millennial generation.