IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
STATE OF MARYLAND, et al,
                                    CA No. 1:17-cv-02139-KBJ
              Plaintiffs,
                                    Washington, D.C.
v.                                  Tuesday, May 1, 2018
                                    10:00 a.m.


UNITED STATES DEPARTMENT OF
EDUCATION, et al.,


              Defendants.
- - - - - - - - - - - - - - - - x
_____
                   TRANSCRIPT OF MOTION HEARING
          HELD BEFORE THE HONORABLE KETANJI B. JACKSON
                    UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the Plaintiffs:  Michael J. Fischer, Esq.
                     PENNSYLVANIA OFFICE OF ATTORNEY GENERAL
                     CIVIL LAW DIVISION
                     1600 Arch St.
                     Suite 300
                     Philadelphia, PA 19103
                     (215) 560-2171

                     Christopher J. Madaio, Esq.
                     OFFICE OF THE ATTORNEY GENERAL OF MARYLAND
                     CONSUMER PROTECTION DIVISION
                     200 St. Paul Street
                     Baltimore, MD 21202
                     (410) 576-6585

                     Benjamin M. Wiseman, Esq.
                     OFFICE OF THE ATTORNEY GENERAL
                     OFFICE OF CONSUMER PROTECTION
                     441 4th Street NW
                     Suite 600-S
                     Washington, DC 20001
                     (202) 741-5226

**APPEARANCES CONTINUED:**

```
For the Defendants:     Kathryn L. Wyer, Esq.
                        Marcia Berman, Esq.
                        U.S. DEPARTMENT OF JUSTICE
                        CIVIL DIVISION
                        20 Massachusetts Avenue, NW
                        Washington, DC 20001
                        (202) 616-8475

                        Steven Z. Finley, Esq., DOE


Court Reporter:         Timothy R. Miller, RPR, CRR, NJ-CCR
                        Official Court Reporter
                        U.S. Courthouse, Room 6722
                        333 Constitution Avenue, NW
                        Washington, DC 20001
                        (202) 354-3111
```

**Proceedings recorded by machine shorthand; transcript produced by computer-aided transcription.**

1                    **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  Your Honor, this is Civil Case

3      No. 17-2139, the State of Maryland, et al, v. the United

4      States Department of Education, et al.

5              The audio conference, we have representatives from

6      the Commonwealth of Pennsylvania, the Commonwealth of

7      Massachusetts; the State of California; Connecticut;

8      Delaware; Hawaii; Illinois; Iowa; Minnesota; New York; North

9      Carolina; Oregon; Rhode Island; Vermont; and Washington

10     State.

11             Would counsel please approach the lectern and

12     state your appearances for the record.

13             MR. FISCHER:  Good morning, Your Honor.  Michael

14     Fischer for the Commonwealth of Pennsylvania and all of the

15     plaintiff states.

16             THE COURT:  Good morning.

17             MR. MADAIO:  (Indicating.)

18             THE COURT:  Please.

19             MR. MADAIO:  Thank you, Your Honor.  Christopher

20     Madaio on behalf of the State of Maryland, and also, all the

21     states.

22             THE COURT:  Good morning.

23             MR. WISEMAN:  Good morning, Your Honor.  Benjamin

24     Wiseman on behalf of the District of Columbia.

25             THE COURT:  I'm sorry, Mr. Wiseman.  You were

1    District of Columbia?

2            MR. WISEMAN:  Yes.

3            THE COURT:  Okay.  Thank you.

4            MR. WISEMAN:  Thank you.

5            MS. WYER:  Good morning, Your Honor.  Kathryn Wyer

6    for the defendant.  And with me at counsel table is Marcia

7    Berman, also with the Department of Justice, and Steve

8    Finley from the Department of Education.

9            THE COURT:  All right.  Thank you.

10           Welcome to all of you and all of you who are

11   listening in.

12           This is a motions hearing with respect to the

13   pending dispositive motions in this action which are the

14   parties' cross-motions for summary judgment in what turned

15   out to be a remarkably complex Administrative Procedures Act

16   case.

17           What I'm hoping to do is to get a clear

18   understanding of the parties' arguments regarding the

19   threshold standing question as well as your positions on the

20   merits of plaintiffs' APA claims.  You should know that I am

21   familiar with your arguments, but you should certainly feel

22   free to restate them and to provide as much background

23   detail as you deem necessary in order to illuminate the

24   issues.  And, of course, because the purpose of this hearing

25   is to provide me with the information that I need in order

 1    to be able to rule on the pending motions, I will be asking

 2    you clarifying questions, although I'll try not to ask too

 3    many or interrupt you too much.  As far as the procedure we

 4    follow, I don't like to impose time limits on my hearings.

 5    I find them distracting.  I do want to focus on your

 6    argument.  And with respect to our procedure, I think what I

 7    will do is ask plaintiffs' counsel to speak first.

 8            I -- is the counsel for the State of Maryland --

 9    Mr. Fischer, are you going to be arguing?

10            MS. WYER:  Yes, Your Honor.  I'm going to be

11    arguing.  I'm with the Commonwealth of Pennsylvania.

12            THE COURT:  Oh, I'm so sorry.  I've already gotten

13    the states mixed up.

14            MR. FISCHER:  That's okay.

15            THE COURT:  All right.  Let me write that down.

16    Fischer is with Pennsylvania.  And you'll be doing the

17    primary argument or the entire thing?

18            MR. FISCHER:  The entire argument.

19            THE COURT:  Okay.  Thank you.

20            So I will have you start.  And I hope that you'll

21    set the stage for our discussion by providing an overview of

22    the case, the claims that the plaintiffs have brought and

23    then segue into the summary judgment issues.  And because

24    there are lots of moving parts in this case, I see standing

25    as a threshold issue.  So I think it will be important for

1   you to -- in the summary judgment phase of this to argue the

2   standing issue, and then I'll let the department respond on

3   standing and entertain any replies on that, and then we'll

4   move to the merits.

5           As far as the merits are concerned, I think, at

6   that point, we might be at the department explaining why,

7   assuming that the plaintiffs have standing to sue, the

8   department is entitled to summary judgment on plaintiffs'

9   APA contentions to which plaintiffs' counsel can respond,

10   and then we'll go back and forth with replies.  Okay?

11           So Mr. Fischer, you may come forward and tell us

12   what this case is about.

13           MR. FISCHER:  Thank you, Your Honor.

14           We are here today because the states have

15   challenged the Department of Education's refusal to carry

16   out a duly enacted regulation, the Gainful Employment

17   Regulation.  This regulation has been upheld in its entirety

18   on multiple occasions and upheld in large part by this Court

19   in the AACS decision which we will be talking about a lot

20   today.  They've proven -- the regulation has proven to be

21   effective and it is necessary and essential to carrying out

22   the department's mandate under the Higher Education Act to

23   see to it that schools that receive Title IV loans -- Title

24   IV funding prepare students for gainful employment in a

25   recognized occupation.  That's the statutory basis for the

1    rule and that is why we're here today.  That is why it's

2    referred to as the Gainful Employment Regulation.

3            I mentioned that the rule has been upheld several

4    occasions by courts.  I think the D.C. Circuit described it

5    very well when it summarized the purpose of the rule as, It

6    would be a perverse system that, by design, wasted taxpayer

7    money in order to impose crippling, credit-destroying debt

8    on lower-income students and graduates.  That is what this

9    rule was intended to prevent.  It was designed to see to it

10   that students who took out significant loans to attend

11   colleges and universities -- most often, for-profit colleges

12   and universities, because that's where most of the abuse

13   that we're seeing takes place.  The rule was designed to

14   ensure that those students graduated with the skills

15   necessary to earn a gainful employment so that they could

16   pay back the loans that they were required to take out in

17   order to attend these programs.

18           THE COURT:  All right.  So it sounds like the

19   rule's a good idea.  Why do you get to bring this lawsuit?

20           MR. FISCHER:  Well, Your Honor, the states -- this

21   is an area where the states have a longstanding interest.

22   And the department, as you acknowledged, has challenged

23   standing; even challenged the states' -- whether the states

24   fall within the zone of interest for purposes of the

25   prudential standing analysis.  This is not an area where the

1    states are simply spectators.  Under the Higher Education

2    Act, the states have clear responsibilities when it comes to

3    regulation of colleges and universities.  And, in fact, the

4    states are a key part of what's referred to as the triad

5    which is the department, the states and accrediting agencies

6    and, together, those three entities are responsible for

7    regulating colleges and universities.

8             THE COURT:  All right.  So that's in the zone of

9    interest part of this.  But let's start with constitutional

10   standing; right?  Are you suggesting that you don't have --

11            MR. FISCHER:  We believe it also goes to

12   constitutional standing and it at least provides a

13   background for why the states have interest here.  The clear

14   injuries that the states are suffering as a result of the

15   department's refusal to enforce the act are three that we

16   have laid out in our papers.  One, that the states will be

17   required to spend additional resources on investigating

18   fraudulent activity at for-profit colleges and universities

19   and, in some cases, not-for-profit colleges and universities

20   that otherwise either would not be in business or would not

21   have the same level of enrollment or that would have taken

22   steps to address the fraudulent activity.

23            THE COURT:  All right.  Let me take these one at a

24   time.  I'm familiar with them.  And I have to tell you, I'm

25   a little concerned about this argument, and the reason is

1    because I don't understand why you suggest that the states

2    are required to do this in any meaningful sense.  I mean,

3    the government -- the Federal Government is not ordering the

4    states to do anything in this way, are they?

5              MR. FISCHER:  Well, the states are obligated,

6    under their own laws, to enforce their consumer protection

7    statutes.  Our office certainly views it as having an

8    obligation to enforce the consumer protection laws.  And in

9    addition to that, under the Higher Education Act, the states

10   do have specific authorities.  They're to provide

11   information to the secretary about state decisions revoking

12   licenses of accredited colleges and universities and --

13             THE COURT:  All right.  But what does that have to

14   do with the Federal Government's decision to delay or not

15   implement this rule?  I mean, it sounds to me like to the

16   extent you, as states, have independent obligations to

17   enforce consumer protections laws, you're just doing what it

18   is that you have been called to do regardless.  So fine.

19   The Federal Government isn't doing what it may have promised

20   to do through this rule.  But what difference does that make

21   in terms of your obligations?

22             MR. FISCHER:  Because, Your Honor, if you look at

23   the history of the rule, a large part of the impetus for the

24   rule itself was what the states had done in this area.  The

25   states investigated many of these colleges and universities

1    that were ripping off students; that were lying to students

2    about their job prospects; about their likely income;

3    loading them up with massive amounts of debt; and then

4    leaving them without the skills necessary.

5              THE COURT:  I don't think that's a helpful

6    argument for you.  Let me tell you why.

7              MR. FISCHER:  Okay.

8              THE COURT:  Because to the extent that you were

9    already doing this --

10             MR. FISCHER:  Yes.

11             THE COURT:  -- I'm still not appreciating why it

12   injures you to have to do it again or to have to do it

13   without regard to what the Federal Government was going to

14   do.  I understand that you had hoped that the Federal

15   Government, through the implementation of this rule, would

16   take some of that burden off of you, but it doesn't seem to

17   me that the Federal Government's action is actually what's

18   injuring you in that scenario.

19             MR. FISCHER:  Well, the Federal Government has an

20   obligation to enforce the rule.  The rule, as it is, would

21   have lessened the enforcement burden on the state.  So

22   that's the baseline from which we're starting and assessing

23   whether there's an injury.  And what the states found as a

24   result of these investigations was that not only was there a

25   serious problem, but it was a growing problem and it was

1    getting worse.  The department also reviewed the same

2    evidence and said, based on -- based in part on all of these

3    enforcement actions and what they've found that these

4    colleges are ripping off students, we believe some sort of

5    blanket enforcement mechanism is necessary to see to it that

6    colleges and universities are fulfilling their obligations

7    to provide students with --

8             THE COURT:  Yes.  I mean, I understand your point,

9    but it's a confusing concept to me, especially -- you say

10   the baseline is the rule, but the rule was never

11   implemented.  So I don't understand how that could possibly

12   be the baseline.  The baseline is a world in which there is

13   no rule and the states are actively enforcing these as a

14   matter of consumer protection.  The government -- Federal

15   Government enacted a rule that would have helped and,

16   perhaps, the states were seeking and hopeful and happy

17   because this was going to help, but it -- but the baseline

18   is, you're continuing to do the enforcements that you were

19   doing before.

20            MR. FISCHER:  So I think we disagree with the idea

21   that the baseline is the status quo before the rule was

22   enacted.

23            THE COURT:  Has the rule ever been implemented?

24            MR. FISCHER:  In part, it has been implemented,

25   yes.

1           THE COURT:  Okay.

2           MR. FISCHER:  There was a year of debt-to-earnings

3     information that was calculated and that information

4     identified 800 programs that were failing.  Ninety-eight

5     percent of those programs were in the for-profit sector.

6           THE COURT:  Right.

7           MR. FISCHER:  So -- and as a result of simply that

8     announcement, many of those programs closed up and no longer

9     accepted students because they saw the writing on the wall

10    that if the rule continued to be effective, they would be

11    ineligible for Title IV funds the second year if they were,

12    again, identified as failing --

13          THE COURT:  So that, of course, was a benefit to

14    the states because those failing programs closed up and you

15    didn't have to, then, go after them.  I understand that.

16    But the question, I think, is, to the extent that you have

17    an independent obligation to go after whoever is doing

18    something that you find to be harmful to your citizens, the

19    fact that the Federal Government has this rule that

20    indicates that it was going to solve the problem, how does

21    that injure you?

22          MR. FISCHER:  Well, if the Federal Government does

23    not enforce the rule, then it does injure us.  And I would

24    argue this is, sort of, analogous to Massachusetts v. EPA

25    where the EPA had an obligation under the Clean Air Act to

1   address the problem of climate change.

2          THE COURT:  But wasn't there, like, independent,

3   like, erosion?  Something -- I haven't read the case

4   recently, but there was actually something -- some damage to

5   state property in a way.

6          MR. FISCHER:  That was -- so Massachusetts argued

7   that its coastline was threatened by climate change, but

8   that's still the same situation we're in here where the

9   status quo was, nothing was being done about climate change;

10  erosion was continuing; the state could take some action,

11  but it had limited authority because, under our federal

12  system, EPA had global authority to --

13         THE COURT:  Yeah.  But you're not arguing that you

14  have limited authority to go after these for-profit

15  colleges, are you?

16         MR. FISCHER:  Well -- I mean, we have authority to

17  go after them under the tools at our disposal which are the

18  consumer protection statutes that I've mentioned and, to

19  some extent, our accreditation powers.  We do not have the

20  authority to impose -- we can't, for instance, deny these

21  schools Title IV funds.  And I think the department, when it

22  promulgated the rule, really hit on the most effective

23  mechanism to enforce these rules which was to say, If you

24  don't provide students with a meaningful education, you

25  don't get Title IV funding, because that's how these schools

```
1    are making money, was through Title IV student loans.  We

2    don't have that authority; the Federal Government does.  And

3    --

4             THE COURT:  But you only get to enforce it in the

5    context of a lawsuit if you're injured by the Federal

6    Government's refusal to go forward with this policy; right?

7    I mean, in the context of the Article III injury and fact

8    analysis that we're talking about.

9             MR. FISCHER:  Yes, we are injured by the Federal

10   Government's failure to move forward with this policy just

11   like Massachusetts was injured by the Federal Government's

12   failure to take any action to address climate change.  Now,

13   here, actually, we're even farther along than in

14   Massachusetts v. the EPA because there, there was no rule at

15   all.  Massachusetts just said --

16            THE COURT:  Right.  But the rule was for the

17   benefit of the state, in part, because of the erosion of the

18   coastline.

19            MR. FISCHER:  In part.  Mm-hmm.

20            THE COURT:  It wasn't just for the benefit of the

21   people in the state in the same way as here.  And so I'm

22   just a little concerned about this first injury that

23   you've --

24            MR. FISCHER:  It was -- so it was, in part, for

25   the benefit of the state.  That's true.  But there also is a
```

1      lengthy discussion in Massachusetts v. EPA of the state's

2      quasi-sovereign interest in that case.  And I believe the

3      Court said, you know, when Massachusetts joined the federal

4      system, it ceded certain powers of the Federal Government

5      and, as a result, the Federal Government has the obligation

6      to take on certain responsibilities relating to climate

7      change and other environmental hazards.

8                  THE COURT:  All right.  Well, I'll go back and

9      look at that case, but let's talk about the other injuries.

10     So one is, the state's going to have to spend additional

11     resources to bring enforcement actions, you say.  What are

12     the other -- you said there were three clear injuries.

13                 MR. FISCHER:  So the other injuries are that the

14     states also provide student aid to students who attend many

15     of the same colleges and if students are not able to pay

16     back their loans, the states will be deprived of that money,

17     and that's a --

18                 THE COURT:  But isn't that up to you?  I mean, why

19     isn't that a self-inflicted injury?  You don't have to

20     provide money to the same people.

21                 MR. FISCHER:  No, but it's not a self-inflicted

22     injury in that it's not an action we are taking in response

23     to anything the department --

24                 THE COURT:  No, no, no, what I mean --

25                 MR. FISCHER:  This is a pre-existing --

1              THE COURT:  No, but for the purpose of

2      self-inflicted injury, when you're talking about state

3      action in that way, the suggestion that because the state

4      has opted to tie its own financial aid funding system to the

5      Federal Government; therefore, we have the right to enforce

6      the Federal Government's policy choices with respect to that

7      seems to me to turn on the state's initial decision to

8      follow the feds.  It doesn't -- so that's a self-inflicted

9      injury, not from the standpoint of the Attorney General's

10     office, but I'm not sure the state can enforce in court, you

11     know -- can bring an action to try to make the Federal

12     Government change its policies related to this or anything

13     else on the grounds that, Well, if you don't change, our

14     decision to have tied our policies to yours is somehow

15     injury -- injurious.

16             MR. FISCHER:  Well, I think this case is analogous

17     to Texas v. United States where the District Court held that

18     Texas had standing, the Fifth Circuit affirmed and the

19     Supreme Court affirmed by an evenly divided court.  So there

20     was no published opinion.  But in that case, Texas argued

21     that it had standing -- this was a challenge to the

22     immigration program -- the DAPA program that allowed certain

23     undocumented immigrants to remain in the United States.

24     Texas's argument for standing there was that under Texas

25     law, it was obligated to provide driver's licenses to any

1    immigrant who was legally authorized to remain in the

2    country and that as a result of this program, it would now

3    have to provide driver's licenses to additional immigrants

4    who are now legally allowed to stay in the country, and the

5    Fifth Circuit held that that was not a self-inflicted injury

6    for purposes of the standing analysis because the --

7            THE COURT:  Because --

8            MR. FISCHER:  -- decision -- because the decision

9    predated -- it was not in response to the announcement of

10   the DAPA program.  It wasn't anything that Texas was doing.

11   Texas was not trying to create an injury just to challenge

12   this program, and that's the same here.  We are not -- we

13   are supporting students not because we want to be able to

14   sue --

15           THE COURT:  I have to tell you, I haven't read the

16   opinion, but I will because it sounds very strange to me.

17   And it may be that the D.C. Circuit has different and,

18   perhaps, even more stringent standing requirements than

19   other circuits, but, you know, I've read similar kinds of

20   analyses that make very clear that it's not a matter of

21   timing.  It's this idea that if you, as the state, have a

22   policy that voluntarily connects itself to the Federal

23   Government's policy -- that doesn't provide you with a basis

24   for claiming -- or bringing a claim against the Federal

25   Government for changes or even, you know, dereliction of

1    duty with respect to its policy.  The solution is to change

2    your decision to tie your system to theirs.  That's how it

3    gets solved.

4              MR. FISCHER:  Well, but the Federal Government

5    does have an obligation to ensure that these -- that

6    programs that are eligible are providing students for --

7              THE COURT:  I understand, but that -- you're

8    slipping into the merits.  I'm not talking about the merits

9    of whether or not they're actually doing what it is they're

10   supposed to do.  I'm asking, do you have the right to bring

11   the lawsuit?  And there are all these requirements that are

12   pretty strictly enforced in this circuit about who gets to

13   come to court.  And so, you know, I'm just -- I'm trying to

14   get my mind around the injuries that you have articulated.

15             MR. FISCHER:  What I think -- I apologize.  What I

16   am saying --

17             THE COURT:  Yeah.

18             MR. FISCHER: -- was that I believe the federal --

19   the states are -- or states are permitted to rely on the

20   Federal Government complying with its legal obligation; that

21   the injury flows from the state -- from the Federal

22   Government not complying so that the states' decision to tie

23   their funding with the Federal Government's funding is

24   simply based on this idea that the Federal Government will

25   do its job.

```
 1            THE COURT:  All right.  So that's the second

 2      injury.  The third?

 3            MR. FISCHER:  And then, of course, all of the

 4      states have their own systems of higher education that will

 5      suffer and do suffer loss of students and student tuition

 6      revenue because students who would otherwise attend these

 7      institutions choose to go to for-profit colleges and

 8      universities --

 9            THE COURT:  Now, how do you know that?  How do you

10      know that?  I was looking for affidavits or something that

11      would document this claim.

12            MR. FISCHER:  Well, we believe it's simply,

13      frankly, common sense when you look at the fact that 800

14      programs were identified as fraudulent.  If those programs

15      are --

16            THE COURT:  Did you see a substantial uptick in

17      the applicants to state institutions after those programs

18      folded?

19            MR. FISCHER:  I do not know if we did.  I don't

20      know if there's data available on that.  And I think --

21            THE COURT:  Wouldn't that be the kind of thing

22      you'd have to look for in order to establish that there was

23      some connection or that the students would have gone to your

24      programs, had these other fraudulent programs not been in

25      existence?
```

1          MR. FISCHER:  We don't believe we do because the

2     nature of the injury is -- the nature of the injury itself

3     is not speculative.  What is difficult to establish is, you

4     know, if this particular program were shut down, then

5     students would go to this other, you know, public program.

6     What is clear, though, is that if all of these fraudulent

7     programs were no longer eligible for Title IV funding,

8     presumably students would have to go somewhere and some

9     number --

10          THE COURT:  No, that's -- but you can't presume.

11     That's precisely the issue that I'm trying to get my fingers

12     around.  In other words, the thing that keeps it from being

13     speculative is the establishment that if these people

14     weren't in the programs that you say should be shut down,

15     they would be in your school.  They could be at home.  These

16     are graduate education programs.  They're not required by

17     the state to go to any of them.  So I think you'd have to

18     have more to indicate that these individuals actually --

19     that you're harmed competitively because these programs have

20     stolen your students.

21          MR. FISCHER:  Well, we think that, you know, if we

22     were talking about one or two programs, that would be, you

23     know -- if we're talking about a small number of programs,

24     that would be the situation, but when we're talking about

25     such a large number of programs and given the history the

1    states have with investigating these programs and the

2    knowledge that these are, you know, fairly prevalent in all

3    of the plaintiff states -- I mean, Pennsylvania, we have a

4    number of these that have been investigated -- that the

5    inference that some number -- I'm not saying all; I'm not

6    saying that we should even put a specific number on it,

7    but -- some number of those students who are currently being

8    defrauded would wind up in other programs, including --

9            THE COURT:  Maybe.

10           MR. FISCHER:  -- public programs.

11           THE COURT:  Maybe.  That's precisely what I think

12   you have to show.

13           MR. FISCHER:  When we are talking about a rule,

14   you know -- a prospective rule and a prospective injury,

15   again, we are identifying the harm that can reasonably be

16   inferred from --

17           THE COURT:  But what do you do with all of the

18   language in the Article III cases that talk about impending

19   and certainty and not speculative?  I mean, the thing that's

20   so hard about your argument, frankly, from my perspective is

21   that because this rule was not in existence, it is very hard

22   to do what it is that I am suggesting you need to do which

23   is establish that the extent that these -- the Federal

24   Government was enforcing the rule and the programs actually

25   shut down, those same students would be coming to you.  If

1   you had a track record -- if there was a way to show that

2   before the rule, they, you know -- you didn't have this many

3   students and then the rule came into effect and then there

4   was a shift, then, maybe, you'd get a stronger case of, We

5   need to make sure that rule is enforced because we know its

6   effects on our programs, but it's very hard in this world in

7   which the states have come in to sue before we have a rule

8   to make the kind of record that I think you might need to

9   make at least with respect to this claim of injury.

10         MR. FISCHER:  Well, I think the difficulty with

11  that is that under that principle, there would never be a

12  rule because the department could simply say, We're not

13  going to enforce this, and there's no way for us to develop

14  a record and there's no other party that would have

15  standing.  So --

16         THE COURT:  Why is that?  Why wouldn't anybody

17  else have standing?  Why wouldn't a student who had been

18  defrauded in the way that you say these programs operate

19  have standing?

20         MR. FISCHER:  Well, a student -- I believe a

21  student would have to demonstrate that they were

22  defrauded -- they would have to say that they were defrauded

23  after the rule should have gone into effect and that but for

24  --

25         THE COURT:  If I had -- yes, and I think that's an

1       easy -- isn't that an easy case to make because the rule has

2       disclosure obligations?  If I had known that this particular

3       school that I was going to had such a terrible

4       debt-to-earnings ratio and whatever other information as the

5       rule requires them to disclose, I never would have gone

6       there.  You could easily have an affidavit from such a

7       student as the plaintiff in a case like this.

8              MR. FISCHER:  I'm not sure that would be an easy

9       case to make.  I mean, for starters, we would have to wait

10      several years until a student could say, Okay.  I chose to

11      go to this school and, as a result, I suffered injury

12      because now I am out and I cannot, you know --

13             THE COURT:  Right, but usually, that's the kind of

14      evidence that's necessary in order to establish injury.

15             MR. FISCHER:  Well, when the department says

16      wholesale, We're simply not going to enforce a rule, but

17      that's been duly promulgated and that -- that actually has

18      started to go into effect, to say that, Okay.  They can just

19      pause it and then we'll wait, you know, three or four years

20      to see if anyone suffers harm as a result, would really

21      undermine the purposes of the APA which is to allow for

22      meaningful judicial review of agency decisions.

23             THE COURT:  Here's where I'm -- and then I want to

24      move on because we have a lot of other ground to cover, but

25      it's just so interesting to me in this scenario where --

```
1    again, I keep going back to the rule never having been

2    implemented.  What if the Federal Government changes its

3    mind?  I mean, we have this system in which Congress

4    appropriates money on a year-to-year basis with respect to a

5    budget.  So let's say that Congress appropriates money for

6    some program; DOE announces it's going to implement the

7    program; and then in year or two, for whatever reason, we

8    don't have the money anymore; is that a basis for claiming

9    injury?  The rule was never actually implemented.  Everybody

10   was waiting with bated breath because we were going to have

11   this great thing happen and it never happened.  I don't --

12   I'm worried that there's not an actual injury other than the

13   psychic harm of unmet expectations in a situation like that.

14            MR. FISCHER:  If there's a clear legal obligation

15   to enforce the rule -- to carry out the rule, then, yes,

16   there is harm in that scenario, and I think that's -- that's

17   how this case is different from Your Honor's decision in the

18   Citizens [sic] for Biological Diversity case.

19            THE COURT:  I call it chimps.

20            MR. FISCHER:  Chimps?  Okay.

21            THE COURT:  Yes.

22            MR. FISCHER:  Where --

23            THE COURT:  Thank you.

24            MR. FISCHER:  -- there was a rule, but the rule

25   was, I think, very non-specific.  It just said the
```

1    department should continue to review its policies and change

2    them as necessary.

3              THE COURT:  Oh, you're talking about my other one.

4    Sorry.  I got confused.  I have many standing cases.  All

5    right.  Yes.

6              MR. FISCHER:  Where in that case, there simply

7    wasn't a specific obligation.  So as a result, Your Honor

8    decided on the basis of the APA claim that there wasn't

9    anything to challenge, but here -- and I realize that was

10   not actually a standing decision.  Here, we do have a clear

11   legal obligation.  So I would come back to the point I was

12   making.  I do think that for purposes of standing analysis,

13   you know, you're looking at -- when you're looking at the

14   injury, the injury is really, is the plaintiff worse off

15   than he or she would be in the but-for world?  Here --

16             THE COURT:  But that's not the right question.

17   That's not the right question; right?  When you're talking

18   about -- if you're talking about causation -- because I had,

19   sort of, moved ahead to that -- whether your injury's fairly

20   traceable to the agency's conduct is whether you are worse

21   off than before the government action that you're

22   challenging; right?  So you know, not the hypothetical world

23   that, if the government had done this thing, would we be

24   better off?  The government has never implemented this rule.

25   You're in the same position you were to begin with which is

1    no rule implemented.  I don't understand how this is fair --

2    the injury that you're suffering or that your citizens are

3    suffering is fairly traceable to the government -- the

4    Federal Government's conduct in this case.

5          MR. FISCHER:  Well, again, I think the Supreme

6    Court in Massachusetts v. EPA at least implicitly rejected

7    that argument because they said -- the court said that even

8    though EPA had done nothing about climate change and would

9    continue to do nothing -- so the situation before was,

10   Massachusetts was losing coastline and it would continue to

11   lose coastline.  The Court said, EPA, you must act now and

12   Massachusetts is suffering because they will be worse off in

13   the future than if you do not act, not they will be worse

14   off in the future than they are now because the situation

15   was the same.  Their coastline was --

16         THE COURT:  I understand your point.  I have to go

17   and look at that decision carefully.  I, frankly, didn't

18   think of it as being analogous enough to really provide

19   sufficient guidance in this case in part because we have a

20   third-party standing issue here in a way that, I think,

21   interposes itself, you know?  The state -- the states, as

22   you've indicated, have an independent obligation to address

23   this very same problem.  And so it seems to me that this is

24   almost like a fight between which government entity is going

25   to handle it and, at some point, based on this rule, you had

1    an expectation that the Federal Government was going to

2    address this problem of these, you know, allegedly

3    fraudulent GE programs and now the Federal Government is

4    saying no.  It's unclear to me that the harm that you say

5    your people are suffering or the fact that you are going to

6    have to spend money to solve the problem is caused by the

7    Federal Government's refusal to go forward with its promise

8    to help you in this situation.

9            MR. FISCHER:  Well, and just one additional point.

10   In, you know -- in addition to arguing direct standing, we

11   have pointed to parens patriae standing which --

12           THE COURT:  Yes.  Let's get to that.

13           MR. FISCHER:  I'm sorry, parens patriae

14   standing --

15           THE COURT:  Can we spell it.  I don't know.

16           MR. FISCHER:  P-A-R-E-N-S, P-A-T-R-I-A-E.

17           THE COURT:  Thank you.  Which is an alternative

18   basis --

19           MR. FISCHER:  Yes --

20           THE COURT:  -- for Article III.

21           MR. FISCHER:  -- it's an alternative basis and --

22           THE COURT:  All right.  So why do you get that?

23           MR. FISCHER:  And this -- we think this is, in

24   some ways, an ideal example of parens patriae standing, you

25   know?  Under parens patriae standing, states have a

1    quasi-sovereign interest in protecting the health and

2    well-being and -- of the residents and otherwise preventing

3    -- protecting their residents from injury.  Now, as I

4    mentioned, Massachusetts v. EPA does discuss quasi-sovereign

5    interests.  It doesn't really get into parens patriae

6    standing, although you can read it, I think, fairly as a

7    parens patriae decision in some ways and, more than

8    anything, that decision recognizes that when it comes to the

9    standing analysis, the states have special solicitude and

10   are, therefore, in a different position than an interest

11   organization or even a private plaintiff.  So here, we have

12   --

13            THE COURT:  I'm not sure I understand what special

14   solicitude is, but anyway --

15            MR. FISCHER:  Well, it's not an easy concept.

16   I --

17            THE COURT:  I don't know what that means, but --

18            MR. FISCHER:  So the most relevant case on parens

19   patriae standing is the D.C. Circuit decision that we cite

20   and the Government cites in their brief in Maryland's

21   People's Counsel v. FERC, and that's a decision where then

22   Judge Scalia found that a Maryland agency had standing to

23   bring an action against FERC under its parens patriae

24   authority.

25            THE COURT:  Yes.  But wasn't it complicated?  It

1       was very complicated.  You, sort of, reduced it down; right?

2       We had to get around the general rule that you don't apply

3       -- that a state can't sue the Federal Government in the

4       exercise of its parens --

5               MR. FISCHER:  Yeah.

6               THE COURT:  -- patriae standing.

7               MR. FISCHER:  And so what the D.C. Circuit did --

8       the analysis in that case -- Judge Scalia acknowledged that

9       general rule that dates back to some earlier cases and then

10      said, But that is clearly not a rule that goes to Article

11      III standing.  I believe the line -- somewhere -- is --

12              (Brief pause.)

13              So this is what -- Judge Scalia, then.  The

14      question is whether Massachusetts v. Mellon -- which is the

15      case that said the states can't sue the Federal Government

16      under parens patriae -- embodies part of what the Supreme

17      Court has called the core component of the constitutional

18      doctrine of standing --

19              THE COURT REPORTER:  Can you slow down, please.

20              MR. FISCHER:  I'm sorry.  I'll start from the

21      beginning.

22              So here's the question as Judge Scalia framed it:

23      Whether Massachusetts v. Mellon embodies part of what the

24      Supreme Court has called the, quote, core component of the

25      constitutional doctrine of standing, citing to Allen v.

1    Wright, or rather part of the prudential component, i.e., an

2    element that the courts must dispense with if Congress so

3    provides.  We think the latter.

4          So -- and then he further says that there can be

5    no dispute that a state suffers an injury for Article III

6    purposes when it suffers an injury to its parens patriae

7    interests or its quasi-sovereign interest.  So when --

8          THE COURT:  I understand, but let's not go --

9    let's not go too far from the point that you just made which

10   was when Congress dictates that it be so, we have to

11   dispense with the rule that the state can't sue the Federal

12   Government under parens patriae.  Fine.  In that case,

13   apparently, there was a specific statutory provision that

14   inserted state into an appropriate plaintiff.

15         MR. FISCHER:  Well, there was a statutory

16   provision that said that any party to a proceeding --

17   below -- to -- a party to a proceeding before FERC that is

18   aggrieved by an order could bring a suit in the D.C.

19   Circuit.  The judicial review provision did not actually --

20         THE COURT:  I understand.  But didn't it

21   cross-reference some other statute?

22         MR. FISCHER:  Then there was a separate provision

23   that allowed states to participate below, along with several

24   other entities.

25         THE COURT:  And it had the word "state" in it.

1          MR. FISCHER:  Yes, it --

2          THE COURT:  Right.  So do we have a similar

3     situation here?

4          MR. FISCHER:  Well, we have a very broad judicial

5     review provision under the APA which similarly says, I

6     think, any person aggrieved by agency action.

7          THE COURT:  I understand.  But has any other court

8     ever interpreted that language to include the state for the

9     purpose of suing under that -- the Federal Government?

10         MR. FISCHER:  Well, certainly, states bring

11    actions under the APA all the time and courts have generally

12    recognized them.

13         THE COURT:  Maybe when they have a different basis

14    for standing.  Has anybody brought it as a parens patriae

15    matter on the grounds that you are now articulating?

16         MR. FISCHER:  Well, that -- so that question goes

17    to the Article III standing.  So the analogy here is that

18    Maryland People's Counsel v. FERC recognizes that parens

19    patriae standing can be an Article III injury.  So we've got

20    that here.  And then the question is, what is the prudential

21    standing analysis?  Well, we've got --

22         THE COURT:  Oh, that's interesting.  I wasn't

23    thinking of it in that -- so you're putting this whole

24    parens patriae analysis in the context of injury for the --

25    I thought it was an alternative --

1              MR. FISCHER:  Yes.

2              THE COURT:  -- basis of standing entirely.

3              MR. FISCHER:  Well, it is --

4              THE COURT:  I thought you could --

5              MR. FISCHER:  -- in a way, but it gets to the

6     injury.  It's -- I mean, it's -- the whole history of parens

7     patriae is, you know, states have an interest in protecting

8     their residents and, therefore, when their residents suffer

9     an injury, particularly in an area where the state has some

10    responsibility to them, the states suffered injury as a

11    result and that, as under Judge Scalia's decision, satisfies

12    the Article III elements of standing; satisfies the injury

13    in fact.  So then the question is, do we satisfy the

14    prudential test?  Now, the prudential --

15             THE COURT:  But -- I'm sorry.  I don't know that

16    you want to shove it into the Article III analysis.  Because

17    wouldn't you still also have to deal with causation?  I

18    mean, there's actual injury as a part of Article III, but

19    also the fairly traceable which is the causation provision

20    of Article III.  I thought parens patriae took care of all

21    of that, but if you're just focusing on parens patriae as

22    allowing you to satisfy injury, then now I'm worried that we

23    still have to worry about fairly traceable.  I don't think

24    you do; right?

25             MR. FISCHER:  Well, the -- we don't in this case

1    because the injuries suffered by our residents would clearly

2    be traceable to the government's -- to the defendant's

3    conduct.  So --

4              THE COURT:  All right.  So I have to go back and

5    think about it.  I was just not focusing on it in the same

6    way.  But you're saying that parens patriae takes care of

7    that element, and also, necessarily, to the extent that you

8    can prove an injury to your residents by these groups, the

9    causation.  And so then what's left?

10             MR. FISCHER:  Then it's redressability, and we

11   believe that if the rule were enforced, the residents would

12   be protected.

13             THE COURT:  And what do we do with the fact that

14   the state has -- could solve this problem on its own?  It

15   doesn't really matter.

16             MR. FISCHER:  The states have limited tools.  I

17   mean, the states can't solve the problem in its entirety.

18   The states can investigate.  They can go after schools for

19   violating their fraud statutes, but that's not an easy

20   process and we all have limited resources.  We can't go

21   after all the schools that are defrauding students.  It's

22   unfortunate, but we have to make choices, and if we put more

23   into investigating for-profit schools, that means less

24   resources investigating other sources of --

25             THE COURT:  All right.  So tell me about

1    prudential standing.  Because that comes up in both

2    scenarios, doesn't it?

3              MR. FISCHER:  Yes.  So prudential standing, then,

4    under the APA is a zone-of-interest test and the question,

5    then, is simply whether these states are arguably within the

6    zone of interest of the Higher Education Act.  Again, the

7    Higher --

8              THE COURT:  Why -- I'm sorry.  Why is it the

9    Higher Education Act and not the APA?

10             MR. FISCHER:  Well, because I believe that the

11   relevant statute for purposes of the zone of interest, even

12   under an APA analysis, is the authorizing statute for the

13   regulation being challenged.

14             THE COURT:  All right.  So we're in HEA.  And you

15   say the -- that the states are in the zone of interest for

16   the HEA why?

17             MR. FISCHER:  Well, because -- for a number of

18   reasons.  As we mentioned before, the states have a clear

19   role to play under the HEA.  The states are, in some ways,

20   partners -- many ways -- partners with the Federal

21   Government; co-regulators of many of these same schools.  So

22   clearly, it is in our interest to see that the Federal

23   Government does its job, just as it's in the Federal

24   Government's interest --

25             THE COURT:  Is it -- are you co-regulators with

1    respect to the Title IV funding?

2              MR. FISCHER:  No, with respect to Title IV, the

3    Federal Government's our primary regulators.  With

4    respect --

5              THE COURT:  Don't you have to be the co-regulator

6    or interested in the particular thing that you're

7    challenging?

8              MR. FISCHER:  We don't think -- the analysis isn't

9    that narrow that, looking broadly at Title IV and the HEA --

10   I mean, the states, you know, as I mentioned, do have a role

11   to play in making sure that, you know, these schools are

12   licensed and making sure that they are not engaging in

13   misleading, fraudulent activities.  So it's not -- the

14   analysis isn't so narrow that the question is simply whether

15   we have any role to play with Title IV funding.  And, in

16   fact, I think it's relevant that the -- the department

17   itself recognizes the interest the states have, because in

18   the -- there's currently a negotiated rulemaking process

19   going on relating to this rule because the department wants

20   to rewrite it, essentially, which they're certainly free to

21   do, but they have to enforce it while they go through that

22   process.  In announcing the rulemaking, the department

23   identifies stakeholders and it said, These are groups that

24   have interests that are significantly affected by the topics

25   proposed for negotiations, and it listed as one of the

1    categories of participants state attorneys general and other

2    appropriate state officials.  So clearly, there's a

3    recognition by the department that we have an interest in

4    these proceedings.  And, again, the zone-of-interest test is

5    not a demanding one.  The analysis is, are we arguably

6    within the zone of interest?

7         THE COURT:  All right.  So going back really

8    quickly and then I'm going to let the department come in

9    here, with respect to the parens patriae analysis, don't you

10   have to establish that your citizens would themselves have

11   standing?  Isn't that a part of the test?

12        MR. FISCHER:  We have to satisfy -- we have to

13   demonstrate that they are suffering some -- well, we -- what

14   we have to demonstrate is that our interest in their health

15   and well-being is implicated.  I don't believe it's as

16   demanding as a traditional standing test because we can have

17   broad interest in protecting our residents, sort of, across

18   the board and --

19        THE COURT:  I know.  But isn't there something

20   about -- isn't it, sort of, like, organizational standing

21   insofar as you have to show that the citizens that you were

22   seeking to protect themselves have standing or would have

23   been able to bring this lawsuit but you're doing it on their

24   behalf in this way?

25        MR. FISCHER:  So I think the courts -- and some of

1        the cases in this area, I'll concede, are not crystal clear,

2        but the quasi-sovereign parens patriae interest is different

3        from, you know, vicarious standing that you, sort of, get

4        with organizations and, you know -- where organizations

5        actually can represent the claims of their -- bring the

6        claims of their members when they're, you know -- when

7        they -- the purpose of the organization relates to the issue

8        in the case.  Here, it's a broader interest which is the

9        interest of the state itself in protecting its residents.

10       So --

11                THE COURT:  And doesn't the Federal Government

12       have a -- I mean, the whole rule about the states not suing

13       the Federal Government, I thought, had its derivation from

14       the recognition that both entities are sovereigns with

15       responsibility to the citizens.  And so I don't know how far

16       you get as a state by saying, We have a responsibility to

17       our citizens.

18                MR. FISCHER:  Yes.  So the Federal Government also

19       does have a responsibility to its citizens, but that does

20       not eliminate the injury to the states' parens patriae

21       authority.  All that does is it moves the analysis into a --

22       the prudential area where you're looking at concerns about

23       separation of powers and whether it's appropriate in this

24       case for the states to bring an action against a federal

25       agency, and that's why we think there's a distinction

1    between, for instance, a state challenging a federal

2    statute -- which we're not doing here -- and a state trying

3    to enforce its own rights and the rights of its residents --

4            THE COURT:  Why doesn't that open the door to any

5    state action to enforce an agency regulation?  Because

6    almost all agency regulations are going to affect citizens

7    of a particular state or, you know, citizens in general.

8    Why doesn't your analysis create that concern?

9            MR. FISCHER:  The zone-of-interest test would

10   still apply, and that's where the -- and I think that's

11   where the analysis should focus which is on the prudential

12   concerns.  I also think -- I mean, having the states as

13   active litigators is not a bad thing in our system, you

14   know?  There's a, you know -- the court recognizes, again,

15   the special solicitude.  It's not totally clear what it

16   means, you know, as we acknowledge, but at the very least,

17   it means that the states are given perhaps additional

18   deference when it comes to asserting claims or there's a --

19           THE COURT:  Against the Federal Government?  I

20   don't disagree with you that having states as active

21   litigators in the world is a good thing, but suddenly now

22   I'm concerned because this viewpoint suggests that the

23   states can be active litigators against the Federal

24   Government even with respect to rules that have not yet been

25   implemented.

1          MR. FISCHER:  Well, that's exactly what

2    Massachusetts v. EPA was.  It was a suit against the Federal

3    Government.  Judge -- Justice Stevens said states are

4    entitled to special solicitude and --

5          THE COURT:  Whatever that means.

6          MR. FISCHER:  Yeah, so that they can assert a

7    claim that EPA must act.

8          THE COURT:  All right.  Let me have DOE come in.

9    Thank you.

10         MR. FISCHER:  Thank you.

11         THE COURT:  Good morning.

12         MS. WYER:  Good morning, Your Honor.

13         Your Honor, the -- in regard to standing, this

14   case is very similar to the situation in Massachusetts v.

15   Mellon in that there, a state sought to challenge a federal

16   statute, the Maternity Act which provided appropriations to

17   states for the purpose of improving maternal and infant

18   health, an area that, like education, is well within the

19   sphere of traditional state interest and concern.  And the

20   Maternity Act, like the GE regulations, did impose certain

21   requirements on states that they provide information to the

22   Federal Government, yet the Supreme Court rejected

23   Massachusetts's standing in that case either based on its

24   own asserted injury or as a representative of its citizens.

25   That case -- that Supreme Court case is really on all fours

1    with the situation here.

2              THE COURT:  Do you know the year of that case?

3              MS. WYER:  It -- I -- it was an early case.  1923.

4              THE COURT:  All right.  And is it possible that

5    the Supreme Court has moved away from that because in yet

6    another Massachusetts case -- they feature prominently

7    apparently in this area.  Plaintiff's counsel says in a more

8    recent case involving Massachusetts, the Supreme Court seems

9    to think that the state does have standing.

10             MS. WYER:  Your Honor, the Massachusetts v. EPA

11   case has been understood as involving a state's interest in

12   its territory which Your Honor mentioned.  And this is

13   explained in Judge Collyer's opinion in Government of

14   Province of Manitoba v. Zinke where the -- I think it was

15   the State of Missouri -- or there was a state involved in

16   that case attempting to challenge the Bureau of

17   Reclamation's issuance of a supplemental EIS which the cause

18   of action would fall under the APA as a NEPA -- a procedural

19   challenge and the court analyzed the parens patriae doctrine

20   and the Massachusetts v. EPA decision and concluded that the

21   Massachusetts v. EPA decision did not change the rule that

22   states did not have parens patriae standing.

23             THE COURT:  So one of my colleagues.  Judge

24   Collyer, you say?

25             MS. WYER:  Yes.

1          THE COURT:  All right.

2          MS. WYER:  And, as Judge Collyer noted, the

3    Massachusetts v. EPA case did not address parens patriae

4    standing at all.  It was relying on the idea that a state

5    has sovereign interest in its territory.

6          THE COURT:  So you reject plaintiff's counsel's

7    reliance on that case --

8          MS. WYER:  Yes, Your Honor.

9          THE COURT:  -- as instructive as to how the

10   standing analysis goes here?

11         MS. WYER:  Yes, Your Honor.

12         THE COURT:  All right.  And --

13         MS. WYER:  And further, in regard to -- I mean, if

14   you look at the injuries that the states are asserting here,

15   they're all forms of financial injury.  They're all

16   collateral financial injuries resulting allegedly from the

17   department's implementation or failure to implement the GE

18   regulations, but the Supreme Court in Massachusetts v.

19   Mellon, again, addressed that kind of collateral financial

20   injury and simply rejected that kind of injury as

21   cognizable --

22         THE COURT:  Well, tell me what you mean by

23   "collateral".  I mean, I, you know -- we -- there are cases

24   that arise out of this district that suggest that economic

25   injury can qualify as an actual injury.  So what do you

1    mean?

2              MS. WYER:  Well, here -- I mean, collateral in the

3    sense -- maybe, it's tied in with the fairly traceable

4    issue, but it's not something that the Federal Government is

5    imposing on the states directly.  It's not requiring as a

6    mandatory -- as a mandate that the states spend money in any

7    particular way.  This is a -- the states are alleging that

8    because of what the Federal Government is doing, it's having

9    some impact that is collateral -- as a collateral impact

10   requiring them to expend money.

11             THE COURT:  Well, what about their argument with

12   respect to the competitive injury?  I mean, I -- some courts

13   have found it to be compelling, I think, that when you're

14   talking about competitors in the marketplace and the Federal

15   Government intends and perhaps even, at times, does regulate

16   one or more of the competitors, that there's an injury to

17   the other one if the Federal Government doesn't enforce

18   those regulations.

19             MS. WYER:  Well, I -- that does not really seem to

20   be in play here, Your Honor, because if you're -- if we're

21   talking about public schools versus private schools, it's --

22   I don't think the states are suggesting -- and it's not

23   really apparent how they could suggest that there's a

24   question of competition between the two --

25             THE COURT:  They say, The students, if they

1      weren't going to these failing programs, would be coming to

2      our schools.

3              MS. WYER:  Yes, and the impact that they allege

4      would flow from that is simply a financial impact.  They're

5      saying that, Well -- what the states are saying is that they

6      would get more revenue from student tuitions if students

7      went to public schools instead of these private schools,

8      but, of course -- even that -- even that assertion is

9      contradicted by the department's prediction in the final

10     rule -- the GE final rule where it actually expressed some

11     -- I mean, as part of the rulemaking process, it had to

12     analyze the potential financial impacts on various parties,

13     and it analyzed the potential financial impact on states and

14     actually predicted that states might be burdened if students

15     did turn to state schools as an alternative, but it said two

16     things.  It said -- first of all, it did not predict that

17     students would attend public schools because there would be

18     other private schools available and they would simply go to

19     a different private school; and it also suggested, based on

20     the Department of Education's understanding of state

21     resources and the state public education systems, that it

22     suggested that states may not have -- even have the capacity

23     to handle increased enrollment and so --

24              THE COURT:  All right.  So that --

25              MS. WYER:  -- they would have to spend more

```
 1    money --
 2               THE COURT:  Right.
 3               MS. WYER:  -- to accommodate these students.
 4               THE COURT:  But that's --
 5               MS. WYER:  So it wouldn't --
 6               THE COURT:  But those are factual issues.  What
 7    I'm trying to get at a little bit is the extent to which we
 8    have a legal argument that dovetails with standing in this
 9    notion of competitive injury.  I mean, obviously, when you
10    have a competitive injury, you're talking about money
11    because that's whole basis of it.  Are you suggesting that
12    if the states came forward with evidence that students are
13    -- that otherwise would have gone to public institutions are
14    being lured away by their -- these GE program schools and
15    then left with all this debt and all the horrible things
16    that were happening -- are you suggesting that they wouldn't
17    be able to make that claim of injury as a matter of law?  Is
18    that not a cognizable injury for the purpose of standing?
19               MS. WYER:  That states could not make that
20    argument?
21               THE COURT:  States as owners and proprietors of
22    competing -- what -- if they can establish that they're
23    actually in competition -- the same set of students are in
24    one big pool and, to the extent that they go to these
25    programs, they're not going to state schools, if that -- we
```

1    can establish that as a matter of fact, wouldn't they have a

2    legal argument that they were being harmed by the

3    government's failure to enforce the regulations that would

4    potentially put some of these fraudulent schools out of

5    business and, therefore, increase their enrollment and

6    whatever?  Isn't that a cognizable injury for the purpose of

7    Article III?

8              MS. WYER:  I'm not sure, Your Honor, because it

9    would still seem to fall under the collateral financial

10   injury that the Supreme Court in Massachusetts v. Mellon

11   seemed to reject, but it's also very far from the situation

12   we have here where the states simply have not made any kind

13   of showing in that regard.  So as Your Honor --

14             THE COURT:  All right.  Well, maybe, you can tell

15   me what special solicitude is.

16             MS. WYER:  Yes, Your Honor.  Again, that was

17   something that, I think, the Supreme Court in the

18   Massachusetts v. EPA case mentioned.  And it, again, seemed

19   to have to do with the state's sovereign interest in its

20   territory.  There was no suggestion that states have any

21   kind of -- are entitled to any kind of special solicitude

22   absent that kind of sovereign interest at stake.  And here,

23   there is no similar sovereign interest at stake.

24             THE COURT:  I see.  So you've got special

25   solicitude only going with the property right.  It's not

 1    really even the fact that the state is a quasi-sovereign

 2    responsible for its people or anything else.

 3              MS. WYER:  Yes, Your Honor.  I think that's what

 4    the Massachusetts v. EPA opinion is saying.

 5              THE COURT:  All right.  I have to get back to that

 6    opinion.

 7              What about parens patriae?  Mr. Fischer says that

 8    it's pretty clear that parens patriae applies under these

 9    circumstances.  Affected citizens would have the ability to

10    bring this action or at least the state should have the

11    ability to protect them by insisting that the Federal

12    Government enforce its regulations.  Why is he wrong about

13    that?

14              MS. WYER:  Well, again, I think the states

15    recognize that the general rule is that in Massachusetts v.

16    Mellon which said that states do not have the ability to

17    assert parens patriae standing against the Federal

18    Government, and the states are relying on two potential

19    exceptions to that.  They cite the Massachusetts v. EPA

20    case, but as I already explained, that case did not have

21    anything to do with parens patriae standing, as Judge

22    Collyer also explained in that Government of Province of

23    Manitoba case, and then the states turned to this other

24    decision in Maryland People's Counsel which, as -- was

25    discussed, involved a distinct statutory scheme where the

```
 1    Natural Gas Act did provide an express statutory vehicle for

 2    states to participate.

 3             THE COURT:  And you don't read the judicial review

 4    provision of the APA as providing that vehicle?  Mr. Fischer

 5    says states bring APA claims all the time.

 6             MS. WYER:  I'm not sure whether that's the case,

 7    but if it were, I would assume it has to do with the

 8    standard types of final agency actions that the Federal

 9    Government is engaged in such as issuing permits or licenses

10    or something like that.  If there were a program where a

11    state can apply for a license like a -- maybe, a grazing

12    permit and it's denied that license or permit, then, maybe,

13    then, the state could bring a claim, presumably, because

14    that would be -- with -- in the state's role as the

15    permitee, but here, the state is attempting to assert its

16    role simply as a state to protect the rights of its citizens

17    and --

18             THE COURT:  Well, no, not simply.  I mean, the

19    suggestion that you just made with respect to what you could

20    conceive of as a possible way in which a state could bring

21    an APA claim seems to me to dovetail with Mr. Fischer's

22    prudential standing argument; that the plaintiffs could

23    bring one or the state could bring one in a permitting

24    scenario because, presumably, they're within the zone of

25    interests of that kind of a permitting scheme.  And
```

1    Mr. Fischer says, when you look at the HEA, states are

2    clearly involved in these decisions with regard to how the

3    Department of Education operates with respect to funding and

4    these other decisions.  So why isn't he right about the fact

5    that they're not just bringing it as parens patriae on the

6    behalf of their citizens, but also, in light of their role

7    as active in the HEA and in this entire area?

8          MS. WYER:  Well, the -- I -- these two prongs of

9    standing, they should -- they are -- they're not really

10   conflated in that way.  The zone-of-interest test is its own

11   analysis, and it's not enough in the zone-of-interest test

12   just to have an interest in what's going on.  I -- the

13   decision in Center for Law and Education cited in the

14   Government's reply brief explains that -- I mean, the -- for

15   example, the negotiated rulemaking process involves, as the

16   state's counsel mentioned, stakeholders.  Stakeholders can

17   be involved in the process, but that includes a broad array

18   of potential interest holders such as banks, financial --

19   other financial institutions.  I mean, the -- to the extent

20   that the department is seeking to get other points of view

21   in the negotiated rulemaking process, that does not confer

22   the -- that does not serve the same purpose as the

23   zone-of-interest test which really goes to, who is the

24   statute or scheme trying to protect?  And he -- and there's

25   a distinction between just being interested versus being the

1      object of the statute's protection.

2              THE COURT:  I see what you're saying.  So who is

3      it trying to protect?  So you're saying, Fine.  The statute

4      says states be involved at certain points and you play a

5      role in helping us get information, but that's not really

6      what's at issue in the zone of interest.  It's about who is

7      being protected.  Why isn't it the case that with respect to

8      the statute and these regulations, state interests aren't

9      also the focus in addition to the people, you know --

10             MS. WYER:  Well, the statute does not mention the

11     states.  And the courts doing zone-of-interest analysis do

12     focus on the language of the statute.  Like, what is its

13     purpose?  And the -- so -- and I -- I'm not sure I remember

14     the name of it.  I think it might be the Center for Law and

15     Education case when the statute actually says that it's

16     trying to protect the interest of students and parents.  The

17     court concluded that parents were within the zone of

18     interest, whereas if it had only focused on students, the

19     court would have held, it seems, based on the -- its opinion

20     that it would not have found parents to be within the zone

21     of interest.  So here, the purpose provision of Title IV

22     focuses on the students -- protecting students.  It did

23     not -- does not mention states.  They're not included

24     expressly in the terms of the statute, and that's the

25     analysis in zone of interest that courts have undertaken.

1             And when you think about it -- I mean, the --

2     again, the Massachusetts v. Mellon case is illustrative in

3     that regard because there, it was the Maternity Act that,

4     you know -- the health and welfare of mothers and children;

5     the whole health care system, that is something where states

6     have an interest.  You couldn't say that the Maternity Act

7     was designed to protect the state's interest.  It was

8     obviously designed to protect the interests of mothers and

9     children.

10            THE COURT:  So how do you see prudential standing

11    in terms of its analytical role with respect to parens

12    patriae?  Is it an additional test once -- assume he makes

13    the parens patriae part of this.  Are you saying you don't

14    get to have standing unless you're also within the zone of

15    interest as a state?

16            MS. WYER:  Yes, just as with any APA claim because

17    the -- it's -- this is a prudential prong of standing in an

18    APA case.

19            THE COURT:  Here's what confusing to me about

20    that, is that it seems to me that both sides keep conflating

21    state acting in its own interests with state acting in the

22    interests of its citizens.  And so in the parens patriae

23    world, I thought we were talking about the state not having

24    to establish its own injury.  It's enough if its people are

25    being injured.  So it seems odd to me that we would also

1    require in that world -- and, believe me, I'm sure the

2    Supreme Court has done many things I consider to be odd, but

3    -- it seems odd to me that once we're in that universe where

4    we're looking at the state acting on behalf of its citizens

5    for their protection in a quasi-sovereign way, that we also

6    have to have identified some kind of a prudential standing

7    basis for the state to be the one whose interests are being

8    protected by this particular scheme.  Why isn't it enough

9    that the state are protecting people whose people -- and the

10   people's interests are the ones that are being governed by

11   the scheme?

12        MS. WYER:  Well, I -- Your Honor, I think the

13   issue there is that the state is not acting in a quasi --

14   it's not asserting a quasi-sovereign interest when all --

15   the only thing it's asserting is the very same interests

16   that its citizens have.  That's why parens patriae standing

17   against the Federal Government is prohibited, because the

18   state can't simply assert the interests of students or

19   citizens or the general population of the state.  There has

20   to be something more to be considered quasi-sovereign.  So

21   you -- it's not --

22        THE COURT:  I see.  And you're saying that

23   interest has to be what the statute contemplated?  The

24   something more has to be -- in order to satisfy the

25   prudential standing piece of it --

1              MS. WYER:  (Indicates affirmatively.)

2              THE COURT:  -- is that your argument?

3              MS. WYER:  Yes.  I mean, I think it's a bit

4     complicated because I'm not sure of a case that has gone

5     through the whole analysis because, usually, I think case --

6     courts have recognized that states cannot assert parens

7     patriae standing against the Federal Government, and so they

8     have not gotten to the zone-of-interest analysis as another

9     step.

10             THE COURT:  I see.

11             MS. WYER:  So it -- normally, it just cuts off

12    when you decide that there's no parens patriae standing for

13    the state.

14             THE COURT:  I see.

15             MS. WYER:  So --

16             THE COURT:  All right.  Do you have any other

17    standing arguments?

18             MS. WYER:  Well, we've made these arguments in our

19    brief, but if you go through -- I think Your Honor's opinion

20    in the American Federation of Government Employees case sets

21    forth these two categories of cases where the -- when the

22    challenged action regulates the conduct of third parties and

23    the third-party conduct is the direct cause of the injury,

24    there's only two categories where courts have found that the

25    injury is fairly traceable to the Federal Government and

1     neither of those categories are this case.  This is -- and

2     the states rely on this idea that they will have to make

3     greater expenditures to enforce their consumer protection

4     laws, but that is clearly far afield of the GE regulations.

5     Nothing -- whether the GE regulations are enforced or not,

6     the Federal Government is certainly not allowing or even

7     encouraging schools -- it's certainly not requiring schools

8     to violate consumer protection laws.

9              THE COURT:  So you say no causation?

10             MS. WYER:  Right.

11             THE COURT:  Yeah.  They're not any worse off, from

12     your perspective, than they were before.

13             MS. WYER:  Yes, Your Honor, and the level of

14     evidence that the states would have to show at this stage --

15     after all, we are at the summary judgment stage here.  So

16     it's not just a question of making assertions.  And that

17     demonstrates -- I mean, the state's allegations are

18     speculative to begin with.  I don't think they would satisfy

19     the standing standards even at the motion to dismiss stage,

20     but here we are actually at the summary judgment stage where

21     they would have to come forward with actual evidence of

22     their standing and that -- they have not done that here.

23             THE COURT:  All right.  Thank you.

24             Let me have you, Mr. Fischer, for just a few,

25     minutes respond and then we'll move to the merits.

1            MR. FISCHER:  Thank you very much, Your Honor.

2            Your Honor, I just have a few points, hopefully,

3       in response.

4            The first thing I'd like to say is, I'd like to

5       bring to the Court's attention a decision from Judge Walton

6       last year that we don't mention and it's not published

7       anywhere, but I'm happy to provide the Court with copies of

8       it.  That was a case involving a motion to intervene filed

9       by many of the states -- many of the same states here.  The

10      underlying suit was the Accrediting Council for Independent

11      Colleges and Schools against Betsy DeVos and the case

12      concerned a decision by the Department of Education to deny

13      reauthorization of an accrediting agency and the accrediting

14      agency subsequently sued the Department of Education.

15      States, then, moved to intervene and, in the D.C. Circuit,

16      intervention as a defendant requires demonstrating standing;

17      requires demonstrating --

18            THE COURT:  Don't you only have to have one,

19      though?  Don't you have to have -- only have one plaintiff

20      who has standing?

21            MR. FISCHER:  Certainly, but all the plaintiffs --

22      all the proposed intervenors were states.  So there was no

23      separate proposed --

24            THE COURT:  There was no separate proposed

25      intervenors.

1          MR. FISCHER:  No, there -- the department was

2     already a defendant, but that -- the states wished to

3     intervene to also defend the decision and Judge Walton

4     concluded that the states did have to show standing; that

5     one of the states, at least, had to show standing.  And the

6     decision is interesting because it relied heavily on the

7     role that the states play in regulating the system of higher

8     education and then, also, discussed the harm that would

9     happen in the future if the department's decision were

10    overturned and if ACICS were allowed to accredit schools

11    again.  The history was that -- it's actually -- it's tied

12    into this because ACICS had accredited many of the schools

13    that were engaging in some of the --

14         THE COURT:  Let me just -- I'm sorry, I'm not

15    familiar with the decision, but let me just ask you a

16    question based on what you've represented.  Was -- were they

17    being -- were they being proposed intervenors on the

18    plaintiff or on the defendant?

19         MR. FISCHER:  Oh, to the defendant's side.

20         THE COURT:  Isn't that different?

21         MR. FISCHER:  Not for purposes of the standing

22    analysis because for purposes of defendant's standing in the

23    intervenor context, the analysis requires showing that the

24    relief sought by the plaintiff would result in injury to --

25         THE COURT:  Yeah.  But it doesn't have all of the

1    Article III standing components, does it?  I mean, you don't

2    have to -- I've never done a standing analysis with respect

3    to a defendant.  It's the plaintiff who's trying to bring a

4    claim who has to establish Article III standing or some

5    other basis for bringing their claim.  So it isn't clear to

6    me that a standing decision in the context of a defendant

7    intervenor circumstance is going to be the same.

8              MR. FISCHER:  Typically -- so intervenor standing

9    is a very unusual situation, but I believe -- and I

10   apologize; I don't know the name -- I believe there is a

11   decision from the D.C. Circuit that essentially says that

12   intervenor -- the defendant standing requires demonstrating

13   that the relief sought would cause a legally cognizable

14   injury to you as the proposed intervenor and that

15   implicitly, I think --

16             THE COURT:  Yeah, but the -- I mean, it's

17   requiring too much jujitsu in my mind to figure out how that

18   translates here because the relief sought in this case is

19   the -- your affirmative claim of changing the circumstances

20   rather than, you know, not doing what is already underway.

21             MR. FISCHER:  Well, and the relief sought in the

22   case before Judge Walton was that this accrediting agency

23   wanted to be permitted to, essentially, accredit schools

24   again or programs and the state came in and said, Well, if

25   that happens, that's going to cause us injury.  And Judge

1    Walton noted that -- Judge Walton said, First of all, the

2    school -- student -- I'm sorry, the states do have an

3    interest in preventing that outcome from happening.  That

4    gives them standing, and then he also noted -- he said, Even

5    if the states had not already established standing, the

6    Court would still be persuaded by the state's argument that

7    they have a right to intervene under Rule 24(a) to ensure

8    that all three stakeholders of the long-established triad of

9    higher education authorities are adequately represented in

10   this litigation.

11          THE COURT:  All right.  I'll take a look it.

12          MR. FISCHER:  So I'm happy to provide --

13          THE COURT:  Thank you.

14          MR. FISCHER:  And, Your Honor, I think we all

15   agree, Massachusetts v. EPA is very important to the

16   standing analysis here.

17          THE COURT:  DOE does not.  You say you think we

18   all agree.  That was the very first thing she said.

19          MR. FISCHER:  I think they interpret it

20   differently.  I think they agree with it; that's it's at

21   least relevant.  It is the most prominent case on the

22   question of state standing certainly in the last several

23   decades.

24          THE COURT:  Well, she says -- do you -- agree or

25   concede that it has no parens patriae --

1              MR. FISCHER:  Yes.

2              THE COURT:  -- particular analysis --

3              MR. FISCHER:  There is -- I'd like to direct the

4      Court's attention just to some discussion in that case,

5      because I think it shows that that case is about more than

6      Massachusetts as just a landowner which is what the

7      department is trying to describe it as.  I'm looking at 127

8      S. Ct. 1454.  And this is a -- this is what Judge -- Justice

9      Stevens says:  When a state enters the Union, it surrenders

10     certain sovereign prerogatives.  Massachusetts cannot invade

11     Rhode Island to force reduction of greenhouse gas emissions;

12     it cannot negotiate an emissions treaty with China or India;

13     and in some circumstances, the exercise of its police powers

14     to reduce in-state motor-vehicle emissions might well be

15     preempted.  And it goes on and says, These sovereign

16     prerogatives are now lodged in the Federal Government and

17     Congress has ordered EPA to protect Massachusetts, among

18     others, and then it continues and then it goes on to talk

19     about the APA specifically and says --

20             THE COURT:  But wait.  Before you leave that, why

21     does it have anything to do with this?  I mean, I haven't

22     heard you arguing that you would otherwise be regulating

23     these entities except you're going to be preempted or the

24     Federal Government has all the power.  In fact, you argued

25     the opposite.  We're part of the triad.  We're doing this

1    together.  So why is this that situation?

2             MR. FISCHER:  We are performing our role as part

3    of the triad, but that is to --

4             THE COURT:  What precludes you from performing a

5    bigger role?

6             MR. FISCHER:  Well, we can't -- we cannot render

7    these schools ineligible for Title IV funding.  That's the

8    Federal Government's decision.  That's the Department of

9    Education's call.

10            THE COURT:  I understand.

11            MR. FISCHER:  We can't do that.  And our, you

12   know -- we're --

13            THE COURT:  But you can sue them if they are

14   defrauding your people under the Consumer Protection Act.

15            MR. FISCHER:  We can, but that is a

16   backward-looking remedy.  That's not as effective as the

17   forward-looking remedy of the gainful employment

18   regulations, and that's -- the department recognized that.

19   The regulations have discussion about why the fact that

20   there is so much fraud that's been discovered in the past

21   shows that there is a need for this forward-looking --

22            THE COURT:  I understand, and so they adopted the

23   rule.  The question is, can you enforce it if they've

24   decided to go a different way?  And it sounds to me like,

25   from what you've read from Massachusetts v. EPA, that there

1    was a world in which the states were literally restricted

2    from protecting their own interests and so there was a need

3    for them to be able to go to court and say, We can't do

4    this, not as a matter of practicality or it's

5    backward-looking or for -- but it -- we can't because of the

6    way in which the Federal Government has preemption powers

7    over this area.  So make them do it.  That, to me, sounds

8    like a different animal.

9              MR. FISCHER:  I think the situations are actually

10   fairly close because both, when it comes to environmental

11   protection and higher education regulation, states and the

12   Federal Government have their roles; can do certain things.

13   And it's not a case where either the states are the sole

14   regulators or where the Federal Government has stepped in

15   and fully preempted the field.  Certainly, the states have

16   a -- the states can do a lot when it comes to environmental

17   protection and do a lot when it comes to environmental

18   protection, just like they have a role to play in higher

19   education.  They can't do everything, you know?

20   Massachusetts can't limit emissions from Ohio, for instance,

21   just like Pennsylvania cannot shut off Title IV funding to a

22   school with a history of fraud.  So I think the situations

23   are actually fairly analogous --

24             THE COURT:  Can Pennsylvania do other things to

25   solve for -- I mean, as the state legislature, not you as an

1    Attorney General -- but can the state legislature enact laws

2    that restrict the ability of these programs to function,

3    regardless of the Title IV funding?

4          MR. FISCHER:  I would say, yes, there are likely

5    certain things the state could do.  I -- thinking off the

6    top of my head, I'd have to --

7          THE COURT:  I mean, why couldn't they do this;

8    right?  This very thing.  Why couldn't they collect

9    information about their debt-to-earnings ratios and come up

10   with some legislative scheme at the state level that says,

11   "If your debt-to-earnings ratio, as we calculate it, is

12   above or below" -- I don't really know how the math works --

13   "something, you're not going to be licensed to operate in

14   our state anymore"?

15         MR. FISCHER:  I think, there would be a strong

16   argument that a law like that might be preempted.  I -- I'd

17   have to think about it further.  But since the Federal

18   Government has primary responsibility when it comes to Title

19   IV student --

20         THE COURT:  I understand, but that's one solution.

21   One solution is, don't give them financial aid, Title -- and

22   then, maybe, their students won't come there anymore.

23   Another solution is, make them disclose all sorts of things

24   and that was a solution that this rule adopted.  But it's

25   quite different than suggesting that that's the only way to

1    go about solving this problem and that only the Federal

2    Government has the ability to address it which sounds a

3    little bit closer to the Massachusetts v. EPA scenario when

4    it comes to the state's ability to require the Federal

5    Government to act by bringing a lawsuit.  I keep wondering,

6    why can't -- if the state really has a problem with this,

7    why can't it come up with its own solutions?

8              MR. FISCHER:  We're not saying the state has no

9    authority in this area.  What we are saying is that the

10   Federal Government has authority that we simply do not have

11   and --

12             THE COURT:  But that's not really the basis of

13   your claim; is it?  I mean, I haven't really seen a drill

14   down on the respective spheres of authority with respect to

15   this.  I hear the states saying, There was a perfectly good

16   solution that was negotiated in the previous administration.

17   It's on the books.  And now, it appears like they're not

18   going to do it anymore.  That is sad from the states'

19   perspective, but it's unclear to me that the states get to

20   require the Federal Government to do that.

21             MR. FISCHER:  Well, first of all, the decision not

22   to enforce the rule is not just a policy choice.  It was a

23   violation of the APA.  That gets into the merits.  But I

24   think, you know, sort of, attributing this just, you know --

25   there was a new administration and the Federal Government's

1      made a different decision, that doesn't excuse the --

2              THE COURT:  And we'll get into the merits.  And I

3      think we should shift that way.  My only point is that there

4      are a lot of people in the world who are a aggrieved by what

5      the government -- the Federal Government decides to do.  I

6      always think about the person sitting at home on his couch

7      reading the New York Times.  There are a lot of people who

8      thought things were going to go a certain way and now they

9      read, Oh, my goodness.  The Federal Government is doing

10     something different.  I'm upset about that; right?  I had an

11     expectation that they were going to do X and now they're

12     doing Y.  But we're pretty clear that those people can't

13     bring a lawsuit just because they expected it to go a

14     certain way and it's not going that way.  It's only when

15     you're actually injured by this action; that it has caused

16     you some injury.  And I'm still struggling with the states'

17     contention that that's what is actually happening here; that

18     they're -- that the solution to this terrible, terrible

19     problem that they saw on the horizon through this rule,

20     right, is not going to happen or it doesn't appear to be

21     happening and, you know, that's a problem, but only in the,

22     sort of, generic sense perhaps and not in the it's actually

23     injuring you sense, and that's what I'm trying to get my

24     arms around.

25             Let me ask you to move to the merits.

1              MR. FISCHER:  Okay.  Certainly.

2              THE COURT:  Why is it that you think that the

3     agency has not followed the notice and comment procedures

4     with respect to the kind of action it's taken here or has

5     acted arbitrarily and capriciously in doing what it has

6     done?

7              MR. FISCHER:  Okay.  So there are three actions

8     we're challenging, broadly speaking -- or to be clear, two

9     actions and one set of inactions.  Now, the status of the

10    inaction claim has actually changed a little bit because in

11    our complaint, we pointed to two specific duties that the

12    department has.  One is to send to the schools what's called

13    a draft completers list; and then the second is, based on

14    that, to subsequently calculate the debt-to-earnings rates

15    which are the heart of the rule.

16              Now, on the first, the draft completers list, on

17    Friday, the department put out a notice saying that it would

18    be sending the draft completers list out yesterday and that,

19    as of yesterday, there's a 45-day period for the schools to

20    respond.  So that period officially began yesterday.  So

21    based on the department's representations, they have now

22    done, as of yesterday, the first thing we were asking them

23    to do.

24              THE COURT:  Does that moot your claim or no?

25              MR. FISCHER:  It only moots the claim as to the

1     draft completers list.  It -- we still have our claim that

2     the department is obligated to perform the calculations that

3     get to the debt-to-earnings rate --

4             THE COURT:  But they need the draft completers

5     list to be out there for 45 days before they do that --

6             MR. FISCHER:  They do, but the --

7             THE COURT:  -- right?

8             MR. FISCHER:  They can't do it -- I mean, they

9     should have done it by now.  They're way behind, but they --

10    we recognize they can't do it tomorrow.  They have to wait

11    45 days, and then we think they -- they need a reasonable

12    amount of time after that because they do have to request

13    data from the Social Security Administration --

14            THE COURT:  So why isn't your claim moot?

15            MR. FISCHER:  Because we think that since the

16    department has failed to perform a duty that's supposed to

17    be performed on an annual basis --

18            THE COURT:  But they're doing it now.  So can you

19    bring a -- this kind of claim to redress a prior delay?

20            MR. FISCHER:  Well, that goes, in some ways, to

21    the relief sought, and our requested relief would simply be

22    that the department be directed to perform the D/E

23    calculations by a date certain in the future, giving them

24    reasonable time to take the steps.  So if they are, in fact,

25    carrying out their obligations in reasonable time, then we

1    don't have any concern, but --

2             THE COURT:  I have to think about that.

3             MR. FISCHER:  Okay.

4             THE COURT:  I'm not sure.  I'm really leery to

5    provide advisory opinions, you know, to, sort of, make

6    suggestions about things when they're underway with respect

7    to the delay and the task that you say they're required to

8    do.

9             MR. FISCHER:  It's not -- it wouldn't be an

10   advisory opinion, though.  We're asking for a date --

11   certain and --

12            THE COURT:  No, you're asking for even worse, not

13   an advisory opinion but an order with respect to something

14   that is no longer a controversy because they're actually

15   doing the thing that it is that you want them to do.

16            MR. FISCHER:  Well, they've taken the first step,

17   and, you know, it's worth pointing out that they took that

18   step the day before a summary judgment hearing on a claim

19   addressing that.

20            THE COURT:  So you've been successful already.

21            MR. FISCHER:  But what are we going to have to do

22   to get them to take the second step?  Do we have to file

23   another lawsuit and come back here?

24            THE COURT:  You may; right?  You may have to wait,

25   at least.  Why am I giving them an order if they're doing

1    what it is you're asking them to do?  I'm not sure that I

2    have the constitutional authority to do that.

3              MR. FISCHER:  Well, because -- I want to be clear.

4    They have not done everything that we have asked them to do

5    and everything that they're required to do under the rule.

6    They are in a position where we acknowledge, as a practical

7    matter, they cannot do the D/E calculations immediately.

8    They should have done them by now.  They are --

9              THE COURT:  Was there a date certain in the rule?

10   I thought it was just annually.

11             MR. FISCHER:  It was just annually, but they are,

12   I think, roughly a year behind where they were -- where the

13   department was with respect to the first set of

14   calculations.  So at this point, you know, if this were to

15   continue with delay after delay, then the second year would

16   never be finished and, you know, the third year should be --

17             THE COURT:  I understand, but it's very hard to

18   ask the Court to anticipate that they might not do what it

19   is that we know they can't do today because they need 45

20   days, and so give them an order now.  I'm just putting that

21   on the table.

22             What about the other claims?

23             MR. FISCHER:  So the other claims go to two

24   things.  First, the disclosure requirements; and second, the

25   alternate earnings appeal process.  So I'll talk about the

1    disclosure requirements first.

2              The rule had three critical disclosure

3    requirements.  Schools were -- or programs were required to

4    disclose a set of information -- although it's not an

5    exhaustive list -- about their performance to students.

6    There were three ways they had to get this information to

7    students.  One was posting on their website; second was in

8    their promotional materials; and third was through direct

9    distribution to prospective students before they enrolled.

10   And there's a good discussion of this in the amicus brief

11   submitted by the Institute for College Access and Success

12   and Public Citizen and several other groups that

13   participated in the rulemaking process explaining why the

14   direct distribution requirement and the marketing material

15   requirement -- particularly, the direct distribution

16   requirement is the most important one.  Requiring posting of

17   materials on the website is not --

18             THE COURT:  So let me just -- let me ask you as a

19   practical matter because I'm trying to keep track of all the

20   facts, have they done the posting and promotional and not

21   the direct distribution?  What is still outstanding here?

22             MR. FISCHER:  So what the department did was, it

23   delayed the deadline for schools to comply with the direct

24   distribution and the promotional materials.

25             THE COURT:  So now, it's just on the website.

1              MR. FISCHER:  Just on the website.  That's the

2    only requirement that's in effect.  It delayed the deadline

3    for the other two to July 1st, 2018.  And it did this by way

4    of a very brief announcement in the Federal Register that

5    contained, I would say, virtually no rationale for why they

6    were doing it.

7              THE COURT:  But they did invite comment on this

8    action.

9              MR. FISCHER:  After the fact, yes, but that

10   doesn't exclude --

11             THE COURT:  That doesn't give them notice and

12   comment?

13             MR. FISCHER:  Not if they've already taken the

14   action.  Complying with notice and comment requires, you

15   know, producing a proposed rulemaking or proposed rule,

16   inviting comment on it and then publishing a final rule.

17             THE COURT:  Is that really practical?  They say,

18   at some point -- what are you talking about?  We're just

19   delaying -- no one has said anything about changing the

20   substance of this.  We never said we're, you know -- we

21   didn't propose a rule to say that the GE program shouldn't

22   do these things.  We just gave them more time.  Why is that

23   the kind of thing that even implicates the notice and

24   comment process?

25             MR. FISCHER:  Well, because -- so notice and

1      comment can be dispensed with if the agency shows good

2      cause.

3                    THE COURT:  No, I'm asking -- assuming it --

4      you're assuming it applies.  I'm asking, why does it apply

5      to begin with in this circumstance where what they -- or

6      what it is -- the action that the agency has taken is merely

7      to extend the deadline?

8                    MR. FISCHER:  Well, because the courts have

9      repeatedly recognized that delaying implementation of a

10     rulemaking is itself a rulemaking and it can be challenged

11     under the APA and in Environmental Defense Fund v. EPA, the

12     D.C. circuit said, The suspension or delayed implementation

13     of a final regulation normally constitutes substantive

14     rulemaking under the APA.  And here, what we have is delayed

15     implementation of key elements of the rule delayed for, you

16     know -- at the time they issued the notice, the deadline was

17     July 2017 and they extended it for a year.  There is no

18     guarantee that it will not be extended again.  And, in fact,

19     in the case of a parallel regulation dealing with borrower

20     defenses to repayment, the department did extend the

21     deadline on multiple occasions.  And what the agency cannot

22     be permitted to do is simply run out the clock while it

23     tries to come out up with a new rule.  All of this is

24     happening against the backdrop of -- the secretary came in;

25     announced a regulatory reset.  They started --

 1              THE COURT:  Was she not entitled to do that?

 2              MR. FISCHER:  She was -- certainly was.

 3              THE COURT:  All right.

 4              MR. FISCHER:  And she, then, started a negotiated

 5    rulemaking process on this rule which she is more than

 6    entitled to do.  They are free to come up with a new rule.

 7    What they can't do is stop enforcing the current rule while

 8    they do that.  They can't stall on the current rule until

 9    the new rule gets finished, and that's what we're worried

10    that they're clearly trying to do --

11              THE COURT:  And that's because you say the -- that

12    the stalling, in and of itself, is a substantive rule --

13    that the --

14              MR. FISCHER:  Yes, the --

15              THE COURT:  -- delay notice was a substantive --

16              MR. FISCHER:  Delaying the requirement was a

17    substantive change of the rule which required either notice

18    and comment rulemaking or showing that there was good cause

19    to be excused from it.  And they haven't expressly invoked

20    the good-cause exception.  And that exception requires that

21    you spell out in the rule why you think good cause applies

22    and the courts have been clear that that exception is to be

23    used for emergency situations --

24              THE COURT:  And Judge Contreras's opinion is not.

25              MR. FISCHER:  Well, so --

1              THE COURT:  That's different.  I know.  That's in

2      the earnings appeal.

3              MR. FISCHER:  So that gets to the appeals --

4              THE COURT:  Yeah.

5              MR. FISCHER:  -- issue.  They -- and I think

6      that's an important point; that there's no link between the

7      change of the disclosure deadline and Judge Contreras's

8      opinion in AACS.  They're completely disconnected.  The -- I

9      mean, I'll just read for you.  This is their -- this is the

10     department's justification.  It says, The department

11     believes it should evaluate the utility of these disclosures

12     to students and the implementation of this requirement prior

13     to requiring institutions to disclose -- to include the

14     disclosure template in their GE program promotional

15     material --

16             THE COURT REPORTER:  Can you slow down, please.

17             MR. FISCHER:  I'm Sorry.

18             The department believes it should evaluate the

19     utility of these disclosures to students and the

20     implementation of this requirement, and then it says, Prior

21     to actually requiring it.  It says, Moreover, the department

22     expects to further review these requirements as part of its

23     review of the GE regulations and their implementation,

24     including through negotiated rulemaking.

25             So the justifications are, one, we'd like to

1    evaluate how effective these are which is odd because you

2    would think if they want to evaluate their effectiveness,

3    they would implement them and see how they turn out; and,

4    two, we want to revisit this through negotiated rulemaking

5    which, again, doesn't allow you to just --

6          THE COURT:  All right.  I think I understand your

7    argument.  Talk to me a little bit about Judge Contreras and

8    then we'll let --

9          MR. FISCHER:  So -- yes.  So Judge Contreras, in

10   the AACS case, wrote a very careful, thoughtful,

11   narrowly-tailored decision.  What happened in that case was,

12   the American Association of Cosmetology Schools sued on

13   behalf of its members arguing that the way earnings were

14   calculated under the rule was unfair to them because many of

15   their earnings -- many of their -- well, all of their

16   graduates wound up -- if they were employed in certain

17   fields were in industries where a lot of their income came

18   in through tips.  So -- and as a result, they often didn't

19   report their tipped income.  So the social security data

20   that the department relied on was inaccurate with respect to

21   these individuals.

22         THE COURT:  Right.  And I understand he very

23   narrowly tailored his remedy, but the language in the

24   opinion would seem to be broad enough to cause the agency

25   some concern about whether or not its provisions, with

1    respect to this kind of appeal, were okay across the board.

2    So why couldn't that be a basis for a rational determination

3    that we need to suspend some of these while we get this

4    worked out?

5           MR. FISCHER:  So two points on that.  First, Judge

6    Contreras was very careful in that his opinion said that the

7    rule was arbitrary and capricious with respect to tipped

8    income.  With respect to fields where there is no concern

9    about tips, he did not say anything to suggest that the rule

10   was arbitrary and capricious and --

11          THE COURT:  Right.  But surely, tip income goes

12   beyond just cosmetology schools; right?

13          MR. FISCHER:  There are -- certainly, there are

14   other fields, but his decision was based on a factual record

15   in that case that AACS produced showing that many of their

16   graduates received, I think, up to, in some cases, 60

17   percent of their income through tips.  The department was

18   free to look at that opinion and say, We think there may be

19   concerns with respect to other fields.  So we are going to

20   carry out a rulemaking to figure out what those fields are

21   and then, perhaps, to change the rule with respect to those

22   fields.  And, in fact, if they wanted to get a handle on,

23   you know, which industries really do have a lot of tip, you

24   know -- tip income, the way to do that is to put out a, you

25   know -- we'll go through negotiated rulemaking and then put

1    out an NPRM so that you get comments from people and you can

2    evaluate them and then you can come up with a new rule.

3         Instead, what the department did was to say, We

4    are suspending enforcement of certain elements of the appeal

5    process, you know, not just for AACS; not just for

6    cosmetologists; not just for tipped fields, but for

7    everybody, and that goes way beyond the holding of

8    Judge Contreras's decision.  So if, you know -- if the

9    department had said, We're going to issue an interim final

10   rule to implement just this decision that says, We are not

11   enforcing these requirements with respect to AACS member

12   schools --

13        THE COURT:  Could they have done that without

14   notice and comment?

15        MR. FISCHER:  They could have done that without

16   notice and comment because that would have satisfied the

17   good-cause exception under the APA.

18        THE COURT:  I see.

19        MR. FISCHER:  So it could have been done as an

20   IFR.  But when they go beyond that and bring in other

21   industries who were free to challenge the rule in court and

22   are free to appeal their determinations and, therefore,

23   still do have their own rights, then they're going beyond

24   what the APA would allow them to do without notice and

25   comment.  And, you know, the rational response here would

1    have been, in fact, to start a notice and comment process to

2    say, We think, maybe, we should revisit whether the appeals

3    process works for other tipped industries.  That would have

4    been fine.  The states would have participated in that,

5    certainly, and other organizations would have participated.

6              THE COURT:  All right.  Here's what I'm going to

7    do.  I think I need to give my court reporter a few-minute

8    break because we're almost at 2 hours.  I'm going to break

9    for about 10 minutes and then we'll come back.  You can make

10   whatever final points you want to make, and then I'll let

11   DOE respond.  All right?

12             MR. FISCHER:  Thank you very much, Your Honor.

13             THE COURT:  Thank you.

14             THE DEPUTY CLERK:  All rise.  Court stands in

15   recess for 10 minutes.

16             (Brief recess taken.)

17             THE COURT:  Mr. Fischer, I'm sorry to have cut you

18   off.  I don't know if you had anything more on the merits.

19             MR. FISCHER:  Just a few --

20             THE COURT:  Yes.

21             MR. FISCHER:  -- additional points and then I will

22   wrap up.

23             The -- I think it's worth comparing

24   Judge Contreras's decision in AACS and the care with which

25   he fashioned the remedy that analyzes the nature of the

1    violation with the department's blanket issuance of an order

2    simply saying, Every school can now appeal and every school

3    is freed from the obligations under the prior rule.

4         THE COURT:  Now, does it matter that they say

5    temporarily?  Momentarily?  We haven't gotten to the final

6    word on this.

7         MR. FISCHER:  No, because they are saying that for

8    purposes of the first year of D/E data which is what is at

9    issue here, they're not going to enforce elements of the

10   rule.  If they're going to start doing it the second year

11   once they get around to actually performing the

12   calculations, that doesn't save them from having to do it

13   for the first year and there's no guarantee --

14        THE COURT:  You can move that right up to you.

15        MR. FISCHER:  Sorry.  There's no guarantee that

16   they are going to start doing it at any point in the future.

17   They're just saying, Well, we're still trying to figure out

18   what to do.  But the way the APA works is, if you're

19   figuring out what to do, you have to comply with the

20   regulations as they are currently written, unless you can

21   show an excuse for getting around them.  And Judge Contreras

22   considered some broader remedies.  He looked at whether some

23   of the proposals that had been submitted during the

24   rulemaking process were rejected erroneously by the

25   department and he rejected those arguments and said, I'm not

1        going to order a specific appeal standard.  All I'm going to

2        say is that for AACS schools, the department can't enforce

3        the two survey requirements, and the result of that was that

4        the department will look at those appeals on a case-by-case

5        basis.

6                So to rely on this very narrow, very careful

7        decision where the court specifically said that he did not

8        want to go beyond -- he did not want to upset the entire

9        structure or the rule, to rely on that to essentially upset

10       the entire structure of the rule is arbitrary and capricious

11       and what's more, it is certainly a substantive change that

12       required notice and comment and where the department has not

13       offered a legitimate excuse for not complying with notice

14       and comment, you know?  Again, to be clear, if they had just

15       done this for AACS schools, we think they could be excused

16       under the good-cause exception, but to do it for everybody,

17       clearly, there's no basis.  They haven't even invoked that

18       exception.  And we think that it should be struck down on

19       both those reasons.

20               And then finally, Your Honor, we did discuss

21       already the -- our third claim which deals with their

22       failure to act.  The claim itself is that the department has

23       an obligation to do certain things under the rule and it has

24       failed to do those things.

25               THE COURT:  Why do you read the rule to provide --

1    or to require them to calculate the debt-to-earning ratio?

2              MR. FISCHER:  Because the rule says that --

3              THE COURT:  Does it use the "shall" language?

4              MR. FISCHER:  It doesn't use "shall" at all.  It

5    just says, The secretary does this; the secretary doesn't do

6    this.

7              THE COURT:  Right.

8              MR. FISCHER:  That's, I think, consistent with

9    some other ways that Department of Education rules are

10   written.

11             THE COURT:  And have been interpreted as a

12   discreet mandatory duty by courts?

13             MR. FISCHER:  I would have --

14             THE COURT:  Usually, the language "shall" is the

15   way the Court knows that this is a mandatory

16   non-discretionary duty.

17             MR. FISCHER:  Yeah.  Yes, I'm sorry.  And in this

18   case -- I mean, I think that if you read the rule in its

19   entirety, what it says, you know -- the secretary calculates

20   D/E rates.  Its hard to see that as anything other than

21   mandatory.  It's not --

22             THE COURT:  No, but usually --

23             MR. FISCHER:  -- getting a discretionary duty --

24             THE COURT:  No, no, no, no.  I mean, with all due

25   respect, when you look at language and you're doing, like,

1     this kind of interpretation, you know, the statute might

2     say, So and so does this; so and so does that, as a way of

3     delineating who's the person that is responsible for this,

4     but not necessarily indicating that it's a requirement.  If

5     this is to be done, X person will do it versus Y person.

6     You see that language sometimes.

7               MR. FISCHER:  Well, it -- so I think the

8     difference is here.  If the rule used "shall" in certain

9     cases and it didn't use it in other cases, then you could

10    say perhaps it's -- the obligations are discretionary, but

11    to say that not using "shall" at all renders everything

12    discretionary would essentially write the rule out of

13    existence.  Then the --

14              THE COURT:  Maybe.  Maybe; maybe, not.  I mean,

15    there could be other ways to come up with this ratio.

16    You're saying that the regulation which does not order that

17    the secretary do it in a particular order or a particular

18    way requires this in the same way as the cases do with

19    respect to the enforcement of a non-discretionary duty under

20    the APA.

21              MR. FISCHER:  Well, so I -- so the rule actually

22    -- it's interesting because it has -- both prohibitions and

23    commands are written without "shall" --

24              THE COURT:  Tell me where you are.

25              MR. FISCHER:  So for instance, I'm looking at --

1   this is 66 -- 34 C.F.R 668.405 which discusses challenges to

2   the calculation of student debt.  And I'm looking

3   specifically at the appeal process which is Subsection

4   (f)(3).  It says, In a challenge under this section, the

5   secretary does not consider, and then it lists certain

6   things that the secretary does not consider.  Now, if that's

7   a discretionary duty, it's completely meaningless because --

8            THE COURT:  Well, it's hard to look at that one

9   because when you're talking about what the agency doesn't

10  do, we're not even in the world of duties in the same way.

11  Its more like a factor.  You can't take this into account

12  when you're doing X; right?

13           MR. FISCHER:  It's a prohibition.  And -- well --

14           THE COURT:  Right.

15           MR. FISCHER:  -- and that's how it should be read.

16  You can't take this into account when you're doing X, but it

17  doesn't say, The secretary shall not; it says, The secretary

18  does not.  So the flip side --

19           THE COURT:  Right, but what the -- the world that

20  we're in is trying to determine whether and to what extent

21  the secretary has to do something affirmatively.

22           MR. FISCHER:  Yes.

23           THE COURT:  There can be rules that come into

24  place about what the secretary can't do, assuming that he

25  decides -- he or she decides to do the thing that comes

1      before that.  It's very hard to read language to find a

2      discretionary duty.  This is not a usual -- excuse me, a

3      non-discretionary duty.  And usually, the tip-off to that

4      are -- is the kind of requirement language that I'm looking

5      for.  So I'm just a little teeny bit skeptical.  I mean, I

6      understand what you mean when -- you're talking about

7      66.405 -- 668 -- sorry -- .405(a) where it says, The

8      secretary determines the D/E rates by, and then it has a

9      series of things; is that the language --

10             MR. FISCHER:  Yes --

11             THE COURT:  -- that you say --

12             MR. FISCHER:  -- that's the relevant regulation --

13             THE COURT:  And you believe that these things are

14     non-discretionary duties --

15             MR. FISCHER:  That this is a --

16             THE COURT:  -- of the secretary --

17             MR. FISCHER:  -- mandatory duty, yes, just like --

18             THE COURT:  All right.

19             MR. FISCHER:  -- the prohibition I read is a

20     prohibition.  It's not a suggestion that the secretary

21     shouldn't look at these things.  It's saying, as Your Honor

22     said, the secretary can't look at these things, but it

23     doesn't actually -- it doesn't say shall can't.  It just

24     says the -- it doesn't say the secretary shall not.  It says

25     the secretary does not.

1          THE COURT:  And that was in (f)?

2          MR. FISCHER:  (f)(3), yes.

3          THE COURT:  (f)3?  All right.

4          MR. FISCHER:  Your Honor, then, finally, if I may

5    return to standing, there are just a couple points I wanted

6    to emphasize.

7          The first is that this concern about preemption is

8    not an idle one.  Recently, several of the states took

9    action against loan servicers alleging that they were

10   violating state laws.  The department recently put out a

11   notice to states saying, What you are trying to do here is

12   preempted.  We have authority in this area.  You cannot

13   pursue loan services for violating your state consumer

14   protection laws.  Now, that's not completely analogous, but

15   it shows that the states have reason to be concerned that if

16   they try to actually take action here, they might face a

17   preemption challenge.

18         THE COURT:  And that example was in the Department

19   of Education context?

20         MR. FISCHER:  Yes.  Yes, it was -- so states sued

21   loan services for essentially defrauding students by

22   tricking them into payment plans that were unrealistic or by

23   getting them to agree to terms that would ultimately cost

24   them more money in the end and the department issued a

25   notice saying, Under the Higher Education Act, we have sole

1    authority in this area.  States, you cannot enforce your

2    consumer protection or whatever laws against loan servicers.

3    So it's not a reach to think that the department might --

4          THE COURT:  Well, it depends.  I mean, I'd have to

5    see whatever statutory scheme in particular with respect to

6    the HEA they were referencing; right?  The government could

7    be wrong about that.

8          MR. FISCHER:  Certainly, the government could be

9    wrong, but I think if the question is, are the states

10   limited in what they can do in this area?  They are at least

11   limited in some regards because there are some areas where

12   the Federal Government does have sole authority and the

13   states are preempted.  It's just a question of how broad

14   that scope is.  And we -- and to be honest -- to be candid,

15   I think the states will push back on the department's

16   preemption notice, but that doesn't change the fact that the

17   states are right to be concerned; that they simply cannot do

18   everything that they would like to do in this area --

19         THE COURT:  I understand.  I just wonder the

20   extent to which the constitution allows you, under these

21   circumstances, to hold the Federal Government to its promise

22   in this way.

23         MR. FISCHER:  When it's more than a promise; when

24   it's a regulation that's been upheld repeatedly by the

25   courts, then --

1            THE COURT:  Not talking about the merits of it.  I

2      agree.  It's a regulation.  Let's assume that they've even

3      violated it.  Standing is a totally different analysis.  Not

4      every violation of the law by the government can be enforced

5      by everyone.

6            MR. FISCHER:  That's true, but --

7            THE COURT:  And so the quintessential example is

8      the person who is actually injured by the government's

9      action in refusing to enforce its regulations.  And the

10     kinds of arguments that the states have made, especially

11     with respect to, Well, we're going to have to work harder.

12     We're going to have to divert resources to the enforcement

13     of this, actually, in a way, undermines the very point that

14     you were previously making which is, The states can't really

15     act, and so that's why we need the Federal Government.

16     That -- those are two contradictory concepts; right?  The

17     idea of injury because we're going to have to bring more

18     enforcement suits is inconsistent with the thought that, We

19     can't bring enforcement suits and that's why we need the

20     Federal Government to do what it is that it said it was

21     going to do.

22            MR. FISCHER:  Well, it's not inconsistent because

23     we're limited in how we can act.  We can't -- it's not that

24     we can't act entirely, but we can only do certain things and

25     enforcement suits --

1          THE COURT:  But who's being injured by that?

2          MR. FISCHER:  Well, the states are -- the

3     states --

4          THE COURT:  Why?  No, the injury arises out of the

5     spending more money, not out of the -- at least as you've

6     alleged it with respect to that claim of injury.

7          MR. FISCHER:  Yes.

8          THE COURT:  That has nothing to do with how

9     effective your suit is.  It has to do with the fact that you

10    now say, We're going to have to bring more of these lawsuits

11    in order to enforce our consumer protection laws because the

12    Federal Government has created this void by not enforcing

13    its rule.

14         MR. FISCHER:  We will have to bring more lawsuits

15    and, as a result, we'll have to divert resources away from

16    other areas --

17         THE COURT:  Right, and --

18         MR. FISCHER:  -- to go after these --

19         THE COURT:  And the D.C. Circuit has been very

20    unsympathetic to that argument of injury.

21         MR. FISCHER:  Well, in the case of states who,

22    again, are a unique situation, the analysis, we think, is

23    somewhat different.  And, again, I hate to keep coming back

24    to Massachusetts v. EPA, but it has a very good discussion

25    of how the states' quasi-sovereign interests and procedural

1    rights to challenge federal agency actions under the

2    arbitrary and capricious standard inform the broader

3    standing analysis and when you analyze the injury -- the

4    financial injuries that we have asserted here, with that

5    foundation, we think there's enough to show that we do

6    suffer an injury.  And the injury is described fairly

7    well -- or at least in some respects -- in the rule itself.

8    The 2014 rule talked about how the states would benefit as a

9    result of the rule.  First, it talked, as I said, about all

10   the enforcement actions the states have brought that led to

11   the rule and then it said, States would benefit from

12   improved oversight of their investments in post-secondary

13   education, and then, State and local post-secondary

14   education funding will be allocated more efficiently to

15   higher --

16            THE COURT:  I understand, but I hope you

17   appreciate the difference between something like that which

18   is an anticipated benefit -- if this rule goes into effect,

19   states, you're going to benefit -- and an injury.  Those are

20   two different things.  You are not injured, I say -- at

21   least for the purpose of this conversation -- by not getting

22   a benefit that you thought you were going to get.  Those are

23   two different things.  So what you've just said to me is,

24   the rule was enacted for -- with us in mind.  Maybe that

25   gets you the zone of interest.  I don't know.  It's going to

1          help me because of X, Y and Z.  That's fine.  All of that is

2          great.  And so you had reason to be hopeful that this rule

3          would be implemented.  It's not clear to me that when that

4          rule is not implemented, for whatever reason, even

5          wrongfully so, that you were actually injured by the

6          government's failure to do that.

7                    MR. FISCHER:  Your Honor, I could submit some

8          cases -- I don't have them with me -- recently decided in

9          the environmental context that have held that where EPA

10         says, We're not going to enforce a new rule -- and this

11         happened recently with ozone emissions.  The EPA announced

12         that it was not going to enforce a new rule limiting ozone

13         emissions to a level below where they were.  When the states

14         sued, EPA was required to carry out its obligations under

15         the rule.

16                    THE COURT:  I just wonder whether climate change

17         is a different animal because the -- everybody recognizes

18         that the states can't function; that they need the Federal

19         Government in order to implement or to make the relief -- in

20         order to stop the bad thing from happening.

21                    MR. FISCHER:  The -- if the states could do

22         everything that the Federal Government could do when it

23         comes to higher education, we might be in a different

24         situation.

25                    THE COURT:  Is there something in the briefing

1      that focuses in on this point?  Because you keep coming back

2      to it and I've not really seen it.  In other words, is the

3      crux of your argument now, with respect to standing, that we

4      are like Massachusetts v. EPA insofar as, "We are limited in

5      our ability to solve this problem on our own," and, if so --

6      if that's in here somewhere -- "Here are the ways in which

7      we are limited and all of that"?  I haven't seen that.  So

8      I'm just wondering if that's now what we need.

9              MR. FISCHER:  So the crux of our argument is still

10     that we're being injured in these specific ways that are

11     spelled out such as the loss of tuition at state schools;

12     the loss of state-sponsored financial aid that's not being

13     repaid and then the diversion of resources.  And those are

14     fairly traditional Article III injuries and they find

15     support, as I said, in the rule itself.  On top of that,

16     we're making the parens patriae argument that we have a

17     quasi-sovereign interest in protecting our residents.  And

18     it's in that analysis that the preemption issue comes into

19     play, although it's not solely determinative.  And I

20     actually think if you look at, again, Massachusetts v. EPA,

21     that's one of the factors that leads the court to say, Well,

22     the states do get special solicitude, but there are other

23     factors, as well.  It's not solely a question of preemption.

24     And, certainly, with respect to the first -- the direct

25     injury -- we don't need to show anything about preemption.

1    And with respect to parens patriae standing, it's simply one

2    of the many factors that go into it.  So --

3         THE COURT:  All right.  I think I understand your

4    argument.  Thank you.

5         MR. FISCHER:  Thank you, Your Honor.  I appreciate

6    it.

7         Ms. Wyer, we, sort of, slipped back into standing

8    there.  I don't know if you want to start with that or go to

9    the merits.

10        MS. WYER:  Thank you, Your Honor.

11        Well, I guess in direct response to that last

12   point on, you know -- the states seem to be asserting that

13   they don't have the power to control the situation, that

14   seems to -- I mean, the states are regulators of schools.

15   They have the power.  They do regulate schools.  And even in

16   the Title IV context, I was pointed to Regulation 34 C.F.R

17   600.9 that says that, like, states have to authorize schools

18   for Title IV eligibility in the first place and the

19   regulation says that authorization essentially means that

20   the school is licensed under the state licensing law.  So

21   the state has -- actually, I suppose, could affect the

22   federal scheme by controlling the issuance of licenses --

23        THE COURT:  Well, let me speak for the states and

24   when they -- when I say in response they hope that you

25   remember that in the context of this other action and --

1    that has been raised with respect to the scope of their

2    regulatory authority.  And I'm sure you're not going to be

3    binding the government with respect to that one, but in any

4    event --

5              MR. FISCHER:  Well, that -- yeah, but in any

6    way -- in any case, I think the point is that the states do

7    have authority.  I mean, that -- this is not a situation

8    where the Federal Government is the one in charge of this.

9    These are, like, two sovereigns.  And I think that goes,

10   again, back to Massachusetts v. Mellon, and I just point the

11   Court to the statement in that case.  The -- recognizing

12   that the state in that case was calling upon the court to

13   adjudicate not rights of person or property; not rights of

14   dominion over physical domain; not quasi-sovereign rights

15   actually invaded or threatened, but abstract questions of

16   political power.  Who is the one who is going to regulate

17   this?  Who is responsible of sovereignty of government?  And

18   that seems to be what the states here are doing --

19             THE COURT:  So you say there's nothing keeping the

20   State of Pennsylvania or any of these others if they're

21   really worried about these GE programs from enacting their

22   own regulations?

23             MS. WYER:  Not that I'm aware of, Your Honor.

24             THE COURT:  All right.

25             MS. WYER:  And in regard to the cases that the

1    states just mentioned about the climate change, that is

2    really in the same genre as the Maryland v. EPA where the

3    states had a sovereign territorial interest.  I can't

4    remember the name of these cases either, but I -- when I

5    read them, the cases say that just as states have a

6    sovereign interest in territory, they have the same kind of

7    sovereign interest in the air in the territory and that's --

8    was the basis for the --

9              THE COURT:  So climate change, we have to, kind

10   of, carve out as a unique scenario with respect to the

11   states' interests?

12             MS. WYER:  Yeah, this -- just like with the

13   coastal -- whatever that was in the Maryland v. EPA case --

14   the coastal waters, because that impacted state land.

15   Climate change regulations impact state air which is, like,

16   you know, the physical substance of the state --

17             THE COURT:  All right.

18             MS. WYER:  -- and its sovereign -- its

19   sovereignty.

20             Going to the merits, I wanted to give Your Honor a

21   copy of this latest announcement that announces the

22   distribution of the draft GE completers list.

23             THE COURT:  Oh, thank you.  So those have been

24   distributed --

25             MS. WYER:  Yes.

1          THE COURT:  -- as of yesterday or whatever?

2          MS. WYER:  Yes, I believe they were distributed

3     over the weekend.  So now, they --

4          THE COURT:  So do you think the claim is moot?

5          MS. WYER:  Yes, Your Honor, because the APA --

6     that the unreasonable delay cause of action in the EPA -- in

7     the APA is seeking to compel agency action unlawfully

8     withheld or unreasonably delayed.  And so once the action is

9     taken, there's no APA claim and --

10         THE COURT:  No matter how long it took, you don't

11    have a -- any sort of ability as a plaintiff if it takes

12    five years for the agency to get going on this?  But they

13    do, he says, the day before the summary judgment motion in

14    your case.  Your claim is over?

15         MS. WYER:  Yes, Your Honor.  And there are cases

16    on that.  I don't have the cites now, but I -- in an

17    unreasonable delay claim, once the action is taken, the

18    claim is moot.

19         THE COURT:  All right.  So that was the third

20    claim.  They say -- and I think, you know -- let's -- I

21    think they make a decent point.  The secretary comes in.

22    She has new priorities.  All of that is well and good.  But

23    to what extent can the agency effectively refuse to enforce

24    the existing regulations while they undertake a process of

25    change?  Is that something that the law allows?  It seems as

1    though the agency would have to enforce whatever it is on

2    the day they come into office and then go through the steps

3    that are necessary to make changes.  Why isn't he right

4    about that?

5              MS. WYER:  The agency isn't claiming that it does

6    not have to enforce the regulation.  It is going through the

7    steps to enforce it.  There are things that have happened

8    along the way -- in particular, the AACS case -- that have

9    caused inevitable delays in the process of completing that

10   first year of issuing final draft D/E -- GE --

11             THE COURT:  But that opinion, you can't really

12   rely on reasonably for all of the changes that appear to be

13   in the works.  It was very narrow.  And they concede that

14   you could have just issued an interim notice or whatever

15   pertaining to that one situation.

16             MS. WYER:  Yes, Your Honor.  I'm not sure what

17   specifically we're talking about because here, the states

18   have identified specific things that they're challenging,

19   and so --

20             THE COURT:  Right.  And they say those specific

21   things are outside the scope or beyond the scope of what was

22   addressed in AACS.  So to the extent that the agency is

23   suggesting that it was entitled to not enforce the rule

24   because, Oh, my goodness, we have this case, the case, says

25   plaintiffs, is actually very narrow.  And so it doesn't give

1    the agency any sort of an excuse for delaying the disclosure

2    requirements; for relieving anybody else of -- beyond the

3    AACS schools of their responsibility to turn in certain

4    things with respect to the earnings, you know?  The

5    plaintiffs say, Yes, we see that case.  And what does it

6    have to do with the other parts of this rule that has caused

7    the agency to say, "We're going to put it off for another

8    year"?

9              MS. WYER:  Well, the agency never said, We're

10   going to put it off for another year.  The agency, I think,

11   is -- has been struggling to deal with everything that has

12   happened.  First, there was the AACS case which came, like,

13   two days before the deadline that was then in effect to

14   submit the alternate earnings appeal documentation.  So the

15   agency had to scramble at that point and figure out, Well,

16   now this decision says we can't require the same kinds of

17   documentation that we were requiring.  We have to stop that

18   immediately because this deadline is, like, on us right now.

19             THE COURT:  But how reasonable was it for the

20   agency to stop the deadline with respect to everyone?  The

21   decision is very carefully worded.  It's very narrow.  It

22   says, Stop the deadline or change your processes for these

23   schools.  So the question from the standpoint of arbitrary

24   and capricious review is, is it really reasonable for the

25   agency to have gone beyond that with respect to what it

1    requires of other people?

2              MS. WYER:  Well, certainly, if we're talking

3    about -- Count 2 is -- I've lost track of the counts.  But

4    if we're talking about the challenge to the department's

5    implementation of the AACS decision -- and the question is,

6    was it reasonable for the department to apply the decision

7    to all schools?  I think if you look at Judge Contreras's

8    opinion, it's clear that the flaws he identified were not

9    limited to AACS member schools and they were not even

10   limited to professions with tip income.  That's just one

11   subset of the kinds of things that the court identified that

12   could require underreporting.  And "underreporting" is the

13   term that the court used to refer to the problem.  It said,

14   The DOE's overall methodology for determining a program's

15   average income is arbitrary and capricious.  It referred to

16   the wooden use of Social Security Administration's data as

17   problematic and it said, DOE acted arbitrarily and

18   capriciously with respect to the problem of underreporting

19   of income, and that was just a general statement, and then

20   it went on to recognize that the problem of underreporting

21   extends across multiple industries.

22             THE COURT:  So it's the department's position that

23   its changes that it made without the notice and comment

24   procedure was made in response -- across the board, was made

25   in response to this decision?

1          MS. WYER:  Yes, Your Honor.  The department

2     reviewed the decision and concluded that even though the

3     order itself did not go beyond AACS member schools, the

4     reasoning of the decision applied across the board.  The

5     decision went on to say, Other industries likely also

6     experienced different levels of underreporting based on

7     factors like the amount of tips their graduates earn; how

8     frequently their graduates are self-employed; and the amount

9     of tax compliance training their graduates received, and

10    that could really apply to any industry.  I don't know that

11    you could, like, carve out a subset of industries and then

12    apply one standard for alternate --

13         THE COURT:  So even though Judge Contreras

14    specifically stated that notwithstanding that language that

15    you read and that -- that is suggested by his opinion that

16    his remedy was only directed at AACS, it's your view that

17    the department could nevertheless actually upend the program

18    by applying it to everyone in this interim way without

19    notice and comment in the way that it was done?

20         MS. WYER:  Yes, Your Honor.  That was the

21    department's determination.  That's how it analyzed

22    Judge Contreras's opinion and what it thought would be

23    required.  And if it --

24         THE COURT:  And did it say that in the initial

25    delay notice?  Did it say, "We're doing this because we read

1    Judge Contreras's opinion to require it"?

2              MS. WYER:  I believe so, yes.

3              THE COURT:  In the initial -- the first time they

4    decided not to require this information?  I know it appears

5    in supplemental information or supplementary information,

6    but it wasn't clear to me that -- maybe, I'm wrong about

7    that.  I don't know.

8              (Brief pause.)

9              MS. WYER:  And the -- I'm -- I don't have that

10   with me.  So I'm not --

11             THE COURT:  All right.  I'll take a look at it.

12             But let me just ask, then, about the disclosure

13   requirements.  Says plaintiff, there were three disclosure

14   requirements in the rule.  Two of them were delayed by at

15   least a year.  The second time, the agency spoke to it.

16   And, of course, Judge Contreras's opinion has nothing to do

17   with that.  So what was the agency's reason for delaying the

18   disclosure requirements?

19             MS. WYER:  Well, the plaintiffs claim on that

20   point -- first of all, you have to address two threshold

21   questions:  First, is this a final agency action at all?

22   Which courts have taken a pragmatic approach to looking at

23   that.  And what we're dealing at with these disclosure

24   requirements are simply a method of distributing these

25   disclosures.  The information is there on the program

1    website.  So it's still -- it's required to be there and

2    that is not affected by these other two methods of --

3            THE COURT:  So you're saying the other two methods

4    are not substantive requirements of the organizations?  I

5    mean, we have three methods.  You post; you promote; and you

6    give it direct distribution.  The initial promulgators of

7    the rule thought it was important to have more than one

8    method of information.  So how is it that the agency is

9    suggesting now that -- the other two are superfluous; is

10    that the suggestion?

11            MS. WYER:  Well, in regard to the final agency

12    action question, I think the main point there is that this

13    is -- was simply a temporary extension of the compliance

14    deadline for these two methods --

15            THE COURT:  Did they move the deadline?  Did the

16    deadline -- was there any suggestion that the agency was

17    thinking about moving the deadline, but they actually hadn't

18    reached a conclusion about whether the deadline should move?

19    That's when it's not final.  We're thinking about moving the

20    deadline.  We haven't decided.  You can't sue us now because

21    we haven't made a decision.  That's non-final agency action.

22    But to the extent that the agency puts out a notice that

23    says, The deadlines have moved, I'm not sure you get very

24    far with the suggestion that that's not final agency action.

25            MS. WYER:  Well, I think the analysis for final

1    agency action is -- I mean, it -- there are those standards,

2    but it also is looking at the whole situation pragmatically.

3    And so if you are -- it's -- just can't be the case that

4    every extension of a deadline counts as a final agency

5    action that either requires notice and comment or can be

6    challenged under the APA --

7                THE COURT:  No, it depends whether or not it's a

8    substantive change.  It actually affects the rights of the

9    parties in any meaningful sense.  It's not the finality of

10   it that gives it this pragmatic approach.  It's actually

11   what is being done with moving the deadlines.  And so to the

12   extent that we have a rule that requires certain things of

13   the parties who are being governed and the agency makes a

14   decision -- excuse me, the rule by a certain date -- you

15   have to do X, Y and Z by a certain date and the agency

16   decides, No, you don't.  You have to do it by a date a year

17   later, the agency has effectively changed the obligations of

18   the parties.  And to the extent the agency doesn't say,

19   We're still considering whether or not we're going to move

20   the deadline, they have done so as a matter of final agency

21   action.  So that part of it, let's assume there is a final

22   agency action; is your argument that, "Well, the nature of

23   that really doesn't give rise to notice and comment"?

24                MS. WYER:  Yes, Your Honor, beyond the final

25   agency action which, again, it's distinct from the cases

1    that have found a suspension -- a wholesale suspension of a

2    rule final agency action.  That -- I'm not aware of a case

3    that has found an extension to qualify as final agency

4    action, but even assuming that it is final agency action --

5              THE COURT:  Is that -- I'm sorry.  I'm still

6    confused.  What action are we talking about?  You're saying,

7    by its nature, the moving of a deadline -- as an actual

8    fact, the agency has picked a new deadline.  To the extent

9    that they have just put off the substantive thing, that's

10   not final agency action?

11             MS. WYER:  That is -- as far as I can tell in the

12   case law, that has not been found to be final agency action.

13   It's when a rule is actually suspended that it's -- that the

14   courts have considered --

15             THE COURT:  And what's the difference --

16             MS. WYER:  -- that final agency action.

17             THE COURT:  -- between suspending a rule?  Is it

18   the fact that we -- if the agency has said, You don't have

19   to do that now, but they haven't given an end date, then

20   that's a suspension that causes it to be final, but not

21   giving an end date?  Is that the distinction you're drawing

22   between suspension and what we have here?

23             MS. WYER:  Yes, Your Honor.  I mean, I suppose the

24   reasoning is that when you're just extending something,

25   you're not really changing the substantive requirements.

1    You're just moving when they will be in effect, whereas

2    suspension is actually, you know, changing it.  So it's

3    not -- I think a brief extension or --

4              THE COURT:  Do you consider a year to be a brief

5    extension --

6              MS. WYER:  Well --

7              THE COURT:  -- in a program that requires annual

8    obligations?

9              MS. WYER:  There -- well, the -- I'm just saying

10   that there has to be some kind of a continuum or -- at the

11   very least, there has to be a continuum.  So if you -- if

12   you're looking at suspension as a -- as what the courts have

13   considered a final agency action, it would have to be

14   something equivalent to that --

15             THE COURT:  So when do we have final agency

16   action; right?  We have July 1st, 2018, coming up.  The

17   agency decides to file another notice.  They're not ready.

18   They're still trying to figure this out.  Is -- do we have

19   final agency action at that point?  Can they just, year to

20   year, continue to move the deadline out?

21             MS. WYER:  I think in that situation, a court

22   would have the authority to look at it pragmatically and

23   say, Well, I think what's going on here is actually a

24   suspension -- equivalent to a suspension.  But here, there

25   is a final date.  There has been limited -- a limited --

1   relatively limited extension of the deadline.  And so it

2   just doesn't compare to the cases that have talked about

3   suspensions --

4              THE COURT:  Hasn't there also been a suggestion by

5   the agency that people are ultimately not going to have to

6   do this because part of the reason why they've pushed off

7   the date is because they're worried about the, you know,

8   burdens on the companies and the effectiveness of

9   disclosures?  They're actually looking at this.  It's not,

10  you know, some administrative, Oh, we're just suspending it

11  or pushing it off for a year, but you're definitely going to

12  have to do it.  We're not trying to get around the rule.

13  The agency has suggested that they're only pushing it out

14  because they're going to change the substantive requirement.

15  Does that matter with respect to your final agency action

16  analysis?  I mean, I find it fascinating.  I find it

17  fascinating that the agency would pick a final -- there are

18  lots of things you can do with this, but final agency action

19  is not where I thought you were really going to lay your

20  marker.  So I'm trying to understand it.

21             MS. WYER:  I just -- based on the case law, it's

22  an argument that applies here because cases have held a

23  suspension of a rule to be a final agency action, but they

24  have not found an extension to be equivalent in the

25  practical, pragmatic consideration that's required.  So I

1    mean, everyone knows that the department is -- has gone

2    through negotiated rulemaking.  It's considered changing the

3    rules.  But you don't have to look -- that doesn't mean that

4    everything that the department does with the current rules

5    has -- it counts as a suspension; that you'd have to look

6    just like with the implementation of the D/E rate

7    calculation.  The department is going forward and doing

8    that.  It has issued the draft D/E -- G -- D/E [sic]

9    completers list.  So you can't say that the department has

10   suspended wholesale the rule.  It's still implementing the

11   rule.  It's still going forward.

12           THE COURT:  So your point is, it can't be sued

13   until -- unless and until it has wholesale suspended its

14   enforcement of a rule; is that the agency's point?  Like, if

15   it stops certain parts of it, but it's still considering or

16   it says, Don't do this now, do it in a year because we're

17   going to have a negotiated rulemaking about it, that doesn't

18   count as suspension for your purposes?

19           MS. WYER:  Well, I -- the -- this claim is just a

20   challenge to these two disclosure requirements.  So the

21   point here is that when you look at the whole context --

22           First of all, it is a limited extension.  It has

23   an endpoint.  It's not a suspension.

24           Second, it -- these are two methods of

25   disseminating information that remains available through a

```
 1    different method on the program's website.

 2              Third, this is not -- there is no indication that

 3    the department is simply not implementing the GE regulations

 4    as a whole.  It is going forward with the D/E rate

 5    calculation.

 6              THE COURT:  So how does your final agency action

 7    argument dovetail with the procedural notice and comment?

 8    Do you have to have had final agency action in -- or is this

 9    just going to arbitrariness?

10              MS. WYER:  Well, first, in order to raise the

11    claim under the APA at all, there has to be a final agency

12    action; then to establish that notice and comment was

13    required, it has to be substantive as opposed to procedural.

14    And here, again, even if you decide it's a final agency

15    action, notice and comment would not be required because it

16    is a procedural rule.

17              THE COURT:  It doesn't change the substance of the

18    governed individuals' obligations and responsibilities from

19    the agency's perspective?

20              MS. WYER:  It is simply one method.  It's, like --

21              THE COURT:  No, but it was a requirement.  It was

22    a requirement.  Whether it was duplicative; whether it was

23    superfluous; whether the agency could have, you know, chose

24    -- done without it, under the rules, are you conceding that

25    it was a requirement that people were supposed to give this
```

1    direct distribution and promotion on a certain date?

2          MS. WYER:  Well, in that regulation about the

3    disclosure template in 34 C.F.R 668.412, there are --

4    there's indications in the rule itself that the department

5    was retaining some flexibility in how it was going to

6    implement that rule.  It said that the department was going

7    to -- could change the content of what was required in the

8    disclosures.  It was going to engage in some kind of ongoing

9    evaluation of how this information should be disseminated.

10   And this is very much along those lines, because now the

11   department is saying that it wants to consider further these

12   two methods.  And it may be that because of the AACS

13   litigation or the plaintiffs -- the plaintiffs have

14   complained about these -- the burdens -- the supposed

15   burdens of providing this information in promotional

16   materials, you know, in mailings to students.  And there's

17   another case in Arizona where they --

18          THE COURT:  I don't know how you can have it both

19   ways.  How could you have it both ways?  Either this is a

20   procedural rule that doesn't bother anybody or it's a

21   burden.  If it's a burden, then it's a substantive, you

22   know, obligation of the parties.

23          MS. WYER:  Well, as a -- the -- carrying it out --

24   I mean, procedural requirements can be burdensome because

25   it's -- you have to make sure it's on all the mailings and

1    the printings.  It's, like, different from just posting it

2    on a website.  So --

3            THE COURT:  So you're calling it a procedural

4    requirement because it has to do with the --

5            MS. WYER:  The method -- the method of

6    disseminating information.

7            THE COURT:  And aren't procedural requirements

8    usually just about, like, how you interact with the agency?

9    If you're giving something to the agency and we change,

10   you're supposed to mail it to us, but now you can email it

11   to us.  It's not how you interact with the world.  Its not

12   the obligation that you have to do disclosure which is the

13   substance of the very rule that we're talking about.  I

14   mean, it's --

15           MS. WYER:  Well, it -- well, this is the -- there

16   is a distinction between, it seems like, something that

17   would just deprive -- take the information away entirely and

18   not make it available.  Here, the information is available.

19   The department hasn't changed that.  It -- I mean, the --

20           THE COURT:  All right.

21           MS. WYER:  So --

22           THE COURT:  I think I understand your point.  Tell

23   me -- I'm getting exhausted, because I'm trying to get my

24   mind around the arguments.  But is there any other

25   compelling reason why you think that this case on the merits

1   actually is not sustainable by the plaintiffs that we

2   haven't discussed?

3           MS. WYER:  Well, the -- of the three claims, I

4   think we've just addressed the first claim about the

5   disclosures.  I think we've addressed the AACS --

6   implementation of that decision.

7           THE COURT:  In your hierarchy, you say if I find

8   no final agency action, then it doesn't -- then none of the

9   claims --

10          MS. WYER:  No.

11          THE COURT:  -- survive?

12          MS. WYER:  No --

13          THE COURT:  No?

14          MS. WYER:  -- we are only making the final agency

15  action requirement -- argument with respect to the extension

16  of the disclosure --

17          THE COURT:  I see.

18          MS. WYER:  -- requirement.

19          THE COURT:  Okay.

20          MS. WYER:  So the AACS -- the implementation of

21  the AACS is a separate issue.  And there, the --

22          THE COURT:  Judge Contreras comes in.

23          MS. WYER:  The plaintiffs are raising both a

24  notice and comment claim and an arbitrary and capricious

25  claim and the -- we're saying the notice and comment was not

1    required because it does fall under the good-cause exception

2    of the -- of 553 --

3              THE COURT:  Plaintiffs said you had to say all

4    that in your little notices; that when you invoke good

5    cause, you have to say so specifically.  You have to point

6    out the reasons.  Did you do all that?

7              MS. WYER:  The notice does not mention the

8    good-cause exception.  The cases that we cited that say that

9    you don't require notice and comment when you're simply

10   implementing a judicial decision, I think some of them were

11   similar in that regard, but there's also the issue of

12   harmless error, and courts have found that the mere failure

13   to mention good cause is harmless error when there is a

14   basis --

15             THE COURT:  Even in a case where there's some

16   question as to whether or not the judicial decision is --

17   extends to what it is that the agency has actually done?  I

18   mean, I see the issue here as being a sort of -- at least

19   alleged mismatch between what the judicial decision requires

20   and what the agency did.

21             MS. WYER:  But that -- the latter seems to be more

22   of a -- the substantive challenge that the plaintiffs are

23   making.  If you want to say that the department was

24   arbitrary and capricious in the way that it implemented the

25   AACS decision, then that's the substantive challenge.  It's

1    not the notice and comment challenge.

2         THE COURT:  But to the extent that notice and

3    comment informs the agency's determination, I could see a

4    world in which good cause is narrow; that the good cause to

5    put out a rule that makes certain changes could be limited

6    to only the changes that the opinion requires and if the

7    agency goes beyond that, then we do have a notice and

8    comment principle -- or a problem because they didn't

9    explain, for example, why they went beyond it.  They didn't

10   show how going beyond it was necessary under these

11   circumstances to get away from notice and comment or

12   whatever.  I mean, don't you think that if you're going to

13   rely on an opinion to be the reason why you get around the

14   procedural rules, then the fit has to be pretty established?

15        MS. WYER:  I'm just not sure that that makes

16   sense, because then you would essentially have to address

17   the merits of the substantive argument before -- in order to

18   rule on the procedural argument, but even if you did -- even

19   if the Court did go through that process here, the -- I --

20   the AACS decision, the way the opinion is worded, it really

21   left the department no discretion in what it would do with

22   the alternate earnings appeals.  Judge Contreras said he was

23   issuing a limited ruling, but my understanding of what he

24   said is it was limited in that it was only -- he was only

25   going to address the alternate earnings appeals which he was

1     not going to say that the department's use of Social

2     Security Administration data in the first instance was

3     arbitrary and capricious.  He was going to leave that whole

4     part of the rule in place and the only thing he was going to

5     do something about was the alternate earnings appeals.  And

6     so he said that the -- and he did not even impose -- he did

7     not substitute his judgment for the department's.  He only

8     said that the threshold requirements that the AACS

9     plaintiffs had said were too burdensome would not be in

10    effect.  So -- and then he left it to the department to

11    decide what to do with that.  So --

12          THE COURT:  And so you think it's reasonable under

13    those circumstances where the judge intentionally leaves

14    alone portions of the -- of the scheme, albeit suggesting

15    that there may be some issues for the department to respond

16    to that by addressing the broader issues or at least some of

17    them without notice and comment?

18          MS. WYER:  Well, the department did not address

19    the use of Social Security Administration data.  I mean,

20    everything that Judge Contreras said he was going to leave

21    in place, the department also left in place.  The department

22    only implemented the AACS decision by making the exact

23    changes that Judge Contreras had ordered to the alternate --

24          THE COURT:  But with respect to all entities.  And

25    Judge Contreras specifically says, I'm doing this only for

1    AACS entities.  So there is a mismatch between the agency's

2    response and his actual order.

3            MS. WYER:  But not with his -- not with the

4    substance of his opinion, Your Honor, because any -- if the

5    department had limited its changes to the alternate earnings

6    appeals process only to AACS plaintiffs -- and first of all,

7    that would create a very difficult situation where the

8    different standards would apply to different schools and it

9    would also just leave the door wide open to any other

10   school.  It seems like every school that, then, wanted to

11   make this same challenge would have immediately gone in and

12   made the same argument and it would have prevailed under the

13   reasoning that Judge Contreras set forth in his opinion.

14   There was no -- the department was not really given any

15   discretion when you look at the substance.  It had no choice

16   unless it wanted to go through a repeated litigation for

17   every school.  And I don't think that's what is required to

18   invoke the good-cause exception when you're simply

19   implementing what a court has required.

20           THE COURT:  All right.  Anything else?

21           MS. WYER:  I just wanted to go back and address

22   the -- Count 3 of the plaintiff's challenge.

23           They disagree that the issue is moot because

24   they're pointing to the other list of tasks in the

25   regulation 668.405, but that is the kind of broader

1    programatic challenge that is precluded as a discreet agency

2    action.  In order for the Court to try to compel compliance

3    with that broad rule, even if you looked at it as mandatory

4    which, as Your Honor pointed out, it does not contain

5    mandatory language in the rule.  And what the rule seems to

6    be doing is simply giving notice because this process, as

7    the rule itself indicates, it's a back-and-forth process.

8    First, the department does something; then schools have the

9    opportunity to do something.  So what this rule --

10          THE COURT:  I understand, but you don't have the

11    kind of discreetness problem that I have dealt with in other

12    cases where you -- where there's nothing in the regulation

13    that talks about the steps and it just generally says,

14    Agency, you know, in your discretion, do this ultimate

15    thing.  This case has very -- this regulation has a number

16    of steps.  They're enumerated.  There's nothing not discreet

17    about the steps, I think; right?

18          MS. WYER:  Well --

19          THE COURT:  I mean, I can delineate, looking at

20    the regulation, the specific tasks that need to be done.

21          MS. WYER:  If you're looking at each task as a

22    discreet action, then in that case, the claim doesn't -- in

23    regard to any further -- any subsequent step appears to be

24    unripe, I suppose you would say, because now the department

25    has issued the draft GE completers list.  There's a set time

1    period for --

2              THE COURT:  Yes.  Yes.  I mean, yes; right?  Maybe

3    you have a ripeness problem, but you don't have a discreet

4    identification of what is supposed to be done problem.

5              MS. WYER:  Well, if you're looking at it step by

6    step; if you're looking at it as a whole, then it seems to

7    fall more under the broad programatic attack, because this

8    is the program of the D/E rate calculation.  And the problem

9    with judicial oversight of the whole program is that the

10   Court would have to insert itself in all these multiple

11   steps along the way.  So it -- regardless of how you look at

12   it, there's a problem.  Either the Court is having to insert

13   itself even before some of these steps are taken as a, kind

14   of, broad programatic oversight of what's going on or you're

15   -- the Court would be passing judgment on seeking to compel

16   based on the unreasonable delay --

17             THE COURT:  I find the latter more compelling.

18             MS. WYER:  Okay.  We can go with that.  So --

19             THE COURT:  All right.

20             (Laughter.)

21             MS. WYER:  Then it would be unripe for the Court

22   to say that the department has unreasonably delayed the

23   second step when the time has not passed even for it to do

24   that.

25             THE COURT:  All right.  Thank you.

1              MS. WYER:  Thank you, Your Honor.

2              THE COURT:  Mr. Fischer, I'll give you the last

3     word.  I hope it will be short.

4              MR. FISCHER:  Thank you, Your Honor.  I don't

5     think we have anything further.  So I --

6              THE COURT:  Oh, good.  Hooray.  We can all have

7     lunch.

8              MR. FISCHER:  So thank you for --

9              THE COURT:  Thank you.

10              MR. FISCHER:  -- the Court's indulgence.  I

11     appreciate it.

12              THE COURT:  Very interesting case.  I will take

13     the motions under advisement.

14              THE DEPUTY CLERK:  All rise.  Court stands

15     adjourned.

16              (Proceedings concluded at 12:54 p.m.).

17                 *  *  *  *  *  *  *  *  *  *  *

18              **<u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>**

19     **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

20     **that the above and foregoing constitutes a true and accurate**

21     **transcript of my stenographic notes and is a full, true and**

22     **complete transcript of the proceedings to the best of my**

23     **ability, dated this 16th day of May 2018.**

24                          **<u>/s/Timothy R. Miller, RPR, CRR, NJ-CCR</u>**
                             **Official Court Reporter**
25                           **United States Courthouse**
                             **Room 6722**

**333 Constitution Avenue, NW**
**Washington, DC 20001**

## /

**/s/Timothy** [1] - 115:24

## 1

**1** [1] - 1:4
**10** [2] - 76:9, 76:15
**10:00** [1] - 1:5
**127** [1] - 58:7
**12:54** [1] - 115:16
**1454** [1] - 58:8
**1600** [1] - 1:14
**16th** [1] - 115:23
**17-2139** [1] - 3:3
**19103** [1] - 1:15
**1923** [1] - 40:3
**1:17-cv-02139-KBJ** [1] - 1:3
**1st** [1] - 69:3, 102:16

## 2

**2** [2] - 76:8, 96:3
**20** [1] - 2:4
**200** [1] - 1:18
**20001** [4] - 1:23, 2:4, 2:9, 116:1
**2014** [1] - 87:8
**2017** [1] - 70:17
**2018** [4] - 1:4, 69:3, 102:16, 115:23
**202** [3] - 1:23, 2:5, 2:10
**21202** [1] - 1:19
**215** [1] - 1:16
**24(a** [1] - 57:7

## 3

**3** [1] - 112:22
**300** [1] - 1:15
**333** [2] - 2:9, 116:1
**34** [3] - 81:1, 90:16, 106:3
**354-3111** [1] - 2:10

## 4

**405(a** [1] - 82:7
**410** [1] - 1:19
**441** [1] - 1:22
**45** [3] - 65:5, 65:11, 67:19
**45-day** [1] - 64:19
**4th** [1] - 1:22

## 5

**553** [1] - 109:2
**560-2171** [1] - 1:16
**576-6585** [1] - 1:19

## 6

**60** [1] - 74:16
**600-S** [1] - 1:22
**600.9** [1] - 90:17
**616-8475** [1] - 2:5
**66** [1] - 81:1
**66.405** [1] - 82:7
**668** [1] - 82:7
**668.405** [2] - 81:1, 112:25
**668.412** [1] - 106:3
**6722** [2] - 2:8, 115:25

## 7

**741-5226** [1] - 1:23

## 8

**800** [2] - 12:4, 19:13

## A

**a.m** [1] - 1:5
**AACS** [27] - 6:19, 72:8, 73:10, 74:15, 75:5, 75:11, 76:24, 78:2, 78:15, 94:8, 94:22, 95:3, 95:12, 96:5, 96:9, 97:3, 97:16, 106:12, 108:5, 108:20, 108:21, 109:25, 110:20, 111:8, 111:22, 112:1, 112:6
**ability** [9] - 46:9, 46:11, 46:16, 61:2, 62:2, 62:4, 89:5, 93:11, 115:23
**able** [6] - 5:1, 15:15, 17:13, 36:23, 44:17, 60:3
**absent** [1] - 45:22
**abstract** [1] - 91:15
**abuse** [1] - 7:12
**accepted** [1] - 12:9
**Access** [1] - 68:11
**accommodate** [1] - 44:3
**account** [2] - 81:11, 81:16
**accredit** [2] - 55:10, 56:23

**accreditation** [1] - 13:19
**accredited** [2] - 9:12, 55:12
**Accrediting** [1] - 54:10
**accrediting** [4] - 8:5, 54:13, 56:22
**accurate** [1] - 115:20
**ACICS** [2] - 55:10, 55:12
**acknowledge** [2] - 38:16, 67:6
**acknowledged** [2] - 7:22, 29:8
**act** [9] - 8:15, 26:11, 26:13, 39:7, 62:5, 78:22, 85:15, 85:23, 85:24
**Act** [14] - 4:15, 6:22, 8:2, 9:9, 12:25, 34:6, 34:9, 39:16, 39:20, 47:1, 50:3, 50:6, 59:14, 83:25
**acted** [2] - 64:5, 96:17
**acting** [4] - 50:21, 51:4, 51:13
**action** [58] - 4:13, 10:17, 13:10, 14:12, 15:22, 16:3, 16:11, 25:21, 28:23, 31:6, 37:24, 38:5, 40:18, 46:10, 52:22, 63:15, 64:4, 69:8, 69:14, 70:6, 83:9, 83:16, 85:9, 90:25, 93:6, 93:7, 93:8, 93:17, 98:21, 99:12, 99:21, 99:24, 100:1, 100:5, 100:21, 100:22, 100:25, 101:2, 101:4, 101:6, 101:10, 101:12, 101:16, 102:13, 102:16, 102:19, 103:15, 103:18, 103:23, 105:6, 105:8, 105:12, 105:15, 108:8, 108:15, 113:2, 113:22
**actions** [8] - 11:3, 15:11, 31:11, 47:8, 64:7, 64:9, 87:1, 87:10
**active** [4] - 38:13, 38:20, 38:23, 48:7
**actively** [1] - 11:13
**activities** [1] - 35:13
**activity** [2] - 8:18, 8:22

**actual** [6] - 24:12, 32:18, 41:25, 53:21, 101:7, 112:2
**addition** [3] - 9:9, 27:10, 49:9
**additional** [7] - 8:17, 15:10, 17:3, 27:9, 38:17, 50:12, 76:21
**address** [12] - 8:22, 13:1, 14:12, 26:22, 27:2, 41:3, 62:2, 98:20, 110:16, 110:25, 111:18, 112:21
**addressed** [4] - 41:19, 94:22, 108:4, 108:5
**addressing** [2] - 66:19, 111:16
**adequately** [1] - 57:9
**adjourned** [1] - 115:15
**adjudicate** [1] - 91:13
**administration** [2] - 62:16, 62:25
**Administration** [3] - 65:13, 111:2, 111:19
**Administration's** [1] - 96:16
**Administrative** [1] - 4:15
**administrative** [1] - 103:10
**adopted** [2] - 59:22, 61:24
**advisement** [1] - 115:13
**advisory** [3] - 66:5, 66:10, 66:13
**affect** [2] - 38:6, 90:21
**affected** [3] - 35:24, 46:9, 99:2
**affects** [1] - 100:8
**affidavit** [1] - 23:6
**affidavits** [1] - 19:10
**affirmatively** [2] - 52:1, 81:21
**affirmed** [2] - 16:18, 16:19
**afield** [1] - 53:4
**agencies** [1] - 8:5
**agency** [79] - 23:22, 28:22, 31:6, 37:25, 38:5, 38:6, 47:8, 54:13, 54:14, 56:22, 64:3, 70:1, 70:6, 70:21, 73:24, 81:9, 87:1, 93:7, 93:12, 93:23, 94:1, 94:5, 94:22, 95:1, 95:7, 95:9, 95:10, 95:15, 95:20, 95:25, 98:15,

98:21, 99:8, 99:11, 99:16, 99:21, 99:22, 99:24, 100:1, 100:4, 100:13, 100:15, 100:17, 100:18, 100:20, 100:22, 100:25, 101:2, 101:3, 101:4, 101:8, 101:10, 101:12, 101:16, 101:18, 102:13, 102:15, 102:17, 102:19, 103:5, 103:13, 103:15, 103:17, 103:18, 103:23, 105:6, 105:8, 105:11, 105:14, 105:23, 107:8, 107:9, 108:8, 108:14, 109:17, 109:20, 110:7, 113:1, 113:14
**agency's** [6] - 25:20, 98:17, 104:14, 105:19, 110:3, 112:1
**aggrieved** [3] - 30:18, 31:6, 63:4
**agree** [6] - 57:15, 57:18, 57:20, 57:24, 83:23, 85:2
**ahead** [1] - 25:19
**aid** [4] - 15:14, 16:4, 61:21, 89:12
**aided** [1] - 2:12
**air** [2] - 92:7, 92:15
**Air** [1] - 12:25
**al** [4] - 1:2, 1:7, 3:3, 3:4
**albeit** [1] - 111:14
**allegations** [1] - 53:17
**allege** [1] - 43:3
**alleged** [2] - 86:6, 109:19
**allegedly** [2] - 27:2, 41:16
**alleging** [2] - 42:7, 83:9
**Allen** [1] - 29:25
**allocated** [1] - 87:14
**allow** [3] - 23:21, 73:5, 75:24
**allowed** [4] - 16:22, 17:4, 30:23, 55:10
**allowing** [2] - 32:22, 53:6
**allows** [1] - 84:20, 93:25
**almost** [3] - 26:24, 38:6, 76:8
**alone** [1] - 111:14

alternate [8] - 67:25,
95:14, 97:12,
110:22, 110:25,
111:5, 111:23, 112:5
alternative [4] - 27:17,
27:21, 31:25, 43:15
American [2] - 52:20,
73:12
amicus [1] - 68:10
amount [3] - 65:12,
97:7, 97:8
amounts [1] - 10:3
analogous [3] - 12:24,
16:16, 26:18, 60:23,
83:14
analogy [1] - 31:17
analyses [1] - 17:20
analysis [34] - 7:25,
14:8, 17:6, 25:12,
28:9, 29:8, 31:21,
31:24, 32:16, 34:12,
35:8, 35:14, 36:5,
36:9, 37:21, 38:8,
38:11, 41:10, 48:11,
49:11, 49:25, 52:5,
52:8, 55:22, 55:23,
56:2, 57:16, 58:2,
85:3, 86:22, 87:3,
89:18, 99:25, 103:16
analytical [1] - 50:11
analyze [2] - 43:12,
87:3
analyzed [3] - 40:19,
43:13, 97:21
analyzes [1] - 76:25
animal [2] - 60:8,
88:17
announced [2] -
70:25, 88:11
announcement [4] -
12:8, 17:9, 69:4,
92:21
announces [2] - 24:6,
92:21
announcing [1] -
35:22
annual [2] - 65:17,
102:7
annually [2] - 67:10,
67:11
anticipate [1] - 67:18
anticipated [1] - 87:18
anyway [1] - 28:14
APA [28] - 4:20, 6:9,
23:21, 25:8, 31:5,
31:11, 34:4, 34:9,
34:12, 40:18, 47:4,
47:5, 47:21, 50:16,
50:18, 58:19, 62:23,
70:11, 70:14, 75:17,

75:24, 77:18, 80:20,
93:5, 93:7, 93:9,
100:6, 105:11
apologize [2] - 18:15,
56:10
apparent [1] - 42:23
appeal [9] - 67:25,
72:2, 74:1, 75:4,
75:22, 77:2, 78:1,
81:3, 95:14
appeals [7] - 72:3,
76:2, 78:4, 110:22,
110:25, 111:5, 112:6
appear [1] - 63:20,
94:12
APPEARANCES [2] -
1:12, 2:1
appearances [1] -
3:12
applicants [1] - 19:17
applied [1] - 97:4
applies [4] - 46:8,
70:4, 71:21, 103:22
apply [8] - 29:2, 38:10,
47:11, 70:4, 96:6,
97:10, 97:12, 112:8
applying [1] - 97:18
appreciate [3] - 87:17,
90:5, 115:11
appreciating [1] -
10:11
approach [3] - 3:11,
98:22, 100:10
appropriate [3] -
30:14, 36:2, 37:23
appropriates [2] -
24:4, 24:5
appropriations [1] -
39:16
arbitrarily [2] - 64:5,
96:17
arbitrariness [1] -
105:9
arbitrary [9] - 74:7,
74:10, 78:10, 87:2,
95:23, 96:15,
108:24, 109:24,
111:3
Arch [1] - 1:14
area [15] - 7:21, 7:25,
9:24, 32:9, 37:1,
37:22, 39:18, 40:7,
48:7, 60:7, 62:9,
83:12, 84:1, 84:10,
84:18
areas [2] - 84:11,
86:16
arguably [2] - 34:5,
36:5
argue [2] - 6:1, 12:24

argued [3] - 13:6,
16:20, 58:24
arguing [5] - 5:9, 5:11,
13:13, 27:10, 58:22,
73:13
argument [29] - 5:6,
5:17, 5:18, 8:25,
10:6, 16:24, 21:20,
26:7, 42:11, 44:8,
44:20, 45:2, 47:22,
52:2, 57:6, 61:16,
73:7, 86:20, 89:3,
89:9, 89:16, 90:4,
100:22, 103:22,
105:7, 108:15,
110:17, 110:18,
112:12
arguments [7] - 4:18,
4:21, 52:17, 52:18,
77:25, 85:10, 107:24
arise [1] - 41:24
arises [1] - 86:4
Arizona [1] - 106:17
arms [1] - 63:24
array [1] - 48:17
Article [15] - 14:7,
21:18, 27:20, 29:10,
30:5, 31:17, 31:19,
32:12, 32:16, 32:18,
32:20, 45:7, 56:1,
56:4, 89:14
articulated [1] - 18:14
articulating [1] - 31:15
assert [5] - 39:6,
46:17, 47:15, 51:18,
52:6
asserted [2] - 39:24,
87:4
asserting [5] - 38:18,
41:14, 51:14, 51:15,
90:12
assertion [1] - 43:8
assertions [1] - 53:16
assessing [1] - 10:22
Association [1] -
73:12
assume [4] - 47:7,
50:12, 85:2, 100:21
assuming [5] - 6:7,
70:3, 70:4, 81:24,
101:4
attack [1] - 114:7
attempting [2] - 40:16,
47:15
attend [5] - 7:10, 7:17,
15:14, 19:6, 43:17
attention [2] - 54:5,
58:4
Attorney [2] - 16:9,
61:1

ATTORNEY [3] - 1:13,
1:17, 1:21
attorneys [1] - 36:1
attributing [1] - 62:24
audio [1] - 3:5
authorities [2] - 9:10,
57:9
authority [18] - 13:11,
13:12, 13:14, 13:16,
13:20, 14:2, 28:24,
37:21, 62:9, 62:10,
62:14, 67:2, 83:12,
84:1, 84:12, 91:2,
91:7, 102:22
authorization [1] -
90:19
authorize [1] - 90:17
authorized [1] - 17:1
authorizing [1] - 34:12
available [5] - 19:20,
43:18, 104:25,
107:18
Avenue [2] - 2:4, 2:9,
116:1
average [1] - 96:15
aware [2] - 91:23,
101:2

## B

back-and-forth [1] -
113:7
backdrop [1] - 70:24
background [2] -
4:22, 8:13
backward [2] - 59:16,
60:5
backward-looking
- 59:16, 60:5
bad [2] - 38:13, 88:20
Baltimore [1] - 1:19
banks [1] - 48:18
based [14] - 11:2,
18:24, 26:25, 39:23,
43:19, 49:19, 55:16,
64:13, 64:21, 74:14,
97:6, 103:21, 114:16
baseline [6] - 10:22,
11:10, 11:12, 11:17,
11:21
basis [19] - 6:25,
17:23, 24:4, 24:8,
25:8, 27:18, 27:21,
31:13, 32:2, 44:11,
51:7, 56:5, 62:12,
65:17, 74:2, 78:5,
78:17, 92:8, 109:14
bated [1] - 24:10
BEFORE [1] - 1:10
began [1] - 64:20

begin [3] - 25:25,
53:18, 70:5
beginning [1] - 29:21
behalf [6] - 3:20, 3:24,
36:24, 48:6, 51:4,
73:13
behind [2] - 65:9,
67:12
believes [2] - 72:11,
72:18
below [4] - 30:17,
30:23, 61:12, 88:13
benefit [5] - 12:13,
14:17, 14:20, 14:25,
87:8, 87:11, 87:18,
87:19, 87:22
Benjamin [1] - 1:20,
3:23
Berman [2] - 2:2, 4:7
best [1] - 115:22
Betsy [1] - 54:11
better [1] - 25:24
between [24] - 26:24,
38:1, 42:24, 48:25,
72:6, 87:17, 101:17,
101:22, 107:16,
109:19, 112:1
beyond [4] - 74:12,
75:7, 75:20, 75:23,
78:8, 94:21, 95:2,
95:25, 97:3, 100:24,
110:7, 110:9, 110:10
big [1] - 44:24
bigger [1] - 59:5
binding [1] - 91:3
Biological [1] - 24:18
bit [6] - 44:7, 52:3,
62:3, 64:10, 73:7,
82:5
blanket [1] - 11:5,
77:1
board [4] - 36:18,
74:1, 96:24, 97:4
books [1] - 62:17
borrower [1] - 70:19
bother [1] - 106:20
break [2] - 76:8
breath [1] - 24:10
brief [8] - 28:20,
48:14, 52:19, 68:10,
69:4, 76:16, 102:3,
102:4
Brief [2] - 29:12, 98:8
briefing [1] - 88:25
bring [25] - 7:19,
15:11, 16:11, 18:10,
28:23, 30:18, 31:10,
36:23, 37:5, 37:24,
46:10, 47:5, 47:13,
47:20, 47:23, 54:5,

56:3, 63:13, 65:19, 75:20, 85:17, 85:19, 86:10, 86:14
**bringing** [4] - 17:24, 48:5, 56:5, 62:5
**broad** [8] - 31:4, 36:17, 48:17, 73:24, 84:13, 113:3, 114:7, 114:14
**broader** [5] - 37:8, 77:22, 87:2, 111:16, 112:25
**broadly** [2] - 35:9, 64:8
**brought** [3] - 5:22, 31:14, 87:10
**budget** [1] - 24:5
**burden** [4] - 10:16, 10:21, 106:21
**burdened** [1] - 43:14
**burdens** [3] - 103:8, 106:14, 106:15
**burdensome** [2] - 106:24, 111:9
**Bureau** [1] - 40:16
**business** [2] - 8:20, 45:5
**but-for** [1] - 25:15

**C**

**C.F.R** [3] - 81:1, 90:16, 106:3
**CA** [1] - 1:3
**calculate** [3] - 61:11, 64:14, 79:1
**calculated** [2] - 12:3, 73:14
**calculates** [1] - 79:19
**calculation** [4] - 81:2, 104:7, 105:5, 114:8
**calculations** [5] - 65:2, 65:23, 67:7, 67:14, 77:12
**California** [1] - 3:7
**candid** [1] - 84:14
**cannot** [11] - 23:12, 52:6, 58:10, 58:12, 59:6, 60:21, 67:7, 70:21, 83:12, 84:1, 84:17
**capacity** [1] - 43:22
**capricious** [9] - 74:7, 74:10, 78:10, 87:2, 95:24, 96:15, 108:24, 109:24, 111:3
**capriciously** [2] - 64:5, 96:18
**care** [4] - 32:20, 33:6,

50:5, 76:24
**careful** [3] - 73:10, 74:6, 78:6
**carefully** [2] - 26:17, 95:21
**Carolina** [1] - 3:9
**carry** [4] - 6:15, 24:15, 74:20, 88:14
**carrying** [3] - 6:21, 65:25, 106:23
**carve** [2] - 92:10, 97:11
**case** [86] - 4:16, 5:22, 5:24, 6:12, 13:3, 15:2, 15:9, 16:16, 16:20, 22:4, 23:1, 23:7, 23:9, 24:17, 24:18, 25:6, 26:4, 26:19, 28:18, 29:8, 29:15, 30:12, 32:25, 37:8, 37:24, 39:14, 39:23, 39:25, 40:2, 40:3, 40:6, 40:8, 40:11, 40:16, 41:3, 41:7, 45:18, 46:20, 46:23, 47:6, 49:7, 49:15, 50:2, 50:18, 52:4, 52:5, 52:20, 53:1, 54:8, 54:11, 56:18, 56:22, 57:21, 58:4, 58:5, 60:13, 70:19, 73:10, 73:11, 74:15, 78:4, 79:18, 86:21, 91:6, 91:11, 91:12, 92:13, 93:14, 94:8, 94:24, 95:5, 95:12, 100:3, 101:2, 101:12, 103:21, 106:17, 107:25, 109:15, 113:15, 113:22, 115:12
**Case** [1] - 3:2
**case-by-case** [1] - 78:4
**cases** [21] - 8:19, 21:18, 25:4, 29:9, 37:1, 41:23, 52:21, 74:16, 80:9, 80:18, 88:8, 91:25, 92:4, 92:5, 93:15, 100:25, 103:2, 103:22, 109:8, 113:12
**categories** [4] - 36:1, 52:21, 52:24, 53:1
**causation** [5] - 25:18, 32:17, 32:19, 33:9, 53:9
**caused** [4] - 27:6, 63:15, 94:9, 95:6
**causes** [1] - 101:20

**CCR** [3] - 2:7, 115:19, 115:24
**ceded** [1] - 15:4
**Center** [2] - 48:13, 49:14
**certain** [26] - 15:4, 15:6, 16:22, 39:20, 49:4, 58:10, 60:12, 61:5, 63:8, 63:14, 65:23, 66:11, 67:9, 73:16, 75:4, 78:23, 80:8, 81:5, 85:24, 95:3, 100:12, 100:14, 100:15, 104:15, 106:1, 110:5
**certainly** [17] - 4:21, 9:7, 31:10, 35:20, 53:6, 53:7, 54:21, 57:22, 60:15, 64:1, 71:2, 74:13, 76:5, 78:11, 84:8, 89:24, 96:2
**certainty** [1] - 21:19
**CERTIFICATE** [1] - 115:18
**certify** [1] - 115:19
**challenge** [18] - 16:21, 17:11, 25:9, 39:15, 40:16, 40:19, 75:21, 81:4, 83:17, 87:1, 96:4, 104:20, 109:22, 109:25, 110:1, 112:11, 112:22, 113:1
**challenged** [7] - 6:15, 7:22, 7:23, 34:13, 52:22, 70:10, 100:6
**challenges** [1] - 81:1
**challenging** [5] - 25:22, 35:7, 38:1, 64:8, 94:18
**change** [27] - 13:1, 13:7, 13:9, 14:12, 15:7, 16:12, 16:13, 18:1, 25:1, 26:8, 40:21, 71:17, 72:7, 74:21, 78:11, 84:16, 88:16, 92:1, 92:9, 92:15, 93:25, 95:22, 100:8, 103:14, 105:17, 106:7, 107:9
**changed** [3] - 64:10, 100:17, 107:19
**changes** [9] - 17:25, 24:2, 94:3, 94:12, 96:23, 110:5, 110:6, 111:23, 112:5
**changing** [5] - 56:19, 69:19, 101:25, 102:2, 104:2

**charge** [1] - 91:8
**children** [2] - 50:4, 50:9
**chimps** [2] - 24:19, 24:20
**China** [1] - 58:12
**choice** [2] - 62:22, 112:15
**choices** [2] - 16:6, 33:22
**choose** [1] - 19:7
**chose** [2] - 23:10, 105:23
**Christopher** [2] - 1:17, 3:19
**circuit** [2] - 18:12, 70:12
**Circuit** [10] - 7:4, 16:18, 17:5, 17:17, 28:19, 29:7, 30:19, 54:15, 56:11, 86:19
**circuits** [1] - 17:19
**circumstance** [2] - 56:7, 70:5
**circumstances** [6] - 46:9, 56:19, 58:13, 84:21, 110:11, 111:13
**cite** [2] - 28:19, 46:19
**cited** [2] - 48:13, 109:8
**cites** [2] - 28:20, 93:16
**citing** [1] - 29:25
**Citizen** [1] - 68:12
**Citizens** [1] - 24:18
**citizens** [17] - 12:18, 26:2, 36:10, 36:21, 37:15, 37:17, 37:19, 38:6, 38:7, 39:24, 46:9, 47:16, 48:6, 50:22, 51:4, 51:16, 51:19
**CIVIL** [2] - 1:14, 2:3
**Civil** [1] - 3:2
**claim** [36] - 17:24, 19:11, 22:9, 25:8, 39:7, 44:17, 47:13, 47:21, 50:16, 56:4, 56:5, 56:19, 62:13, 64:10, 64:24, 64:25, 65:1, 65:14, 65:19, 66:18, 78:21, 78:22, 86:6, 93:4, 93:9, 93:14, 93:17, 93:18, 93:20, 98:19, 104:19, 105:11, 108:4, 108:24, 108:25, 113:22
**claiming** [3] - 17:24, 24:8, 94:5
**claims** [10] - 4:20,

5:22, 37:5, 37:6, 38:18, 47:5, 67:22, 67:23, 108:3, 108:9
**clarifying** [1] - 5:2
**Clean** [1] - 12:25
**clear** [21] - 4:17, 8:2, 8:13, 15:12, 17:20, 20:6, 24:14, 25:10, 34:18, 37:1, 38:15, 46:8, 56:5, 63:12, 64:8, 67:3, 71:22, 78:14, 88:3, 96:8, 98:6
**clearly** [8] - 29:10, 33:1, 34:22, 36:2, 48:2, 53:4, 71:10, 78:17
**CLERK** [3] - 3:2, 76:14, 115:14
**climate** [10] - 13:1, 13:7, 13:9, 14:12, 15:6, 26:8, 88:16, 92:1, 92:9, 92:15
**clock** [1] - 70:22
**close** [1] - 60:10
**closed** [2] - 12:8, 12:14
**closer** [1] - 62:3
**co** [3] - 34:21, 34:25, 35:5
**co-regulator** [1] - 35:5
**co-regulators** [2] - 34:21, 34:25
**coastal** [2] - 92:13, 92:14
**coastline** [5] - 13:7, 14:18, 26:10, 26:11, 26:15
**cognizable** [4] - 41:21, 44:18, 45:6, 56:13
**collateral** [6] - 41:16, 41:19, 42:2, 42:9, 45:9
**collateral"** [1] - 41:23
**colleagues** [1] - 40:23
**collect** [1] - 61:8
**College** [1] - 68:11
**Colleges** [1] - 54:11
**colleges** [13] - 7:11, 8:3, 8:7, 8:18, 8:19, 9:12, 9:25, 11:4, 11:6, 13:15, 15:15, 19:7
**Collyer** [3] - 40:24, 41:2, 46:22
**Collyer's** [1] - 40:13
**Columbia** [2] - 3:24, 4:1
**COLUMBIA** [1] - 1:1

**coming** [5] - 21:25, 43:1, 86:23, 89:1, 102:16
**commands** [1] - 80:23
**comment** [29] - 64:3, 69:7, 69:12, 69:14, 69:16, 69:24, 70:1, 71:18, 75:14, 75:16, 75:25, 76:1, 78:12, 78:14, 96:23, 97:19, 100:5, 100:23, 105:7, 105:12, 105:15, 108:24, 108:25, 109:9, 110:1, 110:3, 110:8, 110:11, 111:17
**comments** [1] - 75:1
**common** [1] - 19:13
**Commonwealth** [4] - 3:6, 3:14, 5:11
**companies** [1] - 103:8
**compare** [1] - 103:2
**comparing** [1] - 76:23
**compel** [3] - 93:7, 113:2, 114:15
**compelling** [3] - 42:13, 107:25, 114:17
**competing** [1] - 44:22
**competition** [2] - 42:24, 44:23
**competitive** [3] - 42:12, 44:9, 44:10
**competitively** [1] - 20:19
**competitors** [2] - 42:14, 42:16
**complained** [1] - 106:14
**complaint** [1] - 64:11
**complete** [1] - 115:22
**completely** [3] - 72:8, 81:7, 83:14
**completers** [8] - 64:13, 64:16, 64:18, 65:1, 65:4, 92:22, 104:9, 113:25
**completing** [1] - 94:9
**complex** [1] - 4:15
**compliance** [3] - 97:9, 99:13, 113:2
**complicated** [3] - 28:25, 29:1, 52:4
**comply** [2] - 68:23, 77:19
**complying** [4] - 18:20, 18:22, 69:14, 78:13
**component** [3] - 29:17, 29:24, 30:1
**components** [1] - 56:1

**computer** [1] - 2:12
**computer-aided** [1] - 2:12
**concede** [3] - 37:1, 57:25, 94:13
**conceding** [1] - 105:24
**conceive** [1] - 47:20
**concept** [2] - 11:9, 28:15
**concepts** [1] - 85:16
**concern** [6] - 38:8, 39:19, 66:1, 73:25, 74:8, 83:7
**concerned** [7] - 6:5, 8:25, 14:22, 38:22, 54:12, 83:15, 84:17
**concerns** [3] - 37:22, 38:12, 74:19
**concluded** [5] - 40:20, 49:17, 55:4, 97:2, 115:16
**conclusion** [1] - 99:18
**conduct** [5] - 25:20, 26:4, 33:3, 52:22, 52:23
**confer** [1] - 48:21
**conference** [1] - 3:5
**conflated** [1] - 48:10
**conflating** [1] - 50:20
**confused** [2] - 25:4, 101:6
**confusing** [2] - 11:9, 50:19
**Congress** [5] - 24:3, 24:5, 30:2, 30:10, 58:17
**Connecticut** [1] - 3:7
**connection** [1] - 19:23
**connects** [1] - 17:22
**consider** [5] - 51:2, 81:5, 81:6, 102:4, 106:11
**consideration** [1] - 103:25
**considered** [5] - 51:20, 77:22, 101:14, 102:13, 104:2
**considering** [2] - 100:19, 104:15
**consistent** [1] - 79:8
**constitutes** [2] - 70:13, 115:20
**Constitution** [2] - 2:9, 116:1
**constitution** [1] - 84:20
**constitutional** [5] - 8:9, 8:12, 29:17,

29:25, 67:2
**CONSUMER** [2] - 1:18, 1:21
**consumer** [10] - 9:6, 9:8, 9:17, 11:14, 13:18, 53:3, 53:8, 83:13, 84:2, 86:11
**Consumer** [1] - 59:14
**contain** [1] - 113:4
**contained** [1] - 69:5
**contemplated** [1] - 51:23
**content** [1] - 106:7
**contention** [1] - 63:17
**contentions** [1] - 6:9
**context** [10] - 14:5, 14:7, 31:24, 55:23, 56:6, 83:19, 88:9, 90:16, 90:25, 104:21
**continue** [5] - 25:1, 26:9, 26:10, 67:15, 102:20
**CONTINUED** [1] - 2:1
**continued** [1] - 12:10
**continues** [1] - 58:18
**continuing** [2] - 11:18, 13:10
**continuum** [2] - 102:10, 102:11
**contradicted** [1] - 43:9
**contradictory** [1] - 85:16
**Contreras** [11] - 73:7, 73:9, 74:6, 77:21, 97:13, 108:22, 110:22, 111:20, 111:23, 111:25, 112:13
**Contreras's** [8] - 71:24, 72:7, 75:8, 76:24, 96:7, 97:22, 98:1, 98:16
**control** [1] - 90:13
**controlling** [1] - 90:22
**controversy** [1] - 66:14
**conversation** [1] - 87:21
**copies** [1] - 54:7
**copy** [1] - 92:21
**core** [2] - 29:17, 29:24
**cosmetologists** [1] - 75:6
**Cosmetology** [1] - 73:12
**cosmetology** [1] - 74:12
**cost** [1] - 83:23
**couch** [1] - 63:6

**Council** [1] - 54:10
**counsel** [7] - 3:11, 4:6, 5:7, 5:8, 6:9, 40:7, 48:16
**Counsel** [3] - 28:21, 31:18, 46:24
**counsel's** [1] - 41:6
**Count** [2] - 96:3, 112:22
**count** [1] - 104:18
**country** [2] - 17:2, 17:4
**counts** [3] - 96:3, 100:4, 104:5
**couple** [1] - 83:5
**course** [5] - 4:24, 12:13, 19:3, 43:8, 98:16
**COURT** [271] - 1:1, 3:16, 3:18, 3:22, 3:25, 4:3, 4:9, 5:12, 5:15, 5:19, 7:18, 8:8, 8:23, 9:13, 10:5, 10:8, 10:11, 11:8, 11:23, 12:1, 12:6, 12:13, 13:2, 13:13, 14:4, 14:16, 14:20, 15:8, 15:18, 15:24, 16:1, 17:7, 17:15, 18:7, 18:17, 19:1, 19:9, 19:16, 19:21, 20:10, 21:9, 21:11, 21:17, 22:16, 22:25, 23:13, 23:23, 24:19, 24:21, 24:23, 25:3, 25:16, 26:16, 27:12, 27:15, 27:17, 27:20, 27:22, 28:13, 28:17, 28:25, 29:6, 29:19, 30:8, 30:20, 30:25, 31:2, 31:7, 31:13, 31:22, 32:2, 32:4, 32:15, 33:4, 33:13, 33:25, 34:8, 34:14, 34:25, 35:5, 36:7, 36:19, 37:11, 38:4, 38:19, 39:5, 39:8, 39:11, 40:2, 40:4, 40:23, 41:1, 41:6, 41:9, 41:12, 41:22, 42:11, 42:25, 43:24, 44:2, 44:4, 44:6, 44:21, 45:14, 45:24, 46:5, 47:3, 47:18, 49:2, 50:10, 50:19, 51:22, 52:2, 52:10, 52:14, 52:16, 52:19, 53:11, 53:23, 54:18, 54:24, 55:14, 55:20, 55:25, 56:16, 57:11,

57:13, 57:17, 57:24, 58:2, 58:20, 59:4, 59:10, 59:13, 59:22, 60:24, 61:7, 61:20, 62:12, 63:2, 64:2, 64:24, 65:4, 65:7, 65:14, 65:18, 66:2, 66:4, 66:12, 66:20, 66:24, 67:9, 67:17, 68:18, 68:25, 69:7, 69:11, 69:17, 70:3, 71:1, 71:3, 71:11, 71:15, 71:24, 72:1, 72:4, 72:16, 73:6, 73:22, 74:11, 75:13, 75:18, 76:6, 76:13, 76:17, 76:20, 77:4, 77:14, 78:25, 79:3, 79:7, 79:11, 79:14, 79:22, 79:24, 80:14, 80:24, 81:8, 81:14, 81:19, 81:23, 82:11, 82:13, 82:16, 82:18, 83:1, 83:3, 83:18, 84:4, 84:19, 85:1, 85:7, 86:1, 86:4, 86:8, 86:17, 86:19, 87:16, 88:16, 88:25, 90:3, 90:23, 91:19, 91:24, 92:9, 92:17, 92:23, 93:1, 93:4, 93:10, 93:19, 94:11, 94:20, 95:19, 96:22, 97:13, 97:24, 98:3, 98:11, 99:3, 99:15, 100:7, 101:5, 101:15, 101:17, 102:4, 102:7, 102:15, 103:4, 104:12, 105:6, 105:17, 105:21, 106:18, 107:3, 107:7, 107:20, 107:22, 108:7, 108:11, 108:13, 108:17, 108:19, 108:22, 109:3, 109:15, 110:2, 111:12, 111:24, 112:20, 113:10, 113:19, 114:2, 114:17, 114:19, 114:25, 115:2, 115:6, 115:9, 115:12, 115:18
**Court** [25] - 2:7, 2:8, 15:3, 16:17, 16:19, 26:6, 26:11, 29:17, 29:24, 39:22, 39:25, 40:5, 40:8, 41:18, 45:10, 45:17, 51:2,

54:7, 57:6, 76:14,
79:15, 114:15,
114:21, 115:14,
115:24
**court** [26] - 6:18,
16:10, 16:19, 18:13,
26:7, 31:7, 38:14,
40:19, 49:17, 49:19,
60:3, 67:18, 75:21,
76:7, 78:7, 89:21,
91:11, 91:12, 96:11,
96:13, 102:21,
110:19, 112:19,
113:2, 114:10,
114:12
**Court's** [3] - 54:5,
58:4, 115:10
**Courthouse** [2] - 2:8,
115:25
**courts** [17] - 7:4, 30:2,
31:11, 36:25, 42:12,
49:11, 49:25, 52:6,
52:24, 70:8, 71:22,
79:12, 84:25, 98:22,
101:14, 102:12,
109:12
**cover** [1] - 23:24
**create** [3] - 17:11,
38:8, 112:7
**created** [1] - 86:12
**credit** [1] - 7:7
**credit-destroying** [1] -
7:7
**crippling** [1] - 7:7
**critical** [1] - 68:2
**cross** [2] - 4:14, 30:21
**cross-motions** [1] -
4:14
**cross-reference** [1] -
30:21
**CRR** [3] - 2:7, 115:19,
115:24
**crux** [2] - 89:3, 89:9
**crystal** [1] - 37:1
**Ct** [1] - 58:8
**current** [3] - 71:7,
71:8, 104:4
**cut** [1] - 76:17
**cuts** [1] - 52:11

# D

**D.C** [10] - 1:4, 7:4,
17:17, 28:19, 29:7,
30:18, 54:15, 56:11,
70:12, 86:19
**D/E** [11] - 65:22, 67:7,
77:8, 79:20, 82:8,
94:10, 104:6, 104:8,
105:4, 114:8

**damage** [1] - 13:4
**DAPA** [2] - 16:22,
17:10
**data** [7] - 19:20, 65:13,
73:19, 77:8, 96:16,
111:2, 111:19
**date** [11] - 65:23,
66:10, 67:9, 100:14,
100:15, 100:16,
101:19, 101:21,
102:25, 103:7, 106:1
**dated** [1] - 115:23
**dates** [1] - 29:9
**days** [4] - 65:5, 65:11,
67:20, 95:13
**DC** [4] - 1:23, 2:4, 2:9,
116:1
**deadline** [22] - 68:23,
69:2, 70:7, 70:16,
70:21, 72:7, 95:13,
95:18, 95:20, 95:22,
99:14, 99:15, 99:16,
99:17, 99:18, 99:20,
100:4, 100:20,
101:7, 101:8,
102:20, 103:1
**deadlines** [2] - 99:23,
100:11
**deal** [2] - 32:17, 95:11
**dealing** [2] - 70:19,
98:23
**deals** [1] - 78:21
**dealt** [1] - 113:11
**debt** [11] - 7:7, 10:3,
12:2, 23:4, 44:15,
61:9, 61:11, 64:14,
65:3, 79:1, 81:2
**debt-to-earning** [1] -
79:1
**debt-to-earnings** [6] -
12:2, 23:4, 61:9,
61:11, 64:14, 65:3
**decades** [1] - 57:23
**decent** [1] - 93:21
**decide** [3] - 52:12,
105:14, 111:11
**decided** [5] - 25:8,
59:24, 88:8, 98:4,
99:20
**decides** [5] - 63:5,
81:25, 100:16,
102:17
**decision** [54] - 6:19,
9:14, 16:7, 16:14,
17:8, 18:2, 18:22,
24:17, 25:10, 26:17,
28:7, 28:8, 28:19,
28:21, 32:11, 40:20,
40:21, 46:24, 48:13,
54:5, 54:12, 55:3,

55:6, 55:9, 55:15,
56:6, 56:11, 59:8,
62:21, 63:1, 73:11,
74:14, 75:8, 75:10,
76:24, 78:7, 95:16,
95:21, 96:5, 96:6,
96:25, 97:2, 97:4,
97:5, 99:21, 100:14,
108:6, 109:10,
109:16, 109:19,
109:25, 110:20,
111:22
**decisions** [4] - 9:11,
23:22, 48:2, 48:4
**deem** [1] - 4:23
**defend** [1] - 55:3
**defendant** [7] - 4:6,
54:16, 55:2, 55:18,
56:3, 56:6, 56:12
**defendant's** [3] - 33:2,
55:19, 55:22
**Defendants** [2] - 1:8,
2:2
**Defense** [1] - 70:11
**defenses** [1] - 70:20
**deference** [1] - 38:18
**definitely** [1] - 103:11
**defrauded** [4] - 21:8,
22:18, 22:22
**defrauding** [3] -
33:21, 59:14, 83:21
**Delaware** [1] - 3:8
**delay** [10] - 9:14,
65:19, 66:7, 67:15,
71:15, 93:6, 93:17,
97:25, 114:16
**delayed** [8] - 68:23,
69:2, 70:12, 70:14,
70:15, 93:8, 98:14,
114:22
**delaying** [5] - 69:19,
70:9, 71:16, 95:1,
98:17
**delays** [1] - 94:9
**delineate** [1] - 113:19
**delineating** [1] - 80:3
**demanding** [2] - 36:5,
36:16
**demonstrate** [3] -
22:21, 36:13, 36:14
**demonstrates** [1] -
53:17
**demonstrating** [3] -
54:16, 54:17, 56:12
**denied** [1] - 47:12
**deny** [2] - 13:20, 54:12
**DEPARTMENT** [2] -
1:6, 2:3
**Department** [11] - 3:4,
4:7, 4:8, 6:15, 43:20,

48:3, 54:12, 54:14,
59:8, 79:9, 83:18
**department** [67] - 6:2,
6:6, 6:8, 7:22, 8:5,
11:1, 13:21, 15:23,
22:12, 23:15, 25:1,
35:16, 35:19, 35:22,
36:3, 36:8, 48:20,
55:1, 58:7, 59:18,
64:12, 64:17, 65:2,
65:16, 65:22, 67:13,
68:22, 70:20, 72:10,
72:18, 72:21, 73:20,
74:17, 75:3, 75:9,
77:25, 78:2, 78:4,
78:12, 78:22, 83:10,
83:24, 84:3, 96:6,
97:1, 97:17, 104:1,
104:4, 104:7, 104:9,
105:3, 106:4, 106:6,
106:11, 107:19,
109:23, 110:21,
111:10, 111:15,
111:18, 111:21,
112:5, 112:14,
113:8, 113:24,
114:22
**department's** [14] -
6:22, 8:15, 41:17,
43:9, 55:9, 64:21,
72:10, 77:1, 84:15,
96:4, 96:22, 97:21,
111:1, 111:7
**deprive** [1] - 107:17
**deprived** [1] - 15:16
**DEPUTY** [3] - 3:2,
76:14, 115:14
**dereliction** [1] - 17:25
**derivation** [1] - 37:13
**describe** [1] - 58:7
**described** [2] - 7:4,
87:6
**design** [1] - 7:6
**designed** [4] - 7:9,
7:13, 50:7, 50:8
**destroying** [1] - 7:7
**detail** [1] - 4:23
**determination** [3] -
74:2, 97:21, 110:3
**determinations** [1] -
75:22
**determinative** [1] -
89:19
**determine** [1] - 81:20
**determines** [1] - 82:8
**determining** [1] -
96:14
**develop** [1] - 22:13
**DeVos** [1] - 54:11
**dictates** [1] - 30:10

**difference** [4] - 9:20,
80:8, 87:17, 101:15
**different** [24] - 17:17,
24:17, 28:10, 31:13,
37:2, 43:19, 55:20,
59:24, 60:8, 61:25,
63:1, 63:10, 72:1,
85:3, 86:23, 87:20,
87:23, 88:17, 88:23,
97:6, 105:1, 107:1,
112:8
**differently** [1] - 57:20
**difficult** [2] - 20:3,
112:7
**difficulty** [1] - 22:10
**direct** [12] - 27:10,
52:23, 58:3, 68:8,
68:14, 68:15, 68:21,
68:23, 89:24, 90:11,
99:6, 106:1
**directed** [2] - 65:22,
97:16
**directly** [1] - 42:5
**disagree** [3] - 11:20,
38:20, 112:23
**disclose** [4] - 23:5,
61:23, 68:4, 72:13
**disclosure** [15] - 23:2,
67:24, 68:1, 68:2,
72:7, 72:14, 95:1,
98:12, 98:13, 98:18,
98:23, 104:20,
106:3, 107:12,
108:16
**disclosures** [6] -
72:11, 72:19, 98:25,
103:9, 106:8, 108:5
**disconnected** [1] -
72:8
**discovered** [1] - 59:20
**discreet** [5] - 79:12,
113:1, 113:16,
113:22, 114:3
**discreetness** [1] -
113:11
**discretion** [3] -
110:21, 112:15,
113:14
**discretionary** [9] -
79:16, 79:23, 80:10,
80:12, 80:19, 81:7,
82:2, 82:3, 82:14
**discuss** [2] - 28:4,
78:20
**discussed** [3] - 46:25,
55:8, 108:2
**discusses** [1] - 81:1
**discussion** [6] - 5:21,
15:1, 58:4, 59:19,
68:10, 86:24

dismiss [1] - 53:19
dispense [2] - 30:2, 30:11
dispensed [1] - 70:1
disposal [1] - 13:17
dispositive [1] - 4:13
dispute [1] - 30:5
disseminated [1] - 106:9
disseminating [2] - 104:25, 107:6
distinct [2] - 46:25, 100:25
distinction [4] - 37:25, 48:25, 101:21, 107:16
distracting [1] - 5:5
distributed [2] - 92:24, 93:2
distributing [1] - 98:24
distribution [8] - 68:9, 68:14, 68:15, 68:21, 68:24, 92:22, 99:6, 106:1
district [1] - 41:24
District [3] - 3:24, 4:1, 16:17
DISTRICT [3] - 1:1, 1:1, 1:10
diversion [1] - 89:13
Diversity [1] - 24:18
divert [2] - 85:12, 86:15
divided [1] - 16:19
DIVISION [3] - 1:14, 1:18, 2:3
doctrine [3] - 29:18, 29:25, 40:19
document [1] - 19:11
documentation [2] - 95:14, 95:17
DOE [6] - 2:6, 24:6, 39:8, 57:17, 76:11, 96:17
DOE's [1] - 96:14
domain [1] - 91:14
dominion [1] - 91:14
done [25] - 9:24, 13:9, 25:23, 26:8, 51:2, 53:22, 56:2, 64:6, 64:22, 65:9, 67:4, 67:8, 68:20, 75:13, 75:15, 75:19, 78:15, 80:5, 97:19, 100:11, 100:20, 105:24, 109:17, 113:20, 114:4
door [2] - 38:4, 112:9
dovetail [2] - 47:21,

105:7
dovetails [1] - 44:8
down [9] - 5:15, 20:4, 20:14, 21:25, 29:1, 29:19, 62:14, 72:16, 78:18
draft [9] - 64:13, 64:16, 64:18, 65:1, 65:4, 92:22, 94:10, 104:8, 113:25
drawing [1] - 101:21
drill [1] - 62:13
driver's [2] - 16:25, 17:3
due [1] - 79:24
duly [2] - 6:16, 23:17
duplicative [1] - 105:22
during [1] - 77:23
duties [3] - 64:11, 81:10, 82:14
duty [10] - 18:1, 65:16, 79:12, 79:16, 79:23, 80:19, 81:7, 82:2, 82:3, 82:17

E

early [1] - 40:3
earn [2] - 7:15, 97:7
earning [1] - 79:1
earnings [16] - 12:2, 23:4, 61:9, 61:11, 64:14, 65:3, 67:25, 72:2, 73:13, 73:15, 95:4, 95:14, 110:22, 110:25, 111:5, 112:5
easily [1] - 23:6
easy [5] - 23:1, 23:8, 28:15, 33:19
economic [1] - 41:24
education [12] - 13:24, 19:4, 20:16, 39:18, 43:21, 55:8, 57:9, 60:11, 60:19, 87:13, 87:14, 88:23
Education [15] - 3:4, 4:8, 6:22, 8:1, 9:9, 34:6, 34:9, 48:3, 48:13, 49:15, 54:12, 54:14, 79:9, 83:19, 83:25
EDUCATION [1] - 1:7
Education's [3] - 6:15, 43:20, 59:9
effect [8] - 22:3, 22:23, 23:18, 69:2, 87:18, 95:13, 102:1, 111:10
effective [6] - 6:21,

12:10, 13:22, 59:16, 73:1, 86:9
effectively [2] - 93:23, 100:17
effectiveness [2] - 73:2, 103:8
effects [1] - 22:6
efficiently [1] - 87:14
eight [1] - 12:4
EIS [1] - 40:17
either [8] - 8:20, 39:23, 60:13, 71:17, 92:4, 100:5, 106:19, 114:12
element [2] - 30:2, 33:7
elements [4] - 32:12, 70:15, 75:4, 77:9
eligibility [1] - 90:18
eligible [2] - 18:6, 20:7
eliminate [1] - 37:20
email [1] - 107:10
embodies [2] - 29:16, 29:23
emergency [1] - 71:23
emissions [6] - 58:11, 58:12, 58:14, 60:20, 88:11, 88:13
emphasize [1] - 83:6
employed [2] - 73:16, 97:8
Employees [1] - 52:20
Employment [2] - 6:16, 7:2
employment [3] - 6:24, 7:15, 59:17
enact [1] - 61:1
enacted [4] - 6:16, 11:15, 11:22, 87:24
enacting [1] - 91:21
encouraging [1] - 53:7
end [3] - 83:24, 101:19, 101:21
endpoint [1] - 104:23
enforce [34] - 8:15, 9:6, 9:8, 9:17, 10:20, 12:23, 13:23, 14:4, 16:5, 16:10, 22:13, 23:16, 24:15, 35:21, 38:3, 38:5, 42:17, 45:3, 46:12, 53:3, 59:23, 62:22, 77:9, 78:2, 84:1, 85:9, 86:11, 88:10, 88:12, 93:23, 94:1, 94:6, 94:7, 94:23
enforced [5] - 18:12, 22:5, 33:11, 53:5, 85:4

enforcement [12] - 10:21, 11:3, 11:5, 15:11, 75:4, 80:19, 85:12, 85:18, 85:19, 85:25, 87:10, 104:14
enforcements [1] - 11:18
enforcing [5] - 11:13, 21:24, 71:7, 75:11, 86:12
engage [1] - 106:8
engaged [1] - 47:9
engaging [2] - 35:12, 55:13
enrolled [1] - 68:9
enrollment [3] - 8:21, 43:23, 45:5
ensure [3] - 7:14, 18:5, 57:7
enters [1] - 58:9
entertain [1] - 6:3
entire [5] - 5:17, 5:18, 48:7, 78:8, 78:10
entirely [3] - 32:2, 85:24, 107:17
entirety [3] - 6:17, 33:17, 79:19
entities [8] - 8:6, 30:24, 37:14, 58:23, 111:24, 112:1
entitled [6] - 6:8, 39:4, 45:21, 71:1, 71:6, 94:23
entity [1] - 26:24
enumerated [1] - 113:16
environmental [5] - 15:7, 60:10, 60:16, 60:17, 88:9
Environmental [1] - 70:11
EPA [32] - 12:24, 12:25, 13:12, 14:14, 15:1, 26:6, 26:8, 26:11, 28:4, 39:2, 39:7, 40:10, 40:20, 40:21, 41:3, 45:18, 46:4, 46:19, 57:15, 58:17, 59:25, 62:3, 70:11, 86:24, 88:9, 88:11, 88:14, 89:4, 89:20, 92:2, 92:13, 93:6
equivalent [3] - 102:14, 102:24, 103:24
erosion [3] - 13:3, 13:10, 14:17
erroneously [1] - 77:24

error [2] - 109:12, 109:13
especially [2] - 11:9, 85:10
Esq [6] - 1:13, 1:17, 1:20, 2:2, 2:2, 2:6
essential [1] - 6:21
essentially [8] - 35:20, 56:11, 56:23, 78:9, 80:12, 83:21, 90:19, 110:16
establish [10] - 19:22, 20:3, 21:23, 23:14, 36:10, 44:22, 45:1, 50:24, 56:4, 105:12
established [3] - 57:5, 57:8, 110:14
establishment [1] - 20:13
et [4] - 1:2, 1:7, 3:3, 3:4
evaluate [5] - 72:11, 72:18, 73:1, 73:2, 75:2
evaluation [1] - 106:9
evenly [1] - 16:19
event [1] - 91:4
evidence [5] - 11:2, 23:14, 44:12, 53:14, 53:21
exact [1] - 111:22
exactly [1] - 39:1
example [5] - 27:24, 48:15, 83:18, 85:7, 110:9
except [1] - 58:23
exception [9] - 71:20, 71:22, 75:17, 78:16, 78:18, 109:1, 109:8, 112:18
exceptions [1] - 46:19
exclude [1] - 69:10
excuse [6] - 63:1, 77:21, 78:13, 82:2, 95:1, 100:14
excused [2] - 71:19, 78:15
exercise [2] - 29:4, 58:13
exhausted [1] - 107:23
exhaustive [1] - 68:5
existence [3] - 19:25, 21:21, 80:13
existing [2] - 15:25, 93:24
expectation [2] - 27:1, 63:11
expectations [1] - 24:13

**expected** [1] - 63:13
**expects** [1] - 72:22
**expend** [1] - 42:10
**expenditures** [1] - 53:3
**experienced** [1] - 97:6
**explain** [1] - 110:9
**explained** [3] - 40:13, 46:20, 46:22
**explaining** [2] - 6:6, 68:13
**explains** [1] - 48:14
**express** [1] - 47:1
**expressed** [1] - 43:10
**expressly** [2] - 49:24, 71:19
**extend** [2] - 70:7, 70:20
**extended** [2] - 70:17, 70:18
**extending** [1] - 101:24
**extends** [2] - 96:21, 109:17
**extension** [9] - 99:13, 100:4, 101:3, 102:3, 102:5, 103:1, 103:24, 104:22, 108:15
**extent** [18] - 9:16, 10:8, 12:16, 13:19, 21:23, 33:7, 44:7, 44:24, 48:19, 81:20, 84:20, 93:23, 94:22, 99:22, 100:12, 100:18, 101:8, 110:2

### F

**f)(3** [1] - 83:2
**f)(3)** [1] - 81:4
**f)3** [1] - 83:3
**face** [1] - 83:16
**fact** [22] - 8:3, 12:19, 14:7, 19:13, 27:5, 32:13, 33:13, 35:16, 45:1, 46:1, 48:4, 58:24, 59:19, 65:24, 69:9, 70:18, 74:22, 76:1, 84:16, 86:9, 101:8, 101:18
**factor** [1] - 81:11
**factors** [4] - 89:21, 89:23, 90:2, 97:7
**facts** [1] - 68:20
**factual** [2] - 44:6, 74:14
**failed** [2] - 65:16, 78:24
**failing** [4] - 12:4, 12:12, 12:14, 43:1

**failure** [7] - 14:10, 14:12, 41:17, 45:3, 78:22, 88:6, 109:12
**fair** [1] - 26:1
**fairly** [12] - 21:2, 25:19, 26:3, 28:6, 32:19, 32:23, 42:3, 52:25, 60:10, 60:23, 87:6, 89:14
**fall** [5] - 7:24, 40:18, 45:9, 109:1, 114:7
**familiar** [3] - 4:21, 8:24, 55:15
**far** [8] - 5:3, 6:5, 30:9, 37:15, 45:11, 53:4, 99:24, 101:11
**fascinating** [2] - 103:16, 103:17
**fashioned** [1] - 76:25
**feature** [1] - 40:6
**federal** [8] - 13:11, 15:3, 18:18, 37:24, 38:1, 39:15, 87:1, 90:22
**Federal** [81] - 9:3, 9:14, 9:19, 10:13, 10:14, 10:17, 10:19, 11:14, 12:19, 12:22, 14:2, 14:5, 14:9, 14:11, 15:4, 15:5, 16:5, 16:6, 16:11, 17:22, 17:24, 18:4, 18:20, 18:21, 18:23, 18:24, 21:23, 24:2, 26:4, 27:1, 27:3, 27:7, 29:3, 29:15, 30:11, 31:9, 34:20, 34:22, 34:23, 35:3, 37:11, 37:13, 37:18, 38:19, 38:23, 39:2, 39:22, 42:4, 42:8, 42:14, 42:17, 46:11, 46:17, 47:8, 51:17, 52:7, 52:25, 53:6, 58:16, 58:24, 59:8, 60:6, 60:12, 60:14, 61:17, 62:1, 62:4, 62:10, 62:20, 62:25, 63:5, 63:9, 69:4, 84:12, 84:21, 85:15, 85:20, 86:12, 88:18, 88:22, 91:8
**Federation** [1] - 52:20
**feds** [1] - 16:8
**FERC** [4] - 28:21, 28:23, 30:17, 31:18
**few** [4] - 53:24, 54:2, 76:7, 76:19
**few-minute** [1] - 76:7
**field** [1] - 60:15

**fields** [7] - 73:17, 74:8, 74:14, 74:19, 74:20, 74:22, 75:6
**Fifth** [2] - 16:18, 17:5
**fight** [1] - 26:24
**figure** [5] - 56:17, 74:20, 77:17, 95:15, 102:18
**figuring** [1] - 77:19
**file** [2] - 66:22, 102:17
**filed** [1] - 54:8
**final** [40] - 43:9, 43:10, 47:8, 69:16, 70:13, 75:9, 76:10, 77:5, 94:10, 98:21, 99:11, 99:19, 99:21, 99:24, 99:25, 100:4, 100:20, 100:21, 100:24, 101:2, 101:3, 101:4, 101:10, 101:12, 101:16, 101:20, 102:13, 102:15, 102:19, 102:25, 103:15, 103:17, 103:18, 103:23, 105:6, 105:8, 105:11, 105:14, 108:8, 108:14
**finality** [1] - 100:9
**finally** [2] - 78:20, 83:4
**financial** [13] - 16:4, 41:15, 41:16, 41:19, 43:4, 43:12, 43:13, 45:9, 48:18, 48:19, 61:21, 87:4, 89:12
**Fine** [1] - 49:3
**fine** [4] - 9:18, 30:12, 76:4, 88:1
**fingers** [1] - 20:11
**finished** [2] - 67:16, 71:9
**Finley** [2] - 2:6, 4:8
**first** [30] - 5:7, 14:22, 43:16, 54:4, 57:18, 62:21, 64:16, 64:22, 66:16, 67:13, 67:24, 68:1, 74:5, 77:8, 77:13, 83:7, 87:9, 89:24, 90:18, 94:10, 95:12, 98:3, 98:20, 98:21, 104:22, 105:10, 108:4, 111:2, 112:6, 113:8
**First** [1] - 57:1
**FISCHER** [177] - 3:13, 5:14, 5:18, 6:13, 7:20, 8:11, 9:5, 9:22, 10:7, 10:10, 10:19, 11:20, 11:24, 12:2,

12:7, 12:22, 13:6, 13:16, 14:9, 14:19, 14:24, 15:13, 15:21, 15:25, 16:16, 17:8, 18:4, 18:15, 18:18, 19:3, 19:12, 19:19, 20:1, 20:21, 21:10, 21:13, 22:10, 22:20, 23:8, 23:15, 24:14, 24:20, 24:22, 24:24, 25:6, 26:5, 27:9, 27:13, 27:16, 27:19, 27:21, 27:23, 28:15, 28:18, 29:5, 29:7, 29:20, 30:15, 30:22, 31:1, 31:4, 31:10, 31:16, 32:1, 32:3, 32:5, 32:25, 33:10, 33:16, 34:3, 34:10, 34:17, 35:2, 35:8, 36:12, 36:25, 37:18, 38:9, 39:1, 39:6, 39:10, 54:1, 54:21, 55:1, 55:19, 55:21, 56:8, 56:21, 57:12, 57:14, 57:19, 58:1, 58:3, 59:2, 59:6, 59:11, 59:15, 60:9, 61:4, 61:15, 62:8, 62:21, 64:1, 64:7, 64:25, 65:6, 65:8, 65:15, 65:20, 66:3, 66:9, 66:16, 66:21, 67:3, 67:11, 67:23, 68:22, 69:1, 69:9, 69:13, 69:25, 70:8, 71:2, 71:4, 71:14, 71:16, 71:25, 72:3, 72:5, 72:17, 73:9, 74:5, 74:13, 75:15, 75:19, 76:12, 76:19, 76:21, 77:7, 77:15, 79:2, 79:4, 79:8, 79:13, 79:17, 79:23, 80:7, 80:21, 80:25, 81:13, 81:15, 81:22, 82:10, 82:12, 82:15, 82:17, 82:19, 83:2, 83:4, 83:20, 84:8, 84:23, 85:6, 85:22, 86:2, 86:7, 86:14, 86:18, 86:21, 88:7, 88:21, 89:9, 90:5, 91:5, 115:4, 115:8, 115:10
**Fischer** [11] - 1:13, 3:14, 5:9, 5:16, 6:11, 46:7, 47:4, 48:1, 53:24, 76:17, 115:2
**Fischer's** [1] - 47:21
**fit** [1] - 110:14

**five** [1] - 93:12
**flaws** [1] - 96:8
**flexibility** [1] - 106:5
**flip** [1] - 81:18
**flow** [1] - 43:4
**flows** [1] - 18:21
**focus** [4] - 5:5, 38:11, 49:9, 49:12
**focused** [1] - 49:18
**focuses** [2] - 49:22, 89:1
**focusing** [2] - 32:21, 33:5
**folded** [1] - 19:18
**follow** [2] - 5:4, 16:8
**followed** [1] - 64:3
**FOR** [1] - 1:1
**for-profit** [6] - 7:11, 8:18, 12:5, 13:14, 19:7, 33:23
**force** [1] - 58:11
**foregoing** [1] - 115:20
**forms** [1] - 41:15
**forth** [4] - 6:10, 52:21, 112:13, 113:7
**forward** [6] - 6:11, 14:6, 14:10, 27:7, 44:12, 53:21, 59:17, 59:21, 104:7, 104:11, 105:4
**forward-looking** [2] - 59:17, 59:21
**foundation** [1] - 87:5
**four** [1] - 23:19
**fours** [1] - 39:25
**framed** [1] - 29:22
**frankly** [3] - 19:13, 21:20, 26:17
**fraud** [3] - 33:19, 59:20, 60:22
**fraudulent** [8] - 8:18, 8:22, 19:14, 19:24, 20:6, 27:3, 35:13, 45:4
**free** [6] - 4:22, 35:20, 71:6, 74:18, 75:21, 75:22
**freed** [1] - 77:3
**frequently** [1] - 97:8
**Friday** [1] - 64:17
**fulfilling** [1] - 11:6
**full** [1] - 115:21
**fully** [1] - 60:15
**function** [2] - 61:2, 88:18
**Fund** [1] - 70:11
**funding** [13] - 6:24, 13:25, 16:4, 18:23, 20:7, 35:1, 35:15, 48:3, 59:7, 60:21,

61:3, 87:14
**funds** [2] - 12:11,
13:21
**future** [5] - 26:13,
26:14, 55:9, 65:23,
77:16

## G

**Gainful** [2] - 6:16, 7:2
**gainful** [3] - 6:24,
7:15, 59:17
**Gas** [1] - 47:1
**gas** [1] - 58:11
**GE** [15] - 27:3, 39:20,
41:17, 43:10, 44:14,
53:4, 53:5, 69:21,
72:14, 72:23, 91:21,
92:22, 94:10, 105:3,
113:25
**GENERAL** [3] - 1:13,
1:17, 1:21
**general** [7] - 29:2,
29:9, 36:1, 38:7,
46:15, 51:19, 96:19
**General** [1] - 61:1
**General's** [1] - 16:9
**generally** [2] - 31:11,
113:13
**generic** [1] - 63:22
**genre** [1] - 92:2
**given** [4] - 20:25,
38:17, 101:19,
112:14
**global** [1] - 13:12
**good-cause** [6] -
71:20, 75:17, 78:16,
109:1, 109:8, 112:18
**goodness** [2] - 63:9,
94:24
**governed** [3] - 51:10,
100:13, 105:18
**government** [13] - 9:3,
11:14, 25:21, 25:23,
25:24, 26:3, 26:24,
63:5, 84:6, 84:8,
85:4, 91:3, 91:17
**Government** [70] -
9:3, 9:19, 10:13,
10:15, 10:19, 11:15,
12:19, 12:22, 14:2,
15:4, 15:5, 16:5,
16:12, 17:25, 18:4,
18:20, 18:22, 18:24,
21:24, 24:2, 27:1,
27:3, 28:20, 29:3,
29:15, 30:12, 31:9,
34:21, 34:23, 37:11,
37:13, 37:18, 38:19,
38:24, 39:3, 39:22,

40:13, 42:4, 42:8,
42:15, 42:17, 46:12,
46:18, 46:22, 47:9,
51:17, 52:7, 52:20,
52:25, 53:6, 58:16,
58:24, 60:6, 60:12,
60:14, 61:18, 62:2,
62:5, 62:10, 62:20,
63:5, 63:9, 84:12,
84:21, 85:15, 85:20,
86:12, 88:19, 88:22,
91:8
**government's** [4] -
33:2, 45:3, 85:8,
88:6
**Government's** [15] -
9:14, 10:17, 14:6,
14:10, 14:11, 16:6,
17:23, 18:23, 26:4,
27:7, 34:24, 35:3,
48:14, 59:8, 62:25
**graduate** [1] - 20:16
**graduated** [1] - 7:14
**graduates** [6] - 7:8,
73:16, 74:16, 97:7,
97:8, 97:9
**grazing** [1] - 47:11
**great** [2] - 24:11, 88:2
**greater** [1] - 53:3
**greenhouse** [1] -
58:11
**ground** [1] - 23:24
**grounds** [2] - 16:13,
31:15
**groups** [3] - 33:8,
35:23, 68:12
**growing** [1] - 10:25
**guarantee** [3] - 70:18,
77:13, 77:15
**guess** [1] - 90:11
**guidance** [1] - 26:19

## H

**handle** [3] - 26:25,
43:23, 74:22
**happy** [3] - 11:16,
54:7, 57:12
**hard** [7] - 21:20,
21:21, 22:6, 67:17,
79:20, 81:8, 82:1
**harder** [1] - 85:11
**harm** [6] - 21:15,
23:20, 24:13, 24:16,
27:4, 55:8
**harmed** [2] - 20:19,
45:2
**harmful** [1] - 12:18
**harmless** [2] - 109:12,
109:13

**hate** [1] - 86:23
**Hawaii** [1] - 3:8
**hazards** [1] - 15:7
**HEA** [7] - 34:14, 34:16,
34:19, 35:9, 48:1,
48:7, 84:6
**head** [1] - 61:6
**health** [5] - 28:1,
36:14, 39:18, 50:4,
50:5
**hear** [1] - 62:15
**heard** [1] - 58:22
**HEARING** [1] - 1:9
**hearing** [4] - 4:12,
4:24, 66:18
**hearings** [1] - 5:4
**heart** [1] - 64:15
**heavily** [1] - 55:6
**HELD** [1] - 1:10
**held** [5] - 16:17, 17:5,
49:19, 88:9, 103:22
**help** [3] - 11:17, 27:8,
88:1
**helped** [1] - 11:15
**helpful** [1] - 10:5
**helping** [1] - 11:17
**hereby** [1] - 115:19
**hierarchy** [1] - 108:7
**higher** [7] - 19:4, 55:7,
57:9, 60:11, 60:18,
87:15, 88:23
**Higher** [7] - 6:22, 8:1,
9:9, 34:6, 34:7, 34:9,
83:25
**history** [5] - 9:23,
20:25, 32:6, 55:11,
60:22
**hit** [1] - 13:22
**hmm** [1] - 14:19
**hold** [1] - 84:21
**holders** [1] - 48:18
**holding** [1] - 75:7
**home** [2] - 20:15, 63:6
**honest** [1] - 84:14
**Honor** [46] - 3:2, 3:13,
3:19, 3:23, 4:5, 5:10,
6:13, 7:20, 9:22,
25:7, 39:12, 39:13,
40:10, 40:12, 41:8,
41:11, 42:20, 45:8,
45:13, 45:16, 46:3,
51:12, 53:13, 54:1,
54:2, 57:14, 76:12,
78:20, 82:21, 83:4,
88:7, 90:5, 90:10,
91:23, 92:20, 93:5,
93:15, 94:16, 97:1,
97:20, 100:24,
101:23, 112:4,
113:4, 115:1, 115:4

**Honor's** [2] - 24:17,
52:19
**HONORABLE** [1] -
1:10
**Hooray** [1] - 115:6
**hope** [4] - 5:20, 87:16,
90:24, 115:3
**hoped** [1] - 10:14
**hopeful** [2] - 11:16,
88:2
**hopefully** [1] - 54:2
**hoping** [1] - 4:17
**horizon** [1] - 63:19
**horrible** [1] - 44:15
**hours** [1] - 76:8
**hypothetical** [1] -
25:22

## I

**i.e** [1] - 30:1
**idea** [7] - 7:19, 11:20,
17:21, 18:24, 41:4,
53:2, 85:17
**ideal** [1] - 27:24
**identification** [1] -
114:4
**identified** [7] - 12:4,
12:12, 19:14, 51:6,
94:18, 96:8, 96:11
**identifies** [1] - 35:23
**identifying** [1] - 21:15
**idle** [1] - 83:8
**IFR** [1] - 75:20
**III** [15] - 14:7, 21:18,
27:20, 29:11, 30:5,
31:17, 31:19, 32:12,
32:16, 32:18, 32:20,
45:7, 56:1, 56:4,
89:14
**Illinois** [1] - 3:8
**illuminate** [1] - 4:23
**illustrative** [1] - 50:2
**immediately** [3] -
67:7, 95:18, 112:11
**immigrant** [1] - 17:1
**immigrants** [2] -
16:23, 17:3
**immigration** [1] -
16:22
**impact** [5] - 42:9,
43:3, 43:4, 43:13,
92:15
**impacted** [1] - 92:14
**impacts** [1] - 43:12
**impending** [1] - 21:18
**impetus** [1] - 9:23
**implement** [7] - 9:15,
24:6, 41:17, 73:3,
75:10, 88:19, 106:6

**implementation** [12] -
10:15, 41:17, 70:9,
70:12, 70:15, 72:12,
72:20, 72:23, 96:5,
104:6, 108:6, 108:20
**implemented** [2] -
11:11, 11:23, 11:24,
24:2, 24:9, 25:24,
26:1, 38:25, 88:3,
88:4, 109:24, 111:22
**implementing** [4] -
104:10, 105:3,
109:10, 112:19
**implicated** [1] - 36:15
**implicates** [1] - 69:23
**implicitly** [2] - 26:6,
56:15
**important** [5] - 5:25,
57:15, 68:16, 72:6,
99:7
**impose** [5] - 5:4, 7:7,
13:20, 39:20, 111:6
**imposing** [1] - 42:5
**improved** [1] - 87:12
**improving** [1] - 39:17
**IN** [1] - 1:1
**in-state** [1] - 58:14
**inaccurate** [1] - 73:20
**inaction** [1] - 64:10
**inactions** [1] - 64:9
**include** [2] - 31:8,
72:13
**included** [1] - 49:23
**includes** [1] - 48:17
**including** [2] - 21:8,
72:24
**income** [11] - 7:8,
10:2, 73:17, 73:19,
74:8, 74:11, 74:17,
74:24, 96:10, 96:15,
96:19
**inconsistent** [2] -
85:18, 85:22
**increase** [1] - 45:5
**increased** [1] - 43:23
**Independent** [1] -
54:10
**independent** [4] -
9:16, 12:17, 13:2,
26:22
**India** [1] - 58:12
**indicate** [1] - 20:18
**indicated** [1] - 26:22
**Indicates** [1] - 52:1
**indicates** [2] - 12:20,
113:7
**indicating** [2] - 3:17,
80:4
**indication** [1] - 105:2
**indications** [1] - 106:4

**individuals** [2] - 20:18, 73:21
**individuals'** [1] - 105:18
**indulgence** [1] - 115:10
**industries** [7] - 73:17, 74:23, 75:21, 76:3, 96:21, 97:5, 97:11
**industry** [1] - 97:10
**ineligible** [2] - 12:11, 59:7
**inevitable** [1] - 94:9
**infant** [1] - 39:17
**inference** [1] - 21:5
**inferred** [1] - 21:16
**inflicted** [5] - 15:19, 15:21, 16:2, 16:8, 17:5
**inform** [1] - 87:2
**information** [21] - 4:25, 9:11, 12:3, 23:4, 39:21, 49:5, 61:9, 68:4, 68:6, 98:4, 98:5, 98:25, 99:8, 104:25, 106:9, 106:15, 107:6, 107:17, 107:18
**informs** [1] - 110:3
**initial** [4] - 16:7, 97:24, 98:3, 99:6
**injure** [2] - 12:21, 12:23
**injured** [10] - 14:5, 14:9, 14:11, 50:25, 63:15, 85:8, 86:1, 87:20, 88:5, 89:10
**injures** [1] - 10:12
**injuries** [10] - 8:14, 15:9, 15:12, 15:13, 18:14, 33:1, 41:14, 41:16, 87:4, 89:14
**injuring** [2] - 10:18, 63:23
**injurious** [1] - 16:15
**injury** [66] - 10:23, 14:7, 14:22, 15:19, 15:22, 16:2, 16:9, 16:15, 17:5, 17:11, 18:21, 19:2, 20:2, 21:14, 22:9, 23:11, 23:14, 24:9, 24:12, 25:14, 26:2, 28:3, 30:5, 30:6, 31:19, 31:24, 32:6, 32:9, 32:10, 32:12, 32:18, 32:22, 33:8, 37:20, 39:24, 41:15, 41:20, 41:25, 42:12, 42:16, 44:9, 44:10, 44:17,

44:18, 45:6, 45:10, 50:24, 52:23, 52:25, 55:24, 56:14, 56:25, 63:16, 85:17, 86:4, 86:6, 86:20, 87:3, 87:6, 87:19, 89:25
**injury's** [1] - 25:19
**insert** [2] - 114:10, 114:12
**inserted** [1] - 30:14
**insisting** [1] - 46:11
**insofar** [2] - 36:21, 89:4
**instance** [5] - 13:20, 38:1, 60:20, 80:25, 111:2
**instead** [2] - 43:7, 75:3
**Institute** [1] - 68:11
**institutions** [5] - 19:7, 19:17, 44:13, 48:19, 72:13
**instructive** [1] - 41:9
**intended** [1] - 7:9
**intends** [1] - 42:15
**intentionally** [1] - 111:13
**interact** [2] - 107:8, 107:11
**interest** [54] - 7:21, 7:24, 8:9, 8:13, 15:2, 28:1, 28:10, 30:7, 32:7, 34:4, 34:6, 34:11, 34:15, 34:22, 34:24, 35:17, 36:3, 36:4, 36:6, 36:14, 36:17, 37:2, 37:8, 37:9, 38:9, 39:19, 40:11, 41:5, 45:19, 45:22, 45:23, 48:10, 48:11, 48:12, 48:18, 48:23, 49:6, 49:11, 49:16, 49:18, 49:21, 49:25, 50:6, 50:7, 50:15, 51:14, 51:23, 52:8, 57:3, 87:25, 89:17, 92:3, 92:6, 92:7
**interested** [2] - 35:6, 48:25
**interesting** [5] - 23:25, 31:22, 55:6, 80:22, 115:12
**interests** [15] - 28:5, 30:7, 35:24, 47:25, 49:8, 50:8, 50:21, 50:22, 51:7, 51:10, 51:15, 51:18, 60:2, 86:25, 92:11
**interim** [3] - 75:9,

94:14, 97:18
**interposes** [1] - 26:21
**interpret** [1] - 57:19
**interpretation** [1] - 80:1
**interpreted** [2] - 31:8, 79:11
**interrupt** [1] - 5:3
**intervene** [4] - 54:8, 54:15, 55:3, 57:7
**intervenor** [5] - 55:23, 56:7, 56:8, 56:12, 56:14
**intervenors** [3] - 54:22, 54:25, 55:17
**intervention** [1] - 54:16
**invade** [1] - 58:10
**invaded** [1] - 91:15
**investigate** [1] - 33:18
**investigated** [2] - 9:25, 21:4
**investigating** [4] - 8:17, 21:1, 33:23, 33:24
**investigations** [1] - 10:24
**investments** [1] - 87:12
**invite** [1] - 69:7
**inviting** [1] - 69:16
**invoke** [2] - 109:4, 112:18
**invoked** [2] - 71:19, 78:17
**involved** [5] - 40:15, 46:25, 48:2, 48:17, 49:4
**involves** [1] - 48:15
**involving** [3] - 40:8, 42:10, 54:8
**Iowa** [1] - 3:8
**Island** [2] - 3:9, 58:11
**issuance** [1] - 40:17, 77:1, 90:22
**issue** [16] - 5:25, 6:2, 20:11, 26:20, 37:7, 42:4, 49:6, 51:13, 72:5, 75:9, 77:9, 89:18, 108:21, 109:11, 109:18, 112:23
**issued** [5] - 70:16, 83:24, 94:14, 104:8, 113:25
**issues** [5] - 4:24, 5:23, 44:6, 111:15, 111:16
**issuing** [3] - 47:9, 94:10, 110:23
**itself** [16] - 9:24,

17:22, 20:2, 26:21, 35:17, 37:9, 70:10, 71:12, 78:22, 87:7, 89:15, 97:3, 106:4, 113:7, 114:10, 114:13
**IV** [18] - 6:23, 6:24, 12:11, 13:21, 13:25, 14:1, 20:7, 35:1, 35:2, 35:9, 35:15, 49:21, 59:7, 60:21, 61:3, 61:19, 90:16, 90:18

## J

**JACKSON** [1] - 1:10
**job** [3] - 10:2, 18:25, 34:23
**joined** [1] - 15:3
**Judge** [33] - 28:22, 29:8, 29:13, 29:22, 32:11, 39:3, 40:13, 40:23, 41:2, 46:21, 54:5, 55:3, 56:22, 56:25, 57:1, 58:8, 71:24, 72:7, 73:7, 73:9, 74:5, 75:8, 76:24, 77:21, 96:7, 97:13, 97:22, 98:1, 98:16, 111:20, 111:23, 111:25, 112:13
**judge** [3] - 108:22, 110:22, 111:13
**JUDGE** [1] - 1:10
**judgment** [10] - 4:14, 5:23, 6:1, 6:8, 53:15, 53:20, 66:18, 93:13, 111:7, 114:15
**judicial** [8] - 23:22, 30:19, 31:4, 47:3, 109:10, 109:16, 109:19, 114:9
**jujitsu** [1] - 56:17
**July** [3] - 69:3, 70:17, 102:16
**Justice** [3] - 4:7, 39:3, 58:8
**JUSTICE** [1] - 2:3
**justification** [1] - 72:10
**justifications** [1] - 72:25

## K

**Kathryn** [2] - 2:2, 4:5
**keep** [6] - 24:1, 50:20, 62:5, 68:19, 86:23,

89:1
**keeping** [1] - 91:19
**keeps** [1] - 20:12
**KETANJI** [1] - 1:10
**key** [2] - 8:4, 70:15
**kind** [24] - 19:21, 22:8, 23:13, 41:19, 41:20, 45:12, 45:21, 45:22, 47:25, 51:6, 64:4, 65:19, 69:23, 74:1, 80:1, 82:4, 92:6, 92:9, 102:10, 106:8, 112:25, 113:11, 114:13
**kinds** [4] - 17:19, 85:10, 95:16, 96:11
**knowledge** [1] - 21:2
**known** [1] - 23:2
**knows** [2] - 79:15, 104:1

## L

**laid** [1] - 8:16
**land** [1] - 92:14
**landowner** [1] - 58:6
**language** [13] - 21:18, 31:8, 49:12, 73:23, 79:3, 79:14, 79:25, 80:6, 82:1, 82:4, 82:9, 97:14, 113:5
**large** [3] - 6:18, 9:23, 20:25
**last** [4] - 54:6, 57:22, 90:11, 115:2
**latest** [1] - 92:21
**latter** [3] - 30:3, 109:21, 114:17
**laughter** [1] - 114:20
**LAW** [1] - 1:14
**law** [8] - 16:25, 44:17, 61:16, 85:4, 90:20, 93:25, 101:12, 103:21
**Law** [2] - 48:13, 49:14
**laws** [10] - 9:6, 9:8, 9:17, 53:4, 53:8, 61:1, 83:10, 83:14, 84:2, 86:11
**lawsuit** [7] - 7:19, 14:5, 18:11, 36:23, 62:5, 63:13, 66:23
**lawsuits** [2] - 86:10, 86:14
**lay** [1] - 103:19
**leads** [1] - 89:21
**least** [16] - 8:12, 22:9, 26:6, 38:16, 46:10, 55:5, 57:21, 66:25, 84:10, 86:5, 87:7,

87:21, 98:15, 102:11, 109:18, 111:16
**leave** [4] - 58:20, 111:3, 111:20, 112:9
**leaves** [1] - 111:13
**leaving** [1] - 10:4
**lectern** [1] - 3:11
**led** [1] - 87:10
**leery** [1] - 66:4
**left** [5] - 33:9, 44:15, 110:21, 111:10, 111:21
**legal** [5] - 18:20, 24:14, 25:11, 44:8, 45:2
**legally** [3] - 17:1, 17:4, 56:13
**legislative** [1] - 61:10
**legislature** [2] - 60:25, 61:1
**legitimate** [1] - 78:14
**lengthy** [1] - 15:1
**less** [1] - 33:23
**lessened** [1] - 10:21
**level** [4] - 8:21, 53:13, 61:10, 88:13
**levels** [1] - 97:6
**license** [2] - 47:11, 47:12
**licensed** [3] - 35:12, 61:13, 90:20
**licenses** [5] - 9:12, 16:25, 17:3, 47:9, 90:22
**licensing** [1] - 90:20
**light** [1] - 48:6
**likely** [3] - 10:2, 61:4, 97:5
**limit** [1] - 60:20
**limited** [19] - 13:11, 13:14, 33:16, 33:20, 84:10, 84:11, 85:23, 89:4, 89:7, 96:9, 96:10, 102:25, 103:1, 104:22, 110:5, 110:23, 110:24, 112:5
**limiting** [1] - 88:12
**limits** [1] - 5:4
**line** [1] - 29:11
**lines** [1] - 106:10
**link** [1] - 72:6
**list** [10] - 64:13, 64:16, 64:18, 65:1, 65:5, 68:5, 92:22, 104:9, 112:24, 113:25
**listed** [1] - 35:25
**listening** [1] - 4:11
**lists** [1] - 81:5

**literally** [1] - 60:1
**litigation** [3] - 57:10, 106:13, 112:16
**litigators** [3] - 38:13, 38:21, 38:23
**loading** [1] - 10:3
**loan** [4] - 83:9, 83:13, 83:21, 84:2
**loans** [5] - 6:23, 7:10, 7:16, 14:1, 15:16
**local** [1] - 87:13
**lodged** [1] - 58:16
**long-established** [1] - 57:8
**longstanding** [1] - 7:21
**look** [23] - 9:22, 15:9, 19:13, 19:22, 26:17, 41:14, 48:1, 57:11, 74:18, 78:4, 79:25, 81:8, 82:21, 82:22, 89:20, 96:7, 98:11, 102:22, 104:3, 104:5, 104:21, 112:15, 114:11
**looked** [2] - 77:22, 113:3
**looking** [22] - 19:10, 25:13, 35:9, 37:22, 51:4, 58:7, 59:16, 59:17, 59:21, 60:5, 80:25, 81:2, 82:4, 98:22, 100:2, 102:12, 103:9, 113:19, 113:21, 114:5, 114:6
**lose** [1] - 26:11
**losing** [1] - 26:10
**loss** [3] - 19:5, 89:11, 89:12
**lost** [1] - 96:3
**lower** [1] - 7:8
**lower-income** [1] - 7:8
**lunch** [1] - 115:7
**lured** [1] - 44:14
**lying** [1] - 10:1

**M**

**machine** [1] - 2:11
**Madaio** [2] - 1:17, 3:20
**MADAIO** [2] - 3:17, 3:19
**mail** [1] - 107:10
**mailings** [2] - 106:16, 106:25
**main** [1] - 99:12
**mandate** [2] - 6:22, 42:6
**mandatory** [7] - 42:6,

79:12, 79:15, 79:21, 82:17, 113:3, 113:5
**Manitoba** [2] - 40:14, 46:23
**Marcia** [2] - 2:2, 4:6
**marker** [1] - 103:20
**marketing** [1] - 68:14
**marketplace** [1] - 42:14
**MARYLAND** [2] - 1:2, 1:17
**Maryland** [8] - 3:3, 3:20, 5:8, 28:22, 31:18, 46:24, 92:2, 92:13
**Maryland's** [1] - 28:20
**Massachusetts** [41] - 2:4, 3:7, 12:24, 13:6, 14:11, 14:14, 14:15, 15:1, 15:3, 26:6, 26:10, 26:12, 28:4, 29:14, 29:23, 39:2, 39:14, 40:6, 40:8, 40:10, 40:20, 40:21, 41:3, 41:18, 45:10, 45:18, 46:4, 46:15, 46:19, 50:2, 57:15, 58:6, 58:10, 58:17, 59:25, 60:20, 62:3, 86:24, 89:4, 89:20, 91:10
**Massachusetts's** [1] - 39:23
**massive** [1] - 10:3
**material** [2] - 68:14, 72:15
**materials** [4] - 68:8, 68:17, 68:24, 106:16
**maternal** [1] - 39:17
**Maternity** [4] - 39:16, 39:20, 50:3, 50:6
**math** [1] - 61:12
**matter** [13] - 11:14, 17:20, 31:15, 33:15, 44:17, 45:1, 60:4, 67:7, 68:19, 77:4, 93:10, 100:20, 103:15
**MD** [1] - 1:19
**mean** [61] - 9:2, 9:15, 11:8, 13:16, 14:7, 15:18, 15:24, 21:3, 21:19, 23:9, 24:3, 32:6, 32:18, 33:17, 35:10, 37:12, 38:12, 41:13, 41:22, 41:23, 42:1, 42:2, 42:12, 43:11, 44:9, 47:18, 48:14, 48:19, 50:1, 52:3, 53:17, 56:1,

56:16, 58:21, 60:25, 61:7, 62:13, 65:8, 72:9, 79:18, 79:24, 80:14, 82:5, 82:6, 84:4, 90:14, 91:7, 99:5, 100:1, 101:23, 103:16, 104:1, 104:3, 106:24, 107:14, 107:19, 109:18, 110:12, 111:19, 113:19, 114:2
**meaningful** [4] - 9:2, 13:24, 23:22, 100:9
**meaningless** [1] - 81:7
**means** [6] - 28:17, 33:23, 38:16, 38:17, 39:5, 90:19
**mechanism** [2] - 11:5, 13:23
**Mellon** [8] - 29:14, 29:23, 39:15, 41:19, 45:10, 46:16, 50:2, 91:10
**member** [3] - 75:11, 96:9, 97:3
**members** [2] - 37:6, 73:13
**mention** [5] - 49:10, 49:23, 54:6, 109:7, 109:13
**mentioned** [9] - 7:3, 13:18, 28:4, 34:18, 35:10, 40:12, 45:18, 48:16, 92:1
**mere** [1] - 109:12
**merely** [1] - 70:6
**merits** [15] - 4:20, 6:4, 6:5, 18:8, 53:25, 62:23, 63:2, 63:25, 76:18, 85:1, 90:9, 92:20, 107:25, 110:17
**method** [6] - 98:24, 99:8, 105:1, 105:20, 107:5
**methodology** [1] - 96:14
**methods** [6] - 99:2, 99:3, 99:5, 99:14, 104:24, 106:12
**Michael** [2] - 1:13, 3:13
**might** [11] - 6:6, 22:8, 43:14, 49:14, 58:14, 61:16, 67:18, 80:1, 83:16, 84:3, 88:23
**Miller** [2] - 2:7, 115:24
**MILLER** [1] - 115:19

**mind** [5] - 18:14, 24:3, 56:17, 87:24, 107:24
**Minnesota** [1] - 3:8
**minute** [1] - 76:7
**minutes** [3] - 53:25, 76:9, 76:15
**misleading** [1] - 35:13
**mismatch** [2] - 109:19, 112:1
**Missouri** [1] - 40:15
**mixed** [1] - 5:13
**momentarily** [1] - 77:5
**money** [14] - 7:7, 14:1, 15:16, 15:20, 24:4, 24:5, 24:8, 27:6, 42:6, 42:10, 44:1, 44:10, 83:24, 86:5
**moot** [6] - 64:24, 65:14, 93:4, 93:18, 112:23
**moots** [1] - 64:25
**Moreover** [1] - 72:21
**morning** [7] - 3:13, 3:16, 3:22, 3:23, 4:5, 39:11, 39:12
**most** [6] - 7:11, 7:12, 13:22, 28:18, 57:21, 68:16
**mothers** [2] - 50:4, 50:8
**MOTION** [1] - 1:9
**motion** [3] - 53:19, 54:8, 93:13
**motions** [5] - 4:12, 4:13, 4:14, 5:1, 115:13
**motor** [1] - 58:14
**motor-vehicle** [1] - 58:14
**move** [10] - 6:4, 14:10, 23:24, 53:25, 63:25, 77:14, 99:15, 99:18, 100:19, 102:20
**moved** [4] - 25:19, 40:5, 54:15, 99:23
**moves** [1] - 37:21
**moving** [6] - 5:24, 99:17, 99:19, 100:11, 101:7, 102:1
**MR** [182] - 3:13, 3:17, 3:19, 3:23, 4:2, 4:4, 5:14, 5:18, 6:13, 7:20, 8:11, 9:5, 9:22, 10:7, 10:10, 10:19, 11:20, 11:24, 12:2, 12:7, 12:22, 13:6, 13:16, 14:9, 14:19, 14:24, 15:13, 15:21, 15:25, 16:16, 17:8, 18:4, 18:15, 18:18,

19:3, 19:12, 19:19,
20:1, 20:21, 21:10,
21:13, 22:10, 22:20,
23:8, 23:15, 24:14,
24:20, 24:22, 24:24,
25:6, 26:5, 27:9,
27:13, 27:16, 27:19,
27:21, 27:23, 28:15,
28:18, 29:5, 29:7,
29:20, 30:15, 30:22,
31:1, 31:4, 31:10,
31:16, 32:1, 32:3,
32:5, 32:25, 33:10,
33:16, 34:3, 34:10,
34:17, 35:2, 35:8,
36:12, 36:25, 37:18,
38:9, 39:1, 39:6,
39:10, 54:1, 54:21,
55:1, 55:19, 55:21,
56:8, 56:21, 57:12,
57:14, 57:19, 58:1,
58:3, 59:2, 59:6,
59:11, 59:15, 60:9,
61:4, 61:15, 62:8,
62:21, 64:1, 64:7,
64:25, 65:6, 65:8,
65:15, 65:20, 66:3,
66:9, 66:16, 66:21,
67:3, 67:11, 67:23,
68:22, 69:1, 69:9,
69:13, 69:25, 70:8,
71:2, 71:4, 71:14,
71:16, 71:25, 72:3,
72:5, 72:17, 73:9,
74:5, 74:13, 75:15,
75:19, 76:12, 76:19,
76:21, 77:7, 77:15,
79:2, 79:4, 79:8,
79:13, 79:17, 79:23,
80:7, 80:21, 80:25,
81:13, 81:15, 81:22,
82:10, 82:12, 82:15,
82:17, 82:19, 83:2,
83:4, 83:20, 84:8,
84:23, 85:6, 85:22,
86:2, 86:7, 86:14,
86:18, 86:21, 88:7,
88:21, 89:9, 90:5,
91:5, 115:4, 115:8,
115:10
**MS** [88] - 4:5, 5:10,
39:12, 40:3, 40:10,
40:25, 41:2, 41:8,
41:11, 41:13, 42:2,
42:19, 43:3, 43:25,
44:3, 44:5, 44:19,
45:8, 45:16, 46:3,
46:14, 47:6, 48:8,
49:10, 50:16, 51:12,
52:1, 52:3, 52:11,
52:15, 52:18, 53:10,

53:13, 90:10, 91:23,
91:25, 92:12, 92:18,
92:25, 93:2, 93:5,
93:15, 94:5, 94:16,
95:9, 96:2, 97:1,
97:20, 98:2, 98:9,
98:19, 99:11, 99:25,
100:24, 101:11,
101:16, 101:23,
102:6, 102:9,
102:21, 103:21,
104:19, 105:10,
105:20, 106:2,
106:23, 107:5,
107:15, 107:21,
108:3, 108:10,
108:12, 108:14,
108:18, 108:20,
108:23, 109:7,
109:21, 110:15,
111:18, 112:3,
112:21, 113:18,
113:21, 114:5,
114:18, 114:21,
115:1
**multiple** [4] - 6:18,
70:21, 96:21, 114:10
**must** [3] - 26:11, 30:2,
39:7

# N

**name** [3] - 49:14,
56:10, 92:4
**narrow** [7] - 35:9,
35:14, 78:6, 94:13,
94:25, 95:21, 110:4
**narrowly** [2] - 73:11,
73:23
**narrowly-tailored** [1] -
73:11
**Natural** [1] - 47:1
**nature** [5] - 20:2,
76:25, 100:22, 101:7
**necessarily** [2] - 33:7,
80:4
**necessary** [9] - 4:23,
6:21, 7:15, 10:4,
11:5, 23:14, 25:2,
94:3, 110:10
**need** [17] - 4:25,
21:22, 22:5, 22:8,
59:21, 60:2, 65:4,
65:11, 67:19, 74:3,
76:7, 85:15, 85:19,
88:18, 89:8, 89:25,
113:20
**negotiate** [1] - 58:12
**negotiated** [10] -
35:18, 48:15, 48:21,

62:16, 71:4, 72:24,
73:4, 74:25, 104:2,
104:17
**negotiations** [1] -
35:25
**NEPA** [1] - 40:18
**never** [11] - 11:10,
22:11, 23:5, 24:1,
24:9, 24:11, 25:24,
56:2, 67:16, 69:20,
95:9
**nevertheless** [1] -
97:17
**new** [9] - 62:25, 70:23,
71:6, 71:9, 75:2,
88:10, 88:12, 93:22,
101:8
**New** [2] - 3:8, 63:7
**ninety** [1] - 12:4
**ninety-eight** [1] - 12:4
**NJ** [3] - 2:7, 115:19,
115:24
**NJ-CCR** [3] - 2:7,
115:19, 115:24
**non** [6] - 24:25, 79:16,
80:19, 82:3, 82:14,
99:21
**non-discretionary**
[4] - 79:16, 80:19, 82:3,
82:14
**non-final** [1] - 99:21
**non-specific** [1] -
24:25
**none** [1] - 108:8
**normally** [2] - 52:11,
70:13
**North** [1] - 3:8
**not-for-profit** [1] -
8:19
**noted** [3] - 41:2, 57:1,
57:4
**notes** [1] - 115:21
**nothing** [9] - 13:9,
26:8, 26:9, 53:5,
86:8, 91:19, 98:16,
113:12, 113:16
**notice** [39] - 64:3,
64:17, 69:11, 69:14,
69:23, 69:25, 70:16,
71:15, 71:17, 75:14,
75:16, 75:24, 76:1,
78:12, 78:13, 83:11,
83:25, 84:16, 94:14,
96:23, 97:19, 97:25,
99:22, 100:5,
100:23, 102:17,
105:7, 105:12,
105:15, 108:24,
108:25, 109:7,
109:9, 110:1, 110:2,

110:7, 110:11,
111:17, 113:6
**notices** [1] - 109:4
**notion** [1] - 44:9
**notwithstanding** [1] -
97:14
**NPRM** [1] - 75:1
**number** [9] - 20:9,
20:23, 20:25, 21:4,
21:5, 21:6, 21:7,
34:17, 113:15
**NW** [4] - 1:22, 2:4, 2:9,
116:1

# O

**object** [1] - 49:1
**obligated** [3] - 9:5,
16:25, 65:2
**obligation** [14] - 9:8,
10:20, 12:17, 12:25,
15:5, 18:5, 18:20,
24:14, 25:7, 25:11,
26:22, 78:23,
106:22, 107:12
**obligations** [11] -
9:16, 9:21, 11:6,
23:2, 65:25, 77:3,
80:10, 88:14,
100:17, 102:8,
105:18
**obviously** [2] - 44:9,
50:8
**occasions** [3] - 6:18,
7:4, 70:21
**occupation** [1] - 6:25
**odd** [4] - 50:25, 51:2,
51:3, 53:11
**OF** [11] - 1:1, 1:2, 1:6,
1:9, 1:13, 1:17, 1:21,
1:21, 2:3, 115:18
**offered** [1] - 78:13
**OFFICE** [4] - 1:13,
1:17, 1:21, 1:21
**office** [3] - 9:7, 16:10,
94:2
**OFFICIAL** [1] - 115:18
**Official** [2] - 2:8,
115:24
**officially** [1] - 64:20
**officials** [1] - 36:2
**often** [2] - 7:11, 73:18
**Ohio** [1] - 60:20
**once** [5] - 50:12, 51:3,
77:11, 93:8, 93:17
**one** [38] - 8:16, 8:23,
15:10, 20:22, 25:3,
27:9, 35:25, 36:5,
40:23, 42:16, 42:17,
44:24, 47:23, 51:7,

54:18, 54:19, 55:5,
61:20, 61:21, 64:9,
64:12, 68:7, 68:16,
69:19, 72:25, 81:8,
83:8, 89:21, 90:1,
91:3, 91:8, 91:16,
94:15, 96:10, 97:12,
99:7, 105:20
**ones** [1] - 51:10
**ongoing** [1] - 106:8
**open** [2] - 38:4, 112:9
**operate** [2] - 22:18,
61:13
**operates** [1] - 48:3
**opinion** [25] - 16:20,
17:16, 40:13, 46:4,
46:6, 49:19, 52:19,
66:10, 66:13, 71:24,
72:8, 73:24, 74:6,
74:18, 94:11, 96:8,
97:15, 97:22, 98:1,
98:16, 110:6,
110:13, 110:20,
112:4, 112:13
**opinions** [1] - 66:5
**opportunity** [1] -
113:9
**opposed** [1] - 105:13
**opposite** [1] - 58:25
**opted** [1] - 16:4
**order** [23] - 4:23, 4:25,
7:7, 7:17, 19:22,
23:14, 30:18, 51:24,
66:13, 66:25, 67:20,
77:1, 78:1, 80:16,
80:17, 86:11, 88:19,
88:20, 97:3, 105:10,
110:17, 112:2, 113:2
**ordered** [2] - 58:17,
111:23
**ordering** [1] - 9:3
**Oregon** [1] - 3:9
**organization** [2] -
28:11, 37:7
**organizational** [1] -
36:20
**organizations** [4] -
37:4, 76:5, 99:4
**otherwise** [5] - 8:20,
19:6, 28:2, 44:13,
58:22
**outcome** [1] - 57:3
**outside** [1] - 94:21
**outstanding** [1] -
68:21
**overall** [1] - 96:14
**oversight** [3] - 87:12,
114:9, 114:14
**overturned** [1] - 55:10
**overview** [1] - 5:21

**own** [14] - 9:6, 16:4, 19:4, 33:14, 38:3, 39:24, 48:10, 50:21, 50:24, 60:2, 62:7, 75:23, 89:5, 91:22
**owners** [1] - 44:21
**ozone** [2] - 88:11, 88:12

# P

**P-A-T-R-I-A-E** [1] - 27:16
**p.m.)** [1] - 115:16
**PA** [1] - 1:15
**papers** [1] - 8:16
**parallel** [1] - 70:19
**parens** [39] - 27:11, 27:13, 27:24, 27:25, 28:5, 28:7, 28:18, 28:23, 29:4, 29:16, 30:6, 30:12, 31:14, 31:18, 31:24, 32:6, 32:20, 32:21, 33:6, 36:9, 37:2, 37:20, 40:19, 40:22, 41:3, 46:7, 46:8, 46:17, 46:21, 48:5, 50:11, 50:13, 50:22, 51:16, 52:6, 52:12, 57:25, 89:16, 90:1
**PARENS** [1] - 27:16
**parents** [3] - 49:16, 49:17, 49:20
**part** [23] - 6:18, 8:4, 8:9, 9:23, 11:2, 11:24, 14:17, 14:19, 14:24, 26:19, 29:16, 29:23, 30:1, 32:18, 36:11, 43:11, 50:13, 58:25, 59:2, 72:22, 100:21, 103:6, 111:4
**participants** [1] - 36:1
**participate** [2] - 30:23, 47:2
**participated** [3] - 68:13, 76:4, 76:5
**particular** [11] - 20:4, 23:2, 35:6, 38:7, 42:7, 51:8, 58:2, 80:17, 84:5, 94:8
**particularly** [2] - 32:9, 68:15
**parties** [6] - 43:12, 52:22, 100:9, 100:13, 100:18, 106:22
**parties'** [2] - 4:14, 4:18
**partners** [2] - 34:20

**parts** [3] - 5:24, 95:6, 104:15
**party** [5] - 22:14, 26:20, 30:16, 30:17, 52:23
**passed** [1] - 114:23
**passing** [1] - 114:15
**past** [1] - 59:20
**patriae** [39] - 27:11, 27:13, 27:24, 27:25, 28:5, 28:7, 28:19, 28:23, 29:6, 29:16, 30:6, 30:12, 31:14, 31:19, 31:24, 32:7, 32:20, 32:21, 33:6, 36:9, 37:2, 37:20, 40:19, 40:22, 41:3, 46:7, 46:8, 46:17, 46:21, 48:5, 50:12, 50:13, 50:22, 51:16, 52:7, 52:12, 57:25, 89:16, 90:1
**Paul** [1] - 1:18
**pause** [3] - 23:19, 29:12, 98:8
**pay** [2] - 7:16, 15:15
**payment** [1] - 83:22
**pending** [2] - 4:13, 5:1
**PENNSYLVANIA** [1] - 1:13
**Pennsylvania** [8] - 3:6, 3:14, 5:11, 5:16, 21:3, 60:21, 60:24, 91:20
**people** [17] - 14:21, 15:20, 20:13, 27:5, 46:2, 49:9, 50:24, 51:9, 59:14, 63:4, 63:7, 63:12, 75:1, 96:1, 103:5, 105:25
**People's** [3] - 28:21, 31:18, 46:24
**people's** [1] - 51:10
**percent** [2] - 12:5, 74:17
**perfectly** [1] - 62:15
**perform** [3] - 65:2, 65:16, 65:22
**performance** [1] - 68:5
**performed** [1] - 65:17
**performing** [3] - 59:2, 59:4, 77:11
**perhaps** [7] - 11:16, 17:18, 38:17, 42:15, 63:22, 74:21, 80:10
**period** [3] - 64:19, 64:20, 114:1
**permit** [2] - 47:12
**permitee** [1] - 47:15

**permits** [1] - 47:9
**permitted** [3] - 18:19, 56:23, 70:22
**permitting** [2] - 47:23, 47:25
**person** [7] - 31:6, 63:6, 80:3, 80:5, 85:8, 91:13
**perspective** [4] - 21:20, 53:12, 62:19, 105:19
**persuaded** [1] - 57:6
**pertaining** [1] - 94:15
**perverse** [1] - 7:6
**phase** [1] - 6:1
**Philadelphia** [1] - 1:15
**physical** [2] - 91:14, 92:16
**pick** [1] - 103:17
**picked** [1] - 101:8
**piece** [1] - 51:25
**place** [6] - 7:13, 81:24, 90:18, 111:4, 111:21
**plaintiff** [12] - 3:15, 21:3, 23:7, 25:14, 28:11, 30:14, 54:19, 55:18, 55:24, 56:3, 93:11, 98:13
**plaintiff's** [3] - 40:7, 41:6, 112:22
**plaintiffs** [15] - 5:22, 6:7, 47:22, 54:21, 94:25, 95:5, 98:19, 106:13, 108:1, 108:23, 109:3, 109:22, 111:9, 112:6
**Plaintiffs** [2] - 1:3, 1:13
**plaintiffs'** [4] - 4:20, 5:7, 6:8, 6:9
**plans** [1] - 83:22
**play** [8] - 34:19, 35:11, 35:15, 42:20, 49:4, 55:7, 60:18, 89:19
**point** [27] - 6:6, 11:8, 25:11, 26:16, 26:25, 27:9, 30:9, 63:3, 67:14, 69:18, 72:6, 77:16, 85:13, 89:1, 90:12, 91:6, 91:10, 93:21, 95:15, 98:20, 99:12, 102:19, 104:12, 104:14, 104:21, 107:22, 109:5
**pointed** [4] - 27:11, 64:11, 90:16, 113:4
**pointing** [2] - 66:17, 112:24
**points** [7] - 48:20,

49:4, 54:2, 74:5, 76:10, 76:21, 83:5
**police** [1] - 58:13
**policies** [3] - 16:12, 16:14, 25:1
**policy** [7] - 14:6, 14:10, 16:6, 17:22, 17:23, 18:1, 62:22
**political** [1] - 91:16
**pool** [1] - 44:24
**population** [1] - 51:19
**portions** [1] - 111:14
**position** [5] - 25:25, 28:10, 67:6, 96:22
**positions** [1] - 4:19
**possible** [2] - 40:4, 47:20
**possibly** [1] - 11:11
**post** [3] - 87:12, 87:13, 99:5
**post-secondary** [2] - 87:12, 87:13
**posting** [4] - 68:7, 68:16, 68:20, 107:1
**potential** [4] - 43:12, 43:13, 46:18, 48:18
**potentially** [1] - 45:4
**power** [4] - 58:24, 90:13, 90:15, 91:16
**powers** [5] - 13:19, 15:4, 37:23, 58:13, 60:6
**practical** [4] - 67:6, 68:19, 69:17, 103:25
**practicality** [1] - 60:4
**pragmatic** [3] - 98:22, 100:10, 103:25
**pragmatically** [2] - 100:2, 102:22
**pre** [1] - 15:25
**pre-existing** [1] - 15:25
**precisely** [2] - 20:11, 21:11
**precluded** [1] - 113:1
**precludes** [1] - 59:4
**predated** [1] - 17:9
**predict** [1] - 43:16
**predicted** [1] - 43:14
**prediction** [1] - 43:9
**preempted** [6] - 58:15, 58:23, 60:15, 61:16, 83:12, 84:13
**preemption** [7] - 60:6, 83:7, 83:17, 84:16, 89:18, 89:23, 89:25
**prepare** [1] - 6:24
**prerogatives** [2] - 58:10, 58:16
**presumably** [3] - 20:8,

47:13, 47:24
**presume** [1] - 20:10
**pretty** [4] - 18:12, 46:8, 63:12, 110:14
**prevailed** [1] - 112:12
**prevalent** [1] - 21:2
**prevent** [1] - 7:9
**preventing** [2] - 28:2, 57:3
**previous** [1] - 62:16
**previously** [1] - 85:14
**primary** [3] - 5:17, 35:3, 61:18
**principle** [2] - 22:11, 110:8
**printings** [1] - 107:1
**priorities** [1] - 93:22
**private** [5] - 28:11, 42:21, 43:7, 43:18, 43:19
**problem** [23] - 10:25, 12:20, 13:1, 26:23, 27:2, 27:6, 33:14, 33:17, 62:1, 62:6, 63:19, 63:21, 89:5, 96:13, 96:18, 96:20, 110:8, 113:11, 114:3, 114:4, 114:8, 114:12
**problematic** [1] - 96:17
**procedural** [11] - 40:18, 86:25, 105:7, 105:13, 105:16, 106:20, 106:24, 107:3, 107:7, 110:14, 110:18
**procedure** [3] - 5:3, 5:6, 96:24
**Procedures** [1] - 4:15
**procedures** [1] - 64:3
**proceeding** [2] - 30:16, 30:17
**proceedings** [3] - 36:4, 115:16, 115:22
**Proceedings** [1] - 2:11
**process** [22] - 33:20, 35:18, 35:22, 43:11, 48:15, 48:17, 48:21, 67:25, 68:13, 69:24, 71:5, 75:5, 76:1, 76:3, 77:24, 81:3, 93:24, 94:9, 110:19, 112:6, 113:6, 113:7
**processes** [1] - 95:22
**produced** [2] - 2:12, 74:15
**producing** [1] - 69:15
**professions** [1] -

96:10
**profit** [7] - 7:11, 8:18, 8:19, 12:5, 13:14, 19:7, 33:23
**program** [18] - 16:22, 17:2, 17:10, 17:12, 20:4, 20:5, 24:6, 24:7, 44:14, 47:10, 69:21, 72:14, 97:17, 98:25, 102:7, 114:8, 114:9
**program's** [2] - 96:14, 105:1
**programatic** [3] - 113:1, 114:7, 114:14
**programs** [31] - 7:17, 12:4, 12:5, 12:8, 12:14, 18:6, 19:14, 19:17, 19:24, 20:7, 20:14, 20:16, 20:19, 20:22, 20:23, 20:25, 21:1, 21:8, 21:10, 21:24, 22:6, 22:18, 27:3, 43:1, 44:25, 56:24, 61:2, 68:3, 91:21
**prohibited** [1] - 51:17
**prohibition** [3] - 81:13, 82:19, 82:20
**prohibitions** [1] - 80:22
**prominent** [1] - 57:21
**prominently** [1] - 40:6
**promise** [3] - 27:7, 84:21, 84:23
**promised** [1] - 9:19
**promote** [1] - 99:5
**promotion** [1] - 106:1
**promotional** [5] - 68:8, 68:20, 68:24, 72:14, 106:15
**promulgated** [2] - 13:22, 23:17
**promulgators** [1] - 99:6
**prong** [1] - 50:17
**prongs** [1] - 48:8
**property** [3] - 13:5, 45:25, 91:13
**proposals** [1] - 77:23
**propose** [1] - 69:21
**proposed** [8] - 35:25, 54:22, 54:23, 54:24, 55:17, 56:14, 69:15
**proprietors** [1] - 44:21
**prospective** [3] - 21:14, 68:9
**prospects** [1] - 10:2
**protect** [9] - 36:22, 46:11, 47:16, 48:24,

49:3, 49:16, 50:7, 50:8, 58:17
**protected** [3] - 33:12, 49:7, 51:8
**protecting** [9] - 28:1, 28:3, 32:7, 36:17, 37:9, 49:22, 51:9, 60:2, 89:17
**Protection** [1] - 59:14
**PROTECTION** [2] - 1:18, 1:21
**protection** [14] - 9:6, 9:8, 11:14, 13:18, 49:1, 51:5, 53:3, 53:8, 60:11, 60:17, 60:18, 83:14, 84:2, 86:11
**protections** [1] - 9:17
**prove** [1] - 33:8
**proven** [2] - 6:20
**provide** [17] - 4:22, 4:25, 9:10, 11:7, 13:24, 15:14, 15:20, 16:25, 17:3, 17:23, 26:18, 39:21, 47:1, 54:7, 57:12, 66:5, 78:25
**provided** [1] - 39:16
**provides** [2] - 8:12, 30:3
**providing** [4] - 5:21, 18:6, 47:4, 106:15
**Province** [2] - 40:14, 46:22
**provision** [8] - 30:13, 30:16, 30:19, 30:22, 31:5, 32:19, 47:4, 49:21
**provisions** [1] - 73:25
**prudential** [14] - 7:25, 30:1, 31:20, 32:14, 34:1, 34:3, 37:22, 38:11, 47:22, 50:10, 50:17, 51:6, 51:25
**psychic** [1] - 24:13
**Public** [1] - 68:12
**public** [7] - 20:5, 21:10, 42:21, 43:7, 43:17, 43:21, 44:13
**published** [2] - 16:20, 54:6
**publishing** [1] - 69:16
**purpose** [12] - 4:24, 7:5, 16:1, 31:9, 37:7, 39:17, 44:18, 45:6, 48:22, 49:13, 49:21, 87:21
**purposes** [10] - 7:24, 17:6, 23:21, 25:12, 30:6, 34:11, 55:21,

55:22, 77:8, 104:18
**pursue** [1] - 83:13
**push** [1] - 84:15
**pushed** [1] - 103:6
**pushing** [2] - 103:11, 103:13
**put** [11] - 21:6, 33:22, 45:4, 64:17, 74:24, 74:25, 83:10, 95:7, 95:10, 101:9, 110:5
**puts** [1] - 99:22
**putting** [2] - 31:23, 67:20

## Q

**qualify** [2] - 41:25, 101:3
**quasi** [13] - 15:2, 28:1, 28:4, 30:7, 37:2, 46:1, 51:5, 51:13, 51:14, 51:20, 86:25, 89:17, 91:14
**quasi-sovereign** [12] - 15:2, 28:1, 28:4, 30:7, 37:2, 46:1, 51:5, 51:14, 51:20, 86:25, 89:17, 91:14
**questions** [3] - 5:2, 91:15, 98:21
**quickly** [1] - 36:8
**quintessential** [1] - 85:7
**quite** [1] - 61:25
**quo** [2] - 11:21, 13:9
**quote** [1] - 29:24

## R

**raise** [1] - 105:10
**raised** [1] - 91:1
**raising** [1] - 108:23
**rate** [4] - 65:3, 104:6, 105:4, 114:8
**rates** [2] - 64:14, 79:20, 82:8
**rather** [2] - 30:1, 56:20
**ratio** [4] - 23:4, 61:11, 79:1, 80:15
**rational** [2] - 74:2, 75:25
**rationale** [1] - 69:5
**ratios** [1] - 61:9
**reach** [1] - 84:3
**reached** [1] - 99:18
**read** [16] - 13:3, 17:15, 17:19, 28:6, 47:3, 59:25, 63:9, 72:9, 78:25, 79:18, 81:15, 82:1, 82:19, 92:5,

97:15, 97:25
**reading** [1] - 63:7
**ready** [1] - 102:17
**realize** [1] - 25:9
**really** [33] - 13:22, 23:20, 25:14, 26:18, 28:5, 33:15, 36:7, 39:25, 42:19, 42:23, 46:1, 48:9, 48:23, 49:5, 61:12, 62:6, 62:12, 62:13, 66:4, 69:17, 74:23, 85:14, 89:2, 91:21, 92:2, 94:11, 95:24, 97:10, 100:23, 101:25, 103:19, 110:20, 112:14
**reason** [9] - 8:25, 24:7, 83:15, 88:2, 88:4, 98:17, 103:6, 107:25, 110:13
**reasonable** [7] - 65:11, 65:24, 65:25, 95:19, 95:24, 96:6, 111:12
**reasonably** [2] - 21:15, 94:12
**reasoning** [3] - 97:4, 101:24, 112:13
**reasons** [3] - 34:18, 78:19, 109:6
**reauthorization** [1] - 54:13
**receive** [1] - 6:23
**received** [2] - 74:16, 97:9
**recent** [1] - 40:8
**recently** [5] - 13:4, 83:8, 83:10, 88:8, 88:11
**recess** [2] - 76:15, 76:16
**Reclamation's** [1] - 40:17
**recognition** [2] - 36:3, 37:14
**recognize** [2] - 46:15, 65:10, 96:20
**recognized** [5] - 6:25, 31:12, 52:6, 59:18, 70:9
**recognizes** [5] - 28:8, 31:18, 35:17, 38:14, 88:17
**recognizing** [1] - 91:11
**record** [5] - 3:12, 22:1, 22:8, 22:14, 74:14
**recorded** [1] - 2:11
**redress** [1] - 65:19

**redressability** [1] - 33:10
**reduce** [1] - 58:14
**reduced** [1] - 29:1
**reduction** [1] - 58:11
**refer** [1] - 96:13
**reference** [1] - 30:21
**referencing** [1] - 84:6
**referred** [3] - 7:2, 8:4, 96:15
**refusal** [4] - 6:15, 8:15, 14:6, 27:7
**refuse** [1] - 93:23
**refusing** [1] - 85:9
**regard** [10] - 10:13, 39:13, 41:13, 45:13, 48:2, 50:3, 91:25, 99:11, 109:11, 113:23
**regarding** [1] - 4:18
**regardless** [3] - 9:18, 61:3, 114:11
**regards** [1] - 84:11
**Register** [1] - 69:4
**regulate** [3] - 42:15, 90:15, 91:16
**regulates** [1] - 52:22
**regulating** [3] - 8:7, 55:7, 58:22
**regulation** [20] - 6:16, 6:17, 6:20, 8:3, 34:13, 38:5, 60:11, 70:13, 70:19, 80:16, 82:12, 84:24, 85:2, 90:19, 94:6, 106:2, 112:25, 113:12, 113:15, 113:20
**Regulation** [3] - 6:17, 7:2, 90:16
**regulations** [18] - 38:6, 39:20, 41:18, 42:18, 45:3, 46:12, 49:8, 53:4, 53:5, 59:18, 59:19, 72:23, 77:20, 85:9, 91:22, 92:15, 93:24, 105:3
**regulator** [1] - 35:5
**regulators** [5] - 34:21, 34:25, 35:3, 60:14, 90:14
**regulatory** [2] - 70:25, 91:2
**reject** [2] - 41:6, 45:11
**rejected** [5] - 26:6, 39:22, 41:20, 77:24, 77:25
**related** [1] - 16:12
**relates** [1] - 37:7
**relating** [2] - 15:6, 35:19

**relatively** [1] - 103:1
**relevant** [5] - 28:18, 34:11, 35:16, 57:21, 82:12
**reliance** [1] - 41:7
**relied** [2] - 55:6, 73:20
**relief** [7] - 55:24, 56:13, 56:18, 56:21, 65:21, 88:19
**relieving** [1] - 95:2
**rely** [6] - 18:19, 53:2, 78:6, 78:9, 94:12, 110:13
**relying** [2] - 41:4, 46:18
**remain** [2] - 16:23, 17:1
**remains** [1] - 104:25
**remarkably** [1] - 4:15
**remedies** [1] - 77:22
**remedy** [5] - 59:16, 59:17, 73:23, 76:25, 97:16
**remember** [3] - 49:13, 90:25, 92:4
**render** [1] - 59:6
**renders** [1] - 80:11
**repaid** [1] - 89:13
**repayment** [1] - 70:20
**repeated** [1] - 112:16
**repeatedly** [2] - 70:9, 84:24
**replies** [2] - 6:3, 6:10
**reply** [1] - 48:14
**report** [1] - 73:19
**REPORTER** [3] - 29:19, 72:16, 115:18
**Reporter** [3] - 2:7, 2:8, 115:24
**reporter** [1] - 76:7
**represent** [1] - 37:5
**representations** [1] - 64:21
**representative** [1] - 39:24
**representatives** [1] - 3:5
**represented** [2] - 55:16, 57:9
**request** [1] - 65:12
**requested** [1] - 65:21
**require** [9] - 51:1, 62:4, 62:20, 79:1, 95:16, 96:12, 98:1, 98:4, 109:9
**required** [19] - 7:16, 8:17, 9:2, 20:16, 66:7, 67:5, 68:3, 71:17, 78:12, 88:14, 97:23, 99:1, 103:25,

105:13, 105:15, 106:7, 109:1, 112:17, 112:19
**requirement** [16] - 68:14, 68:15, 68:16, 69:2, 71:16, 72:12, 72:20, 80:4, 82:4, 103:14, 105:21, 105:22, 105:25, 107:4, 108:15, 108:18
**requirements** [20] - 17:18, 18:11, 39:21, 67:24, 68:1, 68:3, 72:22, 75:11, 78:3, 95:2, 98:13, 98:14, 98:18, 98:24, 99:4, 101:25, 104:20, 106:24, 107:7, 111:8
**requires** [14] - 23:5, 54:16, 54:17, 55:23, 56:12, 69:14, 71:20, 80:18, 96:1, 100:5, 100:12, 102:7, 109:19, 110:6
**requiring** [8] - 42:5, 42:10, 53:7, 56:17, 68:16, 72:13, 72:21, 95:17
**reset** [1] - 70:25
**residents** [11] - 28:2, 28:3, 32:8, 33:1, 33:8, 33:11, 36:17, 37:9, 38:3, 89:17
**resources** [8] - 8:17, 15:11, 33:20, 33:24, 43:21, 85:12, 86:15, 89:13
**respect** [47] - 4:12, 5:6, 16:6, 18:1, 22:9, 24:4, 35:1, 35:2, 35:4, 36:9, 38:24, 42:12, 47:19, 48:3, 49:7, 50:11, 56:2, 62:14, 64:4, 66:6, 66:13, 67:13, 73:20, 74:1, 74:7, 74:8, 74:19, 74:21, 75:11, 79:25, 80:19, 84:5, 85:11, 86:6, 89:3, 89:24, 90:1, 91:1, 91:3, 92:10, 95:4, 95:20, 95:25, 96:18, 103:15, 108:15, 111:24
**respective** [1] - 62:14
**respects** [1] - 87:7
**respond** [6] - 6:2, 6:9, 53:25, 64:20, 76:11, 111:15

**response** [9] - 15:22, 17:9, 54:3, 75:25, 90:11, 90:24, 96:24, 96:25, 112:2
**responsibilities** [3] - 8:2, 15:6, 105:18
**responsibility** [6] - 32:10, 37:15, 37:16, 37:19, 61:18, 95:3
**responsible** [4] - 8:6, 46:2, 80:3, 91:17
**restate** [1] - 4:22
**restrict** [1] - 61:2
**restricted** [1] - 60:1
**result** [14] - 8:14, 10:24, 12:7, 15:5, 17:2, 23:11, 23:20, 25:7, 32:11, 55:24, 73:18, 78:3, 86:15, 87:9
**resulting** [1] - 41:16
**retaining** [1] - 106:5
**return** [1] - 83:5
**revenue** [2] - 19:6, 43:6
**review** [8] - 23:22, 25:1, 30:19, 31:5, 47:3, 72:22, 72:23, 95:24
**reviewed** [2] - 11:1, 97:2
**revisit** [2] - 73:4, 76:2
**revoking** [1] - 9:11
**rewrite** [1] - 35:20
**Rhode** [2] - 3:9, 58:11
**rights** [9] - 38:3, 47:16, 75:23, 87:1, 91:13, 91:14, 100:8
**ripeness** [1] - 114:3
**ripping** [2] - 10:1, 11:4
**rise** [3] - 76:14, 100:23, 115:14
**role** [12] - 34:19, 35:10, 35:15, 47:14, 47:16, 48:6, 49:5, 50:11, 55:7, 59:2, 59:5, 60:18
**roles** [1] - 60:12
**Room** [2] - 2:8, 115:25
**roughly** [1] - 67:12
**RPR** [3] - 2:7, 115:19, 115:24
**rule** [137] - 5:1, 7:1, 7:3, 7:5, 7:9, 7:13, 9:15, 9:20, 9:23, 9:24, 10:15, 10:20, 11:10, 11:13, 11:15, 11:21, 11:23, 12:10, 12:19, 12:23, 13:22, 14:14, 14:16, 21:13,

21:14, 21:21, 21:24, 22:2, 22:3, 22:5, 22:7, 22:12, 22:23, 23:1, 23:5, 23:16, 24:1, 24:9, 24:15, 24:24, 25:24, 26:1, 26:25, 29:2, 29:9, 29:10, 30:11, 33:11, 35:19, 37:12, 40:21, 43:10, 46:15, 59:23, 61:24, 62:22, 63:19, 64:15, 67:5, 67:9, 68:2, 69:15, 69:16, 69:21, 70:15, 70:23, 71:5, 71:6, 71:7, 71:8, 71:9, 71:12, 71:17, 71:21, 73:14, 74:7, 74:9, 74:21, 75:2, 75:10, 75:21, 77:3, 77:10, 78:9, 78:10, 78:23, 78:25, 79:2, 79:18, 80:8, 80:12, 80:21, 86:13, 87:7, 87:8, 87:9, 87:11, 87:18, 87:24, 88:2, 88:4, 88:10, 88:12, 88:15, 89:15, 94:23, 95:6, 98:14, 99:7, 100:12, 100:14, 101:2, 101:13, 101:17, 103:12, 103:23, 104:10, 104:11, 104:14, 105:16, 106:4, 106:6, 106:20, 107:13, 110:5, 110:18, 111:4, 113:3, 113:5, 113:7, 113:9
**Rule** [1] - 57:7
**rule's** [1] - 7:19
**rulemaking** [19] - 35:18, 35:22, 43:11, 48:15, 48:21, 68:13, 69:15, 70:10, 70:14, 71:5, 71:18, 72:24, 73:4, 74:20, 74:25, 77:24, 104:2, 104:17
**rules** [8] - 13:23, 38:24, 79:9, 81:23, 104:3, 104:4, 105:24, 110:14
**ruling** [1] - 110:23
**run** [1] - 70:22

**S**

**sad** [1] - 62:18
**satisfied** [1] - 75:16
**satisfies** [2] - 32:11,

32:12
**satisfy** [5] - 32:13, 32:22, 36:12, 51:24, 53:18
**save** [1] - 77:12
**saw** [2] - 12:9, 63:19
**Scalia** [4] - 28:22, 29:8, 29:13, 29:22
**Scalia's** [1] - 32:11
**scenario** [6] - 10:18, 23:25, 24:16, 47:24, 62:3, 92:10
**scenarios** [1] - 34:2
**scheme** [9] - 46:25, 47:25, 48:24, 51:8, 51:11, 61:10, 84:5, 90:22, 111:14
**school** [12] - 20:15, 23:3, 23:11, 43:19, 57:2, 60:22, 77:2, 90:20, 112:10, 112:17
**Schools** [2] - 54:11, 73:12
**schools** [44] - 6:23, 13:21, 13:25, 33:18, 33:21, 33:23, 34:21, 35:11, 42:21, 43:2, 43:7, 43:15, 43:17, 43:18, 44:14, 44:25, 45:4, 53:7, 55:10, 55:12, 56:23, 59:7, 64:12, 64:19, 68:3, 68:23, 74:12, 75:12, 78:2, 78:15, 89:11, 90:14, 90:15, 90:17, 95:3, 95:23, 96:7, 96:9, 97:3, 112:8, 113:8
**scope** [4] - 84:14, 91:1, 94:21
**scramble** [1] - 95:15
**second** [11] - 12:11, 19:1, 64:13, 66:22, 67:15, 67:24, 68:7, 77:10, 98:15, 104:24, 114:23
**secondary** [2] - 87:12, 87:13
**secretary** [19] - 9:11, 70:24, 79:5, 79:19, 80:17, 81:5, 81:6, 81:17, 81:21, 81:24, 82:8, 82:16, 82:20, 82:22, 82:24, 82:25, 93:21
**section** [1] - 81:4
**sector** [1] - 12:5
**security** [1] - 73:19
**Security** [4] - 65:13,

96:16, 111:2, 111:19
**see** [22] - 5:24, 6:23, 7:9, 11:5, 19:16, 23:20, 34:22, 45:24, 49:2, 50:10, 51:22, 52:10, 52:14, 73:3, 75:18, 79:20, 80:6, 84:5, 95:5, 108:17, 109:18, 110:3
**seeing** [1] - 7:13
**seeking** [5] - 11:16, 36:22, 48:20, 93:7, 114:15
**seem** [5] - 10:16, 42:19, 45:9, 73:24, 90:12
**segue** [1] - 5:23
**self** [6] - 15:19, 15:21, 16:2, 16:8, 17:5, 97:8
**self-employed** [1] - 97:8
**self-inflicted** [5] - 15:19, 15:21, 16:2, 16:8, 17:5
**send** [1] - 64:12
**sending** [1] - 64:18
**sense** [7] - 9:2, 19:13, 42:3, 63:22, 63:23, 100:9, 110:16
**separate** [4] - 30:22, 54:23, 54:24, 108:21
**separation** [1] - 37:23
**series** [1] - 82:9
**serious** [1] - 10:25
**serve** [1] - 48:22
**servicers** [2] - 83:9, 84:2
**services** [2] - 83:13, 83:21
**set** [7] - 5:21, 44:23, 64:9, 67:13, 68:4, 112:13, 113:25
**sets** [1] - 52:20
**several** [6] - 7:3, 23:10, 30:23, 57:22, 68:12, 83:8
**shall** [9] - 79:3, 79:4, 79:14, 80:8, 80:11, 80:23, 81:17, 82:23, 82:24
**shift** [2] - 22:4, 63:3
**short** [1] - 115:3
**shorthand** [1] - 2:11
**shove** [1] - 32:16
**show** [10] - 21:12, 22:1, 36:21, 53:14, 55:4, 55:5, 77:21, 87:5, 89:25, 110:10
**showing** [4] - 45:13,

55:23, 71:18, 74:15
**shows** [4] - 58:5, 59:21, 70:1, 83:15
**shut** [4] - 20:4, 20:14, 21:25, 60:21
**sic** [2] - 24:18, 104:8
**side** [2] - 55:19, 81:18
**sides** [1] - 50:20
**significant** [1] - 7:10
**significantly** [1] - 35:24
**similar** [5] - 17:19, 31:2, 39:14, 45:23, 109:11
**similarly** [1] - 31:5
**simply** [29] - 8:1, 12:7, 18:24, 19:12, 22:12, 23:16, 25:6, 34:5, 35:14, 41:20, 43:4, 43:18, 45:12, 47:16, 47:18, 51:18, 62:10, 65:21, 70:22, 77:2, 84:17, 90:1, 98:24, 99:13, 105:3, 105:20, 109:9, 112:18, 113:6
**sitting** [1] - 63:6
**situation** [20] - 13:8, 20:24, 24:13, 26:9, 26:14, 27:8, 31:3, 39:14, 40:1, 45:11, 56:9, 59:1, 86:22, 88:24, 90:13, 91:7, 94:15, 100:2, 102:21, 112:7
**situations** [3] - 60:9, 60:22, 71:23
**skeptical** [1] - 82:5
**skills** [2] - 7:14, 10:4
**slipped** [1] - 90:7
**slipping** [1] - 18:8
**slow** [2] - 29:19, 72:16
**small** [1] - 20:23
**Social** [4] - 65:13, 96:16, 111:1, 111:19
**social** [1] - 73:19
**sole** [3] - 60:13, 83:25, 84:12
**solely** [2] - 89:19, 89:23
**solicitude** [8] - 28:9, 28:14, 38:15, 39:4, 45:15, 45:21, 45:25, 89:22
**solution** [7] - 18:1, 61:20, 61:21, 61:23, 61:24, 62:16, 63:18
**solutions** [1] - 62:7
**solve** [6] - 12:20, 27:6, 33:14, 33:17, 60:25,

89:5
**solved** [1] - 18:3
**solving** [1] - 62:1
**sometimes** [1] - 80:6
**somewhat** [1] - 86:23
**somewhere** [3] - 20:8, 29:11, 89:6
**sorry** [13] - 3:25, 5:12, 27:13, 29:20, 32:15, 34:8, 55:14, 57:2, 76:17, 77:15, 79:17, 82:7, 101:5
**Sorry** [2] - 25:4, 72:17
**sort** [14] - 11:4, 12:24, 25:19, 29:1, 36:17, 36:20, 37:3, 62:24, 63:22, 66:5, 90:7, 93:11, 95:1, 109:18
**sorts** [1] - 61:23
**sought** [6] - 39:15, 55:24, 56:13, 56:18, 56:21, 65:21
**sounds** [6] - 7:18, 9:15, 17:16, 59:24, 60:7, 62:2
**sources** [1] - 33:24
**sovereign** [22] - 15:2, 28:1, 28:4, 30:7, 37:2, 41:5, 45:19, 45:22, 45:23, 46:1, 51:5, 51:14, 51:20, 58:10, 58:15, 86:25, 89:17, 91:14, 92:3, 92:6, 92:7, 92:18
**sovereigns** [2] - 37:14, 91:9
**sovereignty** [2] - 91:17, 92:19
**speaking** [1] - 64:8
**special** [8] - 28:9, 28:13, 38:15, 39:4, 45:15, 45:21, 45:24, 89:22
**specific** [11] - 9:10, 21:6, 24:25, 25:7, 30:13, 64:11, 78:1, 89:10, 94:18, 94:20, 113:20
**specifically** [7] - 58:19, 78:7, 81:3, 94:17, 97:14, 109:5, 111:25
**spectators** [1] - 8:1
**speculative** [4] - 20:3, 20:13, 21:19, 53:18
**spell** [2] - 27:15, 71:21
**spelled** [1] - 89:11
**spend** [5] - 8:17, 15:10, 27:6, 42:6, 43:25

**spending** [1] - 86:5
**sphere** [1] - 39:19
**spheres** [1] - 62:14
**sponsored** [1] - 89:12
**St** [2] - 1:14, 1:18
**stage** [5] - 5:21, 53:14, 53:15, 53:19, 53:20
**stake** [2] - 45:22, 45:23
**stakeholders** [4] - 35:23, 48:16, 57:8
**stall** [1] - 71:8
**stalling** [1] - 71:12
**standard** [4] - 47:8, 78:1, 87:2, 97:12
**standards** [3] - 53:19, 100:1, 112:8
**standing** [92] - 4:19, 5:24, 6:2, 6:3, 6:7, 7:23, 7:25, 8:10, 8:12, 16:18, 16:21, 16:24, 17:6, 17:18, 22:15, 22:17, 22:19, 25:4, 25:10, 25:12, 26:20, 27:10, 27:11, 27:14, 27:24, 27:25, 28:6, 28:9, 28:19, 28:22, 29:6, 29:11, 29:18, 29:25, 31:14, 31:17, 31:19, 31:21, 32:2, 32:12, 34:1, 34:3, 36:11, 36:16, 36:20, 36:22, 37:3, 39:13, 39:23, 40:9, 40:22, 41:4, 41:10, 44:8, 44:18, 46:17, 46:21, 47:22, 48:9, 50:10, 50:14, 50:17, 51:6, 51:16, 51:25, 52:7, 52:12, 52:17, 53:19, 53:22, 54:16, 54:20, 55:4, 55:5, 55:21, 55:22, 56:1, 56:2, 56:4, 56:6, 56:8, 56:12, 57:4, 57:5, 57:16, 57:22, 83:5, 85:3, 87:3, 89:3, 90:1, 90:7
**standpoint** [2] - 16:9, 95:23
**stands** [2] - 76:14, 115:14
**start** [7] - 5:20, 8:9, 29:20, 76:1, 77:10, 77:16, 90:8
**started** [3] - 23:18, 70:25, 71:4
**starters** [1] - 23:9
**starting** [1] - 10:22
**state** [82] - 3:12, 9:11,

10:21, 13:5, 13:10, 14:17, 14:21, 14:25, 16:2, 16:3, 16:10, 17:21, 18:21, 19:17, 20:17, 26:21, 29:3, 30:5, 30:11, 30:14, 30:25, 31:8, 32:9, 33:14, 36:1, 36:2, 37:9, 37:16, 38:1, 38:2, 38:5, 38:7, 39:15, 39:19, 40:9, 40:15, 41:4, 43:15, 43:20, 43:21, 44:25, 46:1, 46:10, 47:11, 47:13, 47:15, 47:16, 47:20, 47:23, 49:8, 50:15, 50:21, 50:23, 51:4, 51:7, 51:9, 51:13, 51:18, 51:19, 52:13, 56:24, 57:22, 58:9, 58:14, 60:25, 61:1, 61:5, 61:10, 61:14, 62:6, 62:8, 83:10, 83:13, 89:11, 89:12, 90:20, 90:21, 91:12, 92:14, 92:15, 92:16
**State** [8] - 3:3, 3:7, 3:10, 3:20, 5:8, 40:15, 87:13, 91:20
**STATE** [1] - 1:2
**state's** [11] - 15:1, 15:10, 16:7, 40:11, 45:19, 47:14, 48:16, 50:7, 53:17, 57:6, 62:4
**state-sponsored** [1] - 89:12
**statement** [2] - 91:11, 96:19
**STATES** [3] - 1:1, 1:6, 1:10
**states** [137] - 3:15, 3:21, 5:13, 6:14, 7:20, 7:21, 7:23, 8:1, 8:2, 8:4, 8:5, 8:13, 8:14, 8:16, 9:1, 9:4, 9:5, 9:9, 9:16, 9:24, 9:25, 10:23, 11:13, 11:16, 12:14, 15:14, 15:16, 18:19, 19:4, 21:1, 21:3, 22:7, 26:21, 27:25, 28:9, 29:15, 30:23, 31:10, 32:7, 32:10, 33:16, 33:17, 33:18, 34:5, 34:15, 34:18, 34:19, 35:10, 35:17, 37:12, 37:24, 38:12, 38:17, 38:20, 38:23, 39:3,

39:17, 39:21, 40:22, 41:14, 42:5, 42:6, 42:7, 42:22, 43:5, 43:13, 43:14, 43:22, 44:12, 44:19, 44:21, 45:12, 45:20, 46:14, 46:16, 46:18, 46:23, 47:2, 47:5, 48:1, 49:4, 49:11, 49:23, 50:5, 52:6, 53:2, 53:14, 54:9, 54:15, 54:22, 55:2, 55:4, 55:5, 55:7, 57:2, 57:5, 60:1, 60:11, 60:13, 60:15, 60:16, 62:15, 62:19, 76:4, 83:8, 83:11, 83:15, 83:20, 84:1, 84:9, 84:13, 84:15, 84:17, 85:10, 85:14, 86:2, 86:3, 86:21, 87:8, 87:10, 87:19, 88:13, 88:18, 88:21, 89:22, 90:12, 90:14, 90:17, 90:23, 91:6, 91:18, 92:1, 92:3, 92:5, 94:17
**States** [5] - 3:4, 16:17, 16:23, 87:11, 115:25
**states'** [7] - 7:23, 18:22, 37:20, 62:18, 63:16, 86:25, 92:11
**status** [3] - 11:21, 13:9, 64:9
**statute** [14] - 30:21, 34:11, 34:12, 38:2, 39:16, 48:24, 49:3, 49:8, 49:10, 49:12, 49:15, 49:24, 51:23, 80:1
**statute's** [1] - 49:1
**statutes** [3] - 9:7, 13:18, 33:19
**statutory** [6] - 6:25, 30:13, 30:15, 46:25, 47:1, 84:5
**stay** [1] - 17:4
**stenographic** [1] - 115:21
**step** [8] - 52:9, 66:16, 66:18, 66:22, 113:23, 114:5, 114:6, 114:23
**stepped** [1] - 60:14
**steps** [9] - 8:22, 65:24, 94:2, 94:7, 113:13, 113:16, 113:17, 114:11, 114:13
**Steve** [1] - 4:7
**Steven** [1] - 2:6

**Stevens** [2] - 39:3, 58:9
**still** [20] - 10:11, 13:8, 32:17, 32:23, 38:10, 45:9, 57:6, 63:16, 65:1, 68:21, 75:23, 77:17, 89:9, 99:1, 100:19, 101:5, 102:18, 104:10, 104:11, 104:15
**stolen** [1] - 20:20
**stop** [4] - 71:7, 88:20, 95:17, 95:20
**Stop** [1] - 95:22
**stops** [1] - 104:15
**strange** [1] - 17:16
**Street** [2] - 1:18, 1:22
**strictly** [1] - 18:12
**stringent** [1] - 17:18
**strong** [1] - 61:15
**stronger** [1] - 22:4
**struck** [1] - 78:18
**structure** [2] - 78:9, 78:10
**struggling** [2] - 63:16, 95:11
**student** [12] - 14:1, 15:14, 19:5, 22:17, 22:20, 22:21, 23:7, 23:10, 43:6, 57:2, 61:19, 81:2
**students** [44] - 6:24, 7:8, 7:10, 7:14, 10:1, 11:4, 11:7, 12:9, 13:24, 15:14, 15:15, 17:13, 18:6, 19:5, 19:6, 19:23, 20:5, 20:8, 20:20, 21:7, 21:25, 22:3, 33:21, 42:25, 43:6, 43:14, 43:17, 44:3, 44:12, 44:23, 49:16, 49:18, 49:22, 51:18, 61:22, 68:5, 68:7, 68:9, 72:12, 72:19, 83:21, 106:16
**submit** [2] - 88:7, 95:14
**submitted** [2] - 68:11, 77:23
**Subsection** [1] - 81:3
**subsequent** [1] - 113:23
**subsequently** [2] - 54:14, 64:14
**subset** [2] - 96:11, 97:11
**substance** [6] - 69:20, 92:16, 105:17, 107:13, 112:4,

112:15
**substantial** [1] - 19:16
**substantive** [15] - 70:13, 71:12, 71:15, 71:17, 78:11, 99:4, 100:8, 101:9, 101:25, 103:14, 105:13, 106:21, 109:22, 109:25, 110:17
**substitute** [1] - 111:7
**Success** [1] - 68:11
**successful** [1] - 66:20
**suddenly** [1] - 38:21
**sue** [8] - 6:7, 17:14, 22:7, 29:3, 29:15, 30:11, 59:13, 99:20
**sued** [5] - 54:14, 73:12, 83:20, 88:14, 104:12
**suffer** [4] - 19:5, 32:8, 87:6
**suffered** [3] - 23:11, 32:10, 33:1
**suffering** [6] - 8:14, 26:2, 26:3, 26:12, 27:5, 36:13
**suffers** [3] - 23:20, 30:5, 30:6
**sufficient** [1] - 26:19
**suggest** [4] - 9:1, 41:24, 42:23, 74:9
**suggested** [4] - 43:19, 43:22, 97:15, 103:13
**suggesting** [9] - 8:10, 21:22, 42:22, 44:11, 44:16, 61:25, 94:23, 99:9, 111:14
**suggestion** [8] - 16:3, 45:20, 47:19, 82:20, 99:10, 99:16, 99:24, 103:4
**suggestions** [1] - 66:6
**suggests** [1] - 38:22
**suing** [2] - 31:9, 37:12
**suit** [4] - 30:18, 39:2, 54:10, 86:9
**Suite** [2] - 1:15, 1:22
**suits** [3] - 85:18, 85:19, 85:25
**summarized** [1] - 7:5
**summary** [8] - 4:14, 5:23, 6:1, 6:8, 53:15, 53:20, 66:18, 93:13
**superfluous** [2] - 99:9, 105:23
**supplemental** [2] - 40:17, 98:5
**supplementary** [1] - 98:5

**support** [1] - 89:15
**supporting** [1] - 17:13
**suppose** [3] - 90:21, 101:23, 113:24
**supposed** [6] - 18:10, 65:16, 105:25, 106:14, 107:10, 114:4
**Supreme** [12] - 16:19, 26:5, 29:16, 29:24, 39:22, 39:25, 40:5, 40:8, 41:18, 45:10, 45:17, 51:2
**surely** [1] - 74:11
**surrenders** [1] - 58:9
**survey** [1] - 78:3
**survive** [1] - 108:11
**suspend** [1] - 74:3
**suspended** [3] - 101:13, 104:10, 104:13
**suspending** [3] - 75:4, 101:17, 103:10
**suspension** [13] - 70:12, 101:1, 101:20, 101:22, 102:2, 102:12, 102:24, 103:23, 104:5, 104:18, 104:23
**suspensions** [1] - 103:3
**sustainable** [1] - 108:1
**system** [9] - 7:6, 13:12, 15:4, 16:4, 18:2, 24:3, 38:13, 50:5, 55:7
**systems** [2] - 19:4, 43:21

## T

**table** [2] - 4:6, 67:21
**tailored** [2] - 73:11, 73:23
**talks** [1] - 113:13
**task** [2] - 66:7, 113:21
**tasks** [2] - 112:24, 113:20
**tax** [1] - 97:9
**taxpayer** [1] - 7:6
**teeny** [1] - 82:5
**template** [2] - 72:14, 106:3
**temporarily** [1] - 77:5
**temporary** [1] - 99:13
**term** [1] - 96:13
**terms** [4] - 9:21, 49:24, 50:11, 83:23

**terrible** [3] - 23:3, 63:18
**territorial** [1] - 92:3
**territory** [5] - 40:12, 41:5, 45:20, 92:6, 92:7
**test** [10] - 32:14, 34:4, 36:4, 36:11, 36:16, 38:9, 48:10, 48:11, 48:23, 50:12
**Texas** [6] - 16:17, 16:18, 16:20, 16:24, 17:10, 17:11
**Texas's** [1] - 16:24
**THE** [277] - 1:1, 1:1, 1:10, 1:17, 1:21, 3:2, 3:16, 3:18, 3:22, 3:25, 4:3, 4:9, 5:12, 5:15, 5:19, 7:18, 8:8, 8:23, 9:13, 10:5, 10:8, 10:11, 11:8, 11:23, 12:1, 12:6, 12:13, 13:2, 13:13, 14:4, 14:16, 14:20, 15:8, 15:18, 15:24, 16:1, 17:7, 17:15, 18:7, 18:17, 19:1, 19:9, 19:16, 19:21, 20:10, 21:9, 21:11, 21:17, 22:16, 22:25, 23:13, 23:23, 24:19, 24:21, 24:23, 25:3, 25:16, 26:16, 27:12, 27:15, 27:17, 27:20, 27:22, 28:13, 28:17, 28:25, 29:6, 29:19, 30:8, 30:20, 30:25, 31:2, 31:7, 31:13, 31:22, 32:2, 32:4, 32:15, 33:4, 33:13, 33:25, 34:8, 34:14, 34:25, 35:5, 36:7, 36:19, 37:11, 38:4, 38:19, 39:5, 39:8, 39:11, 40:2, 40:4, 40:23, 41:1, 41:6, 41:9, 41:12, 41:22, 42:11, 42:25, 43:24, 44:2, 44:4, 44:6, 44:21, 45:14, 45:24, 46:5, 47:3, 47:18, 49:2, 50:10, 50:19, 51:22, 52:2, 52:10, 52:14, 52:16, 53:9, 53:11, 53:23, 54:18, 54:24, 55:14, 55:20, 55:25, 56:16, 57:11, 57:13, 57:17, 57:24, 58:2, 58:20, 59:4, 59:10, 59:13, 59:22,

60:24, 61:7, 61:20, 62:12, 63:2, 64:2, 64:24, 65:4, 65:7, 65:14, 65:18, 66:2, 66:4, 66:12, 66:20, 66:24, 67:9, 67:17, 68:18, 68:25, 69:7, 69:11, 69:17, 70:3, 71:1, 71:3, 71:11, 71:15, 71:24, 72:1, 72:4, 72:16, 73:6, 73:22, 74:11, 75:13, 75:18, 76:6, 76:13, 76:14, 76:17, 76:20, 77:4, 77:14, 78:25, 79:3, 79:7, 79:11, 79:14, 79:22, 79:24, 80:14, 80:24, 81:8, 81:14, 81:19, 81:23, 82:11, 82:13, 82:16, 82:18, 83:1, 83:3, 83:18, 84:4, 84:19, 85:1, 85:7, 86:1, 86:4, 86:8, 86:17, 86:19, 87:16, 88:16, 88:25, 90:3, 90:23, 91:19, 91:24, 92:9, 92:17, 92:23, 93:1, 93:4, 93:10, 93:19, 94:11, 94:20, 95:19, 96:22, 97:13, 97:24, 98:3, 98:11, 99:3, 99:15, 100:7, 101:5, 101:15, 101:17, 102:4, 102:7, 102:15, 103:4, 104:12, 105:6, 105:17, 105:21, 106:18, 107:3, 107:7, 107:20, 107:22, 108:7, 108:11, 108:13, 108:17, 108:19, 108:22, 109:3, 109:15, 110:2, 111:12, 111:24, 112:20, 113:10, 113:19, 114:2, 114:17, 114:19, 114:25, 115:2, 115:6, 115:9, 115:12, 115:14
**theirs** [1] - 18:2
**themselves** [2] - 36:10, 36:22
**therefore** [5] - 16:5, 28:10, 32:8, 45:5, 75:22
**they've** [7] - 6:20, 11:3, 59:23, 66:16, 69:13, 85:2, 103:6

**thinking** [4] - 31:23, 61:5, 99:17, 99:19
**third** [9] - 19:2, 26:20, 52:22, 52:23, 67:16, 68:8, 78:21, 93:19, 105:2
**third-party** [2] - 26:20, 52:23
**thoughtful** [1] - 73:10
**threatened** [2] - 13:7, 91:15
**three** [11] - 8:6, 8:15, 15:12, 23:19, 57:8, 64:7, 68:2, 68:6, 98:13, 99:5, 108:3
**threshold** [4] - 4:19, 5:25, 98:20, 111:8
**tie** [3] - 16:4, 18:2, 18:22
**tied** [3] - 16:14, 42:3, 55:11
**timing** [1] - 17:21
**Timothy** [1] - 2:7
**TIMOTHY** [1] - 115:19
**tip** [5] - 74:11, 74:23, 74:24, 82:3, 96:10
**tip-off** [1] - 82:3
**tipped** [4] - 73:19, 74:7, 75:6, 76:3
**tips** [4] - 73:18, 74:9, 74:17, 97:7
**Title** [19] - 6:23, 12:11, 13:21, 13:25, 14:1, 20:7, 35:1, 35:2, 35:9, 35:15, 49:21, 59:7, 60:21, 61:3, 61:18, 61:21, 90:16, 90:18
**today** [4] - 6:14, 6:20, 7:1, 67:19
**together** [2] - 8:6, 59:1
**tomorrow** [1] - 65:10
**took** [5] - 7:10, 32:20, 66:17, 83:8, 93:10
**tools** [2] - 13:17, 33:16
**top** [2] - 61:6, 89:15
**topics** [1] - 35:24
**totally** [2] - 38:15, 85:3
**traceable** [7] - 25:20, 26:3, 32:19, 32:23, 33:2, 42:3, 52:25
**track** [3] - 22:1, 68:19, 96:3
**traditional** [3] - 36:16, 39:19, 89:14
**training** [1] - 97:9
**TRANSCRIPT** [1] - 1:9
**transcript** [3] - 2:11, 115:21, 115:22

**transcription** [1] - 2:12
**translates** [1] - 56:18
**treaty** [1] - 58:12
**triad** [4] - 8:4, 57:8, 58:25, 59:3
**tricking** [1] - 83:22
**tries** [1] - 70:23
**true** [4] - 14:25, 85:6, 115:20, 115:21
**try** [4] - 5:2, 16:11, 83:16, 113:2
**trying** [20] - 17:11, 18:13, 20:11, 38:2, 44:7, 48:24, 49:3, 49:16, 56:3, 58:7, 63:23, 68:19, 71:10, 77:17, 81:20, 83:11, 102:18, 103:12, 103:20, 107:23
**Tuesday** [1] - 1:4
**tuition** [2] - 19:5, 89:11
**tuitions** [1] - 43:6
**turn** [4] - 16:7, 43:15, 73:3, 95:3
**turned** [2] - 4:14, 46:23
**two** [29] - 20:22, 24:7, 42:24, 43:15, 46:18, 48:8, 52:21, 52:24, 64:8, 64:11, 67:23, 69:3, 73:4, 74:5, 78:3, 85:16, 87:20, 87:23, 91:9, 95:13, 98:14, 98:20, 99:2, 99:3, 99:9, 99:14, 104:20, 104:24, 106:12
**types** [1] - 47:8
**typically** [1] - 56:8

**U**

**U.S** [2] - 2:3, 2:8
**ultimate** [1] - 113:14
**ultimately** [2] - 83:23, 103:5
**unclear** [2] - 27:4, 62:19
**under** [48] - 6:22, 8:1, 9:6, 9:9, 12:25, 13:11, 13:17, 16:24, 22:11, 27:25, 28:23, 29:16, 30:12, 31:5, 31:9, 31:11, 32:11, 34:4, 34:12, 34:19, 40:18, 45:9, 46:8, 57:7, 59:14, 67:5, 70:11, 70:14, 73:14,

75:17, 77:3, 78:16, 78:23, 80:19, 81:4, 84:20, 87:1, 88:14, 90:20, 100:6, 105:11, 105:24, 109:1, 110:10, 111:12, 112:12, 114:7, 115:13
**Under** [1] - 83:25
**underlying** [1] - 54:10
**undermine** [1] - 23:21
**undermines** [1] - 85:13
**underreporting** [5] - 96:12, 96:18, 96:20, 97:6
**understood** [1] - 40:11
**undertake** [1] - 93:24
**undertaken** [1] - 49:25
**underway** [2] - 56:20, 66:6
**undocumented** [1] - 16:23
**unfair** [1] - 73:14
**unfortunate** [1] - 33:22
**Union** [1] - 58:9
**unique** [2] - 86:22, 92:10
**UNITED** [3] - 1:1, 1:6, 1:10
**United** [4] - 3:3, 16:17, 16:23, 115:25
**universe** [1] - 51:3
**universities** [10] - 7:11, 7:12, 8:3, 8:7, 8:18, 8:19, 9:12, 9:25, 11:6, 19:8
**unlawfully** [1] - 93:7
**unless** [4] - 50:14, 77:20, 104:13, 112:16
**unmet** [1] - 24:13
**unrealistic** [1] - 83:22
**unreasonable** [2] - 93:6, 93:17, 114:16
**unreasonably** [2] - 93:8, 114:22
**unripe** [2] - 113:24, 114:21
**unsympathetic** [1] - 86:20
**unusual** [1] - 56:9
**up** [18] - 5:13, 10:3, 12:8, 12:14, 15:18, 21:8, 34:1, 61:9, 62:7, 70:23, 71:6, 73:16, 74:16, 75:2, 76:22, 77:14, 80:15,

102:16
**upend** [1] - 97:17
**upheld** [4] - 6:17, 6:18, 7:3, 84:24
**upset** [3] - 63:10, 78:8, 78:9
**uptick** [1] - 19:16
**usual** [1] - 82:2
**utility** [2] - 72:11, 72:19

**V**

**various** [1] - 43:12
**vehicle** [3] - 47:1, 47:4, 58:14
**Vermont** [1] - 3:9
**versus** [3] - 42:21, 48:25, 80:5
**vicarious** [1] - 37:3
**view** [2] - 48:20, 97:16
**viewpoint** [1] - 38:22
**views** [1] - 9:7
**violate** [1] - 53:8
**violated** [1] - 85:3
**violating** [3] - 33:19, 83:10, 83:13
**violation** [3] - 62:23, 77:1, 85:4
**virtually** [1] - 69:5
**void** [1] - 86:12
**voluntarily** [1] - 17:22

**W**

**wait** [5] - 23:9, 23:19, 58:20, 65:10, 66:24
**waiting** [1] - 24:10
**wall** [1] - 12:9
**Walton** [5] - 54:5, 55:3, 56:22, 57:1
**wants** [2] - 35:19, 106:11
**Washington** [6] - 1:4, 1:23, 2:4, 2:9, 3:9, 116:1
**wasted** [1] - 7:6
**waters** [1] - 92:14
**ways** [12] - 27:24, 28:7, 34:19, 34:20, 65:20, 68:6, 79:9, 80:15, 89:6, 89:10, 106:19
**website** [7] - 68:7, 68:17, 68:25, 69:1, 99:1, 105:1, 107:2
**weekend** [1] - 93:3
**welcome** [1] - 4:10
**welfare** [1] - 50:4
**well-being** [2] - 28:2,

36:15

**whereas** [2] - 49:18, 102:1

**whole** [12] - 31:23, 32:6, 37:12, 44:11, 50:5, 52:5, 100:2, 104:21, 105:4, 111:3, 114:6, 114:9

**wholesale** [4] - 23:16, 101:1, 104:10, 104:13

**wide** [1] - 112:9

**wind** [1] - 21:8

**WISEMAN** [3] - 3:23, 4:2, 4:4

**Wiseman** [3] - 1:20, 3:24, 3:25

**wished** [1] - 55:2

**withheld** [1] - 93:8

**wonder** [2] - 84:19, 88:16

**wondering** [2] - 62:5, 89:8

**wooden** [1] - 96:16

**word** [3] - 30:25, 77:6, 115:3

**worded** [2] - 95:21, 110:20

**words** [2] - 20:12, 89:2

**works** [4] - 61:12, 76:3, 77:18, 94:13

**world** [13] - 11:12, 22:6, 25:15, 25:22, 38:21, 50:23, 51:1, 60:1, 63:4, 81:10, 81:19, 107:11, 110:4

**worried** [5] - 24:12, 32:22, 71:9, 91:21, 103:7

**worry** [1] - 32:23

**worse** [7] - 11:1, 25:14, 25:20, 26:12, 26:13, 53:11, 66:12

**worth** [2] - 66:17, 76:23

**wound** [1] - 73:16

**wrap** [1] - 76:22

**Wright** [1] - 30:1

**write** [2] - 5:15, 80:12

**writing** [1] - 12:9

**written** [3] - 77:20, 79:10, 80:23

**wrongfully** [1] - 88:5

**wrote** [1] - 73:10

**Wyer** [3] - 2:2, 4:5, 90:7

**WYER** [88] - 4:5, 5:10, 39:12, 40:3, 40:10, 40:25, 41:2, 41:8,

41:11, 41:13, 42:2, 42:19, 43:3, 43:25, 44:3, 44:5, 44:19, 45:8, 45:16, 46:3, 46:14, 47:6, 48:8, 49:10, 50:16, 51:12, 52:1, 52:3, 52:11, 52:15, 52:18, 53:10, 53:13, 90:10, 91:23, 91:25, 92:12, 92:18, 92:25, 93:2, 93:5, 93:15, 94:5, 94:16, 95:9, 96:2, 97:1, 97:20, 98:2, 98:9, 98:19, 99:11, 99:25, 100:24, 101:11, 101:16, 101:23, 102:6, 102:9, 102:21, 103:21, 104:19, 105:10, 105:20, 106:2, 106:23, 107:5, 107:15, 107:21, 108:3, 108:10, 108:12, 108:14, 108:18, 108:20, 108:23, 109:7, 109:21, 110:15, 111:18, 112:3, 112:21, 113:18, 113:21, 114:5, 114:18, 114:21, 115:1

# Y

**year** [24] - 12:2, 12:11, 24:4, 24:7, 40:2, 54:6, 67:12, 67:15, 67:16, 70:17, 77:8, 77:10, 77:13, 94:10, 95:8, 95:10, 98:15, 100:16, 102:4, 102:19, 102:20, 103:11, 104:16

**year-to-year** [1] - 24:4

**years** [3] - 23:10, 23:19, 93:12

**yesterday** [5] - 64:18, 64:19, 64:20, 64:22, 93:1

**York** [2] - 3:8, 63:7

# Z

**Zinke** [1] - 40:14

**zone** [21] - 7:24, 8:8, 34:4, 34:6, 34:11, 34:15, 36:4, 36:6, 38:9, 47:24, 48:10, 48:11, 48:23, 49:6,

49:11, 49:17, 49:20, 49:25, 50:14, 52:8, 87:25

**zone-of-interest** [8] - 34:4, 36:4, 38:9, 48:10, 48:11, 48:23, 49:11, 52:8