## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF MARYLAND *et al.*,<br><br>　　　　　　　Plaintiffs,<br>　v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION *et al.*,<br><br>　　　　　　　Defendants. | NO. 1:17-cv-2139-KBJ |

## PLAINTIFF STATES' SUPPLEMENTAL MEMORANDUM

BRIAN E. FROSH
Attorney General
State of Maryland

CHRISTOPHER J. MADAIO
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
(410) 576-6585

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

MICHAEL J. FISCHER
Chief Deputy Attorney General
JOHN M. ABEL
JESSE HARVEY
Senior Deputy Attorneys General
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(215) 560-2171

*Additional Counsel Listed on Signature Page*

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Background ........................................................................................................... 1

Argument ............................................................................................................. 2

   I.    *Air Alliance* Controls this Case (Question 1) .................................... 3

   II.   The States Have Shown that They Have Expended Resources in Response
       to the Department's Delay (Question 2) ........................................... 4

   III.  The States' Expenditures Were Addressed to the Same Harms the Gainful
       Employment Rule Was Intended to Address (Question 3) ............................... 10

   IV.  *Air Alliance* Defeats the Department's Arguments ........................................ 11

Conclusion ........................................................................................................... 12

# TABLE OF AUTHORITIES

## CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982) ........................ 10

*Animal Welfare Inst. v. Kreps*, 561 F.2d 1002 (D.C. Cir. 1977). .................................................... 9

*Air Alliance Houston v. Environmental Protection Agency*, 906 F.3d 1049 (D.C. Cir. 2018) (per curiam) ...................................................................................................... *passim*

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322 (D.C. Cir. 1986) ............................................................................................................................ 5, 9

*Maryland People's Counsel v. FERC*, 760 F.2d 318 (D.C. Cir. 1985) ........................................ 13

*Scahill v. D.C.*, 909 F.3d 1177 (D.C. Cir. 2018) ............................................................................ 9

*Sierra Club v. E.P.A.*, 292 F.3d 895 (D.C. Cir. 2002) .................................................................... 9

## STATUTES

Minn. Stat. § 136A.103 ...................................................................................................................... 3

## REGULATIONS

*Program Integrity: Gainful Employment*, 79 Fed. Reg. 64,890 (Oct. 31, 2014) ................ 6, 10, 11

## COURT DOCUMENTS

*Air Alliance Houston v. Environmental Protection Agency*, No. 17-1155 (D.C. Cir.)

    Final Br. of Resps., ECF No. 1715726 (Jan. 31, 2018) ..................................................... 12

*State of Maryland v. U.S. Dept. of Educ.*, No. 1:17-cv-2139-KBJ (D.D.C.)

    Defs.' Reply in Supp. of Defs.' Cross-Mot. For Summ. J., ECF No. 42 (Mar. 27, 2018) ........................................................................................................... 12

    Defs.' Resp. to Pls.' Second Supp. Mem., ECF No. 70 (Sept. 20, 2018) ........................ 12

    Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J., ECF No. 33-1 (Dec. 26, 2017) ............................................................................................................................. 7

    Order, ECF No. 82 (Apr. 12, 2019) ................................................................................ 2-3

    Pls.' Mem. in Opp. to Defs.' Cross-Mot. for Summ. J., ECF No. 39 (March 6, 2018) ................................................................................................ 3, 4, 6, 11, 13

    Pls.' Notice of Supp. Authority, ECF No. 81 (Jan. 8, 2019) ......................................... 7, 8

Pls.' Second Supp. Reply Mem. in Supp. of Mot. for Summ. J., ECF No. 71 (Sept. 27, 2018)..................................................................................................... 4, 11

Supp. Mem. in Supp. of Pls. Mot. for Summ. J., ECF No. 64 (June 19, 2018) ............................................................................................................................ 3, 4

The Plaintiff States respectfully submit this supplemental memorandum in response to the Court's Order of April 12, 2019, directing the parties to address the impact of *Air Alliance Houston v. Environmental Protection Agency*, 906 F.3d 1049 (D.C. Cir. 2018) (per curiam), on the question of standing in this case. As the States explain below, *Air Alliance* makes it unmistakably clear that the States have standing to challenge the Education Department's refusal to enforce the Gainful Employment Rule.

## BACKGROUND

*Air Alliance* involved two consolidated petitions for review filed against the Environmental Protection Agency: one filed by several organizations and a second filed by eleven states. The petitions both challenged a final rule issued by EPA (the "Delay Rule") that postponed the effective date of an earlier final rule that was designed to reduce the harms from the accidental release of chemicals (the "Chemical Disaster Rule"). *Id.* at 1055-57.

EPA challenged the standing of both sets of petitioners. The D.C. Circuit rejected EPA's arguments, finding that both the organizations and the State Petitioners had standing to challenge the Delay Rule. *Id.* at 1057-60. The Court's analysis of the State Petitioners' standing was contained in two paragraphs. First, it summarized certain basic principles of state standing, including the uncontroversial proposition that states have standing to challenge actions that harm their "proprietary interests":

> State Petitioners also have Article III standing. "[T]here is no difficulty in recognizing [a state's] standing to protect proprietary interests or sovereign interests." 13B WRIGHT & MILLER, FED. PRAC. & PROC. § 3531.11.1, *Government Standing – States* (3d ed.). The Supreme Court has recognized "[t]wo kinds of nonsovereign interests" for state standing purposes: proprietary interests such as "own[ing] land or participat[ing] in a business venture," and private interests of another when the state is the "real party in interest." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601–02 (1982).

1

*Id.* at 1059 (alterations in original). It then analyzed whether the State Petitioners had shown a proprietary interest that was implicated by EPA's Delay Rule, easily concluding that they had. The Court summarized the State Petitioners' basis for standing as follows: "The Delay Rule affects State Petitioners' proprietary interests due to the expenditures states have previously made and may incur again when responding to accidental releases during the delay period." *Id.*

> It continued:

> Hundreds of covered industrial facilities are located in State Petitioners' territory. Petitioner Washington State spent $370,000 responding to and investigating a refinery explosion that EPA specifically cited as an example of why the existing regulations needed to be strengthened. State Pet. Br. 26; Chemical Disaster Rule, 82 Fed. Reg. at 4599; *see also* Disaster Rule NPRM, 79 Fed. Reg. at 44,621 (explaining that the CSB found that this explosion in Washington State "could have been avoided if safer technologies had been employed"). Monetary expenditures to mitigate and recover from harms that could have been prevented absent the Delay Rule are precisely the kind of "pocketbook" injury that is incurred by the state itself. *See Snapp*, 458 U.S. at 602.

*Id.* at 1059-60. Finally, it concluded that, because the State Petitioners had shown proprietary standing, it did not need to address their argument that they had *parens patriae* standing:

> Because State Petitioners have demonstrated their independent proprietary interests in avoiding chemical releases in their territory sufficient to support standing, the court need not reach the alternative argument that Congress has abrogated the prudential bar on state *parens patriae* standing under the CAA. *See Md. People's Counsel v. FERC*, 760 F.2d 318, 320 (D.C. Cir. 1985).

*Id.* at 1060.

## DISCUSSION

In its Order of April 12, 2019, the Court directed the parties to address the following questions:

> (1) whether Air Alliance applies or has any effect on this Court's standing analysis; (2) whether and to what extent the States have presented evidence in the instant case regarding the "[m]onetary expenditures" they have expended due to the Department's delay in this matter; and (3) whether and to what extent the

States have presented evidence in the instant case regarding the "harms" to the
States to which any such expenditures were addressed.

ECF No. 82, at 2. The States address these questions in turn.

## I.   *AIR ALLIANCE* CONTROLS THIS CASE (QUESTION 1)

*Air Alliance* confirms that the States have standing here. As an initial matter, the States
have established three separate bases for proprietary standing in this case.[1] *Air Alliance* relates to
one of the three grounds asserted: that the Department's failure to enforce the Gainful
Employment Rule has forced the States to spend additional resources to address the harms that
the Rule was designed to ameliorate. The other two bases provide independent grounds, in
addition to that confirmed by *Air Alliance*, for finding that the States have proprietary standing.

With respect to the States' assertion that the Department's actions have forced them to
devote additional resources to address the harms the Rule was intended to prevent, the States'
argument is materially indistinguishable from that advanced by the State Petitioners in *Air*

---

[1] The three bases for standing are:

> First, "they face the waste and loss of State-funded grant money that is paid to
> schools that would otherwise be ineligible for Title IV loans or that would see a
> reduction in enrollment if they were required to fully comply with the Rule's
> disclosure requirements and specifically inform prospective students that they
> were identified as 'failing' or 'in the zone.'" Pls.' Mem. in Opp. to Defs.' Cross-
> Mot. for Summ. J., ECF No. 39, at 4 (March 6, 2018) ("States' Opp."); *see, e.g.*,
> Minn. Stat. § 136A.103 (tying an institution's eligibility for state financial aid to
> its eligibility for federal financial aid).
>
> Second, "States are forced to spend additional resources to investigate fraudulent
> programs, including programs that would otherwise be ineligible for Title IV
> funding if the Rule were fully enforced." States' Opp. at 4.
>
> Third, "the States lose tuition money from State-sponsored educational
> institutions, as some students who would otherwise attend State institutions opt to
> attend for-profit institutions whose programs would be precluded from receiving
> Title IV funds if the Department enforced the Rule." *Id.*; *see also* Supp. Mem. in
> Supp. of Pls. Mot. for Summ. J., ECF No. 64, at 5-6 & n.5 (June 19, 2018)
> ("States' Supp. Mem.") (discussing evidence that enrollment at community
> colleges increases when for-profit schools are sanctioned).

*Alliance*. In *Air Alliance*, the State Petitioners alleged that, in the past, they had devoted resources to responding to accidents that the Chemical Disaster Rule was intended to prevent. 906 F.3d at 1059-60. As a result, they argued, EPA's Delay Rule—which was tantamount to a refusal to enforce the Chemical Disaster Rule—risked imposing additional harms on the States, as it increased the likelihood that States would have to respond to chemical accidents that could have been prevented by the Chemical Disaster Rule. *Id.*

Here, the States have shown that they have devoted substantial resources to investigation and enforcement efforts directed against fraudulent activity by for-profit colleges and universities of the sort the Gainful Employment Rule was intended to prevent. *See* States' Opp. at 4-7; States' Supp. Mem. at 5-6 & n.6; Pls.' Second Supp. Reply Mem. in Supp. of Mot. for Summ. J., ECF No. 71, at 3-4 (Sept. 27, 2018) ("States' Supp. Reply"). As a result, the Department's refusal to enforce the Gainful Employment Rule risks imposing additional harms on the States, as it increases the likelihood that States will have to respond to ongoing fraudulent activity that could have been prevented through enforcement of the Rule. *See* States' Supp. Mem. at 5-6 (" Had the Department [enforced the Rule], the States … would have benefited from a reduced need to conduct investigations into fraudulent activities at schools subject to the Rule").

As a result, *Air Alliance* controls this case, and the States have standing to challenge the Department's refusal to enforce the Gainful Employment Rule.

## II.     THE STATES HAVE SHOWN THAT THEY HAVE EXPENDED RESOURCES IN RESPONSE TO THE DEPARTMENT'S DELAY (QUESTION 2)

In *Air Alliance*, the D.C. Circuit held that the States Petitioners had standing because "[t]he Delay Rule affects State Petitioners' proprietary interests due to the expenditures states have previously made *and may incur* again when responding to accidental releases during the

4

delay period." 906 F.3d at 1059 (emphasis added). Thus, the *Air Alliance* court did not actually

find that the State Petitioners had expended resources as a result of the Delay Rule. Rather, it

found that they had *previously* devoted resources to responding to accidents of the type the

Chemical Disaster Rule was designed to prevent, and that this showing established that they

might incur similar expenses in the future because EPA was not enforcing the Rule. This

conclusion was unsurprising: as the D.C. Circuit had previously recognized, "[t]he injury need

not have already occurred; it is sufficient if it is 'actual' or "threatened.'" *Ctr. for Auto Safety v.*

*Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1331 (D.C. Cir. 1986).

The *Air Alliance* court specifically discussed one previous incident that gave rise to

standing:

> Petitioner Washington State spent $370,000 responding to and investigating a
> refinery explosion that EPA *specifically cited as an example of why the existing
> regulations needed to be strengthened*. State Pet. Br. 26; Chemical Disaster Rule,
> 82 Fed. Reg. at 4599; *see also* Disaster Rule NPRM, 79 Fed. Reg. at 44,621
> (explaining that the CSB found that this explosion in Washington State "could
> have been avoided if safer technologies had been employed").

*Id.* (emphasis added). Thus, the Washington State accident—which was the only specific

example identified by the D.C. Circuit in its standing analysis—predated the Chemical Disaster

Rule and was offered as an example of the types of future accidents the States Petitioners would

likely face if the Delay Rule remained in effect.

Here, the States have shown not only that they have "previously made" expenditures to

respond to the harms the Rule was intended to address—as did the State Petitioners in *Air

Alliance*—but also that they have devoted resources to respond to harms occurring since the

Department started refusing to enforce the Rule:

*First*, as in *Air Alliance*, the States have devoted resources to address harms of the sort

the Rule seeks to prevent. The *Air Alliance* court identified the Washington State accident as one

"that EPA specifically cited as an example of why the existing regulations needed to be

strengthened." 906 F.3d at 1059. The same is true here. As the States previously demonstrated,

*see* States' Opp. at 5-6, the Department cited the existence of multiple state investigations and

the evidence found by those investigations as justification for the Gainful Employment Rule.

Specifically, the Gainful Employment Rule discusses State investigations or enforcement actions

involving the following institutions:

- Career Education Corporation (two separate actions)
- Westwood College
- National College of Kentucky, Inc.
- Daymar College, Inc.
- Corinthian Colleges, Inc.
- Education Management Co.; and
- ITT Educational Services, Inc.

*Program Integrity: Gainful Employment*, 79 Fed. Reg. 64,890, 65,907-08 (Oct. 31, 2014). The

Rule lists some of the States that were involved in these investigations, including New York,

Illinois, Kentucky, Arizona, Arkansas, Connecticut, Idaho, Iowa, Kentucky, Missouri, Nebraska,

North Carolina, Oregon, Pennsylvania, Tennessee, and Washington, many of which are plaintiffs

in this case. *Id.*

Thus, while the D.C. Circuit found that the State Petitioners in *Air Alliance* had standing

based on one incident in one state "that EPA specifically cited as an example of why the existing

regulations needed to be strengthened," here the States have shown that the Department cited at

least eight separate investigations or enforcement actions brought by 16 different state attorneys

general into whether "for-profit institutions are using aggressive or even deceptive marketing and

recruiting practices that will likely result in the same high debt burdens [that the Rule sought to

address]." *Id.* It further stated that "evidence derived from these actions" had shown that

potential students had "been given such misleading information about program outcomes that

they could not effectively compare programs offered by different institutions in order to make informed decisions about where to invest their time and limited educational funding." *Id.*

*Second*, the States have gone further than the State Petitioners in *Air Alliance*, showing that they have had to devote resources to address harms that have occurred *since* the Department began refusing to enforce the Gainful Employment Rule. As the States have explained, on December 5, 2018, the for-profit chain Education Corporation of America (ECA), which operated Virginia College and Brightwood College, among other schools, abruptly announced that it was closing its non-online programs, stranding 20,000 students. Pls.' Notice of Supp. Authority, ECF No. 81, at 3-4 (Jan. 8, 2019) ("States' Notice"). ECA offered 24 programs that were graded as "failing" under the 2017 debt-to-earnings determinations, which were issued in January of that year. *Id.*; *see also* Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J., ECF No. 33-1, at 11 (Dec. 26, 2017); *id.* Exh. 8, ECF No. 33-11. Had the Department continued to enforce the Rule and issued debt-to-earnings determinations in 2018, any of those programs that failed again would have become ineligible for continued Title IV funding. As a result, many students would have elected to go elsewhere and been protected from ECA's abrupt closure in December 2018. *See* States' Notice at 3-4.

As the States explained in their Notice of Supplemental Authority—to which the Department did not respond—a large-scale closure like that of ECA forces them to "expend resources to handle student complaints and assist students in obtaining academic transcripts, accessing information on transfer options, and understanding student loan discharge eligibility criteria." *Id.* The States supported this point by citing to multiple websites that showed how they were responding to ECA's closure:

- **Maryland Higher Education Commission:** Brightwood College Closure,
  *https://mhec.maryland.gov/preparing/Pages/BrightwoodCollegeClosure.aspx* (providing

detailed information about options for Brightwood students affected by the closure, including transferring to Maryland institutions).

- **Pennsylvania Office of Attorney General:** Brightwood Career Institutes Closings, *https://www.attorneygeneral.gov/protect-yourself/consumer-advisories/brightwood-career-institutes-closings/* ("Due to the sudden nature of this closing, Pennsylvania students have been left with numerous questions regarding their transcripts, loans and transferring credits. At this time, our office is working with the Pennsylvania Department of Education to assist students in getting answers to these questions…. [I]f your immediate concerns are not addressed by the information above, we encourage you to call our office at 1-800-441-2555 or the Pennsylvania Department of Education at 717-783-8228. You may also file a consumer complaint online at https://www.attorneygeneral.gov/submit-a-complaint/consumer-complaint/ or send us an email at scams@attorneygeneral.gov.").

- **California Office of Student Assistance and Relief**, School Closure Information for Brightwood College, *https://osar.bppe.ca.gov/closures/brightwood.shtml* (explaining rights of Brightwood students and various options, including the option of transferring to other schools).

- **Pennsylvania Department of Education:** Brightwood Closure Memo, *https://www.education.pa.gov/Documents/Postsecondary-Adult/College%20and %20Career%20Education/Private%20Licensed%20Schools/Brightwood%20Closure%20 Memo.pdf* (providing information and discussing options for Brightwood students).

*See* States' Notice at 3-4 nn.6-7 (citing all of the above websites to support the following: "State agencies have to expend resources to handle student complaints and assist students in obtaining academic transcripts, accessing information on transfer options, and understanding student loan discharge eligibility criteria. States incur further economic injury as a result of such closures when state institutions and community colleges accept transfer students without requiring students to make additional tuition payments.").

The States concluded: "As a result of the Department's failure to enforce the Rule, the states have incurred and are likely to continue to incur exactly the type of economic injury that the Rule sought to avoid: additional costs to the states to help harmed consumers." States' Notice at 4. All of these efforts by the States require the expenditure of resources: even the act of

creating and maintain a website containing relevant information for students who were harmed

by ECA's closure requires spending money on technology, personnel, and other needs.[2]

Thus, the States have shown that they have previously devoted resources to addressing

the harms the Rule was intended to prevent (as was the case in *Air Alliance*) and that they have

continued to devote resources to address those harms since the Department first refused to

enforce the Rule (which the *Air Alliance* court did not require). It is irrelevant that the *Air*

*Alliance* court was able to quantify the amount spent by Washington to respond to the accidents

discussed by EPA, as standing "does not depend on the size or quantum of harm to the party."

*Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1008 (D.C. Cir. 1977). To the contrary, "[t]here is

… no requirement that the injury be important or large; an 'identifiable trifle' can meet the

constitutional minimum." *Ctr. for Auto Safety*, 793 F.2d at 1331. And to establish standing, a

plaintiff may rely on evidence in the administrative record; there is no obligation to introduce

additional evidence where standing can be determined from the record itself. *See Sierra Club v.*

*E.P.A.*, 292 F.3d 895, 899 (D.C. Cir. 2002) (petitioner can establish standing if it "identif[ies] in

[the administrative] record evidence sufficient to support its standing to seek review"). Here, the

investigations and enforcement actions discussed in the Gainful Employment Rule, the efforts

the States have undertaken to respond to ECA's closure, and the States' continued investigations

---

[2] To be clear, the States' evidence of prior enforcement actions was sufficient to establish
standing under *Air Alliance*. But even if it were not, the D.C. Circuit has held that "a plaintiff
may cure a standing defect under Article III through an amended pleading alleging facts that
arose after filing the original complaint," *Scahill v. D.C.*, 909 F.3d 1177, 1184 (D.C. Cir. 2018),
so the events surrounding the closure of ECA could separately establish that the States have
standing. *See also Mathews v. Diaz*, 426 U.S. 67, 75 (1976) (finding that jurisdictional
prerequisite could be satisfied "while the case was pending in the District Court").

and enforcement actions since the Department announced that it would not enforce the Rule all

impose burdens on the States, and the Department has not suggested anything to the contrary.

## III.   THE STATES' EXPENDITURES WERE ADDRESSED TO THE SAME HARMS THE GAINFUL EMPLOYMENT RULE WAS INTENDED TO ADDRESS (QUESTION 3)

As the *Air Alliance* court concluded, "Monetary expenditures to mitigate and recover

from harms that could have been prevented absent the Delay Rule are precisely the kind of

'pocketbook' injury that is incurred by the state itself." 906 F.3d at 1060 (citing *Alfred L. Snapp*

*& Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 602 (1982)). In *Air Alliance*, the

"harms" to be prevented were dangerous chemical accidents. Here, the harms are the continued

efforts by some for-profit educational institutions to take advantage of students and taxpayers by

requiring students to take out significant amounts of debt to pay the high cost of tuition without

giving them the skills they would need to earn enough to repay that debt.

The Department expressly relied on evidence gathered through State-led investigations in

identifying the harm that it sought to address through the Gainful Employment Rule:

> This accumulation of evidence [from state and federal investigations] of misrepresentations to consumers by for-profit institutions regarding their outcomes provides a sound basis for the Department to conclude that a strong accountability framework for assessing outcomes by objective measures is necessary to protect consumers from enrolling and borrowing more than they can afford to repay. The same accumulation of evidence demonstrates the need for requiring standardized, readily comparable disclosures of outcomes to consumers, to enable consumers to compare programs and identify those more likely to lead to positive results.

79 Fed. Reg. at 64,908. Based on evidence of harms to students uncovered by state and other

investigations, the Department concluded that it was necessary to implement "a strong

accountability framework" along with "standardized, readily comparable disclosures of

outcomes to consumers" to prevent similar harms in the future. But now that the Department has

chosen not to enforce the Rule, the burden falls back on the States to try to prevent those harms and to respond to them when they occur.

The State investigations, enforcement actions, and other efforts all have the same goal: preventing such harms, or mitigating their impact where they do occur. As the States previously demonstrated, *see* States' Opp. at 6; States' Supp. Reply at 3-4, the Department acknowledged in the Gainful Employment Rule that State enforcement efforts were directed at the same types of harms as the Rule itself, asserting: "The evidence derived from [state Attorney General investigations and *qui tam* lawsuits] shows individuals considering enrolling in GE programs offered by for-profit institutions have in many instances been given such misleading information about program outcomes that they could not effectively compare programs offered by different institutions in order to make informed decisions about where to invest their time and limited educational funding." 79 Fed. Reg. at 64,907. The Rule continued: "In addition, a growing number of State and Federal law enforcement authorities have launched investigations into whether for-profit institutions are using aggressive or even deceptive marketing and recruiting practices *that will likely result in the same high debt burdens*." *Id.* (emphasis added). Finally, it observed that "[s]everal State Attorneys General have sued for-profit institutions to stop these fraudulent marketing practices, including manipulation of job placement rates." *Id.*

As a result, it is clear that the investigations, enforcement actions, and other efforts conducted by the States have been and will continue to be directed at the same harms the Rule was designed to prevent.

## IV.   *AIR ALLIANCE* DEFEATS THE DEPARTMENT'S ARGUMENTS

In claiming that the States lack standing here, the Department has asserted that the States' alleged harms are "entirely speculative"; that "the States fail to identify a concrete or certainly

impending injury"; and that the States' purported injuries were not "fairly traceable" to the

Department's actions." *See* Defs.' Reply in Supp. of Defs.' Cross-Mot. For Summ. J., ECF No.

42, at 1, 2 (Mar. 27, 2018); Defs.' Resp. to Pls.' Second Supp. Mem., ECF No. 70, at 1 (Sept. 20,

2018). In *Air Alliance*, EPA used virtually identical language, arguing that the State Petitioners

relied on "no evidence—just speculation" about the effects of the Delay Rule; that the State

Petitioners had "not established a 'concrete' and 'certainly impending' injury"; and that they had

not shown "that their purported injuries are fairly traceable to the Delay Rule." *See* Final Br. of

Resps., Doc. No. 1715726, *Air Alliance Houston v. Environmental Protection Agency*, No. 17-

1155, at 26 (D.C. Cir. Jan. 31, 2018).

The DC Circuit rejected these arguments in *Air Alliance*, and this Court should reject

them here. The Department has not challenged the accuracy of its own statements in the Gainful

Employment Rule about State enforcement efforts, nor could it. Instead, it has questioned

whether the States' efforts to protect their residents are sufficient to support standing to challenge

the Department's refusal to enforce the Rule, relying on the same arguments that EPA made in

*Air Alliance.* The decision in that case put to rest the suggestion that injuries of the type the

States have identified are insufficient to support standing, and the Department's arguments

should be rejected.

## CONCLUSION

For the reasons set forth above, the D.C. Circuit's decision in *Air Alliance* confirms that

the States have standing to challenge the Department's refusal to enforce the Gainful

Employment rule.[3] For this reason, and because the Department's refusal to carry out its

---

[3] The *Air Alliance* court concluded its discussion of state standing with the following:

> Because State Petitioners have demonstrated their independent proprietary
> interests in avoiding chemical releases in their territory sufficient to support

obligation to enforce the Gainful Employment Rule is unlawful, the States' motion for summary judgment should be granted.

Dated: May 13, 2019                        Respectfully submitted,

                                           FOR THE STATE OF MARYLAND
                                           BRIAN E. FROSH
                                           ATTORNEY GENERAL

                              By:    */s/ Christopher J. Madaio*
                                           Christopher J. Madaio
                                           Assistant Attorney General
                                           Office of the Attorney General
                                           Consumer Protection Division
                                           200 St. Paul Place, 16th Floor
                                           Baltimore, MD 21202
                                           (410) 576-6585
                                           Cmadaio@oag.state.md.us

                                           FOR THE COMMONWEALTH OF
                                           PENNSYLVANIA
                                           JOSH SHAPIRO
                                           ATTORNEY GENERAL

                              By:    */s/ Michael J. Fischer*
                                           Michael J. Fischer
                                           Chief Deputy Attorney General
                                           John M. Abel
                                           Jesse Harvey
                                           Senior Deputy Attorneys General
                                           Pennsylvania Office of Attorney General
                                           Strawberry Square
                                           Harrisburg, PA 17120
                                           (215) 560-2171
                                           mfischer@attorneygeneral.gov

---

standing, the court need not reach the alternative argument that Congress has abrogated the prudential bar on state *parens patriae* standing under the CAA. *See Md. People's Counsel v. FERC*, 760 F.2d 318, 320 (D.C. Cir. 1985).

906 F.3d at 1060. Here, the States' have also relied on *Maryland People's Counsel v. FERC* to assert *parens patriae* standing. *See* States' Opp. at 7-8. So even if the States did not have proprietary standing under the three independent grounds discussed above, *see supra* note 1, they would still be able to assert their *parens patriae* standing.

PEOPLE OF THE STATE OF
ILLINOIS, by KWAME RAOUL
ATTORNEY GENERAL OF ILLINOIS

By:   */s/ Joseph Sanders*
Joseph Sanders
Gregory W. Jones
Assistant Attorneys General
Consumer Fraud Bureau
Office of the Illinois Attorney General
100 W. Randolph St., 12th Fl.
Chicago, IL 60601
312-814-6796
jsanders@atg.state.il.us
gjones@atg.state.il.us

FOR THE COMMONWEALTH OF
MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

By:   */s/ Yael Shavit*
Yael Shavit
Assistant Attorney General
Office of the Massachusetts Attorney
General
One Ashburton Place
Boston, MA 02108
(617) 963-2197
yael.shavit@state.ma.us

FOR THE STATE OF CALIFORNIA
XAVIER BECERRA
CALIFORNIA ATTORNEY GENERAL

By:   */s/ Bernard A. Eskandari*
Bernard A. Eskandari
Supervising Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 897-2652
bernard.eskandari@doj.ca.gov

14

FOR THE STATE OF CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL

By:   */s/ Joseph J. Chambers*
Joseph J. Chambers
Assistant Attorney General
Connecticut Office of Attorney General
PO Box 120
Hartford, CT 06141-0120
(860) 808-5270
joseph.chambers@ct.gov

FOR THE STATE OF DELAWARE
KATHLEEN JENNINGS
ATTORNEY GENERAL

By:   */s/ Christian Douglas Wright*
Christian Douglas Wright
Director of Consumer Protection
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 577-8400
christian.wright@state.de.us

FOR THE DISTRICT OF COLUMBIA
KARL A. RACINE
ATTORNEY GENERAL

By:   */s/ Benjamin M. Wiseman*
Benjamin M. Wiseman
Assistant Attorney General
Attorney General for the District of
Columbia
441 4th Street, N.W., 6th Floor
Washington, DC 20001
(202) 741-5226
benjamin.wiseman@dc.gov

FOR THE STATE OF HAWAIʻI
CLARE E. CONNORS
ATTORNEY GENERAL OF HAWAII

By:     */s/ Bryan C. Yee*
Bryan C. Yee
Deputy Attorney General
425 Queen Street
Honolulu, Hawaii 96813
(808) 586-1180
bryan.c.yee@hawaii.gov

FOR THE STATE OF IOWA
THOMAS J. MILLER
ATTORNEY GENERAL

By:     */s/ Jessica Whitney*
Jessica Whitney
Director - Consumer Protection
Office of the Attorney General of Iowa
1305 E. Walnut St.
Des Moines, Iowa 50319
(515) 281-8772
jessica.whitney@iowa.gov

FOR THE STATE OF MINNESOTA
KEITH ELLISON
ATTORNEY GENERAL

By:     */s/ Jason Pleggenkuhle*
Jason Pleggenkuhle
Assistant Attorney General
Bremer Tower, Suite 1200
445 Minnesota Street
St. Paul, MN 55101
(651) 757-1147 (Voice)
(651) 282-5832 (Fax)
jason.pleggenkuhle@ag.state.mn.us

16

FOR THE STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL OF NEW YORK

By:   */s/ Jane M. Azia*
Jane M. Azia
Chief, Bureau of Consumer Frauds and
Protection
28 Liberty Street
New York, NY 10005
Tel.: (212) 416-8727
Jane.azia@ag.ny.gov

FOR THE STATE OF NORTH CAROLINA
JOSHUA H. STEIN
ATTORNEY GENERAL OF NORTH
CAROLINA

By:   */s/ Matt Liles*
Matt Liles
Assistant Attorney General
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC  27603
P.O. Box 629
Raleigh, NC  27602
(919) 716-0141
mliles@ncdoj.gov

FOR THE STATE OF OREGON
ELLEN F. ROSENBLUM
ATTORNEY GENERAL

By:   */s/ Katherine A. Campbell*
Katherine A. Campbell
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
katherine.campbell@doj.state.or.us

17

FOR THE STATE OF RHODE ISLAND
PETER NEHRONA
ATTORNEY GENERAL

By:   */s/ Neil F.X. Kelly*
Neil F.X. Kelly
Deputy Chief, Civil Div.
Assistant Attorney General
Edmund F. Murray, Jr.
Special Assistant Attorney General
Rhode Island Department of Attorney
General
150 South Main Street
Providence, Rhode Island 02903
(401) 274-4400 ext. 2284
nkelly@riag.ri.gov
emurray@riag.ri.gov

FOR THE STATE OF VERMONT
THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

By:   */s/ Christopher J. Curtis*
Christopher J. Curtis
State of Vermont
Office of the Attorney General
Chief, Public Protection Division
109 State St.
Montpelier, VT 05609
(802) 828-5586
christopher.curtis@vermont.gov

FOR THE COMMONWEALTH OF
VIRGINIA
MARK R. HERRING
ATTORNEY GENERAL

By:   */s/ Samuel T. Towell*
Samuel T. Towell
Deputy Attorney General, Civil Litigation
Mark S. Kubiak
Assistant Attorney General, Manager
Barbara Johns Building
202 N. Ninth St.
Richmond, Virginia 23219
(804) 786-6731
stowell@oag.state.va.us

FOR THE STATE OF WASHINGTON
ROBERT W. FERGUSON
ATTORNEY GENERAL

By:   */s/ Jeffrey T. Sprung*
Jeffrey G. Rupert
Chief, Complex Litigation Division
Jeffrey T. Sprung (D.C. Bar No.: 384880)
Assistant Attorney General
Office of the Washington Attorney General
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(206) 326-5492 (Sprung)
jeffreyr2@atg.wa.gov
jeff.sprung@atg.wa.gov