IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF MARYLAND, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 1:17-2139 (KBJ) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| EDUCATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' SUPPLEMENTAL MEMORANDUM

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

     I.    *AIR ALLIANCE* SHOULD NOT AFFECT THE COURT'S ANALYSIS OF
           THE STATES' STANDING (Question 1) .......................................................... 2

           A.    The States' Asserted Injury to Its Sovereign Interest in Enforcing
                  Consumer Protection Laws Does Not Resemble the *Air Alliance* Injury
                  Arising From Hazardous Chemical Accidents on State Territory ............. 3

           B.    The Direct Connection in *Air Alliance* Between Hazardous Chemical
                  Accidents and Resulting Damages Is Lacking Here ................................. 6

     II.    THE STATES HAVE PRESENTED NO EVIDENCE TO SUPPORT THEIR
           ASSERTION OF "MONETARY EXPENDITURES" RESULTING FROM
           THE DEPARTMENT ACTIONS THAT THEY CHALLENGE (Question 2) ... 10

     III.    THE STATES HAVE PRESENTED NO EVIDENCE OF "HARMS" CAUSED
           BY THE DEPARTMENT'S ALLEGED DELAYS OR FAILURES AND
           MITIGATED BY ALLEGED MONETARY EXPENDITURES (Question 3) ... 12

CONCLUSION .......................................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**

*Air Alliance Houston v. Environmental Protection Agency*,
    906 F.3d 1049 (D.C. Cir. 2018) (per curiam) .......................................................*passim*

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982) ............................................ 2, 4

*Am. Ass'n of Cosmetology Schs.* ("*AACS*") *v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017) .......... 7

*Dist. of Columbia v. Trump*, 291 F. Supp. 3d 725 (D. Md. 2018) ................................................. 4

*Georgia v. Tenn. Copper Co.*, 206 U.S. 230 (1907) .................................................................. 4, 5

*Gov't of Province of Manitoba v. Zinke*, 273 F. Supp. 3d 145 (D.D.C. 2017), *aff'd sub nom*
    *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019) ..................................... 5

*Hawaii v. Standard Oil Co.,* 405 U.S. 251 (1972) ....................................................................... 5

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................................ 4, 5

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) .......................................................................... 6

*Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976) ............................................................. 6


**Statutes**

Higher Education Act ("HEA") Title IV, 20 U.S.C. §§ 1070 *et seq.* ........................................... 1

20 U.S.C. § 1002 ........................................................................................................................ 1

20 U.S.C. § 1088 ....................................................................................................................... 1


**Administrative Materials**

Final regulations ("2014 Final Rule"), 79 Fed. Reg. 64890, 65081 (Oct. 31, 2014) ..3, 8, 9, 10, 12

**INTRODUCTION**

Pursuant to the Court's Order of April 12, 2019 [ECF 82], Defendants respectfully submit this supplemental memorandum addressing the potential impact of the D.C. Circuit's decision in *Air Alliance Houston v. Environmental Protection Agency*, 906 F.3d 1049 (D.C. Cir. 2018) (per curiam), on the Court's analysis of whether the plaintiff states in this case (the "States") have standing to challenge certain alleged delays and failures by the U.S. Department of Education ("Department") in its implementation of gainful employment regulations (the "GE Rule"), promulgated in 2014 under Title IV of the Higher Education Act of 1965 ("HEA"), which attempt to implement language in the HEA requiring certain postsecondary programs to "prepare students for gainful employment in a recognized occupation." *See* 20 U.S.C. §§ 1002(b)(1)(A)(i), (c)(1)(A), 1088(b)(1)(A)(i).

Defendants previously have explained that the States lack standing to assert their claims, either on a theory of *parens patriae* standing, or on their own behalf. As discussed in detail below, nothing in the D.C. Circuit's *Air Alliance* decision affects that analysis. *Air Alliance* involved a situation where it was undisputed that states had spent money responding to accidental hazardous chemical releases within their territories. *See Air Alliance*, 906 F.3d at 1056. The plaintiff states in that case sought to challenge an Environmental Protection Agency ("EPA") rule delaying the effective date of a prior EPA rule designed to decrease the incidence of such accidental chemical releases. *See id.* The D.C. Circuit's conclusion that the states had standing to challenge EPA's delay rule rested in large part on its recognition that hazardous chemical releases within a state's territory necessarily imposes certain financial obligations on a state, whether in connection with land or natural resources that it owns, or simply to protect the earth and air within its territorial boundaries. *See id.* at 1059-60. There was also a direct connection between the state financial

expenditures involved in responding to chemical accidents, on the one hand, and a delayed federal rule that was specifically aimed at mitigating the need for those precise expenditures, on the other.

No similar proprietary or quasi-sovereign interest in state-owned or controlled territory is at stake here, and there is no similar direct connection between state expenditures and a delayed federal rule. The States' attempt to analogize enforcement actions under state consumer protection laws—which necessarily reflect state policy goals and enforcement priorities—to hazardous waste cleanup is fundamentally flawed. Moreover, the record contains no evidence of states' monetary expenditures in connection with such actions, nor of any impact on such expenditures from the Department's implementation of aspects of the GE Rule. The States' asserted injuries remain speculative, and are not fairly traceable to the Department actions that they seek to challenge.

## ARGUMENT

### I.   *AIR ALLIANCE* SHOULD NOT AFFECT THE COURT'S ANALYSIS OF THE STATES' STANDING (Question 1)

In *Air Alliance*, the D.C. Circuit recognized that states might rest their standing on "nonsovereign," "proprietary interests such as 'own[ing] land or participat[ing] in a business venture.'" *Air Alliance*, 906 F.3d at 1059 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601-02 (1982)). The States contend that *Air Alliance* relates to one asserted injury that they have claimed establishes their "proprietary standing"—namely, an alleged increase in State expenditures on investigating fraudulent programs, in the course of enforcing state consumer protection laws, that, they contend, will be required if the Department fails to proceed with implementing the GE Rule in the ways challenged in the Complaint. *See* Plaintiff States' Supplemental Memorandum ("Pl. Supp. Br.") [ECF 83] at 3 & n.1.[1]   However, any costs

_____

[1] The States' brief identifies two other alleged injuries identified in their prior briefing—namely, an alleged waste of State-funded grant money paid to schools that might have been deemed

associated with States' law enforcement activities—such as the investigations that they contend will be required—do not relate to any asserted proprietary interest of the States and are far afield of the type of injury found sufficient in *Air Alliance*. Moreover, nothing in *Air Alliance* helps the States establish the causation or redressability prongs of standing.

      **A.**    **The States' Asserted Injury to Its Sovereign Interest in Enforcing Consumer Protection Laws Does Not Resemble the *Air Alliance* Injury Arising From Hazardous Chemical Accidents on State Territory**

First of all, the alleged injury at issue in *Air Alliance*, based on states' proprietary or quasi-sovereign interest in their land, is distinct from the injury that the States have alleged here, and that difference is dispositive. The question before the court in *Air Alliance* was whether states had standing to challenge an EPA rule (the "Delay Rule") delaying the effective date of another recently-promulgated rule (the "new EPA rule"), which would strengthen existing regulations aimed at reducing the occurrence and effects of industrial chemical accidents. *See id.* at 1055-56. The court held that the states did have standing on the theory that they had established injury to their proprietary interests. *See id.* at 1059-60. In reaching this conclusion, the court pointed to evidence in the record that, for example, one of the state plaintiffs had "spent $370,000 responding to and investigating a refinery explosion" of the very type that the new EPA rule was designed to prevent, and that hundreds of industrial facilities whose accidental hazardous chemical releases were meant to be prevented by the new EPA rule were within the plaintiff states' territories. *See*

---

ineligible for Title IV loans if they had had failing debt-to-earnings rates for two years, and an alleged loss of tuition at State-sponsored schools if students who might have switched from GE programs if those programs lost Title IV eligibility then sought to attend State-sponsored schools instead—but the States concede that the D.C. Circuit's analysis in *Air Alliance* does not support their standing based on those alleged injuries. *See id.* at 3 & n.1. As previously explained, neither of these two asserted injuries supports the States' standing, and indeed, the GE Rule predicted that states' costs might increase, not decrease, if more students attended their schools. *See* Final regulations ("2014 Final Rule"), 79 Fed. Reg. 64890, 65081 (Oct. 31, 2014).

*id.* at 1059. In promulgating the new EPA rule, EPA had expressly anticipated that similar future costs would be reduced as a result of the rule's implementation. *See id.* at 1055. The court thus reasoned that the challenged Delay Rule would cause a "pocketbook" injury to the states themselves. *Id.* at 1059-60.

Although the court did not expressly so state, its recognition that a "proprietary interest" would apply to state *ownership* of land suggests that the state expenditures in that case related to cleaning up hazardous chemical releases on land, or in connection with natural resources, that the states *owned*. That understanding is in line with the Supreme Court's analysis in *Snapp*, which explained that state proprietary interests are those that arise from, "for example, own[ing] land or participat[ing] in a business venture," where a state as proprietor would have "the same interests as other similarly situated proprietors." *Snapp*, 458 U.S. at 601; *see also, e.g.*, *Dist. of Columbia v. Trump*, 291 F. Supp. 3d 725, 743-45 (D. Md. 2018) (holding that an asserted competitive injury to the proprietary interests of the State of Maryland and District of Columbia in hotel and convention center properties that they owned was sufficient to confer standing for purposes of their Emoluments Clause challenge regarding the Trump Hotel).

To the extent the state expenditures identified in *Air Alliance* were not due to state ownership of land or natural resources, the D.C. Circuit's finding of state standing is consistent with the Supreme Court's recognition that, even when a state "owns very little of the territory alleged to be affected," it retains a "quasi-sovereign" interest, "'independent of and behind the titles of its citizens, in all the earth and air within its domain.'" *Massachusetts v. EPA*, 549 U.S. 497, 518-19 (2007) (quoting *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907)). In *Georgia*—a case with clear parallels to *Air Alliance*—the Supreme Court held that this quasi-sovereign interest entitled Georgia to sue copper companies that were located in another state when

4

the companies' copper works were discharging sulfur dioxide gas over Georgia territory, allegedly affecting the state's forests, orchards, and crops. *Georgia*, 206 U.S. at 236-37. Similarly in *Massachusetts*, the Court held that the state's quasi-sovereign interest in preserving its sovereign territory gave it standing to challenge the EPA's failure to issue regulations under the Clean Air Act that would limit greenhouse gas emissions. *Massachusetts*, 549 U.S. at 521.

Whether viewed as proprietary or quasi-sovereign, the territorial interest at stake in *Air Alliance* is not at issue here. The injury that the States in this case identify as supporting their standing under *Air Alliance*—the alleged increase in investigatory expenditures in connection with their enforcement of state consumer protection laws—is in fact *not* based on their proprietary ownership of land or of any other business interest. Nor is such an injury based on a quasi-sovereign interest in the land or air of the States' territories. Rather, their asserted injury stems from the *state regulatory actions* that, they suggest, they would be forced to conduct in order to compensate for an absence of regulation on the federal level, in the form of the Department's alleged failure to implement the GE rule.

But regulatory actions necessarily stem from a state's exercise of its sovereign power as a government to regulate. *Gov't of Province of Manitoba v. Zinke*, 273 F. Supp. 3d 145, 164 (D.D.C. 2017) (recognizing "the sovereign power of a state to create and enforce its laws" as a "true sovereign interest[]"), *aff'd sub nom Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019). Such actions therefore do not stem from any proprietary interest of a state. *See Hawaii v. Standard Oil Co.,* 405 U.S. 251, 262-65 (1972) (distinguishing between a state's proprietary interests in its business and property, which "refer to commercial interests or enterprises," and governmental or sovereign interests). And absent a genuine proprietary interest or an interest deriving from a state's sovereign dominion over its territory, courts routinely reject such assertions

of state injury. *Cf. Massachusetts v. Mellon*, 262 U.S. 447, 484-85 (1923) (no cognizable injury to a state where no "rights of person or property" or "rights of dominion over physical domain" were at issue).

Rather than *Air Alliance*, this case resembles *Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976), where the D.C. Circuit held that the incidental impact of the discontinuation of a federal disaster relief program on state tax revenues did not confer standing on the state plaintiff. *See id.* at 671-72. The court observed that "the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing." *Id.* at 672. The same principle applies when it comes to state expenditures when, as here, the increase in expenditures that the states allege would, even under their theory, result from state policy choices regarding how to allocate resources, and the connection to the alleged federal policy would thus merely be incidental.

### B. The Direct Connection in *Air Alliance* Between Hazardous Chemical Accidents and Resulting Damages Is Lacking Here

Second, even if states' expenditures on their own regulatory priorities were sufficient to identify a cognizable injury under a proprietary or quasi-sovereign theory of state standing, the causation analysis here is far different from that in *Air Alliance*. The States attempt to analogize their alleged expenditures on "investigation and enforcement efforts directed against fraudulent activity by for-profit colleges and universities" to the "pocketbook injury" that the D.C. Circuit in *Air Alliance* recognized as a legitimate basis for state standing. *See* Pl. Supp. Mem. at 3-4.

However, in *Air Alliance*, the link between the challenged Delay Rule and state expenditures "when responding to accidental releases during the delay period" was direct and irrefutable. *See Air Alliance*, 906 F.3d at 1055 (quoting EPA's proposed disaster rule as

anticipating that "promulgation and implementation of this rule would result in a reduction of the frequency and magnitude of damages from [chemical] releases," and that "some portion of future damages would be prevented through implementation of a final rule"); *id.* at 1059 (noting uncontested fact that accidental releases of hazardous chemicals had occurred in the past and had cost the states money, and that such releases might happen again during the delay period). Indeed, the Court found it significant that EPA had expressly referred to such expenditures "as an example of why the existing [EPA] regulations needed to be strengthened." *See id.*

Here, on the other hand, there is no similar direct link between the States' alleged anticipated expenditures on investigating allegedly fraudulent school programs and the GE Rule, nor is there any indication that the Department intended or predicted that the GE Rule would reduce such expenditures. To the contrary, as previously discussed, the final GE Rule predicted that it could cost states *more* money. *See* 2014 Final Rule, 79 Fed. Reg. at 65081 ("State and local governments may experience increased costs as enrollment in public institutions increases as a result of some students transferring from programs at for-profit institutions."); *cf.* Def. MSJ Reply [ECF 42], at 4 & n.1. Indeed, the GE Rule by its nature—including in particular the provisions implementation of which the States specifically seek to compel here[2]—is simply not directed at

---

[2] As previously explained, the States here have identified three specific alleged delays or failures in the Department's implementation of the GE Rule as the subjects of their challenge and therefore must show an injury caused by each of those specific alleged delays or failures in order to establish standing. *See* Def. MSJ Mem. at 21-23; Def. MSJ Reply at 4-6. Those specific alleged delays or failures are: (1) the Department's alleged delay in requiring schools to provide certain disclosures; (2) the Department's implementation of the Court's decision in *Am. Ass'n of Cosmetology Schs.* ("*AACS*") *v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017); and (3) the Department's alleged failure to provide Draft GE Completers Lists—though as Defendant informed the Court at the May 1, 2018 hearing on the parties' cross-motions for summary judgment, the Department has now issued those Lists. *See* GE Electronic Announcement ("EA") #114, available at https://ifap.ed.gov/GainfulEmploymentInfo/GEDCLandEAV2.html; *see also* EA #118 (indicating Final GE Completers Lists have been distributed).

preventing schools from violating state consumer protection laws in the same way that the EPA rule at issue in *Air Alliance* was directed at preventing accidental hazardous chemical releases. In particular, none of those provisions sets forth any prohibition on schools engaging in fraudulent consumer practices, such as deceptive marketing. Rather, the GE Rule was intended to encourage schools to prepare their students for gainful employment, such that they could earn enough money in a recognized occupation to repay the debt they incurred to earn their degrees. Indeed, the GE Rule identified a number of ways for schools to meet the required debt to earnings ratios; for example, the Rule suggested that schools could provide more financial aid, improve the quality of training that their programs provide so that their graduates could earn more, or lower their tuition costs. 2014 Final Rule, 79 Fed. Reg. at 64,916. Any connection between such steps and the reduction of fraudulent consumer practices would be incidental, at best.[3]

The States therefore cannot demonstrate a direct connection between the Department's implementation of the GE Rule and their costs in enforcing their own consumer protection laws. Instead, they can only speculate that, *if* a school's GE program were deemed failing two years in a row, and if its students were then denied Title IV loans, and if the program then shut down as a result, the state then would not have to worry about enforcing its consumer protection laws with respect to that program. *E.g.*, Pl. Opp. to Def. MSJ [ECF 39] at 5 (suggesting that, "[h]ad the Department continued to enforce the Rule and published a second year of debt-to-earnings rates,

---

[3] The States again seek to rely on the fact that, in the 2014 Final Rule, the Department did point to state lawsuits in connection with its expressed "concern[] that some for-profit institutions have taken advantage of the lack of access to reliable information about GE programs to mislead students." *Id.* at 65,033. However, unlike in *Air Alliance*, there is no indication in the Final Rule that the Department was concerned with state expenditures of funds, or aimed to reduce those expenditures. After all, a state presumably has a certain budgetary allocation for enforcement of its consumer protection laws, and if that allocation is not used for one thing, it will likely be used for something else. Rather, the Department's point was simply that certain state regulatory actions were consistent with its concern.

some of these programs would have failed again, in which case they would no longer be eligible for Title IV funding"). But the States acknowledge that a program's ultimate failure in this scenario would be far from certain. As they suggest, "programs that wished to avoid this fate would necessarily need to improve their performance on the debt–to-earnings metric." *See id.* And the very structure of the GE Rule—which would not deem a program ineligible for at least two years— was designed to allow programs to do exactly that. The notion that a significant number of programs ultimately would lose Title IV eligibility, or that they would shut down as a result, was neither contemplated nor intended by the GE Rule. *See* 2014 Final Rule, 79 Fed. Reg. at 64,916 (explaining that, "[a]ccording to our data, the great majority of GE programs in all sectors will pass the D/E rates measure," and suggesting ways, as discussed above, for those that do not pass the first year to ensure that they pass in the future). Moreover, even beyond the speculative notion that programs would shut down, the States offer no evidence showing how a school's loss of Title IV funding eligibility or its improved debt-to-earnings metric would affect a state's costs in enforcing its consumer protection laws. *See* Def. Response to Pl. Supp. Br. [ECF 66], at 5 (explaining similar flaws in the States' previous attempt to analogize this case to *Accrediting Council for Indep. Colls. & Schs. v. DeVos*, No. 16-2448 (D.D.C.)). In contrast to *Air Alliance*, the causation analysis here thus fails to support the States' standing.

    *Air Alliance* therefore should not affect the Court's analysis of the States' standing in this case. Rather, the States' claims should be dismissed for lack of standing for the reasons explained in Defendant's prior briefing.

## II.   THE STATES HAVE PRESENTED NO EVIDENCE TO SUPPORT THEIR ASSERTION OF "MONETARY EXPENDITURES" RESULTING FROM THE DEPARTMENT ACTIONS THAT THEY CHALLENGE (Question 2)

The States assert that their showing of monetary expenditures in this case is analogous to that found sufficient in *Air Alliance*. Specifically, they assert that they have shown expenditures, both prior to and since filing their complaint, that "respond[ed] to the harms the [GE Rule] was intended to address." Pl. Supp. Mem. at 5.

However, as explained above, state expenditures in connection with their enforcement of their own consumer protection laws are in no way parallel to the costs of responding to hazardous chemical releases that the D.C. Circuit pointed to in *Air Alliance*. Indeed, the States provide no evidence of expenditures associated with such law enforcement activities. Rather, they simply point to the Department's mention of certain state investigations or enforcement actions that, as explained above, were viewed as consistent with the Department's concerns. The Department did not refer to state expenditures in connection with those actions, much less identify the amounts of such expenditures. *See* 2014 Final Rule, 79 Fed. Reg. at 64,907-08, 65,034-35. Rather, the only monetary figure that the Department identified in connection with those actions was a $2.5 million settlement that states *received* from a company running a fraudulent web site that steered veterans to certain colleges. *See id.* at 65,035.

The States otherwise point to the closure of schools run by the Education Corporation of America ("ECA"), as identified in a notice of supplemental authority that they filed in January. However, the costs that the States attempted to identify in their notice of supplemental authority did not arise from enforcement of state consumer protection laws. Rather, the States asserted that they would incur costs in "handl[ing] student complaints and assist[ing] students in obtaining academic transcripts, accessing information on transfer options, and understanding student loan

discharge eligibility criteria," and from accepting transferring students in schools run by the States. Pl. Notice of Supp. Auth. [ECF 81], at 3-4.  Indeed, the States' attempt to identify costs resulting from the *closure* of ECA is entirely inconsistent with its previous argument that it is the *continuation* of GE programs that might otherwise have shut down, if they lost Title IV funding, that would impose costs on the States.

Regardless of whether the States seek to identify costs resulting from the closure of schools, or from their continuation, they have utterly failed to provide any evidence of such costs, much less any evidence tying such costs to the Department's alleged failure to implement certain aspects of the GE Rule. The failure to provide evidence of actual costs is particularly significant given the possibility, identified above, that states might actually receive income, through settlements, as a result of enforcing their consumer protection laws. Given that real possibility, the notion that a given enforcement action will result in a net expenditure, rather than a net financial gain, cannot simply be assumed. Moreover, states presumably have budgetary allocations from which they finance enforcement activity, as well as the activities the States attempt to identify as resulting from ECA's closure, and much if not all of such allocations likely take the form of the salaries of state employees who carry out such activities. Employees receiving such salaries would presumably continue to receive them regardless of the specific activity they are working on. It is far from clear whether the States would be able to attribute specific expenditures to a specific enforcement action or to any efforts to help former ECA students. In any event, they have made no attempt to do so.

The evidentiary record in this case therefore does not support the States' standing on a theory of "pocketbook injury" similar to that adopted in *Air Alliance*.

### III.   THE STATES HAVE PRESENTED NO EVIDENCE OF "HARMS" CAUSED BY THE DEPARTMENT'S ALLEGED DELAYS OR FAILURES AND MITIGATED BY ALLEGED MONETARY EXPENDITURES (Question 3)

In *Air Alliance*, the D.C. Circuit made clear that the only relevant monetary expenditures, for purposes of identifying a "pocketbook" injury that would confer states' standing, were those made in order to "mitigate and recover from harms that could have been prevented absent" the challenged federal action. *See Air Alliance*, 906 F.3d at 1059. In their supplemental brief, the States identify the relevant "harms" here as "the continued efforts by some for-profit educational institutions to take advantage of students and taxpayers by requiring students to take out significant amounts of debt to pay the high cost of tuition without giving them the skills they would need to earn enough to repay that debt." Pl. Supp. Mem. at 10. As evidence of such harms, the States rely entirely on the same portions of the 2014 Final Rule cited above, referring to state actions to enforce consumer protection laws as consistent with the concerns that the Department expressed in the Rule. *See id.* at 11. However, as already explained, the 2014 Final Rule did not suggest that states' enforcement of their consumer protection laws served the same function as the GE Rule, nor did it identify any evidence of state expenditures that would mitigate the harms that the GE Rule sought to address. Nor is there a logical basis for such a connection.

The States acknowledge that the relevant "harm," from the perspective of the GE Rule, is the inability of individuals to "effectively compare programs offered by different institutions in order to make informed decisions about where to invest their time and limited educational funding." *Id.* (quoting 2014 Final Rule, 79 Fed. Reg. at 64,907). But the States nowhere suggest that state actions to enforce consumer protection laws are aimed at providing students or potential students with information about the likelihood that they will be able to repay their debts if they enroll in a particular GE program, so as to inform student enrollment decisions. Much less do the

States identify any expenditures toward that goal. To the contrary, state enforcement actions would most likely be aimed at imposing monetary penalties on schools, shutting down their programs, or entering into a settlement agreement that results in revenues to the states. Again, the connection between such goals and the Department's alleged delays and failures in implementing aspects of the GE Rule is tenuous at best. The States have not provided evidence of "harm" that would support a "pocketbook" injury of the type the D.C. Circuit identified in *Air Alliance*. The States' asserted injury thus remains speculative, is not fairly traceable to the States' specific allegations of delays and failures by the Department in implementing the GE Rule, and thus cannot establish the States' standing under the reasoning of *Air Alliance*.

## CONCLUSION

For the foregoing reasons and those set forth in prior briefing, the States lack standing to pursue their claims against the Department. Those claims therefore should be dismissed, and summary judgment should be entered in favor of the Department

Dated: June 3, 2019                          Respectfully Submitted,


                                             JOSEPH H. HUNT
                                             Assistant Attorney General
                                             MARCIA BERMAN
                                             Assistant Director, Federal Programs Branch

                                             _/s/ Kathryn L. Wyer_____
                                             KATHRYN L. WYER
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             1100 L Street, N.W., Room 12014
                                             Washington, DC  20005
                                             Tel.: (202) 616-8475
                                             Fax: (202) 616-8470
                                             Email: kathryn.wyer@usdoj.gov
                                             *Attorneys for Defendants*

13