## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| STATE OF MARYLAND *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION *et al.*, <br><br> Defendants. | NO. **1:17-cv-2139-KBJ** |

## PLAINTIFF STATES' MEMORANDUM IN OPPOSITION TO DEFENDANTS' SUPPLEMENTAL MOTION TO DISMISS BASED ON MOOTNESS

BRIAN E. FROSH
Attorney General
State of Maryland

CHRISTOPHER J. MADAIO
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
(410) 576-6585

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania

MICHAEL J. FISCHER
Chief Deputy Attorney General
JOHN M. ABEL
JESSE HARVEY
Senior Deputy Attorneys General
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(215) 560-2171

*Additional Counsel Listed on Signature Page*

**TABLE OF CONTENTS**

Table of Authorities ........................................................................................................... ii

Background ........................................................................................................................ 3

   I.    The Gainful Employment Rule ................................................................. 3

   II.   The Department Refuses to Implement the Rule ..................................... 5

   III.  The States File Suit in Response to the Department's Failures ........................ 6

   IV.  The Department Rescinds the Rule................................................................ 7

Discussion ......................................................................................................................... 8

   I.    The States' Challenge to the Department's Refusal to Act Is Not Moot........................... 9

   II.   The States' Challenges to the Delay Notices Are Not Moot ............................................ 12

       A.  The States Challenged Multiple Aspects of the Delay Notices ................................. 12

       B.  The Court Can Grant Relief with Respect to the Disclosure Delays ......................... 13

Conclusion ....................................................................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356 (D.C. Cir. 2018) ............................ 16, 17

*Becerra v. U.S. Dept. of Interior*, 276 F. Supp. 3d 953 (2017)........................................ 15, 17, 18

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), *as revised* Feb. 9, 2016 .......................... 8

*Chafin v. Chafin*, 568 U.S. 165 (2013) .......................................................................... 8

*Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316 (D.C. Cir. 2009) ........................ 14

*Envtl. Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802 (D.C. Cir. 1983)........................................... 15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167
(2000).......................................................................................................................... 9, 16

*Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298 (2012)................................... 8

*Los Angeles Cty. v. Davis*, 440 U.S. 625 (1979)................................................................. 8

*Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449 (D.C. Cir. 1998) ................................... 8

*Reeve Aleutian Airways, Inc. v. United States*, 889 F.2d 1139 (D.C. Cir. 1989) .......................... 8

*United States v. W. T. Grant Co.*, 345 U.S. 629, (1953)...................................................... 17

*Univ. Legal Servs., Inc. v. D.C.*, No. 18-CV-0301 (KBJ), 2019 WL 1430045
(D.D.C. Mar. 30, 2019)............................................................................................. 14, 15

## STATUTES

5 U.S.C. § 706(1) .......................................................................................................... 11

Higher Education Act, 20 U.S.C. § 1001 *et seq.*

§ 1002........................................................................................................................ 3

§ 1088........................................................................................................................ 3

## REGULATIONS

34 C.F.R.

§ 668.405.............................................................................................................. 4, 10, 11

§ 668.412.................................................................................................................. 4

*Announcement of Applicable Dates; Request for Comments*, 82 Fed. Reg. 30,975
    (July 5, 2017) ...................................................................................... 5, 13, 14

*Announcement of Applicable Dates; Request for Comments*, 82 Fed. Reg. 39,362
    (Aug. 18, 2017) ......................................................................................... 5, 12

*Announcement of Applicable Dates; Request for Comments*, 83 Fed. Reg. 28,177
    (June 18, 2018)............................................................................................ 7, 14

*Program Integrity: Gainful Employment*, 79 Fed. Reg. 64,890 (Oct. 31, 2014)................... 1, 3, 4

*Program Integrity: Gainful Employment*, 83 Fed. Reg. 40,167 (Aug. 14, 2018)......................... 7

*Program Integrity: Gainful Employment*, 84 Fed. Reg. 31,392 (July 1, 2019) .................. 2, 7, 8-9

## OTHER SOURCES

*Gainful Employment Electronic Announcement #114* (April 27, 2018)........................................ 10

*Gainful Employment Electronic Announcement #118* (April 5, 2019)......................................... 10

Press Release, *Secretary DeVos Announces Regulatory Reset to Protect Students,
    Taxpayers, Higher Ed Institutions* (June 14, 2017) ........................................................... 5

The plaintiff States respectfully submit this memorandum in opposition to Defendants' Supplemental Motion to Dismiss Based on Mootness.[1] The States brought this action to force the Department of Education to carry out its obligation to implement and enforce the Gainful Employment Rule.[2] That rule was promulgated nearly five years ago in order to protect students from the predatory practices of certain colleges and universities that forced them to take on excessive amounts of debt while failing to provide them with the tools they needed to earn a wage adequate to pay that debt back. The Rule was based in part on investigations and enforcement actions brought by numerous state attorneys general, including those of many of the plaintiff States. Those investigations uncovered widespread fraud and abuse in the for-profit educational sector and were instrumental in leading to judgments against many institutions that had victimized students for years.

The Rule was issued only after a multi-year rulemaking process during which the Department considered numerous proposals to better protect students from the abuses of certain institutions of higher education. The final rule, which occupied 214 pages in the *Federal Register*, rested on two pillars: a disclosure framework, which required covered institutions to provide more complete information to prospective students about program outcomes, and an accountability framework, which penalized programs that were repeatedly found to fail in their obligation to prepare their students to be gainfully employed.

Since 2017, however, Defendants have made no secret of their desire to get rid of the Rule. Over the last two years, they have carried out a two-pronged attack: First, they have done virtually nothing to enforce the Rule themselves, while also permitting regulated schools to do

---

[1] *See* ECF No. 86-1 (Aug. 9, 2019) ("Mot.").
[2] *Program Integrity: Gainful Employment*, 79 Fed. Reg. 64,890 (Oct. 31, 2014) (the "Rule").

virtually nothing to comply with the Rule. Second, they moved forward with a rulemaking

process designed to rescind the Rule in its entirety. As the States previously argued, "the

Department's actions demonstrated that it had no interest in enforcing the Rule in any

meaningful way," but rather that its goal was "to run out the clock on the current Rule while it

scrambled to promulgate a replacement that would strip students of the Rule's protections." Pl.'s

Sec. Supp. Mem. in Support of Mot. for Summ. J., ECF No. 69, at 3 (Sept. 10, 2018). They have

openly carried out this plan, despite the fact that the Rule has legally been in effect while they

were trying to undermine it, and that it imposed clear legal obligations on them that they simply

disregarded.

Defendants now ask to be rewarded for this strategy. They have recently issued a final

rule that rescinds the Gainful Employment Rule in its entirety as of July 1, 2020, while providing

an option for schools to "implement" the rescission of the Rule early.[3] As a result, they argue

that the States' challenge to the actions they took (and failed to take) in order to stall the Rule's

implementation—no matter how unlawful they were—are now moot, because the Rule will soon

no longer exist. But Defendants are wrong: none of the States' claims is moot. First, the

Department continues to have specific obligations under the Rule, and its ongoing failure to

perform these obligations violates the Administrative Procedure Act, as the States have alleged.

Second, Defendants' previous delay notices substantively modified portions of the Rule—

specifically those relating to the alternate earnings appeal process—and nothing has happened in

the interim to moot the States' challenge to these unlawful modifications. And, finally, under

established principles of mootness, the States remain entitled to a declaratory judgment holding

---

[3] *Program Integrity: Gainful Employment*, 84 Fed. Reg. 31,392 (July 1, 2019) ("Repeal Rule").

unlawful Defendants' earlier repeated delays of the deadline for schools to comply with the Rules' disclosure requirements, even though the end date of the most recent delay has passed.

For these reasons, Defendants' motion should be denied.

## BACKGROUND

## I.     The Gainful Employment Rule

Under the Higher Education Act, 20 U.S.C. § 1001 *et seq.*, postsecondary vocational programs and non-degree programs at public or nonprofit institutions must provide a "program of training to prepare students for gainful employment in a recognized occupation," in order to participate in the Title IV student loan program. *See id.* § 1002(b)(1)(A)(i), 1002(c)(1)(A); *see also id.* § 1088(b)(1)(A)(i). In an effort to implement this statutory requirement, the Department of Education conducted a multi-year rulemaking process that culminated in the issuance of the Gainful Employment Rule on October 31, 2014. *See* 79 Fed. Reg. at 64,890.

The stated purpose of the Rule was to:

address growing concerns about educational programs that, as a condition of eligibility for title IV, HEA program funds, are required by statute to provide training that prepares students for gainful employment in a recognized occupation (GE programs), but instead are leaving students with unaffordable levels of loan debt in relation to their earnings, or leading to default.

*Id.* at 65,024. Specifically, the Department expressed concern "about the growing evidence, from Federal and State investigations and *qui tam* lawsuits, that many GE programs are engaging in aggressive and deceptive marketing and recruiting practices" and that as a result prospective students were "being pressured and misled into critical decisions regarding their educational investments that are against their interests." *Id.* at 64,890.

The Rule relied on both a "transparency framework" and an "accountability framework." *Id.* The "transparency framework" required covered programs to disclose a detailed list of

information relating to the program, to include things such as the total cost of the program and the average load debt of program graduates. 34 C.F.R. § 668.412. Covered programs were required to include this information on their web sites and in their marketing materials, and in addition were required to provide it directly to all prospective students before enrollment. *Id.* The "accountability framework" provided that programs that were found to have, over a period of years, repeatedly failed to "prepare students for gainful employment in a recognized occupation," under the methodology set forth in the Rule, would lose eligibility for Title IV funds. The determination as to whether a program satisfied this requirement rested on the calculation, with respect to each program, of a "debt-to-earnings (D/E) rate." 79 Fed. Reg. 64,891. The D/E rate was intended to serve as a measure of the average debt load relative to the average income of program graduates. Programs were classified as "passing," "failing," or "in the zone" based on their D/E rate for a given year, and those that performed consistently poorly over a specified period of years were declared ineligible for Title IV funds.

The Rule also imposed a number of specific obligations on the Department, including the obligation to calculate, with respect to each covered program, D/E rates for each year. The Department was to begin this process by "[c]reating a list of the students who completed the program during the cohort period and providing the list to the institution" (often referred to as the "Draft Completers List"), and "[a]llowing the institution to correct the information about the students on the list." 34 C.F.R. § 668.405(a)(1), (2). Once the list was finalized, the Department was to provide it to the Social Security Administration (SSA), which would then give the Department aggregate earnings data about the individuals on the list.[4] The Department would

---

[4] Schools that disputed the accuracy of the earnings information provided by SSA were permitted to seek "alternate earnings appeals" and provide the Department with survey data of their graduates' earnings, provided the survey satisfied certain methodological criteria.

then use this information and its own data about student debt loads to determine program D/E rates.

## II.     The Department Refuses to Implement the Rule

On June 14, 2017, Education Secretary Elisabeth DeVos announced that she would impose  a "regulatory reset" of the Gainful Employment Rule. *See* U.S. Department of Education, Press Release, *Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers, Higher Ed Institutions* (June 14, 2017).[5] The following month, without giving prior notice or an opportunity to comment, the Department announced that it was extending certain deadlines under the Rule. *See Announcement of Applicable Dates; Request for Comments*, 82 Fed. Reg. 30,975 (July 5, 2017) ("First Delay Notice"). The First Delay Notice extended the deadline for institutions to comply with the disclosure requirements of the Rule for promotional materials and for direct notifications to students about to enroll until July 1, 2018. The only rationale offered for this delay was that the Department "believes that it should evaluate the utility of these disclosures to students and the implementation of this requirement" and that it therefore would "further review these requirements as part of its review of the GE regulations and their implementation, including through negotiated rulemaking." *Id*.

On August 18, 2017, the Department issued another notice modifying certain deadlines under the Rule. *See Announcement of Applicable Dates; Request for Comments*, 82 Fed. Reg. 39,362 (Aug. 18, 2017) ("Second Delay Notice"). This notice extended the "deadlines for submitting notices of intent to file alternate earnings appeals and for submitting alternate earnings appeals" to October 6, 2017, and February 1, 2018, respectively, for all GE Programs. The Second Delay Notice also stated that the Department would consider "all graduate surveys,

---

[5] https://www.ed.gov/news/press-releases/secretary-devos-announces-regulatory-reset-protect-students-taxpayers-higher-ed-institutions

regardless of response rate" in alternate earnings appeals. *Id*. The Department's explanation for

this provision was that it "seeks to reduce the burden on institutions in conducting these appeals

while still ensuring that institutions provide enough information for the Department to determine

whether the program graduates for whom alternative earnings data are provided are a valid

representation of the overall cohort." *Id*.

In addition to extending the deadlines for schools to comply with their obligations under

the Rule, the Department failed to comply with its own obligations. While the first year of D/E

rates for covered programs had been issued back in January 2017, the Department had failed to

even initiate the process of calculating the second year of D/E Rates. In fact, on August 3, 2017,

the Department acknowledged that it had not "provided the draft completers lists" and that it did

not "currently have any timetable to send completers lists to schools for 2017." Am. Compl.

¶ 90.

## III.    The States File Suit in Response to the Department's Failures

In response to the Department's ongoing efforts to undermine the Rule, the States

initiated this lawsuit, seeking declaratory and injunctive relief, on October 17, 2017. ECF No. 1.

The States' complaint contained three separate counts: Count I alleged that the Department

violated the APA's procedural requirements by failing to engage in notice and comment

rulemaking with respect to the First and Second Delay Notices; Count II alleged that the First

and Second Delay Notices were arbitrary and capricious, in violation of the APA; and Count III

alleged that the Department had failed to take certain actions required under the Rule, including

the circulation of Draft Completers Lists and the determination of D/E Rates.

On December 26, 2017, the States moved for summary judgment. After full briefing, this

Court held a hearing on May 1, 2018. The day before the hearing, the Department suddenly

announced that it was issuing the draft completers lists to covered programs. Then, less than two months after the hearing, the Department issued yet another delay notice, which extended the disclosure deadlines to July 1, 2019. *See* 83 Fed. Reg. 28,177 (June 18, 2018) ("Third Delay Notice"). The States then quickly moved for leave to filed an amended complaint and a supplemental memorandum in support of their motion for summary judgment to challenge the Department's latest delay notice. That motion was granted, and the parties filed supplemental summary judgment briefs in September 2018.

## IV.    The Department Rescinds the Rule

While this litigation was proceeding, the Department was also separately working to rescind or replace the Rule. As required by the Higher Education Act, the Department conducted a negotiated rulemaking process on a potential replacement rule. During that process, the Department never proposed rescission of the Rule. After it ended without a consensus, the Department then issued a Notice of Proposed Rulemaking (NPRM) that proposed simply doing away with the Rule. *Program Integrity: Gainful Employment*, 83 Fed. Reg. 40,167 (Aug. 14, 2018).

On July 1, 2019, the Department issued a final rule rescinding the Rule in its entirety. *See Program Integrity: Gainful Employment*, 84 Fed. Reg. 31,392 (July 1, 2019) ("Repeal Rule"). The justifications offered in the Repeal Rule largely mirrored those in the NPRM. For instance, the Department asserted, without significant detail, that the D/E rate formula was "fundamentally flawed and inconsistent with the requirements of currently available student loan repayment programs." *Id*. It faulted the Rule for failing "to properly account for factors other than institutional or program quality that directly influence student earnings and other outcomes." *Id*. Specifically, it cited research purporting to find that "race, financial dependency status and

7

parental wealth transfer are the strongest predictors of default and non-repayment" and suggested that differences in outcomes among programs were due more to the "demographics of the students served rather than the quality of the educational program." *Id.* at 31,432.

But the most significant problem with the Rule, according to the Department, was that it "unfairly target[ed]" for-profit institutions. *Id.* at 31,398. In the Rule, the Department expressed deep concern for what it characterized as the "disparate impact" of the Rule on for-profit institutions. 84 Fed. Reg. at 31,392. The Department ultimately concluded that the only way to rectify this supposed unfairness was to repeal the Rule in its entirety, thus eliminating all protections for students attending for-profit institutions.

## DISCUSSION

"The burden of establishing mootness rests on the party that raises the issue." *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 459 (D.C. Cir. 1998) (citing *Reeve Aleutian Airways, Inc. v. United States*, 889 F.2d 1139, 1143 (D.C. Cir. 1989). To carry this "heavy" burden, *Nichols*, 142 F.3d at 449 (quoting *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979)), the party must demonstrate that "it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016), *as revised* (Feb. 9, 2016) (quoting *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)). Therefore, "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox*, 567 U.S. at 1019).[6]

---

[6] Defendants continue to assert that the States lack standing to bring this action. As the States have previously explained, they have standing for multiple reasons. In particular, as discussed in the States' recent supplemental filing, the Department's refusal to carry out its obligations under the Rule increases the burden on the States to conduct investigations and enforcement actions against fraudulent for-profit schools. Despite challenging the States' standing in this litigation, the Repeal Rule itself acknowledges the role that state Attorneys General play in addressing fraud:

Furthermore, while mootness, like standing, is jurisdictional in nature, the two doctrines operate in very different ways. As Justice Ginsburg explained, "Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191–92 (2000) (citations omitted). Mootness, however, presents different concerns:

> In contrast, by the time mootness is an issue, the case has been brought and litigated, often (as here) for years. *To abandon the case at an advanced stage may prove more wasteful than frugal.*

*Id.* (citations omitted) (emphasis added). Thus, she explained that a defendant's subsequent conduct "might moot the case, but—we once more reiterate—only if one or the other of these events made it absolutely clear that [the alleged violations] could not reasonably be expected to recur." *Id.* at 193 (citation omitted); *see infra* Part II (discussing exceptions to mootness).

## I.    The States' Challenge to the Department's Refusal to Act Is Not Moot

As an initial matter, the Department continues to have legal obligations under the Gainful Employment Rule, and its failure to carry out those obligations renders its continued conduct unlawful. As a result, the States' challenge to the Department's refusal to act (Count III) is plainly not moot.

---

The Department agrees that during the Great Recession, proprietary institutions likely grew too rapidly, and some have been accused of committing fraud, but the most rapid growth in the sector was by online institutions, where relatively few programs failed the D/E rates measure. During the Great Recession, many students sought relief by enrolling in college, and the Department does not deny that some institutions took advantage of that. However, there are other mechanisms, *such [as] state attorneys general, consumer protection agencies,* civil legal proceedings, internal resolution arrangements, and borrower defense to repayment regulations that enable students to take action against institutions that have committed fraud.

84 Fed. Reg. at 31,400.

As the States alleged, the duties the Department refused to carry out "include[ed], but [were] not limited to, providing institutions with Draft GE Completers Lists and calculating and issuing debt-to-earnings rates." Am. Compl. ¶ 126. The Department did ultimately provide Draft GE Completers Lists to schools on April 30, 2018, just one day before the hearing on the States' summary judgment motion. *See* Supp. Mem. in Support of Mot. for Summ. J., ECF No. 64, at 2-4 (June 19, 2018). It gave schools 45 days, or until June 13, 2018, to submit corrections to the lists. *See Gainful Employment Electronic Announcement #114* (April 27, 2018); *see also* 34 CFR § 668.405. Ten months later, on April 5, 2019, the Department announced that it would be providing schools with final lists in three days. *Gainful Employment Electronic Announcement #118* (April 5, 2019).[7]

Count III of the States' Complaint expressly alleged that the Department was failing to calculate D/E rates, and that this failure violated the APA. Am. Compl. ¶ 126. To date, the Department still has not calculated the second year of D/E rates. In fact, in the April 5 announcement, the Department stated that it would *not* be calculating D/E rates as required by the Rule. Its justification for its refusal to carry out its legal obligations was contained in a single sentence in the announcement: "Since the Memorandum of Understanding (MOU) under which the Social Security Administration (SSA) shared earnings data with the Department has expired, the Department is unable to calculate D/E rates in 2019." No further explanation was provided.

The Department does not dispute that it has a legal obligation to calculate debt-to-earnings rates, at least until July 1, 2020. *Cf.* Mot. at 13 ("In light of the 2019 Final Rule, however, the Department will not calculate D/E rates after July 1, 2020."). But it confirms that it has no intention of doing so, baldly claiming that it is "unable to complete the process of

---

[7] https://ifap.ed.gov/eannouncements/040519GEEA118FinalCompleterListDraftCompleterListCorrection Results.html

calculating D/E rates in accord with the GE regulations." Mot. at 13. Specifically, it asserts it is

"no longer able to obtain [earnings] data from" the Social Security Administration, because the

MOU between the agencies has expired, and therefore it cannot comply with its obligations

under the Rule. Mot. at 13. Based on these asserted facts, the claims that this Court *lacks*

*jurisdiction* over Count III.

This argument makes no sense. Whatever the status of the Agencies' MOU, the

Department has a legal obligation to calculate D/E rates, and Count III squarely challenges its

refusal to do so. To the extent the Department suggests it is now impossible for it to comply with

its legal obligation, it provides no real facts to support this claim, much less undisputed facts that

the Court could consider in ruling on a motion to dismiss. For instance, it provides no

explanation of the circumstances surrounding the lapse of the MOU. There is obviously nothing

in the administrative record on this issue, as it was produced 18 months ago, and the States have

had no opportunity to take discovery on it, so as to enable them to assess whether the Department

made a good-faith effort to renew the MOU or obtain the relevant data another way, or whether it

allowed (or even asked) the SSA to terminate the MOU consistent with its broader strategy of

running out the clock on the Rule.

Furthermore, the Department never explains why an MOU is necessary at all, given that

the Rule simply provides, "The Secretary submits the final [completers] list to SSA," and "SSA

returns [the relevant income information] to the Secretary." 34 C.F.R. § 668.405(d). And even if

the Department could somehow establish that it currently lacks the practical ability to calculate

D/E rates, it provides no explanation as to why such an assertion is relevant to an otherwise valid

claim under section 706(1) of the APA seeking to "compel agency action unlawfully withheld or

unreasonably delayed." 5 U.S.C. § 706(1). And most importantly, the Department does not even

attempt to explain how this argument can be raised in a motion to dismiss on mootness grounds.

At best, Defendants seem to be asserting some sort of defense to Count III on the merits—

although, again, the many factual and legal infirmities with its argument make it unclear what is

actually being asserted. They have not identified (much less carried their "heavy" burden of

establishing) how the States' claim that Defendants have unlawfully failed to carry out their

obligations under the Rule is *jurisdictionally* defective. Count III is not moot.

## II.    The States' Challenges to the Delay Notices Are Not Moot

The Department claims that, because the end date of the last delay notice (July 1, 2019)

has now passed, the States' challenges to those notices (Counts I and II) are now moot. But the

Department's actions in substantively amending the Rule on three separate occasions, including

by extending key deadlines under the Rule, have not been rendered more lawful by the passage

of time. And the Department cannot escape the judgment of this Court for its illegal conduct by

pointing to the fact that it was successful in its attempt to run out the clock.

### A.  The States Challenged Multiple Aspects of the Delay Notices

As an initial matter, the Department fails to acknowledge that the States challenged

multiple substantive amendments to the Rule contained in the Delay Notices, and not simply the

extensions of time granted to schools to comply with the Rule's critical disclosure requirements.

For instance, the Delay Notices extended the deadline for programs to file alternate earnings

appeals. The effect of this extension was that many programs that would not (or could not) have

appealed their D/E rates were permitted to do so. The passage of time and the resolution of

appeals that would not or could not have been filed has not mooted the States' challenge to this

aspect of the Delay Notices.

Furthermore, the Second Delay Notice also substantively amended the Rule by providing

that, in evaluating earnings appeals, the Department would consider "all graduate surveys,

regardless of response rate"—contrary to the Rule, which required graduate surveys to meet

certain basic standards for validity. This substantive amendment to the Rule—which violated

both the procedural and substantive requirements of the APA—was unaffected by the expiration

of the deadline extension for program disclosure requirements. As a result, it is also not moot.

### B.  This Court Can Grant Relief with Respect to the Disclosure Delays

With respect to the delays of the disclosure deadlines themselves—contained in the First

and Third Delay Notices—the States' claims should also not be dismissed as moot. The States

have sought a declaratory judgment that the extensions of the disclosure deadline set forth in

both notices were issued in violation of the procedural and substantive requirements of the APA,

and there is no bar to the Court's granting such relief.

### 1.  *The Challenged Delays Were Not Isolated Incidents*

To be clear, the States did not simply allege that the specific actions taken by the

Department were unlawful under the APA. Rather, they argued they "were part and parcel of

a broader effort to ensure that students would never receive the protections afforded by

the Rule." Pls.' Sec. Supp. Mem. in Support of Mot. for Summ. J., ECF No. 69, at 4 (Sept. 10,

2018). As the States' asserted in their complaint, the Department's actions were all part of a

broader attempt to "delay a duly promulgated and implemented regulation in order to draft a

replacement." Am. Compl. ¶ 12. The Department confirmed as much, as the only justification

offered for extending the disclosure deadlines in the First and Third Delay Notices was that the

Department wanted to replace the Rule. Thus, the First Notice stated:

> The Department believes that it should evaluate the utility of these disclosures to
> students and the implementation of this requirement prior to requiring institutions

13

to include the disclosure template, or a link thereto, in their GE program promotional materials and to directly distribute the disclosure template to prospective students under 34 CFR 668.412(d) and (e). Moreover, the Department expects to further review [the disclosure] requirements as part of its review of the GE regulations and their implementation, including through negotiated rulemaking. Accordingly, the Department is allowing institutions additional time—until July 1, 2018—to comply with the provisions in 34 CFR 668.412(d) and (e).

82 Fed. Reg. at 30,976. The Third Delay Notice stated:

The Department intends to develop proposed regulations that would replace the GE regulations. As part of this rulemaking process, the Department continues to evaluate the efficacy of these disclosures to students, including the manner in which the GE regulations would require institutions make these disclosures, and the burden associated with the implementation of these requirements. As the Department continues to review the utility of these requirements in connection with the proposed rulemaking, we are allowing institutions additional time—until July 1, 2019—to comply with the provisions in 34 CFR 668.412(d) and (e). The requirements in 34 CFR 668.412(a), (b), and (c) that schools post disclosures on their program websites using the approved disclosure template provided by the Department and that those disclosures be updated annually remain in effect.

83 Fed. Reg. at 28,178.

Thus, in challenging the individual Delay Notices, the States specifically challenged the Department's underlying rationale that an agency's "belie[f] that it should evaluate the utility" of a regulatory requirement empowers the agency, without more, to suspend that requirement. As this Court has held, where a plaintiff alleges "more than isolated failures" but rather that the defendant's actions "amount to an unlawful 'policy and/or practice,'" the plaintiff's claims are not rendered moot by the mere termination of the specific conduct at issue. *Univ. Legal Servs., Inc. v. D.C.*, No. 18-CV-0301 (KBJ), 2019 WL 1430045, at \*6-\*7 (D.D.C. Mar. 30, 2019). So even if a claim for injunctive relief is rendered moot, "a plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy." *Del Monte Fresh Produce Co. v. United States,* 570 F.3d 316, 321 (D.C. Cir. 2009). Thus, the States may obtain a declaratory

14

judgment holding those actions were unlawful because the Department may not refuse to implement a valid rule simply because it wishes to "evaluate the utility" of that rule at some future date.

*Becerra v. United States Dep't of Interior*, 276 F. Supp. 3d 953, 960 (N.D. Cal. 2017), illustrates this point. In *Becerra*, California and New Mexico challenged a series of delays in the effective date of a regulation dealing with mineral collection on federal and Indian lands. *Id.* at 956-57. While the lawsuit proceeded, the agency conducted notice-and-comment rulemaking on a proposal to rescind the rule, ultimately issuing a final rule the rescinded the previous rule as of September 6, 2017. *Id.* at 957. Ruling on August 30, 2017, the court rejected defendants' claim that the case was moot and found that declaratory relief was appropriate. It stated:

> Declaratory relief is an appropriate and meaningful remedy for the additional reason that *Defendants' approach to repealing the Rule is sufficiently likely to be repeated without being subject to judicial review* to cut against application of prudential mootness. The likelihood that one or more Defendants will use the same strategy to effectively repeal regulations that California has a stake in maintaining in effect without statutory authority after their effective date is not remote.

*Id.* at 960 (emphasis added). Here, the States may continue to seek a declaratory judgment that those actions were unlawful because an agency may not refuse to implement a valid rule simply because it wishes to "evaluate the utility" of that rule at some future date.[8]

---

[8] As this Court explained in *University Legal Services*, a scenario in which the plaintiff challenges an ongoing policy or practice is not an exception to the mootness doctrine, but rather an application of it. 2019 WL 1430045, at *7. In such cases, no intervening event has mooted the claim, properly construed. *Id.* By contrast, in the two scenarios discussed below—voluntary cessation and capable of repetition yet evading review—the claim *is* otherwise moot, "so that an exception is required." *Id.* Nonetheless, there is overlap in the factors that are relevant to the analysis under all three scenarios; for instance, the fact that here, as in *Becerra*, "Defendants' approach to repealing the Rule is sufficiently likely to be repeated without being subject to judicial review" is relevant to all three. 276 F. Supp. 3d at 960; *see also Envtl. Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 820 (D.C. Cir. 1983) ("Of course, the two tests

2.   *Exceptions to the Mootness Doctrine*

Even if the mootness doctrine applied to the States' claims with respect to the

disclosure deadlines, the facts of this case fit under two exceptions to that doctrine. The

D.C. Circuit has held that,  "even though the specific action that the plaintiff challenges

has ceased, a claim for declaratory relief will not be moot even if the plaintiff has made

no challenge to [an] ongoing underlying policy, but merely attacks an isolated agency

action, so long as the specific claim fits the exception for cases that are capable of

repetition, yet evading review, or falls within the voluntary cessation doctrine." *Del

Monte*, 570 F.3d at 321 (internal quotation marks omitted).

**Voluntary Cessation:** The Department concedes that the events it claims have

mooted the States claims are "in part, 'of the defendant's own doing.'" Mot. at 17

(quoting *Am. Freedom Def. Initiative (AFDI) v. WMATA*, 901 F.3d 356, 362 (D.C. Cir.

2018)). Under such circumstances, the Department can only prevail by demonstrating

that there is "no reasonable expectation that the alleged violation will recur" *and* that

"interim relief or events have completely or irrevocably eradicated the effects of the

alleged violation." *AFDI*, 901 F.3d at 362. To prevail, it must make both showings; here,

it can make neither.

First, the Department cannot establish that there is "no reasonable expectation that

the alleged violation will recur" or that "events made it absolutely clear that [the alleged

violations] could not reasonably be expected to recur." *Friends of the Earth,* 528 U.S. at

193. The Department has plainly not had a change of heart such that it now has no

---

share a common element—both require an inquiry into the likelihood that the plaintiff will again be subject to the
allegedly illegal conduct. Indeed, this appears to be the main concern under both standards.").

objection to enforcing the Rule. To the contrary, it rests its argument entirely on the repeal of the Rule, arguing that "[t]here can be no concerns about the Department returning to its old ways by again delaying the GE regulations once this case is dismissed because there will be no GE regulations to delay." Mot. at 18. This assertion is false, as the Rule will remain in effect until July 1, 2020, under any circumstances. *See Becerra*, 276 F. Supp. 3d at 959 (N.D. Cal. 2017). Regardless, the Department's argument rests entirely on the assumption that the Repeal Rule will either not be challenged in court or will survive judicial review fully intact. Both assertions are doubtful, and it is plainly reasonable to conclude that, if the Repeal Rule were to be vacated or enjoined (even on a temporary basis), the Department would again refuse to enforce the Rule.[9]

Second, the Department cannot show that "interim relief or events have completely or irrevocably eradicated the effects of the alleged violation." *AFDI*, 901 F.3d at 362. In fact, the effects of the Department's violations have not been eradicated at all. Had the Department complied with its legal obligations, it would have carried out its obligations under the Rule over the last two years, while schools would have been required to comply with all of the Rule's disclosure requirements over the same period. Its failure to do so caused real harm: in fact, the States have already shown "that they have had to devote resources to address harms that have occurred *since* the Department began refusing to enforce the Gainful Employment Rule," as a result of the sudden

---

[9] At this stage, the "heavy" burden is on the defendant to "demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'" *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). So plaintiffs need not establish that the Repeal Rule is unlawful; rather, the Department must prove that it is unreasonable to expect that the Repeal Rule could be invalidated, even for a brief period of time.

closure of the for-profit chain Education Corporation of America. Pl. States' Supp. Mem.,
ECF No. 83, at 7-8 (May 13, 2019).

**Capable of Repetition, Yet Evading Review:** For similar reasons, this claim
also falls under the "capable of repetition, yet evading review" exception. Defendants
argue that the conduct at issue is not "capable of repetition" because the only way it could
recur would be if the Department chose to go to the trouble of formally reinstating the
Rule. But this argument ignores the likelihood, discussed above, that the Repeal Rule
itself will be subject to judicial attack and potentially invalidated, even if only briefly.
And it narrowly defines the conduct at issue as the imposition of delays in implementing
the Rule's disclosure requirements. But those delays were grounded in the Department's
claim of authority to decline to enforce any regulation that it wishes to revisit through the
regulatory process. And this conduct could easily recur, and in a situation that causes
harm to the States. *See Becerra*, 276 F. Supp. 3d at 960 ("The likelihood that one or more
Defendants will use the same strategy to effectively repeal regulations that California has
a stake in maintaining in effect without statutory authority after their effective date is not
remote."). And, however characterized, the Department's conduct could easily "evade
review": a refusal to enforce a duly issued regulation could last for any amount of time,
and in some cases only a very brief delay will achieve the Department's goal of running
out the clock while it works to repeal or replace a regulation.

*   *   *

Thus, no matter how the question is framed, the States' challenge to the disclosure
delays are not moot. The delays were both procedurally and substantively invalid under

the APA, and therefore this Court should grant the States a declaratory judgment on

Counts I and II of their complaint.

## CONCLUSION

For the reasons set forth above and in the States' earlier briefing, Defendants' motion to

dismiss should be denied and the States should be granted summary judgment with respect to all

three counts of their complaint.


Dated: August 30, 2019                    Respectfully submitted,

                                          FOR THE STATE OF MARYLAND
                                          BRIAN E. FROSH
                                          ATTORNEY GENERAL

                                  By:     */s/ Christopher J. Madaio*
                                          Christopher J. Madaio
                                          Assistant Attorney General
                                          Office of the Attorney General
                                          Consumer Protection Division
                                          200 St. Paul Place, 16th Floor
                                          Baltimore, MD 21202
                                          (410) 576-6585
                                          Cmadaio@oag.state.md.us

FOR THE COMMONWEALTH OF
PENNSYLVANIA
JOSH SHAPIRO
ATTORNEY GENERAL

By:   */s/ Michael J. Fischer*
Michael J. Fischer
Chief Deputy Attorney General
John M. Abel
Jesse Harvey
Senior Deputy Attorneys General
Pennsylvania Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(215) 560-2171
mfischer@attorneygeneral.gov

PEOPLE OF THE STATE OF
ILLINOIS, by KWAME RAOUL
ATTORNEY GENERAL OF ILLINOIS

By:   */s/ Joseph Sanders*
Joseph Sanders
Gregory W. Jones
Assistant Attorneys General
Consumer Fraud Bureau
Office of the Illinois Attorney General
100 W. Randolph St., 12th Fl.
Chicago, IL 60601
312-814-6796
jsanders@atg.state.il.us
gjones@atg.state.il.us

FOR THE COMMONWEALTH OF
MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

By:   */s/ Yael Shavit*
      Yael Shavit
      Assistant Attorney General
      Office of the Massachusetts Attorney
      General
      One Ashburton Place
      Boston, MA 02108
      (617) 963-2197
      yael.shavit@state.ma.us

FOR THE STATE OF CALIFORNIA
XAVIER BECERRA
CALIFORNIA ATTORNEY GENERAL

By:   */s/ Bernard A. Eskandari*
      Bernard A. Eskandari
      Supervising Deputy Attorney General
      300 South Spring Street, Suite 1702
      Los Angeles, California 90013
      (213) 897-2652
      bernard.eskandari@doj.ca.gov

FOR THE STATE OF CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL

By:   */s/ Joseph J. Chambers*
      Joseph J. Chambers
      Assistant Attorney General
      Connecticut Office of Attorney General
      PO Box 120
      Hartford, CT 06141-0120
      (860) 808-5270
      joseph.chambers@ct.gov

FOR THE STATE OF DELAWARE
KATHLEEN JENNINGS
ATTORNEY GENERAL

By:   */s/ Christian Douglas Wright*
Christian Douglas Wright
Director of Consumer Protection
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE  19801
(302) 577-8400
christian.wright@state.de.us

FOR THE DISTRICT OF COLUMBIA
KARL A. RACINE
ATTORNEY GENERAL

By:   */s/ Benjamin M. Wiseman*
Benjamin M. Wiseman
Assistant Attorney General
Attorney General for the District of
Columbia
441 4th Street, N.W., 6th Floor
Washington, DC 20001
(202) 741-5226
benjamin.wiseman@dc.gov

FOR THE STATE OF HAWAI'I
CLARE E. CONNORS
ATTORNEY GENERAL OF HAWAII

By:   */s/ Bryan C. Yee*
Bryan C. Yee
Deputy Attorney General
425 Queen Street
Honolulu, Hawaii 96813
(808) 586-1180
bryan.c.yee@hawaii.gov

FOR THE STATE OF IOWA
THOMAS J. MILLER
ATTORNEY GENERAL

By:   */s/ Jessica Whitney*
Jessica Whitney
Director - Consumer Protection
Office of the Attorney General of Iowa
1305 E. Walnut St.
Des Moines, Iowa 50319
(515) 281-8772
jessica.whitney@iowa.gov

FOR THE STATE OF MINNESOTA
KEITH ELLISON
ATTORNEY GENERAL

By:   */s/ Jason Pleggenkuhle*
Jason Pleggenkuhle
Assistant Attorney General
Bremer Tower, Suite 1200
445 Minnesota Street
St. Paul, MN 55101
(651) 757-1147 (Voice)
(651) 282-5832 (Fax)
jason.pleggenkuhle@ag.state.mn.us

FOR THE STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL OF NEW YORK

By:   */s/ Jane M. Azia*
Jane M. Azia
Chief, Bureau of Consumer Frauds and
Protection
28 Liberty Street
New York, NY 10005
Tel.: (212) 416-8727
Jane.azia@ag.ny.gov

FOR THE STATE OF NORTH CAROLINA
JOSHUA H. STEIN
ATTORNEY GENERAL OF NORTH
CAROLINA

By:   */s/ Matt Liles*
Matt Liles
Assistant Attorney General
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC  27603
P.O. Box 629
Raleigh, NC  27602
(919) 716-0141
mliles@ncdoj.gov

FOR THE STATE OF OREGON
ELLEN F. ROSENBLUM
ATTORNEY GENERAL

By:   */s/ Katherine A. Campbell*
Katherine A. Campbell
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
katherine.campbell@doj.state.or.us

FOR THE STATE OF RHODE ISLAND
PETER NEHRONA
ATTORNEY GENERAL

By:   */s/ Neil F.X. Kelly*
      Neil F.X. Kelly
      Deputy Chief, Civil Div.
      Assistant Attorney General
      Edmund F. Murray, Jr.
      Special Assistant Attorney General
      Rhode Island Department of Attorney
      General
      150 South Main Street
      Providence, Rhode Island 02903
      (401) 274-4400 ext. 2284
      nkelly@riag.ri.gov
      emurray@riag.ri.gov

FOR THE STATE OF VERMONT
THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

By:   */s/ Christopher J. Curtis*
      Christopher J. Curtis
      State of Vermont
      Office of the Attorney General
      Chief, Public Protection Division
      109 State St.
      Montpelier, VT 05609
      (802) 828-5586
      christopher.curtis@vermont.gov

25

FOR THE COMMONWEALTH OF
VIRGINIA
MARK R. HERRING
ATTORNEY GENERAL

By:   */s/ Samuel T. Towell*
Samuel T. Towell
Deputy Attorney General, Civil Litigation
Mark S. Kubiak
Assistant Attorney General, Manager
Barbara Johns Building
202 N. Ninth St.
Richmond, Virginia 23219
(804) 786-6731
stowell@oag.state.va.us

FOR THE STATE OF WASHINGTON
ROBERT W. FERGUSON
ATTORNEY GENERAL

By:   */s/ Jeffrey T. Sprung*
Jeffrey G. Rupert
Chief, Complex Litigation Division
Jeffrey T. Sprung (D.C. Bar No.: 384880)
Assistant Attorney General
Office of the Washington Attorney General
1125 Washington St. SE
P.O. Box 40100
Olympia, WA 98504
(206) 326-5492 (Sprung)
jeffreyr2@atg.wa.gov
jeff.sprung@atg.wa.gov