```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2    _____

 3    State of Maryland, et al.,    ) Civil Action
                                    ) No. 1:17-cv-02139-KBJ
 4                    Plaintiffs,   )
                                    )
 5    vs.                           ) Motion Hearing
                                    )
 6    United States Department of   )
      Education, et al.,            ) Washington, D.C.
 7                                  ) January 9, 2020
                      Defendants.   ) Time:  10:00 a.m.
 8    _____

 9               Transcript of Motion Hearing
                         Held Before
10          The Honorable Ketanji Brown Jackson
                 United States District Judge
11    _____

12                  A P P E A R A N C E S

13    For the Plaintiff      Christopher J. Madaio
      State of Maryland:     OFFICE OF THE ATTORNEY GENERAL
14                           OF MARYLAND
                             Consumer Protection Division
15                           200 St. Paul Street
                             Baltimore, Maryland 21202
16                           cmadaio@oag.state.md.us

17    For the Plaintiff      Jacob Boyer
      Commonwealth of        Michael J. Fischer
18    Pennsylvania:          OFFICE OF THE ATTORNEY GENERAL
                             1600 Arch Street, Suite 300
19                           Philadelphia, Pennsylvania 19103
                             jboyer@attorneygeneral.gov
20                           mfischer@attorneygeneral.gov

21    For the Plaintiff      Benjamin M. Wiseman
      District of Columbia:  OFFICE OF THE ATTORNEY GENERAL
22                           Office of Consumer Protection
                             441 4th Street, Northwest, Suite 600-S
23                           Washington, D.C. 20001
                             benjamin.wiseman@dc.gov

24

25
```

| | | |
|---|---|---|
| 1 | For the Defendants: | **Kathryn L. Wyer** |
| | | U.S. DEPARTMENT OF JUSTICE |
| 2 | | Civil Division, Federal Programs Branch |
| | | 1100 L Street, Northwest |
| 3 | | Washington, D.C. 20005 |
| | | kathryn.wyer@usdoj.gov |
| 4 | | |
| | Also Present: | Steven Z. Finley |
| 5 | | |

_____

6   Court Reporter:      Nancy J. Meyer
                         Official Court Reporter
7                        Registered Diplomate Reporter
                         Certified Realtime Reporter
8                        United States Courthouse, Room 6509
                         333 Constitution Avenue, Northwest
9                        Washington, D.C. 20001
                         (202) 354-3118

10

11                    P R O C E E D I N G S

12          THE COURTROOM DEPUTY:  Your Honor, this is Civil

13   Action 17-2139.  State of Maryland, et al. v. United States

14   Department of Education, et al.

15          I'm going to ask counsel, please approach the podium,

16   state your appearance for the record, introduce any parties at

17   your table.

18          MS. WYER:  Good morning, Your Honor.  Kathryn Wyer

19   for the defendants, and I have Steve Finley with the Department

20   of Education at the table.

21          THE COURT:  Good morning.

22          MR. MADAIO:  Good morning, Your Honor.  Christopher

23   Madaio on behalf of the State of Maryland.  With me at counsel

24   table is Michael Fischer and Jacob Boyer from the Pennsylvania

25   Attorney General's Office and also Ben Wiseman from the

1    Washington, D.C., Attorney General's Office.

2          THE COURT:  Good morning.  I understand we have a

3    fair number of other folks on the call.  So am I correct about

4    that?  We have other --

5          THE COURTROOM DEPUTY:  Uh-huh.

6          THE COURT:  Great.  So this is a hearing with respect

7    to a motion that the Department of Education has filed seeking

8    dismissal of plaintiffs' complaint on mootness grounds.  As you

9    know, the Court was in the process of entertaining the parties'

10   pending cross-motions for summary judgment in this APA case,

11   which among other things concern arguments related to the

12   states' standing to sue, when the Department of Education filed

13   a notice indicating that there had been a rule change and that

14   the agency has enacted a rule that rescinds the regulation that

15   the plaintiffs are seeking to have this Court enforce.

16          That intervening event complicates matters from the

17   Court's perspective, at least initially, and, thus, the Court

18   interpreted DOE's notice as a request to file a motion to

19   dismiss on mootness grounds.  The parties have now briefed this

20   mootness motion and have also filed in the interim, in response

21   to a Court order, briefs -- supplemental briefs on standing,

22   which, again, appears at least from this Court's perspective to

23   be an alternative basis for dismissing the states' claims.

24          So today I am hoping to hear from the parties both

25   about why this matter is or is not moot and also, to the extent

1    that you are prepared to address it, what remedy the states are

2    seeking given the timing and the circumstances that we are now

3    facing and, again, to the extent you would like to cover it,

4    the -- why the Court should find that the states have standing

5    to seek that remedy.

6         I am familiar with your arguments, but you should

7    feel free to restate them and to provide as much background

8    detail as you deem necessary to illuminate the issues.

9         I apologize.  I know we had a hearing in this case

10   before quite -- quite awhile ago, and there have been a number

11   of intervening events.  Mr. Madaio, did you argue in the prior

12   case?

13        MR. MADAIO:  No, Your Honor.  Mr. Fischer argued.

14        THE COURT:  I see.  I apologize because I don't quite

15   remember.  But that's helpful.

16        And, Ms. Wyer, were you the arguing attorney on the

17   prior case?

18        MS. WYER:  Yes, Your Honor.

19        THE COURT:  Great.  All right.  So you sort of know

20   how this works.  I ask questions during the hearing because I

21   need to understand what's going on.  I'll try not to interrupt

22   you too much, and I don't impose time limits.  I just like to

23   have a conversation.

24        I think what I'll do with respect to this motion and

25   these circumstances is have the department start by explaining

1    the intervening events that prompted its notice and the filing

2    of the -- the mootness motion and why in the agency's view the

3    claims that the plaintiffs have put forward cannot proceed due

4    to mootness.

5              Then I'll let you respond to these mootness issues.

6    You can also address what the plaintiffs would have the Court

7    do under these circumstances.  And then DOE counsel can respond

8    and segue into any other standing issues that you would like to

9    raise, and we'll just go back and forth; all right?

10             So Ms. Wyer.

11             MS. WYER:  Thank you, Your Honor.

12             May it please the Court.  The plaintiff states filed

13   this case in 2017, as Your Honor knows, and from the beginning

14   there has been a recognized issue that their standing has been

15   in question; that continues to be an issue here.

16             Now that the department has issued a new rule

17   rescinding the rule that the plaintiff states sought to compel

18   implementation of, that simply provides another basis, another

19   reason that this Court lacks jurisdiction.  The -- the --

20             THE COURT:  Well, let me -- let me -- let me jump

21   right in just to clarify a few things.

22             As far as I can tell, DOE's new rule has an effective

23   date that has not yet transpired.  I understand the effective

24   date to be July 1st of 2020.  Am I right about that?

25             MS. WYER:  Yes, Your Honor.

1          THE COURT:  First, can you help me to understand why

2     the department would do that?  Is there -- what is this lag

3     about, and then doesn't that somewhat undercut any claim that

4     at least today there's a mootness problem?

5          MS. WYER:  The -- the reason that the rule goes into

6     effect on July 1st, 2020, has to do with the master calendar

7     for department rulemaking which requires that a rule can't go

8     into effect for -- for a certain time.  I think it sets July 1

9     as, like, the next possible date that a rule that was

10    promulgated during this period, when this rule was, could take

11    effect.  So there has to be that.

12         THE COURT:  All right.  So when was this rule

13    promulgated?  Do you remember the promulgation?

14         MS. WYER:  I can't remember the date.  I can find it

15    in our notice.

16         THE COURT:  But it was before July 1st of last -- or

17    after July 1st of last year, I take it?

18         MS. WYER:  It -- I think it was on July 1st, 2019.

19         THE COURT:  Okay.  And the department chose not to

20    make it effective immediately because of this calendar or

21    whatnot?

22         MS. WYER:  Yes.

23         THE COURT:  All right.  So it doesn't come into

24    effect, but then we have some odd thing where it appears as

25    though the department has allowed certain -- or allowed anybody

1   who is regulated by the rule to opt in to having it apply to

2   them now.

3               MS. WYER:  Yes.

4               THE COURT:  So --

5               MS. WYER:  There -- there's a statutory provision

6   where Congress actually allowed the department to allow

7   regulated parties to implement a new rule early, and the

8   department here -- it basically grants the department full

9   discretion to determine whether to allow early implementation

10  and to set what circumstances would apply to early

11  implementation.  And here the department exercised that

12  discretion -- and it's under 20 U.S.C. 1082(c)(2)(A), I

13  believe -- to allow early implementation by any program that

14  chooses to implement it.

15              I think in some sense that recognizes the burden that

16  might be imposed by this calendar that requires this lag

17  between promulgation of a rule and its --

18              THE COURT:  Well, maybe in the ordinary course, if

19  the rule was requiring new things, but in my understanding, the

20  new rule is allowing for rescission.  So it doesn't seem like

21  much of a burden for anybody, right, or the --

22              MS. WYER:  Well, the previous regulations did impose

23  requirements on states -- I mean on schools on programs.  And

24  so the -- the rescission changes those requirements or relieves

25  some of those requirements, and so programs can exercise their

1    choice to relieve themselves of the -- those requirements now

2    by adopting early implementation.

3              THE COURT:  Okay.  I mean, so peculiar; right?  Like,

4    I'm just trying to understand it.  The new rule relieves the

5    burdens.  I understand a lag.  I understand voluntary opt in

6    when a new rule is placing requirements, additional burdens.

7    You've got to do a lot of stuff, and so we allow people to say

8    it's going to take me time to get, you know, involved in this

9    and I've got to really work up to it so I'm not going to do it

10   today, says the regulated entity.  I need to do it closer to

11   next year.  Fine.

12             But the implementation of a new rule that relieves

13   them of burdens and allows them to opt in is very peculiar, and

14   I'm trying to understand, does it have any effect at all on

15   your arguments about mootness?  Does it matter?  Maybe it

16   doesn't, but what do you say?

17             MS. WYER:  I -- I think it does matter, Your Honor,

18   because -- and I -- I think to address what Your Honor is

19   saying about the peculiarity of it, the -- the master calendar,

20   of course, does not distinguish between rules that impose

21   additional burdens or rules that make things easier.  So the

22   department did not have any discretion to put this rule into

23   effect before -- to make the implementation date the official

24   implementation date or effective date earlier than it did.

25             THE COURT:  Is the master calendar schedule or

1    requirements that you're talking about, is that set by statute

2    or is that a --

3              MS. WYER:  Yeah.  Yes, Your Honor.

4              THE COURT:  Does it apply to all agencies or just

5    DOE?

6              MS. WYER:  It -- it's specific to the Department of

7    Education, and --

8              THE COURT:  Okay.

9              MS. WYER:  -- it has to do with this -- I believe it

10   has to do with this negotiated rulemaking process that the --

11   the department has to go through before it then goes through

12   regular notice-and-comment rulemaking under the APA.  So the

13   Department of Education does have a very complex and drawn out

14   process that is even more elaborate than the normal agency

15   would.

16             THE COURT:  Okay.  So this is very helpful, because I

17   deal with a lot of agencies, and I've never seen this before.

18   Many agencies, effective immediately when they do final rules.

19   So fine.

20             So the Department of Education gives until

21   July 20th -- July 1st, 2020.  Some -- but they give you -- give

22   regulated entities, these programs, the option of early

23   implementation of this new rule, notwithstanding the fact that

24   it's a relieving kind of regulation.  Fine.

25             Have any programs done this?  What do we know in

1   terms of the evidence about who's opted in?

2          MS. WYER:  The -- well, the department has not

3   required programs to tell them -- tell the department whether

4   they have adopted early implementation just off the bat or for

5   no reason, but if -- if -- for example, if the department were

6   going to attempt to engage in some kind of enforcement action,

7   then the program could then come back and say:  Well, we've

8   adopted early implementation and, therefore, these requirements

9   do not apply to us.

10         THE COURT:  But, of course, the core of plaintiffs'

11  claim is the argument that the department has, they say,

12  unlawfully failed to implement the requirements of the prior

13  rule.  And I would think that that claim would still be live so

14  long as the prior rule is still in effect.

15         I'm worried about this notion that due to the master

16  calendar or otherwise an agency can push off the effective date

17  of a new rule and yet still claim -- yet still argue that a

18  claim about their failure to implement the old rule is moot

19  because this new rule is going to be coming.

20         MS. WYER:  I mean, in some sense, Your Honor, we're

21  in this situation because of the states' lack of standing.  I

22  understand this implementation provision shows Congress'

23  recognition that it is the programs who are affected by the

24  department's actions, and the programs are the ones that this

25  statute allows the department to exercise a choice to implement

1    early.  Because Congress recognized that it's the programs, the

2    regulated entities, that are the ones most affected by it.

3         And so for -- for the states to come in and say that

4    despite that -- I mean, if it were a program who had brought a

5    claim regarding the past -- these rules, then -- then we would

6    know whether that program had -- had -- had adopted early

7    implementation or not.  And if the program were challenging

8    the -- the ruling in trying to argue that the rule was invalid,

9    then adopting early implementation would take away any injury

10   that -- so its claim would be moot.

11        Or, on the other hand, if it had some continuing

12   obligation that it -- or if it -- I mean, if it sought to

13   compel application of the rule to itself, then we would know

14   exactly what the arguments are.  But here the states don't have

15   any control over whether programs exercise early implementation

16   or not.  So it has to do with the strange position that the

17   states are in in the first place that this situation --

18        THE COURT:  I mean, I see that argument.  I'm trying

19   to hold constant these separate things, and maybe I can't.

20   Maybe your argument is the mootness and standing problems are

21   interrelated in a sense and so, therefore, you can't say

22   assuming the state has -- states have standing what's the

23   argument with regard to mootness.  They're kind of blurring

24   together in -- is that your suggestion here?

25        MS. WYER:  Well, I'm -- I'm just pointing out that

1    the statutory provision that allows for early implementation,

2    it all seems to support the argument that the states don't have

3    standing because it reflects Congress's own recognition that

4    it's really the programs who are the ones affected by

5    department regulation.  It's not for the states to come in and

6    argue about it.

7         THE COURT:  I mean, that's more -- that's like a

8    "zone of interest perhaps" kind of argument, which I

9    understand.  I guess I'm trying -- my suggestion about the

10   interrelatedness had to do with sort of the legal definition of

11   mootness and the extent to which -- let me see if I can find it

12   here.

13        That when -- a case is moot "when the challenged

14   conduct ceases such that there is no reasonable expectation

15   that the wrong will be repeated" in circumstances where it

16   becomes "impossible for the court to grant effectual relief

17   whatever" in the -- "to [the] prevailing party."

18        So in some sense the idea of mootness relates to

19   whether or not the Court could grant relief to the party, which

20   in some sense is also the question in standing, the

21   redressability, and does this party really have an interest.

22   Because, again, mootness is -- I'm reading another statement

23   from the -- the Supreme Court, *County of Los Angeles v. Davis*.

24   ". . . a case becomes moot when the issues presented are no

25   longer 'live' or the parties lack a legally cognizable interest

1    in the outcome." So it sort of relates in some sense to what

2    is their legally cognizable interest and whether or not it

3    still exists after this change.

4         MS. WYER: Right. And, of course, in this case the

5    states have challenged three discrete -- they've brought

6    essentially three discrete claims, and some of those -- or even

7    all of those claims are moot for additional reasons. For

8    example, the -- their challenge to the department's extension

9    of the deadline for programs to include disclosures in their

10   mailings. Now, they originally brought that challenge when the

11   department had extended the deadline to July 1st, 2018. And

12   that deadline passed long ago. And then they challenged the --

13   another extension to July 1st, two thousand --

14        THE COURT: But let me just -- before you move on,

15   the deadline passed, but the requirement didn't occur. So what

16   I'm a little confused about is whether the suggestion that

17   mootness occurs just because a deadline has passed, why doesn't

18   that just let agencies run out the clock; right? I mean, if

19   the -- if the claim -- assuming the claim is legitimate,

20   because we have to hold these things constant as we try to

21   figure out what's happening, but assuming they are right that

22   there was an unlawful pushing forward of the deadline -- it was

23   supposed to be, you know -- I'm making it up. I don't remember

24   the exact dates. Supposed to -- you know, let's say July 1st

25   and the agency says: It's fine. You can give it to us

1    September 1st.  And the plaintiffs rush in and they say:

2    Unlawful.  You had to make sure that the -- the programs gave

3    the information as of July 1st.  The agency, wrong; okay?

4         I understand that it's now in my hypothetical

5    December, but if the action that the agency was supposed to

6    demand didn't even occur as of September 1st, what is the

7    mootness argument that arises out of that that the action never

8    occurred, and if we say that the agency can just moot by not

9    ever allowing -- or by not ever enforcing or requiring the

10   programs to disclose, then haven't you really just undermined

11   the claim in a way that -- that doesn't seem right?

12        MS. WYER:  Well, Your Honor, that is not the case

13   here because the -- the second extension expired on July 1st,

14   2019.  And as of that date, those requirements that the states

15   sought to compel the department to put into effect are now in

16   effect.  So that -- that is exactly the relief that the states

17   had wanted, and that has already happened.

18        THE COURT:  I'm sorry.  So the disclosures have been

19   made?

20        MS. WYER:  The disclosure requirements are in effect

21   for schools that are subject to the GE regulations.  If schools

22   now are supposed to make those disclosures under the GE

23   regulations but they are not, it's not because of the

24   GE regulations.  It's because of the new rule that allowed them

25   to adopt early implementation.  So if a school has now adopted

1    early implementation of the new rule, then they are no longer

2    subject to those requirements.

3          THE COURT:  I see.  So you're suggesting that the old

4    rule is in effect, but to the extent that we don't see it

5    happening in the world, it's because of early implementation.

6          MS. WYER:  Well, that's one -- one -- presumably that

7    would be why.  I mean, if it were -- if, for example, someone

8    made a complaint about a school that -- or a program that they

9    thought was supposed to be providing these disclosures under

10    the GE regulations and the department investigated that, I

11    think they -- they would check the disclosures that were being

12    provided.  And if they were not in compliance with the

13    GE regulations, then the department would contact the school.

14    And then if the school said:  Well, we're not really subject to

15    those because we've adopted early implementation, I think that

16    would be the end of that story, because they -- the school

17    would have the right to adopt early implementation which would

18    relieve it of the requirements.

19          THE COURT:  I guess I'm -- I guess so much hinges on

20    whether or not the school has or has not, and it's odd to me

21    that the agency doesn't know.  I mean, so fine.  The early

22    implementation requirement by statute and regulation apparently

23    does not require the agency to track or determine who is or who

24    isn't; is that correct?

25          MS. WYER:  Yes.

1          THE COURT:  But then what that means is we could --

2     that could be the case, but it also could be the case that

3     they're just violating the old rule, they had no intention of

4     adopting early implementation, and so who wins and, like, how

5     am I supposed to know?  And isn't the burden on the agency to

6     say:  Here are the people who have adopted early

7     implementation, and, therefore, they're acting consistently

8     with the regulatory scheme.

9          It seems odd that the agency can allow people to opt

10    in early rescinding the old rule but not know who has done so

11    and, therefore, we -- right? -- and not bear the burden of

12    plaintiffs' claim that there are people who are in violation of

13    the old rule.

14         MS. WYER:  Well, the plaintiffs have not claimed that

15    there are people in violation of the old rule.  They only

16    sought to compel the disclosure requirement to go into effect,

17    and it is now in effect.  They -- they -- they challenged the

18    extensions.  The extensions are now over.  Everything that they

19    have challenged is gone in regard to their -- the disclosures.

20         THE COURT:  All right.  Well, let me just -- let's --

21    you mentioned the plaintiffs' claims, and I do think we have to

22    evaluate this in light of the claims.  You say they make

23    different ones.  So with respect to the claim that DOE has

24    failed to calculate the rates under the old rule, how is that

25    over -- moot or anything else?  The rates have not been

 1   calculated for the second year; correct?

 2        MS. WYER:  Correct, Your Honor.  And the -- the

 3   plaintiffs' claim, when they first brought this suit in

 4   October 2017, their challenge was to the department's failure

 5   to issue Draft Completers Lists, which are lists of students

 6   that had completed a particular program.  They send the list of

 7   those programs -- of those students to the school, and then the

 8   school has the opportunity to correct the list because that's

 9   the list that the department is going to use to -- to get the

10   earnings data and calculate the rates.

11        So the -- the -- the D/E calculation process, as set

12   forth in the regulations, is a multiple-step process.  It's not

13   itself discrete agency action.  It's a whole process, and

14   that's why when the states originally brought their claim, they

15   challenged the discrete agency action at issue at that time,

16   which was the issuance of the Draft Completers Lists.  And

17   that's what they were limited to under the APA because that was

18   the only --

19        THE COURT:  Under the operation of the APA or under

20   the statement in their complaint?  I'm trying to find -- I

21   mean, I thought their complaint was broader.  Yes, it's a

22   multi-step process, and at that time you had only not done

23   Step 1 or whatever, but the fact that you then go on to do

24   Step 1, does that moot their entire claim, which is we don't

25   have the rates?

1        MS. WYER:  Well, Your Honor, we -- the department

2   always construed their -- their claim to challenge the issuance

3   of the Draft Completers Lists because the -- the department

4   always took the position that that is the only claim that

5   they -- the states could bring under the APA as a challenge to

6   a discrete agency action that the agency failed to take.

7        Because, I mean, one of the reasons that the

8   department construed it like that was because the steps of this

9   process, not all of them are even within the department's

10  control.  After the -- the department issues the Draft

11  Completers Lists, the department then is not the one who takes

12  the next step.  It's the programs that take the next step by --

13  by turning in their corrections.  So it goes back and forth

14  between the department and other entities or the programs

15  themselves.  And it's not a situation where the department is

16  in control of every step.

17        So that -- that's another reason that the department

18  had argued from the beginning that the states could not be

19  challenging this whole process when not all of it is even

20  within the states -- in the department's control.  It's a --

21        THE COURT:  Okay.  So bringing it back -- bringing it

22  back to mootness, the department then did issue the Draft

23  Completers Lists?

24        MS. WYER:  Yes.

25        THE COURT:  So at that point you think their claim is

1    entirely over with respect to the calculation of the -- the

2    rates?

3              MS. WYER:  Yes, Your Honor.

4              THE COURT:  In other words, you think that the

5    issuance of the Draft Completers Lists, whatever happens to it

6    and whether it ultimately results in the rates or not, as far

7    as you are concerned -- by "you," I mean, the department --

8    their claim of delay or failure to act or whatever, agency --

9    denial of agency action for the purpose of the calculation of

10   the rates is over because you've done the Draft Completers

11   Lists?

12             MS. WYER:  Yes.  And then -- I mean the department,

13   even to the extent -- I mean, at this point I can't quite

14   remember what -- what the states' amended complaint challenged.

15   I think it challenged the new extension and the disclosure

16   claim.  I don't think it amended the Claim 3, which was the

17   claim to the Draft Completers Lists.

18             So once the Draft Completers Lists were issued, that

19   mooted that claim.  And I -- if I recall correctly, I don't

20   believe the states amended that, but -- but even so, the

21   department did go on to collect the corrections, and it did go

22   on to issue the Final Completers List.  And at that point, the

23   next step in the process was not something that was in the

24   department's control.  It was something within the Social

25   Security Administration's control.

1        THE COURT:  All right.  But that feels to me a little

2    bit like a merits defense; right?  We -- you're wrong on the

3    merits that we have this obligation or that we can proceed

4    because we have a relationship or we have an MOA or whatever

5    with the Social Security Administration; it can no longer give

6    us the information.  So we're stuck, says the department, which

7    on the merits, I suppose, would defeat a claim that you had

8    acted improperly under the APA.

9        Assuming they're right, are you suggesting that the

10   Court could not order you to complete the ratio at this point;

11   that the Court is without authority to somehow say as a result

12   of this litigation you acted unlawfully in not moving fast

13   enough, you need to get the information somehow, and give them

14   a ratio?

15       MS. WYER:  The -- I -- I don't really understand how

16   the Court could issue an order like that when the department

17   has no -- I mean, I think that there's a causation issue.  It

18   would -- if the -- I mean, if the states could come in from the

19   beginning and challenged the failure to get the SSA data, then

20   the department's response would have been they lack standing

21   because there's no causation; that they haven't shown that the

22   failure to use the data is fairly traceable to the department's

23   action.  It's -- there's an intervening -- there's a --

24       THE COURT:  Well, they would argue it is, because at

25   the time they brought the claim and at the time you should have

1    been doing what you were doing, you had a relationship with the

2    SSA.  You would have been able to get it, but now it's through

3    the delays that they seem to be challenging; right?  You

4    extended, you extended, you extended.  People weren't doing

5    what they were supposed to do, and in the interim, the

6    agreement with the Social Security Administration lapsed, and

7    so it is your fault, they say, because if everybody had stayed

8    on schedule, then we would have been at a point where you could

9    have gotten the information from the SSA.  What's your response

10   to that sort of line of argument?

11         MS. WYER:  Well, the department would dispute that,

12   but even so, at this point, it doesn't seem that there's a way

13   for the Court to grant effective relief in regard to that.

14   Because -- I mean, from -- at -- at the time that the states

15   came in and brought this claim, the -- the department was

16   engaged in multiple things.  It had just gotten this adverse

17   decision in the *AACS* case, which relates to the third claim

18   that we haven't talked about yet, the appeals.

19         So -- so that decision required the department to go

20   back and reopen the appeals from the first year of calculations

21   at the same time that it was trying to ramp up the second-year

22   calculations.  And it simply did not have the resources to do

23   it all.  And then, meanwhile, it started working on this new

24   negotiated rulemaking.  So there were basically three things

25   going on at once throughout this process, and yet even so, the

1    department did continue going forward with the D/E rate

2    calculation process to the extent that it was able to.  And it

3    just ultimately reached a point where it could not go any

4    further because it could not get the data from the Social

5    Security Administration.

6            THE COURT:  All right.  Well, with respect to the

7    third claim, the appeals, why is it -- with respect to those

8    programs that are still going through the appeals process --

9    and I think there may be some -- why is it moot with respect to

10   them, why is their claim?

11           MS. WYER:  Well, I mean, the -- the states' challenge

12   to the appeals process is particularly convoluted.  The states

13   have never identified any particular program that has filed an

14   appeal as -- as one that the department should not be allowing

15   to appeal or that the -- what they're challenging would make

16   any difference to them or -- or they -- they've never really

17   laid out how these appeals would affect the states anyway.

18   So --

19           THE COURT:  Also it's issues of standing; right?

20           MS. WYER:  It's hard.

21           THE COURT:  We're back to the standing.

22           MS. WYER:  It's just -- it's simply hard to see how

23   they could get meaningful relief, though, at this point because

24   the -- the programs have already submitted appeals.  The

25   department has addressed the appeals, and if there were,

1    hypothetically -- because the states have never identified it,

2    but if -- if the states had identified some program as a

3    subject -- as something, like, if the department had handled

4    the appeal of this program differently, then we would -- our

5    injury would be redressed, then it would be possible to go to

6    that program and say:  Have you adopted early implementation?

7    And if the program then said yes, then it would be clear that

8    the states' claims were moot.

9            But the mere -- I mean, and as a practical matter,

10   the -- the fact that the early implementation option exists

11   would be to relieve the programs that feel that they do not

12   want to comply with the regulations from those of -- the GE

13   regulations from those requirements, and the -- it would be

14   very unusual for a program who was then being challenged, like

15   now you haven't complied with something, now you -- your appeal

16   should not have been granted.  In some sense, it would just

17   make sense you could almost assume that a program in that

18   circumstance is going to say:  Well, I've adopted early

19   implementation, because why -- why wouldn't it?  There's no

20   reason that a program in that circumstance would not adopt

21   early implementation.

22           THE COURT:  I hear you.  I understand that early

23   implementation is doing a lot of work in terms of your mootness

24   analysis.  The thing that concerns me is just that it feels so

25   speculative because we don't have the list because we don't

1    actually know.  And so the argument of who is actually getting

2    early implementation seems to always boil down to, well, it

3    would make sense that this person would, and maybe they would.

4    I don't know, but I worry about relying on that.

5         MS. WYER:  But by the same token, it's -- it's the

6    states that have not identified the specific programs that

7    they're claiming would affect their interests.

8         THE COURT:  That's true.  So absent that

9    identification, even if you had a list, you're saying it's not

10   going to help because they haven't shown the particular ones.

11        MS. WYER:  I mean, if the states -- the department

12   doesn't have the ability to go out and find out whether the

13   programs that the states are concerned about have adopted early

14   implementation because the states have never identified those

15   programs, but, I mean, even aside from early implementation,

16   the timing at this point is -- it's hard to see how the Court

17   could rule in a way that these appeals would then come out any

18   different.  I mean, what -- it would be very disruptive to the

19   entire scheme of what has happened thus far for the Court to

20   say now you have to go back and -- I mean, the deadline has

21   already passed again.  So you can't --

22        THE COURT:  Well, let me ask you this:

23   Theoretically -- "theoretically" -- and I was going to ask this

24   of plaintiff, but I'll ask it of you.  Fine.  The deadline is

25   over.  There have not been rates calculated for the second

1    year.  We don't know who failed or who didn't during that time.

2           Setting aside all these sort of other concerns for a

3    second about standing, et cetera, could the Court -- or why

4    couldn't the Court order, even retrospectively, such a

5    calculation be made so we know who was failing and who was not

6    in this second year?  And even if we now have a new scheme,

7    the -- under the old rule, as I understood it, if you failed

8    two years in a row, you were not supposed to get federal

9    funding, I think.  I mean, that might be a gross

10   overexaggeration, but that's kind of generally where we are.

11          So couldn't there be -- assuming standing,

12   assuming -- couldn't there be sort of a disgorgement thing that

13   happens?  So, fine, we have a new rule.  We understand going

14   forward you're not going to have to give up your federal

15   funding, but we do have a year in which the department was

16   supposed to tell us who was failing and who was not, and if the

17   Court were to order that, the department undertake that

18   exercise, even retrospectively, presumably we would have some

19   programs that would be in year two of failing because we know

20   who was in year one -- and now we have year two -- and those

21   programs under the law as it existed at the time should not

22   have gotten federal funding.

23          So isn't there some world in which -- notwithstanding

24   the fact that those programs are free and clear today and going

25   forward and they've opted in to no early implementation or

1     whatever, I could see a case for someone saying:  Yeah, but for

2     2018 or whatever, you still owe the government the funding that

3     you took when you weren't supposed to have it because you

4     really were failing in that second year.

5               MS. WYER:  Well, Your Honor, it's just so

6     speculative.  It's just -- I mean, first of all, which programs

7     would have failed the first year if the appeals had not been

8     handled the way they were?  We don't --

9               THE COURT:  Well, not appeals.  Let's -- so I see

10    what you're saying.

11              MS. WYER:  The appeals relate to the first year.

12              THE COURT:  I see what you're saying.  So the appeals

13    now complicate this because -- they were not sorted out?

14    Aren't they still pending?  You're not going to continue on

15    with them?  You've stopped?

16              MS. WYER:  I think the department has finished most

17    of the appeals, but there are still some pending.

18              THE COURT:  All right.  So fine.  The ones that are

19    finished, tell us the answer of who was rightly categorized in

20    Category 1.  The ones that are still going, I don't understand

21    early implementation to prevent the department from continuing

22    to adjudicate those appeals.  So at some point we're going to

23    know who was properly categorized as failing or not in year

24    one --

25              MS. WYER:  Well --

1          THE COURT:  -- right?

2          MS. WYER:  -- the -- the appeals were submitted under

3     the criteria that the Court in the *AACS* case -- Judge Contreras

4     dictated for the plaintiffs in that case.  After that decision,

5     the department applied it to all programs.  It didn't want to

6     say some programs can submit their appeals under the criteria

7     that Judge Contreras required but everyone else has to do it

8     under the original criteria.

9          There's something very odd about that, especially

10    when you consider that any program who objected to the original

11    criteria could then come in and bring a claim just like the

12    plaintiffs in *AACS*.

13         THE COURT:  Right.

14         MS. WYER:  So on the merits, that's a very weak claim

15    that the states have brought that the department --

16         THE COURT:  Yes.  I'm sorry.  I'm confusing

17    everything.  I am -- I am now -- I've now moved back.  I'm not

18    in appeal world claim.  I'm in the claim that you didn't

19    calculate the rates; all right?

20         MS. WYER:  For the second year.

21         THE COURT:  For the second year.  I'm in "didn't

22    calculate the rates for the second year," and I'm trying to

23    understand why, assuming they're right on the merits of their

24    claim that you should have calculated the rates, assuming they

25    have standing to bring this kind of thing at all, just focusing

1    on the remedy that the Court could offer today -- I understand

2    something about the department's argument to be, well, it seems

3    impractical.  It seems dumb.  We've already rescinded the rule,

4    why would we go back, or whatever.

5            I'm just trying to isolate this argument -- or at

6    least my own -- in my head -- argument that couldn't the

7    department be forced to calculate the ratio and determine who

8    was failing for year two, and having sorted out in my

9    hypothetical who was properly categorized in year one, we would

10   then have two years of data related to who was failing.  And

11   even if those programs are scot-free from here on out because

12   of the change in the rule, wouldn't there be a basis for the

13   Court to say the department has to disgorge the federal funds

14   that those programs received in year two but they were not

15   identified timely because of the department and, therefore,

16   they got to keep the money?

17           MS. WYER:  Well --

18           THE COURT:  Isn't that a remedy that could somehow be

19   fashioned?

20           MS. WYER:  Your Honor, the -- the Title IV loan

21   guarantees, the loans were given to students.  I -- isn't that

22   the way it works?  I mean, the loans are given to students who

23   have already --

24           THE COURT:  But then the students give that money to

25   the school; right?  I mean, the loans are given to the

1    students, but underlying all of this is the for-profit schools

2    that are getting the money.  The students can't just take the

3    money and buy a Ferrari.  I mean, they give it to the school,

4    and so at the end of all of this, I thought the states' point

5    was we need to make sure that -- the prior administration's

6    point was we need to make sure that these schools that aren't

7    giving value to their students aren't getting this money.

8            So, yes, it's funneled through the students, but in

9    one year, the way this is all working out, it seems as though

10   there's one year of students having given money under

11   circumstances in which they may not have had to or they

12   shouldn't have under the rule because the school to which they

13   are giving the money is actually a year-two failing school.

14           And we didn't identify that -- the department didn't

15   identify that, and the states' argument is that you delayed

16   unlawfully in your identifying that.  So I'm just saying -- I

17   understand the -- the -- very well the department saying this

18   is dumb, we've now received -- we've rescinded the rule.  So

19   let's just move ahead.

20           MS. WYER:  Well --

21           THE COURT:  Isn't there something to the notion at

22   least for the year-two failing schools, they should be

23   identified under the old rule and made to suffer the

24   consequences of what the law was at the time?

25           MS. WYER:  No, Your Honor.  I mean, that's entirely

1    unworkable.  I mean, for one thing -- for one thing, going back

2    to the year one, which programs -- I mean, the -- the

3    determinations -- the department's determinations with respect

4    to year one are all online.  So there's a list that says, like,

5    as of now -- with the exception of the appeals that are

6    pending, there's a list of all the schools that are failing

7    under the calculations as they were done.  The states have

8    never come in and said, like, these schools that are failing in

9    year one would also have failed in year two and therefore --

10            THE COURT:  Well, they don't know.  That's the whole

11   point.  They don't know they would have.

12            MS. WYER:  But it's speculative to -- to think that

13   that could be determined at this point.  I mean, how -- there's

14   no way that that could be determined at this point because

15   the -- I mean, the timing for when -- which class of

16   students -- I mean, it's hard for me to even think through it

17   because, I mean, the -- how would that remedy the states?  How

18   would that --

19            THE COURT:  Well, that's just the -- that's --

20            MS. WYER:  -- address the states' injury?

21            THE COURT:  I understand.  We're going back to

22   standing.  I was trying to hold it constant.  Maybe I can't.

23   Let me have the plaintiffs respond.  This is just a wild

24   idea --

25            MS. WYER:  But I mean --

1          THE COURT:  -- I had in trying to understand whether

2     the Court can do anything, the remedy --

3          MS. WYER:  It --

4          THE COURT:  -- today.

5          MS. WYER:  I mean, there are -- I think there's many

6     problems with the idea all along the way, but a big one, again,

7     turns out to be, like, how -- how the department has no way of

8     calculating the second-year rates without the Social Security

9     Administration data, which it is unable to get.  So it's simply

10    impossible.

11         THE COURT:  All right.  Thank you.  Mr. -- is it --

12    how do you pronounce your name?

13         MR. MADAIO:  It's MA-DAY-O, Your Honor.

14         THE COURT:  Madaio.

15         MR. MADAIO:  Thank you, Your Honor.

16         And may it please the Court.

17         THE COURT:  Yes.

18         MR. MADAIO:  So certainly I want to respond to a lot

19    of things that we were just talking about there.  I guess I'll

20    start, if you want, just where you left off.  I mean, certainly

21    we would think the Court could order that the rates can and

22    should be issued and, therefore, the -- the department needs to

23    take the consequences to the schools that are appropriate,

24    including cutting off future Title IV aid and potentially going

25    back and disgorging Title IV aid that schools shouldn't have

1    obtained due to having failed twice.

2          So one example is the Education Corporation of

3    America.  This was Document 83 of this case.  We talked about a

4    school that had failed -- 24 of its program had failed under

5    the first year's rates, and that is a school that certainly --

6    again, it's closed now, but it's an example of a very

7    poor-performing school.  Like I said, 24 programs that failed,

8    and if that was one where a second year's rates were issued and

9    any of those 24 programs fail, then, sure, the department has

10   remedies at its disposal.

11         THE COURT:  Well, here's -- this is very hard; all

12   right?  This case, the claims, the circumstances, I find it

13   hard both on mootness and on standing grounds, but just holding

14   mootness in our sights right now.

15         MR. MADAIO:  Yes.

16         THE COURT:  You say the rates can and should be

17   issued.  The "should be" is a little strange because

18   the department has now changed the policy.  So whether or not

19   they should have been issued for year two in 2017, surely your

20   argument can't be that the Court can compel them to issue the

21   rates going forward, notwithstanding the new rule.

22         MR. MADAIO:  So, yes, the -- the department has the

23   responsibility to issue rates every year under the rule that's

24   currently in place and will be in place until July 1 of 2020.

25   So it didn't do that in 2018.  And it also didn't do it in

1    2019.  And that's the unreasonable delay that we would ask this

2    Court to rule upon.  So that's what we're asking for the rates

3    for those two years, now that we're in 2020.

4           But at least for -- certainly the department can

5    issue them for, like you said -- from what it should have

6    issued in 2018.  So that second year of rates, that's something

7    certainly --

8           THE COURT:  Yes.

9           MR. MADAIO:  -- that is -- so -- and I want to talk

10   about the new rule, because really the new rule really has no

11   effect today.  Obviously it doesn't --

12          THE COURT:  But is that just because -- do you agree

13   that -- that as of July 2nd it would have an effect?

14          MR. MADAIO:  So certainly going forward on July 2nd,

15   yes.  I mean, there would be no need for the department to

16   continue to issue rates after July 2nd, although we do think

17   the Court, you know, could potentially order them to issue the

18   retrospective rates as Your Honor just mentioned, but

19   certainly -- for instance, there may not -- in 2020, after

20   July 2nd, there's no rule that would force the department to

21   issue rates.  So early implementation has nothing to do with

22   the rates.

23          THE COURT:  Okay.  So -- so the rates is the agency's

24   action?

25          MR. MADAIO:  Correct.

1          THE COURT:  And that's your first claim; right?

2          MR. MADAIO:  Count 3 of the complaint, but it's the

3     most important one.  So it's the one I'm addressing first.

4          THE COURT:  Okay.  All right.  So we'll turn to the

5     other things in a second.

6          MR. MADAIO:  Yes.

7          THE COURT:  The rates.  Department of Education

8     counsel says we interpreted your claim legitimately and

9     consistently with the APA to pertain to the first step which we

10    had not done at the time you brought your claim, because we

11    don't understand, says the Department of Education, a valid

12    claim under the APA to extend to the entirety of the process

13    that is necessary to issue the rates because some of those

14    steps don't even have anything to do with us.  So you can't

15    claim that we didn't issue the rate when we look at the

16    regulation, and there's a lot of different pieces to it, some

17    of which aren't under our control.  Why are they wrong about

18    that?  Why are they wrong about that?

19         MR. MADAIO:  Sure.  So, first, our complaint and the

20    amended complaint make this clear.  This is paragraph 121 of

21    the original complaint and 126 of the amended complaint where

22    we say that the department should be compelled to carry out its

23    legal duties under the rule including, but not limited to,

24    providing institutions with Draft GE Completers Lists and

25    calculating and issuing debt-to-earnings rates, and then,

1    second, our prayer for relief specifically asks that the

2    department calculate and publish debt-to-earnings rates.

3                THE COURT:  That's fine, but don't you have to have a

4    plausible claim?  And to the extent that the second piece of

5    that, calculating the debt-to-earnings ratio, relies on the

6    information from parties that you -- you haven't sued that

7    aren't before the Court and the agency now has done the first

8    two steps at this point --

9                MR. MADAIO:  Right.

10               THE COURT:  -- why doesn't that moot this claim in

11   terms of your allegations as alleged against the agency?

12               MR. MADAIO:  Sure.  So, first, as you noted, the

13   schools have already completed their piece.

14               THE COURT:  Yes.

15               MR. MADAIO:  We don't think it relies on the schools

16   anyway.  The department offers schools the ability to make

17   corrections.  If the schools don't want to participate, the

18   department can move forward with the data as far as completers

19   that it has.

20               So -- but regarding for 2018, the department already

21   has gotten information from the schools.  So I think

22   specifically now the department claims that the Social Security

23   Administration doesn't -- it doesn't have an MOU with the

24   Social Security Administration.

25               THE COURT:  Right.

1          MR. MADAIO:  So, first, as Your Honor noted, that's a

2    defense to the merits.  That has nothing to do with mootness.

3    Second, that's not in the administration record anywhere.  So

4    it's nothing -- it's something they kind of introduced in its

5    pleadings in this case.  It's something we don't (a) know that

6    it's true.  We don't know to what extent it's true despite the

7    fact that the department has used social security data in other

8    areas and has been struck down via the Privacy Act.  We don't

9    know to what extent the department could get an MOU back if it

10   wanted to.  We don't know to what extent the department has

11   even tried to get it back.

12          I mean, there's an element of unclean hands here

13   because clearly the department -- and this kind of goes to the

14   big picture -- doesn't want to enforce this rule.  I mean, it's

15   made that very clear through the, from our position, three

16   illegal delays.

17          THE COURT:  And -- and also going to the big

18   picture -- I mean, I suppose you say they have to, which goes

19   to the merits, but on the other hand, we do know under

20   Administrative Procedure Act law that new administrations,

21   different agencies can change the rules.

22          MR. MADAIO:  Sure.

23          THE COURT:  It's not a statute that says that they

24   have to issue any sort of earnings ratio or set this up in this

25   way.  So are you challenging their new rule in some sense,

1    their ability to file a new rule and to -- I guess you're

2    saying they can't put on hold the old rule while they're making

3    the new rule, but what -- where does that come from, and is

4    there a challenge to the new rule?

5          MR. MADAIO:  So to your first question, I mean,

6    exactly.  You -- it's our whole case is that they illegally

7    delayed this rule.  If they wanted to change this rule via the

8    ways they did it, which are those delay notices, they needed to

9    do negotiated rulemaking, which is what they're required to do

10   by the Higher Education Act and, thus, by the APA.

11         So they violated the APA by basically illegally

12   amending this rule and not enforcing it and unreasonably

13   delaying the rule.  So -- so because of that master calendar,

14   which is a Higher Education Act requirement, they have no

15   choice but to wait until July 1.  So they have to implement

16   this rule.  They don't have to like it, but it's a rule on the

17   books, and they have to implement it until it's no longer a

18   rule anymore.

19         THE COURT:  But to the extent -- so this is where the

20   early adoption comes in; right?  You're saying they have to do

21   the piece that they can do.

22         MR. MADAIO:  Yes.

23         THE COURT:  They have to do the earnings ratio piece.

24   That's the piece that's -- but to what end?  I mean, fine.  As

25   a practical matter, even if they do the debt-to-earnings ratio,

1     the entirety of the rule was like a package.  You do the

2     debt-to-earnings ratio.  The GE programs then have to be

3     identified as failing.  They have to put disclosures on their

4     websites.  They have to do all sorts of things, and I guess the

5     money they don't have to do.  They can --

6               MR. MADAIO:  They don't get.

7               THE COURT:  They don't get.  Is that part impacted by

8     the early adoption?

9               MR. MADAIO:  So certainly there are some aspects that

10    early adoption could impact, like a school's choice to do a

11    disclosure.  A school doesn't have a choice as far as the rates

12    go.  They can't opt out of having rates published by the

13    department.

14              THE COURT:  But I thought that's what the rescission

15    of the rule did.

16              MR. MADAIO:  The rescission of the rule does that,

17    but the -- the master calendar requirement says that affected

18    entities don't have to do things that they're required -- in

19    essence, they don't have to -- or excuse me.  Basically -- and

20    I have a master calendar somewhere here, but basically the

21    master calendar says that affected entities may choose to

22    implement the rule.  I think that's the language.  So the

23    department is not an affected entity.  It can't choose to

24    implement the rescission early.  It has to continue to do the

25    rates.

1          THE COURT:  I understand, but to the extent that the

2     department continues to do the rates, but nothing comes of it

3     because the affected or regulated entity says:  Rates-shmates.

4     I get to under the rescission ignore that, you still have to

5     give me money, you still have -- I don't want to do the

6     disclosures, then what difference does it make?

7          MR. MADAIO:  Sure.  They can't ignore the money.

8     They can't say I'm opting out of your refusal to give me

9     money --

10          THE COURT:  Why not?

11          MR. MADAIO:  -- on Title IV.

12          THE COURT:  Why not?

13          MR. MADAIO:  Because that's the department's control.

14     They have the requirements --

15          THE COURT:  The department has rescinded the whole

16     rule and has allowed for affected entities to opt in to that

17     rescission early.  So I am questioning your assumption that the

18     regulated entities by opting in have yet still the -- have not

19     somehow put themselves in a position to sidestep any funding

20     restrictions.

21          It seems to me that if you opt in and the opt in

22     under this very unusual circumstance is to allow the rescission

23     of the rule to apply to you, then it seems odd to suggest that

24     those entities would still be bound by sort of funding

25     restrictions or the -- the agency could still say:  But you

1    know what?  We're still going to take the funding from you

2    under this old rule that you've opted to have rescinded with

3    respect to you.

4           MR. MADAIO:  Right.  And I think early

5    implementation -- and, again, they kind of twisted this, as you

6    noted.  Really it's so they can do something that they didn't

7    have to do before, but in this case, of course, their early

8    implementation allows them not to do something.

9           But the aspect of the rule that prohibits schools --

10   it's not schools may participate in Title IV.  It's the

11   department may not give Title IV aid to schools that fail two

12   years in a row.  So it's a prohibition on what the department

13   can and can't do.  I mean, it's -- the department is charged

14   with administrating Title IV aid, not if schools choose to or

15   not choose to can make the department do anything.  I mean, the

16   department, you know, by its control of the money can decide

17   this school doesn't meet the requirements for the Title IV

18   participation program.

19          THE COURT:  But as a practical matter -- "as a

20   practical matter" -- I try to be practical because the law has

21   to make sense and it's got to work and it's -- you know.  As a

22   practical matter, between now and July, is it the plaintiffs'

23   position that an order from this Court could be implemented

24   such that the department could identify the failing schools and

25   yank their money, and would it have to be done between now and

1    July 1st?

2              MR. MADAIO:  So, yes, we think the department can do

3    it.  We think that the department has the draft -- the

4    completers lists from that 2018 year.  So they need to

5    obviously get the earnings data.  Now, like I said, the

6    department, of course, has taken the position they can't do

7    that.  We have no reason to believe that that's true or not

8    true.  The department perhaps can get another MOU with the SSA.

9    They've never explained why they can't do that.

10             So we would think the department should go to the

11   Social Security Administration, negotiate whatever it has to

12   do, take whatever reasonable efforts it can in order to not be

13   in contempt with the court order to try and get the data.  And

14   if it gets the data, then it needs to publish the rates.  And

15   then when those rates are published, it then will take --

16   basically it needs to follow the rule and prohibit schools that

17   fail twice from obtaining Title IV aid.

18             THE COURT:  Of course, only with respect to the

19   schools that are still in business, because you've already

20   named one that isn't; right?

21             MR. MADAIO:  There were 800 programs at various

22   schools that failed the first year's rates.  So there are many

23   schools still in business that have -- that are operating

24   programs that failed once.

25             THE COURT:  All right.  So let me pivot as the

 1   government -- or as the department has many times to standing;

 2   right?  So to the extent that you're seeking this sort of

 3   remedy from the Court, the Court has to be concerned about the

 4   extent to which the remedy would relieve the plaintiffs'

 5   injury.  So what is your injury, and how would my ordering this

 6   impact it?

 7           MR. MADAIO:  Sure.  I mean, our injury is that the

 8   states are harmed when individuals are -- (a) we've expended

 9   resources, as we noted, prosecuting schools that are continuing

10   to defraud students.

11           THE COURT:  Self-inflicted; yes?  I mean, you don't

12   have to do that.  You don't have to do that.

13           MR. MADAIO:  Well, the department isn't doing it, and

14   these schools are harming our students, and the harm to the

15   students affects the state as well.  That's what we've talked

16   about.

17           THE COURT:  How so?

18           MR. MADAIO:  Loss of funds to the state specifically.

19   I mean, I think these are things addressed in some of our

20   briefs.

21           THE COURT:  Yeah.

22           MR. MADAIO:  So I think it's the -- the harm.  I

23   mean, of course, not outside -- not *parens patriae*.  The state

24   is harmed -- it's outside of parens patriae.  So I'm not

25   arguing --

```
1              THE COURT:  Right.

2              MR. MADAIO:  -- talking about that at the moment --

3              THE COURT:  Right.

4              MR. MADAIO:  -- I think as we're talking about.  The

5    state is directly harmed when the students are attending a

6    failing school in which they, you know, didn't receive

7    disclosures and -- and couldn't have received Title IV federal

8    student aid funds to attend.  I mean --

9              THE COURT:  But how is that traceable to the federal

10   government's decisions one way or the other; right?  To the

11   extent that the school -- that the states have taken it upon

12   themselves via their own legislation or otherwise to help

13   students who are in these failing schools -- I understand it

14   would have been helpful to have the information from the

15   federal government about who was failing and maybe some of the

16   schools would go out of business if the disclosures were made

17   or federal funding was yanked pursuant to the prior

18   administration's policies, but what difference does that make

19   to the state?

20             Your baseline is we're helping these students, and

21   whether the federal government implements a rule that would

22   have relieved the states of some of their burden or not seems

23   to be -- to me to be not really an injury in any meaningful

24   sense.

25             MR. MADAIO:  Right.  So, I mean, kind of for
```

1    instance, as -- we talked about this in our Document 83,

2    supplemental filing --

3             THE COURT:  Yes.

4             MR. MADAIO:  -- is when schools -- students are at a

5    school that otherwise they wouldn't be attending because it

6    wouldn't be able to use Title IV aid to go there, for instance,

7    then if a school closes, the states expend resources to handle

8    complaints and assist students obtain academic transcripts.

9    These are duties that states have, access information,

10   understand discharge of loan information.  So the states have

11   and --

12            THE COURT:  But these duties are imposed under state

13   law.

14            MR. MADAIO:  Of course.

15            THE COURT:  I mean, the federal government doesn't

16   say you've got to come behind and clean up the mess as a result

17   of these schools.  That's not a requirement that is placed on

18   states by federal law, is it?

19            MR. MADAIO:  No.  It's a requirement -- I mean,

20   not -- not that I'm aware of.  I mean, there are state laws

21   that require the states to expend resources.

22            THE COURT:  Right.  So the duties that the states are

23   undertaking to deal with the fallout from these terrible

24   programs are duties that are imposed by the states.  And they

25   don't have to do them; correct?

1          MR. MADAIO:  Well, if it's a state law, then they

2     would --

3          THE COURT:  No.  But, I mean, they're imposed by the

4     state itself.  The state says:  We're going to try to help

5     students who are in this terrible predicament and we're

6     expending resources to help them.

7          MR. MADAIO:  I mean, I think that doesn't mean that

8     we -- they don't have standing.  I mean, I think states have to

9     take certain issues --

10          THE COURT:  Well, standing depends on injury in fact

11     that is caused by the actions that you're challenging.  And so

12     what I'm worried about and what I'm trying to suss out here is

13     whether the resources that the state is expending to help these

14     students in the wake of these terrible programs is really being

15     caused -- the injury to the state in terms of the money that

16     they're expending is in some sense really being caused by the

17     federal government's failure to implement a rule that would

18     have identified these programs faster and gotten them out of

19     business.

20          I mean, that would have been nice.  So nice.  I

21     understand the states are very happy about this rule, but

22     what's really hard about this case -- and I'll just say it in

23     this way:  We found very, very few other cases in which the

24     basis for injury in this sense is the dashed hopes -- what I

25     call a dashed hope injury where the baseline is the state is

1    doing what it does.  These programs are terrible.  People are

2    not thriving.  They get this funding or whatever.  They go to

3    these schools and it's a disaster, and the states pass laws

4    that say we are going to be helpful.

5         And then the federal government in the distance says:

6    Here's the rule.  We're going to pass a rule that's going to

7    actually mean we're not going to give the funds and, therefore,

8    there won't be that many students going to these terrible

9    schools and some of the schools will close.  And all of that,

10   the state is very happy about, but then it doesn't happen

11   because the delay, because the new administration, it's not a

12   priority, or whatever.

13        I am trying to understand -- and it's really hard to

14   understand -- how the federal government's delay or lack of

15   implementation is actually injuring the states with respect to

16   a rule that was never implemented.  It's one thing if it was

17   implemented and the state was actually benefiting and so now

18   the baseline is different because it's really going gangbusters

19   and now it's not.  But with respect to a rule that was never

20   implemented and that we just wanted to have happen and maybe

21   legally it was supposed to happen, maybe you're right that they

22   unlawfully delayed this rule, but, in any event, how is that

23   harming you today?  I'm having a hard time with it.

24        MR. MADAIO:  Right.

25        THE COURT:  Maybe you want to speak to that.

1          MR. MADAIO:  Well, sure.  I mean, I think it goes --

2     of course, a lot of briefing we've done before in this case --

3     and we talked about the *Air Alliance* case.  I mean, that's one

4     where there was standing found because the expenditures the

5     states would have to incur and previously devoted resources to

6     responding to accidents that the rule was designed to

7     prevent --

8          THE COURT:  Wasn't *Air Alliance* really about two

9     particular kinds of nonsovereign interests, proprietary

10    interests, owning land, participation in a business, or the

11    private interests of another when the state is the real party

12    in interest?  I feel like this is different.  I mean, we're not

13    talking about a proprietary interest of the state in the same

14    way, are we?

15         MR. MADAIO:  Sure.  I mean, that, I think, goes back

16    to the state expending the resources.  That's the state --

17    proprietary interest is the state money, the state fisc

18    expending resources because students are harmed.  I mean,

19    that's -- the state has a duty to expend resources to --

20         THE COURT:  Self-imposed.  Self-imposed.

21         MR. MADAIO:  It's the same thing with --

22         THE COURT:  But it's not the same as real property;

23    right?  You own real property, and your property is being --

24    it's not a self-imposed injury.  It is I am the owner of this

25    land, says the state, and because the federal government isn't

1    doing what it's supposed to do, my land is eroding.  And so as

2    a property owner, I am injured.

3              MR. MADAIO:  You could choose to do nothing and let

4    it be poisoned or eroded.  I mean, that's -- it's

5    self-inflicted to spend money to make repairs to your real

6    property.  So I suppose -- I just don't really see that there's

7    a difference.

8              THE COURT:  Well, all right.  So you say the

9    proprietary interest is the states' duty to assist the students

10   and spend money in helping them afterwards, and so that is why

11   you think that brings it into the *Air Alliance* purview.

12             MR. MADAIO:  Yes, that's right.

13             THE COURT:  Okay.

14             MR. MADAIO:  Yes.  Okay.  So shall I move to the

15   alternative earnings issue?

16             THE COURT:  The --

17             MR. MADAIO:  The alternative earnings appeals --

18             THE COURT:  Yes, please.

19             MR. MADAIO:  -- issue?

20             Sure.  So on this issue, first, this has nothing to

21   do with early implementation because this happened a long time

22   ago where the department in its second delay notice, as we

23   feel, improperly amended the rule.  So the department basically

24   blew open and used this other court ruling improperly to allow

25   schools, that the rule did not allow it, to file alternative

1    earnings appeals.  So this is something -- just because they've

2    been adjudicated at this point makes no difference.  This Court

3    could vacate the delay notice that permitted those appeals and

4    also vacate any appeals adjud- --

5             THE COURT:  Right, but only between now and July.

6    Again, to me this one is one in which the new rule really does

7    make a difference in terms of mootness.

8             What I'm worried about is the precedent of even valid

9    and legitimate claims about improper agency action in the past

10   being the source of a claim or the Court being -- going back

11   and addressing that when now we're under a totally different

12   regime.  I mean, that to me is sort of like the classic

13   mootness scenario.  We have a new rule and anybody or everybody

14   can see that they didn't implement the old rule properly.  The

15   old rule is not -- maybe even facially invalid in some way,

16   and, therefore, we have an APA problem.

17            But I had understood that my jurisdiction was not to

18   be extended to prior cases in controversies related to rules

19   that are no longer in effect, related to agency actions that

20   really today don't make a difference.  And so what I'm

21   concerned about is we get to July 2nd and now I'm still talking

22   about what was wrong with the appeals process and the changes

23   that they made under the old rule.

24            MR. MADAIO:  So like I said, two things on that.  You

25   know, first, before July 2nd, there's the current rule that

1    requires them to do appeals a certain way, and they're not

2    following that method.  So obviously anytime before July 2nd

3    Your Honor could issue an order that would have them go back

4    and fix the appeals.

5          Because what the appeals are, basically it's -- the

6    department publishes an earnings and -- a median or mean -- the

7    amount of earnings that graduates are making from these

8    programs, and schools want to appeal the number.  They want it

9    to be higher.  So that's what the appeal is.  So if that appeal

10   is done illegally, then that number is artificially high.  The

11   data -- I mean, people are still seeing this earnings document.

12         THE COURT:  I understand, but what about the document

13   about prudent mootness, which the D.C. Circuit has endorsed?

14   Fine.  Fine, fine, fine.  I'm accepting for the purpose of this

15   argument that you are correct.  We have a problem.  The agency

16   has not done what it's supposed to do under the prior rule.

17         But now we know that a new rule is coming July 1st.

18   So to the extent that the D.C. Circuit says in a case *MBIA*

19   *Insurance Corporation*, 708 F.3d 234, 2013 case, "'Where it is

20   so unlikely that the court's grant of [remedy] will actually

21   relieve the injury,' the doctrine of prudential mootness

22   permits the court in its discretion to 'stay its hand.'"

23         It seems to me that even if you're right and even if

24   we're able to get this going between now and July 1st to have

25   the Court announce that the appellate process in the old rule

1    was either improperly derived because they didn't do notice and

2    comment or whatever or it's substantively deficient or under --

3    under the APA, what difference does it make?

4         As of July 1st, the new -- the old rule is not there

5    anymore.  So how is this relieving any injury or anything with

6    respect to the states?

7         MR. MADAIO:  Well, I mean, there's -- there's

8    earnings information being -- still be published on the

9    department's website showing how much these schools -- what

10   their earnings are.  So if the school used an improper appeal

11   to up that earnings number and that appeal should not have been

12   used per the rule, per the APA, that number still is improper

13   and could be --

14        THE COURT:  So is the -- so is this coupled with

15   injunctive relief to say take down the prior earnings, you

16   know?  So it's a declaration that the appeal process that led

17   to the earnings that are on the website is improper and so the

18   agency can't proceed under the new rule with that information

19   still on the website; is that what you're seeking then?

20        MR. MADAIO:  Well, the agency could proceed with

21   anything else it's doing, whether including implementing the

22   rates from this rule.  As far as the first year, though, the

23   appeals were done in a way that doesn't comport --

24        THE COURT:  No, I understand.  I'm just -- I am

25   trying to address my concern that assuming you're right,

1     assuming you have standing, all of those things -- and maybe I

2     can't assume that because I'm questioning the nature of the

3     injury -- but, in any event, how would today a declaration that

4     you are seeking concerning the invalidity of the appeal process

5     relieve any injury?  How would it make any difference as of

6     July 1st?

7              Maybe it'll make a difference in the next two months,

8     three months, but according to the D.C. Circuit -- even though

9     that's not a live mootness issue because we still have a live

10    issue for the next three months, the D.C. Circuit suggests if I

11    can see coming down the pike that it's not going to make any

12    difference, then the Court shouldn't exercise its jurisdiction

13    to make such a declaration with respect to -- about something

14    that's about to be a dead letter.

15             I'm just trying to help you out in my mind by saying,

16    well, maybe the Court should if the result is -- the remedy is

17    the declaration that the appeals process is improper and,

18    therefore, enjoining the agency going forward from putting on

19    its website or relying on in any way or whatever the earnings

20    that you say were improperly derived from that first process,

21    which could still maybe somehow factor into their new scheme.

22    Do you understand what I'm saying?  So it's still up on the

23    website and people are still focusing on that after July 1st,

24    and so your argument is the remedy could include telling the

25    agency they have to take it down?

1              MR. MADAIO:  So I think, first, coupled with -- if

2     Your Honor was to require the department to issue the second

3     set of earnings rates, the correct appeals from the first rates

4     would be necessary to ensure the schools that fail twice -- or

5     actually schools that fail twice and there aren't schools from

6     the first year that, you know, have a higher number and, thus,

7     all of a sudden don't fail.

8              So, I mean, of course, that's kind of -- certainly a

9     place where it would come into play.  Obviously after July 2 --

10    or after July 1, I mean, at that point it's -- it's kind of

11    information for people to see.  And, I mean, at that point an

12    earnings number that is inaccurate could perhaps be something

13    that could be ordered to be taken down.  Obviously I wouldn't

14    want all of the data taken down, just the earnings for the

15    appeals that were done via the second delay notice that we

16    would want to be vacated.

17             THE COURT:  All right.  This is very, very confusing,

18    Mr. Madaio.

19             MR. MADAIO:  Okay.

20             THE COURT:  It's just so convoluted.  And I -- can I

21    just ask you this:  Are the plaintiffs challenging the new

22    rule?

23             MR. MADAIO:  Well, there's no lawsuit filed as we

24    stand here today.  I mean, obviously a lot of things are being

25    considered, I think, by a lot of different people.  I don't

1    know.  I can't speak to anything more about what the future

2    will hold, of course, but you know --

3              THE COURT:  But it is your claim that the enactment

4    of a new rule does not moot your claims at least for the next

5    two months and -- is there anything after July 1st?

6              MR. MADAIO:  So for the five months.

7              THE COURT:  Five months.  Five months.  I won't -- I

8    won't cut it close.  Five months.

9              MR. MADAIO:  It sounds a lot better to me.

10             So, I mean, yeah, we think that's a lot of time where

11   students will continue to be harmed because of the

12   nonimplementation of the rule in the books.  So we think

13   there's still a lot of time --

14             THE COURT:  Students and presumably the state?

15             MR. MADAIO:  Yes, of course.  Students and through

16   those students the state.  Absolutely.  And there's still a lot

17   of time for the harm to continue to occur and that this Court

18   can prevent.

19             THE COURT:  All right.  But what about the deadlines;

20   all right?  The other claim, the deadlines are done.  Can't we

21   at least concede that that's moot, that a Court declaration

22   with respect to the extension of the disclosure deadlines?

23             MR. MADAIO:  So -- yes, so obviously that those delay

24   notices have expired --

25             THE COURT:  Yes.

1      MR. MADAIO:  -- and to date schools either are early

2   implementing or are complying with the rule.  Those are the two

3   options.  Of course, because the department doesn't track --

4      THE COURT:  Right.

5      MR. MADAIO:  -- and that kind of goes to the big

6   picture of the department clearly doesn't want to implement

7   this rule because it just doesn't care who is doing it and who

8   is not doing it.  It's clear there's no enforcement mechanisms

9   whatsoever, but at this point the Court could issue just a

10   vacate of the -- to vacate the delay notices.  Obviously --

11      THE COURT:  Why?  They're dead.  They're over.  And

12   do I have the authority to do that?  I am concerned about

13   stepping outside of my lane; right?  The Constitution gives me

14   a certain amount of power, and I'm only supposed to deal with

15   live claims and you figure out standing mootness, all of that,

16   per the claim, not the case.

17      MR. MADAIO:  Right.

18      THE COURT:  So if you're making a claim that the

19   agency improperly issued these disclose- -- these extension

20   notices and that period of time is over, what is the claim that

21   is left that is live that I can touch?

22      MR. MADAIO:  Well, so the -- kind of the case of

23   evading review.  So there's the exception as well as under the

24   *Becerra* court that we -- case that we cited.

25      THE COURT:  Why is it evading review, and isn't this

1   different than *Becerra*?  *Becerra* didn't have a deadline.

2   *Becerra* just said we're not going to do this while we -- while

3   we review it.  There was no end date.  It wasn't like you're

4   supposed to do this July 1st and the agency announces:  Okay.

5   You can do it September 1st.  My understanding of *Becerra*

6   said -- was that it said:  You don't have to do it July 1st,

7   and we'll tell you at some future point when you have to do it.

8              MR. MADAIO:  Right.

9              THE COURT:  So it was still open in some sense.  Here

10  we have September 1st has come and gone, and if your claim is

11  that the agency acted unlawfully by extending the deadline to

12  September 1st, seems to me there's nothing I can do.  I'm

13  making up that date, by the way.  But --

14             MR. MADAIO:  Right.  I know.

15             THE COURT:  There's nothing I can do now.

16             MR. MADAIO:  So, I mean, that's -- I think as we kind

17  of talked about actually in our hearing quite a lot of months

18  ago, the department was continually issuing these delay

19  notices.  So although they had individual end dates, these were

20  basically repetitive and indefinite delays.  So, I mean, that's

21  number one.

22             Number two, as far as evading review, the

23  department -- this is kind of a pattern and practice throughout

24  the department.  I mean, there are at least two other cases

25  that the department issued delays, repeated delays, and the

1    Court struck them down.

2             THE COURT:  But you don't have a pattern and practice

3    claim in your complaint; right?  That's a different kind of

4    claim.

5             MR. MADAIO:  Well, it's an exception to the mootness,

6    and this issue is the -- the -- the template here the

7    department has is issuing limited delay notices, limited in

8    time, but issuing new delay notices when those expire until

9    they run out the clock on the rule that they're trying to

10   rewrite.  That's what they did in *NEA v. DeVos* where the Court

11   found that the delay notice violated negotiated rulemaking in

12   *Bauer v. DeVos*.  The Court found that the delay notice --

13            THE COURT:  Yeah, but the -- but maybe they won.

14   Maybe they were successful.  What -- I still have to fashion a

15   remedy that relieves the plaintiffs' injury, and there

16   are times -- and I say this to my law clerk -- law clerks all

17   the time -- not every wrong has a remedy that I can issue;

18   right?  So there we are.

19            I mean, they -- they delayed.  It's unlawful.  Maybe

20   they've gotten to the point now where they have a new rule and

21   I just don't know what I'm supposed to do about it or what I

22   can do about it consistent with the Constitution.

23            MR. MADAIO:  So I guess it's our position that at

24   least on the disclosures Your Honor could issue a vacate of the

25   delay notices, and that would, you know, make the -- certainly

1      close that issue of the case, and the fact that the

2      department's delay notices -- they do not use negotiated

3      rulemaking -- violate the APA.

4              THE COURT:  All right.  So delay notices, you're

5      seeking a vacator.

6              MR. MADAIO:  Yes.

7              THE COURT:  What other relief?

8              MR. MADAIO:  Yeah, so a vacator of Delay Notice 1, 2,

9      and 3, and then an order under 706 of the APA that the -- the

10     Court -- or excuse me -- that the department enforce the rule

11     and issue debt-to-earnings rates by a date certain that the

12     department finds appropriate.  I mean, we would think the

13     department --

14             THE COURT:  Issue debt-to-earnings ratios for 2018

15     and 2019?

16             MR. MADAIO:  Yes.

17             THE COURT:  Okay.

18             MR. MADAIO:  Could give a deadline of, say, 30 days

19     for the department to issue that debt-to-earnings rate and

20     continue with -- with the -- you know, enforce the rule from a

21     general sense.

22             THE COURT:  All right.  Anything else?

23             MR. MADAIO:  I think that's mostly it.  I guess the

24     one minor point on the -- again, the MO -- the lack of -- I'm

25     sure the department's going to come back up here and say that,

1    you know, even if you order that, we couldn't do it even if we

2    wanted to.  And I guess I just want to kind of make clear that

3    there's really no evidence of that whatsoever that the

4    department can't do it if it wanted to.  I mean, there's

5    certainly nothing in the record, there's nothing really out in

6    the world other than they just say they don't have an MOU, but

7    what that means and why that means they can't either get

8    another one or, you know, get the -- the rate -- get the

9    information in some other way has completely not been provided

10   whatsoever, and that should be the burden on the department as

11   the party bringing the mootness claim.

12             THE COURT:  All right.  Ms. Wyer.

13             MS. WYER:  Your Honor, just to go through some of

14   these points, the -- the programs that have adopted early

15   implementation are not required to participate in the D/E rates

16   calculation process at all.  So, I mean, the -- the process as

17   a whole process is a back and forth between the department and

18   the programs and the schools.

19             THE COURT:  Well, plaintiffs' counsel doesn't read it

20   that way.  He suggests that while the regulation allows for the

21   programs to have input, that that's not really a requirement of

22   the calculation.  In other words, you give them the

23   opportunity.  You say:  Here's the draft.  Here's what we

24   think.  If you'd like to comment, please do so.  And then they

25   do or they don't, but, in any event, you march ahead and you

1    figure out what the ratio is.  Is he wrong about that?

2         MS. WYER:  Yes, Your Honor, because I don't -- the

3    department cannot unilaterally calculate rates without

4    information from the schools in the first instance.  I believe

5    that the first step does involve data from the schools and then

6    the completers lists -- the Draft Completers Lists are compiled

7    and then the schools, again, have a sense to correct those and

8    then --

9         THE COURT:  I see.  So you're saying Step 1 can't

10   even be undertaken without the schools' information.

11        MS. WYER:  That's my recollection.  And it's all set

12   forth in the -- in the regulation, and we're -- we're not at

13   that point.  I mean, we would be at that point if now the

14   states are saying that the department should actually calculate

15   rates for 2019, which it hasn't even -- a third year that it

16   hasn't even started calculating.

17        THE COURT:  That's what they're saying.  They're

18   saying I can order that.

19        MS. WYER:  Well, I mean --

20        THE COURT:  They're saying that's what you had to do

21   under the rule as it existed and as it currently exists because

22   it hasn't been superseded yet, in effect, by the new rule.

23        MS. WYER:  Well, I mean, that's -- that's not a

24   remedy that they sought previously, and -- but I believe that

25   the first step does involve getting information from the

1    programs, which they would not be required to provide if they

2    had adopted early implementation.  I don't -- I don't think

3    the -- the department does not have a way to force these

4    programs to go back and cooperate with a court order that is

5    requiring the department to do these re- -- recalculations or

6    calculations that have not yet been done.

7         THE COURT:  For year two, the impediment is the

8    Social Security Administration; right?  In other words, you've

9    already started the first -- year one is done.  Year two you

10   did get whatever information you needed from the programs.  You

11   did the Draft Completers List.  You got the feedback.  You get

12   the Final Completers List.  And so now we're at Social Security

13   Administration time on year two; right?  Is that right?

14        MS. WYER:  Yes.  Yes.

15        THE COURT:  Okay.  So what about his argument that

16   suddenly the department just jumps up and says:  Well, our MOU

17   has expired.  Too bad, so sad.  And there's nothing in the

18   record, there's nothing anywhere that suggests that you

19   couldn't either renew or somehow otherwise seek the information

20   from the Social Security Administration?

21        MS. WYER:  Well -- well, Your Honor, that was

22   actually announced or explained in the 2019 final rule.  The

23   department explained that it was not -- that the Social

24   Security Administration had not renewed the MOU and that the

25   department had decided not to attempt to revise the regulation

1      that -- the GE regulation that requires the use of SSA data

2      because it was now rescinding the rule entirely.  I mean, there

3      would have been no time for the department to go through an

4      entirely new negotiated rulemaking and notice-and-comment

5      rulemaking to establish another data source for --

6              THE COURT:  Yeah.  I understand.  I'm just trying to

7      isolate two different things.  One is the world in which the

8      department is making choices about whether to pursue the Social

9      Security Administration data.  You know, do we seek to renew

10     the MOU?  And I completely understand that it doesn't make

11     sense from the department's standpoint given that this new rule

12     that is in effect doesn't require it.

13              The second is the world in which the department is

14     saying as a practical matter it cannot be done.  And they kind

15     of blur a little bit in terms of your analysis, but I hear the

16     plaintiff saying that if a court ordered the department to get

17     the information from the -- from the Social Security

18     Administration in 30 days or whatever, then it could be done.

19     Do you object to that or do you deny that?

20              MS. WYER:  Well, we certainly object to it because

21     that would be construing the plaintiffs' claim as a challenge

22     to the whole process when the department does not think that's

23     a valid APA claim.  It's not --

24              THE COURT:  I understand.  I'm assuming the merits.

25     I'm assuming that they are correct.  I'm just asking as a

1      matter of remedy, there -- here's a totally -- here's an

2      example out of complete left field; right?  This is -- this is

3      the way that my mind operates.

4              In FOIA cases, which I get a lot of, departments

5      approach me and they say:  Your Honor, I understand the statute

6      says we're supposed to give, you know, all of this information

7      in 20 days.  As a practical matter, even if you order it today,

8      that cannot be done.  Period.  Full stop.  It's not even our

9      choice.  We're thinking.  We're doing.  We happen to -- none of

10     that.  Can't be done.

11             Is that the department's position with respect to the

12     Social Security Administration data in this context?  I know

13     you don't want to give it.  You don't think it's legal.  You

14     don't think it's right.  It's not the right claim, blah, blah,

15     blah.  I want to know practically can it be done?

16             Can you -- assuming the Court says -- my order, as a

17     result of this lawsuit -- wrongly, in your view, but whatever.

18     My order is that they win and that in 30 days you have to

19     calculate the debt-to-earnings ratio by getting the information

20     from the Social Security Administration.  As a practical

21     matter, can that be done?

22             MS. WYER:  Well, no, Your Honor, it cannot be done

23     because the Social Security Administration is not going to give

24     the department the information.  It's --

25             THE COURT:  So they'd have to be joined in this

1    lawsuit as a defendant in order to make this happen?

2          MS. WYER:  Yes.  And they would have to -- I mean,

3    there would have to be a claim against them, and I don't think

4    there is any claim against the Social Security Administration

5    because -- I don't -- I mean, I'm not representing them right

6    now, but how would that be an agency action or a final agency

7    action that could be challenged?  I mean, it's part of --

8          THE COURT:  All right.  So if you got the -- how long

9    does it take to calculate a debt-to-earnings ratio?  Like,

10   assuming you get the data, between now and July 1st could we

11   see a list of those things, or that's not a possibility?  Let's

12   say the data comes in next week.  Is there enough time to -- I

13   just don't know all that goes into all of the steps to get this

14   done.

15         MS. WYER:  I don't -- I don't recall all the

16   remaining steps either off the top of my head.  It's all set

17   forth in a regulation, but I --

18         THE COURT:  I guess there's an appeal window and some

19   other things.

20         MS. WYER:  Right.  I mean, there would have to be a

21   chance for appeals, and then I think, as we've seen, that can

22   take some time.  So I -- it seems impossible that all of that

23   would be resolved by July 1st.

24         THE COURT:  Okay.

25         MS. WYER:  I mean, as a practical matter.  And, of

1    course -- going back to some of the other things that states

2    have argued, their -- their theory of injury is very convoluted

3    and attenuated and confusing, and that's demonstrated by their

4    citation of the ECA schools as closing, and -- and that was

5    discussed in the briefing, because --

6           THE COURT:  Let me ask you a question because they

7    also in a supplemental notice, speaking of their theory of

8    injury, point to a Ninth Circuit case that seems, in my view,

9    to support their view; right?  Are you familiar with the

10   *California v. Azar* case?  I think they put it in a supplemental

11   notice, and we have found that apparently the First Circuit

12   recently has also sort of adopted this position.

13          That's the case in which the Ninth Circuit held that

14   the states had standing because women who lose contraceptive

15   coverage through the federal scheme will seek contraceptive

16   care through state-run programs and -- or programs that the

17   states have to reimburse and, therefore, the states are

18   spending money -- or would be as a result of this.  And

19   apparently the First Circuit in *Massachusetts v. Department of

20   Health and Human Services* case from 2019 also held similarly.

21          Is that case this one, and if not, why not?

22          MS. WYER:  It does not sound at all similar, because

23   I'm assuming that those cases have to do with state

24   institutions providing services.  So it's the state and their

25   proprietary interest as --

1          THE COURT:  No.  I think it was institutions -- it

2     was also reimbursement.  So the state says:  We have passed a

3     law that will reimburse health care providers who provide

4     contraceptive care.  The federal government, to the extent that

5     it was doing this, obviously the state had less of a fiscal

6     burden related to this state legislation because the federal

7     government was reimbursing contraceptive care.  And then with

8     the new administration, the federal government says:  We're not

9     doing that anymore.  And the states sue because pursuant to

10    their own legislation that provides these -- this

11    reimbursement, now they're going to have to pay more.

12          I say -- or I would say in my conversations with your

13    colleague, seems self-inflicted to me because the state doesn't

14    have to do that.  If they decide to do that, so be it, but

15    apparently the Ninth Circuit and the First Circuit think that

16    that's a sufficient injury setting aside *parens patriae*, state

17    interests, or whatever; that that's a sufficient injury to the

18    state's financial interests to give rise to standing.

19          I mean, maybe the Ninth Circuit is wrong and because

20    the D.C. Circuit hasn't ruled I can just say that, but do -- is

21    there another distinction that you think can be drawn between

22    those cases and this one?

23          MS. WYER:  Yes, Your Honor.  I mean, I -- I agree

24    with you that those cases are wrong, but even -- even if that

25    were a valid basis for standing in those cases, the link there

1   is so much more direct.  Here the link is so attenuated to

2   begin with.

3          The -- the -- there you're talking about apparently a

4   federal law providing contraceptive coverage for -- and a state

5   law providing finances for contraceptive coverage.  They're

6   both aimed at the exact same thing.  Here the federal law, the

7   GE regulations, originally promulgated are aimed at providing

8   information to students so that they can make decisions about

9   where to go to school.  They're not aimed at alleviating state

10  consumer protection enforcement.

11         THE COURT:  I see.  That's very interesting.  So you

12  think it would be a closer fit if the states' legislation was

13  similar to the GE program legislation.  If the states said:  We

14  have this program where we're going to identify the failing

15  programs and we're not going to give state funding to the

16  students who go to those programs, et cetera, and then they

17  didn't really have to do it or they would be relieved of that

18  burden if this regulation was in place, but then because of the

19  delay, now they have to follow their own prescriptions with

20  respect to this particular kind of expenditure.

21         MS. WYER:  Well, that -- that -- that would just be a

22  much clearer case at least of causation, because there would

23  be -- I mean, I think that's where the states' standing really

24  becomes speculative because they are suggesting all of these

25  little steps would somehow affect their enforcement of their

1    consumer protection laws when -- and that that would change

2    their finances or that that would cost them money.

3          I mean, the -- it's very unclear how exactly that

4    works or what -- how all of those parts fit together,

5    especially when you have the states arguing in their

6    supplemental brief that it's the closing of ECA that led them

7    to incur all these -- this money to help students that were

8    kicked out of this program.  When here there -- I mean, what

9    they had been arguing here originally is that it's the

10   continuation of these supposedly fraudulent programs that is

11   causing them to have to spend money on consumer protection,

12   so --

13         THE COURT:  Well, I suppose they could argue in the

14   alternative, but it does make it harder to figure out exactly

15   what the injury is.

16         MS. WYER:  I mean, because I thought that what they

17   wanted was for these programs to close, and now they're arguing

18   that it's the closure that is causing them to incur expenses.

19   So I don't -- it's just very attenuated, the distance between

20   the department issuing this -- requiring programs to calculate

21   these rates so that this information can be provided to

22   students and whatever the states are doing in their own

23   universe enforcing their consumer protection laws.

24         I mean, presumably if the states are not going after

25   one fraudulent act, they're going after another.  So how does

1    that really affect their budgetary allocations?  I don't --

2    they haven't really provided any -- any details on that or any

3    information that really explains what --

4              THE COURT:  Hypothetically, would they have standing,

5    in your view, if they had found a student or two who actually

6    suffered as a result of the failure of the DOE to give them the

7    information?  So this is the student who in 2018 decides to go

8    to one of these schools.  And if he had known that this was a

9    failing school or if the DOE had actually implemented the

10   regulations and not allowed them to have Title IV funding as a

11   result of this year-two failing school, then he wouldn't have

12   gone obviously and he wouldn't be in the debt and terrible

13   position he is in today.  Would that student have standing?

14             MS. WYER:  It certainly might have standing in that

15   circumstance.  The state would still not have standing on that

16   basis because that would be an instance where the state would

17   be claiming *parens patriae* standing, which --

18             THE COURT:  Right.

19             MS. WYER:  -- would be prohibited.  So, I mean,

20   here -- here there has been no attempt by the states to

21   identify a student or join a student as a plaintiff to

22   alleviate their standing problem.

23             So I -- going back to the appeals, there -- there's

24   no way that I see that the department could go back and

25   recalculate the appeals under the regulations that existed

1      before the *AACS* decision because it's the programs that have to

2      submit data for their appeals to be considered.  And if the

3      programs adopt early implementation and say that they are not

4      subject to these regulations anymore, they're not going to

5      cooperate in submitting appeals all over again under the new --

6      under this reverse -- reversal of the department's process that

7      it established after the *AACS* decision.  This is just going to

8      result in a great --

9              THE COURT:  So let me just be clear.  The claim is

10     that they -- setting aside the extension for appeals, the

11     substantive change, the plaintiffs are claiming that the new

12     appeals process that was put into place after the A -- after

13     Judge Contreras's decision needed to be implemented through

14     notice and comment, et cetera; and so, therefore, any appeals

15     that flowed -- that used those new criteria are invalid.  Is

16     that what you understand the plaintiffs' claim to be?

17             MS. WYER:  I mean, yes, they're saying that the

18     decision to apply the -- Judge Conteras's decision --

19             THE COURT:  To everyone?

20             MS. WYER:  -- to everyone is invalid.

21             THE COURT:  And so then if they're right about that,

22     the remedy would be we'd have to go back and only apply

23     Judge Conteras's decision to the particular plaintiffs at issue

24     in his case and then everybody else would have to have their

25     appeals redone.  And you're saying that can't be done because

1    today those same programs wouldn't give the information or they

2    would say:  We don't care about our appeal.  Forget it.  And so

3    it's just practically not a thing that can be ordered.  Is that

4    right?

5              MS. WYER:  Yes.  I mean, as a practical matter, it

6    doesn't seem to make sense, and then ultimately what if the

7    results of the first-year calculations -- the only impact that

8    the first-year calculations have by themselves is for schools

9    that received failing grades at that first year to include that

10   information in their disclosures?  And so then we go back to

11   the disclosure claim, and no school now is required to give

12   disclosures.

13             THE COURT:  And is there -- is there no other impact

14   of the first year?  It's on the website.  It's creating some

15   issue.  Is the department when -- as of July 1st going to take

16   it down?

17             MS. WYER:  Apparently we don't know the department's

18   plan.

19             THE COURT:  In other words, will -- is there any- --

20   is there anything about the new rule that relies at all on the

21   information or the designation of the first year or any other

22   year, as far as you know?

23             MS. WYER:  I don't believe so, Your Honor, no.

24             THE COURT:  Okay.  All right.  Thank you.  I don't

25   have anything more for you.

1          MS. WYER:  Okay.

2          THE COURT:  Mr. Madaio, I'll let you have the last

3     word.

4          MR. MADAIO:  Thank you, yes.

5          A few very brief points.  Certainly I want to hit on

6     standing.  I guess right before that I'll add a few quick

7     bullets is just first on the completers list, there was talk

8     about that obviously for 2018, that is done.  Ed sends the

9     completers lists to the schools.  So Ed starts with

10    information.  It asks and invites alterations.  Schools can

11    make them or not make them.  So Ed has info.  Schools can make

12    alterations if they choose to.  If they don't want to, either

13    because they just don't feel like it or because they don't have

14    the information, Ed would proceed with the process with that

15    information.  So that's one.

16         As far as the Social Security Administration, I mean,

17    I think we'll -- what I just heard was that the department

18    feels that the Social Security Administration won't give

19    information to it.  I mean, we have no idea if that's the case

20    or why -- if it is the case, why that would possibly be the

21    case.

22         THE COURT:  But wouldn't the Social Security

23    Administration need to be in this case if the Court is going to

24    issue an order that impacts it in this way?

25         MR. MADAIO:  No.  Because the Court isn't by issuing

1      the order forcing the Social Security Administration to do

2      anything.  It's forcing the department -- the Department of

3      Education to go to the Social Security Administration to ask

4      for the data, perhaps through an MOU or through some other

5      method.  So, I mean, if it's a department's position that the

6      Social Security Administration will never give it any more

7      data, why is that?  We have no idea.  I mean, there's no

8      information on the record.  Obviously there's no discovery

9      that's --

10             THE COURT:  If there was -- if there was an affidavit

11     in the record in which the Department of Education indicated

12     its -- or listed its efforts to get the data and establish that

13     it didn't -- wasn't able to get the data, what then?

14             MR. MADAIO:  We would characterize that as the most

15     self-serving affidavit of all time, and we would want discovery

16     on that affidavit, potentially a deposition of a high-ranking

17     official to determine what steps they've taken, why they lost

18     the MOU.  If that's actually the case, what steps they've taken

19     to get it back, what ability -- what the Social Security

20     Administration has told them about why they lost it, other ways

21     that could be -- there could be to get the data.  So, I mean,

22     that isn't in the record.  We would contest if it was -- an

23     affidavit was added to the record certainly at this late stage.

24             THE COURT:  No.  I'm just trying to understand the

25     impact of -- you seem to be questioning the state of the

1    evidence with respect to their representation that they need

2    to -- they need data from the Social Security Administration

3    and they don't have it and so they've stopped.  And you seem to

4    be suggesting, well, we don't know why they don't have it.  We

5    don't know what they have or whatever.  So I'm trying to say if

6    there's an affidavit to this -- to this effect, does that solve

7    your problem?  It seems like it doesn't.

8                   MR. MADAIO:  No.

9                   THE COURT:  We need to have a full round of

10   litigation that focuses on the extent to which they don't have

11   it.

12                  MR. MADAIO:  Well, we suggest a very limited

13   discovery, you know, extremely short.  We could make it 10

14   days, 15 days, some very limited discovery period, perhaps,

15   either documents -- a deposition would probably be the number

16   one thing we would want and then potentially some number of

17   documents.

18                  THE COURT:  All right.  And then ultimately we do

19   this and I agree.  The Social Security Administration is not

20   going to give it to them.  Then what?  What difference -- what

21   is the result of that?  Then you say we withdraw our claim

22   because we know they can't do the debt-to-earning ratio or

23   what?

24                  MR. MADAIO:  Well, I guess I'm not prepared to say

25   what the effect of that is -- would be today.  I mean, we'd

1    want the opportunity, I guess, to -- to brief that, depending

2    on what the facts actually were.  But certainly there's no

3    evidence that that's the case.  I mean, if it comes out that

4    the reason they don't have it is just because the department

5    wants it to be terminated or terminated the MOU themself

6    because they didn't want to implement this rule and do the

7    rates, then that could perhaps implement this Court's order

8    differently.

9              THE COURT:  Would I have to do this discovery or make

10   this determination prior to any such order?  In other words,

11   how could the Court go blindly into ordering them to do

12   something when the record is silent about their ability to do

13   it?

14             MR. MADAIO:  So, I mean, we think, first, the Court

15   could, if it wanted, enter an order, and then if -- it'd be the

16   department's burden to show that it couldn't do it.

17   Alternatively, if the Court didn't -- wasn't comfortable doing

18   that, prior to issuing an order we -- you know, we could leave

19   here today and there could be a deposition scheduled or some --

20   again, obviously in the interest of speed -- very limited,

21   short duration discovery period for which this could be sussed

22   out whether, in fact, the information can be obtained.

23             THE COURT:  All right.

24             MR. MADAIO:  So that's the Social Security

25   Administration.

1    And then on standing.  So -- so, first, I think we

2    want to update the Court that the Third Circuit has adopted the

3    Ninth Circuit's ruling on the Azar-California Health Insurance

4    case.

5         THE COURT:  And why are they right about that?

6         MR. MADAIO:  So --

7         THE COURT:  I mean, I'm just trying to understand it;

8    right?  It seems to me very odd to suggest in the ways that I

9    did before that there is a -- a nonself-inflicted injury to the

10   Court to -- to the states' fisc under the circumstance in which

11   the state undertakes to provide a benefit to its citizens and

12   then sues the federal government for its failure to do so.

13        MR. MADAIO:  I mean, these are significant structures

14   set up, whether it's in health insurance or the education

15   context, obviously, because I want to get to the fact that we

16   have reg- -- education regulators who have legislation that

17   they have to follow to -- and responsibilities to the students

18   of our states.

19        So I think that these are things that the states

20   knowing what is going on at the federal level takes certain

21   steps to either implement those things or --

22        THE COURT:  Well, that's not in the record.  In other

23   words, I understand what you're saying, but that's sort of like

24   a reliance interest.  But I don't see anything in this record

25   that indicates that the -- the kinds of state responsibilities

1    and duties that you are pointing to were undertaken in reliance

2    on the state's understanding that the GE program would be

3    affected; right?  You're not saying that.

4              MR. MADAIO:  So -- I mean, not specifically that.  I

5    think what exact -- what we're saying is that the states

6    expended resources be- -- when students attended schools or

7    programs at schools for which rates should have been out and

8    some of those programs should not have been eligible for

9    Title IV aid, those students would not have been attending.

10             So the Education Corporation of America case is an

11   example of that because that was a school that -- regardless

12   whether the school was open or closed -- offered programs to

13   students continually despite the fact that it failed one year

14   and --

15             THE COURT:  All right.  But DOE says -- and I take

16   this point -- that this is not the Ninth Circuit case because

17   in that case the state expended resources that were directly

18   attributable to the particular service that the federal

19   government did not provide.  So what kind of resources are you

20   talking about, and are you suggesting that the states have some

21   sort of GE identification and disclosure program that they now

22   have to ramp up in the absence of the federal program?  That

23   that, she suggests, is more of a direct correlation to the

24   *Azar* -- the Ninth Circuit case, whatever that --

25             MR. MADAIO:  I don't think that is the bar that the

1    states have to meet.  They have to have some sort of either

2    direct reimbursement or direct --

3              THE COURT:  But can it just be your general consumer

4    protection?  Is that enough?  I mean, the state has to spend --

5    right?  Money is fungible.  You're always protecting your

6    people, and to the extent that the federal government does or

7    does not do anything, I suppose, the state could say:  Well,

8    that injures me because we've opted to help our people.  I

9    mean, that's the kind of reasoning, I think, that the

10   Supreme Court has been unimpressed by with respect to the whole

11   *parens patriae* argument, this overlapping jurisdiction in terms

12   of the helping people in your state.

13             And so is it enough for the state to suggest that

14   they have standing to sue the federal government with respect

15   to this particular circumstance based on a general injury to

16   people who live in your state and your commitment to help them

17   under consumer protection laws generally?

18             MR. MADAIO:  I think it's much farther than just a

19   commitment to help people in our state generally.  Like, for

20   instance, the 20,000 students who were attending Education

21   Corporation of America schools at the time it closed, those

22   students -- or at least some number of them -- would have been

23   attending programs that would not have been eligible for

24   Title IV aid and, thus, would not have been attending those

25   programs when the school closed.  So those are people

1    that basically but for the lack of enforcement of the gainful

2    employment rule the state would not have had to expend money to

3    help at the school's closure.

4              THE COURT:  But how did you help them at the --

5              MR. MADAIO:  Sure.

6              THE COURT:  -- school's closure?

7              MR. MADAIO:  Yeah.

8              THE COURT:  That's the point I'm trying to

9    understand.

10             MR. MADAIO:  Understood.  So, for instance, when a

11   school closes, regulators in states have to obtain transcripts

12   from schools, take them -- basically take the paper, take the

13   electronic records of transcripts.  That's one example of --

14   take the transcripts and hold them and distribute them to

15   students as necessary, because -- right? -- the school's

16   closing.  It's -- poof.  It's disappearing.  So in order to

17   protect, you know, students, be able to take jobs and whatnot,

18   things in the future, transfer to other schools, the states

19   obtain transcripts.  You know, that's one.

20             Other ways that the states also incur resources

21   are -- you know, whether it's sending information, arranging

22   what's called teach-out agreements with other institutions,

23   in-state institutions.  These are basically ways that a student

24   can transfer at a reduced cost to another institution, for

25   instance, an in-state institution.  So when ECA closed, the

1    Maryland Higher Education Commission, which is our regulator,

2    expended resources to set up these kinds of teach-out

3    agreements, is the general term for them, which is, like I

4    said, a way for a student to transfer, but still -- it's like a

5    special transfer, is kind of a layman's way of describing it, a

6    way to get to another institution while not potentially losing

7    credits when that new institution doesn't want to recognize

8    credits from a low-quality, poor-performing school.

9        THE COURT:  But I'm just -- I'm still in my mind --

10   and we're going -- we're going to stop soon because we're all

11   exhausted.  I am still troubled by the many steps we have to

12   take to get here.  Because those harms seem to flow from the

13   closure of the school.  And I guess you're assuming that if the

14   second year of ratings had come out and the school had been

15   deemed failing for the second year in a row, they would have to

16   disclose that in a way that would have made them fail faster.

17       MR. MADAIO:  So right.  Let me clarify the point.

18   Basically -- I'm not saying that when they failed twice the

19   school's going to close.  I mean, obviously the state is not

20   interested in enforcing schools to close.  What we're saying is

21   there would have been less students enrolled at the school

22   because they wouldn't have been eligible for Title IV at those

23   programs.

24       So when the school later closed, like ECA did, and

25   as -- inevitably, some schools abruptly closed -- there's less

1    students who are harmed.  So it's that kind of delta.  Students

2    who are -- basically shouldn't have been attending that school,

3    because if the department had issued rates, say in January of

4    2018 -- right? -- or at some point in 2018, then when ECA

5    closed at the very, very end, late December of 2018, those

6    students wouldn't have been there and, thus, would not have

7    been students the state would have had to expend to help.

8          So in other words -- right -- I would analogize it to

9    the land context; whereas if the -- the -- the agencies were

10   enforcing rules, state's land would have been more protected

11   potentially, still a little eroded, but would have been less

12   eroded, say, and I think that's when the state chose to spend

13   money to protect its -- its land in that case, protected

14   students in our case, and I think that's where those track is

15   that the state has a choice -- like anything, the state can do

16   or -- do something, anything it wants, but has a choice to

17   incur monetary -- incur resources, spend money in order to

18   protect itself from the harm incurred by the failure to enforce

19   rules.

20          THE COURT:  All right.

21          MR. MADAIO:  Thank you, Your Honor.

22          THE COURT:  Thank you.  I'm going to take this motion

23   under advisement.  I will try to address this quickly.  I

24   understand the circumstances.

25          Thank you very much.

 1                    (The proceedings were concluded.)

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                    Dated this 31st day of January, 2020.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest, Room 6509
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25