# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| STATE OF MARYLAND, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-2139 (KBJ) |
| | ) | |
| UNITED STATES DEPARTMENT OF EDUCATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

In 2014, the United States Department of Education ("DOE") promulgated a series of regulations that were designed to counteract the deceptive marketing that certain for-profit colleges and universities use to entice students to take on large amounts of debt in order to pursue what can turn out to be worthless degrees or credentials. *See generally Program Integrity: Gainful Employment*, 79 Fed. Reg. 64,890 (Oct. 31, 2014). These regulations became effective on July 1, 2015, but were not immediately implemented. And the DOE that came to power with the change of presidential administrations in 2017 delayed implementing these regulations, or modified them altogether, while it undertook to formulate a new set of policies.

Consequently, eighteen States ("the States") filed the instant lawsuit against the DOE and its Secretary, Elisabeth Devos, in her official capacity (collectively, "Defendants"), claiming that the agency's delay in implementing the rule was procedurally improper and substantively invalid under the Administrative Procedure Act ("APA"), Pub. L. 79-404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C.

§§ 551–559, 701–706), and seeking a court order requiring the DOE to begin enforcing the 2014 regulations in earnest.  (*See* Am. Compl., ECF No. 65-2, at 32 "Prayer for Relief").)  This Court entertained briefing and oral argument related to a series of dispositive motions that both parties subsequently filed, and on June 26, 2020, the Court issued an Order that dismissed the States' complaint for lack of Article III standing.  (*See* Order of June 26, 2020, ECF No. 106.)

The instant Memorandum Opinion explains the reasons for that Order.  In short, none of the three nonsovereign injuries that the States have asserted concerning this matter constitutes an injury in fact that can be deemed fairly traceable to the challenged agency actions, and the States cannot base their standing on a quasi-sovereign injury in this case—*i.e.*, they cannot bring a *parens patriae* action to remedy alleged harm to their citizens—because such suits do not lie against the federal government when the States' legal claims are brought under the APA.  Thus, even if the States' arguments about the impropriety of the DOE's stalling tactics are legally meritorious, this Court lacks subject matter jurisdiction to entertain the claims the States' bring here.  Accordingly, and as set forth in the Court's June 26th Order, the DOE's motion to dismiss has been **GRANTED**, and the parties' cross-motions for summary judgment have been **DENIED AS MOOT**.[1]

---

[1] Of course, nothing in this Memorandum Opinion should be taken to suggest that the States' claims are meritless, or that there is *no* plaintiff who would ever have standing to litigate the allegations that the States have made.  *See, e.g.*, *Bauer v. DeVos*, 325 F. Supp. 3d 74, 88 (D.D.C. 2018) (finding that students who attended for-profit colleges had standing to challenge DOE's refusal to implement certain regulations of for-profit colleges, but "not decid[ing] whether the state plaintiffs have carried their burden").

I.       BACKGROUND

A.  Student Loan Funding And The Gainful Employment Rule

In 1965, Congress enacted Title IV of the Higher Education Act ("HEA"), Pub.

L. No. 89-329, 79 Stat. 1219 (1965), which authorizes the federal government to

provide financial aid to students at post-secondary institutions of higher learning, *see,*

*e.g.*, 20 U.S.C. § 1070.  This federally sponsored educational loan program "provide[s]

more than $150 billion in new federal aid" to students at post-secondary schools every

year, *Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 435 (D.C.

Cir. 2012), and that money supports students who attend a wide array of post-secondary

institutions, including "private for-profit institutions, public institutions, and private

nonprofit institutions[,]" *id.*  The students who receive these loans are expected to repay

their debt to the federal government eventually; otherwise, "their failure to do so shifts

[those students'] tuition costs onto taxpayers." *Id.*   But the post-secondary institutions

that such students attend stand to benefit from this federal financial aid regardless, even

if the students are not ultimately able to repay the loans, because the loan proceeds are

tendered to the schools upfront to pay for the students' tuition.  *See id.*  Thus, to guard

"against abuse by schools[,]" Congress enacted a series of statutory requirements that

are intended to discourage post-secondary educational institutions from taking students'

(and thus taxpayers') money without providing those students with a quality education.

*Id.*

One of these statutory protections is the requirement that, "to be an eligible

institution for the purposes of any [Title IV] program[,]" the institution "must be an

institution of higher education[,]" 20 U.S.C. § 1094(a), which the HEA defines in

relevant part as either a "proprietary institution of higher education" or a "postsecondary vocational institution[,]" *id.* § 1002(a)(1)(A)–(B).  The statute then specifically defines those terms to include only those schools that provide "an eligible program of training to prepare students for *gainful employment* in a recognized occupation[.]"  *Id.* § 1002(b)(1)(A)(i), (c)(1)(A) (emphasis added).  In other words, if an educational program does not "prepare students for gainful employment," then the students who attend that program are ineligible for federal financial aid, and the schools will not receive taxpayer-funded tuition dollars.  Notably, however, the statute does not *define* the term "gainful employment"; instead, it vests the DOE Secretary with the authority to "make, promulgate, issue, rescind, and amend rules and regulations governing" Title IV programs, *id.* § 1221e–3, which includes the authority to define via regulation what constitutes "gainful employment," *Ass'n of Private Sector Colleges & Univs. v. Duncan*, 110 F. Supp. 3d 176, 182 (D.D.C. 2015) (hereinafter "*APSCU III*").

In 2014, the DOE announced that it would "seek to establish standards[,]" by promulgating regulations regarding what it means for a postsecondary educational program to "prepare students for 'gainful employment' in a recognized occupation."  79 Fed. Reg. 16,426, 16,433 (Mar. 25, 2014).  The proposed regulations were "intended to address growing concerns about educational programs that . . . are required by statute to provide training that prepares students for gainful employment in a recognized occupation (GE Programs), but instead are leaving students with unaffordable levels of loan debt in relation to their earnings, or leading to default."  *Id.*  In short, according to the DOE, the agency's "primary concern[]" was

> that a number of GE Programs: (1) do not train students in the skills
> they need to obtain and maintain jobs in the occupation for which the

4

> program purports to train students, (2) provide training for an
> occupation for which low wages do not justify program costs, and (3)
> are experiencing a high number of withdrawals or 'churn' because
> relatively large numbers of students enroll but few, or none, complete
> the program, which can often lead to default.

*Id.* These underperforming GE Programs thus charged "excessive costs"; possessed

"low completion rates"; "fail[ed] to satisfy requirements that are necessary for students

to obtain higher paying jobs in a field"; exhibited "a lack of transparency regarding

program outcomes"; and, in some instances, engaged in "aggressive or deceptive

marketing practices." *Id.*

The DOE also highlighted alarming statistics that supported its concerns. The

agency determined that "27 percent of [the] GE Programs" that it had evaluated

"produced graduates with average annual earnings below . . . the Federal minimum

wage ($15,080)," and an additional "[s]ixty-four percent of [the] GE Programs

evaluated produced graduates with average annual earnings less than the earnings of

individuals who ha[d] not obtained a high school diploma ($24,492)." *Id.* at 16,433–34.

This meant that individuals who had paid significant sums to attend GE Programs often

ended up with extremely low incomes, despite years of higher education. The DOE

further found that this problem was especially pronounced with respect to those GE

Programs that were run by "for-profit institutions[,]" because, in that context, students

often incurred "greater amounts of debt" and faced especially poor employment

prospects. *Id.*

Relatedly, the DOE also intended for its rulemaking to address the possibility

that some "students seeking to enroll in these programs do not have access to reliable

information that will enable them to compare programs in order to make informed

decisions about where to invest their time and limited educational funding." *Id.* at 16,435.  Indeed, the agency focused in particular on mounting "evidence of high-pressure and deceptive recruiting practices at some for-profit institutions." *Id.*; *see also id.* at 16,426 (noting "the growing evidence . . . that many GE Programs are engaging in aggressive and deceptive marketing and recruiting practices").  That evidence included reports from a variety of government bodies that cast light on the "'boiler room'-like sales and marketing tactics[,]" and the manner in which some GE Programs sometimes "identify and manipulate emotional vulnerabilities and target non-traditional students." *Id.* at 16,435.  Given all this, the DOE concluded that, "without reliable information, students, prospective students, and their families are vulnerable to inaccurate or misleading information when they make critical decisions about their educational investments[,]" and that, "without accurate and comparable information, the public, taxpayers, and the Government are in the dark as to the performance of these programs and the return on the Federal investment in these programs." *Id.* at 16,436.

To address these twin evils—*i.e.*, those GE Programs that swindle taxpayers and saddle students with debt that will never actually be paid off, and the lack of transparency regarding the actual pros and cons of particular GE Programs—the DOE proposed what came to be known as the Gainful Employment Rule ("the GE Rule"). The agency's first stab at the GE Rule was promulgated in 2011, but never went into effect because a district court concluded that the DOE had failed to engage in reasoned decisionmaking concerning one of the central aspects of the 2011 version of the GE Rule.  *See Ass'n of Private Sector Colleges & Univs. v. Duncan*, 870 F. Supp. 2d 133, 149–55 (D.D.C. 2012).  The DOE went back to the drawing board, and announced a

proposed rulemaking in March of 2014.  *See* 79 Fed. Reg. 16,426 (Mar. 25, 2014).  A final published version of the GE Rule followed approximately seven months later, in October of 2014.  *See* 79 Fed. Reg. 64,890 (Oct. 31, 2014).  The 2014 version of the GE Rule was also challenged in court; however, this time, the Rule survived in its entirety. *See APSCU III*, 110 F. Supp. 3d at 204, *aff'd* 640 F. App'x 5 (D.C. Cir. 2016) (per curiam).

### B.  Relevant Parts Of The 2014 GE Rule

The 2014 GE Rule seeks to cure the two problems discussed above by making all GE Programs subject to affirmative disclosure requirements, and also by punishing those GE Programs that regularly leave low-income graduates with overwhelming debt loads.  *See id.* at 182–83.  With respect to the affirmative disclosure duty, the GE Rule requires the DOE to design a "disclosure template" that the GE Programs have to complete and "update at least annually[.]"  34 C.F.R. § 668.412(a)–(b) (2019).[2]  The Rule further clarifies that any institution that offers multiple GE Programs will be required to create a separate disclosure template for each program.  *See id.* § 668.412(f) (2019).  Furthermore, each institution that offers GE Programs must post the completed disclosure template on the GE Program's web page, *see id.* § 668.412(c)(1) (2019), and must also include it in any promotional materials for the program, *see id.* § 668.412(d)(1) (2019), and in mandated direct disclosures that GE Programs have to make to all prospective students before those students sign an enrollment agreement or

---

[2] The Rule tasks the Secretary with "identif[ying] the information that must be included in the template in a notice published in the Federal Register[,]" 34 C.F.R. § 668.412(a) (2019), and it specifies that, among other things, the Secretary can require: "[t]he primary occupations . . . that the program prepares students to enter"; "the program's completion rates"; and/or "[t]he length of the program in calendar time[,]" *id.* §§ 668.412(a)(1)–(3) (2019).

make a financial commitment, *see id.* § 668.412(e)(1) (2019).

Meanwhile, to prevent GE Programs from selling students a low-return education at a high price, the GE Rule also enacted a technocratic regime of punitive measures designed to weed out poor-performing programs.  To understand how and when those penalties actually come into play under the GE Rule, one must be familiar with what the Rule terms a "debt-to-earnings rate."  *Id.* § 668.402 (2019).  Broadly speaking, debt-to-earnings rates are statistics that measure one of two things: (1) how much, on average, of a GE Program graduate's annual earnings go toward servicing student loans; or (2) how much of a GE Program graduate's discretionary income (*i.e.*, the amount of money not spent on certain basic necessities) goes toward paying off student loans.  *See id.* §§ 668.402, 668.404(a)(1)–(2) (2019).  Under the GE Rule, a GE Program provides its students with sufficiently gainful employment if their "discretionary income rate is less than or equal to 20 percent" or the "annual earnings rate is less than or equal to eight percent[,]" *id.* § 668.403(c)(1) (2019), and the higher these rates are, the larger the proportion of a GE Program graduate's income is spent on loan payments, which suggests that their expensive education has not resulted in sufficiently gainful employment.

To calculate the debt-to-earnings rates for a given GE Program, the DOE relies primarily on data from the Social Security Administration, which it uses to engage in a complex multi-step calculation process.  This process involves: (1) collecting certain information (that every "institution must report" to the Secretary) about "each student enrolled in a GE Program during an award year who received title IV . . . funds for enrolling in that program" and who "completed . . . the GE program[,]" *id.* at

§ 668.411(a)(1)–(2) (2019); (2) "[c]reating a list of the students who completed the program during the [relevant] cohort period[,]" *id.* § 668.405(a)(1) (2019); (3) "[a]llowing the institution to correct the information about the students on the list[,]" *id.* § 668.405(a)(2) (2019); (4) "obtaining from the [Social Security Administration] the mean and median annual earnings of the students on the list[,]" *id.* § 668.405(a)(3) (2019); (5) "[c]alculating draft [debt-to-earnings] rates[,]" *id.* § 668.405(a)(4) (2019); (6) "[a]llowing the [pertinent] institution to challenge the median loan debt used to calculate [these] rates[,]" *id.* § 668.405(a)(5) (2019); (7) "[c]alculating final [debt-to-earnings] rates[,]" *id.* § 668.405(a)(6) (2019); and (8) "[a]llowing the institution to appeal the final [debt-to-earnings] rates[,]'" *id.* § 668.405(a)(7) (2019).  In addition, as part of the last step, and as relevant to the States' claims in the instant action, each GE Program has the opportunity to file an "alternate earnings appeal" in an effort to demonstrate that it would have received a better debt-to-earnings rate if the DOE had used a different earnings measurement (*i.e.*, one collected from either a school-conducted survey or a state-sponsored data system), instead of the mean and median earnings data from the Social Security Administration. *See id.* §§ 668.406(a), (b)(1) (2019).

Eventually, once all of these challenges have been resolved, the DOE publishes the final debt-to-earnings rates for the various GE Programs, *see id.* § 668.403(b), and based on those rates, the agency assigns each school a corresponding designation of "passing[,]" "in the zone[,]" or "failing[,]" *id.* § 668.403(c) (2019).  And if a GE Program maintains a "failing" debt-to-earnings rate for "two out of any three consecutive award years[,]" or has "a combination of [in the] zone and failing" ratings

for "four consecutive award years[,]" that program becomes an "ineligible" program. *Id.* §§ 668.403(c)(4)(i), (ii) (2019).

The consequences that attach to a GE Program's designation (or even its potential designation) as an "ineligible program" are quite severe. First, an ineligible program's students cannot receive federal financial aid under Title IV of the HEA, which reflects the DOE's conclusion that that particular GE Program does not offer the prospect of gainful employment. *See id.* § 668.410(b)(1) (2019). Second, any GE Program that might "become ineligible based on its final [debt-to-earnings] rates measure for the next award year" must provide the following specific warning to students and prospective students:

> This program has not passed standards established by the U.S. Department of Education. The Department based these standards on the amounts students borrow for enrollment in this program and their reported earnings. If in the future the program does not pass the standards, students who are then enrolled may not be able to use federal student grants or loans to pay for the program, and may have to find other ways . . . to pay for the program.

*Id.* §§ 668.410(a)(1), (2)(i) (2019). This warning must also inform prospective students that "there might be other similar (and presumably less risky) programs available to them—even at different schools altogether." *APSCU III*, 110 F. Supp. 3d at 183 (citing 34 C.F.R. § 668.410(a)(2) (2019)).

## C. The DOE's Implementation Of The GE Rule

Thus, as explained above, the 2014 GE Rule was intentionally designed to inform students and to incentivize GE Programs to ensure that their debt-to-earnings rates did not render them ineligible, or close to ineligible, for continued financial aid support. Once the DOE had successfully defended these regulations from a series of

lawsuits, the agency began to implement the disclosure requirements and to calculate the debt-to-earnings rates for GE Programs throughout the country.  The DOE posted the final debt-to-earnings rates for 2015 on January 9, 2017 (*see* Gainful Employment Electronic Announcement No. 100 (Jan. 6, 2017), ECF No. 37-4, at 40), and on January 19, 2017, it released the 2017 Gainful Employment disclosure template (*see* Gainful Employment Electronic Announcement No. 103 (Jan. 19, 2017), ECF No. 37-4, at 44). In addition, the agency gave GE Programs until April 3, 2017, to update their disclosure templates and to begin providing the information in the templates directly to prospective students and in the programs' promotional materials.  (*See id.* at 44.)  GE Programs that received a "failing" or "in the zone" designation for the 2015 cohort of debt-to-earnings rates were also given until March 10, 2017, to submit documentation relating to any "alternate earnings appeal."  (Gainful Employment Electronic Announcement No. 101 (Jan. 6, 2017), ECF No. 37-4, at 42.)

However, in March of 2017, the agency changed course.  Under the new leadership that had taken over the reins after the change of presidential administrations in January of 2017, the DOE  published an announcement on its website that postponed the deadlines for implementing the disclosure requirements and for submitting documentation relating to any "alternate earnings appeal" process until July 1, 2017, "to allow the Department to further review the GE regulations and their implementation." (Gainful Employment Electronic Announcement No. 105 (Mar. 6, 2017), ECF No. 37-4, at 47.)  On June 30, 2017, the DOE once again delayed the deadlines by which GE Programs had to comply with the disclosure requirements for promotional materials and direct distribution to prospective students, authorizing an additional year to come into

compliance (until July 1, 2018); the agency granted this extension by publishing a notice in the Federal Register.  *See* 82 Fed. Reg. 30,975, 30,976 (July 5, 2017).[3]  The following month, the DOE further announced via the Federal Register that it would establish new deadlines for the alternate earnings appeals process.  *See* 82 Fed. Reg. 39,362 (Aug. 18, 2017).

In the August 2017 announcement, the agency also took several actions relating to the alternate earnings appeals deadlines and standards.  First, it stated that any notice of intent to file an alternate earnings appeal was due on or before October 6, 2017, and that any such appeal had to be filed on or before February 1, 2018.  *See id.* at 39,363.  Second, it "modifi[ed] the alternate appeals submission requirements," allowing GE Programs to submit a wider variety and less stringent forms of evidence of graduate earnings.  *Id.*  Third, and finally, the agency freed "institutions intending to file a notice of appeal" from having "to issue warnings to students unless [the institution] fail[s] to timely submit an alternate earnings appeal or the appeal is resolved."  *Id.*

### D.  The States' Claims And The Parties' Cross-Motions For Summary Judgment

Given the implementation delays and the DOE's other changes to the GE Rule, the States filed a complaint in this Court against the DOE and Secretary DeVos, accusing the agency of violating the APA in three respects.  According to the States, the DOE (1) has effectively engaged in new rulemaking concerning an existing regulation while failing to adhere to the APA's and the HEA's notice-and-comment or negotiated-rulemaking procedures (*see* Compl., ECF No. 1, ¶¶ 94–104); (2) has acted arbitrarily

---

[3] The DOE did not delay the portion of the disclosure requirements mandating that GE Programs publish information on their websites.  *See* 82 Fed. Reg. at 30,976.

and capriciously in delaying, amending, and/or repealing the GE Rule without an explanation or reasoned basis for doing so (*see id.* ¶¶ 105–13); and (3) has unlawfully refused take the steps that are necessary to calculate and publish the next round of debt-to-earnings rates (*see id.* ¶¶ 114–21).  The parties proposed moving directly to filing cross-motions for summary judgment on these issues (*see* Defs.' Consent Mot. for Briefing Schedule, ECF No. 32), and this Court agreed (*see* Minute Order of Dec. 21, 2017).

In their motion for summary judgment, the States chiefly contend that the DOE's actions are both procedurally invalid, because the DOE has essentially engaged in "substantive rulemaking" without the notice-and-comment or negotiated-rulemaking processes that the APA and the HEA respectively require (Mem. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Summ. J. Mem."), ECF No. 33-1, at 24), and substantively invalid, because the DOE has failed to "set forth factual findings and a reasoned analysis supporting the Department's decision[,]" and has failed to address either the "costs and benefits" of these actions or why less drastic alternatives would not have sufficed (*id.* at 28–29).  The States also allege that "the Department has violated the APA by unlawfully refusing to perform or unreasonably delaying the calculation of the debt-to-earnings rates[.]"  (*Id.* at 34.)

For its part, the DOE has responded with a broad array of arguments.  The agency contends at the outset that the States lack both Article III and prudential standing to bring these legal claims (*see* Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. & in Supp. of Defs.' Cross-Mot. for Summ. J. ("Defs.' Summ. J. Mem."), ECF No. 36-1, at 24, 32–33), and it also insists that the DOE has not engaged in final agency

action within the meaning of the APA (*see id.* at 33).  With respect to the merits of the States' claims, the DOE asserts that the agency was permitted to forego the notice-and-comment and negotiated-rulemaking procedures because its actions were exempt from those requirements under the APA and the HEA (*see id.* at 36–37), and that its actions were well-reasoned and reasonably explained for the purpose of the APA's arbitrary-and-capricious standard (*see id.* at 41–43).  Third, and finally, the DOE rejects the notion that it has unreasonably delayed or illegally withheld agency action, because, in its view, the agency was not "required to take" any "discrete agency action" under the 2014 Rule.  (*Id.* at 43.)

In their reply, the States argue *inter alia* that they have Article III standing to maintain this legal action because the DOE's refusal to implement and enforce the GE Rule has caused the States to lose tuition and grant money, and has also forced the States to spend additional resources to investigate fraudulent programs—*i.e.*, the DOE's allegedly unlawful delay has injured the States' nonsovereign interests.  (Pls.' Mem. in Opp'n to Defs.' Cross-Mot. for Summ. J. & Reply Mem. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Summ. J. Reply"), ECF No. 39, at 9.)  The States also contend that the DOE's actions "saddle[]" the States' residents "with debt that they are unable to pay off" (*id.* at 12), and that this alleged injury entitles the States to bring a *parens patriae* lawsuit against the DOE (*see id.* at 13).

This Court held a hearing regarding the parties' cross motions for summary judgment on May 1, 2018.  (*See* Summ. J. Hr'g Tr., ECF No. 61).

### E. Intervening Developments And Procedural History (Including The DOE's Filing Of A Motion To Dismiss On Mootness Grounds)

Following the hearing in this case, the DOE took several actions related to the

complaint's claims and allegations.  First, the agency announced a further delay of the deadline for GE Programs to include the information contained within the disclosure template in their promotional materials and in direct distributions to prospective students; it gave GE Programs yet another year, until July 1, 2019, to satisfy this mandate.  *See* 83 Fed. Reg. 28,177, 28,177 (June 18, 2018).  Second, the DOE began a methodical march toward taking the necessary steps to calculate and finalize the debt-to-earnings rates under the GE Rule for the second year, *i.e.*, for 2016.  (*See, e.g.*, Gainful Employment Electronic Announcement No. 112 (Mar. 16, 2018), ECF No. 42–1.)  Third, and finally, the DOE published a notice of proposed rulemaking that notified the public of the agency's intention to rescind the 2014 GE Rule altogether.  *See* 83 Fed. Reg. 40,167, 40,168 (Aug. 14, 2018).  This rescission policy was promulgated as a rule on July 1, 2019, after the expiration of the required comment period, with an effective date of July 1, 2020.  *See* 84 Fed. Reg. 31,392, 31,393 (July 1, 2019) (hereinafter "Rescission Rule").  Moreover, at the time the Rescission Rule was adopted, the Secretary exercised her discretion to designate the Rescission Rule for early implementation, at the discretion of each institution.  *See id.*; *see also* 20 U.S.C. § 1089(c)(2)(A) ("The Secretary may designate any regulatory provision that affects the programs . . . as one that an entity subject to the provision may, in the entity's discretion, choose to implement prior to the effective date[.]").

Of course, these subsequent developments impacted the procedural history of the instant case significantly, and in various ways.  First of all, because the DOE persisted in delaying the effective date for the GE Program disclosure requirements, the States moved to amend their original complaint to reflect the additional delay that the DOE

announced and the new extended deadline of July 1, 2019.  (*See* Pls.' Mot. for Leave to File Am. Compl. & Request for Expedited Schedule to File Suppls. To Cross-Mots. for Summ J., ECF No. 65.)  The Court granted the States' motion to amend (*see* Minute Order of Aug. 30, 2018), which permitted the States to seek invalidation of the DOE's most recent alteration of the GE Rule's disclosure requirements (*see* Am. Compl., ECF No. 65-2, ¶¶ 84, 106).  The DOE then separately notified the Court that the agency had promulgated the Rescission Rule, such that, as of July 1, 2019, the GE regulations at issue in this lawsuit would be rescinded entirely effective July 1, 2020, with the option of early implementation by individual institutions.  (*See* Defs.' Notice of Admin Action and Suggestion of Mootness, ECF No. 85, at 1.)  This Court construed the DOE's notice of this development as a motion for leave to file a supplemental motion to dismiss on mootness grounds (*see* Minute Order of July 12, 2019), which the Court granted, and the agency proceeded to file said motion to dismiss (*see* Defs.' Mem. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mot. to Dismiss"), ECF No. 86-1), which the States opposed (*see* Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n to Dismiss"), ECF No. 87).

In the motion to dismiss, the DOE contends that all of the States' claims are moot for three reasons: (1) the challenged extensions of the deadline for GE Programs to comply with certain disclosure requirements have now expired, and any regulated institution might elect to implement the Rescission Rule early, thus relieving itself of the disclosure requirements entirely (*see* Defs.' Mot. to Dismiss at 6); (2) the challenged extension of the deadline for certain GE Programs to file alternate earnings appeals for the first year of debt-to-earnings rates has passed, and the outcome of those

appeals would have no repercussions anyway in light of the DOE's present inability to obtain from the Social Security Administration the earnings data necessary to calculate debt-to-earnings rates for the second year (*see id.* at 7)[4]; and (3) the DOE has taken all of the steps within its control to calculate debt-to-earnings rates for the second year and, regardless, regulated institutions could refuse to comply with any consequences that the GE Rule dictated by opting to implement the Rescission Rule effective immediately (*see id.* at 8).  The DOE's motion to dismiss also harkens back to the agency's summary judgment arguments, by insisting that, in any event, "the States lack standing."  (*Id.* at 6.)

In their opposition to the DOE's motion to dismiss, the States disagree entirely. They first assert that, despite the intervening promulgation of the Rescission Rule, the States remain entitled to a declaratory judgment that holds unlawful the DOE's earlier repeated delays of the disclosure requirements deadline established in the now-rescinded GE Rule.  (*See* Pls.' Opp'n to Dismiss at 7).  Second, the States contend that the DOE has substantively modified the criteria for alternate earnings appeals in a way that conflicts with the GE Rule.  (*See id.* at 6.)  Third, the States argue that the DOE had specific obligations to calculate debt-to-earnings rates under the GE Rule until the effective date of the Rescission Rule, and the agency's ongoing failure to perform those obligations violated the APA.  (*See id.*)  The States also incorporate, and thereby reiterate, their summary judgment arguments regarding their Article III standing.  (*See*

---

[4] According to the DOE, "the Memorandum of Understanding ('MOU'), pursuant to which the [Social Security Administration] had agreed to share such earnings data with the Department, expired before [the DOE] was able to obtain the earnings data necessary to complete the [debt-to-earnings] rate calculation for a second year[,]" (Defs.' Mot. to Dismiss at 11), and the Social Security Administration "has failed to renew its agreement with the Department to provide the aggregate program earnings data that would be needed to complete the calculation[,]" (*id.* at 7).

*id.* at 12 n.6.)

This Court held a hearing with respect to the DOE's motion to dismiss on January 9, 2020 (*see* Mootness Hr'g Tr., ECF No. 104), at which time the Court took the matter under advisement.

## II.   LEGAL STANDARDS

### A.  Motions To Dismiss Under Rule 12(b)(1)

A motion to dismiss a complaint brought under Federal Rule of Civil Procedure 12(b)(1) "imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001); *see also* Fed. R. Civ. P. 12(b)(1) (authorizing a party to challenge by motion the "lack of subject-matter jurisdiction").  The doctrines of standing, mootness, and ripeness are "[t]hree inter-related" doctrines that determine the "constitutional boundaries" of a court's jurisdiction, *Worth v. Jackson*, 451 F.3d 854, 855, 857 (D.C. Cir. 2006), and as such, each implicates the concerns that a Rule 12(b)(1) motion addresses.  To be sure, "there is a significant difference between determining whether a federal court has 'jurisdiction of the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is 'justiciable.'" *Powell v. McCormack*, 395 U.S. 486, 512 (1969). However, just as "the defect of standing is a defect in subject matter jurisdiction" for Rule 12(b)(1) purposes, *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987), "[a] motion to dismiss for mootness is properly brought under Federal Rule of Civil Procedure 12(b)(1)" as well, *Friends of Animals v. Salazar*, 670 F. Supp. 2d 7, 11 (D.D.C. 2009).

18

When ruling on a Rule 12(b)(1) motion, a court must "treat the complaint's factual allegations as true" and afford the States "the benefit of all inferences that can be derived from the facts alleged." *Delta Air Lines, Inc. v. Export–Import Bank of U.S.*, 85 F. Supp. 3d 250, 259 (D.D.C. 2015) (internal quotation marks and citation omitted). But those factual allegations receive "closer scrutiny" than they would in the Rule 12(b)(6) context. *Id.* (internal quotation marks and citation omitted).  Furthermore, unlike a Rule 12(b)(6) motion, the court may look to documents outside of the complaint in order to evaluate whether or not it has jurisdiction to entertain a claim. *See Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  If the court determines that the plaintiff lacks standing or that a claim is moot because it no longer presents a live controversy, it lacks Article III jurisdiction to entertain the claim and must dismiss it.  *See* Fed. R. Civ. P. 12(b)(1), 12(h)(3).

## B.  The Article III Standing Of State Plaintiffs

Under Article III of the United States Constitution, federal courts are "vested with the 'Power' to resolve not questions and issues but 'Cases' or 'Controversies.'" *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132 (2011) (quoting U.S. Const. art. III, § 2).  Standing doctrine was developed to ensure that courts do not stray from adjudicating cases and controversies and thereby "usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *see also Food & Water Watch, Inc. v. Vilsack*, 79 F. Supp. 3d 174, 185 (D.D.C. 2015) (explaining that the doctrine of standing "limit[s] the business of federal courts . . . to assure that the federal courts will not intrude into areas committed to the other branches of government" (internal quotation marks and citation omitted)).

Generally speaking, standing jurisprudence requires federal courts to evaluate whether the plaintiff has demonstrated "such a personal stake in the outcome of the controversy as to warrant the invocation of federal-court jurisdiction[.]"  *New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 155 (D.D.C. 2016) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  In this regard, the court must assess whether the plaintiff has demonstrated the "irreducible constitutional minimum" circumstances necessary to invoke a federal court's subject-matter jurisdiction over a lawsuit, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks and citation omitted), which consists of three elements: "injury in fact, causation, and redressability," *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012) (internal quotation marks and citation omitted).  These requirements for the invocation of federal-court jurisdiction are "essential and unchanging[.]"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  And "[i]t is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."  *Renne v. Geary*, 501 U.S. 312, 316 (1991) (citation and quotation marks omitted); *see also Food & Water Watch*, 808 F.3d at 912 ("It is well-established that each element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." (internal quotation marks and citation omitted)).

When a state files a lawsuit in federal court to protect its interests, the same standing-related question regarding whether or not the state has proven that it has a

sufficient stake in the matter arises, just as with any other plaintiff. *See, e.g.*, *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007); *Air All. Hous. v. E.P.A.*, 906 F.3d 1049, 1059 (D.C. Cir. 2018) (per curiam). But "[i]t is of considerable relevance that the party seeking review . . . is a sovereign [s]tate and not . . . a private individual[,]" because states "are not [treated as] normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts*, 549 U.S. at 518; *see also Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) (noting that "[t]he case has been argued largely as if it were one between two private parties; but it is not. The very elements that would be relied upon in a suit between fellow-citizens . . . are wanting here").

One of the chief differences between the standing of a plaintiff state and the standing of an individual plaintiff is the fact that a state can suffer certain injuries to its interests that nonsovereign plaintiffs cannot. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). For example, a state's "sovereign interests"—such as its authority to "exercise [] sovereign power over individuals and entities" within its borders, or "the maintenance and recognition of its borders"—can be harmed due to a defendant's actions. *Id.*; *see, e.g.*, *New York v. United States*, 505 U.S. 144, 181–82 (1992); *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 450 (1945). States can also possess "quasi-sovereign" interests, which "consist of a set of interests that the [s]tate has in the well-being of its populace[,]" *Snapp*, 458 U.S. at 602; these include, for example, lawsuits brought to prevent widespread economic harm to the citizens of a state or threats to the "health and comfort of the inhabitants of a [s]tate[,]" *id.* at 603 (internal quotation marks and citations omitted). Standing premised on injuries to these quasi-sovereign interests is typically referred to as "*parens patriae* standing." *Id.* at

600; *accord New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 149 (D.D.C. 2002). Last, but not least, a state may file suit to defend at least "[t]wo kinds of nonsovereign interests"—either "proprietary interests such as 'own[ing] land or participat[ing] in a business venture,'" or "private interests of another when the state is the 'real party in interest.'" *Air All. Hous*, 906 F.3d at 1059 (quoting *Snapp*, 458 U.S. 592, 601–02). In these instances, the question of state standing most closely resembles the familiar standing analysis that applies to private individuals. *See, e.g.*, *Massachusetts*, 549 U.S. at 522; *Kansas v. United States*, 16 F.3d 436, 439 (D.C. Cir. 1994).

Harm to any of these state interests—sovereign, quasi-sovereign, or nonsovereign—is sufficient to establish that a state has suffered an injury in fact, *see Snapp*, 458 U.S. at 601–02, and if it further establishes that the defendant has caused the harm, *see, e.g, Air All. Hous.*, 906 F.3d at 1060 (noting that the defendant caused the state's proprietary injury), and that the harm is of a type that can be redressed through judicial decision, then the state has standing and the Court can proceed to evaluate its legal claims consistent with Article III. *See also Md. People's Counsel v. Fed. Energy Regulatory Comm'n*, 760 F.2d 318, 322 (D.C. Cir. 1985) (explaining that, for any assertion of standing based on a quasi-sovereign interest, the "citizen interests represented" must be of the sort that would confer "standing" upon those citizens).

## III.   ANALYSIS

The States vigorously maintain that the DOE's delay in implementing the GE Rule has harmed their nonsovereign and quasi-sovereign interests in a manner that gives them Article III standing to litigate their APA claims, and that the DOE's inaction will continue to harm them absent a court order that requires the DOE to stop delaying

the implementation of the previous administration's GE Rule and to adhere to the promulgated policy (which the agency no longer supports).  To be specific, the States contend that three species of harm to their nonsovereign interests have resulted from the DOE's refusal to enforce the GE Rule's disclosure requirements and calculate the GE Programs' debt-to-earnings rates, as the GE Rule requires: (1) the States "lose tuition money from state-sponsored educational institutions, as some students who would otherwise attend [s]tate institutions [unwittingly] opt to attend [failing] for-profit institutions"; (2) the States "face the waste and loss of [s]tate-funded grant and loan money that is paid to schools that would otherwise be ineligible for Title IV loans or would see a reduction in enrollment" if the GE Rule was fully enforced; and (3) the States "are forced to spend additional resources to investigate fraudulent programs, including programs that would otherwise be ineligible for Title IV funding [.]"  (Pls.' Summ. J. Reply at 9.)  The States further assert that the DOE's nonenforcement and delay "saddles" the States' residents "with debt that they are unable to pay off" (*id.* at 12), and that Congress has explicitly granted the States permission to vindicate harms to their quasi-sovereign interest in the economic well-being of their populaces by bringing a *parens patriae* lawsuit against the federal government under the APA (*see id.* at 13).

In response, the DOE maintains that none of these asserted harms to the States' nonsovereign interests qualifies as "a cognizable injury for standing purposes[,]" because "at bottom" the alleged harms are "nothing more than 'self-inflicted injuries' that are a result of [the States'] own independent decisions regarding allocation of resources and enforcement efforts[.]"  (Defs.' Summ. J. Mem. at 27.)  Nor, in the DOE's view, have the States demonstrated that these injuries are "fairly traceable" to

the challenged actions in this case, given that each injury rests upon a "theory of causation [] based on speculation . . . about how third parties might act[.]"  (*Id.* at 32; *see also* Defs.' Reply in Supp. of Defs.' Summ. J. Mem. ("Defs.' Reply"), ECF. 42, at 9–13.)  The DOE further argues that, with respect to the States' attempt to claim *parens patriae* standing, the law in the D.C. Circuit is clear: "states cannot represent their citizens as *parens patriae* in a suit against the federal government[,]" at least not where there exists no explicit congressional authorization permitting states to challenge the decisions of the federal government.  (Defs.' Reply at 13.)

For the reasons explained below, this Court agrees with the DOE that the States have not established a cognizable injury to their nonsovereign interests for the purpose of Article III standing, given that each of the States' alleged injuries is either too speculative to qualify as an injury in fact for standing purposes or is self-inflicted, and is therefore not fairly traceable to the DOE's actions.  Moreover, there is no doubt that Congress has not given the States permission to rely upon the doctrine of *parens patriae* standing for APA claims such as those in the instant complaint.  Therefore, the Court concludes that the States lack Article III standing to bring the instant claims, and it has dismissed the States' complaint on this basis.

### A. The States Have Not Demonstrated That Their Nonsovereign Interests Have Been Injured In Fact And In A Manner That Is Fairly Traceable To DOE's Actions

None of the alleged nonsovereign injuries that the States say give rise to Article III standing to press the APA claims in this case—*i.e.*, (1) the loss of tuition dollars at state-run schools due to students who choose to attend problematic GE Programs instead of those public institutions; (2) the waste and loss of money that is given to

failing GE Programs through state-funded grants and loans that the States provide to students who attend such programs; and (3) the costs of investigating and prosecuting those fraudulent GE Programs that would have ceased operations if the GE Rule was in effect (*see* Pls.' Summ. J. Reply at 9)—suffices to establish Article III standing, for the following reasons.

      1.  <u>The Alleged Loss Of Tuition Revenue Is Too Speculative To</u>
              <u>Constitute A Cognizable Injury In Fact</u>

Consistent with separation-of-powers principles, the doctrine of Article III standing prevents federal courts from "review[ing] and revis[ing] legislative and executive action" except when necessary to "redress or prevent *actual* or *imminently threatened* injury" to the prospective plaintiff. *Summers*, 555 U.S. at 492 (emphases added) (citation omitted). Accordingly, a plaintiff can only invoke the jurisdiction of a federal court when he has suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted). It is also well established that an "actual or imminent injury is *certainly* impending and immediate[,]" and is "*not* remote, speculative, conjectural, or hypothetical[.]" *Food & Water Watch*, 808 F.3d at 914 (emphasis supplied) (internal quotation marks and citation omitted).

A plaintiff can satisfy this "actual or imminent" injury requirement in two ways. Most obviously, the plaintiff could demonstrate that he has *already* suffered an injury that the challenged action of the defendant caused. *See, e.g.*, *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 977–78 (D.C. Cir. 2016) (finding an actual injury where the plaintiff had already been deprived of a government benefit). Alternatively, the

plaintiff can show either that he faces a "future injury" that is "certainly impending" or a "substantial risk" of a particular future injury. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted). Notably, however, to demonstrate either of these circumstances, the plaintiff cannot rely upon a future injury that depends upon "a highly attenuated chain of possibilities[.]" *Clapper*, 568 U.S. at 410. In other words, if there are "[too] many links in the causal chain" that purportedly will lead to a plaintiff's future injury, then the plaintiff has asserted an injury that is "too speculative to qualify as [an] 'injury in fact.'" *Attias v. Carefirst, Inc.*, 865 F.3d 620, 626 (D.C. Cir. 2017).

In the instant case, the States allege that they have already suffered harm to their fiscs in the form of lost tuition revenue due to the DOE's failure to implement the GE Rule. (*See* Pls.' Summ. J. Reply at 9 (arguing that "the States lose tuition money from [s]tate-sponsored educational institutions, as some students who would otherwise attend [s]tate institutions opt to attend for-profit institutions whose programs would be precluded from receiving Title IV funds if the Department enforced the Rule"); Suppl. Mem. in Supp. of Pls.' Mot. for Summ. J., ECF No. 64, at 5–6 & n.5 (citing a then-unpublished study that concludes that, "[o]n average, sanctioned for-profit institutions experienced a 40 percent decline in their own enrollment in the five years following sanction receipt[,]" and that "[a]n additional for-profit sanction increases each local community college's enrollment by about 6 percent." (internal citation omitted).) But the record evidence in this case does not necessarily or directly support this contention. For example, there are no declarations from students who attest to the fact that they would have gone to a state-run school if they had known about the failing status of their

chosen GE Programs.  And without such evidence, the States are hard-pressed to establish with the necessary degree of certainty that the DOE's delay in enforcing the GE Rule has already injured them in this manner.  *Cf. Fed. Forest Res. Coal. v. Vilsack*, 100 F. Supp. 3d 21, 34 (D.D.C. 2015) ("The party invoking federal jurisdiction bears the burden of establishing standing—and, at the summary judgment stage, such a party can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts." (internal quotation marks and citation omitted)).

With respect to the States' suggestion that they will face future harm based on lost tuition if unwitting students choose failing GE Programs over state schools, the States have presented, at the most general level of abstraction, a counterfactual that *hypothesizes* that students would attend state schools, if the DOE had, in fact, implemented the GE Rule; they say, in essence, that the failing GE Programs would either cease to exist or that students would be repelled by them, and that the students who would have otherwise attended these programs would matriculate at state-run educational institutions instead.  (*See* Pls.' Summ. J. Reply at 9, 13; Compl. ¶ 92.)  But Plaintiffs have not shown that this seemingly intuitive set of circumstances would *necessarily* occur if the DOE had enforced the GE Rule.  And there are several significant links in the chain of causation between the challenged actions of the DOE and the alleged impact on the States' coffers, none of which are guaranteed to happen.

To understand why this is so, the myriad steps that are necessary to get from the DOE's allegedly improper actions in the instant case to the States' supposed loss of income from a decrease in tuition dollars must be acknowledged.  Indeed, the chain of events that would have to take place in order to compel the conclusion that the States

will necessarily realize a loss of revenue based on the DOE's alleged dereliction of its enforcement duties has at least the following logical links: (1) students who are attending or are set to attend failing GE Programs would have to choose not to attend (or would be unable to attend) the GE Programs on the basis of the information that the GE Rule requires disclosed or the designation that those programs receive from the DOE; (2) instead of abandoning the prospect of higher education altogether, students who would have attended the GE Programs would have to apply to state-run educational institutions; (3) the state-run educational institutions would have to admit these students; (4) the students would have to choose to matriculate at the state-run institutions; and (5) the students' attendance at these institutions would have to enhance, rather than detract from, state's finances.[5]  Thus, although the States' theory of injury is that they will lose tuition dollars because students have enrolled in failing GE Programs rather than state-run educational institutions, in reality, the States will suffer an injury to their fiscs due to the DOE's failure to implement the GE Rule *only if* all five of the previously mentioned steps occur.  *Cf. Clapper*, 568 U.S. at 410 (concluding that five links in a "chain of possibilities" is "highly attenuated").

This Court has no doubt that the sheer number of assumptions that are required to reach the conclusion that the DOE's alleged APA violations will actually result in a future loss of tuition dollars for the States renders it nearly impossible to characterize

---

[5] With respect to the final link in this chain of events, the record evidence actually appears to *contradict* the States' premise that the diversion of students from state-run institutions to GE programs costs the States money.  To the contrary, the data suggests that failed GE Programs result in students being driven *into* state-run programs in a manner that is costly to the States.  *See* 79 Fed. Reg. 64,890, 65,081 (Oct. 31, 2014) ("State and local governments may experience increased costs as enrollment in public institutions increases as a result of some students transferring from programs at for-profit institutions.").

the tuition-loss injury as "certainly impending." *Susan B. Anthony List*, 134 S.Ct. at 2341 (citation omitted). Moreover, this particular injury argument has the added disadvantage of being contingent upon the independent decisions that the students who attend GE Programs and the admissions departments at state-run institutions will make. No less an authority than the Supreme Court has cautioned against such theories of standing, and has emphasized the federal courts' "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414; *see also Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) ("When considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)[.]"). Indeed, unless the States "show that the relevant third parties *will* react to the challenged action in such manner as to create [a] substantial risk" of harm to state finances due to greater enrollment in problematic GE Programs, this Court must reject that theory of Article III standing. *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 22 (D.D.C. 2018) (emphasis added) (citing *Lujan*, 504 U.S. at 562).

In this regard, the recent case of *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), is instructive. *Department of Commerce* involved a challenge to the decision of Secretary of the Commerce to reinstate in the decennial census a question concerning citizenship status, which included claims under the U.S. Constitution, the Census Act, and the APA. *Id.* at 2563. The Supreme Court held that the state plaintiffs had Article III standing because they demonstrated "that third parties will likely react in predictable ways to the citizenship question[,]" *id.* at 2566; namely, that "noncitizen households [would] respond[] . . . at lower rates than other groups, which in turn would

cause them to be undercounted[,]" and that this undercounting would, in turn, injure the state and local governments by "diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources," *id*. at 2565. *See also City & Cty. of San Francisco v. U.S.C.I.S.*, 944 F.3d 773, 787 (9th Cir. 2019) (finding standing where the final rule itself specifically predicted that the rule would "encourage aliens to disenroll from public benefits" and that this "would result in a reduction in Medicaid reimbursement payments to the States of about $1.01 billion"). By contrast, here, the States provide no evidence that the students who attend GE Programs and the admissions departments at state-run institutions will act predictably in the absence of information regarding the status of the GE Programs, such that the DOE's failure to enforce a rule that requires disclosures about the programs and the potential withholding of funds will almost certainly cause injury to the States.

In short, to satisfy their burden of establishing the "actual or imminent" nature of the loss-of-tuition injury, the States rely on an attenuated and lengthy chain of reasoning that assumes that third parties would most certainly respond to the DOE's implementation of the GE Rule in a particular way. (*See* Pls.' Summ. J. Reply at 9.) But a successful showing of Article III standing reuqires significantly more than just the "common sense" beliefs upon which the States' injury argument here. (Summ. J. Hr'g Tr. at 19:12–14); *see also Clapper*, 568 U.S. at 411 (rejecting a purported injury as too speculative when the "respondents merely speculate[d] and ma[d]e assumptions about" future events).

2.   <u>The Alleged Waste Of State Loan And Grant Funding And The Costs</u>
<u>Of Investigating Fraudulent GE Programs Are Self-Inflicted Injuries</u>
<u>That Are Not Fairly Traceable To The DOE's Actions</u>

It almost goes without saying that *the defendant* must "cause[]" the harm that the plaintiff identifies as its injury in fact for standing purposes, *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Library of Cong., Inc. v. Billington*, 737 F.3d 767, 770 (D.C. Cir. 2013); consequently, a "self-inflicted harm"—*i.e.*, an "injury . . . largely of [the plaintiff's] own making"—is neither "an 'injury' cognizable under Article III" nor an injury that is "fairly traceable to the defendant's challenged conduct[,]" *Nat'l Family Planning & Reprod. Health Ass'n, v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).  In other words, an injury that is "so completely due to the [plaintiff's] own fault as to break the causal chain" is not fairly traceable to the defendant's conduct, and thus cannot be the basis for Article III standing to sue.  *Petro-Chem Processing, Inc. v. E.P.A.*, 866 F.2d 433, 438 (D.C. Cir. 1989) (quoting 13 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3531.5 (2d ed. 1984)).  These well-worn principles are relevant here, for it is clear to this Court that the two remaining nonsovereign injuries that the States identify—*i.e.*, the wasted loan and grant funding that the States funnel (through students) to those GE Programs that are not providing value and would suffer lower enrollment numbers and/or shut down if the GE Rule was enforced, and the costs associated with investigating and prosecuting fraudulent GE Programs, which would cease to exist if the GE Rule was implemented (*see* Pls.' Summ. J. Reply at 9; Compl. ¶ 92)—fit squarely into the category of non-cognizable, self-inflicted harms.

With respect to the alleged waste of state money that results from dolling out

grants and loans to individuals who attend failing GE Programs, it appears that the States have *voluntarily* opted to provide their residents with grants and student loans for educational purposes; that is, the States do not assert that federal law *requires* them to provide such financial support. Moreover, and importantly, the States apparently provide this aid to students without restricting the availability of such grants or loans to those students who enroll in GE Programs that the States condone. (*See* Pls.' Reply at 9.) And if it is *state* law that is the impetus for such unbounded expenditures, then any loss or harm to the States' fiscs is a quintessentially self-inflicted wound, because it "result[s] from decisions by their respective state legislatures." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam).

Put another way, no state "can be heard to complain about damage inflicted by its own hand[,]" *id.*, and as far as this Court can tell from the briefs and the record that the parties have presented, nothing requires the States to run their financial aid regimes such that they incur losses of this nature. *Cf. id.* ("Nothing required Maine, Massachusetts, and Vermont to extend a tax credit to their residents for income taxes paid to New Hampshire, and nothing prevents Pennsylvania from withdrawing that credit for taxes paid to New Jersey."). Moreover, if providing aid to students who attend failing GE Programs no longer suits the States' interests, it appears that they can make a different choice, such that there is no "real need" to invoke the power of the federal courts to remedy the alleged harm. *Summers*, 555 U.S. at 493. What the States cannot do is voluntarily link their fiscs to federal practices, and then demand that federal policy be maintained so as to avoid financial losses for the States.[6]

---

[6] That there may be exogenous constraints on the States' options for changing their laws to avoid their self-imposed "harm" does not change this Court's analysis. The Supreme Court reasoned similarly in

This same reasoning also dooms the States' suggestion that they have suffered an injury in fact for standing purposes because the DOE's failure to implement the GE Rule in a timely fashion has required them "to spend additional resources to investigate fraudulent programs, including programs that would otherwise be ineligible for Title IV funding[.]" (Pls.' Summ. J. Reply at 9.) To hear the States tell it, it is the DOE's refusal to implement the GE Rule that has "placed the burden back on the States to use their consumer protections laws and other tools to police" GE Programs. (*Id.* at 11.) But, again, *the DOE* has not "burden[ed]" the States, for nothing in the record or either parties' briefs hints at any federal law or regulation that requires the States to investigate or prosecute GE Programs in the manner that the States describe. Instead, *the States' legislatures* have presumably passed laws that protect consumers and that authorize the investigation and prosecution of fraudulent GE Programs, and the state officials who enforce such laws have elected to use their prosecutorial discretion to target, investigate, and prosecute GE Programs for running afoul of state law. (*See* Summ. J. Hr'g Tr. at 9:5–8 ("[T]he states are obligated, *under their own law*, to enforce their consumer protection statutes. *Our office* certainly views it as having an obligation to enforce the consumer protection laws." (emphases added)).) Thus, it is the States themselves that have chosen to assume the obligation to police GE Programs, and

---

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (per curiam), without suggesting that potential external constraints on the ability of the Pennsylvania legislature to change its tax scheme would lead to a different result. *See id.* at 664 (reasoning that Pennsylvania would have been free to drop its tax credit to avoid the self-inflicted injury of credits on income taxes paid to other states, without addressing whether the dormant Commerce Clause would have constrained the legislature by requiring it to also drop any tax on income earned by New Jersey residents from Pennsylvania sources); *cf. Comptroller of the Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1805-06 (2015) (holding that Maryland violated the dormant aspect of the Commerce Clause by refusing to grant a tax credit for taxes that its residents paid to another state where Maryland also taxed the income that residents of other states earned from sources in Maryland).

"insofar as it is incurred voluntarily," *Petro-Chem Processing*, 866 F.2d at 438, the costs related to this burden do not qualify as a cognizable injury in fact under Article III. *See Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 177 (D.C. Cir. 2012) (explaining that the government's "action" did "not force, require, or even encourage" plaintiffs to bring new fuels to the market, and "[t]o the extent the petroleum group's members implement that option voluntarily, any injury they incur as a result is a self-inflicted harm not fairly traceable to the challenged government conduct" (internal quotation marks and citation omitted)).

This Court also has its doubts about whether state expenditures of this nature actually qualify as *injuries* in any meaningful sense. *Cf. Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1290 (D.C. Cir. 2007) (Kavanaugh, J.) (holding that a self-inflicted injury is, by definition, not an "actual" injury for standing purposes. For one thing, the States have not shown that, due to the DOE's lack of enforcement of the GE Rule, their coffers are any worse off today than before the DOE promulgated that regulation. Indeed, the States were apparently incurring losses with respect to financial aid loans and grants to students, and making the same types of investments to investigate fraudulent for-profit schools, before the federal government even conceived of the GE Rule. (*See* Pls.' Suppl. Mem., ECF No. 83, at 8 (explaining how, even before the GE Rule was promulgated, the States "devoted substantial resources to investigation and enforcement efforts directed against fraudulent activity by for-profit colleges and universities of the sort the Gainful Employment Rule was intended to prevent").) And the GE Rule was never fully implemented; therefore,

presumably, the status quo concerning the States' losses and investments remains.[7]

It is also clear beyond cavil that a bare allegation that a federal agency's action (or inaction) will require increased spending by the States does not, in itself, establish an actual or concrete injury; rather, pointing to the increased costs of state-funded programming "is just the beginning of the analysis." *Winn*, 563 U.S. at 137. This is because, when a state government expends resources, "its budget does not necessarily suffer." *Id.* at 136; *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006). "On the contrary, the purpose of many governmental expenditures and tax benefits is to 'spur economic activity, which in turn *increases* government revenues'" or provides other anticipated benefits. *Winn*, 563 U.S. at 136 (quoting *Cuno*, 547 U.S. at 344) (emphasis in original). And, here, it is likely that the States undertook their own cost-

---

[7] To maintain that the States are somehow harmed is therefore to rely on the curious assumption that a cognizable injury occurs for standing purposes if the federal government fails to come to the rescue when unscrupulous third parties (e.g., failing GE Programs) act in unsavory ways that the plaintiff itself feels compelled to address in the absence of federal action. (*See* Pls.' Reply at 9 (arguing that "States are forced to spend additional resources to investigate fraudulent programs, including programs that would otherwise be ineligible for Title IV funding if the Rule were fully enforced."); Pls.' Opp'n at 8 n.6 ("[T]he Department's refusal to carry out its obligations under the Rule increases the burden on the States to conduct investigations and enforcement actions against fraudulent for-profit schools.").) To be sure, the DOE promulgated a rule that plainly expressed the federal government's intention to address the scourge of fraudulent for-profit schools, and its implementation of the GE Rule might well have actually resulted in a financial benefit to the States. (*See* Pls.' Reply at 9–10 (arguing that "the States could potentially see significant benefits as a result" of the GE Rule's implementation, in the form of "'improved oversight'" and a "'more efficient[]'" allocation of funding (quoting 79 Fed. Reg. at 65,080)).) But it is not at all clear that the States' thwarted hope of this promised benefit qualifies as an injury in fact, at least in the absence of a statutory right to such federal agency action or a demonstration of the States' actual reliance on the promulgated rule. *See New England Anti-Vivisection Soc'y*, 208 F. Supp. 3d at 168–71 (identifying the "dashed-hopes injury" theory of standing, and explaining why "more than hurt feelings over a defendant's allegedly wrong (or even illegal) policy choices is required for a plaintiff to have Article III standing to sue"); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("By the mere bringing of his suit, *every* plaintiff demonstrates his belief that a favorable judgment will make him happier[,]" but "that psychic satisfaction . . . does not redress a cognizable Article III injury." (citation omitted)); *cf. Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 483 (1982) ("[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning.").

benefit analyses before approving financial aid and investigations expenditures (which were the status quo before the GE Rule came into the picture). Thus, it is at best "conjectural or hypothetical" for the States to assert now that these same voluntary expenses should not be viewed as part of a bargained-for benefit, and, instead, qualify as a cognizable injury in fact. *Cuno*, 547 U.S. at 344 (internal quotation marks and citation omitted).

### B. Cases That Suggest That States Have Special Solicitude To Seek Redress For Alleged Injuries To Their Own Interests Do Not Compel The Conclusion That These States Have Article III Standing

The States' primary effort to refute the conclusion that they lack Article III standing hinges on their interpretation of *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007), which they say stands squarely for the proposition that this Court must consider the merits of their challenges to the DOE's inaction in light of the "special solicitude" owed to states in "in any standing analysis[.]" (Pls.' Summ. J. Reply at 9.) (*See also* Summ. J. Hr'g Tr. at 14:9–15 ("[W]e are injured by the Federal Government's failure to move forward with this policy just like Massachusetts was injured by the Federal Government's failure to take any action to address climate change.").) However, the alleged injury to the interests at stake in the *Massachusetts* case is quite different from the injuries that the States claim here, as explained below. And that difference is material from the standpoint of determining whether these States have identified a sufficient injury in fact to invoke the authority of the federal courts.

In the *Massachusetts* case, the Environmental Protection Agency ("EPA") had refused to promulgate nationwide carbon dioxide regulations, and this inaction indisputably led to higher greenhouse gas emissions, which, in turn, resulted in rising

sea levels, as both parties conceded.  *See*, 549 U.S. at 524.  The state of Massachusetts

is a coastline property owner and, as such, it claimed that the state had suffered, and

would continue to suffer, harm to its coastal territory due to the increased sea levels

that greenhouse gases caused, unless the EPA was ordered to regulate carbon emissions.

*Id.* at 522–23.  The Supreme Court determined that the EPA's inaction had, in fact,

contributed to the damaging erosion of Massachusetts's land, *see id.* at 524–25, and,

thus, that Massachusetts had suffered a "particularized injury" to the property interest

that the state had in the coastal land areas "in its capacity as a landowner[,]" *id.* at 522.

In addition, the Court explained that Massachusetts was entitled to "special solicitude"

because (1) Massachusetts had a "quasi-sovereign" interest in "preserv[ing] its

sovereign territory[,]" *id.* at 519–20, and (2) in the Clean Air Act, 42 U.S.C.

§ 7606(b)(1), Congress had specifically provided states with "a concomitant procedural

right" to sue in order "to challenge agency action unlawfully withheld[,]" *id.* at 517–20

(citing 42 U.S.C. § 7607(b)(1)), which Massachusetts was "seek[ing] to assert[,]" *id.* at

520 n.17.  *See also, e.g.*, *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 182 (D.C. Cir.

2019) (clarifying the scope of the "special solicitude" doctrine, which applies where a

state has "asserted its own statutory right *and* alleged its own harm to establish an

injury in fact" (emphasis added)).

Here, by contrast, even assuming that the States are seeking to assert some

procedural right that Congress expressly bestowed upon them (*see infra* Section III.C

(discussing the States' invocation of the APA)), the States have failed to assert *any*

cognizable nonsovereign injury, as discussed above—either as landowners or as

business owners.  *See Air All. Houston*, 906 F.3d at 1060; *see also North Carolina v.*

*E.P.A.*, 587 F.3d 422, 426 (D.C. Cir. 2009) (affirming that whatever "special solicitude" a state may receive in the Article III standing analysis, that state must still "demonstrate Article III standing"). Nor have the States asserted that the DOE's inaction threatens their own sovereignty or their sovereign territory in any way.  Thus, this Court concludes that the standing analysis in the *Massachusetts* case, and the solicitude that the state of Massachusetts was given in that context, is inapposite with respect to the instant circumstances.  *See Ctr. for Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 476–77 (D.C. Cir. 2009) ("*Massachusetts* stands only for the limited proposition that, where a harm is widely shared, a sovereign, suing in its individual interest, has standing to sue where that sovereign's individual interests are harmed, wholly apart from the alleged general harm.").

The States fare no better with respect to the two other relatively recent rulings from courts of appeals outside this jurisdiction that the States offer in support of those standing arguments.  In *Texas v. United States*, the Fifth Circuit addressed a legal action that the state of Texas brought against the federal government, where Texas subsidized the cost of drivers' licenses to people lawfully present in the United States, and where, because of the federal government's actions, Texas law required the state to hand out these subsidized drivers' licenses to certain undocumented immigrants who were deemed to be lawfully present in the United States under the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program.  *Texas v. United States*, 809 F.3d 134, 147–49 (5th Cir. 2015); (*see also* Summ. J. Hr'g Tr. at 16:16–17:6 ("Texas's argument for standing [in *Texas*] was that under Texas law, it was obligated to provide driver's licenses . . . [which] was not a self-inflicted injury[.]").)

The Fifth Circuit concluded that the alleged injury—*i.e.*, the cost of issuing driver's licenses to DAPA beneficiaries—was not "self-inflicted[,]" largely because Texas "issue[d] licenses only to those lawfully present in the United States[,]" which meant that "the state [was] *required* to use federal immigration classifications" to determine who was eligible for a license. *Texas*, 809 F.3d at 158 (emphasis added).

Similarly, in a recent Ninth Circuit decision, a majority of the panel concluded that plaintiff states had standing to challenge on procedural grounds the interim final rules that various agencies had adopted to exempt employers with religious or moral objections from the requirement to cover contraceptive care without cost sharing under the Affordable Care Act. *See California v. Azar*, 911 F.3d 558, 566, 570–74 (9th Cir. 2018); (*see also* Pls.' Not. of Supp. Auth, ECF No. 81, at 1–3). Specifically, the Ninth Circuit determined that the record supported the plaintiff states' theory of standing that "women who lose [contraceptive] coverage will seek contraceptive care through state-run programs or programs that the states are responsible for reimbursing," thus causing injury to the states' fiscs. *California*, 911 F.3d at 571.

In reaching these conclusions, both the Fifth Circuit and the Ninth Circuit majorities attempted to distinguish the Supreme Court's decision in *Pennsylvania v. New Jersey*, a case in which the plaintiffs challenged other states' laws that increased taxes on nonresident income, on the grounds that the plaintiffs provided tax credits to their residents for taxes paid to other states, and thus the defendants' tax increases also increased the amount of tax credits provided by the plaintiffs, causing the plaintiffs to lose revenue. *See Pennsylvania*, 426 U.S. at 662–63. The Supreme Court held that the plaintiffs in *Pennsylvania* lacked Article III standing because "[n]othing required

Maine, Massachusetts, and Vermont to extend a tax credit to their residents for income taxes paid to New Hampshire, and nothing prevents Pennsylvania from withdrawing that credit for taxes paid to New Jersey." *Id.* at 664.  In *California*, the Ninth Circuit observed that "the plaintiff states' laws in *Pennsylvania* directly and explicitly tied the states' finances (revenue loss caused by tax credit) to another sovereign's laws (other states' taxes on nonresident income)" which was not the case in California.  911 F.3d at 574.  Similarly, in *Texas*, the Fifth Circuit reasoned that Texas's "injury is not self-inflicted" because Texas "sued in response to a significant change in the defendants' policies" (unlike in *Pennsylvania*), and because Texas "cannot both change [its] laws to avoid injury from amendments to another sovereigns laws and achieve [its] policy goals[.]"  809 F.3d at 158 & n.65.  Both the Fifth Circuit's and the Ninth Circuit's rulings in *California* and *Texas* also included powerful dissents.  *See California*, 911 F.3d at 585 (Kleinfeld, J., dissenting); *Texas*, 809 F.3d at 188 (King, J., dissenting).

Respectfully, this Court disagrees with the Article III standing analysis of the majorities in the *California* and *Texas* cases, in light of relevant Supreme Court case law and also as a matter of first principles.  In *Pennsylvania*, the Supreme Court determined that the Article III subject-matter jurisdiction of the federal courts did not extend to the case or controversy presented, because the alleged harm was self-inflicted. *See* 426 U.S. at 664; *see also, e.g.*, *Clapper*, 568 U.S. at 416 (applying *Pennsylvania* outside the original jurisdiction context).  To the extent that the Supreme Court has subsequently suggested otherwise in the case of *Wyoming v. Oklahoma*, 502 U.S. 437, 450 (1992) (holding that Wyoming had standing to challenge an Oklahoma statute that decreased Wyoming's revenue), *Wyoming*'s standing analysis is plainly distinguishable

because Oklahoma had *specifically targeted* Wyoming coal through its new law, and

had thereby forged the causal link between the challenged law and Wyoming's injury,

*see id*. at 445 (explaining that Oklahoma utilities previously purchased "virtually

100%" of their coal from Wyoming, and the stated purpose of the new Oklahoma law

was to reduce the use of "Wyoming coal").  That is a far cry from the circumstance that

appears in the instant case (as well as in in *Pennsylvania*, *Texas*, and *California*),

because the DOE's inaction with respect to the GE Rule was not aimed at the States or

their coffers, and it is the States themselves that have yoked their fiscs to the federal

government's policies and laws.

Moreover, and perhaps most importantly, it appears that the Fifth Circuit's and

the Ninth Circuit's holdings in *California* and *Texas* diverge from what ordinarily

qualifies as "self-inflicted injury" for the purpose of Article III's standing analysis.  For

example, the Ninth Circuit majority generally notes that "[c]ourts regularly entertain

actions brought by states and municipalities that face economic injury, even though

those governmental entities theoretically could avoid the injury by enacting new

legislation." *California*, 911 F.3d at 574.  The Fifth Circuit's majority makes a similar

point. *Texas*, 809 F.3d at 158 n.65.  But it is *the source* of the injury that is the

hallmark of a self-inflicted injury within the meaning of Article III, not whether the

state can supply its own remedy.  *See Petro-Chem Processing, Inc. v. E.P.A.*, 866 F.2d

433, 438 (D.C. Cir. 1989) (explaining that an injury is self-inflicted if it is "so

completely due to the [state's] own fault as to break the causal chain." (internal

quotation marks and citation omitted)).  And it is textbook standing analysis to reason

that "voluntary acts [that] are sufficient independent causes" of a state's injury preclude

standing to sue.  *Taylor v. Fed. Deposit Ins. Corp.*, 132 F.3d 753, 767 (D.C. Cir. 1997).

Here, the States chose to provide loan and grant aid to students who attend GE

Programs, even programs that would otherwise be shut down under the GE Rule

according to the States.  The States have not established that they are *required* to

provide this funding.  And it is the loss of such funds that the States now point to as one

of their nonsovereign harms.  (*See* Pls.' Summ. J. Reply at 9.)  The States have also

chosen to investigate and prosecute fraudulent GE Programs, which they say they would

not have to do if the DOE had implemented the GE Rule (because, pursuant to the GE

Rule, no student aid would be made available to failing GE Programs, and thus those

programs would be forced to shutter their operations).  (*See id.*)  But, again, it is the

discretionary decision that state officials have made to invest money to investigate such

schools that is the *actual* cause of the financial losses that the States have identified.

And where, as here, the federal government's inaction only injures the plaintiff state

because the state voluntarily undertakes some action that is the direct cause of its injury

(*i.e.*, it opts to spend the money that it now says qualifies as a financial loss), any such

injury is a self-inflicted wound that cannot provide the basis for Article III standing.

*See Pennsylvania*, 426 U.S. at 664.

Finally, this Court notes that, even if the States have asserted a cognizable (as

opposed to self-inflicted) injury in fact under the circumstances presented here, they

still fall short of establishing Article III standing on traceability grounds.  *See Clapper*,

568 U.S. at 413.  In each of the previously discussed cases upon which the States

attempt to rely, there was a *conflict* between the challenged government action (or

inaction) and the particular state interest or activity that was allegedly being harmed.

In *California*, for instance, the challenged federal regulation potentially deprived employees of contraceptive coverage, while the state's laws provided employees with access to contraceptives.  *See California*, 911 F.3d at 566.  In *Wyoming*, both the challenged Oklahoma law and Wyoming's own tax laws regulated Wyoming coal.  *See Wyoming*, 502 U.S. at 443.  And the challenged federal law in the *Texas* case expanded the number of individuals who are lawfully present in the United States in a manner that increased the number of people who were entitled to subsidized driver's licenses under Texas law, when Texas was allegedly not interested in expanding that number.  *See Texas*, 809 F.3d at 147–49.  By contrast, the DOE's GE Rule is aimed at regulating the conduct of certain for-profit educational programs, which is not inconsistent with state laws and actions that grant financial aid to students and protect consumers either generally on in the education realm.  Moreover, the States' alleged injuries do not follow directly from the DOE's decision not to enforce the GE Rule; instead, they effectively depend on numerous intervening decisions that other regulated and unregulated entities make, unlike the circumstances in *Wyoming*, *California*, and *Texas*.

The instant circumstances thus appear to implicate the well-established principle that, when "the plaintiff is [itself] an object of the action (or forgone action)" it wishes to challenge, "there is ordinarily little question" that the Article III standing requirements are met, but where "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed[,]" and standing "is ordinarily substantially more difficult to establish[.]" *Lujan*, 504 U.S. at 561–62 (emphasis in original) (internal quotation marks and citation omitted). As a conceptual matter, this is so because the federal courts are

courts of limited jurisdiction under Article III, and if a plaintiff could establish standing to sue merely on the basis of the indirect effects of federal policy choices, federal courts would be drawn into all manner of generalized grievances at the behest of plaintiffs who disagree with federal policy judgments but who have not been harmed by them in a manner that gives rise to a justiciable case or controversy.

This kind of consideration is one that the Supreme Court has long highlighted in the context of Article III standing.  In *Massachusetts v. Mellon*, 262 U.S. 447 (1923), for instance, the Supreme Court considered the issue of taxpayer standing and explained that, because any federal policy or legislation is "likely to produce additional taxation to be imposed upon a vast number of taxpayers[,]" "[t]he party who invokes the power [of this Court] must be able to show . . . that he has sustained or is immediately in danger of sustaining some direct injury as the result of [the] enforcement [of a challenged law], and not merely that he suffers in some indefinite way in common with people generally."  *Id.* at 486–88; *see also id.* (explaining that, if the federal courts were to step in whenever such indirect harms were invoked, they "would be [asked], not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and coequal department, an authority which plainly we do not possess.").  Similarly, in *Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976)*,* the D.C. Circuit held that "the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing."  *Id.* at 672.

Thus, in cases like the instant one, it is "appropriate to require some fairly direct

link" between the States' professed injury and the federal "legislative or administrative action being challenged."  *Id.*  And there is no such link here, for the reasons explained above.  Therefore, this Court concludes that there also is no "real need to exercise the power of judicial review in order to protect the interests" of these States.  *Summers*, 555 U.S. at 493 (internal quotation marks and citation omitted).

### C.  The States Cannot Assert *Parens Patriae* Standing Against The Federal Government Without The Express Permission Of Congress, And No Such Permission Has Been Given Here

The States' other claim to Article III standing is that they are entitled to file the instant lawsuit in their role as *parens patriae*, to safeguard the economic well-being of their citizens.  (*See* Pls.' Summ. J. Reply at 12–13.)  But that assertion runs headlong into the well-established rule that a state "does not have standing as *parens patriae* to bring an action against the Federal Government."  *Snapp*, 458 U.S. at 610 n.16.  The Supreme Court has repeatedly maintained that, while a state, "under some circumstances, may sue in that capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relation with the Federal Government[,]" because "[i]n that field[,] it is the United States, and not the [s]tate, which represents [the citizens] as *parens patriae*."  *Mellon*, 262 U.S. at 485–86; *see also Kleppe*, 533 F.2d 668, 678 (recognizing that a legal action brought by a state as *parens patriae* against the federal government would cause the "disruption of asserted federal powers at the hands of a plaintiff state[,]" and because "federal interest[s] will generally predominate" over the state's *parens patriae* interest, "any such action" would ordinarily be "bar[red]"); *see, e.g., Md. People's Counsel*, 760 F. 2d at 320 (reaffirming this general principle); *Manitoba*, 923 F.3d at 181 (same).

Notably, the ban on *parens patriae* actions against the federal government is not a "core component of the constitutional doctrine of standing"—*i.e.*, one that implicates the "separation of powers"; rather, it is a "prudential component" of standing doctrine, which is focused on "the powers of the federal government vis-à-vis the states[.]" *Id.* This means that there can be exceptions. One exception that the States point to in the instant context (*see* Pls.' Summ. J. Reply at 13) is the established notion that Congress can "abrogate[] the prudential bar on state *parens patriae* standing" against the federal government. *Air All. Houston*, 906 F.3d at 1060; *see also Md. People's Counsel*, 760 F.2d at 321 (explaining that the ban on *parens patriae* actions against the federal government "must [be] dispense[d] with if Congress so provides"). Such a congressional waiver is decidedly rare. *See Kleppe*, 533 F.2d at 678 (noting an "extreme reluctance to recognize state *parens patriae* standing against a federal defendant"). Indeed, only one court within this jurisdiction has ever spotted a statutory waiver of the ban on *parens patriae* actions against the federal government. *See Md. People's Counsel*, 760 F.2d at 321–22 (holding, on the basis of an explicit expression of congressional intent to authorize states to sue to vindicate harm to their residents, that the language of the Natural Gas Act recognized "the states' *parens patriae* interest").[8]

Significantly for present purposes, the D.C. Circuit has recently concluded that

---

[8] In *Maryland People's Counsel*, the D.C. Circuit interpreted the statute that authorizes the Federal Energy Regulatory Commission to order the establishment of a natural gas special marketing program—*i.e.*, the Natural Gas Act, 15 U.S.C. § 717r(b) (1982)—and, in particular, its statement that "any party to a proceeding under this chapter . . . may obtain review of such order" in the D.C. Circuit. 760 F.2d at 320 (internal quotation marks, citation, and alteration omitted). The statute further specifies that a "party" may be "any interested State," *id.* (quoting what is now 15 U.S.C. § 717n(e)), and such explicit and repeated nods to "State" plaintiffs led the panel to conclude that the judicial review provision reflected a "special solicitude for states and state agencies" and "was evidently designed to recognize precisely the interest of the states in protecting their citizens"—*i.e.*, "the states' *parens patriae* interest[,]" *id.* at 320–21.

the text of the APA does not recognize a state's *parens patriae* standing against the federal government. *See Manitoba*, 923 F.3d at 181. Its reasoning in this regard primarily pertains to the APA's judicial review provision, which states that "[a] person suffering legal wrong because of agency action" may challenge a final agency action that causes that individual harm, 5 U.S.C. § 702, and elsewhere the APA specifically defines "person" to "include[] an individual, partnership, corporation, association, or public or private organization other than an agency[,]" *id.* § 551(2). The APA never explicitly mentions a state or state agency, much less expressly authorizes a state or state entity to sue the federal government in their role as *parens patriae*. In fact, to the contrary, the text of the APA disclaims any intent of Congress to "limit or repeal additional requirements imposed by statute or otherwise recognized by law[,]" *id.* § 559, presumably including the well-established rule that a state cannot bring a *parens patriae* action against the federal government, which had been settled for more than two decades by the time that the APA was enacted, *see Mellon*, 262 U.S. at 485–86; *see also United States v. Wells*, 519 U.S. 482, 495 (1997) ("[W]e presume that Congress expects its statutes to be read in conformity with this Court's precedents[.]").

The text of the APA's judicial review provision suggests that Congress did not intend to authorize *parens patriae* lawsuits against the federal government in other ways as well. For example, the APA specifically states that the "person" who is authorized to challenge an "agency action" in federal court is one who has actually "suffer[ed] legal wrong" at the hands of the agency. 5 U.S.C. § 702. Thus, by its plain terms, the APA's judicial review provision envisions that the "right of review" is bestowed "upon any person adversely affected *in fact* by agency action[.]" S. Rep. No.

752 at 26 (1945); *see also* H.R. Rep. No. 79-1980, at 42 (1946) (describing the legal wrong sufficient to trigger judicial review as "something more than mere personal effect").  Yet, by its nature, a state's quasi-sovereign interest as *parens patriae* derives solely from the mass suffering of its citizens' legal wrongs, and is thus not a personal injury that the state has suffered in fact.  *See also Snapp*, 458 U.S. at 602 ("Quasi-sovereign interests . . . are not sovereign interests, proprietary interests, or private interests . . . They consist of a set of interests that the [s]tate has in the well-being of its populace."); *id.* at 607 (explaining that a quasi-sovereign interest capable of sustaining a *parens patriae* action must rest upon "an interest apart from the interests of particular private parties").

Thus, quite unlike the statute at issue in *Maryland People's Counsel*, the APA does not evince any "special solicitude" toward state actions brought in *parens patriae* to challenge federal administrative programs or actions.  *See Manitoba*, 923 F.3d at 181.  Consequently, the States cannot persist in litigating APA claims against the DOE in a *parens patriae* lawsuit.

## IV.   CONCLUSION

For the reasons discussed above, the States have not established a cognizable injury to their quasi-sovereign or nonsovereign interests for the purpose of Article III standing.  Therefore, as set forth in the Order that this Court issued on June 26, 2020, DOE's motion to dismiss under Rule 12(b)(1) has been **GRANTED**, and the parties' cross-motions for summary judgment have been **DENIED AS MOOT**.


DATE:  July 17, 2020                          *Ketanji Brown Jackson*
                                              KETANJI BROWN JACKSON
                                              United States District Judge